1  Peter Strojnik, 006464
2  3030 North Central Avenue, Suite 1401
   Phoenix, Arizona 85012
3  Telephone: 602-524-6602
   Facsimile: 602-296-0135
4  e-mail: *ps@strojnik.com*
5  Attorney for Ms. Sahakian

6              **UNITED STATES DISTRICT COURT**

7                  **DISTRICT OF ARIZONA**

8  DIANE SAHAKIAN, a single woman,  ) NO.  CV-08-241-PHX-HRH
                                     )
9          Ms. Sahakian,             ) **DECLARATION OF PETER STROJNIK**
                                     ) **IN SUPPORT OF MOTION TO AMEND**
10                                   ) **FIRST AMENDED COMPLAINT**
       vs.                           )
11                                   )
12 STATS  ChipPAC,  Inc.,  a  foreign )
   corporation; STATS  ChipPAC, Ltd., a )
13 foreign corporation,              )
                                     )
14                      Defendant.   )
15 _____ )

16

17 I, Peter Strojnik, make the following declaration under the penalty of perjury. I offer this

18 Declaration, in part, to demonstrate the lack of delay and dilatory conduct in bringing the

19 Motion to Amend First Amended Complaint.

20
21 1.  I am an attorney licensed to practice law in the Supreme Court and all lower courts of

22     the State of Arizona.  I am also licensed to practice in the United States District Court

23     for the District of Arizona and the 9th Circuit Court of Appeals. I became licensed in

24     or about 1980.
25

                                      -1-

2. I am a naturalized citizen of the United States. I earned the United States citizenship through my service in the United States Army in 1973.

3. I was in the military service in 1973-74. My tour of duty was on the demilitarized zone on the 36th parallel between North and South Korea with the 2nd Division of the 5th US Army.

4. During my term with the 2nd Division, I studied Korean language, culture and society.

5. Upon honorable discharge from the Armed Services, I enrolled in the specialized program of Chinese language, writing, history and literature at Arizona State University; I graduated with a minor in Chinese studies.

6. During my career as a lawyer, I represented many clients in the semi-conductor and other industries who conducted business with Singapore, Korea and mainland China.

7. During my career as a lawyer, I also represented Singaporean companies and Singaporean individuals who conduct business in the United States.

8. During my career as a lawyer, I personally conducted business in Singapore.

9. Based on my experience, I gained an understanding of the Singaporean business culture.

10. The above captioned cause was brought to my attention in October of 2008 through a recommendation of one of my previous clients who is likewise familiar with the Singaporean business culture.

11. I noted that the underlying case is based on sexual harassment, retaliatory discharge, racist view of the American workers by a Korean employee (BJ Han) of a Singaporean Company[1] and a deceitful disregard for US immigration laws[2].

12. I took the case, in part, because of my firm's belief that Korean and Singaporean racism, sexism and prejudice have no place in the American workplace.

13. I took the case, in part, because as a naturalized citizen of the United States, I find it particularly disturbing that a Singaporean company would engage in illegal and deceitful misconduct for the purpose of immigrating

14. Immediately upon the receipt of the case, I and my co-counsel, Peter Kristofer Strojnik (my son) conducted an investigation into the ownership of Defendant corporation and its private – public status.

15. We learned that Defendant Stats ChipPAC is owned 83% by a Singaporean company Singapore Technologies Semiconductors Private LTD ("STS") which is in turn wholly owned by Temasek Holdings ("Temasek"). We learned that Jimmy Phoon has been a Director of Stats ChipPAC since August 2007. Mr. Phoon previously was the Senior Managing Director and Chief Investment Officer at Temasek Holdings Pte.

---

[1] The allegations are that BJ Han referred to a work group consisting of Americans as a group of "monkeys." BJ Han has referred to Ms. Sahakian and Americans in general as "fat" and "lazy" and to Ms. Sahakian individually as "fat".

[2] Plaintiff was not offered certain job postings because the posting was an 'artificial' posting to process a green card for one GS Kim, a Korean national.

Ltd.  Prior to Temasek, Mr. Phoon was a Deputy Director in the Ministry of Finance for the nation of Singapore and that Peter Seah Lim Huat has been a Director of Stats ChipPAC since July 2002.  He has been a member of the Temasek Advisory Panel since January 1, 2005.  Upon information and belief, Messrs. Phoon and Huat receive their instructions directly from Temasek. Counsel's initial review of the facts discloses that STS and/or Temasek control STATS and, therefore, both STS and Temasek may be liable to Sahakian under the theories outlined in *Gatecliff v. Great Republic Life Insurance Co.*, 821 P.2d 725 (Ariz. 1991). Therefore, in late November I drafted a Motion to Amend to add STS and Temasek as party defendants.

16. I have sufficient experience and knowledge relating to Chinese culture in general and Singaporean business culture in particular to know that allegations of sexual misconduct, retaliatory firing and the disclosure of insidious prejudice practiced by a Singaporean company are often handled in private in order to avoid the stigma to the Singaporean Company. Therefore, I engaged in confidential discussions with one of my Singaporean contacts to determine the appropriate manner of bringing this matter to the attention of STS and Temasek. I was confidentially advised to communicate about this matter directly with Temasek's president, Madam Ho Chin, the wife of the Singaporean current prime minister. I was confidentially advised under Madam Ho Chin's guidance, Temasek takes a dim view of sexual, retaliatory, racist, sexist and deceitful misconduct. It was confidentially suggested to communicate with Madam

Ho Chin directly in an attempt to avoid any unintended consequences to STS's, Temasek's and indeed Singapore's business reputations.

17. I avowed to my confidential sources that I would not disclose the names of these sources to anyone.

18. Following the advice from my confidential sources, I sent a letter to Madam Ho Chin, Attachment A to this Declaration.  I attached a draft Second Amended Complaint, Attachment B, to the Madam Ho Chin letter. The letter included a fair and equitable offer of settlement of a case where the economic damages alone equal $1,335,482, Attachment C, and intangible damages, including pain, suffering, humiliation, double that amount. The salient portion of the letter is reproduced here:

> Under normal circumstances, my firm would have filed the Motion to Amend the Complaint and issued a press release based on the new allegations without communicating with you first.
>
> However, in private discussions with those closely familiar with Temasek, I have been assured that under your guidance, Temasek takes a dim view of sexual and retaliatory misconduct. It was confidentially suggested that I communicate with you directly in an attempt to avoid any unintended consequences to STS's, Temasek's and indeed Singapore's business reputations.
>
> We are hopeful that your office will not condone the predatory misconduct alleged here, and that you will take appropriate remedial measures. Alternatively, civic duty would compel us to ensure the widest possible broadcast of this matter for the protection of the American worker. American women in my client's shoes need to be protected from foreign companies' sexual and retaliatory misconduct. Additionally, in today's heightened public attention to illegal immigration, the allegations that Ms. Sahakian was not considered for a position within STATS "because [the

position] was an 'artificial' posting to process a green card for one GS Kim, a non-citizen of the United States" is particularly disturbing.

We do not see aggressive litigation as the optimal resolution for either side. My client's interest is to put this unpleasant experience behind her and move on with her life. Your interest is to right the wrong with minimal exposure. My client will settle the case for $2,500,000.00 coupled with mutual releases, confidentiality and non-disparagement covenants. We tender this offer of resolution to you in good faith.

If you have interest in early resolution, please have your lawyers contact me. Time is of the essence.

19. The attorneys for Temasek filed their response to my letter to Madam Ho Chin on January 12, 2008. Attachment D.

20. In order to avoid criticism based on "dilatory conduct" and "undue delay", I decided to file the Motion to Amend without waiting any longer.

I AFFIRM THAT THE ABOVE STATEMENTS ARE TRUE AND CORRECT TO THE BEST OF MY CURRENT KNOWLEDGE, INFORMATION AND BELIEF.

Peter Strojnik

*Attachment A*

THE LAW FIRM OF

# PETER STROJNIK

ATTORNEY AT LAW

December 1, 2008

**CONFIDENTIAL**
**SUBJECT TO FEDERAL RULE OF**
**EVIDENCE 408 OR EQUIVALENT**

Madam Ho Ching
Temasek Holdings (Private) Limited
60B Orchard Road, #06-18 Tower 2
The Atrium @ Orchard
Singapore 238891

    Re:   1. *Sahakian v. STATS ChipPAC, Inc. et al* 2:08-cv-00241-HRH

Dear Madam Ho:

My firm was recently retained by Ms. Diane Sahakian in the above captioned litigation matter. In conducting due diligence review of the case, we discovered that Defendant STATS is owned 83% by Singapore Technologies Semiconductors Private LTD ("STS"), a wholly owned subsidiary of Temasek Holdings ("Temasek"). Our initial review of the facts discloses that STS and/or Temasek control STATS and, therefore, both STS and Temasek may be liable to Sahakian under the theories outlined in *Gatecliff v. Great Republic Life Insurance Co.*, 821 P.2d 725 (Ariz. 1991). We are in the process of preparing a Motion to Amend the Complaint to include both STS and Temasek as party defendants. I attach a draft [Proposed] Second Amended Complaint for your private viewing.

Under normal circumstances, my firm would have filed the Motion to Amend the Complaint and issued a press release based on the new allegations without communicating with you first.

However, in private discussions with those closely familiar with Temasek, I have been assured that under your guidance, Temasek takes a dim view of sexual and retaliatory misconduct. It was confidentially suggested that I communicate with you directly in an attempt to avoid any unintended consequences to STS's, Temasek's and indeed

3030 NORTH CENTRAL AVENUE · SUITE 1401 · PHOENIX · ARIZONA – 85012-2712
TEL: 602.524.6602 – FAX: 602.296.0135 – CELL: 602.524.6602 – EMAIL: PS@STROJNIK.COM

Singapore's business reputations.

We are hopeful that your office will not condone the predatory misconduct alleged here, and that you will take appropriate remedial measures. Alternatively, civic duty would compel us to ensure the widest possible broadcast of this matter for the protection of the American worker. American women in my client's shoes need to be protected from foreign companies' sexual and retaliatory misconduct. Additionally, in today's heightened public attention to illegal immigration, the allegations that Ms. Sahakian was not considered for a position within STATS "because [the position] was an 'artificial' posting to process a green card for one GS Kim, a non-citizen of the United States" is particularly disturbing.

We do not see aggressive litigation as the optimal resolution for either side. My client's interest is to put this unpleasant experience behind her and move on with her life. Your interest is to right the wrong with minimal exposure. My client will settle the case for $2,500,000.00 coupled with mutual releases, confidentiality and non-disparagement covenants. We tender this offer of resolution to you in good faith.

If you have interest in early resolution, please have your lawyers contact me. Time is of the essence.

                                Respectfully,

                                Peter Strojnik

PS: pjs
CC: PKSESQ
Encls: Draft [Proposed] Second Amended Complaint

*Attachment B*

**DRAFT**

Peter Strojnik, 006464
3030 North Central Avenue, Suite 1401
Phoenix, Arizona 85012
Telephone: 602-524-6602
Facsimile: 602-296-0135
e-mail: *ps@strojnik.com*
Attorney for Plaintiff

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| DIANE SAHAKIAN, a single woman, | ) NO. CV-08-241-PHX-HRH |
| | ) |
| Plaintiff, | ) **[PROPOSED]** |
| | ) **SECOND AMENDED COMPLAINT** |
| vs. | ) |
| | ) **JURY TRIAL DEMANDED** |
| STATS ChipPAC, Inc., a foreign | ) |
| corporation; STATS ChipPAC, Ltd., a | ) |
| foreign corporation; TEMASEK | ) |
| HOLDINGS PRIVATE LIMITED, a | ) |
| foreign corporation; SINGAPORE | ) |
| TECHNOLOGIES SEMICONDUCTORS | ) |
| PRIVATE LIMITED, a foreign | ) |
| corporation. | ) |
| | ) |
| Defendants. | ) |

Plaintiff alleges as follows:

## PARTIES

1) Plaintiff DIANE SAHAKIAN is a single mother currently residing in Maricopa County, State of Arizona.

2) Defendants STATS ChipPAC, Inc. and STATS ChipPAC, Ltd. (collectively as "Stats ChipPAC") are foreign corporations authorized to and conducting business in the County of Maricopa, State of Arizona. Stats ChipPAC are employers and/or vicariously

-1-

liable for the acts of each other under Title VII because all acts taken by Plaintiff's supervisors were within the course and scope of his employment.

3) Defendant TEMASEK HOLDINGS PRIVATE LIMITED ("Temasek") is a foreign corporation with its principal place of business in the Country of Singapore. Temasek is the parent corporation of Defendant Singapore Technologies Semiconductors Private Limited.

4) Defendant SINGAPORE TECHNOLOGIES SEMICONDUCTORS PRIVATE LIMITED ("STS") is a foreign corporation with its principal place of business in the nation of Singapore. STS is the wholly owned subsidiary of Temasek.

5) On information and belief, Temasek is a private entity owned and operated by the Singaporean Government.

6) STS owns approximately 83% of the outstanding shares of Stats ChipPAC.

7) Stats ChipPAC has seven directors.

8) Jimmy Phoon has been a Director of Stats ChipPAC since August 2007. Mr. Phoon previously was the Senior Managing Director and Chief Investment Officer at Temasek Holdings Pte. Ltd. Prior to Temasek, Mr. Phoon was a Deputy Director in the Ministry of Finance for the nation of Singapore.

9) Peter Seah Lim Huat has been a Director of Stats ChipPAC since July 2002. He has been a member of the Temasek Advisory Panel since January 1, 2005.

10) On information, Defendants Temasek and STS caused the voluntary delistment of Stats ChipPAC from the NASDAQ in their attempt to become completely privatized.

11) On information, Defendants Temasek and STS are attempting to cause the delistment of Stats ChipPAC from the Singapore Exchange.

12) On information, Defendants Temasek and STS control the operations and day to day functions of Stats ChipPAC.

## JURISDICTION AND VENUE

13) This action is brought to remedy discrimination on the basis of sex in the terms, conditions and privileges of employment and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq.* ("Title VII").

14) Injunctive and declaratory relief, damages and other appropriate legal and equitable relief are sought pursuant to 42 U.S.C. §2000e (f) and (g).

15) Plaintiff filed a charge of sex discrimination against Defendants Stats ChipPAC with the Equal Employment Opportunity Commission (hereinafter "EEOC") on or about September 18, 2007.   Plaintiff filed a subsequent charge of retaliation against Defendants Stats ChipPAC with the EEOC on July 30, 2008 as a result of the termination of her employment by Defendants Stats ChipPAC on July 1, 2008.

16) On or about January 25, 2008, the EEOC issued a Notice of Right to Sue to Plaintiff. On or about September 9, 2008, the EEOC issued a Notice of Right to Sue to Plaintiff.

17) Plaintiff has complied fully with all prerequisites to jurisdiction in this Court under Title VII. This Court has jurisdiction under §706(f)(3) of Title VII, 42 U.S.C. §2003-5(f)(3).

18) As the unlawful employment practices complained of herein occurred within Maricopa County, venue is proper in this District Court.

-3-

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

19) Plaintiff began her employment with Stats ChipPAC in August 1999. As a Vice President in the Technology Development organization, Plaintiff was one of the few female executives in the companies. Plaintiff managed a technical group responsible for generating the corporate technology roadmaps and emerging technology strategies, and engaging customers in emerging technologies. Plaintiff reported to her supervisor, Dr. Han Byung Joon, who is employed by Defendant Stats ChipPAC, Ltd. as the Executive Vice President and Chief Technology Officer (commonly referred to as "BJ Han"), and she has always received good performance evaluations.

20) Beginning in 2006 and through April 2007, Plaintiff reported to her management and human resources department that certain subordinate male employees, including, but not limited to, Eric Israel Gongora, who, on information and belief, is a convicted felon and has been referred to within Stats ChipPAC as a "troublemaker", were undermining her authority within her group, her reputation in the company, and were creating a hostile work environment. As a result of her complaints, Plaintiff's supervisor, BJ Han, became increasingly hostile towards her and undermined her further within her group notwithstanding BJ Han's prior reference to this group of subordinate employees as a group of "monkeys." BJ Han has referred to Plaintiff and Americans in general as "fat" and "lazy" and to Plaintiff individually as "fat".

21) On or about April 9, 2007, with the implied assurance of impunity from BJ Han, male employees put ketchup on Plaintiff's office chair on a day that Plaintiff was wearing white pants, making it appear that Plaintiff had an "accident" relating to her female

gender. Plaintiff was humiliated by this incident and reported it to her supervisor, BJ Han, and the human resources department. In response to Plaintiff's complaints, BJ Han told her: "Drink a beer and have a good sleep. It will be OK."

22) Stats ChipPAC acknowledged the ketchup incident was harassment and not merely horseplay.

23) Stats ChipPAC employee handbook reads as follows: "The Company will not tolerate unlawful harassment of any type."

24) Stats ChipPAC employee handbook reads as follows: "Sexual or other unlawful harassment includes any conduct that has the purpose or effect or unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive work environment".

25) On June 22, 2007, Plaintiff started a thirty-day leave under the Family Medical Leave Act due to the stress she experienced as a result of the hostile work environment created and maintained at Stats ChipPAC by, among others, BJ Han.

26) When Plaintiff returned from her FMLA leave, BJ Han, without notification, made a company-wide announcement demoting and removing Plaintiff from her supervisory position. She was given a new position – "Special Project" at the bottom of the organization chart, and her title as Voce President was removed.

27) Since that time, Plaintiff has been given assignments with no real possibility of completing them as assigned by BJ Han. Plaintiff was ostracized, omitted from meetings and conferences she previously attended; omitted from relevant communications; and placed in a dead-end position removing virtually all of her job

–5–

duties and responsibilities, all in a blatant attempt to force her resignation from employment.

28) Despite Plaintiff's complaints, no disciplinary action was taken against the male employees who undermined her authority within her group and her reputation within the company, and created a hostile work environment.

29) Plaintiff was demoted when she complained to her management and human resources department and upon her return from FMLA leave.

30) After the demotion, on September 18, 2007, Plaintiff filed a charge of discrimination and retaliation with the EEOC.

31) On December 11, 2007, Defendants Stats ChipPAC, through their attorneys, made a settlement offer to Plaintiff to resolve her legal claims against Defendants Stats ChipPAC, in exchange for Plaintiff's resignation from employment. Plaintiff rejected Defendants' settlement offer and on January 24, 2008 made a counteroffer, which was not accepted by Defendants.

32) Having received a Notice of Right to Sue from the EEOC relative to Plaintiff's first charge of discrimination and retaliation, on February 6, 2008, Plaintiff filed her Complaint in this lawsuit in federal court.

33) On April 11, 2008, Defendants Stats ChipPAC, through their attorneys, made a settlement offer in exchange for a complete release of claims and Plaintiff's resignation from employment. Defendants Stats ChipPAC, through their attorneys, subsequently advised that its settlement offer would be "off the table" on May 16, 2008. Plaintiff did not accept Defendants' settlement offer, which lapsed.

-6-

34) On or about May 30, 2008, Sahakian inquired about a STATS-Tempe job posting. After several inquiries, Defendant STATS informed Sahakian that this posting was unavailable to Sahakian because it was an 'artificial' posting to process a green card for one GS Kim, a non-citizen of the United States.

35) On July 1, 2008, Defendants Stats ChipPAC terminated Plaintiff's employment.

## COUNT ONE
## (VIOLATION OF TITLE VII – HOSTILE WORK ENVIRONMENT)

36) Plaintiff realleges all allegations heretofore alleged.

37) Defendants have discriminated against Plaintiff in the terms and conditions of her employment on the basis of her sex in violation of Title VII as a result of a discriminatory and hostile work environment created by her supervisor and co-workers.

38) As a direct result of the hostile work environment, Plaintiff has suffered mental and emotional distress, pain and suffering, anger, depression, anxiety, humiliation, loss of reputation and embarrassment.

39) The actions of Defendants were done in reckless indifference to Plaintiff's federally protected rights and Plaintiff is therefore entitled to recover punitive and exemplary damages.

40) Defendants Temasek and STS are liable for the acts alleged because they so dominate and control Defendants Stats ChipPAC such that Stats ChipPAC is an instrumentality and adjunct to Temasek and STS pursuant *to Walker v. Southwest Mines Dev. Co.*, 52 Ariz. 403 (1938); *Gatecliff v. Great Republic Life Insurance Co.*, 821 P.2d 725 (Ariz. 1991) and their progeny.

41) Defendants Temasek and STS are liable for the acts alleged because Stats ChipPAC is the alter ego of Temasek and STS pursuant *to Walker v. Southwest Mines Dev. Co.*, 52 Ariz. 403 (1938); *Gatecliff v. Great Republic Life Insurance Co.*, 821 P.2d 725 (Ariz. 1991) and their progeny.

42) Defendants Temasek and STS are liable for the acts alleged herein because Stats ChipPAC is a mere instrumentality of Temasek and STS pursuant *to Walker v. Southwest Mines Dev. Co.*, 52 Ariz. 403 (1938); *Gatecliff v. Great Republic Life Insurance Co.*, 821 P.2d 725 (Ariz. 1991) and their progeny.

## COUNT TWO
### (VIOLATION OF TITLE VII – RETALIATION)

43) Plaintiff realleges all allegations heretofore alleged.

44) Defendants have retaliated against the Plaintiff due to her reporting complaints of a hostile work environment by demoting Plaintiff. Defendants further retaliated against Plaintiff due to her subsequently engaging in protected activity under Title VII, including but not limited to: (a) filing a charge of discrimination and retaliation with the EEOC on September 18, 2007; (b) engaging in settlement negotiations with Defendants to resolve her charge of discrimination after filing her charge of discrimination on September 18, 2007; (c) filing the present lawsuit against Defendants on February 6, 2008; (d) engaging in settlement negotiations with Defendants to resolve her legal claims after filing the present lawsuit; and (e) taking the FMLA leave, all of which resulted in the termination of Plaintiff's employment on July 1, 2008.

45) As a direct result of retaliatory action by Defendants, Plaintiff has suffered mental and emotional distress, pain and suffering, anger, depression, anxiety, humiliation and embarrassment. As a further direct result of the retaliatory action by Defendants, Plaintiff has and will suffer lost wages, lost promotional opportunities in the future and damage to her reputation and career.

46) The actions of Defendants were done in reckless indifference to Plaintiff's federally protected rights and Plaintiff is therefore entitled to recover punitive and exemplary damages.

47) Defendants Temasek and STS are liable for the acts alleged because they so dominate and control Defendants Stats ChipPAC such that Stats ChipPAC is an instrumentality and adjunct to Temasek and STS pursuant *to Walker v. Southwest Mines Dev. Co.*, 52 Ariz. 403 (1938); *Gatecliff v. Great Republic Life Insurance Co.*, 821 P.2d 725 (Ariz. 1991) and their progeny.

48) Defendants Temasek and STS are liable for the acts alleged because Stats ChipPAC is the alter ego of Temasek and STS pursuant *to Walker v. Southwest Mines Dev. Co.*, 52 Ariz. 403 (1938); *Gatecliff v. Great Republic Life Insurance Co.*, 821 P.2d 725 (Ariz. 1991) and their progeny.

49) Defendants Temasek and STS are liable for the acts alleged herein because Stats ChipPAC is a mere instrumentality of Temasek and STS pursuant *to Walker v. Southwest Mines Dev. Co.*, 52 Ariz. 403 (1938); *Gatecliff v. Great Republic Life Insurance Co.*, 821 P.2d 725 (Ariz. 1991) and their progeny.

WHEREFORE, Plaintiff demands Judgment against Defendants as follows:

1. Declaring the acts and practices complained of herein are in violation of Title VII;

2. Compensatory damages to be proven at time of trial;

3. Lost wages and the value of benefits to be proven at time of trial;

4. Punitive and Exemplary damages to be proven at time of trial;

5. Attorneys' fees and costs of suit;

6. Reinstatement and promotion to the position held prior to her FMLA leave;

7. For such other relief this Court deems just.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial.

RESPECTFULLY SUBMITTED this _____ Day of December, 2008.

**PETER STROJNIK, P.C.**

███████████████████

Peter Strojnik
Attorney for the Plaintiff

-10-

*Attachment C*

# Diane Sahakian

## v.

# STATS ChipPAC, Inc., et al

**Expert Report of David R. Perry**

**Sterling Group LLC**

**December 4, 2008**

Sterling Group LLC
Diane Sahakian v. STATS ChipPAC, Inc., et al

## TABLE OF CONTENTS

1. **Background** .................................................................................................................... 1

   1.1    Introduction................................................................................................................ 1

   1.2    Scope of Engagement ............................................................................................... 1

   1.3    Fundamental Assumption ......................................................................................... 2

2. **Lost Earnings** ................................................................................................................. 2

   2.1    Retirement Date ........................................................................................................ 2

   2.2    But-For Earnings....................................................................................................... 2
       2.2.1   Historical Earnings ............................................................................................2
       2.2.2   Non-Reimbursed Expenses .................................................................................4
       2.2.3   Economic Slowdown ...........................................................................................5
       2.2.4   Earnings of Similar Individuals ..........................................................................6
       2.2.5   But-For Earnings Summary .................................................................................6

   2.3    Actual Earnings........................................................................................................ 6
       2.3.1   2008 Post-Termination Earnings .........................................................................6
       2.3.2   IEEE Compensation Survey .................................................................................7
       2.3.3   Economic Slowdown ...........................................................................................8
       2.3.4   Actual Earnings Summary ...................................................................................9

   2.4    Discounting of Future Losses ................................................................................ 10

   2.5    Lost Earnings Summary......................................................................................... 10

3. **Lost Stock** .................................................................................................................... 10

4. **Conclusion** .................................................................................................................. 11

## LIST OF APPENDICES

Appendix A ........David R. Perry's Resume, Testimony Experience and Publications

Appendix B ........Documents Considered

Appendix C ........Ms. Sahakian's Lost Earnings

# 1. Background

## 1.1 Introduction

A complaint filed by Diane Sahakian ("Ms. Sahakian" or "Plaintiff") against STATS ChipPAC, Inc. and STATS ChipPAC Ltd. (collectively, "Defendants") alleges, inter alia:[1]

- Defendants hired Ms. Sahakian in August 1999.

- Defendants removed Ms. Sahakian from supervising her group and transferred her to a new position entitled Special Project in or around July 2007.

- Defendants terminated Ms. Sahakian in July 2008.

- Defendants' actions against Ms. Sahakian represent discrimination, retaliation and/or wrongful termination ("Alleged Actions").

- Ms. Sahakian suffered economic damages as a result of the Alleged Actions.

## 1.2 Scope of Engagement

Ms. Sahakian's counsel engaged David R. Perry of Sterling Group LLC ("Sterling") to determine the economic damages suffered by Ms. Sahakian as a result of the Alleged Actions.

Mr. Perry's resume, testimony experience and publications are provided in Appendix A. Mr. Perry is charging $275 an hour for his work in this matter.

Sterling reviewed the documents listed in Appendix B in the course of the analysis. Sterling understands discovery continues in this matter and Defendants have yet to produce information relevant to a damage analysis in this matter. Sterling may revise and/or supplement the analysis if additional information is provided.

## 1.3 Fundamental Assumption

Sterling assumed Defendants are liable for the Alleged Actions to create a basis for a damage calculation. Sterling's assumption provides no support for Ms. Sahakian's liability claims. If Defendants are not found to be liable for the Alleged Actions, all damage calculations are irrelevant.

---

[1] "First Amended Complaint" dated September 29, 2008.

## 2. Lost Earnings

Ms. Sahakian's lost earnings are the difference between the earnings that she would have made but-for the Alleged Actions ("But-For Earnings") and the earnings that she actually has made or will make in the future ("Actual Earnings").

### 2.1 Retirement Date

Ms. Sahakian was born on April 23, 1961 and has a bachelor's degree.

Ms. Sahakian informed Sterling that she did not have any specific retirement plans prior to her termination.

Ms. Sahakian was approximately 47.2 years old at the time of her termination on July 1, 2008. Worklife expectancy tables show a 47 year old active woman with a bachelor's degree will work for an additional 15.1 years through age 62.1.[2] Therefore, worklife expectancy tables show Ms. Sahakian would be expected to retire on or around May 30, 2023 at age 62.1.

Based on the above, Sterling assumed Ms. Sahakian would have retired on May 30, 2023 but-for the Alleged Actions.

### 2.2 But-For Earnings

Sterling analyzed the available information to determine Ms. Sahakian's But-For Earnings:

#### 2.2.1 Historical Earnings

Defendants hired Ms. Sahakian on August 23, 1999 and terminated her on July 1, 2008.

Ms. Sahakian's compensation from Defendants included a base salary, various bonuses, employer-paid benefits and stock awards. Ms. Sahakian provided Sterling with W-2s, earnings statements, salary increase letters, bonus notification letters, tax returns and other documents showing her 2003 to 2008 earnings from Defendants were as follows:

---

[2]   "The Markov (Increment-Decrement) Model of Labor Force Activity: Extended Tables of Central Tendency, Variation, and Probability Intervals" by Gary R. Skoog and James E. Ciecka, page 68.

Sterling Group LLC
Diane Sahakian v. STATS ChipPAC, Inc., et al

| Year | Salary[3] | Bonus[4] | Stock[5] | Total | Change from Prior Year |
|---|---|---|---|---|---|
| 2003 | $127,300 | $4,022 | $- | $131,322 | NA |
| 2004 | $136,570 | $7,010 | $- | $143,580 | 9.3% |
| 2005 | $143,835 | $49,683 | $- | $193,518 | 34.8% |
| 2006 | $156,750 | $60,354 | $- | $217,104 | 12.2% |
| 2007 | $165,300 | $39,085 | $122,508 | $326,893 | 50.6% |
| 2008 (to 7/1) | $83,700 | $31,217 | $- | $114,917 | -64.8% |

The above table shows Ms. Sahakian's total earnings from Defendants increased substantially in each year from 2003 to 2007. In addition to increasing Ms. Sahakian's base salary and giving her bonuses and stock awards, the available documents show Defendants promoted Ms. Sahakian on several occasions prior to the Alleged Actions.

Sterling understands Ms. Sahakian's base salary was not decreased when she was removed from supervising her team and reassigned to a "Special Project" role in mid 2007. Ms. Sahakian informed Sterling that the short term incentive bonus she received in early 2008 was adversely affected by the Alleged Actions. The above table shows Ms. Sahakian's 2008 bonus was lower than the bonus she received in each of the three previous years. Additionally, documents show the short term incentive bonus received by Ms. Sahakian in early 2007 was 25% higher than the short term incentive bonus that she received in early 2008.[6] Ms. Sahakian's 2005 and 2006 bonuses included retention payments of $29,683 and $30,087 respectively in addition to a short term incentive bonus in each year.

The employer-paid benefits received by Ms. Sahakian included statutory benefits (i.e., social security and Medicare contributions), life insurance, short-term disability insurance, various health insurances and retirement contributions. The following information is available on the cost of these benefits to Defendants:

- The cost of statutory benefits to employers is 7.65% of an employee's earnings (6.2% for social security and 1.45% for Medicare) subject to an annual maximum for social security.

- An email from Gail Uy dated January 22, 2008 shows the cost to Defendants of Ms. Sahakian's medical, dental, vision and employee assistance program benefits totaled $7,637 in 2007.

- Defendants matched 50% of the first 6% of Ms. Sahakian's contribution to a 401k plan. Ms. Sahakian typically contributed the maximum amount allowable for tax purposes (i.e.,

---

[3]   Items marked "regular", "float holiday", "holiday", "retro earns", "sick" and "vacation" on earnings statements and/or other documents.
[4]   Items marked "bonus", "retention bonus", "sti" (short term incentive), "recognition bonus" and "retention" on Ms. Sahakian's earnings statements and/or other documents.
[5]   Items marked "non qualified" and "espp match" on Ms. Sahakian's earnings statements and/or other documents.
[6]   $39,085 received in early 2007 and $31,217 received in early 2008.

$15,000 and $15,500 in 2006 and 2007 respectively), which represented more than 6% of her salary and bonus earnings in each year. Therefore, the cost to Defendants of the matching contributions was 3% of Ms. Sahakian's salary and bonus earnings in those years.

• No information has been produced to date on the cost to Defendants of the life insurance and short term disability insurance provided to Ms. Sahakian.

Ms. Sahakian ceased receiving pay and benefits from Defendants on July 1, 2008 as shown by a letter stating:

> "Your final day of employment and final day in the office is July 1, 2008. You will be paid through July 1, 2008. All medical insurances cease the last day of the month you terminate and your life insurance will cease on your date of termination."

Defendants had awarded stock options and restricted stock awards to Ms. Sahakian at various times. Ms. Sahakian's economic loss related to unvested restricted stock awards is discussed in a later section of this report.

## 2.2.2 Non-Reimbursed Expenses

Ms. Sahakian informed Sterling that she did not incur any non-reimbursed expenses related to her employment by Defendants. Ms. Sahakian's statement is consistent with her tax returns, which do not show any deductions for unreimbursed employee business expenses.

## 2.2.3 Economic Slowdown

Defendants are a "…leading semiconductor test and advanced packaging service provider".[7] As detailed later in this report, the semiconductor and hi-tech industry as a whole has experienced a sharp downturn in late 2008 after the problems in the housing and financial sectors spread to other sectors of the economy.

Defendants recently reported strong revenue growth, lower profits and increased capital spending in the third quarter of 2008. Specifically:

> "Tan Lay Koon, President and Chief Executive Officer of STATS ChipPAC, said, 'Revenue for the third quarter of 2008 of $472.2 million increased by 8.8% over prior quarter and by 14.0% over the third quarter of 2007. We recorded strong revenue growth in the third quarter despite the challenging global macroeconomic conditions with broad-based customer demand increase in all major markets.'
>
> Net income for the third quarter of 2008, including $21.1 million in equipment impairment charges and $5.1 million in restructuring expenses, decreased by 71.7% to $7.9 million or $0.00 per diluted ordinary share, compared to net

---

[7]   Press release entitled "STATS ChipPAC Reports Third Quarter 2008 Results" dated October 29, 2008.

income of $27.9 million or $0.01 per diluted ordinary share in the third quarter of 2007.

John Lau, Chief Financial Officer of STATS ChipPAC, said, 'We implemented cost control measures to closely align expenses with our business growth and profitability, resulting in restructuring expenses of $5.1 million in the third quarter of 2008. Gross margin for the third quarter of 2008 was 18.5% compared to 17.2% in the prior quarter, and 20.3% in the third quarter of 2007. Our operating margin for the third quarter of 2008, including $21.1 million in equipment impairment charges and $5.1 million in restructuring expenses, was 4.6% of revenue, compared to 8.1% in the prior quarter, and 11.7% in the third quarter of 2007. Capital spending in the third quarter of 2008 was 20.6% of revenue compared to 14.8% in the prior quarter, and 21.4% in the third quarter of 2007. Capital spending increased as we invested in a new wafer bump line to support the growth of our flip chip business.'"[8]

Ms. Sahakian informed Sterling that Defendants may have implemented forced vacations and/or a hold on merit pay increases to control expenses in response to the slowdown. Sterling understands Defendants have not produced documents discussing any actions recently taken to control expenses. A later section of this report shows other major companies in the industry have taken actions to control expenses in response to the slowdown and these factors have adversely impacted Ms. Sahakian's ability to find suitable replacement employment.

### 2.2.4 Earnings of Similar Individuals

In discrimination and/or wrongful termination cases, it is often relevant to analyze the earnings and performance of similar individuals before and after the complained-about acts in order to estimate a plaintiff's lost earnings.

Given the economic downturn, recent information on compensation paid to individuals employed by Defendants would be useful to help determine the effect, if any, that the slowdown would have had on Ms. Sahakian's earnings but-for the Alleged Actions.

Sterling understands Ms. Sahakian requested Defendants to produce compensation information from 2003 through present for at least five individuals (i.e., Mike Schraeder, Joe Adam, Blake Gillett, Raj Pendse and Flynn Carson). Furthermore, Sterling understands Defendants have not produced the requested information to date.

As a result, Sterling has been unable to (i) compare Ms. Sahakian's pre-termination earnings to the earnings of the five individuals, (ii) analyze what each of the five individuals have earned since Ms. Sahakian's termination and/or (iii) consider the information in determining Ms. Sahakian's But-For Earnings.

---

[8]   Press release entitled "STATS ChipPAC Reports Third Quarter 2008 Results" dated October 29, 2008.

## 2.2.5 But-For Earnings Summary

Based on the available information, Sterling calculated Ms. Sahakian's But-For Earnings using the following assumptions:

- Ms. Sahakian would have remained employed by Defendants until her retirement.

- Ms. Sahakian's 2007 salary and bonus earnings represent the appropriate base amounts to use in determining her future salary and bonus earnings from Defendants but-for the Alleged Actions.[9]

- Ms. Sahakian's salary and bonus earnings from Defendants would, on average, have increased by inflation in each year until her retirement in 2023 but-for the Alleged Actions.[10]

- Ms. Sahakian would have received statutory benefits from Defendants equal to 7.65% of her but-for salary and bonus earnings in each year subject to applicable maximums.

- Ms. Sahakian would have received health insurances, life insurance and short-term disability benefits equal to at least $8,000 in 2008 and the value of these benefits would have increased by inflation in each future year.

- Ms. Sahakian would have received retirement benefits equal to 3% of her salary and bonus earnings in each year.

## 2.3 Actual Earnings

Sterling analyzed the available information to determine Ms. Sahakian's Actual Earnings:

### 2.3.1 2008 Post-Termination Earnings

Ms. Sahakian informed Sterling:

- She has had no earned income since her July 1, 2008 termination.[11]

- She has not found replacement employment to date.

- Her opportunities are currently limited because of the state of the economy.

---

[9] Ms. Sahakian's economic damages from lost stock awards are calculated in a later section of this report.
[10] Ms. Sahakian's earnings from Defendants had, on average, increased by substantially more than inflation annually between 2003 and 2007 as shown earlier in the report. However, Sterling reduced the average increase to inflation to take account of the fact that earnings increases may be lower or non-existent during economic slowdowns.
[11] Ms. Sahakian has received unemployment compensation which Sterling understands to be a collateral source that is excluded in determining Ms. Sahakian's lost earnings.

### 2.3.2 IEEE Compensation Survey

"The Institute of Electrical and Electronics Engineers -- United States of America (IEEE-USA) promotes the career and public policy interests of more than 220,000 U.S. members of the IEEE, the world's largest technical professional society, with a total membership of more than 360,000 electrical, electronics and computer engineers and computer scientists in approximately 165 countries. For more than 30 years, IEEE-USA has been conducting, analyzing, and distributing a salary and fringe benefit survey of IEEE members in the United States. The aim of the project is to provide timely information on current and long-term trends related to the income, salary and benefits of electrotechnology professionals in the United States. The information is critical for accurate understanding of compensation practices in these occupations, including how those practices impact on individual professionals."[12]

"IEEE-USA's compensation surveys set high standards. In 1991 the society began to test the use of regression-based mathematical models as a means to generate much more robust, specific estimates of pay. This work has led to the web-based individual compensation analyzer in use today, a tool that can generate accurate, detailed estimates for complete ranges of base salaries for literally hundreds of thousands of different employment situations, allowing simultaneously for variations in experience, training, areas of specialization, employer characteristics, geographic locations, and other factors that affect compensation. Conventional tabulation-based treatments of salary data cannot yield such results. Internet-based data collection for the surveys was begun in 1999 and moved entirely to the web in 2001. Now further changes have been made. Distribution of results from the surveys, as well as collection of data, is now a web-based operation, and includes the capacity for extensive custom database queries for users of the surveys. Data collection has moved toward real-time tracking of compensation trends, with new information added quarterly. These systems solidify IEEE-USA's status as the most reliable and innovative source of information in the world on the compensation of technical professionals."[13]

Sterling used the information in the IEEE-USA compensation survey to estimate the earnings that Ms. Sahakian can expect when she finds suitable replacement employment. Specifically, Sterling analyzed data from the latest compensation survey published in September 2008. A major factor affecting Ms. Sahakian's compensation from replacement employment is the responsibility level at which Ms. Sahakian will be hired. Ms. Sahakian informed Sterling that many large technology companies require new hires to join at levels below their capabilities to allow them to assimilate into the organization.

Ms. Sahakian informed Sterling that her qualifications and experience would allow her to perform the responsibilities required for individuals in the "Engineer Level 8" classification in the IEEE-USA compensation study. The Engineer Level 8 classification is defined as follows:

> "Makes decisions and recommendations that are recognized as authoritative and have a far-reaching impact on extensive engineering and related activities of the company. Negotiates critical and controversial issues with top-level engineers

---

[12]  http://salaryapp.ieeeusa.org.
[13]  http://salaryapp.ieeeusa.org.

and officers of other organizations and companies. Demonstrates a high degree of creativity, foresight, and importance. Receives general administrative direction. Supervises several subordinate supervisors or team leaders. As an individual researcher and consultant, may be assisted on individual projects by other engineers or technicians."[14]

Ms. Sahakian informed Sterling that her job search efforts to date have indicated that she would more likely be hired into a position with responsibilities as described in the "Engineer Level 6" classification in the IEEE-USA compensation study. The Engineer Level 6 classification is defined as follows:

"Technical responsibility for interpreting, organizing, executing, and coordinating assignments. Plans and develops engineering projects with unique or controversial problems which impact major company programs. Involves exploration of subject area, definition of scope and selection of problems for investigation, novel concepts and approaches. Maintains liaison with individuals and units within or outside the organization, with responsibility for acting independently on technical matters. Work at this level requires extensive progressive experience. Supervision received is administrative, with assignments given in terms of general objectives and limits. Plans, organizes, and supervises the work of a staff of engineers and technicians. Evaluates progress and results obtained, recommends major changes to achieve objectives. As individual researcher or staff specialist, may be assisted on individual projects."[15]

The September 2008 IEEE-USA compensation survey shows the following median earnings for individuals working in Phoenix as Engineer Level 6 and Engineer Level 8:

| Responsibility Level | Median Base Salary | Median Salary and Bonuses |
|---|---|---|
| Engineer Level 6 | $118,500 | $130,700 |
| Engineer Level 8 | 138,700 | 156,300 |
| Mid-point | $128,600 | $143,500 |

The above amounts are lower than the compensation received by Ms. Sahakian from Defendants in 2007 (i.e., base salary of $165,300 and combined salary and bonus of $204,385). This supports Ms. Sahakian's opinion that she will not be able to find a replacement position that pays as much as she was earning from Defendants.

## 2.3.3 Economic Slowdown

Numerous press releases over the last few months by companies in the semiconductor and high tech industry have discussed upcoming layoffs, hiring restrictions and other cost control measures.

---

[14] http://salaryapp.ieeeusa.org.
[15] http://salaryapp.ieeeusa.org.

An October 8, 2008 article entitled "Semi equipment demand not expected to recover until 2010, Gartner reports" states:

> "As the global economic slowdown continues to have a significant impact on the semiconductor industry, capital spending is still slowing across the board, with all segments seeing a decline in capital spending in 2008 and through 2009, according to market researchers at Gartner Dataquest.
>
> The company said oversupply in memory, combined with a slowing consumer market due to the uncertain economic picture, gives little hope for an upside until 2010 with the most likely scenario showing capital spending declining 25.7% in 2008 and down by another 12.8% in 2009 with growth expected to return in 2010.
>
> As such, Gartner recommends that the semiconductor industry prepare for a prolonged downturn while device manufacturers adjust supply to meet slowing demand, with equipment suppliers needing to prepare for a slower-than-anticipated 2009 and potentially fewer memory customers when the industry returns to health."[16]

Gartner is a respected research firm in the high-tech industry. Gartner's website states the firm advises "technology vendors, large and small, all over the world" and "...has helped technology vendors grow by collecting and interpreting critical IT and telecom market data, and translating it into actions for success" for over 30 years.[17]

Since the Gartner study was released in early October 2008, the economic situation has deteriorated further forcing numerous actions by governments worldwide.

### 2.3.4 Actual Earnings Summary

Based on the available information, Sterling calculated Ms. Sahakian's Actual Earnings using the following assumptions:

- Ms. Sahakian will find a position on January 1, 2010 with annual compensation at the mid-point of the Engineer Level 6 and Engineer Level 8 classifications from the IEEE-USA compensation survey.

- Ms. Sahakian will remain employed in this position until her retirement.

- Ms. Sahakian's earnings from the replacement position will, on average, increase by inflation in each year until her retirement.[18]

---

[16] www.edn.com.
[17] www.gartner.com.
[18] The inflation-based growth rate assumption is consistent with the assumption used to calculate Ms. Sahakian's But-For Earnings.

- Ms. Sahakian will receive statutory benefits from the replacement position equal to 7.65% of her earnings in each year subject to applicable maximums.

- Ms. Sahakian will receive health benefits from the replacement position equal to the health benefits that she would have received from Defendants in each year.

- Ms. Sahakian will receive retirement benefits from the replacement position equal to 3% of her earnings in each year.[19]

## 2.4   Discounting of Future Losses

Sterling discounted Ms. Sahakian's future lost earnings back to December 31, 2008 using discount rates based on U.S. Treasury securities with terms matching the discount period. Sterling may update the discount date and discount rates once a trial date is known.

## 2.5   Lost Earnings Summary

Based on the above, Ms. Sahakian's lost earnings as a result of the Alleged Actions are $1,276,988 as detailed on Appendix C.

## 3.   Lost Stock

Defendants awarded Ms. Sahakian 32,200 shares under the STATS ChipPAC Restricted Share Plan ("RSP") on February 16, 2007 with approximately 1/3rd of the shares scheduled to vest after each of the following three years.  Ms. Sahakian received the 10,730 shares that vested on February 16, 2008 and made a profit of $9,465 or approximately $0.88 per share. Ms. Sahakian was terminated prior to the vesting date for the remaining 21,470 shares and informed Sterling that she received no compensation for the lost shares.

Additionally, Defendants awarded Ms. Sahakian 45,000 shares under the STATS ChipPAC Performance Share Plan ("PSP") on February 16, 2007 with all of the shares scheduled to vest on February 16, 2010.  Ms. Sahakian was terminated prior to the vesting date for the 45,000 shares and informed Sterling that she received no compensation for the lost shares.

Ms. Sahakian would still have worked for Defendants as of the vesting dates for the lost 66,470 shares under the RSP and PSP but-for the Alleged Actions and, therefore, is entitled to damages for the value of the lost shares.

Defendants filed a Form 6-K with the Securities and Exchange Commission on November 7, 2008 stating:

- Defendants decided to terminate the PSP and RSP in January 2008 and the termination became effective at the end of March 2008.

---

[19]   The 3% assumption is consistent with the matching contributions paid by Defendants.

- Defendants cancelled all outstanding shares under the PSP in the three months ended June 29, 2008 and, as a result, recorded $1.6 million of accelerated share-based compensation expense in the nine months ended September 28, 2008.

- Millions of shares under the RSP remain outstanding as of September 28, 2008.

Based on the above, Ms. Sahakian would likely have received compensation payments in respect to the cancellation of 45,000 unvested PSP shares but-for the Alleged Actions. Additionally, it is reasonable to expect compensation payments will be paid in the future when the outstanding RSP shares are cancelled and that Ms. Sahakian would have received payments for 21,470 unvested RSP shares. The information in the Form 6-K is insufficient to show whether the payments varied by individual and if so, how. Furthermore, Sterling understands Defendants have failed to produce documents to date showing the specific compensation payments already made and/or expected to be made in the future to employees who would have been in a similar situation to Ms. Sahakian but-for the Alleged Actions.

Based on the available information, Sterling valued the lost 66,470 shares using the approximately $0.88 per share profit received from the shares that vested in February 2008, which results in a total loss of $58,494.[20]

Ms. Sahakian informed Sterling that Defendants have introduced an alternative Bonus Bank Plan to replace stock awards. Defendants have not yet produced any information showing how much has been awarded under the Bonus Bank Plan to employees who would have been in a similar situation to Ms. Sahakian but-for the Alleged Actions. At this time, Sterling's damage calculation excludes any awards that would have been made to Ms. Sahakian under the Bonus Bank Plan prior to her retirement in May 2023 but-for the Alleged Actions. Sterling may update this assumption and include damages for lost awards under the Bonus Bank Plan after additional discovery and/or further analysis is performed.

## 4.  Conclusion

Based on the available information, Ms. Sahakian's economic damages total $1,335,482 comprising (i) lost earnings of $1,276,988 and (ii) lost stock of $58,494.

Sterling may update this analysis if further information is provided and/or additional analysis is performed.

David R. Perry
For the Firm

12/4/08
Date

---

[20]   66,470 * $0.88 = $58,494.

- 11 -

# David R. Perry's Resume, Testimony Experience and Publications

## Summary

Mr. Perry is President and Founder of Sterling Group LLC. He is a Certified Public Accountant, Accredited in Business Valuation, Certified in Financial Forensics and a British Chartered Accountant. He has over twenty years of experience in accounting and finance. His areas of expertise include damage calculations, financial investigations and business valuations. He has consulted for companies in numerous industries and has been based in the major financial capitals of New York, London and Singapore. He received the highest score in Arizona when he took the examination to become a Certified Public Accountant.

## Selected Experience

### Litigation Support

Provided consulting services in numerous legal actions including:

- Breach of Contract
- Breach of Fiduciary Duty
- Business Interruption
- Construction Defect/Delay
- Discrimination
- Fraud
- Intellectual Property
- Marital Dissolution
- Personal Injury
- Professional Malpractice
- Securities
- Wrongful Death
- Wrongful Termination

### Damage Calculations

Determined the damages in a lawsuit in which a multi-billion dollar corporation alleged copyright infringement and trade secret misappropriation of its software products. Calculated plaintiff's lost profits and defendant's gained profits. Presented findings in successful mediation.

Analyzed the damages in a lawsuit alleging patent infringement in the gaming products industry. Assessed the demand for, and supply of, the product and used the results to forecast future cash flows. Analyzed historic royalty arrangements for similar products.

Calculated the damages in a lawsuit involving an alleged oral agreement for a truck part. Calculated damages assuming the alleged oral agreement had existed. Analyzed whether the alleged oral agreement was commercially reasonable.

## David R. Perry's Resume, Testimony Experience and Publications

Assessed the damages in a multi-million dollar lawsuit alleging trade secret and trademark infringement of a quality improvement methodology. Calculations involved restating income statements as if the infringement had not existed.

Determined the damages in a multi-million dollar lawsuit against an insurance carrier related to a claim for mold contamination of an apartment complex. Calculation involved the apartment complex's lost rents and profits based on an analysis of relevant factors.

Analyzed the damages in a matter involving the development of a master-planned community of approximately 1,000 homes. Calculation involved a comparison of the expected profits from the development with the actual profits from the development.

Assessed the damages in a lawsuit alleging fraud and misrepresentation on the part of a leading accounting firm. Calculations included the tax-effected value of real estate and related loans over a period of 20 years.

Determined a reasonable royalty in a patent infringement case involving health products. Included an analysis of the "Georgia-Pacific" factors and the forecast performance of the infringing companies.

Calculated the present value of lost earnings and household services in a wrongful death case. Analyzed the future expected profits from the deceased's business and quantified his personal expenses.

Determined the present value of lost earnings in a wrongful dismissal case. Calculated the difference between the plaintiff's expected earnings in the position from which he was dismissed and his expected earnings in his new position.

Assessed the present value of future medical costs and lost earnings in a personal injury case involving alleged medical malpractice at the time of a child's birth. Researched appropriate earnings, discount rates and growth rates.

*Financial Investigations*

Performed an investigation of a manufacturing company as part of a dispute over the accuracy of financial statements used in a $90 million acquisition. Quantified multi-million dollar errors in the financial statements despite poor records and missing documents. Analyzed the auditor's work papers to identify why the company's audits had failed to identify the misstatements.

Managed the audit of one of the world's largest banks. Coordinated audit work in over 30 countries. Communicated directly with Senior Management and federal regulators. Analyzed complex business transactions. Reviewed SEC filings.

# David R. Perry's Resume, Testimony Experience and Publications

Assisted a Stanford law professor to determine whether certain companies had complied with various federal and state statutes that governed their activities. Analysis included identification and quantification of the companies' activities over a 10-year period.

Identified fund flows and business relationships in a bankruptcy matter alleging global money laundering and fraud. Reviewed information produced by banks and other parties in numerous countries over a 15-year period.

Performed electronic matching on millions of records in multiple databases as part of a lawsuit alleging failure to make agreed commission payments on the sales of certain financial products.

Analyzed alleged misstatements in financial statements used to calculate the earn-out payments that formed part of the purchase price of a furniture manufacturer.

Scrutinized documentation on the expenditures authorized by a senior executive of a professional sports league in an employment related lawsuit. Analyzed the executive's adherence with the league's internal controls.

### Business Valuations

Valued over ten billion dollars worth of telecommunications companies as part of a divorce proceeding. Interests valued included minority and majority holdings of private companies and a substantial holding of a public company.

Assessed the value of a chiropractic business as of multiple dates in a professional malpractice action. Valuation issues included the accuracy of issued financial statements and the identification of issues that caused the value of the business to change over time.

Valued the business of a homebuilder in connection with a lawsuit with a homeowners' association. Analyzed the financial prospects for the homebuilder at the time of the valuation.

Determined the current value of over $30 million of bonds in connection with an alleged infringement of the Securities Act of 1933. The work required understanding the expected future financial performance of a utility infrastructure project that the bonds funded.

Valued a multi-million dollar business that cleans the tools used to manufacture microchips in connection with a marital dissolution.

### Other

Managed a team of business analysts, systems analysts and computer programmers to design and implement a customer/product information system in over 30 countries with different operational systems and processes.

## David R. Perry's Resume, Testimony Experience and Publications

Managed a team of accountants and consultants to perform an Operational Review of the second-largest bank in Romania. Presented the resulting report to the bank's Board of Directors and officials of the World Bank and European Commission.

Performed a key role in the restructure of the U.S. operations of a major international bank to eliminate duplicate and non-core businesses and increase profitability.

Designed and implemented a management information system that provided information on revenues, costs and risks for a business that trades foreign exchange and interest rate products.

Managed due diligence assignments for companies seeking to expand in the U.K. and Eastern Europe. Presented comprehensive reports arising from these assignments to Senior Management and Boards of Directors.

Analyzed the benefits, costs and risks of alternative general ledger options for a large U.S. bank. Made recommendations to Senior Management that resulted in improved quality reporting and significant cost savings.

Managed the design and implementation of risk management processes to provide a stronger internal control environment for the U.S. operations of a major international bank and an improved grading by the Federal Reserve Board.

Prepared a Business Continuity Plan for a complex $30 million business. Conducted a business impact analysis, developed recovery alternatives and recommended the preferred recovery route. The plan was approved by the Federal Reserve Board.

Assisted in the preparation of London Stock Exchange listing documents and Bank of England applications for various international banks seeking to raise capital and/or open branches in London.

**Professional History**

| | | |
|---|---|---|
| Sterling Group LLC | Founder and President | Scottsdale |
| Lancaster Consulting | Principal Consultant | Phoenix |
| Standard Chartered Bank | Vice President - Finance | New York and Singapore |
| KPMG | Senior Manager | London, Houston and New York |

# David R. Perry's Resume, Testimony Experience and Publications

## Professional Qualifications and Affiliations

Certified Public Accountant in Arizona (Honored for highest score in Arizona on CPA examination).

"Accredited in Business Valuation" by the American Institute of Certified Public Accountants.

"Certified in Financial Forensics" by the American Institute of Certified Public Accountants.

Fellow of the Institute of Chartered Accountants of England and Wales.

Member of the American Institute of Certified Public Accountants.

Member of the Arizona Society of Certified Public Accountants.

## Education and Training

Bachelor's degree in Physics from London University in England (Highest Honors).

Post-graduate studies in accounting leading to Chartered Accountant qualification.

Numerous technical skills and management development courses in the U.K. and U.S.

## Testimony Experience

Smith v. BNSF Railway Company
Maricopa County Superior Court, Arizona
Date of deposition testimony: July 2, 2008

Marquette Equipment Finance, LLC v. Rowe Fine Furniture, Inc., et al
United States District Court, Eastern District of Virginia
Date of deposition testimony: February 23, 2008

Mirage Crossing Resort Casitas HOA, Inc. v. Mirage Homes Construction, Inc. et al
Maricopa County Superior Court
Date of deposition testimony: July 12, 2007

Abbett, et al v. Terravita Corp., et al
Maricopa County Superior Court, Arizona
Date of deposition testimony: March 1, 2007

## David R. Perry's Resume, Testimony Experience and Publications

Advante, et al v. Mintel, et al
United States District Court, Northern District of California
Date of deposition testimony: February 8, 2007

Allen, et al v. Del Webb's Coventry Homes, Inc., et al
Maricopa County Superior Court, Arizona
Date of deposition testimony: January 19, 2007

Eagle Mountain Community Association v. Eagle Mountain Investors, LLC
Maricopa County Superior Court, Arizona
Date of deposition testimony: June 28, 2006
Date of trial testimony: July 19, 2006

Lefkowitz v. CIGNA, et al
Maricopa County Superior Court, Arizona
Date of deposition testimony: March 30, 2006

Shuffle Master, Inc. v. Awada, et al.
United States District Court, District of Nevada
Date of deposition testimony: March 1, 2006

Geraci v. Schimweg, et al
Arbitration in Phoenix, Arizona
Date of deposition testimony: January 21, 2005

Blakemore v. Blakemore
Maricopa County Superior Court, Arizona
Date of deposition testimony: October 15, 2004
Date of trial testimony: October 18, 2004 and October 19, 2004

Barnett v. CIGNA
United States District Court, District of Arizona
Date of trial testimony: August 20, 2004

Brake Masters Systems, Inc. v. Shajari, et al.
Arbitration in Phoenix, Arizona
Date of arbitration testimony: May 11, 2004

North American Enterprises v. McLeodUSA
Maricopa County Superior Court, Arizona
Date of deposition testimony: March 16, 2004
Date of trial testimony: April 6, 2004

# David R. Perry's Resume, Testimony Experience and Publications

Brake Masters Systems, Inc. v. Castillo, et al.
Arbitration in Tucson, Arizona
Date of arbitration testimony: March 10, 2004

Lewis v. Smith, et al.
United States District Court, District of Arizona
Date of deposition testimony: June 25, 2003

Brake Masters Systems, Inc. v. Diehl, et al.
Arbitration in Tucson, Arizona
Date of arbitration testimony: May 6, 2002

Autumn Creek Associates et al. v. TIG Insurance Company
Lawsuit in Phoenix, Arizona
Date of deposition testimony: February 27, 2001


**Mediation Experience**

Yelas v. Nautilus Insurance Company
Phoenix, Arizona
Date of mediation: May 26, 2007

Eagle Mountain Community Association v. Eagle Mountain Investors, LLC
Phoenix, Arizona
Dates of mediation: January 12, 2005

In re: Berkshire Realty Shareholder Litigation
Boston, Massachusetts
Date of mediation: February 3, 2004

Compuware Corporation v. Serena Software Inc.
San Francisco, California
Date of mediation: June 12, 2000


**Speaking Engagements (last ten years)**

"Accounting 101 for Lawyers"
Maricopa County Bar Association.  2002

"Foreign Currency Risk Management"
International Issues Conference of the Arizona Society of Certified Public Accountants. 2000

# David R. Perry's Resume, Testimony Experience and Publications

"Intellectual Property Valuation and Infringement Damages"
Business Valuation Committee of the Arizona Society of Certified Public Accountants. 2000

"Valuation Premiums and Discounts"
Business Valuation Committee of the Arizona Society of Certified Public Accountants. 1999

"Accounting for Lawyers"
Maricopa County Bar Association. 1998

"Fraud & Money Laundering"
Financial Institutions Committee of the Arizona Society of Certified Public Accountants. 1998

**Publications (last ten years)**

"Year 2000 – Mitigating the Business and Legal Risks"
Maricopa County Bar Association.  1999

**Appendix B**

### Diane E. Sahakian v. STATS ChipPAC, Inc., et al
### Documents Considered

1. "Complaint" dated February 6, 2008.

2. "Defendants' Answer to Complaint" dated April 8, 2008.

3. "Joint Report of Scheduling Conference" dated June 2, 2008.

4. "Scheduling & Planning Order" dated June 4, 2008.

5. "Order from Chambers" filed August 14, 2008.

6. "Stipulation for Plaintiff to Amend Her Complaint" dated September 29, 2008.

7. "First Amended Complaint" dated September 29, 2008.

8. "Motion to Withdraw as Counsel" dated October 23, 2008.

9. "Notice of Appearance and Joinder in Mr. Schleier's Request to Extend Deadlines" dated November 5, 2008.

10. "Order" dated November 6, 2008 on "Motion to Withdraw as Counsel".

11. Various pay stubs, W-2's, letters, print-outs and other documents showing Ms. Sahakian's earnings from Defendants.

12. Relevant pages of Ms. Sahakian's income tax returns from 2005 to 2007.

13. Ms. Sahakian's resume.

14. Various documents discussing Ms. Sahakian's employee benefits from Defendants.

15. Various documents related to Ms. Sahakian's unemployment compensation.

16. Various industry articles discussing recent financial performance of and actions taken by certain semiconductor and high tech companies.

17. Organizational flowchart prepared by Ms. Sahakian.

18. Gary R. Skoog and James E. Ciecka, "The Markov (Increment-Decrement) Model of Labor Force Activity: New Results Beyond Work-Life Expectancies", *Journal of Legal Economics,* 11(1), 2001.

19. Gary R. Skoog and James E. Ciecka, "The Markov (Increment-Decrement) Model of Labor Force Activity: Extended Tables of Central Tendency, Variation, and Probability Intervals", *Journal of Legal Economics,* 11(1), 2001.

Diane E. Sahakian v. STATS ChipPAC, Inc., et al
**Documents Considered**

20. Information from:

- http://finance.yahoo.com
- http://findarticles.com
- http://money.cnn.com
- www.amkor.com
- www.edn.com
- www.federalreserve.gov
- www.gartner.com
- www.ieee.org
- www.ieeeusa.org
- www.irs.gov
- www.marketwire.com
- www.payscale.com
- www.philadelphiafed.org
- www.sec.gov
- www.statschippac.com
- www.themoneyalert.com

Appendix C

Diane Sahakian v. STATS ChipPAC, Inc., et al
Ms. Sahakian's Last Earnings

| Start of Period | End of Period | But-For Earnings [1] | | | | | Actual Earnings [7] | | | | | Lost Earnings [13] | Discount Period [14] | Discount Rate [15] | Present Value of Lost Earnings [16] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Salary and Bonuses [2] | Statutory Benefits [3] | Health and Other Insurances [4] | Retirement Contributions [5] | Total But-For Earnings [6] | Salary and Bonuses [8] | Statutory Benefits [9] | Health and Other Insurances [10] | Retirement Contributions [11] | Total Actual Earnings [12] | | | | |
| 01/01/08 | 12/31/08 | $ 209,495 | $ 9,362 | $ 8,000 | $ 6,285 | $ 233,142 | $ 114,917 | $ 7,990 | $ 4,000 | $ 3,448 | $ 130,355 | $ 102,787 | 0.0 | 0.00% | $ 102,787 |
| 01/01/09 | 12/31/09 | 214,732 | 9,596 | 8,200 | 6,442 | 238,970 | - | - | - | - | - | 238,970 | 0.5 | 0.48% | 238,399 |
| 01/01/10 | 12/31/10 | 220,100 | 9,836 | 8,405 | 6,603 | 244,944 | 150,765 | 8,830 | 8,405 | 4,523 | 172,523 | 72,421 | 1.5 | 0.93% | 71,422 |
| 01/01/11 | 12/31/11 | 225,603 | 10,082 | 8,615 | 6,768 | 251,068 | 154,534 | 9,051 | 8,615 | 4,636 | 176,836 | 74,232 | 2.5 | 1.09% | 72,247 |
| 01/01/12 | 12/31/12 | 231,243 | 10,334 | 8,830 | 6,937 | 257,344 | 158,397 | 9,277 | 8,830 | 4,752 | 181,256 | 76,088 | 3.5 | 1.38% | 72,524 |
| 01/01/13 | 12/31/13 | 237,024 | 10,592 | 9,051 | 7,111 | 263,778 | 162,357 | 9,509 | 9,051 | 4,871 | 185,788 | 77,990 | 4.5 | 1.38% | 73,325 |
| 01/01/14 | 12/31/14 | 242,950 | 10,857 | 9,277 | 7,289 | 270,373 | 166,416 | 9,747 | 9,277 | 4,992 | 190,432 | 79,941 | 5.5 | 2.01% | 71,653 |
| 01/01/15 | 12/31/15 | 249,024 | 11,128 | 9,509 | 7,471 | 277,132 | 170,576 | 9,991 | 9,509 | 5,117 | 195,193 | 81,939 | 6.5 | 2.01% | 71,997 |
| 01/01/16 | 12/31/16 | 255,250 | 11,406 | 9,747 | 7,658 | 284,061 | 174,840 | 10,241 | 9,747 | 5,245 | 200,073 | 83,988 | 7.5 | 2.43% | 70,148 |
| 01/01/17 | 12/31/17 | 261,631 | 11,691 | 9,991 | 7,849 | 291,162 | 179,211 | 10,497 | 9,991 | 5,376 | 205,075 | 86,087 | 8.5 | 2.43% | 70,195 |
| 01/01/18 | 12/31/18 | 268,172 | 11,983 | 10,241 | 8,045 | 298,441 | 183,691 | 10,759 | 10,241 | 5,511 | 210,202 | 88,239 | 9.5 | 2.43% | 70,243 |
| 01/01/19 | 12/31/19 | 274,876 | 12,283 | 10,497 | 8,246 | 305,902 | 188,283 | 11,028 | 10,497 | 5,648 | 215,456 | 90,446 | 10.5 | 2.99% | 66,381 |
| 01/01/20 | 12/31/20 | 281,748 | 12,590 | 10,759 | 8,452 | 313,549 | 192,990 | 11,304 | 10,759 | 5,790 | 220,843 | 92,706 | 11.5 | 2.99% | 66,064 |
| 01/01/21 | 12/31/21 | 288,792 | 12,905 | 11,028 | 8,664 | 321,389 | 197,815 | 11,587 | 11,028 | 5,934 | 226,364 | 95,025 | 12.5 | 2.99% | 65,751 |
| 01/01/22 | 12/31/22 | 296,012 | 13,228 | 11,304 | 8,880 | 329,424 | 202,760 | 11,877 | 11,304 | 6,083 | 232,024 | 97,400 | 13.5 | 2.99% | 65,437 |
| 01/01/23 | 05/30/23 | 123,859 | 9,475 | 4,730 | 3,716 | 141,780 | 84,840 | 6,490 | 4,730 | 2,545 | 98,605 | 43,175 | 14.2 | 2.99% | 28,415 |
| | | $ 3,880,511 | $ 177,348 | $ 148,184 | $ 116,416 | $ 4,322,459 | $ 2,482,392 | $ 148,178 | $ 135,984 | $ 74,471 | $ 2,841,025 | $ 1,481,434 | | | $ 1,276,988 |

Notes

[1]    Worklife expectancy tables show Ms. Sahakian would have retired on or around May 30, 2023 but-for the Alleged Actions as discussed in the report.

[2]    Ms. Sahakian's 2007 salary and bonus earnings from Defendants increased by inflation in each year as discussed in the report (2.5% 10-year inflation estimate per www.philadelphiafed.org).

[3]    6.2% of but-for salary and bonus earnings for social security and 1.45% of but-for salary and bonus earnings for Medicare subject to annual maximums for social security (www.irs.gov).

[4]    $8,000 2008 employer contribution increased by inflation in each year as discussed in the report (2.5% 10-year inflation estimate per www.philadelphiafed.org).

[5]    Employer retirement contribution equal to 3% of salary and bonus earnings as discussed in the report.

[6]    The sum of [2] to [5].

[7]    Assumed retirement on May 30, 2023 (i.e., consistent with the But-For Earnings calculation).

[8]    Actual earnings from Defendants for first half of 2008. Assumed replacement employment starts on January 1, 2010 at estimated median earnings increased by inflation in future years as discussed in the report (2.5% 10-year inflation estimate per www.philadelphiafed.org).

[9]    6.2% of actual salary and bonus earnings for social security and 1.45% of actual salary and bonus earnings for Medicare subject to annual maximums for social security (www.irs.gov).

[10]    $4,000 employer contribution from Defendants for first half of 2008. Assumed replacement position provides health and other insurances equivalent to those provided by Defendants as discussed in the report.

[11]    3% of salary and bonus earnings from Defendants for first half of 2008. Assumed replacement position provides employer retirement contribution equal to 3% of salary and bonus earnings as discussed in the report.

[12]    The sum of [8] to [11].

[13]    = [6] - [12].

[14]    For 2009 and future years, number of years between middle of period and December 31, 2008.

[15]    Interest rates on U.S. Treasury securities as of November 26, 2008 per www.federalreserve.gov with terms matching the discount period.

[16]    = [13] / (1 + [15])^[14].

*Attachment D*

# GT GreenbergTraurig



## Transmittal Cover Sheet

| From: | Tel: | E-Mail: |
|---|---|---|
| Lawrence J. Rosenfeld | 602.445.8502 | RosenfeldL@gtlaw.com |

| To: | Company: | Phone No.: |
|---|---|---|
| Peter Strojnik, Esq. | Peter Strojnik, P.C. | 602-296-0135 |

**File No.:**  046474.010300

**Re:**  **Sahakian v. STATS ChipPac, Inc.**

**Date:**  **January 12, 2009**

**No. Pages:**  Including Cover Sheet  **5**

<u>If you do not receive all pages properly, please call (602) 445-8196.</u>

**Notes:**

---

**Also sent via:**   [X] US Mail   [ ] Overnight   [ ] Messenger   [ ] Email   [ ] No Other

The information contained in this transmission is attorney privileged and confidential. It is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone collect and return the original message to us at the address below via the U.S. Postal Service. We will reimburse you for your postage. Thank you.

2375 East Camelback Road, Suite 700, Phoenix, Arizona 85016   Phone: 602.445.8000  Fax: 602.445.8100
TCO 357,740,684.1

# Greenberg Traurig

Lawrence J. Rosenfeld
Tel. 602.445.8502
Fax 602.445.8100
RosenfeldL@gtlaw.com

January 12, 2009

**VIA FACSIMILE – 602-296-0135**
**FIRST-CLASS MAIL**

Peter Strojnik, Esq.
Peter Strojnik, P.C.
3030 North Central Avenue, Suite 1401
Phoenix, Arizona 85012

    **Re:**    **Sahakian v. STATS ChipPac, Inc.**

Dear Mr. Strojnik:

    This letter constitutes the response of our client, Temasek Holdings (Private) Limited ("Temasek"), to your letter of December 1, 2008 (addressed to Madam Ho Ching, Executive Director and CEO of Temasek). For each and all of the reasons set forth herein, your December 1 settlement demand is rejected.

    <u>First</u>. Temasek is not an "employer" for purposes of Title VII, and thus cannot be held liable for the acts alleged in the Complaint. In your Complaint, you allege that STATS ChipPAC – and not Temasek – employed your client. And, in fact, as you know, Temasek was never your client's employer. Under these circumstances (your citations to non-Title VII case law notwithstanding), Temasek cannot be held liable for the alleged acts of your client's employer, absent "special circumstances". *See*, for example, *Watson v. Gulf & W. Indus.*, 650 F.2d 990, 993 (9th Cir. 1981), wherein the court held that such circumstances exist only where "there is evidence that [the non-employer company] participated in or influenced the employment policies of [the employer company], or where there is evidence "that the parent-subsidiary relationship is a 'sham' or that circumstances exist that would render the parent liable for debts of its subsidiary." No such facts exist here.[1]

---

[1]   Indeed, the *Watson* case involved a circumstance where the employer company was the <u>wholly-owned subsidiary</u> of the parent company that was unsuccessfully sought to be included as a party defendant. STATS ChipPAC is <u>not</u> a wholly-owned subsidiary of Temasek. Thus, if anything, the "relationship" between Temasek and your client's employer is even <u>more</u> attenuated than the relationship between the employer company and non-employer company in the *Watson* case.

TCO 357,748,581.2

ALBANY
AMSTERDAM
ATLANTA
BOCA RATON
BOSTON
BRUSSELS*
CHICAGO
DALLAS
DELAWARE
DENVER
FORT LAUDERDALE
HOUSTON
LAS VEGAS
LONDON*
LOS ANGELES
MIAMI
MILAN*
NEW JERSEY
NEW YORK
ORANGE COUNTY
ORLANDO
PHILADELPHIA
PHOENIX
ROME*
SACRAMENTO
SILICON VALLEY
TALLAHASSEE
TAMPA
TOKYO*
TYSONS CORNER
WASHINGTON, D.C.
WEST PALM BEACH
ZURICH
*Strategic Alliance
Tokyo–Office/Strategic Alliance

Peter Strojnik, Esq.
January 12, 2009
Page 2

Indeed, the allegations in your Proposed Second Amended Complaint relating to Temasek (¶¶ 3, 5, 8-12) are insufficient to establish any of the "special circumstances" described in *Watson*. You have not alleged (nor is it the case) that Temasek "participated in or influenced the employment policies" of STATS ChipPAC[2]; you have not alleged (nor is it the case) that the relationship between the two entities is a "sham"; and you have not alleged the existence of any circumstances that would render Temasek liable for STATS ChipPAC's debts (nor are there any such circumstances). Your theory appears to rest on the notion that Temasek can somehow be held liable under Title VII for the alleged acts of STATS ChipPAC because "STS owns approximately 83% of the outstanding shares of STATS ChipPAC" (Proposed Second Amended Complaint, ¶ 6), and Temasek is the "parent corporation" of STS (Proposed Second Amended Complaint, ¶ 3). No case in the Title VII context of which we are aware has held that the existence of any such "relationship" is sufficient to confer "employer" status on Temasek here.

Likewise, neither the assertion that a Director of STATS ChipPAC "previously" held a position with Temasek, nor the assertion that a Director of STATS ChipPAC "has been a member" of the Temasek Advisory Panel (Proposed Second Amended Complaint, ¶¶ 8-9), is a legally sufficient basis upon which to seek to name Temasek as a party-defendant in this Title VII case.

Nor do the allegations in ¶¶ 10-11 of your Proposed Second Amended Complaint (alleged "on information") support your theory. And, as regards the allegation in ¶ 12 of your Proposed Second Amended Complaint (also alleged "on information"), there is absolutely no basis for that assertion, particularly as it pertains to the employment decisions and policies of STATS ChipPAC (as required by *Watson*), and even more particularly as to any events which may or may not have occurred vis-à-vis your client. Indeed, the bare, formulaic "on information" recitation set forth in ¶ 12 is insufficient to withstand an early dispositive motion. *See, Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 163 L.Ed.2d 929 (2007):

> [A] plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. . . . [F]actual allegations must be enough to raise a right to relief above the speculative level.

127 S.Ct. at 1964.

Second. The Court does not have jurisdiction over Temasek, either generally or specially. Plainly, there is no general jurisdiction over Temasek in Arizona. As pled in your Proposed Second Amended Complaint, Temasek's "contact" with the state consists of its

---

[2] Temasek does not direct the commercial or operational decisions of companies in its portfolio. Those decisions are made by each company's management personnel, and supervised by their respective boards.

*TCO 357,748,581.2*

Peter Strojnik, Esq.
January 12, 2009
Page 3

owning a company (STS) which in turn owns "approximately 83%" of a company (STATS ChipPAC), which does business in Arizona. This hardly meets the "minimum contacts" with Arizona which due process demands exist prior to a party being obligated to appear and defend a claim against it in this forum.

Nor have you alleged in the Proposed Second Amended Complaint that special jurisdiction may be asserted against Temasek. You do not allege (nor is it the case) that Temasek caused events to occur in Arizona out of which your client's claims arise. Indeed, it is clear from a reading of your pleadings that all of the alleged acts upon which your client bases her claims were purportedly committed by employees of STATS ChipPAC. And, to the extent that the basis upon which you seek to assert jurisdiction over Temasek is that Temasek was your client's "employer" under Title VII, we have fully explained, above, why that theory is without legal efficacy.

Third. Temasek was not identified as a respondent in the charge of discrimination your client filed with the EEOC, and thus there has been a failure to exhaust administrative remedies as to Temasek. As you know, the filing of a charge of discrimination, and the issuance of a right to sue notice, are statutory prerequisites to the ability to commence a Title VII lawsuit. See, for example, Viswanathan v. Leland Stanford Junior University, 1 Fed.Appx. 669, 2001 WL 30497 (9th Cir. 2001) ("The failure to name a party in an EEOC charge precludes the possibility of suing under Title VII unless the unnamed party was 1) involved in acts which were the subject of the EEOC charge, or 2) 'should have anticipated' that it would be named in a Title VII suit.") In ¶ 15 of the Proposed Second Amended Complaint, you allege that your client filed two charges "against Defendant STATS ChipPAC". Nowhere do you allege – nor is it the case – that your client ever filed a charge against Temasek; or that Temasek was involved in the alleged acts giving rise to the Title VII suit; or that Temasek should have anticipated being named in this suit.

Fourth. Per the Court's scheduling order, the time to seek leave to amend the pleadings has long since passed. Pursuant to its Order dated June 4, 2008, the Court established a deadline of October 2, 2008, by which any motions to amend the Complaint were to be filed. It does not appear that, in connection with your having been substituted in as counsel, the court relieved your client of any of the deadlines previously established, and thus any attempt to add Temasek by amendment now will likely be precluded.

\* \* \* \* \* \*

Based on the foregoing, it would be imprudent – at a minimum – for you to seek to add Temasek as a party defendant to these proceedings, or to take any of the other steps you describe in your December 1 letter. We therefore urge you to abandon these efforts immediately. Should you, nonetheless, make the unwise decision to proceed against my client, it will vigorously oppose your efforts, and it will affirmatively seek all relief to which it may be entitled as a consequence of its having been improvidently drawn into this dispute.

Peter Strojnik, Esq.
January 12, 2009
Page 4

_____

Thank you.

Sincerely,

GREENBERG TRAURIG, LLP

Lawrence J. Rosenfeld

LJR/hp

GREENBERG TRAURIG, LLP ▪ ATTORNEYS AT LAW ▪ WWW.GTLAW.COM