# Diane Sahakian

# v.

# STATS ChipPAC, Inc., et al

**Expert Report of David R. Perry**

**Sterling Group LLC**

**December 4, 2008**

Sterling Group LLC
Diane Sahakian v. STATS ChipPAC, Inc., et al

## TABLE OF CONTENTS

1.  **Background** ........................................................................................................... **1**

    1.1   Introduction .......................................................................................... 1

    1.2   Scope of Engagement ........................................................................... 1

    1.3   Fundamental Assumption ..................................................................... 1

2.  **Lost Earnings** ...................................................................................................... **2**

    2.1   Retirement Date .................................................................................... 2

    2.2   But-For Earnings .................................................................................. 2

        2.2.1   Historical Earnings ................................................................. 2

        2.2.2   Non-Reimbursed Expenses ..................................................... 4

        2.2.3   Economic Slowdown ............................................................... 4

        2.2.4   Earnings of Similar Individuals .............................................. 5

        2.2.5   But-For Earnings Summary ..................................................... 6

    2.3   Actual Earnings .................................................................................... 6

        2.3.1   2008 Post-Termination Earnings ............................................ 6

        2.3.2   IEEE Compensation Survey ..................................................... 7

        2.3.3   Economic Slowdown ............................................................... 8

        2.3.4   Actual Earnings Summary ....................................................... 9

    2.4   Discounting of Future Losses ............................................................... 10

    2.5   Lost Earnings Summary ........................................................................ 10

3.  **Lost Stock** .......................................................................................................... **10**

4.  **Conclusion** ......................................................................................................... **11**

## LIST OF APPENDICES

Appendix A ........David R. Perry's Resume, Testimony Experience and Publications

Appendix B ........Documents Considered

Appendix C ........Ms. Sahakian's Lost Earnings

# 1.  Background

## 1.1  Introduction

A complaint filed by Diane Sahakian ("Ms. Sahakian" or "Plaintiff") against STATS ChipPAC, Inc. and STATS ChipPAC Ltd. (collectively, "Defendants") alleges, inter alia:[1]

- Defendants hired Ms. Sahakian in August 1999.

- Defendants removed Ms. Sahakian from supervising her group and transferred her to a new position entitled Special Project in or around July 2007.

- Defendants terminated Ms. Sahakian in July 2008.

- Defendants' actions against Ms. Sahakian represent discrimination, retaliation and/or wrongful termination ("Alleged Actions").

- Ms. Sahakian suffered economic damages as a result of the Alleged Actions.

## 1.2   Scope of Engagement

Ms. Sahakian's counsel engaged David R. Perry of Sterling Group LLC ("Sterling") to determine the economic damages suffered by Ms. Sahakian as a result of the Alleged Actions.

Mr. Perry's resume, testimony experience and publications are provided in Appendix A.  Mr. Perry is charging $275 an hour for his work in this matter.

Sterling reviewed the documents listed in Appendix B in the course of the analysis.  Sterling understands discovery continues in this matter and Defendants have yet to produce information relevant to a damage analysis in this matter.  Sterling may revise and/or supplement the analysis if additional information is provided.

## 1.3   Fundamental Assumption

Sterling assumed Defendants are liable for the Alleged Actions to create a basis for a damage calculation.  Sterling's assumption provides no support for Ms. Sahakian's liability claims.  If Defendants are not found to be liable for the Alleged Actions, all damage calculations are irrelevant.

---

[1]    "First Amended Complaint" dated September 29, 2008.

Sterling Group LLC
Diane Sahakian v. STATS ChipPAC, Inc., et al

## 2.  Lost Earnings

Ms. Sahakian's lost earnings are the difference between the earnings that she would have made but-for the Alleged Actions ("But-For Earnings") and the earnings that she actually has made or will make in the future ("Actual Earnings").

### 2.1  Retirement Date

Ms. Sahakian was born on April 23, 1961 and has a bachelor's degree.

Ms. Sahakian informed Sterling that she did not have any specific retirement plans prior to her termination.

Ms. Sahakian was approximately 47.2 years old at the time of her termination on July 1, 2008. Worklife expectancy tables show a 47 year old active woman with a bachelor's degree will work for an additional 15.1 years through age 62.1.[2]  Therefore, worklife expectancy tables show Ms. Sahakian would be expected to retire on or around May 30, 2023 at age 62.1.

Based on the above, Sterling assumed Ms. Sahakian would have retired on May 30, 2023 but-for the Alleged Actions.

### 2.2  But-For Earnings

Sterling analyzed the available information to determine Ms. Sahakian's But-For Earnings:

#### 2.2.1 Historical Earnings

Defendants hired Ms. Sahakian on August 23, 1999 and terminated her on July 1, 2008.

Ms. Sahakian's compensation from Defendants included a base salary, various bonuses, employer-paid benefits and stock awards.  Ms. Sahakian provided Sterling with W-2s, earnings statements, salary increase letters, bonus notification letters, tax returns and other documents showing her 2003 to 2008 earnings from Defendants were as follows:

---

[2]    "The Markov (Increment-Decrement) Model of Labor Force Activity:  Extended Tables of Central Tendency, Variation, and Probability Intervals" by Gary R. Skoog and James E. Ciecka, page 68.

Sterling Group LLC
Diane Sahakian v. STATS ChipPAC, Inc., et al

| Year | Salary[3] | Bonus[4] | Stock[5] | Total | Change from Prior Year |
|---|---|---|---|---|---|
| 2003 | $127,300 | $4,022 | $- | $131,322 | NA |
| 2004 | $136,570 | $7,010 | $- | $143,580 | 9.3% |
| 2005 | $143,835 | $49,683 | $- | $193,518 | 34.8% |
| 2006 | $156,750 | $60,354 | $- | $217,104 | 12.2% |
| 2007 | $165,300 | $39,085 | $122,508 | $326,893 | 50.6% |
| 2008 (to 7/1) | $83,700 | $31,217 | $- | $114,917 | -64.8% |

The above table shows Ms. Sahakian's total earnings from Defendants increased substantially in each year from 2003 to 2007.  In addition to increasing Ms. Sahakian's base salary and giving her bonuses and stock awards, the available documents show Defendants promoted Ms. Sahakian on several occasions prior to the Alleged Actions.

Sterling understands Ms. Sahakian's base salary was not decreased when she was removed from supervising her team and reassigned to a "Special Project" role in mid 2007.  Ms. Sahakian informed Sterling that the short term incentive bonus she received in early 2008 was adversely affected by the Alleged Actions.  The above table shows Ms. Sahakian's 2008 bonus was lower than the bonus she received in each of the three previous years.  Additionally, documents show the short term incentive bonus received by Ms. Sahakian in early 2007 was 25% higher than the short term incentive bonus that she received in early 2008.[6]  Ms. Sahakian's 2005 and 2006 bonuses included retention payments of $29,683 and $30,087 respectively in addition to a short term incentive bonus in each year.

The employer-paid benefits received by Ms. Sahakian included statutory benefits (i.e., social security and Medicare contributions), life insurance, short-term disability insurance, various health insurances and retirement contributions.  The following information is available on the cost of these benefits to Defendants:

- The cost of statutory benefits to employers is 7.65% of an employee's earnings (6.2% for social security and 1.45% for Medicare) subject to an annual maximum for social security.

- An email from Gail Uy dated January 22, 2008 shows the cost to Defendants of Ms. Sahakian's medical, dental, vision and employee assistance program benefits totaled $7,637 in 2007.

- Defendants matched 50% of the first 6% of Ms. Sahakian's contribution to a 401k plan.  Ms. Sahakian typically contributed the maximum amount allowable for tax purposes (i.e.,

---

[3]  Items marked "regular", "float holiday", "holiday", "retro earns", "sick" and "vacation" on earnings statements and/or other documents.

[4]  Items marked "bonus", "retention bonus", "sti" (short term incentive), "recognition bonus" and "retention" on Ms. Sahakian's earnings statements and/or other documents.

[5]  Items marked "non qualified" and "espp match" on Ms. Sahakian's earnings statements and/or other documents.

[6]  $39,085 received in early 2007 and $31,217 received in early 2008.

$15,000 and $15,500 in 2006 and 2007 respectively), which represented more than 6% of her salary and bonus earnings in each year. Therefore, the cost to Defendants of the matching contributions was 3% of Ms. Sahakian's salary and bonus earnings in those years.

- No information has been produced to date on the cost to Defendants of the life insurance and short term disability insurance provided to Ms. Sahakian.

Ms. Sahakian ceased receiving pay and benefits from Defendants on July 1, 2008 as shown by a letter stating:

> "Your final day of employment and final day in the office is July 1, 2008. You will be paid through July 1, 2008. All medical insurances cease the last day of the month you terminate and your life insurance will cease on your date of termination."

Defendants had awarded stock options and restricted stock awards to Ms. Sahakian at various times. Ms. Sahakian's economic loss related to unvested restricted stock awards is discussed in a later section of this report.

### 2.2.2 Non-Reimbursed Expenses

Ms. Sahakian informed Sterling that she did not incur any non-reimbursed expenses related to her employment by Defendants. Ms. Sahakian's statement is consistent with her tax returns, which do not show any deductions for unreimbursed employee business expenses.

### 2.2.3 Economic Slowdown

Defendants are a "…leading semiconductor test and advanced packaging service provider".[7] As detailed later in this report, the semiconductor and hi-tech industry as a whole has experienced a sharp downturn in late 2008 after the problems in the housing and financial sectors spread to other sectors of the economy.

Defendants recently reported strong revenue growth, lower profits and increased capital spending in the third quarter of 2008. Specifically:

> "Tan Lay Koon, President and Chief Executive Officer of STATS ChipPAC, said, 'Revenue for the third quarter of 2008 of $472.2 million increased by 8.8% over prior quarter and by 14.0% over the third quarter of 2007. We recorded strong revenue growth in the third quarter despite the challenging global macroeconomic conditions with broad-based customer demand increase in all major markets.'
>
> Net income for the third quarter of 2008, including $21.1 million in equipment impairment charges and $5.1 million in restructuring expenses, decreased by 71.7% to $7.9 million or $0.00 per diluted ordinary share, compared to net

---

[7]    Press release entitled "STATS ChipPAC Reports Third Quarter 2008 Results" dated October 29, 2008.

income of $27.9 million or $0.01 per diluted ordinary share in the third quarter of 2007.

John Lau, Chief Financial Officer of STATS ChipPAC, said, 'We implemented cost control measures to closely align expenses with our business growth and profitability, resulting in restructuring expenses of $5.1 million in the third quarter of 2008.  Gross margin for the third quarter of 2008 was 18.5% compared to 17.2% in the prior quarter, and 20.3% in the third quarter of 2007.  Our operating margin for the third quarter of 2008, including $21.1 million in equipment impairment charges and $5.1 million in restructuring expenses, was 4.6% of revenue, compared to 8.1% in the prior quarter, and 11.7% in the third quarter of 2007.  Capital spending in the third quarter of 2008 was 20.6% of revenue compared to 14.8% in the prior quarter, and 21.4% in the third quarter of 2007.  Capital spending increased as we invested in a new wafer bump line to support the growth of our flip chip business.'"[8]

Ms. Sahakian informed Sterling that Defendants may have implemented forced vacations and/or a hold on merit pay increases to control expenses in response to the slowdown.  Sterling understands Defendants have not produced documents discussing any actions recently taken to control expenses.  A later section of this report shows other major companies in the industry have taken actions to control expenses in response to the slowdown and these factors have adversely impacted Ms. Sahakian's ability to find suitable replacement employment.

### 2.2.4  Earnings of Similar Individuals

In discrimination and/or wrongful termination cases, it is often relevant to analyze the earnings and performance of similar individuals before and after the complained-about acts in order to estimate a plaintiff's lost earnings.

Given the economic downturn, recent information on compensation paid to individuals employed by Defendants would be useful to help determine the effect, if any, that the slowdown would have had on Ms. Sahakian's earnings but-for the Alleged Actions.

Sterling understands Ms. Sahakian requested Defendants to produce compensation information from 2003 through present for at least five individuals (i.e., Mike Schraeder, Joe Adam, Blake Gillett, Raj Pendse and Flynn Carson).  Furthermore, Sterling understands Defendants have not produced the requested information to date.

As a result, Sterling has been unable to (i) compare Ms. Sahakian's pre-termination earnings to the earnings of the five individuals, (ii) analyze what each of the five individuals have earned since Ms. Sahakian's termination and/or (iii) consider the information in determining Ms. Sahakian's But-For Earnings.

---

[8]    Press release entitled "STATS ChipPAC Reports Third Quarter 2008 Results" dated October 29, 2008.

Sterling Group LLC
Diane Sahakian v. STATS ChipPAC, Inc., et al

## 2.2.5 But-For Earnings Summary

Based on the available information, Sterling calculated Ms. Sahakian's But-For Earnings using the following assumptions:

- Ms. Sahakian would have remained employed by Defendants until her retirement.

- Ms. Sahakian's 2007 salary and bonus earnings represent the appropriate base amounts to use in determining her future salary and bonus earnings from Defendants but-for the Alleged Actions.[9]

- Ms. Sahakian's salary and bonus earnings from Defendants would, on average, have increased by inflation in each year until her retirement in 2023 but-for the Alleged Actions.[10]

- Ms. Sahakian would have received statutory benefits from Defendants equal to 7.65% of her but-for salary and bonus earnings in each year subject to applicable maximums.

- Ms. Sahakian would have received health insurances, life insurance and short-term disability benefits equal to at least $8,000 in 2008 and the value of these benefits would have increased by inflation in each future year.

- Ms. Sahakian would have received retirement benefits equal to 3% of her salary and bonus earnings in each year.

## 2.3   Actual Earnings

Sterling analyzed the available information to determine Ms. Sahakian's Actual Earnings:

## 2.3.1 2008 Post-Termination Earnings

Ms. Sahakian informed Sterling:

- She has had no earned income since her July 1, 2008 termination.[11]

- She has not found replacement employment to date.

- Her opportunities are currently limited because of the state of the economy.

---

[9]  Ms. Sahakian's economic damages from lost stock awards are calculated in a later section of this report.

[10]  Ms. Sahakian's earnings from Defendants had, on average, increased by substantially more than inflation annually between 2003 and 2007 as shown earlier in the report.  However, Sterling reduced the average increase to inflation to take account of the fact that earnings increases may be lower or non-existent during economic slowdowns.

[11]  Ms. Sahakian has received unemployment compensation which Sterling understands to be a collateral source that is excluded in determining Ms. Sahakian's lost earnings.

**2.3.2 IEEE Compensation Survey**

"The Institute of Electrical and Electronics Engineers -- United States of America (IEEE-USA) promotes the career and public policy interests of more than 220,000 U.S. members of the IEEE, the world's largest technical professional society, with a total membership of more than 360,000 electrical, electronics and computer engineers and computer scientists in approximately 165 countries. For more than 30 years, IEEE-USA has been conducting, analyzing, and distributing a salary and fringe benefit survey of IEEE members in the United States. The aim of the project is to provide timely information on current and long-term trends related to the income, salary and benefits of electrotechnology professionals in the United States. The information is critical for accurate understanding of compensation practices in these occupations, including how those practices impact on individual professionals."[12]

"IEEE-USA's compensation surveys set high standards. In 1991 the society began to test the use of regression-based mathematical models as a means to generate much more robust, specific estimates of pay. This work has led to the web-based individual compensation analyzer in use today, a tool that can generate accurate, detailed estimates for complete ranges of base salaries for literally hundreds of thousands of different employment situations, allowing simultaneously for variations in experience, training, areas of specialization, employer characteristics, geographic locations, and other factors that affect compensation. Conventional tabulation-based treatments of salary data cannot yield such results. Internet-based data collection for the surveys was begun in 1999 and moved entirely to the web in 2001. Now further changes have been made. Distribution of results from the surveys, as well as collection of data, is now a web-based operation, and includes the capacity for extensive custom database queries for users of the surveys. Data collection has moved toward real-time tracking of compensation trends, with new information added quarterly. These systems solidify IEEE-USA's status as the most reliable and innovative source of information in the world on the compensation of technical professionals."[13]

Sterling used the information in the IEEE-USA compensation survey to estimate the earnings that Ms. Sahakian can expect when she finds suitable replacement employment. Specifically, Sterling analyzed data from the latest compensation survey published in September 2008. A major factor affecting Ms. Sahakian's compensation from replacement employment is the responsibility level at which Ms. Sahakian will be hired. Ms. Sahakian informed Sterling that many large technology companies require new hires to join at levels below their capabilities to allow them to assimilate into the organization.

Ms. Sahakian informed Sterling that her qualifications and experience would allow her to perform the responsibilities required for individuals in the "Engineer Level 8" classification in the IEEE-USA compensation study. The Engineer Level 8 classification is defined as follows:

> "Makes decisions and recommendations that are recognized as authoritative and have a far-reaching impact on extensive engineering and related activities of the company. Negotiates critical and controversial issues with top-level engineers

---

[12] http://salaryapp.ieeeusa.org.
[13] http://salaryapp.ieeeusa.org.

Sterling Group LLC
Diane Sahakian v. STATS ChipPAC, Inc., et al

and officers of other organizations and companies. Demonstrates a high degree of creativity, foresight, and importance. Receives general administrative direction. Supervises several subordinate supervisors or team leaders. As an individual researcher and consultant, may be assisted on individual projects by other engineers or technicians."[14]

Ms. Sahakian informed Sterling that her job search efforts to date have indicated that she would more likely be hired into a position with responsibilities as described in the "Engineer Level 6" classification in the IEEE-USA compensation study. The Engineer Level 6 classification is defined as follows:

"Technical responsibility for interpreting, organizing, executing, and coordinating assignments. Plans and develops engineering projects with unique or controversial problems which impact major company programs. Involves exploration of subject area, definition of scope and selection of problems for investigation, novel concepts and approaches. Maintains liaison with individuals and units within or outside the organization, with responsibility for acting independently on technical matters. Work at this level requires extensive progressive experience. Supervision received is administrative, with assignments given in terms of general objectives and limits. Plans, organizes, and supervises the work of a staff of engineers and technicians. Evaluates progress and results obtained, recommends major changes to achieve objectives. As individual researcher or staff specialist, may be assisted on individual projects."[15]

The September 2008 IEEE-USA compensation survey shows the following median earnings for individuals working in Phoenix as Engineer Level 6 and Engineer Level 8:

| Responsibility Level | Median Base Salary | Median Salary and Bonuses |
| --- | --- | --- |
| Engineer Level 6 | $118,500 | $130,700 |
| Engineer Level 8 | 138,700 | 156,300 |
| Mid-point | $128,600 | $143,500 |

The above amounts are lower than the compensation received by Ms. Sahakian from Defendants in 2007 (i.e., base salary of $165,300 and combined salary and bonus of $204,385). This supports Ms. Sahakian's opinion that she will not be able to find a replacement position that pays as much as she was earning from Defendants.

### 2.3.3 Economic Slowdown

Numerous press releases over the last few months by companies in the semiconductor and high tech industry have discussed upcoming layoffs, hiring restrictions and other cost control measures.

---

[14]  http://salaryapp.ieeeusa.org.
[15]  http://salaryapp.ieeeusa.org.

Sterling Group LLC
Diane Sahakian v. STATS ChipPAC, Inc., et al

An October 8, 2008 article entitled "Semi equipment demand not expected to recover until 2010, Gartner reports" states:

> "As the global economic slowdown continues to have a significant impact on the semiconductor industry, capital spending is still slowing across the board, with all segments seeing a decline in capital spending in 2008 and through 2009, according to market researchers at Gartner Dataquest.
>
> The company said oversupply in memory, combined with a slowing consumer market due to the uncertain economic picture, gives little hope for an upside until 2010 with the most likely scenario showing capital spending declining 25.7% in 2008 and down by another 12.8% in 2009 with growth expected to return in 2010.
>
> As such, Gartner recommends that the semiconductor industry prepare for a prolonged downturn while device manufacturers adjust supply to meet slowing demand, with equipment suppliers needing to prepare for a slower-than-anticipated 2009 and potentially fewer memory customers when the industry returns to health."[16]

Gartner is a respected research firm in the high-tech industry. Gartner's website states the firm advises "technology vendors, large and small, all over the world" and "…has helped technology vendors grow by collecting and interpreting critical IT and telecom market data, and translating it into actions for success" for over 30 years.[17]

Since the Gartner study was released in early October 2008, the economic situation has deteriorated further forcing numerous actions by governments worldwide.

### 2.3.4 Actual Earnings Summary

Based on the available information, Sterling calculated Ms. Sahakian's Actual Earnings using the following assumptions:

- Ms. Sahakian will find a position on January 1, 2010 with annual compensation at the mid-point of the Engineer Level 6 and Engineer Level 8 classifications from the IEEE-USA compensation survey.

- Ms. Sahakian will remain employed in this position until her retirement.

- Ms. Sahakian's earnings from the replacement position will, on average, increase by inflation in each year until her retirement.[18]

---

[16]  www.edn.com.
[17]  www.gartner.com.
[18]  The inflation-based growth rate assumption is consistent with the assumption used to calculate Ms. Sahakian's But-For Earnings.

Sterling Group LLC
Diane Sahakian v. STATS ChipPAC, Inc., et al

- Ms. Sahakian will receive statutory benefits from the replacement position equal to 7.65% of her earnings in each year subject to applicable maximums.

- Ms. Sahakian will receive health benefits from the replacement position equal to the health benefits that she would have received from Defendants in each year.

- Ms. Sahakian will receive retirement benefits from the replacement position equal to 3% of her earnings in each year.[19]

## 2.4    Discounting of Future Losses

Sterling discounted Ms. Sahakian's future lost earnings back to December 31, 2008 using discount rates based on U.S. Treasury securities with terms matching the discount period. Sterling may update the discount date and discount rates once a trial date is known.

## 2.5    Lost Earnings Summary

Based on the above, Ms. Sahakian's lost earnings as a result of the Alleged Actions are $1,276,988 as detailed on Appendix C.

## 3.    Lost Stock

Defendants awarded Ms. Sahakian 32,200 shares under the STATS ChipPAC Restricted Share Plan ("RSP") on February 16, 2007 with approximately 1/3rd of the shares scheduled to vest after each of the following three years. Ms. Sahakian received the 10,730 shares that vested on February 16, 2008 and made a profit of $9,465 or approximately $0.88 per share. Ms. Sahakian was terminated prior to the vesting date for the remaining 21,470 shares and informed Sterling that she received no compensation for the lost shares.

Additionally, Defendants awarded Ms. Sahakian 45,000 shares under the STATS ChipPAC Performance Share Plan ("PSP") on February 16, 2007 with all of the shares scheduled to vest on February 16, 2010. Ms. Sahakian was terminated prior to the vesting date for the 45,000 shares and informed Sterling that she received no compensation for the lost shares.

Ms. Sahakian would still have worked for Defendants as of the vesting dates for the lost 66,470 shares under the RSP and PSP but-for the Alleged Actions and, therefore, is entitled to damages for the value of the lost shares.

Defendants filed a Form 6-K with the Securities and Exchange Commission on November 7, 2008 stating:

- Defendants decided to terminate the PSP and RSP in January 2008 and the termination became effective at the end of March 2008.

---

[19]    The 3% assumption is consistent with the matching contributions paid by Defendants.

- Defendants cancelled all outstanding shares under the PSP in the three months ended June 29, 2008 and, as a result, recorded $1.6 million of accelerated share-based compensation expense in the nine months ended September 28, 2008.

- Millions of shares under the RSP remain outstanding as of September 28, 2008.

Based on the above, Ms. Sahakian would likely have received compensation payments in respect to the cancellation of 45,000 unvested PSP shares but-for the Alleged Actions. Additionally, it is reasonable to expect compensation payments will be paid in the future when the outstanding RSP shares are cancelled and that Ms. Sahakian would have received payments for 21,470 unvested RSP shares. The information in the Form 6-K is insufficient to show whether the payments varied by individual and if so, how. Furthermore, Sterling understands Defendants have failed to produce documents to date showing the specific compensation payments already made and/or expected to be made in the future to employees who would have been in a similar situation to Ms. Sahakian but-for the Alleged Actions.

Based on the available information, Sterling valued the lost 66,470 shares using the approximately $0.88 per share profit received from the shares that vested in February 2008, which results in a total loss of $58,494.[20]

Ms. Sahakian informed Sterling that Defendants have introduced an alternative Bonus Bank Plan to replace stock awards. Defendants have not yet produced any information showing how much has been awarded under the Bonus Bank Plan to employees who would have been in a similar situation to Ms. Sahakian but-for the Alleged Actions. At this time, Sterling's damage calculation excludes any awards that would have been made to Ms. Sahakian under the Bonus Bank Plan prior to her retirement in May 2023 but-for the Alleged Actions. Sterling may update this assumption and include damages for lost awards under the Bonus Bank Plan after additional discovery and/or further analysis is performed.

## 4. Conclusion

Based on the available information, Ms. Sahakian's economic damages total $1,335,482 comprising (i) lost earnings of $1,276,988 and (ii) lost stock of $58,494.

Sterling may update this analysis if further information is provided and/or additional analysis is performed.

_____        _____
David R. Perry                          Date
For the Firm

12/4/08

---

[20]   66,470 * $0.88 = $58,494.

# David R. Perry's Resume, Testimony Experience and Publications

## Summary

Mr. Perry is President and Founder of Sterling Group LLC.  He is a Certified Public Accountant, Accredited in Business Valuation, Certified in Financial Forensics and a British Chartered Accountant.  He has over twenty years of experience in accounting and finance.  His areas of expertise include damage calculations, financial investigations and business valuations.  He has consulted for companies in numerous industries and has been based in the major financial capitals of New York, London and Singapore.  He received the highest score in Arizona when he took the examination to become a Certified Public Accountant.

## Selected Experience

### Litigation Support

Provided consulting services in numerous legal actions including:

- Breach of Contract
- Breach of Fiduciary Duty
- Business Interruption
- Construction Defect/Delay
- Discrimination
- Fraud
- Intellectual Property
- Marital Dissolution
- Personal Injury
- Professional Malpractice
- Securities
- Wrongful Death
- Wrongful Termination

### Damage Calculations

Determined the damages in a lawsuit in which a multi-billion dollar corporation alleged copyright infringement and trade secret misappropriation of its software products.  Calculated plaintiff's lost profits and defendant's gained profits.  Presented findings in successful mediation.

Analyzed the damages in a lawsuit alleging patent infringement in the gaming products industry.  Assessed the demand for, and supply of, the product and used the results to forecast future cash flows.  Analyzed historic royalty arrangements for similar products.

Calculated the damages in a lawsuit involving an alleged oral agreement for a truck part.  Calculated damages assuming the alleged oral agreement had existed.  Analyzed whether the alleged oral agreement was commercially reasonable.

**David R. Perry's Resume, Testimony Experience and Publications**

_____

Assessed the damages in a multi-million dollar lawsuit alleging trade secret and trademark infringement of a quality improvement methodology. Calculations involved restating income statements as if the infringement had not existed.

Determined the damages in a multi-million dollar lawsuit against an insurance carrier related to a claim for mold contamination of an apartment complex. Calculation involved the apartment complex's lost rents and profits based on an analysis of relevant factors.

Analyzed the damages in a matter involving the development of a master-planned community of approximately 1,000 homes. Calculation involved a comparison of the expected profits from the development with the actual profits from the development.

Assessed the damages in a lawsuit alleging fraud and misrepresentation on the part of a leading accounting firm. Calculations included the tax-effected value of real estate and related loans over a period of 20 years.

Determined a reasonable royalty in a patent infringement case involving health products. Included an analysis of the "Georgia-Pacific" factors and the forecast performance of the infringing companies.

Calculated the present value of lost earnings and household services in a wrongful death case. Analyzed the future expected profits from the deceased's business and quantified his personal expenses.

Determined the present value of lost earnings in a wrongful dismissal case. Calculated the difference between the plaintiff's expected earnings in the position from which he was dismissed and his expected earnings in his new position.

Assessed the present value of future medical costs and lost earnings in a personal injury case involving alleged medical malpractice at the time of a child's birth. Researched appropriate earnings, discount rates and growth rates.

*Financial Investigations*

Performed an investigation of a manufacturing company as part of a dispute over the accuracy of financial statements used in a $90 million acquisition. Quantified multi-million dollar errors in the financial statements despite poor records and missing documents. Analyzed the auditor's work papers to identify why the company's audits had failed to identify the misstatements.

Managed the audit of one of the world's largest banks. Coordinated audit work in over 30 countries. Communicated directly with Senior Management and federal regulators. Analyzed complex business transactions. Reviewed SEC filings.

## David R. Perry's Resume, Testimony Experience and Publications
_____

Assisted a Stanford law professor to determine whether certain companies had complied with various federal and state statutes that governed their activities.  Analysis included identification and quantification of the companies' activities over a 10-year period.

Identified fund flows and business relationships in a bankruptcy matter alleging global money laundering and fraud.  Reviewed information produced by banks and other parties in numerous countries over a 15-year period.

Performed electronic matching on millions of records in multiple databases as part of a lawsuit alleging failure to make agreed commission payments on the sales of certain financial products.

Analyzed alleged misstatements in financial statements used to calculate the earn-out payments that formed part of the purchase price of a furniture manufacturer.

Scrutinized documentation on the expenditures authorized by a senior executive of a professional sports league in an employment related lawsuit.  Analyzed the executive's adherence with the league's internal controls.

*Business Valuations*

Valued over ten billion dollars worth of telecommunications companies as part of a divorce proceeding.  Interests valued included minority and majority holdings of private companies and a substantial holding of a public company.

Assessed the value of a chiropractic business as of multiple dates in a professional malpractice action.  Valuation issues included the accuracy of issued financial statements and the identification of issues that caused the value of the business to change over time.

Valued the business of a homebuilder in connection with a lawsuit with a homeowners' association.  Analyzed the financial prospects for the homebuilder at the time of the valuation.

Determined the current value of over $30 million of bonds in connection with an alleged infringement of the Securities Act of 1933.  The work required understanding the expected future financial performance of a utility infrastructure project that the bonds funded.

Valued a multi-million dollar business that cleans the tools used to manufacture microchips in connection with a marital dissolution.

*Other*

Managed a team of business analysts, systems analysts and computer programmers to design and implement a customer/product information system in over 30 countries with different operational systems and processes.

## David R. Perry's Resume, Testimony Experience and Publications
_____

Managed a team of accountants and consultants to perform an Operational Review of the second-largest bank in Romania.  Presented the resulting report to the bank's Board of Directors and officials of the World Bank and European Commission.

Performed a key role in the restructure of the U.S. operations of a major international bank to eliminate duplicate and non-core businesses and increase profitability.

Designed and implemented a management information system that provided information on revenues, costs and risks for a business that trades foreign exchange and interest rate products.

Managed due diligence assignments for companies seeking to expand in the U.K. and Eastern Europe.  Presented comprehensive reports arising from these assignments to Senior Management and Boards of Directors.

Analyzed the benefits, costs and risks of alternative general ledger options for a large U.S. bank. Made recommendations to Senior Management that resulted in improved quality reporting and significant cost savings.

Managed the design and implementation of risk management processes to provide a stronger internal control environment for the U.S. operations of a major international bank and an improved grading by the Federal Reserve Board.

Prepared a Business Continuity Plan for a complex $30 million business.  Conducted a business impact analysis, developed recovery alternatives and recommended the preferred recovery route. The plan was approved by the Federal Reserve Board.

Assisted in the preparation of London Stock Exchange listing documents and Bank of England applications for various international banks seeking to raise capital and/or open branches in London.

**Professional History**

| | | |
|---|---|---|
| Sterling Group LLC | Founder and President | Scottsdale |
| Lancaster Consulting | Principal Consultant | Phoenix |
| Standard Chartered Bank | Vice President - Finance | New York and Singapore |
| KPMG | Senior Manager | London, Houston and New York |

Appendix A

# David R. Perry's Resume, Testimony Experience and Publications

---

**Professional Qualifications and Affiliations**

Certified Public Accountant in Arizona (Honored for highest score in Arizona on CPA examination).

"Accredited in Business Valuation" by the American Institute of Certified Public Accountants.

"Certified in Financial Forensics" by the American Institute of Certified Public Accountants.

Fellow of the Institute of Chartered Accountants of England and Wales.

Member of the American Institute of Certified Public Accountants.

Member of the Arizona Society of Certified Public Accountants.


**Education and Training**

Bachelor's degree in Physics from London University in England (Highest Honors).

Post-graduate studies in accounting leading to Chartered Accountant qualification.

Numerous technical skills and management development courses in the U.K. and U.S.


**Testimony Experience**

Smith v. BNSF Railway Company
Maricopa County Superior Court, Arizona
Date of deposition testimony: July 2, 2008

Marquette Equipment Finance, LLC v. Rowe Fine Furniture, Inc., et al
United States District Court, Eastern District of Virginia
Date of deposition testimony: February 23, 2008

Mirage Crossing Resort Casitas HOA, Inc. v. Mirage Homes Construction, Inc. et al
Maricopa County Superior Court
Date of deposition testimony: July 12, 2007

Abbett, et al v. Terravita Corp., et al
Maricopa County Superior Court, Arizona
Date of deposition testimony:  March 1, 2007

# David R. Perry's Resume, Testimony Experience and Publications

Advante, et al v. Mintel, et al
United States District Court, Northern District of California
Date of deposition testimony: February 8, 2007

Allen, et al v. Del Webb's Coventry Homes, Inc., et al
Maricopa County Superior Court, Arizona
Date of deposition testimony:  January 19, 2007

Eagle Mountain Community Association v. Eagle Mountain Investors, LLC
Maricopa County Superior Court, Arizona
Date of deposition testimony:  June 28, 2006
Date of trial testimony: July 19, 2006

Lefkowitz v. CIGNA, et al
Maricopa County Superior Court, Arizona
Date of deposition testimony:  March 30, 2006

Shuffle Master, Inc. v. Awada, et al.
United States District Court, District of Nevada
Date of deposition testimony: March 1, 2006

Geraci v. Schimweg, et al
Arbitration in Phoenix, Arizona
Date of deposition testimony: January 21, 2005

Blakemore v. Blakemore
Maricopa County Superior Court, Arizona
Date of deposition testimony: October 15, 2004
Date of trial testimony: October 18, 2004 and October 19, 2004

Barnett v. CIGNA
United States District Court, District of Arizona
Date of trial testimony: August 20, 2004

Brake Masters Systems, Inc. v. Shajari, et al.
Arbitration in Phoenix, Arizona
Date of arbitration testimony: May 11, 2004

North American Enterprises v. McLeodUSA
Maricopa County Superior Court, Arizona
Date of deposition testimony: March 16, 2004
Date of trial testimony: April 6, 2004

# David R. Perry's Resume, Testimony Experience and Publications

Brake Masters Systems, Inc. v. Castillo, et al.
Arbitration in Tucson, Arizona
Date of arbitration testimony: March 10, 2004

Lewis v. Smith, et al.
United States District Court, District of Arizona
Date of deposition testimony: June 25, 2003

Brake Masters Systems, Inc. v. Diehl, et al.
Arbitration in Tucson, Arizona
Date of arbitration testimony: May 6, 2002

Autumn Creek Associates et al. v. TIG Insurance Company
Lawsuit in Phoenix, Arizona
Date of deposition testimony: February 27, 2001

**Mediation Experience**

Yelas v. Nautilus Insurance Company
Phoenix, Arizona
Date of mediation: May 26, 2007

Eagle Mountain Community Association v. Eagle Mountain Investors, LLC
Phoenix, Arizona
Dates of mediation: January 12, 2005

In re: Berkshire Realty Shareholder Litigation
Boston, Massachusetts
Date of mediation: February 3, 2004

Compuware Corporation v. Serena Software Inc.
San Francisco, California
Date of mediation: June 12, 2000

**Speaking Engagements (last ten years)**

"Accounting 101 for Lawyers"
Maricopa County Bar Association.  2002

"Foreign Currency Risk Management"
International Issues Conference of the Arizona Society of Certified Public Accountants. 2000

# David R. Perry's Resume, Testimony Experience and Publications

---

"Intellectual Property Valuation and Infringement Damages"
Business Valuation Committee of the Arizona Society of Certified Public Accountants. 2000

"Valuation Premiums and Discounts"
Business Valuation Committee of the Arizona Society of Certified Public Accountants. 1999

"Accounting for Lawyers"
Maricopa County Bar Association. 1998

"Fraud & Money Laundering"
Financial Institutions Committee of the Arizona Society of Certified Public Accountants. 1998

**Publications (last ten years)**

"Year 2000 – Mitigating the Business and Legal Risks"
Maricopa County Bar Association.  1999

**Diane E. Sahakian v. STATS ChipPAC, Inc., et al
Documents Considered**

1. "Complaint" dated February 6, 2008.

2. "Defendants' Answer to Complaint" dated April 8, 2008.

3. "Joint Report of Scheduling Conference" dated June 2, 2008.

4. "Scheduling & Planning Order" dated June 4, 2008.

5. "Order from Chambers" filed August 14, 2008.

6. "Stipulation for Plaintiff to Amend Her Complaint" dated September 29, 2008.

7. "First Amended Complaint" dated September 29, 2008.

8. "Motion to Withdraw as Counsel" dated October 23, 2008.

9. "Notice of Appearance and Joinder in Mr. Schleier's Request to Extend Deadlines" dated November 5, 2008.

10. "Order" dated November 6, 2008 on "Motion to Withdraw as Counsel".

11. Various pay stubs, W-2's, letters, print-outs and other documents showing Ms. Sahakian's earnings from Defendants.

12. Relevant pages of Ms. Sahakian's income tax returns from 2005 to 2007.

13. Ms. Sahakian's resume.

14. Various documents discussing Ms. Sahakian's employee benefits from Defendants.

15. Various documents related to Ms. Sahakian's unemployment compensation.

16. Various industry articles discussing recent financial performance of and actions taken by certain semiconductor and high tech companies.

17. Organizational flowchart prepared by Ms. Sahakian.

18. Gary R. Skoog and James E. Ciecka, "The Markov (Increment-Decrement) Model of Labor Force Activity:  New Results Beyond Work-Life Expectancies", *Journal of Legal Economics,* 11(1), 2001.

19. Gary R. Skoog and James E. Ciecka, "The Markov (Increment-Decrement) Model of Labor Force Activity:  Extended Tables of Central Tendency, Variation, and Probability Intervals", *Journal of Legal Economics,* 11(1), 2001.

Appendix B

**Diane E. Sahakian v. STATS ChipPAC, Inc., et al**
**Documents Considered**

20. Information from:

- http://finance.yahoo.com
- http://findarticles.com
- http://money.cnn.com
- www.amkor.com
- www.edn.com
- www.federalreserve.gov
- www.gartner.com
- www.ieee.org
- www.ieeeusa.org
- www.irs.gov
- www.marketwire.com
- www.payscale.com
- www.philadelphiafed.org
- www.sec.gov
- www.statschippac.com
- www.themoneyalert.com

Diane Sahakian v. STATS ChipPAC, Inc., et al

Appendix C

Ms. Sahakian's Lost Earnings

| | | But-For Earnings [1] | | | | | Actual Earnings [7] | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start of Period | End of Period | Salary and Bonuses [2] | Statutory Benefits [3] | Health and Other Insurances [4] | Retirement Contributions [5] | Total But-For Earnings [6] | Salary and Bonuses [8] | Statutory Benefits [9] | Health and Other Insurances [10] | Retirement Contributions [11] | Total Actual Earnings [12] | Lost Earnings [13] | Discount Period [14] | Discount Rate [15] | Present Value of Lost Earnings [16] |
| 01/01/08 | 12/31/08 | $ 209,495 | $ 9,362 | $ 8,000 | $ 6,285 | $ 233,142 | $ 114,917 | $ 7,990 | $ 4,000 | $ 3,448 | $ 130,355 | $ 102,787 | 0.0 | 0.00% | $ 102,787 |
| 01/01/09 | 12/31/09 | 214,732 | 9,596 | 8,200 | 6,442 | 238,970 | - | - | - | - | - | 238,970 | 0.5 | 0.48% | 238,399 |
| 01/01/10 | 12/31/10 | 220,100 | 9,836 | 8,405 | 6,603 | 244,944 | 150,765 | 8,830 | 8,405 | 4,523 | 172,523 | 72,421 | 1.5 | 0.93% | 71,422 |
| 01/01/11 | 12/31/11 | 225,603 | 10,082 | 8,615 | 6,768 | 251,068 | 154,534 | 9,051 | 8,615 | 4,636 | 176,836 | 74,232 | 2.5 | 1.09% | 72,247 |
| 01/01/12 | 12/31/12 | 231,243 | 10,334 | 8,830 | 6,937 | 257,344 | 158,397 | 9,277 | 8,830 | 4,752 | 181,256 | 76,088 | 3.5 | 1.38% | 72,524 |
| 01/01/13 | 12/31/13 | 237,024 | 10,592 | 9,051 | 7,111 | 263,778 | 162,357 | 9,509 | 9,051 | 4,871 | 185,788 | 77,990 | 4.5 | 1.38% | 73,325 |
| 01/01/14 | 12/31/14 | 242,950 | 10,857 | 9,277 | 7,289 | 270,373 | 166,416 | 9,747 | 9,277 | 4,992 | 190,432 | 79,941 | 5.5 | 2.01% | 71,653 |
| 01/01/15 | 12/31/15 | 249,024 | 11,128 | 9,509 | 7,471 | 277,132 | 170,576 | 9,991 | 9,509 | 5,117 | 195,193 | 81,939 | 6.5 | 2.01% | 71,997 |
| 01/01/16 | 12/31/16 | 255,250 | 11,406 | 9,747 | 7,658 | 284,061 | 174,840 | 10,241 | 9,747 | 5,245 | 200,073 | 83,988 | 7.5 | 2.43% | 70,148 |
| 01/01/17 | 12/31/17 | 261,631 | 11,691 | 9,991 | 7,849 | 291,162 | 179,211 | 10,497 | 9,991 | 5,376 | 205,075 | 86,087 | 8.5 | 2.43% | 70,195 |
| 01/01/18 | 12/31/18 | 268,172 | 11,983 | 10,241 | 8,045 | 298,441 | 183,691 | 10,759 | 10,241 | 5,511 | 210,202 | 88,239 | 9.5 | 2.43% | 70,243 |
| 01/01/19 | 12/31/19 | 274,876 | 12,283 | 10,497 | 8,246 | 305,902 | 188,283 | 11,028 | 10,497 | 5,648 | 215,456 | 90,446 | 10.5 | 2.99% | 66,381 |
| 01/01/20 | 12/31/20 | 281,748 | 12,590 | 10,759 | 8,452 | 313,549 | 192,990 | 11,304 | 10,759 | 5,790 | 220,843 | 92,706 | 11.5 | 2.99% | 66,064 |
| 01/01/21 | 12/31/21 | 288,792 | 12,905 | 11,028 | 8,664 | 321,389 | 197,815 | 11,587 | 11,028 | 5,934 | 226,364 | 95,025 | 12.5 | 2.99% | 65,751 |
| 01/01/22 | 12/31/22 | 296,012 | 13,228 | 11,304 | 8,880 | 329,424 | 202,760 | 11,877 | 11,304 | 6,083 | 232,024 | 97,400 | 13.5 | 2.99% | 65,437 |
| 01/01/23 | 05/30/23 | 123,859 | 9,475 | 4,730 | 3,716 | 141,780 | 84,840 | 6,490 | 4,730 | 2,545 | 98,605 | 43,175 | 14.2 | 2.99% | 28,415 |
| | | $ 3,880,511 | $ 177,348 | $ 148,184 | $ 116,416 | $ 4,322,459 | $ 2,482,392 | $ 148,178 | $ 135,984 | $ 74,471 | $ 2,841,025 | $ 1,481,434 | | | $ 1,276,988 |

*Notes*

[1]    Worklife expectancy tables show Ms. Sahakian would have retired on or around May 30, 2023 but-for the Alleged Actions as discussed in the report.

[2]    Ms. Sahakian's 2007 salary and bonus earnings from Defendants increased by inflation in each year as discussed in the report (2.5% 10-year inflation estimate per www.philadelphiafed.org).

[3]    6.2% of but-for salary and bonus earnings for social security and 1.45% of but-for salary and bonus earnings for Medicare subject to annual maximums for social security (www.irs.gov).

[4]    $8,000 2008 employer contribution increased by inflation in each year as discussed in the report (2.5% 10-year inflation estimate per www.philadelphiafed.org).

[5]    Employer retirement contribution equal to 3% of salary and bonus earnings as discussed in the report.

[6]    The sum of [2] to [5].

[7]    Assumed retirement on May 30, 2023 (i.e., consistent with the But-For Earnings calculation).

[8]    Actual earnings from Defendants for first half of 2008.  Assumed replacement employment starts on January 1, 2010 at estimated median earnings increased by inflation in future years as discussed in the report (2.5% 10-year inflation estimate per www.philadelphiafed.org).

[9]    6.2% of actual salary and bonus earnings for social security and 1.45% of actual salary and bonus earnings for Medicare subject to annual maximums for social security (www.irs.gov).

[10]   $4,000 employer contribution from Defendants for first half of 2008.  Assumed replacement position provides health and other insurances equivalent to those provided by Defendants as discussed in the report.

[11]   3% of salary and bonus earnings from Defendants for first half of 2008.  Assumed replacement position provides employer retirement contribution equal to 3% of salary and bonus earnings as discussed in the report.

[12]   The sum of [8] to [11].

[13]   = [6] - [12].

[14]   For 2009 and future years, number of years between middle of period and December 31, 2008.

[15]   Interest rates on U.S. Treasury securities as of November 26, 2008 per www.federalreserve.gov with terms matching the discount period.

[16]   = [13] / (1 + [15])^[14].