

THE LAW FIRM OF
# **PETER STROJNIK**
ATTORNEY AT LAW

November 6, 2008

Caroline Kathleen Larsen, Esq. *by e-mail only caroline.larsen@ogletreedeakins.com*
Leigh Eric Dowell, Esq. *by e-mail only eric.dowell@ogletreedeakins.com*
Monique DeAnne Young, Esq. *by e-mail only monique.young@ogletreedeakins.com*
Ogletree Deakins Nash Smoak & Stewart PC
2415 E Camelback Rd, Ste 800
Phoenix , Arizona 85016


David J. Ball, Esq. *by e-mail only David.Ball@weil.com*
Weil Gotshal
1300 Eye Street, NW, Suite 900
Washington, DC 20005


Re:   1. *Sahakian v. STATS ChipPAC, Inc. et al* 2:08-cv-00241-HRH

2. In Re *Certain Semiconductor Chips With Minimized Chip Package Size; and Products Containing Same* Investigation No. 337-TA-649

Gentlemen and Gentle Ladies:

My firm has been retained by Ms. Sahakian for representation in the *Sahakian v. STATS ChipPAC, Inc.* matter.  I will also guide Ms. Sahakian in the *In Re Certain Semiconductor Chips With Minimized Chip Package Size; and Products Containing Same* Investigation No. 337-TA-649 patent litigation matter. By the time you receive this letter, you should have received my Notice of Appearance.

1) *Sahakian v. STATS ChipPAC, Inc. et al* **2:08-cv-00241-HRH**

The facts in the *Sahakian v. STATS* case are not complex: STATS committed sexual harassment against Diane.  In response to her complaint, Diane's Korean / Singaporean supervisor commented, "Drink a beer and have a good sleep. It will be ok".  These comments were made at a time when Eric Gongora, whom we currently believe to be a

convicted felon with a history of anger management issues[1], was known to STATS as a "troublemaker". When Diane complained to the EEOC, STATS' Korean / Singaporean supervisors demoted her, created, permitted and encouraged a hostile work environment, and caused her termination. Throughout the events more fully described in Addendum A, the Singaporean and Korean supervisors referred to Diane and other Americans as "fat". "lazy" and otherwise displayed a demeaning, derogatory and inappropriate cultural bias. Indeed, this is a case of great public interest.

Before my firm becomes immersed in litigation, I would like to elicit comments regarding some of the business issues that will arise. As I understand it, Stats ChipPAC, Ltd. is incorporated in Singapore; while it is attempting to go completely private (see delistment from NASDAQ), its shares remain trading on SGX Mainboard of the Singapore Exchange under the ticker symbol SGX-ST: StatsChp[2]. STATS is currently in the process of getting the approval for a "Capital Reduction" - roughly equivalent to dividend distribution - which would permit a cash distribution of $813 million to the shareholders.

STATS is owned 83% by Technologies Semiconductors Pte. LTD. ("STS") STS is a wholly-owned subsidiary of Temasek Holdings, which is in turn owned by the Singaporean Government. Singaporean Government reaps direct gains of STAT's fortunes and incurs direct losses in STAT's misfortunes. My experience in dealing with Singapore disclose that Singaporean government is highly protectionist; its business code is designed to protect its two sources of income - semiconductor business and trade. The government is often involved in private businesses just like STATS. Appearance and façade are highly prized qualities in the Singaporean business environment.

We cannot confirm that Diane's lawsuit has been publicized to STS, Temasek, the Singaporean Government or to the SGX-ST securities market. I would find this failure highly relevant to STATS' guilt. Please comment on this failure.

Lastly, I am in receipt of Mr. Dowell's letter dated November 4, 2008, to Mr. Schleier. I would like to meet with Mr. Dowell in person in my office and discuss the discovery

---

[1] This statement represents our current opinion based on the records in Pinellas County Case No. CRC-9302346CFANO; and the Scottsdale Municipal Court Case No. R-0751-PR-2007002914. We make no factual accusation relative to Mr. Gongora until we have confirmed the identity of the defendants in these cases.

[2] As of today, we can only confirm the Singapore listing, although there are listings with similar company names on the Munich, Taiwan, Stuttgart, Frankfurt and Berlin stock exchanges, and the pink sheets.

issues that have arisen, resolve them all, and enter into a stipulation regarding the same. I would like to discuss the responses to discovery produced by your office, and the timing of depositions for the following persons listed in Defendants' Disclosure Statement:

a)  Jerry Almeida;
b)  Flynn Carson;
c)  Brett Dunlap;
d)  Ng Tiong Gee;
e)  Eric Gongora;
f)  Scott Gooch;
g)  Dr. Han Byung Joon;
h)  Jeff Howell;
i)  Scott Jewler;
j)  Tan Lay Koon;
k)  Cindy Palar;
l)  Nehal Patel;
m) Ram Ramakrishna;
n)  Mike Schraeder;
o)  Chris Shea;
p)  Gaul Uy;
q)  Jeff Yang;
r)  30(b)(6) of STATS ChipPac, Inc.;
s)  30(b)(6) of STATS ChipPac, LTD;
t)  All witnesses listed by Plaintiff.

Beginning November 24, I should be available for depositions through the end of the year. I do have various court appearances in late November and in December, but nothing longer than an hour. I also have oral arguments in the North Dakota Supreme Court in December, but the date has not yet been set. In addition, during December I am on call for travel abroad on an unrelated matter. However, for purposes of scheduling depositions, I suggest we consider the entire month of December open and, if a contingency comes up, we can reschedule.

I would like to meet and discuss the adequacy of Defendants' Disclosure Statement; Defendants' Response to Plaintiff's First Request for Production of Documents; Defendants' Response to Plaintiff's Second Request for Production of Documents; and any other discovery issues that may arise. I am available in the afternoon of November 17, all of November 18 and all of November 20.

Lastly, I recognize I cannot communicate directly with BJ Han, STAT's vice president and chief technology officer or Tan Lay Koon, STAT's President and CEO because of

Peter Strojnik                                Page 4                              11/6/2008

their direct involvement as witnesses in this case[3]. However, would anyone object if I sought direct comment from Mr. Wan Choong Hoe, STAT's Executive VP and Chief Operating Officer regarding upcoming press releases?

   2) **In Re** *Certain Semiconductor Chips With Minimized Chip Package Size; and Products Containing Same* **Investigation No. 337-TA-649**

Diane is under a subpoena to testify on November 18, 2008 at 9:00 a.m. at the offices of Osborn Meladon here in Phoenix. I assume this would be a continuation of the testimony previously given on behalf of STATS. I do not have the transcript or the exhibits of the previous testimony; it would be imperative that I obtain these well prior to the testimony so that Diane may properly prepare for this deposition. Mr. Ball, can you PDF me the transcript and the exhibits? I would also like to extend the time for giving the deposition so that I may bet a complete bearing on the case. Mr. Ball, can you give me a call, 602-524-6602 so that we can discuss representation?

Thank you all for your anticipated courtesy in this matter.

                                        Sincerely,

                                        Peter Strojnik

PS: pjs
CC:
*Client by e-mail only*
Tod F Schleier, Esq. *by e-mail only tod@schleierlaw.com*

---

[3] *Alexander v. Superior Court*, 141 Ariz. 157, 162, 685 P.2d 1309, 1314 (1984) (party divulges secrets to lawyer to secure advice). And, to be privileged, the communication must be made to or by the lawyer for the purpose of securing or giving legal advice, must be made in confidence, and must be treated as confidential. Wigmore, § 2292, at 554. See *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir.1961) ("What is vital to the privilege is that the communication be made in confidence for the purpose of obtaining legal advice from the lawyer.") (Friendly, J.). Thus, not all communications to one's lawyer are privileged. See also *Samaritan Foundation v. Goodfarb*, 862 P.2d 870, 176 Ariz. 497 (Ariz. 11/16/1993)

# ADDENDUM A

## 1) FACTUAL BACKGROUND

### a) The Parties

Sahakian is a 47- year old single mother who began her employment with STATS in August 1999. Plaintiff received her Bachelor of Science degree in Mechanical Engineering from the University of California Santa Barbara. Prior to her employment by Defendants, she successfully worked in various engineering capacities for several semiconductor companies.

Defendant STATS ChipPAC Ltd. ("STATS") provides assembly and testing solutions to customers within the semiconductor industry. Corporate headquarters are located in Singapore. The Company has manufacturing, design, testing and customer support operations throughout Asia and the United States. The Company's customer support offices are centered in the United States, including Phoenix where Sahakian was employed. It is Sahakian's position that she was employed by a wholly-owned subsidiary, STATS ChipPac Inc. (a California corporation), as well as STATS ChipPAC Ltd.

Sahakian was hired as a Product Engineering Manufacturer in August 1999 and was promoted to the position of Senior Product Engineer Manager in May 2001. She received two interim promotions and due to her exemplary job performance, was again promoted to the position of Vice President of Emerging Technology ("ET") in April 2006. As a Vice President in Defendant's Technology Development organization,
Sahakian was one of the very few female executives in the companies. She managed a technical group of approximately seven employees in Phoenix who were responsible for generating the corporate technology roadmaps and emerging technology strategies, and engaging customers in emerging technologies.

Sahakian reported to her supervisor, Dr. Han Byung Joon a/k/a BJ Han ("Han"), Chief Technology Officer, who is employed by Defendant STATS ChipPAC Ltd. and based in Singapore. In September 2004, Scott Jewler, Chief Strategy Officer, became Sahakian's supervisor. As a result of reorganization, Han became Sahakian's supervisor again in August 2006.

Sahakian's personnel file contains her job performance evaluations, bonuses and awards, which demonstrate that she has always been considered a stellar performer by STATS until the events which led to this lawsuit. In Sahakian's 2005 and 2006 performance reviews, it is important to note that during the oral review period, Tan Lay Koon, Chief Executive Officer of STATS, verbally commended Sahakian on her ability to manage a difficult

group and advised her to keep doing what she was doing. In both review periods, Sahakian received satisfactory ratings.

### b) Sahakian Reports Problems Being Created by Subordinate Employees

#### i) Eric Gongora

The hostile work environment created by Sahakian's peers began soon after Eric Gongora, a director subordinate to Sahakian, began to create a clique of male employees in 2006. Gongora had been transferred into her department in November 2004. Soon after the transfer, Scott Jewler, CSO and Senior Vice President and then Sahakian's manager, asked her several times if Gongora was behaving, because he had a reputation for being a trouble maker; Jewler had terminated Gongora at their former company. Sahakian assured Jewler there were no problems at the time, but she soon learned that Gongora was a master at manipulating people and situations for his own gain. Gongora constantly came to Sahakian's office seeking advice on personal situations, his ex-wife, divorce, road rage problems and anger management training by the police and made inappropriate remarks which Sahakian dismissed out of embarrassment; he also bad-mouthed many co-workers and managers, pitting people against others for his own personal gain.

In July 2006, Sahakian began reporting to management insubordination, attendance and performance issues with Gongora. Jewler and Han both acknowledged Gongora was a troublemaker. Jewler suggested "not to waste time on the guy... and to move him to the side or out." Gongora pitted other employees (Dunlap, Gooch, Schraeder, and possibly others) against Sahakian. In August 2006, Sahakian sent emails to Han complaining about Gongora's attitude and work ethics and reported to Han that she was giving Gongora a verbal warning on August 23, 2006. On September 6, 2006, Sahakian sent an email to her team informing them that she was taking the day off to have her air conditioning installed. She also sent an email to the managers who worked under her, including Gongora, telling them that she was not impressed with the work ethics in Tempe and asked them to set a better example, because Gongora was taking advantage of Sahakian not being in the office. Subsequently, on September 19, 2006, Sahakian sent an email directly to Gongora in which she criticized him for coming in after 9:00 **am,** taking two-hour lunches and leaving between 4:30-5:00 p.m.' Gongora responded with an attacking email to Sahakian, his supervisor.

Sahakian forwarded Gongora's emails to Han and asked that Gongora be made an individual contributor while she documented him, since he was not able to set a good example for others and he was pitting the employees who reported to him against Sahakian. She complained that he had been insubordinate on several occasions and told Han that Jewler did not want her wasting any more time with Gongora. On September 20, 2006, Han recommended Sahakian to "not react on what he does...not to reorganize based on a person and advised her of the steps to take, which began with verbal and written

warnings leading to a 90 day action plan with specific expectations." Han specifically stated: "you have to make a very fair and long process."[4] Han's instructions were difficult to decipher and contradictory. When Sahakian informed Han of the troubles she was having with Gongora on September 20, 2006, Han responded in email: "You survived a cancer and everybody call you for BJ. [sic] What are you afraid of now?" In September, Gongora aggressively stated he would tell his group (Dunlap and Gooch) how to behave toward Sahakian. This email was sent because Gongora would disappear without notice, employees were complaining about his whereabouts and that he was not responsive or meeting commitments. Sahakian rightfully believed she needed action to correct the situation.

This statement stands in stark contrast to the total absence of "process" before Sahakian was demoted in August 2007, without prior notice, warning or progressive discipline.

Soon thereafter, while Sahakian was documenting Gongora and giving him verbal warnings, Jewler called her, asking to transfer a resource from ET to Product Line Management ("PLM") since he didn't feel ET could justify 3 employees with SiP (System in Package) expertise. He asked for one employee (Scott Gooch) to transfer but Sahakian didn't want to transfer him at that time. Jewler then said he would take Gongora and Sahakian agreed, but she warned Jewler that Gongora was acting up and that he needed disciplining. Consequently, Gongora leaving Sahakian's group was due to the request of Jewler.

Notwithstanding the transfer to PLM, Sahakian was required to continue sending Han emails criticizing Gongora because his behavior continued to be disruptive and damaging in the Tempe office. His work area cube was just outside of Sahakian's office and he would talk loudly, whistle loudly and engage in conduct to annoy Sahakian in her office. Han repeatedly requested Sahakian to focus on her work and ignore Gongora, despite her warning Han that he was damaging her reputation, working relationships, and creating a hostile work environment. Sahakian informed her management on multiple occasions that if the harassment/collusion didn't stop, it would eventually destroy her career at STATS ChipPAC, which it did. On March 3, 2007, Sahakian sent an email to senior management requesting Gongora be officially warned about his disruptive behavior. Incredibly, Gongora's new manager, Mr. Cindy Palar, Vice President Corporate Planning in the PLM group, forwarded that email to Gongora.

      ii) Brett Dunlap

In March 2007, Flynn Carson and Sahakian gave Brett Dunlap, a SiP Product Manager in her group, his performance evaluation for the first quarter of 2007. Prior to the review,

---

[4] This is a "fair and long process" that was not afforded Ms. Sahakian in her demotion and subsequent termination.

Sahakian had complained to Han about Dunlap's attitude issues and work ethic. Upon receiving the review, Dunlap became hostile toward Sahakian and enlisted Gongora's assistance. The two of them complained to many employees in the Tempe and Fremont offices, with a one-sided story about how unfair the review was and criticizing Sahakian. Dunlap complained to Han about the rating system and Sahakian's review. Han supported Sahakian in an email to Dunlap and reminded him that others also concurred with Sahakian's review and that Dunlap misunderstood the performance appraisal scoring system. Dunlap created a Powerpoint presentation regarding his negative perception of Sahakian and accused her of making racial comments to him and others. Dunlap's accusations were self-serving and no one in the Tempe office other than Dunlap or Gongora would support his false accusations.

Sahakian requested repeatedly that Gongora stay out of confidential, private matters such as Dunlap's performance review. Human Resources told her that Gongora was advised to "shut up." Sahakian requested Human Resources to write up Gongora for his actions, Human Resources agreed it should happen, but it never issued any warning.

Ultimately, Han thought it would be best for Dunlap to transfer and "granted" Dunlap's wish to transfer to the PLM group, which was done on April 16, 2007. Once Gongora, Dunlap and Gooch (see below) were removed from the ET group, Sahakian's group worked very well.

    c) <u>The Ketchup Incident</u>

On or about April 9, 2007, an employee put ketchup on Sahakian desk chair on a day she was wearing white pants, making it appear that Sahakian had an "accident." Sahakian immediately notified Han and Gail Uy, Human Resources Manager in Fremont, California of the incident. Sahakian told Uy that Vice President Mike Schraeder, Brett Dunlap and Gongora were the only employees near her office at the time the ketchup was put on her chair. Uy conducted some telephonic interviews on April 9 and April 12 and some of the people she interviewed suspected that Gongora was responsible for the incident, although no one actually saw him put ketchup on Sahakian's chair; of course, Gongora denied that he did it. Gongora and Dunlap lied about their whereabouts at the time of the incident, saying they were not present; Han and Human Resources acknowledged that someone in Tempe was lying about the incident. Yet, no one was disciplined.

Sahakian was humiliated by this incident which she considered vindictive, mean, embarrassing and very humiliating. Upon informing Han how humiliated she was, his nonchalant, inappropriate response was: "Drink a beer and have a good sleep. It will be ok". But the e-mails from the Human Resources department confirm that it considered this act to be harassment, not horseplay. Another manager (VP of Sales)

confirmed to Sahakian that the "PLM" boys, *i.e.,* Gongora, Dunlap, Schrader were "messing with her mind

Sahakian did not feel a proper investigation was conducted. In fact, she was promised Gongora and Scott Dunlap's offices would be moved away from hers; that did not happen until approximately one month after the ketchup incident, and then only upon Sahakian's insistence. Sahakian was unhappy because she knew that if no one was held accountable, the harassment would continue. For over a year, no disciplinary action taken against any of her former subordinates who were creating the hostile work environment.

    d) <u>Scott Gooch</u>

In February 2007, Scott Gooch, Director of SiP, who was part of Sahakian's ET group, sent an email to Han indicating that he thought his job function would be best suited for the PLM group. Han sent an email to Sahakian stating he "smell politics" from PLM and agreed to support the transfer to PLM. Subsequently, on June 6, 2007, Gooch resigned from STATS to join a start up company. Gooch was very close with Gongora and Brett Dunlap, who pitted others against Sahakian.

On June 22, Sahakian called in sick for a meeting. Immediately thereafter, Han informed Sahakian that an employee (Gooch) had complained about her. Han was vague, refusing to tell Sahakian the identity of the employee. Although he sent her an email concerning how she should modify her behavior, Han acknowledged the alleged complaint by an "exiting" employee was not substantiated. By this time, Sahakian was exhausted, depressed and overly stressed by Han not acknowledging and addressing her complaints. As a result of the increasing stress experienced by Sahakian in the work environment, on June 22, 2007, she started a thirty-day leave under the Family Medical Leave Act.

    e) <u>STATS Human Resources Interview Some of Sahakian's Subordinates and One States: "She is one of the best managers they have ever had."</u>

While Sahakian was on FMLA leave, Nehal Patel of the STATS Human Resources Department in Fremont, California interviewed a couple of people who worked closely with Sahakian. The two employees who were interviewed stated they had **no** problems with Sahakian and respected her as a manager and that she was very candid friendly and open. Although they did have a few criticisms of Sahakian's management style, one of the employees stated to Patel: **"she is one of the best managers they have ever had and they really respect her management style. They said that she works hard to help those who have potential to grow to become winners."** Patel

conducted these interviews based upon a phone call with Gail Uy of Human Resources and Kaw Jik Hoon, Human Resources in Singapore.

In an email reporting the results of her interviews, it was Patel's recommendation that "...it sounds like Diane may need to attend a training/seminar on managing people or communication." There is absolutely **no** recommendation that she be removed as a supervisor, nor could there have been based upon the reports to Human Resources by these subordinates. This email demonstrates no intent to demote by Human Resources and confirms Sahakian's conversation with Gail Uy after the August demotion (see Section 6, *infra*) during which Uy stated she had **no** prior knowledge of the demotion. It is absolutely incredible that a long-term Vice President, with an exceeds-expectations performance review, would be demoted, without notice, warning and without the approval of Human Resources. Most significantly, Mr. Kelly Priest, former STATS Vice President of Sales, was laid off in late August 2008. Priest has advised Sahakian that Gail Uy, the Human Resources person who investigated the ketchup incident, told Priest and others that Han totally mishandled Sahakian's demotion.

> f) <u>Plaintiff is Demoted from Vice President of ET to a Non-Supervisory, Non-Descript "Special Projects" Position at the Bottom of the Organizational Chart.</u>

Prior to Sahakian's return from FMLA leave, in early July she emailed Han and requested a face-to-face meeting with him and Tan Lay Koon, CEO in Singapore; Sahakian knew enormous amounts of money was being spent by STATS sendingemployees to, from and around Asia for internal meetings. Sahakian volunteered to fly, during her FMLA, from Japan to Singapore to save on expense. She finally agreed to wait a month until Han and Tan were in the United States. After multiple attempts to get Han to agree to this meeting, she was promised a three-way meeting which never happened. Sahakian had hoped to arrive at a mutual, amicable solution of her issues.

Plaintiff returned from her FMLA leave in late July. As of August 5, Sahakian was the Vice President of ET and on Han's staff. On August 7, 2007, Han and Sahakian had a telephone call, during which he yelled at her for approximately three hours. The conversation quickly turned to the "complaint" made by Gooch. Han became extremely upset when Sahakian stated she did not feel that her subordinates should have been interviewed while she was on FMLA leave, especially since she was not having any issues with her group because the troublemakers were gone. She stated this undermined her authority. Han began screaming, saying "if you don't agree, then quit!". Sahakian could not understand why she always needed to be on the defensive, why false claims were not being challenged, etc. Han told Sahakian to go to the CEO if she had issues. Sahakian was told if she did not apologize within one hour for not agreeing with Han's action to interview her reports, he would take action against her. Han repeatedly yelled he was "D-O-N-E" with her, that she should sue him, etc. One hour later, Sahakian received

an official "complaint" via email. Sahakian informed the CEO of Han's comments on Friday, August 10, 2007.

On August 12, without any prior notification, warning or any type of progressive discipline, Sahakian was demoted, removed from Han's staff permanently and removed as Vice President of ET. On the Organizational Chart, she relocated to the bottom right corer of the page with a bold line inside a box labeled "Special Projects, " with her Vice President titled removed. This was followed by a totally denigrating announcement of the demotion, with no acknowledgement or appreciation of Sahakian's prior accomplishments or requests of others to support her in her new role. This announcement was a total deviation from prior announcements made when other employees left the company or changed their positions.

On August 15, 2007, Executive Vice President of Human Resources TG Ng, asked Gail Uy, Human Resources, to call Sahakian to see how she was doing. Uy stated that Human Resources was surprised by Han's actions and thought it was "hasty" and that Sahakian should talk to the CEO.

On August 29, 2007, Sahakian met with Tan in Fremont, California. He was unwilling to reverse the decision Han had made to demote Sahakian so as to not undermine Han in front of the company. Tan stated he would like Sahakian to stay in the company and asked her what she desired to do. He said the "stigma" surrounding the demotion was only in Sahakian's head and there was no reason why she could not continue working at STATS. Tan asked whether she was still interested in working at STATS, and she replied affirmatively. He also asked Sahakian whether she could still work for Han and again she replied affirmatively. Tan asked Sahakian to work with Han to come up with a new role.

Although Han was to discuss Sahakian's new "special project" with her, he avoided telling her what it would be. Han repeatedly said he didn't see the point of telling Sahakian about a position if she did not have a passion for it. He left it up to her to define her new role and would see if there was a fit with other managers. If not, Sahakian was told she would have to work hard to come up to technical speed to remain in Han's group as an individual contributor, but that she would not be allowed to be a manager under him. Han kept asking what Sahakian's "passion" was and it was obvious he did not have a role in mind for her.

On the following day, Sahakian sent a "special project" proposal that she was "passionate" about to the CEO. That proposal was rejected on September 4, 2007, suggesting that Sahakian "help in bridging the gap between technology and market applications." Han called to discuss Sahakian's new role while walking into the Financial Health meeting. All she got out of this discussion was "There are multiple things to be done." Sahakian and Han discussed her new role later that day, but nothing was accomplished.

On September 5, 2007, Sahakian requested clarification from Han on the "multiple things to be done" in writing from Han. He responded aggressively and she responded that she agreed with the role the CEO had proposed. He replied with "mission impossible" to set Sahakian up for failure. On the following day, Sahakian requested
clarification from Han about who she reported to and why. Han replied that Sahakian "made her choice not to purse any existing role in any existing organization..." and pushed for a timeline. In fact, this was not the case. Sahakian's responses to Han's questions are as follows in a September 6 email:

> 1. Please answer me if you want to do something else in the existing organization. The answer is yes or no. **YES**
> 2. If the answer is yes, let me know which organization it is. I will check the possibility and get back to you. If possible, you will be transferred. **I am open to whatever function head this role, 'bridging the gap between technology and market applications', should report to.**
> 3. If not possible or the answer to #1 is no, I will give you specific assignment instantly and your special project starts. There is no need for you to propose anything.

On September 5, Han sent Sahakian an assignment which could not be accomplished in a vacuum. He would not permit her to have a role which required interacting with others and wanted her to work in complete isolation as an independent contributor. The project assigned was impossible to do in isolation.

By September 7, Sahakian was permanently removed from the Executive Overview posted on the corporate website. On September 11, 2007, Sahakian requested a job description and long term career path. Han provided a three-line job description and pushed for a timeline again.

Although Han was to discuss Sahakian's new "special project" with her, he avoided telling her what it would be. Han repeatedly said he didn't see the point of telling her about a position if she did not have a passion for it. Han left it up to Sahakian to define her new role and would see if there was a fit with other managers. If not, she was told she would have to work hard to come up to technical speed to remain in Han's group as an individual contributor, but she would not be allowed to be a manager. Han stated that the demotion was due to insubordination for not replying to him twice: once prior to her FMLA leave (about Gooch who had left the company and one time when he threatened her to respond/apologize or he would take action).[5]

  g) <u>Sahakian Files an EEOC Charge in September 2007, a Lawsuit in February 2008 and the Parties Engage in Settlement Negotiations.</u>

   After the demotion, on September 18, 2007, Sahakian filed a charge of discrimination and retaliation with the EEOC. Since her demotion, Sahakian has been given assignments with no real possibility of completing them as assigned by Han. She has been ostracized and basically isolated, she has been omitted from meetings, conferences, and training she previously attended, did no further business travel and went from receiving over 100 email communications per day to approximately 3-4 per day. Sahakian was deliberately placed in a dead-end position removing virtually all of her job duties and responsibilities, in a blatant attempt to force her resignation of employment. Tan (CEO) told a new hire VP, a former peer of Sahakian, "she is not working out for us." Obviously having been in the industry for more than two decades and earning significant compensation, Sahakian had no intention of resigning from her employment.

On January 18, 2008, STATS gave Sahakian's name to a recruiter who contacted her regarding a position on the East Coast.

Soon thereafter, Eric Dowell and Caroline Larsen of Ogletree Deakins substituted in as counsel for Defendants and on May 13, 2008 advised that the prior settlement offer of $250,000.00 would be "off the table" on May 16, 2008. Sahakian did not respond to Eric Dowell's email and the settlement offer lapsed.

Six weeks later, on July 1, 2008, Defendants terminated Sahakian's employment. The reasons given by BJ Han were Sahakian's performance on the "special projects" and her "disengaging" from the company. On July 17, 2008, the undersigned sent an email to Dowell noting that the termination of Sahakian's employment exponentially increased her potential economic losses and that an additional charge of retaliation would be filed. Reiterating Ms. Creta's notion that the parties would expend significant monies in discovery including several dozen depositions, Sahakian reduced her prior settlement demand from $985,000 to $885,000. Dowell's vitriolic and unprofessional attack upon Sahakian and Sahakian's former counsel, Mr. Schleier, on July 23, 2008 followed. On July 29, 2008, Sahakian filed another charge of retaliation as a result of the termination of her employment and requested an immediate Notice of Right to Sue. The parties then agreed to proceed with mediation.

   2) **LEGAL CLAIMS**

Sahakian has brought discrimination and retaliation claims based upon Title VII of the Civil Rights Act of 1964, as amended. Legally, Diane's retaliation claims are strong.

To establish a *prima facie* case of retaliation, a plaintiff must show that: "(1) she engaged in a protected activity, such as the filing of a complaint alleging racial discrimination, (2) the [defendant] subjected her to an adverse employment action, and (3) 'a causal link exists between the protected activity and the adverse action.' *See Manatt v. Bank of America, NA,* 339 F.3d 792, 800 (9th Cir. 2003) (quoting *Ray v.*

*Henderson,* 217 F.3d 1234, 1240 (9th Cir. 2000)) (footnotes omitted). The quantum of evidence needed to establish a *prima facie* case is "minimal" and less than a preponderance of the evidence. Once a *prima facie* case is established, the defendant must offer "a legitimate, nondiscriminatory reason for the adverse employment action." *Fonseca v. Sysco Food Serv. of Arizona, Inc.,* 374 F.3d 840, 849 (9th Cir. 2004). If a legitimate reason is provided, the plaintiff must then show that the reason given is pretextual. *See Pottenger v. Potlach Corp.,* 329 F.3d 740, 746 (9th Cir. 2003). "[A] plaintiff can prove pretext either (1) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Lyons v. England,* 307 F.3d 1092, 1113 (9th Cir. 2002) (internal quotation marks omitted). The evidence used to establish the plaintiff's *prima facie* case may be sufficient to rebut a defendant's evidence and show that the defendant's proffered reason for the adverse action is a pretext. *Chuang v. Univ. of Cal. Davis, Bd. of Trustees,* 225 F.3d 1115, 1127 (9th Cir. 2000). "Temporal proximity between the protected activity and an adverse employment action can by itself constitute sufficient circumstantial evidence of retaliation in some cases." *Bell v. Clackamas County,* 341 F.3d 858, 864 (9th Cir. 2003).

In this case, it is beyond question that Sahakian can establish a *prima facie* case of retaliation in connection with her demotion and ultimate termination from employment. As to the demotion in August 2007, Sahakian engaged in protected activity when she complained about the hostile work environment created by Gongora and her complaints to Human Resources of harassment in connection with the ketchup placed on her chair on April 9, 2007 by one of the subordinate employees in the Tempe office. Informal complaints to supervisors constitute statutorily protected expression. *See Holifield v. Reno,* 115 F.3d 1555, 1566 (11th Cir. 1997); *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1308 (2nd Cir. 1995). The documents produced by STATS clearly demonstrate the Company considered the ketchup incident to be harassment and was not simply "horseplay." When Sahakian returned from her FMLA leave in early August 2007, she was demoted from her supervisory position as leader of the ET group into a dead-end "special projects" position at the bottom of the organizational chart, with no clearly defined job description or duties and responsibilities. It is clear that the demotion from Vice President of ET to "special projects" altered the terms and conditions of Sahakian's employment in a negative way. She suffered significantly diminished material responsibilities in the "special projects" job and the new organizational chart is the best evidence demonstrating the effect of the demotion. Consequently, the temporal proximity between her protected activity in April 2007 and the adverse employment action in August 2007, coupled with Sahakian's continuing protests about how the Company handled the situation in May and June 2007, establish a *prima facie* case of retaliation in connection with her demotion.

Sahakian can also establish a *prima facie* case of retaliation in connection with the termination of her employment on July 1, 2008. It cannot be disputed that Sahakian's

filing of her charge of discrimination in September 2007 and the filing of her lawsuit against Defendants in February 2008 are considered to be protected activity. Title VII provides protection against retaliation for those who oppose discrimination or participate in Title VII processes:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment. because he has opposed any practice made an unlawful employment practice by this title, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this title. 42 U.S.C. § 2000(e)-3(a).

A complainant's activity is protected under the participation clause if such activity takes place in the context of a Title VII "proceeding," such as an EEOC investigation or Title VII lawsuit. *See Jowers v. Lakeside Family and Children's Servs.,* 2005 WL 3134019, at *4 (S.D.N.Y.2005); *EEOC v. Total System Services, Inc.,* 221 F.3d 1171 (2000); *Walters v. City of Atlanta,* 803 F.2d 1135, 1144 (1 1th Cir. 1986) (affirming the district court's finding of retaliation). Other circuits have similarly recognized that filing a lawsuit for Title VII violations in Federal district Court constitutes protected activity. *See generally Johnson v. Sullivan.* 945 F.2d 976 (7th Cir. 1991) ("[Plaintiff] engaged in protected activity by pursuing his lawsuit against the agency."); *Greenwood v. Ross,* 778 F.2d 448 (8th Cir. 1985); *Womack v. Munson,* 619 F.2d 1292 (8th Cir. 1980) ("access to the EEOC and federal courts by filing charges is clearly conduct protected from employer retaliation by § 704(a). Filing a lawsuit alleging a former employer violated Title VII is protected activity.").

Furthermore, since alleging discrimination and retaliation constitutes protected activity, negotiating and attempting to secure a settlement that resolves such allegations likewise constitutes protected activity. *See Miller v. Fairchild Indus., Inc.,* 797 F.2d 727, 731-2 (9th Cir. 1986) (causal connection for *prima facie* case established, in part, by the fact that plaintiffs' layoffs occurred less than two months after they negotiated EEOC settlement agreements). Other courts have also concluded that settlement is protected activity. *See Gallimore-Wright v. Long Island R. Co.,* 354 F.Supp.2d 478, 490 (S.D.N.Y. 2005) (indicating that the maintenance of the Title VII action until it was settled is protected activity); *Sprott v. Franco,* 1997 WL 79813, at * 13 (S.D.N.Y 1997) (engaging in settlement negotiations constitutes protected activity). The extremely close proximity between Sahakian's rejection of STATS' settlement offer in late May 2008 and her termination on July 1, 2008 is extremely powerful evidence of retaliation.

STATS' has contended in its position statement to the EEOC that Sahakian was demoted because of her deteriorating relationship with her subordinates and she was advised by Han when he terminated her that she was being fired due to her job performance on "special projects" and her "disengaging" from the Company. However, there is significant

evidence that the legitimate, non-discriminatory reasons proffered by STATS are pretextual. Most significantly, Mr. Kelly Priest, former STATS Vice President of Sales, was laid off in late August 2008. Priest has advised Sahakian that Gail Uy, the Human Resources person who investigated the ketchup incident, told him and others that Han totally mishandled Sahakian's demotion; this will be a powerful admission against STATS. Most significantly, STATS interviewed two of Sahakian's remaining subordinates who stated she was one of the best managers they ever had and the only recommendation by Human Resources was possible management and/or communication training. One month later, Sahakian is demoted. Likewise, Sahakian's prior performance evaluations are powerful evidence that Han's demotion of her was pretextual. Indeed, in April 2008, Sahakian received a **merit increase.** *See, Padilla v. Metro-North Commuter RR.,* 92 F.3d 117, 123 (2nd Cir. 1996) (holding that reasonable jury could have found defendant demoted plaintiff in retaliation for protected activity when plaintiff had received favorable performance reviews prior to engaging in protected activity).

Consequently, Sahakian is very confident, as is her counsel, that she will survive STATS' inevitable Motion for Summary Judgment and this matter will be tried to a jury.

3) **DAMAGES**

As a result of Defendants' actions/inaction, Plaintiff has sustained damages as follows: Plaintiff has suffered humiliation, embarrassment and damaged reputation in the semiconductor industry where she has spent 25 years to establish herself. Sahakian will argue that she may recover for reputational injury under Title VII if such injury causes harm to her future earning capacity. Title VII authorizes compensatory damages for a plaintiff's "future pecuniary losses." 42 U.S.C. 1981a(b)(3). The Seventh Circuit has held that injury to an employee's reputation is compensable under Title VII where such injury negatively impacts the employee's "lost future earnings." *Williams v. Pharmacia, Inc.,* 137 F.2d 944, 954 (7th Cir. 1997). According to *Williams,* an award for reputational damages "compensates [the plaintiff] for a lifetime of diminished earnings resulting from the reputational harm she suffered" as a result of the employer's unlawful conduct. Thus, where an employee like Sahakian can expect to encounter increased difficulty in finding comparable employment due to "injury to [her] professional standing" caused by an employer's unlawful conduct, the employee may recover for the added difficulty in the form of compensatory damages. Sahakian will present evidence at trial that her demotion was publicized and highly visible within the semiconductor industry which will negatively affect her ability to secure future employment. Indeed, it is certainly reasonable to anticipate that while interviewing for jobs after her termination, Sahakian will be asked repeatedly about the circumstances of her separation from STATS and probably asked about her lawsuit.

Significantly, in light of STATS' termination of Sahakian's employment, she is now in a position to claim lost wages and the value of lost benefits. Sahakian has commenced the

job search by contacting industry contacts and submitting her resume to companies, but as of this time and in light of the dismal state of the economy, it is not surprising that she remains unemployed as of the date of this correspondence. It is anticipated that the present day value of Sahakian's economic losses will range in seven figures.

Furthermore, as a result of a hostile environment, retaliation, humiliation, unjustified, demeaning demotion, being blackballed, alienation, complete disrespect, and a manager who completely dismissed all complaints, Plaintiff's health has been affected as follows:

- Teeth grinding, resulting in cracked molars (several crowns replaced. Fitted with a mouth guard.)
- Muscle aches, neck and back pain, knots (massage therapy, medication, chiropractor)
- Sleeplessness and insomnia (medication)
- Abdominal pain (many cysts)
- Diarrhea, constipation (medication)
- Uncontrollable crying at work, on the way to work, during interactions with friends and family and alone (medication)
- Feeling sick to her stomach
- Hair loss
- Skin breakouts and circles under the eyes
- Heart palpitations and escalated blood pressure (medication)
- Weight gain
- Exhaustion, lack of energy (increased vitamins)
- Socially withdrawn
- Strain on relationships (family and friends)
- Low self-esteem

- Forgetfulness

- Confusion

- Inability to concentrate

- Burnout

- Nightmares

4) **STRENGTHS AND WEAKNESSES**

   a) Strengths

      i) One of the greatest strengths of Sahakian's case is Sahakian herself. She is extremely knowledgeable about the facts and circumstances surrounding this case, has excellent recall and memory about the events and will make an excellent witness on her own behalf. This assessment is confirmed as Sahakian was deposed in a significant patent case filed against STATS in the Northern District of California and she was selected to be deposed on behalf of STATS. We have email evidence from the attorney who represented her in the deposition as to a superior job she did during her deposition. Conversely, based upon my conversations with Sahakian, we anticipate Han will be a very poor witness, his communication skills are limited and he will not be well-received by a jury.

      ii) A very significant hurdle for STATS will be the email documenting the Human Resources interviews conducted in July 2007. Gongora, Dunlap and Gooch had all been removed from the ET group and the remaining group was working well together. The reports from the subordinates commending Sahakian as a manager will stand in stark contradiction to Han's actions just one month later in demoting Sahakian and removing her supervisory duties and responsibilities into an ill-defined, career-ending position. This is especially true in light of Human Resources' admissions to other executives that Han's actions were inappropriate and its lack of prior knowledge that he was going to demote Sahakian.

      iii) From a legal perspective, in light of the timing of STATS actions, the undersigned is confident Sahakian will survive the inevitable motion for summary judgment. The temporal proximity between Sahakian's protected activity and the adverse employment actions will be sufficient to establish causation under applicable Ninth Circuit Title VII law. In light of the termination of her employment, Sahakian's damages rose exponentially

from a statutory cap of $300,000 compensatory damages under Title VII to seven figures in light of her anticipated economic losses over her career. Fortunately, there is ample insurance coverage.

iv) There are several former employees and executives who have contacted Sahakian and advised that they will be supportive witnesses if they are deposed. Many of these witnesses will confirm the anti-American corporate culture of STATS, racist comments made by its executives (including Han) and that Sahakian was treated unfairly. They will also be very critical of Han's management style, confusing and incomprehensible instructions, etc.

v) Sahakian's years of excellent performance, her promotions, merit increases and bonuses will be powerful evidence that she has never been anything but an exemplary employee.

b) <u>Weaknesses</u>

i) None.

**END**