# Exhibit A

STD

# U.S. District Court
## DISTRICT OF ARIZONA (Phoenix Division)
## CIVIL DOCKET FOR CASE #: 2:09-cv-00143-HRH

Strojnik v. STATS ChipPAC, Inc. et al
Assigned to: Judge H Russel Holland
Cause: 28:2201 Declaratory Judgement

Date Filed: 01/23/2009
Jury Demand: Plaintiff
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Peter Strojnik**
*dealing with his sole and separate claim*

represented by   **Peter Strojnik**
Peter Strojnik PC
3030 N Central Ave
Ste 1401
Phoenix , AZ 85012
602-524-6602
Fax: 602-296-0135
Email: strojnik@aol.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**STATS ChipPAC, Inc.**
*a Delaware corporation*

**Defendant**

**STATS ChipPAC, Ltd.**
*a foreign corporation*

**Defendant**

**Temasek Holdings Private Limited**
*a foreign corporation*

**Defendant**

**Singapore Technologies Semiconductors Private Limited**
*a foreign corporation*

**Defendant**

**Caroline Larsen**
*a natural person*

**Defendant**

**Ogletree, Deakins, Nash, Smoak & Stewart, P.C.**

*an Arizona Corporation*

**Defendant**

**State Bar of Arizona**
*an Arizona non-profit Corporation*

**Defendant**

**United States Department of Justice**
*a governmental entity*

**Defendant**

**Singapore, Country of**
*a foreign entity*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/23/2009 | 1 | COMPLAINT. Filing fee received: $ 350.00, receipt number 09700000000002517426, filed by Peter Strojnik. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Civil Cover Sheet, # 4 Summons)(Strojnik, Peter) (Entered: 01/23/2009) |
| 01/23/2009 | | This case has been assigned to the Honorable John W. Sedwick. All future pleadings or documents should bear the correct case number: CV-09-143-PHX-JWS. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MHA) (Entered: 01/26/2009) |
| 01/23/2009 | 2 | Notice of Availability (MHA) (Entered: 01/26/2009) |
| 01/26/2009 | 3 | Summons Issued as to Singapore, Country of, STATS ChipPAC, Inc., STATS ChipPAC, Ltd., Temasek Holdings Private Limited, Singapore Technologies Semiconductors Private Limited, Caroline Larsen, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., State Bar of Arizona, United States Department of Justice. (MHA). *** IMPORTANT: You must select "Document and stamps" or "Document and comments" on the print screen in order for the court seal to appear on the summons you print. (Entered: 01/26/2009) |
| 01/26/2009 | 4 | NOTICE TO FILER OF DEFICIENCY re 1 Complaint filed by Peter Strojnik. Description of deficiency: Incorrect information added to Party Information Screen. (MHA) (Entered: 01/26/2009) |
| 01/29/2009 | 5 | MINUTE ORDER FROM CHAMBERS: Judge Sedwick recuses from this case. The Clerk will please reassign this case to another judge. NOTE: this case has been reassigned by random draw to H. Russel Holland. All Further pleadings/papers should now list the following COMPLETE case number: CV09-00143-PHX-HRH.(ESL) (Entered: 01/29/2009) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 02/02/2009 18:32:20 | | |
| PACER Login: | od0028 | Client Code: |
| Description: | Docket Report | Search Criteria: 2:09-cv-00143-HRH |

| Billable Pages: | 2 | Cost: | 0.16 |

Peter Strojnik, 6464
THE LAW FIRM OF PETER STROJNIK
3030 North Central Avenue, Suite 1401
Phoenix, Arizona 85012
Telephone: 602-524-6602
Facsimile: 602-296-0135
e-mail: *Strojnik@aol.com*
Attorney for Plaintiff

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| PETER STROJNIK, dealing with his sole and separate claim,<br><br>                                    Plaintiff,<br><br>        vs.<br><br>STATS ChipPAC, Inc., a Delaware corporation; STATS ChipPAC, Ltd., a foreign corporation; TEMASEK HOLDINGS PRIVATE LIMITED, a foreign corporation; SINGAPORE TECHNOLOGIES SEMICONDUCTORS PRIVATE LIMITED, a foreign corporation; CAROLINE LARSEN a natural person; OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C., an Arizona Corporation; STATE BAR OF ARIZONA, an Arizona non-profit Corporation; THE UNITED STATES DEPARTMENT OF JUSTICE, a governmental entity; THE COUNTRY OF SINGAPORE, a foreign entity,<br><br>                                    Defendants. | NO.<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT**<br>**28 U.S.C. § 2201** |

-1-

This Action seeks federal declaratory relief arising out of an actual case or controversy relating to Plaintiff's right to exercise his 1st Amendment protected speech free of threats by foreign governments, foreign companies, and their local agents. This Action is brought pursuant to 28 U.S.C. § 2201 and the Arizona version of the Uniform Declaratory Judgment Act, A.R.S. §§12-1831 *et seq.*

## PARTIES, JURISDICTION AND VENUE

1) Plaintiff PETER STROJNIK is a natural person currently residing in Maricopa County, State of Arizona.

2) Defendants STATS ChipPAC, Inc. is a Delaware corporation, and STATS ChipPAC, Ltd. (collectively "STATS") is a foreign corporation authorized to and conducting business in the County of Maricopa, State of Arizona.

3) Defendant SINGAPORE TECHNOLOGIES SEMICONDUCTORS PRIVATE LIMITED ("STS") is a foreign corporation with its principal place of business in the nation of Singapore.  STS is the wholly owned subsidiary of Temasek. STS owns approximately 83% of the outstanding shares of STATS.

4) Defendant TEMASEK HOLDINGS PRIVATE LIMITED ("Temasek") is an investment company headquartered in Singapore that is wholly owned by The Minister for Finance, Inc., a body corporate constituted under Singapore law that is controlled by the Government of Singapore. Temasek is the parent corporation of Defendant Singapore Technologies Semiconductors Private Limited. Temasek is

headed by the wife of the Singaporean Prime Minister Lee Hsien Loong, Madam Ho Ching.

5) Defendant CAROLINE LARSEN ("Larsen") is an attorney licensed to practice in the State of Arizona and the agent for Defendants STATS and, upon information and belief, for STS, Temasek and, by extension, the Government of Singapore.

6) OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C. ("Ogletree Deakins") is Larsen's employer. Larsen performed the acts complained of herein within the scope of her employment and as an agent for STATS, STS, Temasek and, by extension, the Government of Singapore.

7) The STATE BAR OF ARIZONA ("State Bar") is an Arizona non-profit corporation consisting of an organization of attorneys with power to sanction attorneys licensed to practice law in the State of Arizona.  State Bar is listed as a party Defendant in order to receive notice of this matter that concerns, or may concern, State Bar, and to comply with A.R.S. §12-1841.

8) US DEPARTMENT OF JUSTICE is listed as a party Defendant in order to receive notice of this matter that concerns, or may concern, the Justice Department and to comply with A.R.S. §12-1841.

9) The COUNTRY OF SINGAPORE is a city-state located just South of Malaysia.

10)   On information and belief, Defendants Temasek and/or STS control the operations and day to day functions of STATS.

-3-

11)    Upon information and belief, the Government of Singapore controls, directly or indirectly, the activities of Temasek, STS and STATS.

12)    Jurisdiction of this Court is conferred by virtue of 28 U.S.C. § 1331 (federal question).

13)    The facts and allegations contained herein arise out of transactional occurrences that transpired in Maricopa County, State of Arizona.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

14)    Plaintiff is a United States citizen; Plaintiff earned his US citizenship through service in the United States Army in 1972.

15)    Plaintiff is an attorney licensed to practice in the State of Arizona.    Plaintiff represents Diane Sahakian in a case presently pending in the US District Court for the District of Arizona under cause number CV-08-241-PHX-HRH ("the Sahakian case").

16)    The issues and allegations in the Sahakian case include, *inter alia*:

a) Serious allegations of sexual, racist and retaliatory misconduct by STATS, a Singaporean company; and

b) Discrimination on the basis of sex in the terms, conditions and privileges of employment and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000 et seq.; and

-4-

c) Allegations of STATS', STS's and Temasek's misuse of the United States Immigration statutes and policies relating to permanent labor certifications for foreign workers; and

d) Allegations of Singaporean employers referring to Americans as "monkeys" and American character as "fat" and "lazy".

e) The existence of a racist and sexist corporate culture of STATS, STS, Temasek and the Country of Singapore.

17)    It is Plaintiff's opinion that STATS, STS, Temasek and the Country of Singapore are racist and sexist entities. Plaintiff believes that dissemination of his opinion regarding STATS', STS' Temasek's and Country of Singapore's alleged sexist, racist, retaliatory and illegal immigration policies warrant – indeed require - a dissemination of a press release to alert the American public of the dangers posed by these certain defendants within the bounds of the United States Supreme Court decision in *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991)

18)    Defendant Larsen became aware that Plaintiff intended to issue a press release fairly reporting the allegations in the Second Amended Complaint. Defendant Larsen issued the following threat (Exhibit 1):

> We find your scarcely-veiled threat to "ensure the widest possible broadcast of this matter" if Temasek Holdings Private Ltd. and Singapore Technologies Semiconductors Private Ltd.'s refuse to capitulate to your client's exorbitant settlement demand in potential violation of the Arizona Rules of Professional Conduct, Rule 42, ER 3.6. We are prepared to bring any extrajudicial statements regarding this action that might prejudice the adjudication of this matter to the attention of the Court and the State Bar of Arizona if necessary.

19)    In issuing the threat, Larsen was acting within the scope of her employment with Ogletree Deakins and in her capacity as the agent for STATS and, upon information and belief, as the local agent for STS, Temasek and, by extension, the Singaporean Government.

20)    Plaintiff has reason to believe that the following relationships demonstrate, in part, Singaporean Government's control of Temasek and STATS:

a) The relationship between Singaporean ruling family (Lee Hsien Loong and his father Lee Kuan Yew) and the appointment of Madam Ho Ching as president of Temasek; and

b) The status of Temasek as a "private" company which is in fact owned by the Singaporean Government; and

c) Temasek's control over operations of STATS, including control over STATS publicly trading status, the pending delistment from the Singapore exchange, and the control over the purchase of STAT's shares by STS.  STS's offer, through its counsel, to purchase STATS addressed to, inter alia, the Securities and Exchange Commission is attached hereto as Exhibit 2.

21)    It is Plaintiff's opinion that Singapore is an oligarchic dictatorship pretending to be a democracy.

-6-

22) It is Plaintiff's opinion that the Government of Singapore, its ruling family and Temasek have a motive to cower Plaintiff into silence for the following reasons that Plaintiff believes to be true:

a) Singapore relies on the success of its trade and manufacturing to sustain its existence; and

b) In order for Singaporean Government to sustain its existence – and the power of the ruling family Lee Hsien Loong and his father Lee Kuan Yew behind the scenes - Singapore has enacted laws that are fundamentally inimical to the dignity of free men and women, including the passage and enforcement of laws restricting the freedom of speech and brutal corporal punishment for the unauthorized exercise thereof; and

c) In order for Singaporean Government to sustain Singaporean economic viability, Singapore restricts and brutally punishes the exercise of unauthorized speech; and

d) Singaporean Government, intentionally or otherwise, permits or encourages its anti-human dignity policies to become a part of the work culture in its directly or indirectly owned enterprises, including Temasek, STS and STATS.

23) Plaintiff's belief is based in part on the following non-exclusive allegations and online reports which Plaintiff believes to be true:

a) The Government of Singapore strictly controls the dissemination of news relating to the Government of Singapore.

–7–

b) In 2007, Singapore ranked 141[th] out of 167 nations by Reporters Without Borders in the Worldwide Press Freedom Index.

c) Singapore uses the Internal Security Act ("ISA") and the Undesirable Publications Act ("UPA") in order to force those who disagree with the views of the Singaporean oligarchy into silence.

d) Under the ISA, the Government of Singapore may indict, convict, imprison and corporally punish anyone who publishes information that is "prejudicial to the national interest" of Singapore.

e) Singaporean Government believes that it is in its national interest to silence those who disagree with its views.  For example, while hosting a World Bank and International Monetary Fund (IMF) meeting in October 2006, Prime Minister Lee Hsien Loong spoke out against the international media, which he said were trying to impose "their norms and their standards" on the country in relation to freedom of expression. The head of government justified control on the press in comments in July when he said that Asian countries who got "the best financial results were those whose media was less aggressive".

f) Under the UPA, the Government of Singapore may inflict corporeal punishment against those who exercise speech deemed illegal by the Government of Singapore.  The corporeal punishment includes the barbaric practice of "caning". Caning involves hitting a person on a bare buttock with a rattan stick, soaked in

water in order to achieve maximum pain. Caning sessions are held Tuesdays and Fridays at Changi, Singaporean famous top-security prison. Caning is also administered regularly at Queenstown Remand Prison, where the American teenager Michael Fay was caned in May 1994.

g) The World Corporate Punishment Research (www.corpun.com) publishes Singaporean Government's official demonstration of caning thus:



How it happened: A Singapore prison officer demonstrates the caning technique on a dummy lashed to the rack

**Official demonstration of caning of a dummy in Singapore**

h) According to the United States State Department, commercial disputes that may be handled as civil suits in the United States can escalate to criminal cases in Singapore, and result in heavy fines and prison sentences.

i) Reporters Without Borders report in 2007 that the government headed by Lee Hsien Loong, with his father Lee Kuan Yew behind the scenes, has been engaged in a fierce battle with several foreign publications and at the same time has cracked down on Singaporean bloggers and cyber dissidents.

j) Singaporean authorities have tried – and succeeded - into cowering foreign press including, *inter alia*, the Far Eastern Economic Review, the International Herald Tribune,T ime and the Financial Times, into submission.

k) Singaporean authorities are particularly sensitive to any criticism of Madam Ho Ching, the president of Temasek, her husband, the Prime Minister of Singapore Lee Hsien Loong and his father, Lee Kuan Yew, their friends and family.

l) Any distribution of truthful reporting that is not perceived as complimentary to STATS, STS, Temasek, Madam Ho Ching, Lee Hsien Loong, Lee Kuan Yew or the Singaporean Government may be met with civil and/or criminal prosecution under Singaporean law, particularly the law relating to defamation, the ISA or the UPA.

m) In a different matter Plaintiff was previously threatened by a Singaporean law firm with civil and criminal prosecution if he published a matter of his opinion in the Untied States.

24)    It is not uncommon for the Nation of Singapore to file lawsuits against American businesses and citizens on the legal theory of libel for statements that would

otherwise be permissible under the First Amendment of the United States Constitution and Arizona Constitution. For example, earlier this decade, Singapore filed and settled a libel lawsuit against Bloomberg LP, the popular news dissemination service created by the now current Mayor Bloomberg of New York City. Ultimately, Bloomberg settled that case for nearly a half million dollars and for a public apology published by Bloomberg, on information, on the web. Singapore forced Bloomberg to delete all online copies of its report from the website. See http://www.singapore-window.org/sw02/020830re.htm; http://query.nytimes.com/gst/fullpage.html?res=9907EFDC113CF934A1575BC0A96 49C8B63; http://www.singapore-window.org/sw02/020829ny.htm.

25)    Plaintiff believes that he has the right under the 1st Amendment to the United States Constitution to express his views and opinions on any matter, and particularly on matters of national and international importance relating to racist and sexist corporate culture of Singaporean businesses.

26)    Plaintiff bases his belief on *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974) where the Supreme Court provided absolute immunity from defamation actions for all opinions, stating:

> Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas.

-11-

27)    Plaintiff is willing and welcomes an exchange of ideas with Temasek, Madam Ho Ching, Lee Hsien Loong, Lee Kuan Yew and or any other members of the Singaporean oligarchy.

28)    Plaintiff also understands that the 1st Amendment to the Constitution of the United States is an empty vessel unless it is vigorously protected by the United States' legislative, judicial and executive branches.

29)    Plaintiff's 1st Amendment right is an empty vessel if the following likely events occur:

a)    Plaintiff engages in a free exchanged of ideas under the 1st Amendment of the United States; and thereafter

b)    The Singaporean oligarchy initiates a defamation action against Plaintiff for the exercise by Plaintiff of protected speech in the United States; and thereafter

c)    The Singaporean judiciary – whom Plaintiff believes is the executive branch of the Singaporean Oligarchy – initiates trumped up defamation proceedings, either civil or criminal, against Plaintiff; and thereafter

d)    The Singaporean oligarchy attempts to domesticate their trumped up defamation judgment in the United States and/or initiate extradition proceedings against Plaintiff; and thereafter

e)    Plaintiff's exercise of his 1st Amendment rights results in economic ruin, imprisonment and caning.

-12-

30)    Plaintiff comes from a long line of conscientious opposition to dictatorial governments who seek to impose limits on liberty: (i) Plaintiff's father Dr. Aleš Strojnik was imprisoned in Mussolini's Fascist hostage camp[1] at Gonars during WWII for his beliefs; (ii) Plaintiff's uncle Štefan Pogačar was killed by Hitler's Nazi's during WWII for his beliefs; (iii) Plaintiff was persecuted by Tito's Communists during the late 1960's for his religious beliefs; (iv) Plaintiff was detained by Tito's Communists for voicing his opinion; and (iv) Plaintiff's best friend's mother, S. L. was imprisoned in Dachau during WWII for her religious affiliation.

31)    Plaintiff is not willing to be cowered into silence by the Singaporean oligarchy, or to compromise his beliefs.    Such beliefs are the foundation of American independence and freedom, and Americans have never compromised their beliefs in the face of tyranny and oppression, *e.g.* England and the Revolution.

32)    Plaintiff desires to publish a series of press releases in the United States, European and Asian markets that would disclose the following:

a)  The allegations and proceedings in the Sahakian case; and

b)  Plaintiff's opinion that Madam Ho Ching and the Singaporean oligarchy, support STATS unfair treatment of Sahakian; and

---

[1] Hostage Camp at Gonars was used by Mussolini to imprison Slovenian population during WWII; if Slovenian freedom fighters harmed an occupying soldier during the occupation, the

c) That Plaintiff continues his investigation into alleged immigration abuses by STATS, STS, Temasek and the Singaporean Government; and

d) Plaintiff's opinion that local agents for STATS, STS, Temasek, Lee Hsien Loong, Lee Kuan Yew, Madam Ho Chin and the Singaporean Government are attempting to cower Plaintiff into silence; and

e) Plaintiff's opinion that all anti human dignity policies of emerging or established right wing dictatorships must be confronted immediately and decisively; and

f) Plaintiff's opinion that American employees, especially women, should exercise caution before permitting themselves to work for STATS, STS, Temasek or any other company associated with the Government of Singapore; and

g) Plaintiff's opinion that Singapore, while pretending to be a democracy, is a *de facto* totalitarian oligarchy; and

h) Plaintiff's opinion that Singaporean oligarchy maintains its power through the imposition of barbaric methods of punishment, including caning; and

i) Plaintiff's opinion that Singaporean judiciary is a *de facto* an executive arm of the Singaporean oligarchy, See, e.g. The Politics of Defamation by Judge Paul Bentley Published in The Provincial Judges' Journal, Canada Autumn 1997; and

j) Plaintiff's other opinions, some of which may or may not be complimentary to the Singaporean oligarchy.

Fascists would randomly select prisoners from the Gonars hostage camp and execute them.

33)    Plaintiff fears that by the exercise of his 1st Amendment right to free speech, he may be sued or indicted, convicted and sentenced by the Singaporean judiciary *in abstentia*, and that Singapore may seek to domesticate a trumped up civil judgment in the United States or to extradite him to Singapore if he exercises his 1st Amendment Rights in the United States. United States recognizes the extradition treaty with Singapore. *In re Extradition of Vivien Then*, 92 F.3d 851 (9th Cir. 08/07/1996)

34)    Plaintiff fears that if Plaintiff publishes the allegations in the Sahakian case, including the allegations of the Second Amended Complaint, or his views and opinions, the Singaporean oligarchy will commence a civil, criminal, ISA or UPA prosecution of Plaintiff.

35)    Actual controversy exists between Plaintiff and Defendants relating to Plaintiff's constitutional right of free speech.  Plaintiff believes that he has the right to publish the allegations and the proceedings in the Sahakian case and also to express his own, personal opinions regarding the Singaporean oligarchy, its judiciary, its perceived racism and sexism, and any other matter of opinion that Plaintiff chooses. Defendants believe that Plaintiff enjoys no such right.

WHEREFORE, Plaintiff prays for a declaratory judgment that:

A.    Plaintiff is constitutionally protected in his anticipated, widely distributed press releases:

    a. Describing and discussing the subjects listed in Paragraph 32 above; and

-15-

b.  Describing and discussing the claims in the Sahakian case and in the present case, and the scheduling and the result of any step in the Sahakian case and the present case; and

c.  Describing Plaintiff's continuing investigation into the human rights and free speech abuses by the Singaporean Government and Plaintiff's findings with respect thereto; and

d.  Describing Plaintiff's continuing investigation into the alleged immigration abuses and violations of law by STATS; and

e.  Sounding a warning of danger to American workers concerning the behavior of the Defendants and the Proposed Defendants in the Sahakian case and the danger posed to Americans in general by the Singaporean Government and companies owned, directly or indirectly, by the Singaporean Government; and

f.  Request for information from those with knowledge of the abuses by the Singaporean Government and companies owned, directly or indirectly, by the Singaporean Government, and the publication of findings; and

B.  That Plaintiff's publications of the subjects listed in Paragraph 32 above does not violate Ethical Rules governing the conduct of Arizona lawyers, including Plaintiff; and

C.   That in the event of a trumped up defamation judgment by the Singaporean Judiciary in direct response to Plaintiff's exercise of his First Amendment Rights, the American Judiciary cannot and will not permit a domestication of any such judgment; and

D.   That in the event of any trumped up judgment of guilt of any Singaporean criminal law arising out of Plaintiff's exercise of his 1st Amendment Rights, Plaintiff shall not be extradited to Singapore.

E.   That Plaintiff cannot be extradited to Singapore for the exercise of his constitutionally protected rights.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial for issues triable by a jury.

RESPECTFULLY SUBMITTED this 23rd day of January, 2009.

**PETER STROJNIK, P.C.**

Peter Strojnik
Attorney for the Plaintiff

-17-

# Ogletree
# Deakins

**OGLETREE, DEAKINS, NASH,**
**SMOAK & STEWART, P.C.**

*Attorneys at Law*

Esplanade III
2415 East Camelback Road
Suite 800
Phoenix, AZ 85016
Telephone: 602.778.3700
Facsimile: 602.778.3750
www.ogletreedeakins.com

L. Eric Dowell
Managing Shareholder
Direct: (602) 778-3718
Eric.Dowell@ogletreedeakins.com

Caroline Larsen
Direct: (602) 778-3756
Caroline.Larsen@ogletreedeakins.com

December 31, 2008

**VIA FACSIMILE (602-264-1441) AND U.S. MAIL**

Peter K. Strojnik
The Law Firm of Peter K. Strojnik
3030 North Central Avenue, Suite 1401
Phoenix, Arizona 85012

*Re:      STATS ChipPAC Ltd. et al. adv. Sahakian*

Dear Peter,

We have reviewed your Motion to Amend the Complaint, draft Amended Complaint, and declaration in support thereof. STATS ChipPAC Ltd. still declines to stipulate to the amendment and we are prepared to oppose the Motion to Amend in the event you proceed to file the same.

From the sketchy allegations in the Motion to Amend, there are no valid legal or factual bases for adding Temasek Holdings Private Ltd. or Singapore Technologies Semiconductors Private Ltd. as defendants in this action. In fact, there does not even appear to be any basis for the United States District Court for the District of Arizona to assert jurisdiction over these entities. To the extent that you suggest acts allegedly committed by STATS ChipPAC, Inc. and/or STATS ChipPAC, Ltd. should be imputed to Singapore Technologies Semiconductors Private Ltd., a court cannot exercise personal jurisdiction over a parent corporation solely because it may have jurisdiction over its subsidiary. "The existence of a parent-subsidiary relationship is insufficient to establish personal jurisdiction over [the parent company]." *Transure Inc. v Marsh & McLennan, Inc.*, 766 F.2d 1297, 1299 (9th Cir. 1985). Even if Ms. Sahakian could establish that Technologies Semiconductors Private Ltd. exercises some control over STATS ChipPAC, Inc. and/or STATS ChipPAC, Ltd., as long as "[t]he corporate separation, though perhaps merely formal, [is] real," this limited control cannot provide an automatic basis for conferring personal jurisdiction over the parent company. *Id.* (quoting *Cannon Mfg. Co. v Cudahy Packing Co.*, 267 U.S. 333, 337 (1925)). Of course, any connection between STATS ChipPAC, Inc. and/or STATS ChipPAC, Ltd. and Temasek Holdings Private Ltd. is even more remote and attenuated.

Peter K. Strojnik
December 31, 2008
Page 2



Moreover, we note that many of the "facts" stated in your Motion to Amend and supporting declaration come from alleged discussions between your father and his "Singaporean contacts," which he has avowed to keep confidential. With such secrecy regarding the source of the information on which you base your belief that Temasek Holdings Private Ltd. or Singapore Technologies Semiconductors Private Ltd. are proper defendants in this action, we cannot determine whether you have evidentiary support for your allegations sufficient to meet the requirements of Rule 11(b) of the Federal Rules of Civil Procedure. We trust that you will be prepared to substantiate the basis for these allegations, and provide further detail regarding your claim that Temasek Holdings Private Ltd. and Singapore Technologies Semiconductors Private Ltd. control the operations and day-to-day functions of STATS ChipPAC before you proceed with your Motion to Amend.

We find your scarcely-veiled threat to "ensure the widest possible broadcast of this matter" if Temasek Holdings Private Ltd. and Singapore Technologies Semiconductors Private Ltd.'s refuse to capitulate to your client's exorbitant settlement demand in potential violation of the Arizona Rules of Professional Conduct, Rule 42, ER 3.6. We are prepared to bring any extrajudicial statements regarding this action that might prejudice the adjudication of this matter to the attention of the Court and the State Bar of Arizona if necessary.

Finally, when we discussed the prior mediation and other efforts to resolve this action during our telephone conversation on November 14, 2008, you advised that you would provide a "realistic" settlement demand early the following week. By "realistic," we inferred that you meant a settlement demand less than the $685,000 demand your client tendered before walking out in the middle of the earlier mediation. More than a month later, we have received no demand or other communication from you regarding settlement, except to learn that you demanded $2,500,000 from Temasek Holdings Private Ltd. and Singapore Technologies Semiconductors Private Ltd. We are taken aback by your contradictory messages regarding the possibility of settlement in this action, and see no point to continuing the previously adjourned mediation.

Please call me if you would like to discuss any of these matters.

Sincerely,

Caroline Larsen

CLEARY GOTTLIEB STEEN & HAMILTON LLP
INTERNATIONAL LAWYERS

佳利律師事務所
國際律師

BANK OF CHINA TOWER
ONE GARDEN ROAD
HONG KONG

香港花園道一號
中銀大廈

TELEPHONE (852) 2521-4122
FACSIMILE  (852) 2845-9026
WWW.CLEARYGOTTLIEB.COM

電話 (852) 2521-4122
傳真 (852) 2845-9026

NEW YORK
WASHINGTON, DC
PARIS
BRUSSELS
LONDON
MOSCOW
FRANKFURT
COLOGNE
ROME
MILAN
BEIJING

W. CLAYTON JOHNSON¹
FILIP MOERMAN¹,²
JINDUK HAN¹
DAVID W. HIRSCH¹
YONG G. LEE¹
SUNG K. KANG¹

RESIDENT PARTNERS

1 MEMBER OF THE
  NEW YORK BAR
2 MEMBER OF THE
  BRUSSELS BAR

Writer's direct dial: (852) 2532-3731
E-Mail: dhirsch@cgsh.com

March 15, 2007

<u>VIA COURIER AND EMAIL</u>

Mr. Brian V. Breheny
Chief
Office of Mergers & Acquisitions
Division of Corporation Finance

Ms. Christina Chalk
Special Counsel
Office of Mergers & Acquisitions
Division of Corporation Finance

Mr. James A. Brigagliano
Associate Director
Office of Trading Practices and Processing
Division of Market Regulation

U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C.  20549
United States of America

Re:     Cash Offer by Singapore Technologies Semiconductors Pte Ltd for
        STATS ChipPAC Ltd.

Ladies and Gentlemen:

    We are writing on behalf of Singapore Technologies Semiconductors Pte Ltd ("STSPL"), a Singapore company wholly owned by Temasek Holdings (Private) Limited ("Temasek"). Temasek is an investment company headquartered in Singapore that is wholly

U.S. Securities and Exchange Commission, p. 2

owned by The Minister for Finance, Incorporated, a body corporate constituted under Singapore law that is controlled by the Government of Singapore. On March 1, 2007, STSPL announced that it intends to make a cash tender offer (the "Offer") for (1) all outstanding ordinary shares (the "Ordinary Shares") of STATS ChipPAC Ltd. (the "Company"), a Singapore company, that it does not already own, (2) all outstanding American Depositary Shares (the "ADSs") representing Ordinary Shares, and (3) two of the three outstanding series of bonds (the "Bonds", and together with the Ordinary Shares and ADSs, the "Securities") of the Company that are convertible into Ordinary Shares. STSPL will also make a concurrent proposal to all holders of outstanding share options (the "Options") of the Company that may be exercised for Ordinary Shares. The Singapore Code on Takeovers and Mergers (the "Singapore Code") requires that STSPL commence the Offer within 14 to 21 days after announcement of STSPL's intention to make the Offer. Accordingly, STSPL intends to commence the Offer on March 16.

The Ordinary Shares and ADSs are registered under §12 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). The Ordinary Shares are listed on the Singapore Exchange Securities Trading Limited (the "SGX-ST"), and the ADSs are quoted on the Nasdaq Global Market ("NASDAQ"). Neither the Bonds nor the Options are registered under the Exchange Act. The Bonds are traded only over the counter, and the Options are not transferable. STSPL currently owns approximately 35.3% of the Ordinary Shares of the Company.

As previously discussed with members of the staff (the "Staff") of the Securities and Exchange Commission (the "Commission" or the "SEC"), we respectfully request on behalf of STSPL that:

1. The Commission grant exemptive relief from:

   a. Rule 14d-11 under the Exchange Act to permit STSPL to keep the Subsequent Offering Period (as defined below) open in accordance with Singapore law and practice, but for a period no longer than four months after the Commencement Date (as defined below) unless required by Rule 14e-1(b);

   b. Rule 14d-11(c) under the Exchange Act to permit STSPL to commence the Subsequent Offering Period while payment for Securities tendered during the Initial Offer Period (as defined below) is in process in accordance with Singapore law and practice;

   c. Rule 14d-11(e) under the Exchange Act to permit STSPL to pay for Securities tendered during the Subsequent Offering Period as soon as practicable in accordance with Singapore law and practice, but in any case within 14 calendar days after receipt; and

   d. Rule 14e-5 under the Exchange Act to permit purchases of, or arrangements to purchase, Securities and Related Securities (as defined below) other than the Convertible Subordinated Notes (as defined below) by or on behalf of STSPL otherwise than pursuant to the Offer, subject to the restrictions described in part IV of this letter.

U.S. Securities and Exchange Commission, p. 3

2. The Staff of the Division of Corporation Finance confirm that it will not recommend that the Commission take enforcement action against STSPL or Temasek:

    a. Under Rule 14d-4(d) under the Exchange Act, if STSPL terminates the Initial Offer Period and thereby ends withdrawal rights before the scheduled expiration of a voluntary extension of the Initial Offer Period, so long as (i) at the time withdrawal rights terminate (a) the Initial Offer Period has been open for at least 20 U.S. business days and (b) all Offer conditions have been satisfied in accordance with any applicable rules of the Commission, (ii) the disclosure outlined in this letter below as to the possibility of an early termination of the Initial Offer Period and of any actual early termination of the Initial Offer Period has been made available to U.S. security holders, and (iii) STSPL provides a Subsequent Offering Period so that the Offer, including such Subsequent Offering Period, remains open for at least 10 U.S. business days after the announcement of the early termination;

    b. Under Rule 14e-1(b) under the Exchange Act, if STSPL pays an additional cash amount for the Ordinary Shares or ADSs or each series of Bonds purchased in the Offer if the 90% Threshold (as defined below) is reached, without providing additional withdrawal rights as a result of such increase in consideration, so long as (i) the potential increase in consideration and the amount of such increase are disclosed in the offer document, (ii) the effectiveness of such increase in consideration is announced by press release, by a filing on EDGAR, by publication in a newspaper of national circulation in the United States and via SGXNET, (iii) such announcement is made at the end of the Initial Offer Period or during any Subsequent Offering Period and (iv) a Subsequent Offering Period is provided, continued or extended so that the Offer, including such Subsequent Offering Period, remains open for at least 10 U.S. business days after the announcement of such increase; and

    c. Under Rule 14e-1(c) under the Exchange Act, if STSPL pays for or returns Securities tendered during the Initial Offer Period as soon as practicable in accordance with Singapore law and practice, but in any case within 14 calendar days, after the Offer is declared unconditional or lapses.

3. The Staff of the Division of Market Regulation confirm that it will not recommend that the Commission take enforcement action against STSPL or Temasek under Rule 14e-5 under the Exchange Act, if the Government Entities (as defined below) and the Independent Companies (as defined below) purchase, or arrange to purchase, Securities and Related Securities outside the Offer.

U.S. Securities and Exchange Commission, p. 4

## I. Background

**STATS ChipPAC Ltd.**

      The Company is a leading service provider of semiconductor packaging design, assembly, test and distribution solutions. It was incorporated as ST Assembly Test Services Ltd on October 31, 1994 and began operations in January 1995. In February 2000, it completed an initial public offering in Singapore and the United States and in August 2004 merged with ChipPAC, Inc., a U.S. public company. The Company is incorporated and headquartered in Singapore and has manufacturing facilities located in Singapore, South Korea, China, Malaysia and Taiwan and test pre-production facilities in the United States.

      The Company is a "foreign private issuer" as defined in Rule 3b-4 under the Exchange Act. Its Ordinary Shares and ADSs are registered under §12 of the Exchange Act. The Ordinary Shares are listed on the SGX-ST (SGX-ST: STATSChp) and the ADSs are quoted on NASDAQ (NASDAQ: STTS). Each ADS represents ten Ordinary Shares. The Company has three series of convertible bonds that are not registered under the Exchange Act and are only traded over the counter: its US$175,000,000 1.75% Convertible Notes due 2007, US$115,000,000 Zero Coupon Convertible Notes due 2008 and US$150,000,000 2.50% Convertible Notes due 2008. The Options are issued pursuant to stock option plans, are not registered under the Exchange Act and are not transferable.

      For the year ended December 31, 2006, the Company had reported (unaudited) revenues of US$1.6 billion, net income of US$76.8 million, or $0.37 per diluted ADS, and total assets of US$2.5 billion.

**Singapore Technologies Semiconductors Pte Ltd**

      STSPL is a Singapore company that is wholly owned by Temasek. Temasek is an investment company headquartered in Singapore that is wholly owned by The Minister for Finance Inc., a body corporate constituted under Singapore law that is controlled by the Government of Singapore. Established in 1974, Temasek actively manages a diversified global portfolio of US$80 billion (as of March 31, 2006), with the aim of creating and maximizing the sustainable value of its investments. Its investments are principally made in Singapore, the rest of Asia and the OECD economies and in various industries including telecommunications and media, financial services, real estate, transportation and logistics, energy and resources, infrastructure, engineering and technology, as well as biosciences and healthcare.

**U.S. Holders**

      STSPL announced its intention to make the Offer on March 1, 2007. Since then, STSPL has requested that the Company provide it with copies of the registers of holders of the Ordinary Shares, ADSs, Bonds and Options, and has received copies of the Ordinary Share, ADS and Option registers. STSPL has reiterated its request for the Bond registers. STSPL has also requested with the permission of the Company the Non-Objecting Beneficial Owners list from Automatic Data Processing, Inc. (ADP), but has not yet received this list. In an attempt to expedite the identification of U.S. holders, STSPL has also requested that the Company execute an authorization letter that could be delivered to holders of record by STSPL's information agent

U.S. Securities and Exchange Commission, p. 5

to determine whether they hold Securities on behalf of U.S. holders. The Company recently provided such an authorization letter with respect to the Ordinary Shares and the ADSs, but not the Bonds. STSPL's information agent has sent the authorization letter to all nominees in Singapore that it has identified on the Ordinary Share register, but has not yet received any responses to this request. STSPL still faces the practical difficulty of obtaining responses from holders of record, since there is no effective means to compel responses to these inquiries, and the Singapore Code requires that the Offer commence within 14 to 21 days of announcement.

At this time, STSPL has used its best efforts to determine the number of U.S. holders of the Ordinary Shares and ADSs based on an analysis of the register for the Ordinary Shares and ADSs and publicly available information, including the Company's Annual Report on Form 20-F for the fiscal year ended December 31, 2006 and Exchange Act filings since December 31, 2006 by or in respect of the Company, data on beneficial shareholding positions supplied by Thomson Financial as of February 22, 2007 (the "Thomson Financial Data") and available trading data.

According to the Company's Ordinary Share register, as of March 2, 2007, the Company had 2,013,808,051 Ordinary Shares issued and outstanding, including those represented by ADSs (the "Issued Share Capital"). Registered holders with U.S. addresses held just 360,690 Ordinary Shares (approximately 0.02% of the Issued Share Capital). Registered holders with addresses outside the United States or Singapore held 7,095,380 Ordinary Shares (approximately 0.35% of the Issued Share Capital). Registered holders with addresses in Singapore held the balance of 2,006,351,981 Ordinary Shares. This figure includes the 712,228,050 Ordinary Shares held by STSPL. Excluding the Ordinary Shares held by STSPL, registered holders with addresses in Singapore held 1,294,123,931 Ordinary Shares. Of this amount, holders that do not appear to be brokers, dealers, banks or other nominees held 190,913,350 Ordinary Shares (approximately 9.48% of the Issued Share Capital). This leaves 1,103,210,581 Ordinary Shares (approximately 54.78% of the Issued Share Capital) held by possible brokers, dealers, banks or other nominees. As discussed above, STSPL is seeking information regarding the beneficial owners of these Ordinary Shares, but does not have access to such information at this time. Based on the above information, even in the unlikely event that all of the Ordinary Shares held by possible brokers, dealers, banks or other nominees were held for the benefit of U.S. residents, the maximum amount of the Issued Share Capital that could be held by U.S. holders would be approximately 54.80%.

According to the ADS register, as of March 2, 2007, the ADSs represented approximately 29.19% of the Issued Share Capital. Nearly all of the ADSs were held in book-entry form through DTC. As discussed above, STSPL is seeking information regarding the beneficial owners of these ADSs, but does not have access to such information at this time. Based on the Thomson Financial Data, however, STSPL believes that some number of the ADSs are held by non-U.S. holders.

According to Schedules 13G filed by holders of Ordinary Shares and ADSs and the Thomson Financial Data, only two investors hold more than 10% of the Issued Share Capital: STSPL (35.3%) and FMR Corp. ("Fidelity") (12.5%). The Thomson Financial Data, which is based on a review of various public sources including Schedules 13G and Form 13F reports filed by institutional investment managers, indicates that institutional investors accounted for 32.5%

U.S. Securities and Exchange Commission, p. 6

of the Issued Share Capital and that institutional investors that are classified by Thomson as U.S. holders (including Fidelity) accounted for 29.5% of the Issued Share Capital. The Thomson Financial Data together with Ordinary Shares held by STSPL and Fidelity accounts for 68.1% of the Issued Share Capital. For the twelve months ending February 21, 2007, trading of the ADSs in the U.S. accounted for 40.4% of the global trading volume of Ordinary Shares and ADSs.

Without more information regarding the beneficial owners of Ordinary Shares held by potential nominees, it is not possible at this point for STSPL to use the data obtained from the Ordinary Share and ADS registers to perform the calculations required by Instruction 2 to Rule 14d-1(d) of the Exchange Act. However, if STSPL were to assume at this point, pursuant to Instruction 2(iv), that all of the Ordinary Shares held through nominees with addresses in Singapore were held by residents of Singapore, then approximately 0.02% percent of the Issued Share Capital would be held by U.S. holders. If STSPL were to assume that the Ordinary Shares held by the Singapore custodian for the ADR program were all held by U.S. holders, that figure would increase to approximately 29.21% of the Issued Share Capital. Similarly, calculating the number of U.S. holders in accordance with Instruction 2 to Rule 14d-1(d) by reference to the Thomson Financial Data and the filings on Schedule 13Gs, approximately 32.8% percent of the Issued Share Capital would be held by U.S. holders.

In each case, these figures are lower than the 40% threshold required for relief under Rule 14d-1(d) ("Tier II Relief"). Although STSPL has used its best efforts in calculating this number, it is unable to make this calculation strictly in accordance with the requirements of Instruction 2 to Rule 14d-1(d), as described above. The ability of STSPL to conduct look-through procedures will ultimately depend on the Company's willingness to aid STSPL in identifying U.S. holders; even then, it is uncertain how effective those procedures will be, particularly in light of the short period of time prior to the commencement of the Offer and the practical difficulty of obtaining responses to the Company's requests for information from holders of record. STSPL must therefore assume that Tier II Relief is not available for purpose of requesting the relief described in this letter.[1]

As discussed above, STSPL is unable at this point to obtain detailed information on U.S. holders of the Bonds, which are not registered under the Exchange Act and which are traded over the counter. Only the Company has access to the Bond registers, and STSPL has requested, but not yet received, copies of these registers. Instead, STSPL has used its best efforts to determine the number of U.S. holders of the Bonds based on an analysis of publicly available information, including data on beneficial ownership positions as of December 31, 2006 supplied by STSPL's information agent. The Offer is being made for two of the three outstanding series of convertible bonds of the Company: its US$115,000,000 Zero Coupon Convertible Notes due 2008 (the "Convertible Notes") and its US$150,000,000 2.50% Convertible Subordinated Notes due 2008 (the "Convertible Subordinated Notes").

The Convertible Notes were issued by the Company in 2003, prior to its merger with ChipPAC, Inc. The Convertible Notes were issued outside the United States under

---

[1]    In Release No. 34-42054 (January 24, 2000) (Cross Border Tender and Exchange Offers, Business Combinations and Rights Offerings), the Commission indicated its willingness to consider requests for relief from certain provisions of the Exchange Act on a case-by-case basis where a bidder could not avail itself of Tier II Relief.

U.S. Securities and Exchange Commission, p. 7

Regulation S and are cleared through Euroclear and Clearstream (but not DTC). STSPL has not yet been able to obtain any information regarding the current beneficial owners of the Convertible Notes, but STSPL believes it is likely that the Convertible Notes are predominantly held by non-U.S. holders in light of the manner in which the Convertible Notes were originally issued and are currently cleared.

The Convertible Subordinated Notes were issued by ChipPAC, Inc., prior to its merger with the Company in 2003. The Convertible Subordinated Notes were issued in a Rule 144A / Regulation S offering, and are cleared through DTC. According to data on beneficial ownership positions for the Convertible Subordinated Notes as of December 31, 2006 supplied by STSPL's information agent,[2] approximately 99% of the Notes are held by eight institutional investors with U.S. addresses. The amount offered by STSPL for the Convertible Subordinated Notes under the terms of the Offer constitutes less than 11% of the total amount offered by STSPL for all Securities in the Offer.

STSPL has received from the Company a copy of the register of holders of Options, dated as of March 7, 2007, which lists the addresses of holders of the Options. According to this register, 17.1% of the Options are held by U.S. holders, which is below the 40% threshold required for Tier II relief.

**Regulation of Tender Offers in Singapore**

Tender offers in Singapore are regulated under the Singapore Code, and the Offer must conducted in accordance with the requirements of the Singapore Code. The primary objective of the Singapore Code is the fair and equal treatment of all shareholders in a tender offer or merger; the company and its shareholders are left to determine the merits of the transaction. A fundamental requirement of the Singapore Code is that shareholders of a company subject to a tender offer must be given sufficient information, advice and time to consider an offer.

The Singapore Code is issued by the Monetary Authority of Singapore (the "MAS") and administered and enforced by the Securities Industry Council of Singapore (the "SIC"), whose members comprise representatives from the private and public sectors. The Singapore Code does not have the force of law, but the SIC has legal authority to investigate any dealing in securities that is connected with a tender offer or merger. If the SIC determines that there has been a breach of the Singapore Code, it may reprimand or censure the offender or bar the offender temporarily or permanently from use of the facilities of the Singapore securities markets.

Singapore counsel has informed us that the procedures and regulations in the Singapore Code that govern tender offers are very similar to those in the City Code on Takeovers and Mergers, which govern tender offers in the U.K. Indeed, the relief requested here is substantially similar to that relief granted by the Commission in connection with the offer by

---

[2]    The data is based on Form 13F reports filed by institutional investment managers.

U.S. Securities and Exchange Commission, p. 8

AstraZeneca for all ordinary shares of Cambridge Antibody Technology Group plc, a cross-border tender offer made in the U.S. and the U.K.[3]

We also note the existence of the Memorandum of Understanding Concerning Consultation and Cooperation and the Exchange of Information signed on May 16, 2000 between the Commission and the MAS on securities and futures matters.

## II.  Summary of the Offer

### General

The Offer will be for all Ordinary Shares and ADSs and will be subject to the condition that STSPL receives tenders of a number of Ordinary Shares and ADSs which, together with Ordinary Shares and ADSs owned, controlled or agreed to be acquired by STSPL before or during the Offer, would result in STSPL owning more than 50% of the Ordinary Shares (including those represented by ADSs) as of the final scheduled closing date of the Offer.  If STSPL acquires 90% (the "90% Threshold") of the total number of Ordinary Shares (other than those held by STSPL or its related corporations or their respective nominees as of the Commencement Date) as of the final scheduled closing date of the Offer, STSPL intends to effect a compulsory acquisition of the remaining Ordinary Shares, or "squeeze out", under Section 215 of the Companies Act of Singapore (the "Companies Act").

Under Rule 19 of the Singapore Code, where an offer is made for ordinary shares of a company and the company has securities outstanding that are convertible into or exercisable for the ordinary shares of that company, the bidder is obligated to make an offer to all holders of those securities.  As a result, the Offer will be extended to holders of the Bonds, in addition to holders of the Ordinary Shares and ADSs.  STSPL has obtained confirmation from the SIC that one series of convertible bonds, the 1.75% Convertible Bonds due 2007, need not be included in the Offer since these bonds will mature on March 18, 2007.  The Options are not included in the Offer because they are not transferable.  STSPL has also obtained SIC confirmation to make a concurrent proposal to all holders of the Options pursuant to which STSPL will agree to pay a cash amount in return for the holders agreeing to not exercise their options.

The Offer will be structured as a single cash offer and the same procedures will govern the Offer for all Securities.  The Offer will be made concurrently in Singapore, the United States and certain other jurisdictions where the Offer may be legally extended and will be structured to comply with (i) the Singapore Code, (ii) the Companies Act, (iii) the rules of the SGX-ST, and (iv) Sections 14(d) and 14(e) of the Exchange Act (including Regulations 14D and 14E promulgated thereunder) and Rule 13e-3 thereunder.  Temasek and STSPL intend to file one combined Schedule TO and Schedule 13E-3 on which both Temasek and STSPL will be listed as filing parties.

In addition to seeking relief from certain provisions of the SEC rules here, STSPL has also sought and obtained confirmation from the SIC that the Offer may depart from certain standard practices and procedures required under Singapore law in order to accommodate SEC rules.  In particular, the SIC has agreed that (i) STSPL may provide withdrawal rights to holders,

---

[3]        AstraZeneca plc (available May 23, 2006).

U.S. Securities and Exchange Commission, p. 9

but only until all conditions to the Offer are satisfied or, if later, the First Closing Date (as defined below) and (ii) the Offer, including any Subsequent Offering Period, may remain open for acceptances for at least 10 U.S. business days after notice that the 90% Threshold has been reached.

**Procedures**

STSPL announced its intention to make the Offer on March 1, 2007 (the "Announcement Date"). The Offer will commence (such date, the "Commencement Date") when the offer document is mailed to all holders, which must be no earlier than 14 days, and no later than 21 days, after the Announcement Date. The offer document will state that the Offer may be accepted by holders on or prior to the first closing date (the "First Closing Date"), which will be a date not less than 20 U.S. business days from the Commencement Date. If all conditions to the Offer are satisfied or waived by the First Closing Date, the Offer will become unconditional on the First Closing Date. If the Offer has not become unconditional on the First Closing Date, STSPL will announce that it is voluntarily extending the Offer or that the Offer will lapse. If STSPL extends the Offer, it will announce a new closing date (each such date, a "Closing Date"). Under the Singapore Code, STSPL must declare the Offer unconditional at any time during the extension period if all conditions to the Offer are satisfied or waived. The Offer must be declared unconditional on or before the 60th calendar day after the Commencement Date (the "Final Day") or it will lapse.

The period between the Commencement Date and the date on which the Offer becomes unconditional is the initial offer period (the "Initial Offer Period"). The Offer will remain open for acceptances and withdrawals for the Initial Offer Period, which will be at least 20 U.S. business days from the Commencement Date. If the Offer is declared unconditional, it will remain open for acceptances (but not withdrawals) for a subsequent offering period (the "Subsequent Offering Period"), unless STSPL provides at least 10 U.S. business days' notice in advance of the end of the Initial Offer Period that it will not provide for a Subsequent Offering Period. Under Singapore law and practice, the Subsequent Offering Period may remain open up to the Final Day, and the SIC may permit the offer to remain open for a longer period. In the Offer, STSPL proposes to keep the Subsequent Offering Period open to the extent permitted under Singapore law and practice, but for a period no longer than four months after the Commencement Date unless required by Rule 14e-1(b). Holders that accept the Offer during the Subsequent Offering Period will receive consideration in the same amount and form as that provided to holders who accepted the Offer in the Initial Offer Period.

Under the Singapore Code, payment for securities tendered in a tender offer must be made within 21 calendar days after such offer is declared unconditional or after the relevant holder accepts the Offer, whichever is later. In the Offer, STSPL will pay holders who accept the Offer during the Initial Offer Period as soon as practicable in accordance with Singapore law and practice, but in any case within 14 calendar days, after the Offer is declared unconditional. STSPL will pay holders who accept the Offer during the Subsequent Offering Period as soon as practicable in accordance with Singapore law and practice, but in any case within 14 calendar days of receipt of their acceptances. If the Offer lapses, STSPL will return Securities tendered as soon as practicable in accordance with Singapore law and practice, but in any case within 14 calendar days, of the relevant Closing Date.

U.S. Securities and Exchange Commission, p. 10

**Conditions and Pricing**

        The Offer will be subject to the condition that STSPL receives tenders of a number of Ordinary Shares and ADSs which, together with Ordinary Shares and ADSs owned, controlled or agreed to be acquired by STSPL (or parties acting in concert with STSPL) before or during the Offer, would result in STSPL (and parties acting in concert with STSPL) owning more than 50% of the Ordinary Shares (including those represented by ADSs) as of the final Closing Date of the Offer. However, if STSPL receives tenders of a number of Ordinary Shares and ADSs which, together with Ordinary Shares and ADSs owned, controlled or agreed to be acquired by STSPL (or parties acting in concert with STSPL) before or during the Offer, would result in STSPL (and parties acting in concert with STSPL) owning more than 50% of the Ordinary Shares (including those represented by ADSs) on a fully diluted basis, the Offer must (subject to the relief requested in this letter) be declared unconditional at any point after the first scheduled Closing Date of the Offer. Under the Singapore Code, STSPL may not amend or waive this minimum acceptance condition. The Offer will contain other conditions such as the absence of material adverse events affecting the Company, its business or operations. These additional conditions may be invoked by STSPL, subject to SIC consent, or waived by STSPL in accordance with SEC rules.

        The offer price will be based on a two-tier pricing structure (the "Two-Tier Share Pricing Structure") where the offer price for each Ordinary Share and ADS will be a fixed price if the 90% Threshold is not reached, and a higher fixed price per Ordinary Share and ADS if the 90% Threshold is reached. The Singapore Code requires that the offer price for the Bonds be at least the price a holder would receive if the Bonds were converted at their conversion price and the Ordinary Shares or ADSs received upon conversion tendered in the Offer (the "See-Through Price"). The offer price for the Bonds will also be based on a two-tier pricing structure (the "Two-Tier Bond Pricing Structure," and each of the Two-Tier Share Pricing Structure and Two-Tier Bond Pricing Structure, a "Two-Tier Pricing Structure") where the offer price for each series of Bonds will be a See-Through Price based on the original offer price for the Ordinary Shares and ADSs if the 90% Threshold is not reached, and a higher See-Through Price based on the higher offer price for the Ordinary Shares and ADSs if the 90% Threshold is reached. We note that the announced offer price for the Ordinary Shares is less than the conversion price for one of the two series of Bonds that will be included in the Offer. Consequently, the offer price for this series of Bonds will be less than the face value of the bonds. The offer document will contain appropriate disclosure to highlight this result.

        If the offer price for any of the Securities is increased pursuant to the Two-Tier Pricing Structure, STSPL will announce the increase in consideration by press release, by a filing on EDGAR, by publication in a newspaper of national circulation in the United States and via SGXNET, the standard medium for public announcements by listed companies in Singapore. Any such announcement will be made at the end of the Initial Offer Period or during any Subsequent Offering Period if, at such time, STSPL has determined that the 90% Threshold has been reached. STSPL will also provide, continue or extend a Subsequent Offering Period so that the Offer, including such Subsequent Offering Period, remains open for at least 10 U.S. business days after the announcement of such increase. In any case, all holders of the Ordinary Shares (including holders of ADSs representing Ordinary Shares) and each series of Bonds, respectively, who accept the Offer will receive the same price per Security regardless of the time

U.S. Securities and Exchange Commission, p. 11

of acceptance. To the extent that payment of the basic consideration for the relevant Securities purchased in the Offer has already been made at the time the 90% Threshold is reached, the additional consideration will be paid to the tendering holders in respect of such Securities as soon as practicable in accordance with Singapore law and practice after notice that the 90% Threshold has been reached, but in any case within 14 calendar days.

In the concurrent proposal for the Options, the consideration paid will be the difference between the offer price for the Ordinary Shares and the exercise price or, for Options whose exercise price is greater than the offer price for the Ordinary Shares, a nominal price.

## III.  Issues

### Rule 14-4(d) — Termination of Withdrawal Rights During a Voluntary Extension of the Initial Offer Period

Under Rule 29 of the Singapore Code, acceptances are irrevocable and withdrawals are not permitted during an offer until 14 calendar days after the first closing date and only if the offer has not been declared unconditional as to acceptances. Furthermore, under Singapore law, an offer must be declared unconditional as to acceptances as soon as the minimum tender condition is satisfied, and withdrawal rights (if any) terminate upon the offer being declared unconditional as to acceptances. To accommodate the requirements of the Exchange Act, STSPL has sought and obtained confirmation from the SIC that it may depart from standard practice in Singapore and permit withdrawals in the Offer, but only during the Initial Offer Period, which will last for a period of at least 20 U.S. business days from the Commencement Date.

If the Offer is not declared unconditional by the First Closing Date, STSPL may voluntarily extend the Offer and declare a new Closing Date or STSPL may allow the Offer to lapse. If STSPL voluntarily extends the Initial Offer Period and the Offer conditions are satisfied[4] by STSPL during this extension period, STSPL must declare the Offer unconditional in accordance with Singapore law and practice. In these circumstances, early termination of the extended Initial Offer Period and, correspondingly, withdrawal rights, would depart from U.S. practice where withdrawals are permitted until the scheduled expiration date. The conflict here is created by the fact that withdrawals are normally not permitted in Singapore tender offers and by the concept under Singapore law that an offer may become unconditional in all respects prior to its scheduled expiration date. STSPL has sought and obtained confirmation from the SIC that STSPL may depart from Singapore law and practice to permit withdrawals during the Initial Offer Period in order to accommodate U.S. rules. Likewise, STSPL respectfully requests that the SEC allow STSPL to terminate withdrawal rights in accordance with Singapore law and practice in the limited case where all conditions to the Offer have been satisfied (but not waived) during a voluntary extension of the Initial Offer Period. Early termination of the Initial Offer Period in these circumstances also enables accepting holders to be paid for their Securities at an earlier date. In the case of any such early termination, STSPL will announce the early termination through a press release and a filing on EDGAR. STSPL also will provide a Subsequent Offering

---

[4]    As discussed above, prior to the final Closing Date of the Offer, the Offer will be declared unconditional only if tenders have been received in an amount that would result in ownership of a majority of the outstanding Ordinary Shares on a fully diluted basis.

U.S. Securities and Exchange Commission, p. 12

Period so that the Offer, including such Subsequent Offering Period, remains open for at least 10 U.S. business days after the announcement of the early termination. In addition to disclosure of the number of Securities tendered at that time, as required by Rule 14e-1(d), STSPL will include in any announcement of a voluntary extension of the Initial Offer Period a reminder of (i) the possibility of an early termination of the Initial Offer Period if all of the Offer conditions are satisfied, (ii) the continuing right of security holders to withdraw any Securities tendered into the Offer, (iii) the fact that security holders' rights to withdraw their tenders will expire upon the occurrence of an early termination of the Initial Offer Period, and (iv) the fact that immediately following an early termination of the Initial Offer Period, a Subsequent Offering Period will commence, during which time the Offer would remain open for tenders, but no withdrawal rights would apply. STSPL will issue a reminder announcement (through a press release and a filing on EDGAR) containing the same disclosures described in the preceding sentence (including disclosure of the number of Securities tendered at the time of the announcement) midway through any voluntary extension of the Initial Offer Period (unless STSPL has declared the Offer unconditional and terminated the Initial Offer Period by that time). We note that the relief requested here is consistent with relief previously granted by the Staff.[5]

STSPL accordingly requests that the Staff of the Division of Corporation Finance confirm that it will not recommend that the Commission take enforcement action against STSPL or Temasek if STSPL terminates the Initial Offer Period and thereby ends withdrawal rights before the scheduled expiration of a voluntary extension of the Initial Offer Period, so long as (i) at the time withdrawal rights terminate (a) the Initial Offer Period has been open for at least 20 U.S. business days and (b) all Offer conditions have been satisfied in accordance with any applicable rules of the Commission, (ii) the disclosure outlined in this letter above as to the possibility of an early termination of the Initial Offer Period and of any actual early termination of the Initial Offer Period has been made available to U.S. security holders, and (iii) STSPL provides a Subsequent Offering Period so that the Offer, including such Subsequent Offering Period, remains open for at least 10 U.S. business days after the announcement of the early termination. We note that STSPL is not seeking relief to permit the early termination of withdrawal rights during any extension required under the provisions of Regulation 14D or 14E under the Exchange Act or under the Singapore Code.

**Rule 14d-11 — Duration of the Subsequent Offering Period**

Rule 22.6 of the Singapore Code generally provides that, if an Offer has been declared unconditional, the Offer must remain open (without withdrawal rights) for at least 14 calendar days from the scheduled Closing Date to allow additional holders to accept the Offer and receive consideration in the same amount and form of consideration as that provided to holders who accepted the Offer in the Initial Offer Period. Section 215 of the Companies Act permits a bidder to count ordinary shares that have been tendered within four months after the commencement of a tender offer (but prior to the close of the tender offer) in calculating whether the 90% Threshold required to effect a compulsory acquisition under Singapore law has been met. The SIC may permit, at STSPL's request, the Subsequent Offering Period to remain open for an extended period, after the Final Day and for a period longer than 20 U.S. business days.

---

[5]     See, e.g., AstraZeneca plc (available May 23, 2006); UCB S.A. (available May 19, 2004); RWE Aktiengesellschaft (available March 22, 2002).

U.S. Securities and Exchange Commission, p. 13

STSPL would like the flexibility to keep the Subsequent Offering Period open to the extent permitted by the SIC in accordance with Singapore law and practice, but for a period no longer than four months after the Commencement Date unless required by Rule 14e-1(b).

In the U.S., acquisition of 100% ownership of a company can be achieved through a second step merger once the requisite threshold (frequently, a majority) of the target company's stock is acquired in a tender offer. However, in a tender offer for a Singapore company, 100% ownership can be achieved only if 90% of the ordinary shares not already held by the bidder, its related corporations or their respective nominees as of the date of the commencement of the offer are acquired and the bidder completes the compulsory acquisition procedures under the Companies Act. Consequently, STSPL intends to use the Subsequent Offering Period to better enable it to reach the 90% Threshold needed to conduct a squeeze out. If STSPL is unsuccessful in meeting the 90% Threshold, the Offer will be closed and STSPL will obtain majority control of the company. In the latter case, the Ordinary Shares and ADSs not tendered will remain outstanding.

Rule 14d-11 under the Exchange Act permits bidders to provide for a subsequent offering period during which acceptances will be received and withdrawal rights do not apply, but this period is limited to 20 U.S. business days. Accordingly, STSPL requests that the Commission grant exemptive relief from Rule 14d-11 to permit STSPL to keep the Subsequent Offering Period open in accordance with Singapore law and practice, but for a period no longer than four months after the Commencement Date unless required by Rule 14e-1(b). We note that the relief requested here is consistent with previous no-action letters furnished by the Staff.[6]

**Rule 14e-1(b) — Two-Tier Pricing Structure**

We understand that in other transactions that are structured so as to provide for additional consideration if a specified tender threshold is reached, the Staff has taken the position that the determination that the threshold has in fact been reached may require that the tender offer remain open for 10 U.S. business days from such determination, because such determination may be viewed as an increase in the consideration offered in the tender offer. While we do not necessarily agree with the Staff's interpretation of Rule 14e-1(b) in this regard, we respectfully request that the Staff not recommend that any enforcement action be taken under Rule 14e-1(b) if the Offer is made using a Two-Tier Pricing Structure for the Ordinary Shares or the Bonds as described in this letter.

As discussed above, STSPL has announced a Two-Tier Pricing Structure to increase holder participation in the Offer consistent with Singapore practice in similar takeover offers. Reaching the 90% Threshold is particularly difficult here because STSPL already holds approximately 35.3% of the Ordinary Shares (including those represented by ADSs) and so must obtain ownership of 90% of the approximately 64.7% of Ordinary Shares not owned by STSPL, or 93.5% of the total Ordinary Shares outstanding (including those represented by ADSs), in order to meet this requirement.

---

[6]    See, e.g., AstraZeneca plc (available May 23, 2006); UCB S.A. (available May 19, 2004); Harmony Gold Mining Company (available November 19, 2004); SERENA Software, Inc. (available April 13, 2004); Celltech Group plc (available March 3, 2002); RWE Aktiengesellschaft (available March 22, 2002); Shlumberger Limited (available July 2, 2001).

U.S. Securities and Exchange Commission, p. 14

With a Two-Tier Pricing Structure, holders will be treated fairly whether or not the 90% Threshold is reached. All holders who accept the Offer will receive the same consideration, regardless of when they accept the Offer, and those holders who have not accepted the Offer at the time the 90% Threshold is announced as satisfied will have at least 10 U.S. business days to tender their Securities and receive the total consideration offered.[7] This announcement will not be made until after withdrawal rights terminate in order to avoid the market confusion that would be created if withdrawals later reduced the number of acceptances below the 90% Threshold. As a result, holders who have accepted the Offer prior to the announcement that the 90% Threshold has been satisfied will not have withdrawal rights during the following 10 U.S. business day period. In the context of this Offer, however, this seems inconsequential given that the receipt of an additional cash payment only increases the attractiveness of the Offer to those holders who have already tendered their Securities.

STSPL accordingly requests that the Staff of the Division of Corporation Finance confirm that it will not recommend that the Commission take enforcement action against STSPL or Temasek under Rule 14e-1(b) if STSPL pays an additional cash amount for the Ordinary Shares or ADSs or each series of Bonds purchased in the Offer if the 90% Threshold is reached, without providing additional withdrawal rights as a result of such increase in consideration, so long as (i) the potential increase in consideration and the amount of such increase are disclosed in the offer document, (ii) the effectiveness of such increase in consideration is announced by press release, by a filing on EDGAR, by publication in a newspaper of national circulation in the United States and via SGXNET, (iii) such announcement is made at the end of the Initial Offer Period or during any Subsequent Offering Period and (iv) a Subsequent Offering Period is provided, continued or extended so that the Offer, including such Subsequent Offering Period, remains open for at least 10 U.S. business days after the announcement of such increase.

### Rule 14e-1(c) and Rule 14d-11(c) — Prompt Payment and Return of Securities following the Initial Offer Period and Commencement of the Subsequent Offering Period

Under the Singapore Code, a bidder is required to pay for acceptances received within 21 calendar days after an offer is declared unconditional. Where an offer is unsuccessful and lapses, tendered securities must be returned within 21 calendar days of the relevant closing date. This 21-day settlement period is well established in Singapore market practice.

Rule 14e-1(c) under the Exchange Act requires that the consideration offered in a tender offer be paid, or securities tendered be returned, "promptly" after the termination of such offer. Furthermore, as a condition to the implementation of a subsequent offering period, Rule 14d-11(c) under the Exchange Act requires that a bidder immediately accept and promptly pay for all securities tendered during the initial offer period. STSPL will pay for or return Securities tendered during the Initial Offer Period as soon as practicable after the Offer is declared unconditional or lapses, but in any case within 14 calendar days. This represents a significant shortening of the 21-day period that is standard to Singapore settlement practices and the minimum period that can be accommodated by Singapore settlement agents with any certainty at

---

[7]     We also note that if holders do not tender into the Offer and are squeezed out through the compulsory acquisition procedures under the Companies Act, STSPL will be obligated to pay to such holders the same price paid in the Offer.

U.S. Securities and Exchange Commission, p. 15

this time.  All payments for the Ordinary Shares are made through the Singapore depositary, CDP.  This process is out of the control of STSPL and can take a minimum of four to five days depending the volume of transactions that are being processed by CDP at that time. In addition, to our knowledge, the Offer is also the first to be settled concurrently in Singapore and the U.S. via multiple settlement systems and presents a number of logistical issues that must be resolved by the CDP and STSPL to ensure that it occurs without error.  In any case, STSPL will commit to settle the transaction within 14 calendar days, which is consistent with previous no-action letters furnished by the Staff,[8] and will use its best efforts to shorten the settlement period to seven U.S. business days.

In the context of the Offer, STSPL believes that the payment for, or return of, tendered Securities as soon as practicable in accordance with Singapore law and practice after the Offer is declared unconditional or lapses, but in any case within 14 calendar days, will constitute "prompt" payment or return within the meaning of Rule 14e-1(c) and accordingly requests that the Staff of the Division of Corporation Finance confirm that it will not recommend that the Commission take enforcement action against STSPL or Temasek if STSPL settles the Offer in this manner and that the Commission grant exemptive relief from Rule 14d-11(c) to permit STSPL to commence the Subsequent Offering Period while payment for acceptances received is being made.

**Rule 14d-11(e) — Prompt Payment during the Subsequent Offering Period**

Under the Singapore Code, a bidder is required to accept and pay for acceptances received during a subsequent offering period within 21 calendar days after receipt.  In practice, bidders in Singapore "bunch" together securities in multiple settlements over the course of the subsequent offering period to meet this requirement.  Rule 14d-11(e) of the Exchange Act requires that a bidder immediately accept and promptly pay for securities tendered during a subsequent offering period.  STSPL will expedite the settlement of the Offer and will pay holders who accept the Offer during the Subsequent Offering Period as soon as practicable after receipt of tendered Securities in accordance with Singapore law and practice, but in any case within 14 calendar days.  In addition, STSPL will use its best efforts to shorten this settlement period to seven U.S. business days.  STSPL believes that settlement by this time will constitute "prompt" payment within the meaning of Rule 14d-11(e) and is consistent with previous no-action letters furnished by the Staff.[9]

STSPL therefore requests that the Commission grant exemptive relief under Rule 14d-11(e) to permit STSPL to pay for Securities tendered during the Subsequent Offering Period as soon as practicable in accordance with Singapore law and practice, but in any case within 14 calendar days after receipt.

---

[8]    With respect to Rule 14e-1(c), see, e.g., AstraZeneca plc (available May 23, 2006); Nordic Telephone Company Aps (available January 3, 2006) Harmony Gold Mining Company (available November 19, 2004); Finalream Limited (available December 29, 1999); Lighthouse Holdings, Inc. (available March 30, 1999); and Adecco S.A. (available February 4, 1999).  With respect to 14d-11(c), see, e.g., AstraZeneca plc (available May 23, 2006); Harmony Gold Mining Company (available November 19, 2004).
[9]    See, e.g., AstraZeneca plc (available May 23, 2006); Harmony Gold Mining Company (available November 19, 2004).

U.S. Securities and Exchange Commission, p. 16

**Rule 14e-5 — Purchases Outside the Offer by STSPL and Persons Acting for STSPL**

Under Singapore law, a bidder or any person acting for the account or benefit of the bidder is free to purchase securities outside a tender offer. Such purchases are common in connection with offers for Singapore companies. If a purchase is made above the offer price, however, Rule 21.1 of the Singapore Code requires that the bidder increase the offer price in the tender offer to match the price paid for such purchase. This requirement applies to all purchases made from the announcement of the offer until the offer closes or lapses. The bidder must disclose such purchases by 12 p.m. (Singapore time) on the business day following the purchase via SGXNET.

Subject to certain exceptions, Rule 14e-5 of the Exchange Act prohibits a covered person from directly or indirectly purchasing or arranging to purchase any securities to be acquired in a tender offer or any securities immediately convertible into, or exchangeable or exercisable for, such securities (collectively, "Securities and Related Securities"), except as part of the tender offer. This prohibition applies from the time the offer is publicly announced until it expires. Rule 14e-5 defines a covered person as (i) the bidder and its affiliates, (ii) the bidder's dealer-managers and any of their respective affiliates, (iii) any advisers to the parties described in (i) and (ii) above whose compensation is dependent on the completion of the offer and (iv) any person acting in concert either directly or indirectly with any of the foregoing in connection with any purchase or arrangement to purchase any subject securities or any related securities. Purchases of Securities or Related Securities by STSPL or other covered persons acting for the account or benefit of STSPL outside the Offer would not fall within any of the excepted activities specifically outlined in Rule 14e-5. Accordingly, in the absence of exemptive relief, such purchases would be prohibited after the date on which the Offer is announced. Temasek and STSPL are not seeking the relief proposed here for the Convertible Subordinated Notes.

The Commission has enumerated certain factors that it considers important in ruling on a Rule 14e-5 exemption request, including (i) the degree of ownership of the target by U.S. holders, (ii) whether the offer will be made to U.S. holders on an equal basis to non-U.S. holders, (iii) whether the consideration will be cash or securities, (iv) the nature of the foreign regulation to which the offer is subject and (v) whether the principal trading market for the securities is outside the United States.

In the context of the Offer, we note that (i) the level of U.S. shareholdings is consistent with levels noted in prior letters requesting relief from Rule 14e-5,[10] (ii) the Offer is for all outstanding Securities, (iii) the Offer will be made on the same basis to U.S and non-U.S. holders of all Securities, (iv) the consideration will consist entirely of cash, (v) the Offer will be subject to SIC regulation under the Singapore Code and there is a memorandum of understanding between the Commission and the MAS concerning securities and futures matters, and (vi) the principal trading market of the Ordinary Shares is outside the United States on the SGX-ST.

---

[10]     The Commission has granted relief from Rule 14e-5 in cases where the offers qualified for Tier II Relief as well as those where Tier II Relief was not available. For examples of where relief from Rule 14e-5 was granted and Tier II Relief was not available, see, e.g., AstraZeneca plc (available May 23, 2006); Harmony Gold Mining Company (available November 19, 2004); Anheuser Busch (available May 7, 2004).

U.S. Securities and Exchange Commission, p. 17

Accordingly, we request that the Commission grant exemptive relief from Rule 14e-5 to permit purchases of, or arrangements to purchase, Securities and Related Securities (other than the Convertible Subordinated Notes) outside the United States outside the Offer by STSPL and any adviser, broker or other financial institution acting as its agent and any person acting in concert either directly or indirectly with any of the foregoing in connection with any purchase or arrangement to purchase any Securities or Related Securities (the "Prospective Purchasers") that would otherwise be prohibited by Rule 14e-5, subject to the customary conditions under which Rule 14e-5 relief has been granted by the Staff, as further described below in part IV of this letter. We believe the relief requested is consistent with relief the Staff has afforded to bidders in similar circumstances in the past.[11]

Please note that, in our view, there are serious doubts as to whether the jurisdictional predicate for the application of the Exchange Act, namely that there be a purchase of a security "by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange", would be satisfied if STSPL, or financial institutions acting on its behalf, made purchases of, or arrangements to purchase, Ordinary Shares outside the United States. We have been requested by STSPL to emphasize that this letter does not reflect an admission that Rule 14e-5 would apply to such purchases of Securities or Related Securities outside the United States in the absence of such exemptive relief.

## Rule 14e-5 — Purchase Outside the Offer by Certain Entities

As described above, STSPL is wholly owned by Temasek, which is an investment company headquartered in Singapore that is in turn wholly owned by The Minister for Finance, Incorporated, a body corporate constituted under the Minister for Finance (Incorporation) Act Chapter 183 of the Statutes of the Republic of Singapore that is controlled by the Government of Singapore. The Government of Singapore may be considered to be an affiliate of STSPL as the Government of Singapore indirectly wholly owns STSPL. Other entities that are owned or controlled by the Government of Singapore may also be considered to be affiliates of STSPL as such entities and STSPL are under the common control of the Government of Singapore (the "Government of Singapore and the other entities that are owned or controlled by the Government of Singapore, excluding Temasek and its subsidiaries, are collectively referred to as the "Government Entities"). Additionally, Temasek has made investments with a total value of US$80 billion as of March 30, 2006 in numerous companies. Certain of Temasek's investments are in or through investment holding vehicles directly managed by Temasek (the "Managed Companies"). The other companies in which Temasek has shareholding interests are independently managed and operated (the "Independent Companies").

The definition of "covered person" under Rule 14e-5 includes affiliates of the bidder, which include all persons that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the bidder.

---

[11]    See, e.g., Giordano International Limited (available December 22, 2006); AstraZeneca plc (available May 23, 2006), Harmony Gold Mining Company (available November 19, 2004); UCB S.A. (available May 19, 2004); Anheuser Busch (available May 7, 2004); Vodafone Group plc (available March 11, 2003) Celltech Group plc (available March 3, 2002); RWE Aktiengesellschaft (available March 22, 2002); Schlumberger Limited (available February 15, 2001).

U.S. Securities and Exchange Commission, p. 18

Purchases of Securities or Related Securities by the Government Entities or the Independent Companies outside the Offer would not generally fall within any of the activities specifically permitted in the exceptions in Rule 14e-5.[12]  Accordingly, in the absence of exemptive relief, such purchases may be prohibited after the date on which the Offer is announced.

The Government Entities include certain entities that may make investments in securities. For example, the Government of Singapore has established The Government of Singapore Investment Corporation Pte Ltd. ("GIC"), an investment company that manages Singapore's foreign reserves, and the Central Provident Fund, Singapore's social security fund. According to its website, the holdings of GIC exceed US$100 billion in equities, fixed income securities, foreign exchange, commodities, money markets, alternative investments, real estate and private equity. Information regarding the investments of the Government Entities is not made public and is not known to either STSPL or Temasek. Neither STSPL nor Temasek has any means of controlling the Government Entities, and it is not possible for STSPL or Temasek to prevent transactions by the Government Entities that may be prohibited by Rule 14e-5. In any event, neither Temasek nor STSPL would take any action to induce purchases by the Government Entities to facilitate the tender offer.  Conversely, neither the Government of Singapore nor Temasek's sole shareholder (The Minister for Finance, Incorporated) involve themselves in Temasek's investment, divestment or other business decisions. All investment, business and commercial decisions of Temasek are the responsibility of the board of directors and management of Temasek, and there is no requirement that transactions over a certain size or involving particular sectors be subject to shareholder approval (other than the requirement of Singapore company law that a disposal of all or substantially all assets be approved by shareholders).  Temasek does not rely on regular financing or capital injections from the Government of Singapore for Temasek's investments or other operations, and Temasek does not rely on the Government of Singapore for any support services.

We note that the Singapore Code also imposes certain restrictions and disclosure obligations in respect of purchases of securities during a tender offer by the offeror and all parties acting in concert with the offeror.  Furthermore, the Singapore Code provides that certain persons, including the parent company, subsidiaries and associated companies, are presumed to be acting in concert with the offeror, unless otherwise rebutted.[13]  For the Offer being made by STSPL, however, the regulation imposed by the Singapore Code does not apply to the Government Entities, because STSPL and Temasek are considered to be sufficiently independent of the Government of Singapore that the Government Entities are not presumed to be acting in concert with STSPL or Temasek for the purposes of the Singapore Code.

In light of these facts, we request that the Staff of the Division of Market Regulation confirm that it will not recommend that the Commission take enforcement action

---

[12]      One Independent Company, Singapore Investment Consortium Management Ltd. ("SICM"), is the discretionary investment manager of the Singapore Index Fund, which tracks the performance of the Straits Times Index. As the Company is a component of the Straits Times Index, SICM must purchase Ordinary Shares. We believe, however, that the exception provided in Rule 14e-5(b)(5) would apply to these purchases.

[13]      Under the Singapore Code, a company is an associated company of another company if the second company owns or controls at least 20% but not more than 50% of the voting rights of the first company.

U.S. Securities and Exchange Commission, p. 19

against STSPL or Temasek if the Government Entities purchase, or arrange to purchase, Securities and Related Securities outside the Offer.[14]

The Independent Companies include both publicly-traded and privately held companies. Temasek's ownership interest in the Independent Companies varies greatly, and some Independent Companies are majority- or wholly-owned. Most of the Independent Companies are organized outside of the United States. The Independent Companies include listed companies such as Singapore Airlines Ltd. and Singapore Telecommunications Ltd., as well as financial institutions, such as a bank incorporated in Singapore, DBS Group Holdings Ltd. ("DBS"), and two banks incorporated in Indonesia, PT Bank Danamon Indonesia Tbk. and PT Bank Internasional Indonesia Tbk. In addition to any proprietary investment activities, these financial institutions may act on an agency basis for their clients in the ordinary course of their business to execute trades for the Securities and act as market makers for the Securities, activities that are unrelated to the Offer and may be critical to their business.

Each Independent Company is managed by its own management team and guided and supervised by its own board of directors independently from Temasek. Temasek, as a matter of longstanding policy and investment philosophy, does not direct the commercial or operational decisions of the Independent Companies, except in respect of matters where shareholder approval is specifically required under applicable law. Few directors of the Independent Companies are also directors or employees of Temasek, and there are no Independent Companies for which Temasek directors or employees constitute a majority of the board of directors. There is no agreement, arrangement or understanding, whether formal or informal, between the Independent Companies and Temasek to cooperate so as to obtain or consolidate effective control of the Company, and Temasek has not involved any Independent Companies in the decision-making in respect of the Offer. In any event, neither Temasek nor STSPL would take any action to induce purchases by the Independent Entities to facilitate the tender offer.

Temasek also has in place formal policies and procedures that establish informational barriers regarding shareholdings in U.S.-listed equity securities acquired by the Independent Companies as part of their treasury and portfolio operations, in their ordinary course of business (e.g., not with a view to changing control of the listed issuer) or as a pure financial investment. As a consequence of these informational barriers and the independent way in which these entities operate, Temasek does not have or share voting and/or dispositive power over U.S.-listed equity securities acquired by the Independent Companies as described in the preceding sentence, and disclaims beneficial ownership in such securities. If such securities are also listed on the Singapore Exchange, Temasek does receive reports on the number of securities acquired or disposed of by the Independent Companies for the sole purpose of ensuring Temasek's compliance with shareholding reporting requirements under Singapore law. Additionally, because the Singapore Code requires a mandatory offer for the shares of a

---

[14]    The Commission granted exemptive relief in the past in a somewhat similar context to Teléfonos de México, S.A. de C.V. (available May 10, 1991). In this letter, the Commission granted an exemption from former Rule 10b-6 for certain banks controlled by the Federal Government of the United Mexican States in light of the fact that the banks were distinct corporate entities separate from the government, had no officers or employees in common with the government, had employee compensation arrangements that are separate from those of the government, and that the government had a policy of non-intervention in the affairs of the banks and would not attempt to cause the banks to effect transactions in securities of the issuer in order to facilitate the offering.

U.S. Securities and Exchange Commission, p. 20

Singapore company once shareholdings by a shareholder and its concert parties, which would include its associated companies, have reached specified thresholds, Temasek requests that the Independent Companies seek Temasek's approval before purchasing shares of companies in which the total holdings of Temasek, the Managed Companies and the Independent Companies are near such thresholds, so as to avoid triggering a mandatory offer.[15]

As noted above, the Singapore Code imposes certain restrictions and disclosure obligations in respect of purchases of securities during a tender offer by the offeror and all parties acting in concert with the offeror. Furthermore, the Singapore Code provides that certain persons, including associated companies, are presumed to be acting in concert with the offeror, unless otherwise rebutted. Accordingly, Temasek has requested confirmation from the SIC that the presumption that the Independent Companies are acting in concert with the offeror is rebutted. Similar rulings have been granted to Temasek by the SIC in the past, on grounds such as the facts described in the previous paragraph. The SIC has granted such relief with respect to the Offer.

Accordingly, we request that that the Staff of the Division of Market Regulation confirm that it will not recommend that the Commission take enforcement action against STSPL or Temasek if the Independent Companies purchase, or arrange to purchase, Securities and Related Securities outside the Offer.

Please note that, as further discussed above, in our view, there are serious doubts as to whether the jurisdictional predicate for the application of the Exchange Act would be satisfied if the Government Entities or the Independent Companies made purchases of, or arrangements to purchase, Ordinary Shares outside the United States, and this letter does not reflect an admission that Rule 14e-5 would apply to such purchases in the absence of SEC relief.

## IV. Requested Exemptive Relief and Confirmation

Based on the foregoing, STSPL respectfully requests that:

1. The Commission grant exemptive relief from:

    a. Rule 14d-11 under the Exchange Act to permit STSPL to keep the Subsequent Offering Period open in accordance with Singapore law and practice, but for a period no longer than four months after the Commencement Date unless required by Rule 14e-1(b);

    b. Rule 14d-11(c) under the Exchange Act to permit STSPL to commence the Subsequent Offering Period while payment for Securities tendered during the Initial Offer Period is in process in accordance with Singapore law and practice;

    c. Rule 14d-11(e) under the Exchange Act to permit STSPL to pay for Securities tendered during the Subsequent Offering Period as soon as practicable in

---

[15]    While the Staff considers our request for no-action relief, Temasek has issued a notice requiring the Independent Companies not to purchase the Securities.

U.S. Securities and Exchange Commission, p. 21

accordance with Singapore law and practice, but in any case within 14 calendar days after receipt; and

d. Rule 14e-5 under the Exchange Act to permit purchases of, or arrangements to purchase, Securities and Related Securities (other than the Convertible Subordinated Notes) outside the Offer by the Prospective Purchasers that would otherwise be prohibited by Rule 14e-5, subject to the following conditions:

    i. no purchases or arrangements to purchase such Securities or Related Securities, otherwise than pursuant to the Offer, will be made in the United States;

    ii. disclosure of the possibility of such purchases by the Prospective Purchasers, otherwise than pursuant to the Offer, will be included prominently in the offer document;

    iii. the Prospective Purchasers shall disclose in the United States information regarding such purchases to the extent such information is made public in Singapore pursuant to the Singapore Code;

    iv. the Prospective Purchasers shall comply with any applicable rules in Singapore, including the Singapore Code;

    v. upon request of the Division of Market Regulation (the "Division"), the Prospective Purchasers shall disclose to it a daily time-sequenced schedule of all purchases of Securities or Related Securities made by any of them during the Offer, on a transaction-by-transaction basis, including: (a) a description of the size, broker (if any), time of execution and purchase price; and (b) if not executed on the SGX-ST, the exchange, quotation system or other facility through which the purchase occurred;

    vi. upon request of the Division, the Prospective Purchasers shall transmit the information specified in clauses (v)(a) and (v)(b) above to the Division at its offices in Washington, D.C. within 30 days of its request;

    vii. the Prospective Purchasers shall retain all documents and other information required to be maintained pursuant to this exemption for a period of not less than two years from the date of the termination of the Offer;

    viii. representatives of the Prospective Purchasers shall be made available (in person at the offices of the Division in Washington, D.C. or by

U.S. Securities and Exchange Commission, p. 22

telephone) to respond to enquiries of the Division relating to such records; and

ix. except as otherwise exempted herein, the Prospective Purchasers shall comply with Rule 14e-5.

2. The Staff of the Division of Corporation Finance confirm that it will not recommend that the Commission take enforcement action against STSPL or Temasek:

a. Under Rule 14d-4(d) under the Exchange Act, if STSPL terminates the Initial Offer Period and thereby ends withdrawal rights before the scheduled expiration of a voluntary extension of the Initial Offer Period, so long as (i) at the time withdrawal rights terminate (a) the Initial Offer Period has been open for at least 20 U.S. business days and (b) all Offer conditions have been satisfied in accordance with any applicable rules of the Commission, (ii) the disclosure outlined in this letter above as to the possibility of an early termination of the Initial Offer Period and of any actual early termination of the Initial Offer Period has been made available to U.S. security holders, and (iii) STSPL provides a Subsequent Offering Period so that the Offer, including such Subsequent Offering Period, remains open for at least 10 U.S. business days after the announcement of the early termination;

b. Under Rule 14e-1(b) under the Exchange Act, if STSPL pays an additional cash amount for the Ordinary Shares or ADSs or each series of Bonds purchased in the Offer if the 90% Threshold is reached, without providing additional withdrawal rights as a result of such increase in consideration, so long as (i) the potential increase in consideration and the amount of such increase are disclosed in the offer document, (ii) the effectiveness of such increase in consideration is announced by press release, by publication in a newspaper of national circulation in the United States and via SGXNET, (iii) such announcement is made at the end of the Initial Offer Period or during any Subsequent Offering Period and (iv) a Subsequent Offering Period is provided, continued or extended so that the Offer, including such Subsequent Offering Period, remains open for at least 10 U.S. business days after the announcement of such increase; and

c. Under Rule 14e-1(c) under the Exchange Act, if STSPL pays for or returns Securities tendered during the Initial Offer Period as soon as practicable in accordance with Singapore law and practice, but in any case within 14 calendar days, after the Offer is declared unconditional or lapses.

3. The Staff of the Division of Market Regulation confirm that it will not recommend that the Commission take enforcement action against STSPL or Temasek under Rule 14e-5 under the Exchange Act, if the Government Entities (as defined below) and the Independent Companies (as defined below) purchase, or arrange to purchase, Securities and Related Securities outside the Offer.

U.S. Securities and Exchange Commission, p. 23

## VI. Conclusion

On behalf of STSPL, we respectfully request that the Commission issue the requested exemptive relief and confirmation as soon as practicable.

If you require any further information or have any questions, please contact me in our Hong Kong office at (852) 2532-3731 or via e-mail at dhirsch@cgsh.com or William A. Groll in our New York office at (212) 225-2142 or via email at wgroll@cgsh.com.

Very truly yours,

David W. Hirsch

# Allen&Gledhill

## ADVOCATES & SOLICITORS

ONE MARINA BOULEVARD #28-00
SINGAPORE 018989

| | | |
|---|---|---|
| WRITER'S NAME | : Lim Mei / Koh Shang Yun | |
| DIRECT TEL | : +65 6890 7732 / 7748 | |
| DIRECT FAX | : +65 6302 3148 / 3138 | |
| DIRECT E-MAIL | : lim.mei@allenandgledhill.com | |
| | koh.shangyun@allenandgledhill.com | |
| OUR REF | : LM/KSY/2007001365 | |
| YOUR REF | : | |

| | |
|---|---|
| TEL | : +65 6890 7188 |
| FAX | : +65 6327 3800 |
| EFS MAILBOX ID | : ale7001, ale7003 |
| E-MAIL | : inquiries@allenandgledhill.com |
| WEBSITE | : www.allenandgledhill.com |

15 March 2007

**IMMEDIATE ATTENTION**

**BY DHL**

Mr. Brian V. Breheny
Chief
Office of Mergers & Acquisitions
Division of Corporation Finance

Ms. Christina Chalk
Special Counsel
Office of Mergers & Acquisitions
Division of Corporation Finance

Mr. James A. Brigagliano
Associate Director
Office of Trading Practices and Processing
Division of Market Regulation

U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
United States of America

Dear Sirs

**RE: CASH OFFER BY SINGAPORE TECHNOLOGIES SEMICONDUCTORS PTE LTD FOR STATS CHIPPAC LTD.**

We refer to the letter dated 15 March 2007 (the "**Letter**") from David W. Hirsch, a partner at the firm of Cleary Gottlieb Steen & Hamilton LLP, Hong Kong office, writing to you on behalf of our clients, Singapore Technologies Semiconductors Pte Ltd ("**STSPL**") and Temasek Holdings (Private) Limited ("**Temasek**"). In the Letter, STSPL and Temasek respectfully requested that the Staff grant exemptive and no action relief under certain provisions of the U.S. securities laws in connection with its offer (the "**Offer**") to acquire for cash (1) all outstanding ordinary shares (the "**Ordinary Shares**") of STATS ChipPAC Ltd. (the "**Company**"), a Singapore company, that it does not already own, (2) all outstanding American Depositary Shares representing Ordinary Shares, and (3) two of the three outstanding series of bonds of the Company that are convertible into Ordinary Shares. The Letter also made reference to certain discussions between Allen & Gledhill and Cleary Gottlieb Steen & Hamilton LLP about the Singapore regulatory regime and Singapore tender offer practice and mechanics in connection with the Offer and relevant to the relief sought.

A list of the partners and their professional qualifications is open to inspection at the above office.

Allen&Gledhill                                              PAGE 2

This letter is rendered at your request solely in connection with the Letter and is limited to matters of Singapore law and practice.  This letter is provided incidentally to, and in the ordinary course of, our practice of Singapore law in Singapore, does not purport to cover any aspects of U.S. law and without prejudice to our status as a "non-appearing foreign attorney" for purposes of SEC rules and practice.

We hereby acknowledge that we have been and are Singapore counsel to STSPL and Temasek in connection with the Offer and that the references in the Letter to discussions with Singapore counsel about the description of the Singapore regulatory regime and Singapore tender offer practice and mechanics contained in the Letter refer to discussions with Allen & Gledhill.  We have reviewed the Letter and we believe the descriptions of the Singapore regulatory regime and Singapore tender offer practice and mechanics therein are accurate.  The statements of Singapore legal and regulatory requirements and practice contained in the Letter consist of brief summaries only and should not be construed as a comprehensive description of all relevant issues.

Please do not hesitate to contact us if we can be of any further assistance or if you have any further questions.


Yours faithfully

*Allen & Gledhill*

Allen & Gledhill

JS 44   (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

### I. (a) PLAINTIFFS
PETER STROJNIK

**DEFENDANTS**
STATS ChipPAC, Inc., Temasek Holdings Private Limited, singapore Technologies Semiconductors Private Limited,

**(b)** County of Residence of First Listed Plaintiff   Maricopa
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
The Law Firm of Peter Strojnik
3030 N. Central Avenue, Suite 1401, Phoenix, AZ 85012,

Attorneys (If Known)

### II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question (U.S. Government Not a Party)
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT (Place an "X" in One Box Only)

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

*PERSONAL INJURY*
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

*PERSONAL INJURY*
- ☐ 362 Personal Injury - Med. Malpractice
- ☐ 365 Personal Injury - Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

*PERSONAL PROPERTY*
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☒ 440 Other Civil Rights

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence
  Habeas Corpus:
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt.Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 463 Habeas Corpus - Alien Detainee
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

### V. ORIGIN (Place an "X" in One Box Only)
- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from another district (specify)
- ☐ 6  Multidistrict Litigation
- ☐ 7  Appeal to District Judge from Magistrate Judgment

### VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28-2201
Brief description of cause:
Declaratory Judgement Re First Amendment

### VII. REQUESTED IN COMPLAINT:
- ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes   ☐ No

### VIII. RELATED CASE(S) IF ANY
(See instructions):   JUDGE                    DOCKET NUMBER

DATE
01/22/2009

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT #         AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

_____PHOENIX_____    District of    ARIZONA

PETER STROJNIK

                V.                                    **SUMMONS IN A CIVIL CASE**

STATS ChipPAC, Inc., STATS ChipPAC, Ltd.
Temasek Holdings Private Limited,
Singapore Technologies Semiconductors
Private Limited, Caroline Larsen, Ogletree,     CASE
Deakins, Nash, Smoak & Stewart, P.C.
State Bar of Arizona, The United States
Justice Department, The Country of Singapore

              TO: (Name and address of Defendant)

Nation of Singapore
Singaporean Embassy
3501 International Place, NW
Washington, D.C. 20008

    **YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Peter Strojnik
3030 North Central Avenue, Suite 1401
Phoenix, Arizona 85012

an answer to the complaint which is served on you with this summons, within ____60_____ days after service
of this summons on you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for
the relief demanded in the complaint.  Any answer that you serve on the parties to this action must be filed with the Clerk of this
Court within a reasonable period of time after service.

CLERK                                         DATE

(By) DEPUTY CLERK

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

PHOENIX                    District of    ARIZONA

PETER STROJNIK

V.                                    **SUMMONS IN A CIVIL CASE**

STATS ChipPAC, Inc., STATS ChipPAC, Ltd.
Temasek Holdings Private Limited,
Singapore Technologies Semiconductors
Private Limited, Caroline Larsen, Ogletree, CASE
Deakins, Nash, Smoak & Stewart, P.C.
State Bar of Arizona, The United States
Justice Department, The Country of Singapore

TO: (Name and address of Defendant)

Singapore Technologies Semiconductors (Private) Limited
President and CEO
No. 1 Woodlands Industrial PArk D Street 1
Singapore 738799

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Peter Strojnik
3030 North Central Avenue, Suite 1401
Phoenix, Arizona 85012

an answer to the complaint which is served on you with this summons, within _____60_____ days after service
of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for
the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this
Court within a reasonable period of time after service.

CLERK                                           DATE


(By) DEPUTY CLERK

AO 440  (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

PHOENIX          District of    ARIZONA

PETER STROJNIK

                                          **SUMMONS IN A CIVIL CASE**

V.

STATS ChipPAC, Inc., STATS ChipPAC, Ltd.
Temasek Holdings Private Limited,
Singapore Technologies Semiconductors
Private Limited, Caroline Larsen, Ogletree, CASE
Deakins, Nash, Smoak & Stewart, P.C.
State Bar of Arizona, The United States
Justice Department, The Country of Singapore


        TO: (Name and address of Defendant)

    Temasek Holdings (Private) Limited
    President and CEO
    Madam Ho Ching
    60B Orchard Road
    #06-18 Tower 2
    The Atrium @ Orchard
    Singapore 238891
        **YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

    Peter Strojnik
    3030 North Central Avenue, Suite 1401
    Phoenix, Arizona 85012


an answer to the complaint which is served on you with this summons, within _____60_____ days after service
of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for
the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this
Court within a reasonable period of time after service.


CLERK                                    DATE


(By) DEPUTY CLERK

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

PHOENIX                District of    ARIZONA

PETER STROJNIK

**SUMMONS IN A CIVIL CASE**

V.

STATS ChipPAC, Inc., STATS ChipPAC, Ltd.
Temasek Holdings Private Limited,
Singapore Technologies Semiconductors
Private Limited, Caroline Larsen, Ogletree,
Deakins, Nash, Smoak & Stewart, P.C.
State Bar of Arizona, The United States
Justice Department, The Country of Singapore

CASE

TO: (Name and address of Defendant)

State Bar of Arizona
REgistered Agent – Teresa Schmid
4201 North 24th Street, Suite 200
Phoenix, Arizona 85016

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Peter Strojnik
3030 North Central Avenue, Suite 1401
Phoenix, Arizona 85012

an answer to the complaint which is served on you with this summons, within _____20_____ days after service
of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for
the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this
Court within a reasonable period of time after service.

CLERK                                          DATE

(By) DEPUTY CLERK

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

| PHOENIX | District of | ARIZONA |

PETER STROJNIK

V.

**SUMMONS IN A CIVIL CASE**

STATS ChipPAC, Inc., STATS ChipPAC, Ltd.
Temasek Holdings Private Limited,
Singapore Technologies Semiconductors
Private Limited, Caroline Larsen, Ogletree,
Deakins, Nash, Smoak & Stewart, P.C.
State Bar of Arizona, The United States
Justice Department, The Country of Singapore

CASE

TO: (Name and address of Defendant)

United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C.  20530

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Peter Strojnik
3030 North Central Avenue, Suite 1401
Phoenix, Arizona 85012

an answer to the complaint which is served on you with this summons, within _____60_____ days after service
of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for
the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this
Court within a reasonable period of time after service.

| | |
|---|---|
| CLERK | DATE |

(By) DEPUTY CLERK

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

PHOENIX      District of   ARIZONA

PETER STROJNIK

**SUMMONS IN A CIVIL CASE**

V.

STATS ChipPAC, Inc., STATS ChipPAC, Ltd.
Temasek Holdings Private Limited,
Singapore Technologies Semiconductors
Private Limited, Caroline Larsen, Ogletree,
Deakins, Nash, Smoak & Stewart, P.C.
State Bar of Arizona, The United States
Justice Department, The Country of Singapore

CASE

         TO: (Name and address of Defendant)

STATS ChipPAC Ltd
President and CEO Tan Lay Koon
5 Yishum Street 23
Singapore 768442

      **YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Peter Strojnik
3030 North Central Avenue, Suite 1401
Phoenix, Arizona 85012

an answer to the complaint which is served on you with this summons, within     60     days after service
of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for
the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this
Court within a reasonable period of time after service.

CLERK                                      DATE

(By) DEPUTY CLERK

AO 440  (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

PHOENIX                              District of    ARIZONA

PETER STROJNIK

**SUMMONS IN A CIVIL CASE**

V.

STATS ChipPAC, Inc., STATS ChipPAC, Ltd.
Temasek Holdings Private Limited,
Singapore Technologies Semiconductors
Private Limited, Caroline Larsen, Ogletree,    CASE
Deakins, Nash, Smoak & Stewart, P.C.
State Bar of Arizona, The United States
Justice Department, The Country of Singapore

TO: (Name and address of Defendant)

Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
c/o Registered Agent
CT Corporation System
2394 East Camelback Road
Phoenix, Arizona 85016

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Peter Strojnik
3030 North Central Avenue, Suite 1401
Phoenix, Arizona 85012

an answer to the complaint which is served on you with this summons, within _____20_____ days after service
of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for
the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this
Court within a reasonable period of time after service.

CLERK                                              DATE

(By) DEPUTY CLERK

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

PHOENIX                    District of    ARIZONA

PETER STROJNIK

**SUMMONS IN A CIVIL CASE**

V.

STATS ChipPAC, Inc., STATS ChipPAC, Ltd.
Temasek Holdings Private Limited,
Singapore Technologies Semiconductors
Private Limited, Caroline Larsen, Ogletree,     CASE
Deakins, Nash, Smoak & Stewart, P.C.
State Bar of Arizona, The United States
Justice Department, The Country of Singapore

TO: (Name and address of Defendant)

Caroline Larsen
6449 East Parkview Dr
Scottsdale, Arizona 85257-2566

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Peter Strojnik
3030 North Central Avenue, Suite 1401
Phoenix, Arizona 85012

an answer to the complaint which is served on you with this summons, within _____20_____ days after service
of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for
the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this
Court within a reasonable period of time after service.

_____         _____
CLERK                                    DATE

_____
(By) DEPUTY CLERK

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

PHOENIX                District of    ARIZONA

PETER STROJNIK

                                              **SUMMONS IN A CIVIL CASE**

V.

STATS ChipPAC, Inc., STATS ChipPAC, Ltd.
Temasek Holdings Private Limited,
Singapore Technologies Semiconductors
Private Limited, Caroline Larsen, Ogletree,
Deakins, Nash, Smoak & Stewart, P.C.
State Bar of Arizona, The United States
Justice Department, The Country of Singapore

CASE

TO: (Name and address of Defendant)

STATS ChipPAC, Inc.
Registered Agent-Corporation Service Company
2711 Centerville Road, Suite 400
Wilmington, Delaware  19808

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Peter Strojnik
3030 North Central Avenue, Suite 1401
Phoenix, Arizona 85012

an answer to the complaint which is served on you with this summons, within _____20_____ days after service
of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for
the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this
Court within a reasonable period of time after service.

CLERK                                          DATE

(By) DEPUTY CLERK

STD

# U.S. District Court
## DISTRICT OF ARIZONA (Phoenix Division)
## CIVIL DOCKET FOR CASE #: 2:09-cv-00143-HRH

Strojnik v. STATS ChipPAC, Inc. et al
Assigned to: Judge H Russel Holland
Cause: 28:2201 Declaratory Judgement

Date Filed: 01/23/2009
Jury Demand: Plaintiff
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Peter Strojnik**
*dealing with his sole and separate claim*

represented by **Peter Strojnik**
Peter Strojnik PC
3030 N Central Ave
Ste 1401
Phoenix , AZ 85012
602-524-6602
Fax: 602-296-0135
Email: strojnik@aol.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**STATS ChipPAC, Inc.**
*a Delaware corporation*

**Defendant**

**STATS ChipPAC, Ltd.**
*a foreign corporation*

**Defendant**

**Temasek Holdings Private Limited**
*a foreign corporation*

**Defendant**

**Singapore Technologies Semiconductors
Private Limited**
*a foreign corporation*

**Defendant**

**Caroline Larsen**
*a natural person*

**Defendant**

**Ogletree, Deakins, Nash, Smoak &
Stewart, P.C.**

*an Arizona Corporation*

**Defendant**

**State Bar of Arizona**
*an Arizona non-profit Corporation*

**Defendant**

**United States Department of Justice**
*a governmental entity*

**Defendant**

**Singapore, Country of**
*a foreign entity*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/23/2009 | 1 | COMPLAINT. Filing fee received: $ 350.00, receipt number 09700000000002517426, filed by Peter Strojnik. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Civil Cover Sheet, # 4 Summons)(Strojnik, Peter) (Entered: 01/23/2009) |
| 01/23/2009 |  | This case has been assigned to the Honorable John W. Sedwick. All future pleadings or documents should bear the correct case number: CV-09-143-PHX-JWS. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MHA) (Entered: 01/26/2009) |
| 01/23/2009 | 2 | Notice of Availability (MHA) (Entered: 01/26/2009) |
| 01/26/2009 | 3 | Summons Issued as to Singapore, Country of, STATS ChipPAC, Inc., STATS ChipPAC, Ltd., Temasek Holdings Private Limited, Singapore Technologies Semiconductors Private Limited, Caroline Larsen, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., State Bar of Arizona, United States Department of Justice. (MHA). *** IMPORTANT: You must select "Document and stamps" or "Document and comments" on the print screen in order for the court seal to appear on the summons you print. (Entered: 01/26/2009) |
| 01/26/2009 | 4 | NOTICE TO FILER OF DEFICIENCY re 1 Complaint filed by Peter Strojnik. Description of deficiency: Incorrect information added to Party Information Screen. (MHA) (Entered: 01/26/2009) |
| 01/29/2009 | 5 | MINUTE ORDER FROM CHAMBERS: Judge Sedwick recuses from this case. The Clerk will please reassign this case to another judge. NOTE: this case has been reassigned by random draw to H. Russel Holland. All Further pleadings/papers should now list the following COMPLETE case number: CV09-00143-PHX-HRH.(ESL) (Entered: 01/29/2009) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 02/02/2009 18:32:20 | | |
| **PACER Login:** | od0028 | **Client Code:** |
| **Description:** | Docket Report | **Search Criteria:** 2:09-cv-00143-HRH |

| Billable Pages: | 2 | Cost: | 0.16 |