# Exhibit 3

1  Peter Strojnik, Esq. – Arizona Bar No. 006464
   **PETER STROJNIK, P.C.**
2  3030 North Central Avenue, Suite 1401
3  Phoenix, Arizona 85012
   Telephone: 602-524-6602
4  Facsimile: 602-296-0135
   e-mail: strojnik@aol.com
5
6  Peter K. Strojnik, Esq. – Arizona Bar No. 026082
   3030 North Central Avenue, Suite 1401
7  Phoenix, Arizona 85012
   Telephone: 408-655-0984
8  Facsimile: 602-264-1441
   e-mail: pksesq@aol.com
9
10 Attorneys for Plaintiff

11
## IN THE UNITED STATES DISTRICT COURT
12
## FOR THE DISTRICT OF ARIZONA
13

14 DIANE SAHAKIAN, a single woman,       ) NO.  2:08-cv-00241-HRH
                                          )
15                          Plaintiff,    )   **PLAINTIFF'S RESPONSE TO**
                                          )   **DEFENDANTS' FIRST SET OF NON-**
16                  v.                     )   **UNIFORM INTERROGATORIES**
                                          )
17                                         )
   STATS   ChipPAC,   Inc.,   a   foreign )   (ASSIGNED TO THE HONORABLE H. RUSSEL
18 corporation;  STATS  ChipPAC, LTD, a   )          HOLLAND)
19 foreign corporation,                   )
                            Defendants.   )
20

21     Plaintiff DIANE SAHAKIAN, by and through her undersigned counsel, and pursuant to

22 Federal Rules of Civil Procedure 33, hereby responds and objects to Defendants Stats

23 ChipPACT, Inc. and Stats ChipPAC, Ltd.'s (collectively as "Stats") First Set of Non-Uniform

24 Interrogatories as follows:

25

## **GENERAL OBJECTIONS**

Plaintiff makes the following General Objections to the discovery Interrogatories. These General Objections apply to each of the Interrogatories, Definitions, and Instructions, and are incorporated in each Response as if fully set forth therein. The assertion of the same or a similar objection is response to a specific Interrogatory does not limit the applicability of each General Objection to each specific Interrogatory.

1. Plaintiff objects to the Interrogatories to the extent that they seek to impose requirements or obligations different than or in excess of those imposed by the Federal Rules of Civil Procedure or other Federal or Arizona law.

2. Plaintiff objects to the Interrogatories to the extent they are vague, overly broad, seek information or documents that is or are not reasonably calculated to lead to the discovery of admissible evidence and/or would require Plaintiff to engage in a search for documents or information that would be unduly burdensome.

3. Plaintiff objects to the Interrogatories to the extent they seek "all" information concerning a given subject matter. Plaintiff shall make a diligent, good faith inquiry of those individuals and/or entities most likely to have information responsive to the Interrogatories and shall provide the information it locates to the extent it is responsive and non-privileged, subject to Plaintiff's Specific and General Objections.

4. Plaintiff objects to Interrogatories to the extent they purport to require Plaintiff to produce information not in its knowledge, possession, custody, or control, or to make unreasonable inquiries of persons and/or entities regarding the same.

5.  Plaintiff objects to the Interrogatories to the extent they seek information that is subject to the attorney-client privilege, the work product doctrine, or any other applicable privilege, immunity, or other protection, or to the extent they require the disclosure of the mental impressions, conclusions, or legal theories of Plaintiff's attorneys or other representatives concerning this action.   Plaintiff shall not provide any information subject to such privileges, protections, or immunities.   Any production of privileged or otherwise protected information is inadvertent and shall not constitute a waiver of any claim of privilege or other such protection.

6.  Plaintiff objects to the Interrogatories to the extent they seek confidential or proprietary information, competitively sensitive information, trade secrets, and/or documents or information subject to any confidentiality agreements, or statutory provisions that may bar disclosure of the documents or information without the consent of third parties. Plaintiff shall, at a mutually agreed upon time, only produce relevant, discoverable internal confidential information, to the extent it exists, under protection of a Protective Order and/or a Confidentiality Agreement between the Parties.

7.  Plaintiff's responses as set forth herein are based upon information presently known to Plaintiff.   Plaintiff reserves the right (a) to rely on any facts, documents, or evidence that may develop or subsequently come to its attention, (b) to assert additional objections or supplemental responses should it discover additional information or grounds for objections, and (c) to supplement or amend these responses at any time.

Plaintiff incorporates each of the foregoing General Objections by reference verbatim into each specific Response stated below.  Subject to these General Objections, Plaintiff sets forth its further specific objections and response to the Interrogatories below.

## OBJECTIONS TO "INSTRUCTIONS"

1.  Plaintiff objects to each instruction to the extent that it is inconsistent with the Federal Rules of Civil Procedure.

2.  Plaintiff objects to each instruction to the extent that it is vague, ambiguous, or the application of the instruction imposes undue burden.

## RESPONSES TO NON-UNIFORM INTERROGATORIES (SET ONE)

### INTERROGATORY NO. 1:

Identify each person answering and/or providing information used to answer each of these interrogatories and all persons consulted in preparing or forming the answers to these interrogatories.  For each person identified, identify the specific interrogatories answered by that person and/or the information provided.

### RESPONSE NO. 1:

Plaintiff and counsel.

### INTERROGATORY NO. 2:

Explain in detail any and all actions by Defendants, or any employee, agent or representative of Defendants, that you allege support the claim of sexual harassment in your Complaint.  For each such action, please state:  the date such action took place; the identity of each person you allege engaged in these acts; the identity of any person whom you believe may have knowledge

of the facts surrounding your allegations; a detailed explanation of your characterization of the facts; and the identity of anyone present at the time of each alleged act of harassment.

**RESPONSE NO. 2:**

## I.    FACTUAL BACKGROUND

### A.    The Parties

Sahakian is a 47 year old single mother who began her employment with STATS in August 1999. Plaintiff received her Bachelor of Science degree in Mechanical Engineering from the University of California Santa Barbara. Prior to her employment by Defendants, she successfully worked in various engineering capacities for several semiconductor companies.

Defendant STATS ChipPAC Ltd. ("STATS") provides assembly and testing solutions to customers within the semiconductor industry. Corporate headquarters are located in Singapore and most of the executive team is Oriental. The Company has manufacturing, design, testing and customer support operations throughout Asia and the United States. The Company's customer support offices are centered in the United States, including Phoenix where Sahakian was employed. It is Sahakian's position that she was employed by a wholly-owned subsidiary, STATS ChipPac Inc. (a California corporation), as well as STATS ChipPAC Ltd.

Sahakian was hired as a Product Engineering Manufacturer in August 1999 and was promoted to the position of Senior Product Engineer Manager in May 2001. She received two interim promotions and due to her exemplary job performance, was again promoted to the position of Vice President of Emerging Technology ("ET") in April 2006. As a Vice President in Defendant's Technology Development organization, Sahakian was one of the very few female executives in the companies. She managed a technical group of approximately seven

employees in Phoenix who were responsible for generating the corporate technology roadmaps and emerging technology strategies, and engaging customers in emerging technologies.

Sahakian reported to her supervisor. BJ Han ("Han"), Chief Technology Officer, who is employed by Defendant STATS ChipPAC Ltd. and based in Singapore. In September 2004, Scott Jewler, Chief Strategy Officer, became Sahakian's supervisor. As a result of a reorganization, Han became Sahakian's supervisor again in August 2006.

Sahakian's personnel file contains her job performance evaluations, bonuses and awards which demonstrate that she has always been considered a stellar performer by STATS until the events which led to this lawsuit. See Sahakian's 2006 performance review analyzing her job performance prior to the events that led to this lawsuit previously exchanged by the parties. It is important to note that Tan Lay Koon, Chief Executive Officer of STATS, commended Sahakian during her 2006 performance review on her ability to manage a difficult group and advised her to keep doing what she was doing. Sahakian received an "exceeding" expectations rating.

      B.   Sahakian Reports Problems Being Created by Subordinate Employees

      1.   Evan Eric Gongora

The hostile work environment created by Sahakian's peers began soon after Evan Eric Gongora, a director subordinate to Sahakian began to create a clique of male employees in 2006. Gongora had been transferred into her department in November 2004. Soon after the transfer, Scott Jewler, CSO and Senior Vice President and then Sahakian's manager, asked her several times if Gongora was behaving, because he had a reputation for being a trouble maker; Jewler had terminated Gongora at their former company. Sahakian assured Jewler there were no problems at the time, but she soon learned that Gongora was a master at manipulating people

and situations for his own gain. Gongora constantly came to Sahakian's office seeking advice on personal situations, his ex-wife, divorce, road rage problems and anger management training by the police and made inappropriate remarks which Sahakian dismissed out of embarrassment; he also bad-mouthed many co-workers and managers, pitting people against others for his own personal gain.

In July 2006, Sahakian began reporting to management insubordination, attendance and performance issues with Gongora.     Jewler and Han both acknowledged Gongora was a troublemaker. Jewler suggested 'not to waste time on the guy...and to move him to the side or out.'  Gongora pitted others (Dunlap, Gooch, Schraeder, and possibly others) against Sahakian. In August 2006, Sahakian sent emails to Han complaining about Gongora's attitude and work ethics and she reported to Han that she was giving Gongora a verbal warning on August 23, 2006.  On September 6, 2006, Sahakian sent an email to her team informing them that she was taking the day off to have her air conditioning installed.  She also sent an email to the managers who worked under her, including Gongora, telling them that she was not impressed with the work ethics in Tempe and asked them to set a better example, because Gongora was taking advantage of Sahakian not being in the office.  Subsequently, on September 19, 2006, Sahakian sent an email directly to Gongora in which she criticized him for coming in after 9:00 am, taking two-hour lunches and leaving between 4:30-5:00 p.m.[1]  Gongora responded with an attacking email to Sahakian, his supervisor.

---

[1]     This email was sent because Gongora would disappear with notice, employees were complaining about his whereabouts and that he was not responsive or meeting commitments. Sahakian rightfully believed that she needed action to correct the situation.

Sahakian forwarded Gongora's emails to Han and asked that Gongora be made an individual contributor while she documented him, since he was not able to set a good example for others and he was pitting the employees who reported to him against Sahakian. She complained that he had been insubordinate on several occasions and told Han that Jewler did not want her wasting any more time with Gongora. (See documentation previously exchanged between the parties) On September 20, 2006, Han recommended Sahakian to "not react on what he does…not to reorganize based on a person and advised her of the steps to take, which began with verbal and written warnings leading to a 90 day action plan with specific expectations." Han specifically stated: "you have to make a very fair and long process."[2] (See documentation previously exchanged between the parties) Han's instructions were difficult to decipher and contradictory. When Sahakian informed Han of the troubles she was having with Gongora on September 20, 2006, Han responded in email: "You survived a cancer and everybody call you for BJ. What are you afraid of now?" In September, Gongora aggressively stated that he would tell his group (Dunlap and Gooch) how to behave toward Sahakian.

Soon thereafter, while Sahakian was documenting Gongora and giving him verbal warnings, Jewler called her, asking to transfer a resource from ET to Product Line Management ("PLM") since he didn't feel ET could justify 3 employees with SiP (System in Package) expertise. He asked for one employee (Scott Gooch) to transfer but Sahakian didn't want to transfer him at that time. Jewler then said he would take Gongora and Sahakian agreed, but she

---

[2]    This statement stands in start contrast to the total absence of "process" before Sahakian was demoted in August 2007, without prior notice, warning or progressive discipline.

warned Jewler that Gongora was acting up and that he needed disciplining. Consequently, Gongora leaving Sahakian's group was due to the request of Jewler.

Notwithstanding the transfer to PLM, Sahakian was required to continue sending Han emails criticizing Gongora because his behavior continued to be disruptive and damaging in the Tempe office. His work area cube was just outside of Sahakian's office and he would talk loudly, whistle loudly and engage in conduct to annoy Sahakian in her office. Han repeatedly requested Sahakian to focus on her work and ignore Gongora, despite her warning Han that he was damaging her reputation, working relationships, and creating a hostile work environment. Sahakian informed her management on multiple occasions that if the harassment/collusion didn't stop, it would eventually destroy her career at STATS ChipPAC, which it did. On March 3, 2007, Sahakian sent an email to senior management requesting Gongora be officially warned about his disruptive behavior. Incredibly, Gongora's new manager, Cindy Palar, Vice President Corporate Planning in the PLM group, forwarded that email to Gongora.

2.    Brett Dunlap

In March 2007, Flynn Carson and Sahakian gave Brett Dunlap, a Sip Product Manager in her group, his performance evaluation for the first quarter of 2007. Prior to the review, Sahakian had complained to Han about Dunlap's attitude issues and work ethic. Upon receiving the review, Dunlap became hostile toward Sahakian and enlisted Gongora's assistance. The two of them complained to many employees in the Tempe and Fremont offices, with a one-sided story about how unfair the review was and criticizing Sahakian. Dunlap complained to Han about the rating system and Sahakian's review. Han supported Sahakian in an email to Dunlap and reminded him that others also concurred with Sahakian's review and that Dunlap

misunderstood the performance appraisal scoring system.   Dunlap created a Powerpoint presentation regarding his negative perception of Sahakian and accused her of making racial comments to him and others.   Dunlap's accusations were self-serving and no one in the Tempe office other than Dunlap or Gongora would support his false accusations.

Sahakian requested repeatedly that Gongora stay out of confidential, private matters such as Dunlap's performance review.   Human Resources told her that Gongora was advised to "shut up."   Sahakian requested Human Resources to write up Gongora for his actions, Human Resources agreed it should happen, but it never issued any warning.

Ultimately, Han thought it would be best for Dunlap to transfer or 'granted' Dunlap's wish to transfer to the PLM group, which was done on April 16, 2007.   Once Gongora, Dunlap and Gooch (see below) were removed from the ET group, Sahakian's group worked very well. (See documentation previously exchanged between the parties)

3.    The Ketchup Incident

On or about April 9, 2007, an employee put ketchup on Sahakian desk chair on a day she was wearing white pants, making it appear that Sahakian had an "accident."   (See documentation previously exchanged between the parties)  Sahakian immediately notified Han and Gail Uy,

Human Resources Manager in Fremont, California of the incident.  Sahakian told Uy that Vice President Mike Schraeder, Scott Gooch,  Brett Dunlap and Gongora were the only employees near her office at the time the ketchup was put on her chair. Uy conducted some telephonic interviews on April 9 and April 12 and some of the people she interviewed suspected that Gongora was responsible for the incident, although no one actually saw him put ketchup on

Sahakian's chair; of course, Gongora denied that he did it.[3]  Gongora and Dunlap lied about their whereabouts at the time of the incident, saying they were not present; Han and Human Resources acknowledged that someone in Tempe was lying about the incident.  (See documentation previously exchanged between the parties) Yet, no one was disciplined.

Sahakian was humiliated by this incident which she considered vindictive, mean, embarrassing and very humiliating.  Upon informing Han how humiliated she was, his nonchalant, inappropriate response was: "Drink a beer and have a good sleep.  It will be ok."[4] (See documentation previously exchanged between the parties) Emails from the Human Resources department confirm that it considered this act to be harassment, not horseplay. (See documentation previously exchanged between the parties) Another manager confirmed to Sahakian that the "PLM" boys, *i.e.,* Gongora, Dunlap, and Schraeder Gooch, were "messing with her mind."  (See documentation previously exchanged between the parties)

Sahakian did not feel a proper investigation was conducted.  In fact, she was promised Gongora and Scott Dunlap's offices would be moved away from hers; that did not happen until approximately one month after the ketchup incident, and then only upon Sahakian's insistence. Sahakian was unhappy because she knew because no one was held accountable, the harassment would continue.  For over a year, there was no disciplinary action taken against any of her former subordinates who were creating the hostile work environment.

_____

[3]    Dunlap who was in the area when the incident occurred, walked around the corner toward Sahakian with ketchup in his hand seconds after the incident occurred, making it unlikely he did it. When Sahakian asked who did it, Gongora, but three feet from her, refused to look up.

4. <u>Scott Gooch</u>

In February 2007, Scott Gooch, Director of Sip, who was part of Sahakian's ET group, sent an email to Han indicating that he thought his job function would be best suited for the PLM group.  Han sent an email to Sahakian stating he "smell politics" from PLSM and agreed to support the transfer to PLM.  Subsequently, on June 6, 2007, Gooch resigned from STATS to join a start up company.  Gooch was very close with Gongora and Scott Dunlap, who pitted others against Sahakian.  Although he no longer reported to Sahakian, during his exit interview with Human Resources, Gooch stated that Sahakian was a very poor manager, he could not communicate with her, she made racist comments and he did not know why she was employed by STATS.

On June 22, Sahakian called in sick for a meeting.  Immediately thereafter, Han informed Sahakian that an employee (Gooch) had complained about her.  Han was vague, refusing to tell Sahakian the identity of the employee. Although he sent her an email concerning how she should modify her behavior, Han acknowledged the alleged complaint by an "exiting" employee was not substantiated.  By this time, Sahakian was exhausted, depressed and overly stressed by Han not acknowledging and addressing her complaints.  As a result of the increasing stress experienced by Sahakian in the work environment, on June 22, 2007, she started a thirty day leave under the Family Medical Leave Act.  (See documentation previously exchanged between the parties)

---

[4]   Notwithstanding the existence of an email from Han documenting his statement, the Defendants denied he made such a statement in their Answer to Plaintiff's Complaint.

6. <u>STATS Human Resources Interview Some of Sahakian's Subordinates and One</u>
<u>States: "She is one of the best managers they have ever had."</u>

While Sahakian was on FMLA leave, Nehal Patel of the STATS Human Resources Department in Fremont, California interviewed a couple of people who worked closely with Sahakian.   The two employees who were interviewed stated they had **no** problems with Sahakian and respected her as a manager and that she was very candid friendly and open. Although they did state have a few criticisms of Sahakian's management style, one of the employees stated to Patel:  "**she is one of the best managers they have ever had and they really respect her management style.  They said that she works hard to help those who have potential to grow to become winners**." (See documentation previously exchanged between the parties) Patel did these interviews based upon a phone call with Gail Uy of Human Resources and Kaw Jik Hoon, Human Resources in Singapore during which the Gooch exit interview was discussed.

In an email reporting the results of her interviews, it was Patel's recommendation that "...it sounds like Diane may need to attend a training/seminar on managing people or communication." There is absolutely **no** recommendation that she be removed as a supervisor, nor could there have been based upon the reports to Human Resources by these subordinates. This email demonstrates no intent to demote by Human Resources and confirms Sahakian's conversation with Gail Uy after the August demotion (see Section 7, *infra*) during which Uy stated she had **no** prior knowledge of the demotion.  It is absolutely incredible that a long-term Vice President, with an exceeds expectations performance review, would be demoted, without notice, warning and without the approval of Human Resources.  Most significantly, Kelly Priest

was STATS Vice President of Sales, who was laid off recently in late August 2008. Priest has advised Sahakian that Gail Uy, the Human Resources person who investigated the ketchup incident, told him and others that Han totally mishandled Sahakian's demotion. The July 11, 2007 email and Priest's testimony will be powerful evidence demonstrating that Han's reasons for demoting Sahakian are pretextual.

7. <u>Plaintiff is Demoted from Vice President of ET to a Non-Supervisory, Non-Descript "Special Projects" Position at the Bottom of the Organizational Chart</u>

Prior to Sahakian's return from FMLA leave, in early July she emailed Han and requested a face-to-face meeting with him and Tan Lay Koon, CEO in Singapore; Sahakian knew enormous amounts of money was spent by STATS spending employees to, from and around Asia for internal meetings. Sahakian volunteered to fly, during her FMLA, from Japan to Singapore to save on expense. She finally agreed to wait a month until Han and Tan were in the United States. After multiple attempts to get Han to agree to this meeting, she was promised a three way meeting which never happened. Sahakian had hoped to arrive at a mutual, amicable solution of her issues.

Plaintiff returned from her FMLA leave in late July. As of August 5, Sahakian was the Vice President of ET and on Han's staff. On August 7, 2007, Han and Sahakian had a telephone call, during which he yelled at her for approximately three hours. The conversation quickly turned to the 'complaint' made by Gooch. Han became extremely upset when Sahakian stated that she did not feel that her subordinates should have been interviewed while she was on FMLA leave, especially since she was not having any issues with her group because the troublemakers were gone. She stated that this undermined her authority. Han began screaming, saying ' if you

don't agree, than quit!'.  Sahakian could not understand why she always needed to be on the defensive, why false claims were not being challenged, etc. Han told Sahakian to go to the CEO if she had issues. Sahakian was told if she did not apologize within  one hour for not agreeing with his action to interview her reports, he would take action against her. Han repeatedly yelled he was ' D-O-N-E' with her, that she should sue him, etc.  One hour later, Sahakian received an official 'complaint' via email.  She informed the CEO of Han's comments on Friday, August 10, 2007.

On August 12, without any prior notification, warning or any type of progressive discipline, Sahakian was demoted, removed from Han's staff permanently and removed as Vice President of ET.  On the Organizational Chart, she relocated to the bottom right corer of the page with a bold line inside a box labeled "Special Projects, " with her Vice President titled removed. (See documentation previously exchanged between the parties) This was followed by a totally denigrating announcement of the demotion, with no acknowledgement or appreciation of  Sahakian's prior accomplishments or requests of others to support her in her new role.  (See documentation previously exchanged between the parties) This announcement was a total deviation from prior announcements made when other employees left the company or changed their positions.  (See documentation previously exchanged between the parties)

On August 15, Executive Vice President of Human Resources TG Ng, asked Gail Uy, Human Resources, to call Sahakian to see how she was doing.  Uy stated that Human Resources was surprised by Han's actions and though it was "hasty" and that Sahakian should talk to the CEO.  From August 14-16, the CEO had one on one calls with each of Sahakian's former direct

reports.   He left the impression with them that she was "out of the picture" altogether, notwithstanding them telling her that she was a great manager and defending her.

On August 29, 2007, Sahakian met with Tan in Fremont, California.  He was unwilling to reverse the decision Han had made to demote Sahakian so as to not undermine Han in front of the company.   Tan stated that he would like  Sahakian to stay in the company and asked her what she desired to do.  He said the "stigma" surrounding the demotion was only in Sahakian's head and there was no reason why she could not  continue working at STATS.  He asked her whether she was still interested to work at Stats  STATS, and she replied affirmatively.  He also asked her whether she could  still work for  Han and again she replied affirmatively.  He asked her to work with Han to come up with a new role.

Although Han was to discuss Sahakian's new "special project' with her, he avoided telling her what it would be.  He repeatedly  said he didn't see the point of telling her about a position if she did not have a passion for it.  He left it up to her to define her new role and would see if there was a fit with other managers.   If not, she was told she would have to work hard to come up to technical speed to remain in his group as an individual contributor, but he told her she would not be allowed to be a manager under him.  Han kept asking what Sahakian's 'passion' was and it was obvious he did not have a role in mind for her.

On the following day, Sahakian sent a "special project" proposal that she was "passionate" about to the CEO, which he rejected on September 4, 2007, suggesting that she "help in bridging the gap between technology and market applications." Han called to discuss Sahakian's  new role while walking into the Financial Health meeting.  All she got out of this

discussion was 'There are multiple things to be done'.  Sahakian and Han discussed her new role later that day, but nothing was accomplished.

On September 5, 2007,  Sahakian  requested clarification from Han on the "multiple things to be done" in writing from Han. He responded aggressively and she responded that she agreed with the role the CEO had proposed.   He replied with 'mission impossible' to set Sahakian up for failure.  On the following day, Sahakian requested clarification from Han about who she reported to and why.  Han  replied that Sahakian 'made her choice not to purse any existing role in any existing organization...' and pushed for timeline.  In fact, this was not the case.  Here responses to Han's questions are as follows in a September 6 email:

1. Please answer me if you want to do something else in the existing organization. The answer is yes or no.

**YES**

2. If the answer is yes, let me know which organization it is. I will check the possibility and get back to you. If possible, you will be transferred.

**I am open to whatever function head this role, 'bridging the gap between technology and market applications', should report to.**

3. If not possible or the answer to #1 is no, I will give you specific assignment instantly and your special project starts. There is no need for you to propose anything.

On September 5, Han sent Sahakian an assignment which could not be accomplished in a vacuum.  He would not permit her to have a role which required interacting the others and wanted her to work in complete isolation as an independent contributor.  The project assigned was impossible to do in isolation.

By September 7, Sahakian was permanently removed from the Executive Overview posted on the corporate website (See documentation previously exchanged between the parties). On September 11, 2007, Sahakian requested a job description and long term career path. Han provided a three line job description and pushed for a timeline again.

Although Han was to discuss Sahakian's new "special project' with her, he avoided telling her what it would be. He repeatedly  said he didn't see the point of telling her about a position if she did not have a passion for it. He left it up to her to define her new role and would see if there was a fit with other managers.   If not, she was told she would have to work hard to come up to technical speed to remain in his group as an individual contributor, but he told her she would not be allowed to be a manager under him. Han stated that the demotion was due to "insubordination for not replying to him twice:  once prior to her FMLA leave (about Gooch who had left the company and one time when he threatened her to respond/apologize or he would take action.[5]

7.  <u>Sahakian Files An EEOC Charge in September 2007,  a Lawsuit in February 2008 and the Parties Engage in Settlement Negotiations</u>

After the demotion, on September 18, 2007, Sahakian filed a charge of discrimination and retaliation with the EEOC. Since her demotion, Sahakian has been given assignments with no real possibility of completing them as assigned by Han.  She has been ostracized and basically isolated, she has been omitted from meetings, conferences, and training she previously

---

[5]    In October 2007, unbeknownst to Sahakian, her supervisor was changed from Han to Tan (CEO); Sahakian first learned of this change upon receiving STATS' Disclosure Statement.

attended, did no further business travel and went from receiving over 100 email communications per day to approximately 3-4 per day. She was put in a dead-end position removing virtually all of her job duties and responsibilities, in a blatant attempt to force her resignation from employment. Tan (CEO) told a new hire VP, a former peer of Sahakian, 'she is not working out for us." Obviously having been in the industry for more than two decades and earning significant compensation, Sahakian had no intention of resigning from her employment.

On December 11, 2007, Defendants, through their attorney Sandra Creta of Quarles Brady, made a settlement offer of six months continued salary in the amount of $83,700 and six months of continued benefits, in exchange for Sahakian's resignation from employment. In light of the dismal state of the economy, the downturn in the semiconductor industry and the amount of time it would take to find a comparable job and achieve the same compensation level, Sahakian rejected that settlement offer and made a counteroffer of $985,000 (four years' full compensation) plus attorneys' fees on January 24, 2008.[6] The four years' full compensation was based upon feedback Sahakian received from various executives as to how long it would take before she achieved a Vice-President position with a comparable compensation package, once she did find employment.

Having received a Notice of Right to Sue, on February 6, 2008, Sahakian filed her Complaint in federal court. On April 11, 2008, Ms. Creta wrote to Sahakian's previous counsel and advised that before our clients' expended additional funds on discovery, she was authorized to offer $250,000 in exchange for a complete release of claims and Sahakian's resignation from

employment. Soon thereafter, Eric Dowell and Caroline Larsen of Ogletree Deakins substituted in as counsel for Defendants and on May 13, 2008 advised that the prior settlement offer would be "off the table" on May 16, 2008. Sahakian did not respond to Eric Dowell's email and the settlement offer lapsed.

On or about May 30, 2008, Sahakian inquired about a STATS-Tempe job posting. After several inquiries, Defendant STATS informed Sahakian that this posting was unavailable to Sahakian because it was an 'artificial' posting to process a green card for one GS Kim, a non-citizen of the United States.

Six weeks later, on July 1, 2008, Defendants terminated Sahakian's employment. The reasons given by BJ Han were Sahakian's performance on the "special projects" and her "disengaging" from the company.

**INTERROGATORY NO. 3:**

Explain in detail any and all actions by Defendants, or any employee, agent or representative of Defendants, that you allege support the claim of retaliation in your Complaint. For each such actions, please state: the date such action took place; the identity of each person you allege engaged in these acts; the identity of any person whom you believe may have knowledge of the facts supporting your allegations; a detailed explanation of your characterization of the facts; and the identity of anyone present at the time of each alleged act of retaliation.

**RESPONSE NO. 3:**

Please refer to:

---

[6]    On January 18, 2008, STATS gave Sahakian's name to a recruiter who contacted her

> ➤ Answer to Interrogatory No. 2; and

> ➤ Previously exchanged discovery; and

> ➤ Plaintiffs Disclosure.

**INTERROGATORY NO. 4:**

Explain in detail any and all reports or complaints of sexual harassment and/or retaliation that you made to Defendants, or any employee, agent or representative of Defendants.  For each such Interrogatory, please state:  the nature of your complaint or report; to whom the complaint or report was made; when the Interrogatory was made; in what manner the Interrogatory was made (verbal or written); describe in detail Defendants' response to the complaint or report; and identify from whom the response was received, when the response was received, and in what manner the response was received (verbal or written).

**RESPONSE NO. 4:**

> Please refer to:

> ➤ Answer to Interrogatory No. 2; and

> ➤ Previously exchanged discovery; and

> ➤ Plaintiffs Disclosure.

**INTERROGATORY NO. 5:**

With regard to the allegation in paragraph 10 of your Complaint that "Plaintiff reported to her management and human resources department that certain subordinate male employees were undermining her authority within her group," please state:

regarding a position on the East Coast.

(a) All facts supporting this allegations;

(b) The name, address, and telephone number of all witnesses you claim to have knowledge of facts to support this allegations;

(c) Any documents, including notes or videotapes, that you claim support this allegation; and

(d) With respect to any documents identified in subpart (b), the name, address, and telephone number of the custodian of records of each such document.

**RESPONSE NO. 5:**

Please refer to:

➢ Answer to Interrogatory No. 2; and

➢ Previously exchanged discovery; and

➢ Plaintiffs Disclosure.

**INTERROGATORY NO. 6:**

With regard to the allegations in paragraph 10 of your Complaint that "as a result of [Plaintiff's] complaints, Plaintiff's supervisor became increasingly hostile towards her and undermined her within her group," please state:

(a) All facts supporting this allegations;

(b) The name, address, and telephone number of all witnesses you claim to have knowledge of facts to support this allegations;

(c) Any documents, including notes or videotapes, that you claim support this allegation; and

(d) With respect to any documents identified in subpart (b), the name, address, and telephone number of the custodian of records of each such document.

**RESPONSE NO. 6:**

Please refer to:

> ➤ Answer to Interrogatory No. 2; and

> ➤ Previously exchanged discovery; and

> ➤ Plaintiffs Disclosure.

**INTERROGATORY NO. 7:**

With regard to the allegations in paragraph 14 of your Complaint that Plaintiff supervisor gave Plaintiff "assignments with no real possibility of completing the since her return from FMLA leave," please state:

(a) All facts supporting this allegations;

(b) The name, address, and telephone number of all witnesses you claim to have knowledge of facts to support this allegations;

(c) Any documents, including notes or videotapes, that you claim support this allegation; and

(d) With respect to any documents identified in subpart (b), the name, address, and telephone number of the custodian of records of each such document.

**RESPONSE NO. 7:**

Please refer to:

> ➤ Answer to Interrogatory No. 2; and

> ➤ Previously exchanged discovery; and

-23-

➢ Plaintiffs Disclosure.

## INTERROGATORY NO. 8:

With regard to the allegations in paragraph 14 of your Complaint that Plaintiff "has been ostracized, has been omitted from meetings and conferences she previously attended, and has been put in a dead-end position removing virtually all of her job duties and responsibilities . . . in order to force her resignation from employment," please state:

    (a) All facts supporting this allegations;

    (b) The name, address, and telephone number of all witnesses you claim to have knowledge of facts to support this allegations;

    (c) Any documents, including notes or videotapes, that you claim support this allegation; and

    (d) With respect to any documents identified in subpart (b), the name, address, and telephone number of the custodian of records of each such document.

## RESPONSE NO. 8:

Please refer to:

➢ Answer to Interrogatory No. 2; and

➢ Previously exchanged discovery; and

➢ Plaintiffs Disclosure.

## INTERROGATORY NO. 9:

With regard to the allegations in paragraph 15 of your Complaint that "no disciplinary action was taken against the male employees who undermined her authority within her group and her reputation with the company, and created a hostile work environment," please state:

(a) All facts supporting this allegations;

(b) The name, address, and telephone number of all witnesses you claim to have knowledge of facts to support this allegations;

(c) Any documents, including notes or videotapes, that you claim support this allegation; and

(d) With respect to any documents identified in subpart (b), the name, address, and telephone number of the custodian of records of each such document.

**RESPONSE NO. 9:**

Please refer to:

➢ Answer to Interrogatory No. 2; and

➢ Previously exchanged discovery; and

➢ Plaintiffs Disclosure.

**INTERROGATORY NO. 10:**

List each element of damages that you are claiming and include in your response the following: the category in which each item of damages falls (i.e. front pay, back pay, emotional distress, general damages, special or consequential damages, punitive damages, interest, and any other relevant categories); the factual basis for each item of damages; the amount claimed for each; an explanation of how each amount was calculated, including any mathematical formula; and a description of each document on which such calculation was based.

**RESPONSE NO. 10:**

| ITEM OF DAMAGE | AMOUNT | CALCULATION |
|---|---|---|
| Front Pay & Back Pay | See report by Dr. Perry to be forwarded when complete. | |

| | | |
|---|---|---|
| Emotional Distress, Pain, Suffering | Reasonable as determined by a jury | NA |
| Punitive Damages | Reasonable as determined by a jury | NA |

**INTERROGATORY NO. 11:**

Identify all medical practitioners, including, but not limited to, physicians, psychologists, therapists, counselors, and other health care providers from whom you have received consultation, treatment, and/or examination for any physical, mental, or emotional illness, injury, or condition from January 1, 2003 to the present; list the address of each and their specialty area of practice; and describe briefly the reason for the service(s) and the date(s) on which the service was provided. In doing so, identity which of the medical practitioners, if any, were seen in relation to any of the alleged damages sought in this case.

**RESPONSE NO. 11:**

See medical release forms supplied to counsel on December 1, 2008.

**INTERROGATORY NO. 12:**

Identity any and all arrests, convictions, pleas, or other disposition of any crime or alleged crime with which you have been involved, except for parking tickets, including the identities of the parties, the style and number of the case, the court in which the action was or is pending; the nature of each criminal offense asserted, the grounds for and dates of the arrest and/or offense for which you were charged and/or convicted, all relief sought, the name of your attorney or attorneys in each matter; the opposing parties in each matter, whether the action is pending; and the resolution of the matter.

**RESPONSE NO. 12:**

None.

**INTERROGATORY NO. 13:**

Identify all experts you intend to call to testify at trial, and describe in detail the subject matter of each such expert's anticipated testimony, the facts and opinions to which each expert is expected to testify, and the grounds for each opinion.

**RESPONSE NO. 13:**

See report by Dr. Perry to be produced when it is complete. The economist is expected to testify as to Plaintiff's economic damages. Plaintiff reserves the right to amend this response at any time before the end of discovery, and shall do so when her intentions have been solidified and experts have been chosen to testify.

**INTERROGATORY NO. 14:**

State whether, other than in relation to this lawsuit, Plaintiff has ever been a party or a witness to a lawsuit (including but not limited to small claims court, bankruptcy, divorce, etc.) or ever filed a charge or complaint with the EEOC, Department of Labor, or any other state, federal or local administrative agency. If so, for each charge or lawsuit state: (a) name and location of the agency or court; (b) charge or court file number; (c) date commenced; (d) whether Plaintiff was the Plaintiff or Defendant in the prior action; (e) names and addresses of all other parties and their attorneys, including a designation whether the party was a Plaintiff, Defendant, etc.; (f) nature of the charge, complaint and defense; and (g) present status of the charge or suit.

**RESPONSE NO. 14:**

Objection. This Interrogatory seeks information that is not relevant to these proceedings nor reasonably calculated to lead to the discovery of admissible evidence, and therefore is beyond

the scope of discovery. The Interrogatory seeks information that is subject to the attorney-client privilege.

**INTERROGATORY NO. 15:**

If you have ever complained of employment discrimination, harassment, or retaliation to an employer, excluding Defendants, formally or informally, state the date and describe in detail the nature and resolution of each such complaint.

**RESPONSE NO. 15:**

NA

**INTERROGATORY NO. 16:**

Please identify each employee or former employee, agent or representative of Defendants with whom you had contact regarding this Complaint or any of your allegations set forth in the Complaint.

**RESPONSE NO. 16:**

Please refer to:

➢ Answer to Interrogatory No. 2; and

➢ Previously exchanged discovery; and

➢ Plaintiffs Disclosure.

**INTERROGATORY NO. 17:**

Identify and explain in detail all information that Plaintiff has that supports her claim that Defendants' alleged conduct was done with "reckless indifference to Plaintiff's federally protected rights."

**RESPONSE NO. 17:**

Please refer to:

> ➤ Answer to Interrogatory No. 2; and

> ➤ Previously exchanged discovery; and

> ➤ Plaintiffs Disclosure.

**INTERROGATORY NO. 18:**

Identify in detail and with particularity each and every effort that Plaintiff has made to obtain employment since her employment with Defendants ended.  For each and every prospective employer from Plaintiff has sought employment from the time her employment with Defendants ended through the present, provide the following information:

  a.  the name and address of the prospective employer;

  b.  the date(s) on which Plaintiff contacted the prospective employer;

  c.  the manner in which Plaintiff contacted or communicated with the prospective employer (e.g., letter, online application, resume, in-person visit, telephone call);

  d.  the name and title of any individual who interviewed Plaintiff;

  e.  the title, duties and responsibilities of the position sought;

  f.  whether Plaintiff was offered employment of any kind; and

  g.  the salary and benefits offered in connection with the position.

**RESPONSE NO. 18:**

Please refer to documents produced in response to Defendants' Request for Production Sets One and Two.

**INTERROGATORY NO. 19:**

For each and every position of employment that Plaintiff has held since her employment with Defendants ended, identify the following:

    (a) name, address and telephone number of the employer;

    (b) dates and duration of the employment;

    (c) title, duties and responsibilities of any position(s) held by Plaintiff;

    (d) wages, salary, and other benefits paid or offered;

    (e) Whether your employment was terminated for any reason; and:

        a. If the termination was voluntary, the reason(s) why you elected to quit the position;

        b. If the termination was involuntary, the reason given to you, if any, by your employer for such termination.

**RESPONSE NO. 19:**

Plaintiff has not been employed since she was unlawfully terminated by Defendants.

**INTERROGATORY NO. 20:**

Has Plaintiff been self-employed at any time since her employment with Defendants ended? If so, please state the following for each and every period of self-employment:

    (a) dates of Plaintiff's self-employment;

    (b) nature of occupation of Plaintiff's self-employment;

    (c) gross profits earned from Plaintiff's self-employment; and

    (d) net profits earned from Plaintiff's self-employment.

**RESPONSE NO. 20:**

Plaintiff has not been self-employed since she was unlawfully terminated by Defendants.

**INTERROGATORY NO. 21:**

From January 1, 2005 to present, please identify any travel you have done outside of Maricopa County. For each trip, identify where you traveled to; the dates you traveled; the reason(s) for the travel; and identify anyone who traveled with your [sic] or accompanied you in each trip.

**RESPONSE NO. 21:**

Objection. This Interrogatory seeks information that is not relevant to these proceedings nor reasonably calculated to lead to the discovery of admissible evidence, and therefore is beyond the scope of discovery. The Interrogatory is overly broad and unduly burdensome. The Interrogatory seeks information that is subject to the attorney-client privilege and work product doctrine.

RESPECTFULLY SUBMITTED this 5th day of December, 2008.

**PETER STROJNIK, P.C.**

By: Peter Strojnik
Attorney for the Plaintiff