Peter Strojnik, 006464
3030 North Central Avenue, Suite 1401
Phoenix, Arizona 85012
Telephone: 602-524-6602
Facsimile: 602-296-0135
e-mail: *ps@strojnik.com*
Attorney for Plaintiff

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| DIANE SAHAKIAN, a single woman, ) | NO.  CV-08-241-PHX-HRH |
| ) | |
| Plaintiff, ) | **[PROPOSED]** |
| ) | **THIRD AMENDED COMPLAINT** |
| vs. ) | |
| ) | **JURY TRIAL DEMANDED** |
| STATS  ChipPAC,  Inc.,  a  foreign ) | |
| corporation;  STATS  ChipPAC,  Ltd.,  a ) | |
| foreign  corporation;  TEMASEK ) | |
| HOLDINGS  PRIVATE  LIMITED,  a ) | |
| foreign  corporation;  SINGAPORE ) | |
| TECHNOLOGIES SEMICONDUCTORS ) | |
| PRIVATE  LIMITED,  a  foreign ) | |
| corporation. ) | |
| ) | |
| Defendants. ) | |

Plaintiff alleges as follows:

## PARTIES

1) Plaintiff DIANE SAHAKIAN is a single mother currently residing in Maricopa County, State of Arizona.

2) Defendants STATS ChipPAC, Inc. and STATS ChipPAC, Ltd. (collectively as "Stats ChipPAC") are foreign corporations authorized to and conducting business in the County of Maricopa, State of Arizona.  Stats ChipPAC are employers and/or vicariously

liable for the acts of each other under Title VII because all acts taken by Plaintiff's supervisors were within the course and scope of his employment.

3) Defendant TEMASEK HOLDINGS PRIVATE LIMITED ("Temasek") is a foreign corporation with its principal place of business in the Country of Singapore. Temasek is the parent corporation of Defendant Singapore Technologies Semiconductors Private Limited.

4) Defendant SINGAPORE TECHNOLOGIES SEMICONDUCTORS PRIVATE LIMITED ("STS") is a foreign corporation with its principal place of business in the nation of Singapore. STS is the wholly owned subsidiary of Temasek.

5) On information and belief, Temasek is a private entity owned and operated by the Singaporean Government.

6) STS owns approximately 83% of the outstanding shares of Stats ChipPAC.

7) Stats ChipPAC has seven directors.

8) Jimmy Phoon has been a Director of Stats ChipPAC since August 2007. Mr. Phoon previously was the Senior Managing Director and Chief Investment Officer at Temasek Holdings Pte. Ltd. Prior to Temasek, Mr. Phoon was a Deputy Director in the Ministry of Finance for the nation of Singapore. Mr. Phoon has since resigned.

9) Peter Seah Lim Huat has been a Director of Stats ChipPAC since July 2002. He has been a member of the Temasek Advisory Panel since January 1, 2005.

10) On information, Defendants Temasek and STS caused the voluntary delistment of Stats ChipPAC from the NASDAQ in their attempt to become completely privatized.

11) On information, Defendants Temasek and STS are attempting to cause the delistment of Stats ChipPAC from the Singapore Exchange.

12) On information, Defendants Temasek and STS control the operations and day to day functions of Stats ChipPAC.

## JURISDICTION AND VENUE

13) This action is brought to remedy discrimination on the basis of sex in the terms, conditions and privileges of employment and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq*. ("Title VII").

14) Injunctive and declaratory relief, damages and other appropriate legal and equitable relief are sought pursuant to 42 U.S.C. §2000e (f) and (g).

15) Plaintiff filed a charge of sex discrimination against Defendants Stats ChipPAC with the Equal Employment Opportunity Commission (hereinafter "EEOC") on or about September 18, 2007.  Plaintiff filed a subsequent charge of retaliation against Defendants Stats ChipPAC with the EEOC on July 30, 2008 as a result of the termination of her employment by Defendants Stats ChipPAC on July 1, 2008.

16) On or about January 25, 2008, the EEOC issued a Notice of Right to Sue to Plaintiff. On or about September 9, 2008, the EEOC issued a Notice of Right to Sue to Plaintiff.

17) Plaintiff has complied fully with all prerequisites to jurisdiction in this Court under Title VII.  This Court has jurisdiction under §706(f)(3) of Title VII, 42 U.S.C. §2003-5(f)(3).

18) As the unlawful employment practices complained of herein occurred within Maricopa County, venue is proper in this District Court.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**FACTUAL ALLEGATIONS COMMON TO ALL COUNTS**

19) Plaintiff began her employment with Stats ChipPAC in August 1999. As a Vice President in the Technology Development organization, Plaintiff was one of the few female executives in the companies. Plaintiff managed a technical group responsible for generating the corporate technology roadmaps and emerging technology strategies, and engaging customers in emerging technologies. Plaintiff reported to her supervisor, Dr. Han Byung Joon, who is employed by Defendant Stats ChipPAC, Ltd. as the Executive Vice President and Chief Technology Officer (commonly referred to as "BJ Han"), and she has always received good performance evaluations.

20) Beginning in 2006 and through April 2007, Plaintiff reported to her management and human resources department that certain subordinate male employees, including, but not limited to, Eric Israel Gongora, who, on information and belief, is a convicted felon and has been referred to within Stats ChipPAC as a "troublemaker", were undermining her authority within her group, her reputation in the company, and were creating a hostile work environment. As a result of her complaints, Plaintiff's supervisor, BJ Han, became increasingly hostile towards her and undermined her further within her group notwithstanding BJ Han's prior reference to this group of subordinate employees as a group of "monkeys." BJ Han has referred to Plaintiff and Americans in general as "fat" and "lazy" and to Plaintiff individually as "fat".

21) On or about April 9, 2007, with the implied assurance of impunity from BJ Han, male employees put ketchup on Plaintiff's office chair on a day that Plaintiff was wearing white pants, making it appear that Plaintiff had an "accident" relating to her female

gender.  Plaintiff was humiliated by this incident and reported it to her supervisor, BJ Han, and the human resources department.  In response to Plaintiff's complaints, BJ Han told her: "Drink a beer and have a good sleep.  It will be OK."

22) Stats ChipPAC acknowledged the ketchup incident was harassment and not merely horseplay.

23) Stats ChipPAC employee handbook reads as follows:  "The Company will not tolerate unlawful harassment of any type."

24) Stats ChipPAC employee handbook reads as follows:   "Sexual or other unlawful harassment includes any conduct that has the purpose or effect or unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive work environment".

25) Human Resources Policy revision dated November 22, 2005, indicates that "Management is responsible for taking necessary steps to prevent all forms of harassment, including sexual harassment from occurring within their department and throughout the company. These steps should encompass discussion of the subject, expression of strong disapproval, informing employees of procedures for submission of complaints and for making appropriate disciplinary action up to and including termination when acts of harassment occur."

26) Human Resources Policy revision dated November 22, 2005, further states that "complaints brought forward under this policy will be investigated in a prompt, confidential and objective manner".

27) Human Resources Policy revision dated November 22, 2005, further states that "all members of the management team are responsible for the interpretation, maintenance, coordination and enforcement of this policy".

28) Human Resources Policy revision dated November 22, 2005, indicates that "Employees who feel that they have been harassed, or employees who witness any harassment, should immediately report such conduct to their supervisors or Human Resources."

29) Human Resources Policy revision dated November 22, 2005, indicates that "STATS ChipPAC will take disciplinary action up to and including immediate termination of any employee who retaliates against another employee for engaging in any of these protected activities".

30) On June 22, 2007, Plaintiff started a thirty-day leave under the Family Medical Leave Act due to the stress she experienced as a result of the hostile work environment created and maintained at Stats ChipPAC by, among others, BJ Han.

31) When Plaintiff returned from her FMLA leave, BJ Han, without notification, made a company-wide announcement demoting and removing Plaintiff from her supervisory position. She was given a new position – "Special Project" at the bottom of the organization chart, and her title as Voce President was removed.

32) Since that time, Plaintiff has been given assignments with no real possibility of completing them as assigned by BJ Han. Plaintiff was ostracized, omitted from meetings and conferences she previously attended; omitted from relevant communications; and placed in a dead-end position removing virtually all of her job

duties and responsibilities, all in a blatant attempt to force her resignation from employment.

33) Despite Plaintiff's complaints, no disciplinary action was taken against the male employees who undermined her authority within her group and her reputation within the company, and created a hostile work environment.

34) Plaintiff was demoted when she complained to her management and human resources department and upon her return from FMLA leave.

35) After the demotion, on September 18, 2007, Plaintiff filed a charge of discrimination and retaliation with the EEOC.

36) On December 11, 2007, Defendants Stats ChipPAC, through their attorneys, made a settlement offer to Plaintiff to resolve her legal claims against Defendants Stats ChipPAC, in exchange for Plaintiff's resignation from employment. Plaintiff rejected Defendants' settlement offer and on January 24, 2008 made a counteroffer, which was not accepted by Defendants.

37) Having received a Notice of Right to Sue from the EEOC relative to Plaintiff's first charge of discrimination and retaliation, on February 6, 2008, Plaintiff filed her Complaint in this lawsuit in federal court.

38) On April 11, 2008, Defendants Stats ChipPAC, through their attorneys, made a settlement offer in exchange for a complete release of claims and Plaintiff's resignation from employment. Defendants Stats ChipPAC, through their attorneys, subsequently advised that its settlement offer would be "off the table" on May 16, 2008. Plaintiff did not accept Defendants' settlement offer, which lapsed.

39) On or about May 30, 2008, Sahakian inquired about a STATS-Tempe job posting. After several inquiries, Defendant STATS informed Sahakian that this posting was unavailable to Sahakian because it was an 'artificial' posting to process a green card for one GS Kim, a non-citizen of the United States.

40) On July 1, 2008, Defendants Stats ChipPAC terminated Plaintiff's employment.

**COUNT ONE**
**(VIOLATION OF TITLE VII – HOSTILE WORK ENVIRONMENT)**

41) Plaintiff realleges all allegations heretofore alleged.

42) Defendants have discriminated against Plaintiff in the terms and conditions of her employment on the basis of her sex in violation of Title VII as a result of a discriminatory and hostile work environment created by her supervisor and co-workers.

43) As a direct result of the hostile work environment, Plaintiff has suffered mental and emotional distress, pain and suffering, anger, depression, anxiety, humiliation, loss of reputation and embarrassment.

44) The actions of Defendants were done in reckless indifference to Plaintiff's federally protected rights and Plaintiff is therefore entitled to recover punitive and exemplary damages.

45) Defendants Temasek and STS are liable for the acts alleged because they so dominate and control Defendants Stats ChipPAC such that Stats ChipPAC is an instrumentality and adjunct to Temasek and STS pursuant *to Walker v. Southwest Mines Dev. Co.*, 52 Ariz. 403 (1938); *Gatecliff v. Great Republic Life Insurance Co.*, 821 P.2d 725 (Ariz. 1991) and their progeny.

46) Defendants Temasek and STS are liable for the acts alleged because Stats ChipPAC is the alter ego of Temasek and STS pursuant *to Walker v. Southwest Mines Dev. Co.*, 52 Ariz. 403 (1938); *Gatecliff v. Great Republic Life Insurance Co.*, 821 P.2d 725 (Ariz. 1991) and their progeny.

47) Defendants Temasek and STS are liable for the acts alleged herein because Stats ChipPAC is a mere instrumentality of Temasek and STS pursuant *to Walker v. Southwest Mines Dev. Co.*, 52 Ariz. 403 (1938); *Gatecliff v. Great Republic Life Insurance Co.*, 821 P.2d 725 (Ariz. 1991) and their progeny.

## COUNT TWO
### (VIOLATION OF TITLE VII – RETALIATION)

48) Plaintiff realleges all allegations heretofore alleged.

49) Defendants have retaliated against the Plaintiff due to her reporting complaints of a hostile work environment by demoting Plaintiff.  Defendants further retaliated against Plaintiff due to her subsequently engaging in protected activity under Title VII, including but not limited to:  (a) filing a charge of discrimination and retaliation with the EEOC on September 18, 2007; (b) engaging in settlement negotiations with Defendants to resolve her charge of discrimination after filing her charge of discrimination on September 18, 2007; (c) filing the present lawsuit against Defendants on February 6, 2008; (d) engaging in settlement negotiations with Defendants to resolve her legal claims after filing the present lawsuit; and (e) taking the FMLA leave, all of which resulted in the termination of Plaintiff's employment on July 1, 2008.

50) As a direct result of retaliatory action by Defendants, Plaintiff has suffered mental and emotional distress, pain and suffering, anger, depression, anxiety, humiliation and embarrassment.  As a further direct result of the retaliatory action by Defendants, Plaintiff has and will suffer lost wages, lost promotional opportunities in the future and damage to her reputation and career.

51) The actions of Defendants were done in reckless indifference to Plaintiff's federally protected rights and Plaintiff is therefore entitled to recover punitive and exemplary damages.

52) Defendants Temasek and STS are liable for the acts alleged because they so dominate and control Defendants Stats ChipPAC such that Stats ChipPAC is an instrumentality and adjunct to Temasek and STS pursuant *to Walker v. Southwest Mines Dev. Co.*, 52 Ariz. 403 (1938); *Gatecliff v. Great Republic Life Insurance Co.*, 821 P.2d 725 (Ariz. 1991) and their progeny.

53) Defendants Temasek and STS are liable for the acts alleged because Stats ChipPAC is the alter ego of Temasek and STS pursuant *to Walker v. Southwest Mines Dev. Co.*, 52 Ariz. 403 (1938); *Gatecliff v. Great Republic Life Insurance Co.*, 821 P.2d 725 (Ariz. 1991) and their progeny.

54) Defendants Temasek and STS are liable for the acts alleged herein because Stats ChipPAC is a mere instrumentality of Temasek and STS pursuant *to Walker v. Southwest Mines Dev. Co.*, 52 Ariz. 403 (1938); *Gatecliff v. Great Republic Life Insurance Co.*, 821 P.2d 725 (Ariz. 1991) and their progeny.

WHEREFORE, Plaintiff demands Judgment against Defendants as follows:

1.  Declaring the acts and practices complained of herein are in violation of Title VII;

2.  Compensatory damages to be proven at time of trial;

3.  Lost wages and the value of benefits to be proven at time of trial;

4.  Punitive and Exemplary damages to be proven at time of trial;

5.  Attorneys' fees and costs of suit;

6.  Reinstatement and promotion to the position held prior to her FMLA leave;

For such other relief this Court deems just.

**COUNT THREE**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

55) Plaintiff realleges all allegations heretofore set forth.

56) Plaintiff alerted Defendants to at least one act of sexual harassment, to wit, the ketchup incident.  The ketchup incident occurred on April 9, 2007.

57) Plaintiff reported the incident to her direct supervisor, BJ Han and to Gail Uy, STATS' Human Resources representative.

58) Defendants commenced an "investigation" of the ketchup incident.

59) STATS' HR was not properly staffed or otherwise capable of conducting a meaningful "investigation" into an act or acts of sexual harassment.  STATS' HR investigating this matter lacked, *inter alia*:

    (a) Knowledge in Plaintiffs' Characteristics in Employment Law;

    (b) Examination of Hostile Work Environment and Sexual Harassment Claims;

    (c) The fundamentals of "motive, means and opportunity" to commit acts of sexual harassment;

(d) Prior incidents of sexual harassment by the primary suspect, Eric Gongora; and

(e) Background investigations of potentially responsible parties.

60) Following initial investigation, STATS report noted that several employees pointed their accusatory finger at Eric Gongora as the sexual harasser; however, Eric Gongora denied the harassment. On April 11, 2007, STATS concluded that "there is someone lying in Tempe".

61) STATS was completely unprepared and unwilling to determine who was "lying in Tempe" although all indicators pointed to Eric Gongora.

62) STATS failed to conduct a due diligence investigation into Eric Gongora's background to determine whether he was guilty of past instances of sexual harassment and aggression, which would reveal the following instances:

(a) Mayuli Lamm petitioned for and received an Order of Protection against Eric Gongora in 2005 in the Chandler Justice Court;

(b) Eric Gongora was terminated from his previous employment at Amkor Technology, Inc. for the following reasons:

1. He attempted to ship drugs from Arizona to the Philippines using the Amkor business Federal Express account;

2. He wrote sexually explicit and x-rated emails to female Amkor employees on Amkor computers during normal working hours;

3. He made unwanted and repeated sexual advances on an Amkor receptionist while he was employed at Amkor; and,

4. <u>He browsed and logged onto numerous pornographic websites on Amkor company computers during normal business hours</u>

63) <u>STATS did not consider any of the following facts that were available to it regarding Eric Gongora:</u>

   (a) <u>The fact that he had been convicted of a felony in Florida; and</u>

   (b) <u>The fact that his previous employer, Amcor, listed 4 reasons for his termination from Amkor:</u>

       (i) <u>Unwanted sexual advances to a female employee; and</u>

       (ii) <u>The misuse of company computers to view pornographic websites; and</u>

       (iii) <u>The misuse of company computers to exchange sexually explicit materials with female co-employees;</u>

       (iv) <u>Attempt to Eric Gongora to transport illegal drugs from Arizona to the Philippines using Amkor's fed ex account.</u>

   (c) <u>The fact that two of his ex-wives had filed for an order of protection for physical abuse and the use of the "c___" word in referring to her; and</u>

   (d) <u>The fact that Gongora lied on his employment application with STATS (twice); and</u>

   (e) <u>The fact that Gongora had to take an anger management course in a criminal prosecution in Chandler, Arizona.</u>

64) <u>Despite available evidence that Eric Gongora was the perpetrator of the sexual harassment acts, STATS made a conscientious decision to retain Eric Gongora in its employ and to terminate Plaintiff.</u>

65) Instead of investigating who was "lying in Tempe", STATS turned its investigation of the ketchup incident into an investigation of Plaintiff.

66) On May 12, 2007, Plaintiff inquired of BJ Han why was she investigated when she is the victim.

67) BJ Han responded that the duty to investigate the ketchup incident has fallen on Plaintiff to "Bring …material evidence beyond a reasonable doubt [that] someone did such incident.  The person can be fired." At the time of this statement, BJ Han knew that the duty of performing an adequate investigation lay with STATS, not with Plaintiff.

68) On June 6, 2007, STATS' HR documented in the exit interview of one Scott Gooch that Scott Gooch's "main reason" for leaving STATS was that Plaintiff was "The worst manager I've ever had".

69) At the time of the documentation of this exit interview, STATS knew that:

    (a) Plaintiff had been a rising star within the organization;

    (b) Plaintiff started the Tempe office, along with Joe Jorowski, of STATS ChipPAC;

    (c) Plaintiff consistently garnered the highest employment reviews; and

    (d) Plaintiff had been selected for a "high potential" designation available to only very few STATS employees; and

    (e) Gooch was actually not managed at the time of the exit interview by Plaintiff but by Mike Schraeder; and

    (f) That Gooch was unhappy with the performance review and the resulting bonus, and blamed Plaintiff; and

(g) That Gooch only took the job with STATS because his wife had been transferred to the Bay area; and

(h) That Gooch told Mike Schraeder that he was leaving to follow a better opportunity.

70) At the time of the exit interview, STATS knew that Gooch had been managed by Mike Schraeder for 2 months, and that Gooch's statement could not possibly be truthful.

71) However, BJ Han used the Gooch Exit interview to further "document" Plaintiff.

72) Plaintiff took the FMLA leave on June 23, 2007.

73) The decision to affect termination of Plaintiff was to retaliate against Plaintiff for her continuing demands to conduct a credible investigation.

74) STATS knew that in order to terminate Plaintiff with the least possible exposure for damages in a lawsuit, STATS had to create a paper trail to make it appear that STATS' had cause to terminate Plaintiff other than retaliation and hostile work environment.

75) BJ Han believed that if it could bide his time and let time pass between his decision to terminate Plaintiff and the actual termination, STATS' liability for terminating Diane would be greatly diminished.

76) BJ Han also believed that if he commenced an investigation of Plaintiff, he would be able to assert in any subsequent court proceedings that Plaintiff was terminated for reasons *other than* retaliation.

77) On July 11, 2007, STATS commissioned Nehal Patel of STATS' corporate HR to investigate Diane's "management style". Ms. Patel's investigation concluded that the

Plaintiff's reports he interviewed had "no problem with Diane and respect her management style".

78) Patel recommended that "Diane may need to attend a training/seminar on managing people or communications.  We will look into some training in the Tempe, AZ area and see if we can find a good program."

79) STATS did not accept Patel's recommendation.

80) On August 7, 2007, Plaintiff discussed the matter of STATS' investigation of Plaintiff with BJ Han.  During this communication, Plaintiff advised BJ Han that "she did not agree with how BJ handled the investigation or Scott Gooch's exit interview". BJ Han responded to her that "She [Plaintiff] can sue him [BJ Han]", that he "will take action if she [Plaintiff] does not apologize to him [BJ Han]; that he "never wants to see [Plaintiff] again" and that he is "done with her".

81) STATS' HR then interviewed BJ Han regarding his statements to Plaintiff.  Janet Taylor, STATS' general counsel, was also present during this conversation. STATS has refused to disclose the contents of BJ Han's statements during this meeting between HR, BJ Han and Janet Taylor on the basis of attorney client privilege.

82) Instead, on August 13, 2007, Plaintiff was demoted into a newly created position of "Special Projects".

83) The "Special Projects" position was created for the sole purpose of demoting and demeaning Plaintiff.

84) Plaintiff was kept on as STATS' employee under a false pretense that her job as a "special project" manager was a valuable contribution to the company and not a method of slowly firing her from her job.

85) Former STATS ChipPAC employees have stated and sworn under oath that the special projects were a "demotion", "polite/subtle way of demoting", "notice to the employee that the employee should begin to find new employment or else they will ultimately be fired", "politely force a person out of the particular company", a "kiss of death", taking the employee "out of the mainstream of the company", etc.

86) On August 22, 2007, BJ Han issued a self serving "Management Statement for Diane Sahakian" for the purpose of covering up the true reason for STATS' actions toward Plaintiff.

87) On July 1, 2008, STATS terminated Plaintiff's employment.

88) Defendants acts were extreme and outrageous in the following respects:

(a) Defendants intentionally failed to conduct adequate investigation of the sexual harassment although they knew or recklessly disregarded the near certainty that Plaintiff would suffer emotional distress as a result; and

(b) Defendants intentionally and consciously decided to place the burden of proof of sexual harassment on Plaintiff when they knew that the burden was on them, recklessly disregarding the near certainty that Plaintiff would suffer emotional distress as a result; and

(c) Defendants intentionally and consciously created a false paper trail in order to deprive Plaintiff of her legitimate rights under Title VII, recklessly

disregarding the near certainty that Plaintiff would suffer emotional distress as

a result; and

(d) Defendants intentionally and consciously chose to retain Eric Gongora, the

perpetrator of the harassment, and to terminate the Plaintiff, recklessly

disregarding the near certainty that Plaintiff would suffer emotional distress as

a result; and

(e) Defendants set up Plaintiff for termination without disclosing their true

intentions, recklessly disregarding the near certainty that Plaintiff would suffer

emotional distress as a result; and

(f) Defendants deceived Plaintiff into believing that she was acting within her

rights and that her position would not be compromised as a result of her

exercise of her rights, recklessly disregarding the near certainty that Plaintiff

would suffer emotional distress as a result; and

(g) Defendants otherwise acted in a manner that is destructive of the "justice

principle", recklessly disregarding the near certainty that Plaintiff would

suffer emotional distress as a result.

89) Defendants either intended to cause emotional distress or recklessly disregarded the near

certainty that such distress will result from their conduct; and

90) Severe emotional distress occurred as a result.

91) Defendants conduct was premeditated and intentional, designed to benefit Defendants at

the expense and harm to Plaintiff, entitling Plaintiff to an award of punitive damages.

92) This count arises out of contract, entitling Plaintiff to an award of attorney's fees pursuant to ARS 12-341.01.

WHEREFORE, Plaintiff prays for judgment as follows:

1.  For damages for intentional infliction of emotional distress; and

2.  For punitive damages commensurate with the degree of Defendants misconduct and assets in an amount sufficient to deter these Defendants from future misconduct of like style, and others similarly situated.

3.  For attorney's fees and costs; and

4.  For such other and further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial.

RESPECTFULLY SUBMITTED this 2nd day of June, 2009.

**PETER STROJNIK, P.C.**

_____
Peter Strojnik
Attorney for the Plaintiff