1  Peter Strojnik, 006464
2  3030 North Central Avenue, Suite 1401
   Phoenix, Arizona 85012
3  Telephone: 602-524-6602
   Facsimile: 602-296-0135
4  e-mail: *ps@strojnik.com*
   Attorney for Plaintiff
5

6                    **UNITED STATES DISTRICT COURT**

7                         **DISTRICT OF ARIZONA**

   DIANE SAHAKIAN, a single woman,    ) NO.  CV-08-241-PHX-HRH
8                                      )
                              Plaintiff, )    **MOTION FOR IN CAMERA**
9                                      )      **EXAMINATION OF GAIL UY**
       vs.                             )   **REGARDING THE MEETING WITH**
10                                     )        **CORPORATE COUNSEL**
                                       )
11 STATS  ChipPAC,  Inc.,  a  foreign )
   corporation; STATS ChipPAC, Ltd., a )      (Crime – Fraud Exception)
12 foreign     corporation;    TEMASEK )
   HOLDINGS   PRIVATE   LIMITED,   a )
13 foreign     corporation;   SINGAPORE )
   TECHNOLOGIES SEMICONDUCTORS )
14 PRIVATE      LIMITED,   a    foreign )
   corporation.                        )
15                                     )
                                       )
16                            Defendants. )
17 _____)

18

                         **SUMMARY OF MOTION**
19

20      On May 27, 2009, Plaintiff took the deposition of Gail Uy, STATS' Human Resources

21 employee based in Fremont, California[1] who was charged with the investigation of Eric

22 Gongora's sexual harassment of Plaintiff.  Ms. Uy was questioned about handwritten notes she

23 made on or about August 7, 2007 (Uy Handwritten notes, Exhibit 1) in which she confirmed a

24 _____

25

[1] There is no Human Resources representation for STATS ChipPAC in the Tempe office.

call from Plaintiff.  During this call, Plaintiff stated to Ms. Uy that Plaintiff's supervisor, BJ Han, demanded an apology from Plaintiff for the manner in which BJ Han "handled the investigation and Scott Gooch's exit interview"; that BJ Han told Plaintiff that he "will take action if [Plaintiff] does not apologize"; that BJ Han told Plaintiff "she can sue him"; that BJ Han told Plaintiff that he "never wants to see [Plaintiff] again" and that BJ Han is "done with [Plaintiff]".

Upon questioning whether Ms. Uy confirmed the truth of these statements with BJ Han, Ms. Uy testified that she did; however, this discussion was conducted in the presence of STATS' corporate counsel, Ms. Janet Taylor, and Ms. Uy asserted the attorney-client privilege.

The Uy – Han – Taylor discussion was followed closely in time (anywhere between 1 and 3 business days) by a reassignment of Plaintiff from a managerial position to a position with no managerial duties, no prospect of advancement, no reports, no clear structure, no clear assignment, no prestige, and no title.  Plaintiff believes that the discussion between Uy, Han and Taylor was designed to seek advice on how to terminate Plaintiff without exposing the Company to Title VII or other legal liability.  There are sufficient indicia that the Uy – Han – Taylor discussion related to a "crime" (18 U.S.C. §241) and "fraud".  Accordingly, the crime-fraud exception applies to the Uy – Han – Taylor discussions.

This Motion is more fully supported by the following memorandum of points and authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

**The Uy – Han – Taylor Discussion Occurred After Han's Statement to Plaintiff That He is "Done" with Her and Just Prior to her Reassignment to Special Projects.**

On August 7, 2007, Plaintiff reported to Gail Uy (Human Resources) that BJ Han threatened her with "taking action if [Plaintiff] does not apologize to [BJ Han]" [for the way BJ mishandled the investigation]; BJ Han told Plaintiff that he "never wanted to see [her] again"; and that he (BJ Han) is "done" with her; and that Plaintiff can sue BJ Han. (Exhibit 1).

BJ Han reiterated his thoughts in an email on August 8, 2007 as follows:  "Just in case you didn't hear me right yeaterday [sic], I repeat, I have DONE more than enough on this matter.  As said you do what is right for you independently from me.  **I have started my side of the action**."  (Han/Sahakian email, Exhibit 2) (Emphasis supplied).

Gail Uy responded to this complaint by organizing a meeting with BJ Han and Janet Taylor, STATS' corporate counsel.  Since BJ Han had already stated his intentions "I am done with you" and "I never want to see you again", a reasonable inference arises that the purpose of the meeting with Ms. Taylor was to determine *how* to fire Plaintiff without incurring corresponding Title VII liability.  By virtue of the proximity of time between (1) BJ Han's statement, "I never want to see you again" (Wednesday), (2) the Uy – Han – Taylor conference (Wednesday, Thursday or Friday), and (3) the demotion to "special projects" (following Monday), a reasonable inference can be reached that corporate counsel provided a legal opinion on *how* to fire Plaintiff in violation of Title VII but minimize the risk of corresponding liability.

**August 7:**          **BJ Han/Diane Sahakian conversation and report to Uy**

**August 8, 9 or 10:**   **Uy / Han/ Taylor conference**

**August 13:**          **Plaintiff demotion to special projects**

The discussion with BJ Han and Janet Taylor took place either on Wednesday, August 8, Thursday, August 9 or Friday August 10.  It is undisputed that on Monday, August 13, 2007,

Plaintiff was reassigned to "special project" (Han email to All & New Organizational Chart, Exhibit 3).  The term "special project" is understood as a "kiss of death" and a "demotion and career-limiting position" (Declarations of Ram Ramakrishna and Jay Ewanich, Exhibit 4) designed as an inducement for the Plaintiff to quit; the treatment of Plaintiff follows closely Dr. Wilson's[2] description of treatment of a victim of sexual harassment (the "group deviant") by the dominant group:

> The complainant becomes a "group deviant".  A socially critical group will tend to isolate the complainant inviting criticism of the victim rather than an examination of the complaint or scrutiny of the perpetrator.  Research on discrimination and sex-role stereotyping in particular reveal that such situations are characterized by selective interpretation of the complaint.  The group selectively interprets the behavior of the perpetrator and the victim along the lines of stereotypes (male vs. female; management vs. subordinate; us vs. them; etc) and denigrates the merit of the individual claimant.

## Crime-Fraud Exception to the Attorney-Client Privilege

The effect of the advice by counsel to place Plaintiff on "special project" was to affect an adverse employment action and a direct assault on the rights of this Title VII Plaintiff. An "adverse employment action" is "adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity." *Ray v. Henderson*, 217 F.3d 1234, 1242-43 (9th Cir. 2000) (quoting EEOC Compliance Manual Section 8, "Retaliation," ¶ 8008 (1998)).  Clearly, the demotion was based on Plaintiff's complaints both as to the harassment itself and as to the manner of investigation of the

---

[2] Dr. Wilson is Defendant retained Independent Medical Examiner who was qualified to give expert opinion on these matters during his deposition on May 26, 2009.

harassment. BJ Han's response was clear:  "I never want to see you again". "I am done with you". (Exhibit 1).

"The attorney-client privilege is not without its costs.  Since the privilege has the effect of withholding relevant information from the factfinder, it applies only where necessary to achieve its purpose.  The attorney-client privilege…ceases to operate at a certain point, namely, where the desired advice refers not to prior wrongdoing, but to future wrongdoing."  *United States v. Zolin*, 491 U.S. 554, 562, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989) (citation omitted).  "It is the purpose of the crime fraud exception to the attorney-client privilege to assure that the 'seal of secrecy,' between lawyer and client does not extend to communications 'made for the purpose of getting advice for the commission of a fraud' or crime." *Zolin*, 491 U.S. at 563, 109 S.Ct. 2619 (citations omitted). A client has no expectation of confidentiality where the purpose of legal advice is to commit "fraud that is reasonably certain to result in substantial injury to the financial interest or property of another and in furtherance of which the client has used or is using the lawyer's services".  See ER 1.6(d) (1).

**Crime**

The advice and the agreement to deprive Plaintiff of her benefits represents a crime under federal law. See 18 U.S.C. § 241 (Conspiracy Against Rights[3]). Here, Defendants clearly

---

[3] If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or

If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured—

They shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, they shall be fined under this title or imprisoned for any term of years or for life, or both, or may be sentenced to death.

1  violated Plaintiff's Title VII rights and protections.  Intracorporate conspiracy doctrine does not

2  apply. *United States v. Hughes Aircraft Co.*, 20 F.3d 974, 978-79 (9th Cir. 1994) (noting that the

3  intracorporate conspiracy doctrine "has never been applied to criminal cases" and holding that "a

4  corporation may be liable under § 371 for conspiracies entered into by its agents and

5  employees") The "crime" element of the "crime-fraud" exception is satisfied.

6      **Fraud**

7      The term "fraud" is a broadly defined term. For example, in *United Services Automobile*

8  *Ass'n v. Werley*, 526 P.2d 28 (Alaska 1974), the Alaska Supreme Court adopted a broad view of

9  the fraud exception. *Werley* stated that the attorney-client privilege does not apply when there is

10  evidence that "an insurer through its attorney engage[d] in a **bad faith** attempt to defeat, or at

11  least reduce, the rightful claim of its insured[.]" (emphasis supplied) *Werley*, 526 P.2d at 33.

12  Thus, under *Werley* mere evidence of bad-faith can defeat the attorney-client privilege. Indeed,

13  in the context of the exception, there are nearly as many definitions for the term "fraud" as there

14  are courts tackling the issue. See, e.g., *In re Sealed Case*, 754 F.2d 395, 399 (D.C. Cir. 1985)

15  ("Communications otherwise protected by the attorney-client privilege are not protected if the

16  communications are made in furtherance of a crime, fraud, or **other misconduct**.") (emphasis

17  supplied); *Cooksey v. Hilton Int'l Co.*, 863 F.Supp. 150, 151 (S.D.N.Y. 1994) ("**[T]orts moored**

18  **in fraud** can trigger the crime-fraud exception.") (emphasis supplied); *Central Constr. Co. v.*

19  *Home Indem. Co.*, 794 P.2d 595, 598 (Alaska 1990) (same); *Volcanic Gardens Mgmt. Co.,* 847

20  S.W.2d 343, 347 ("'Fraud' is sometimes defined as '[a] generic term, embracing all multifarious

21  means which human ingenuity can devise, and which are resorted to by one individual to get

advantage over another by false suggestions or by **suppression of truth, and includes all surprise, trick, cunning dissembling, and any unfair way by which another is cheated**." (emphasis supplied) (quoting *Johnson v. McDonald*, 39 P.2d 150 (Okla. 1934))); *International Tel. & Tel. Corp. v. United Tel. Co. of Florida*, 60 F.R.D. 177, 180 (M.D.Fla. 1973) ("The privilege may be overcome, not only where fraud or crime is involved, but also where there are other **substantial abuses** of the attorney-client relationship."); *United States v. White*, 887 F.2d 267, 271 (D.C. Cir.1989) (emphasis supplied) ("To subject the attorney-client communications to disclosure, they must actually have been made with an intent to further an **unlawful act**.") Here, Uy, Han and Taylor engaged in "bad faith", "misconduct", suppression of truth" and a "substantial abuse" of the attorney-client privilege in the planning to demote and thereafter terminate Plaintiff in a manner that they believed would avoid Title VII liability. They agreed to defraud Plaintiff of her Title VII remedies. They further defrauded her by inducing her belief that her position with STATS was safe when the entire purpose of the "special project" was to weed her out of the company.

## CONCLUSION AND PRAYER FOR RELIEF

Sufficient indicia of crime and/or fraud exist to warrant an in-camera interview of Gail Uy with respect to the discussions with corporate counsel during a three-day period just prior to the retaliatory demotion of Plaintiff in violation of Title VII.


RESPECTFULLY SUBMITTED this 3rd day of June, 2009.

**PETER STROJNIK, P.C.**

1

2

                _____

3                      Peter Strojnik
                      Attorney for the Plaintiff

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25