UNITED STATES DISTRICT COURT OF ARIZONA

DIANE SAHAKIAN, a single          )
woman,                            )
                                  )
          Plaintiff,              ) Case No.
     vs.                          ) 2:08-CV-241-PHX-HRH
                                  )
STATS CHIP PAC,                   )
                                  )
          Defendant.              )
_____  )

DEPOSITION OF GAIL UY

Wednesday, May 27,2009

10:00 a.m.

39737 Paseo Padre Parkway, Suite A1
Fremont, California  94536

Monica A. Comer
License No. 11017

09-341MC

Page 2

```
 1   A P P E A R A N C E S :
 2   FOR THE PLAINTIFF:
 3   THE LAW FIRM OF PETER STROJNIK
     BY:   PETER STROJNIK
 4   3030 NORTH CENTRAL AVENUE, SUITE 1401
     PHOENIX, ARIZONA  85012
 5   (602) 297-3019
 6   FOR THE DEFENDANT, STATS CHIP PAC:
 7   OGLETREE DEAKINS
     BY:  L. ERIC DOWELL
 8   ESPLANADA CENTER III, SUITE 800
     2415 EAST CAMELBACK ROAD
 9   PHOENIX, ARIZONA  85016
     (602) 778-3700
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1            INDEX OF EXHIBITS - CONTINUED
 2   19   Redacted email chain starting April 11, 2007
 3   20   Handwritten notes
 4   21   Policies meeting sign in sheet
 5   22   Letter dated April 12, 2007
 6   23   Employee change notice
 7   24   Email chain starting May 12, 2007
 8   25   Employee change notice
 9   26   Email to BJ Han dated May 17, 2007
10   27   Email to Diane Sahakian dated June 23, 2007
11   28   Email chain starting June 22, 2007
12   29   Handwritten notes
13   30   Email chain starting June 27, 2007
14   31   Email to Kaw Jik Hoon dated July 11, 2007
15   32   Email chain starting August 23, 2007
16   33   Emerging Technology organizational chart
17   34   Management statement for Diane Sahakian
18   35   Letter to Ms. Sahakian dated Feb. 18, 2008
19   36   Email chain starting May 28, 2008
20   37   Petition for protection order
21   38   Declaration of Ram Ramakrishna
22   39   Declaration of Jay Ewanich
23   40   Declaration of James Gallagher
24   41   Declaration of Dennis Daniels
25   42   Declaration of Michael Gentry
```

Page 3

```
 1
 2           INDEX OF EXAMINATIONS
 3   BY MR. STROJNIK..............................5
 4
 5           INDEX OF EXHIBITS
 6      (All exhibits were pre-marked on page 5
 7       prior to deposition beginning)
 8   1      Organizational charts
 9   2      Discipline memo dated 22 June 2001
10   3      E-mail by Eric Gongora
11   4      Employee Status Change - Gongora
12   5      Gongora employment application
13   6      Background check release form
14   7      Employment application-ChipPAC, Inc.
15   8      Notes re Gongora interview
16   9      Sexual/unlawful harassment policy
17   10     Employee change notice dated 9/28/06
18   11     Email chain starting October 5, 2006
19   12     Email chain starting October 5, 2006
20   13     Email chain starting March 31, 2007
21   14     Email chain starting April 2, 2007
22   15     Email to BJ Han dated April 9, 2007
23   16     Email chain starting April 10, 2007
24   17     Email chain starting April 12, 2007
25   18     Redacted email chain starting April 10, 2007
```

Page 5

```
 1        (Whereupon, Exhibits 1 through 42
 2        were marked for identification.)
 3                  -o0o-
 4                GAIL UY,
 5   Being first duly sworn by the Court Reporter to tell
 6   the truth, the whole truth and nothing but the
 7   truth, testified as follows:
 8         EXAMINATION BY MR. STROJNIK
 9   Q    Would you please state your full name.
10   A    My name is Gail Uy.
11   Q    Where do you reside, Ms. Uy?
12   A    I live in Newark, California.
13   Q    Where?
14   A    Newark.
15   Q    Newark, California?
16   A    Yes.
17   Q    Is it close to Fremont?
18   A    It is adjacent.
19   Q    About how many miles from here?
20   A    From here I would say about seven miles.
21   Q    Are you employed?
22   A    Yes, I am.
23   Q    How are you employed?
24   A    I am employed at STATS ChipPAC.
25   Q    Is STATS ChipPAC a domestic company?
```

Page 6

1    A    STATS ChipPAC, Inc. is a U.S. company.
2    Q    Is there a STATS ChipPAK, Ltd.?
3    A    Yes.
4    Q    What company is that?
5    A    STATS ChipPAC, Ltd., is out of Singapore.
6    Q    You work for STATS ChipPAC, Inc.?
7    A    Yes.
8    Q    How do you differentiate from STATS
9    ChipPAK, Inc. and STATS ChipPAK, Ltd.?
10   A    STATS ChipPAC, Inc. is a U.S. company.
11   Q    How do you distinguish headquarters; do
12   they different businesses, do they have locations?
13   Are they run by different people?
14   A    STATS ChipPAC, Ltd. is the parent company
15   of the STATS ChipPAC, Inc.
16   Q    Is Tan Lay Koon, for example, CEO or for
17   STATS ChipPAC, Ltd.?
18   A    Yes, he is.
19   Q    Is he CEO for STATS ChipPak, Inc.?
20   A    Yes.
21   Q    Is B.J. Han employed by STATS ChipPAK,
22   Ltd.?
23   A    Yes.
24   Q    Is he employed by STATS ChipPAC, Inc.?
25   A    I don't know that for sure.

Page 7

1    Q    But both STATS ChipPAC, Inc. and STATS
2    ChipPAC, Ltd. are run by Tan Lay Koon?
3    A    Yes.
4    Q    What is your employment function with
5    STATS?
6    A    HR manager.
7    Q    How long have you been the HR manager?
8    A    Since 2006.
9    Q    HR means human resources?
10   A    Yes.
11   Q    And you were that since 2006?
12   A    Yes.
13   Q    Can you tell me what is it that an HR
14   manager does?
15   A    I do all functions of human resources.
16   Q    What are these functions?
17   A    Including staffing, recruiting benefits,
18   compensation, employee relations, compliance.
19   Q    What do you mean by employee relations?
20   A    It deals with any aspects of employee
21   functions, employee welfare.
22   Q    If disputes between employees arise, that
23   comes to you?
24   A    Yes.
25   Q    If an employee charges another employee

Page 8

1    with harassment, that goes to you?
2    A    Yes.
3    Q    If a supervisor makes a sexual advance
4    toward a report of his or hers, that comes to you?
5    A    Yes.
6    Q    You deal with gender harassment issues,
7    for example?
8    A    Yes.
9    Q    What prepared you prior to work at human
10   resources at STATS ChipPAC, to deal with, for
11   example, sexual harassment issues?
12   A    I've attended seminars and training in
13   sexual harassment.  I have also worked other HR
14   functions, HR positions in other companies.
15   Q    Okay.  Is there anything in your
16   educational background that prepared you for dealing
17   with sexual harassment?
18   A    I did take one course of sexual -- that
19   included sexual harassment.
20   Q    Was that course taken in college?
21   A    In college, yes.
22   Q    What did you learn in that course?
23   A    The, just the basics of sexual harassment.
24   Q    Are you aware that sexual harassment cases
25   follow a certain pattern?

Page 9

1    A    Yes.
2    Q    Can you tell me what that pattern is?
3    A    It has to be pervasive, has to be
4    persistent.  It has to affect the employee's
5    employment.
6    Q    I think you're trying to define what
7    sexual harassment is.  My question is somewhat
8    different.  My question was whether you are aware
9    that sexual harassment in general follows a
10   particular pattern.
11   A    No.
12   Q    Do you think it would be helpful for you
13   to know that sexual harassment cases follow a
14   particular pattern?
15   A    Yes.
16   Q    What have you done to familiarize yourself
17   with the pattern of sexual harassment cases?
18        MR. DOWELL:  Object to the form of the
19   question.
20   Q    BY MR. STROJNIK:  What, if anything, have
21   you done to familiarize yourself with the pattern of
22   sexual harassment cases?
23   A    I said I don't know the pattern of sexual
24   harassment.
25   Q    And you have done nothing to familiarize

Page 10

1  yourself with that concept?
2      A    No.
3      Q    Do you know the meaning of stereotyping?
4      A    Yes.
5      Q    What does that mean?
6      A    It means if you look at a person and you
7  classify them as you perceive them.
8      Q    Okay.  Is there anything inherently wrong
9  about stereotyping?
10         MR. DOWELL:  Object to the form.
11         THE WITNESS:  Maybe.
12     Q    BY MR. STROJNIK:  What do you mean maybe?
13     A    It may or may not.
14     Q    Can you tell me, can you give me some
15  instances where it is wrong?
16         MR. DOWELL:  Object to the form.  Go
17  ahead.
18         THE WITNESS:  It depends.
19     Q    BY MR. STROJNIK:  Give me an example.  Let
20  me ask you a different question.
21         Do you believe there's a difference
22  between stereotyping and prejudice?
23         MR. DOWELL:  Object to the form.
24         THE WITNESS:  I don't know.
25     Q    BY MR. STROJNIK:  Would you agree with me

Page 11

1  that stereotyping is simply observing a group as a
2  group to which a person might belong?  As for
3  example, a person stereotypes when a person says all
4  the persons in this room are women.  It's simply an
5  observation.
6         Would you agree with me?
7         MR. DOWELL:  Object to the form.
8         THE WITNESS:  It depends.
9      Q    BY MR. STROJNIK:  For example, if I were
10  to say this person is a woman, is that stereotyping?
11     A    No.
12     Q    But if I say this person is a woman and
13  then I add an emotional content to it that is
14  negative to that person, does that become then
15  prejudice?
16     A    Maybe.
17     Q    Would it be a fair statement you are not
18  entirely familiar between the difference of
19  stereotyping and prejudice?
20     A    Yes.
21         MR. DOWELL:  Object to the form.
22     Q    BY MR. STROJNIK:  Okay.  In your
23  experience and training that you've had in the past,
24  have you learned about how sexual discrimination
25  victims respond to sexual harassment?

Page 12

1      A    Yes.
2      Q    There are three responses; correct?
3      A    I'm not sure.
4      Q    Would you agree with me that the primary
5  response is the appraisal of the harassment itself
6  by the person by the victim, the victim says, okay,
7  something bad happened.  In other words, she
8  appraises the situation.  Would you agree that's the
9  first step in the response by the victim?
10     A    It could be.
11         MR. DOWELL:  Object to the form.
12     Q    BY MR. STROJNIK:  And then as part of that
13  response, the victim says I need to correct this
14  situation, and she tries to correct it directly with
15  the perpetrator.  Is that how it normally occurs?
16         MR. DOWELL:  Object to the form.
17         THE WITNESS:  Maybe.
18     Q    BY MR. STROJNIK:  Okay.  Are you familiar
19  with the concept of a justice principle?
20     A    No.
21     Q    A justice principle says that people
22  always expect a just result to occur as a result of
23  their action.
24         Do you have any disagreement with that
25  statement?

Page 13

1         MR. DOWELL:  Object to the form of the
2  question.
3         THE WITNESS:  Maybe.
4      Q    BY MR. STROJNIK:  Normally people would
5  say in any environment people would say if I do good
6  things, good things will happen.  If I do bad
7  things, bad things will happen.  As a general
8  proposition, do you agree with that statement?
9         MR. DOWELL:  Object to the form.
10         THE WITNESS:  I don't know.
11     Q    BY MR. STROJNIK:  If a victim says if I do
12  nothing wrong, nothing bad should happen to me.
13         Do you agree with that statement?
14         MR. DOWELL:  Object to the form.
15         THE WITNESS:  I really can't tell.
16     Q    BY MR. STROJNIK:  Will you agree with me
17  that a woman would approach her work environment
18  with the mentality, would say if I do nothing wrong,
19  nothing bad will happen to me?
20         MR. DOWELL:  Object to the form.
21     Q    BY MR. STROJNIK:  Do you agree with that?
22     A    That I really don't know.
23     Q    The secondary response is that the victim
24  tries to seek support from an outside group, church
25  group, family group and so forth.

## Page 14

1        Are you aware of that?

2        MR. DOWELL:  Object to the form.

3        THE WITNESS:  I don't know for sure.

4    Q    BY MR. STROJNIK:  Okay.  And the next

5    response when the first doesn't work is that the

6    person becomes autistic.  Do you know what autistic

7    means?

8        MR. DOWELL:  Objection to the form.

9        THE WITNESS:  I am not a professional to

10   know what autism is.

11   Q    BY MR. STROJNIK:  I understand it's not

12   autism.  Autistic simply means a person looks inward

13   and says there must be something wrong with me.

14       Has that been your experience in reviewing

15   sexual harassment cases?

16       MR. DOWELL:  Object to the form.

17       THE WITNESS:  It depends.

18   Q    BY MR. STROJNIK:  What does it depend on?

19   A    It depends on the incident of the

20   harassment.

21   Q    Have you personally observed any incidents

22   of harassment in which you found that the victim

23   turned inward and concluded that she must be at

24   fault for what had happened to her?

25   A    No.

## Page 15

1    Q    Do you think that is an unusual response

2    to sexual harassment?

3        MR. DOWELL:  Object to the form.

4        THE WITNESS:  I don't know.

5    Q    BY MR. STROJNIK:  Do you know what the

6    pathology of work-based trauma is?

7    A    No, I don't.

8    Q    Do you know what workplace trauma is?

9        MR. DOWELL:  Object to the form.

10       THE WITNESS:  I'm not sure.

11   Q    BY MR. STROJNIK:  Do you know what a

12   dysfunctional workplace environment is?

13       MR. DOWELL:  Object to the form.

14       THE WITNESS:  No.

15   Q    BY MR. STROJNIK:  Do you know what

16   dysfunctional employment practices is?

17       MR. DOWELL:  Objection to the form.

18       THE WITNESS:  No.

19   Q    BY MR. STROJNIK:  Are you familiar with

20   any aspect of group dynamics in the work

21   environment?

22       MR. DOWELL:  Object to the form.

23       THE WITNESS:  No.

24   Q    BY MR. STROJNIK:  Are you familiar with

25   the concept of insider and outsider in the work

## Page 16

1    environment?

2        MR. DOWELL:  Object to the form.

3        THE WITNESS:  I don't know.

4    Q    BY MR. STROJNIK:  Are you familiar with

5    the concept of rarity and priming?

6    A    No.

7    Q    Okay.  Let me show you, if I may, what's

8    been marked as Exhibit No. 1, which is this entire

9    document.

10       Can you take a look at it?

11   A    (Reviewing document.)

12       MR. DOWELL:  Would you like her to read

13   each page?

14   Q    BY MR. STROJNIK:  If you can generally

15   look at the entire document.  The next question I

16   will ask you is do you recognize the document, and

17   if you have seen this document or this type of

18   document, you can say yes, I've seen it before, I

19   know what it is, and then you can tell me what it

20   is.

21   A    (Reviewing document.)  I have seen some of

22   these documents.  Not all of them.  These are

23   organizational charts.

24   Q    Are they organizational charts for STATS

25   ChipPAC?

## Page 17

1    A    Some of them are.  Some include some

2    organizational charts for overseas company, overseas

3    factories.

4    Q    But they all include STATS ChipPAC, Ltd.

5    or STATS ChipPAC, Inc.?

6    A    Yes.

7    Q    If you look at these charts, can you make

8    a distinction between the number of women and the

9    number of men who are listed on these charts?

10   A    Only for the U.S.

11   Q    Yes.

12   A    Only for the U.S., yes.

13   Q    Does it appear that there are fewer women

14   than men in these charts?

15   A    Yes.

16   Q    Does it appear that the women represent

17   less than 20 percent of these charts?

18       MR. DOWELL:  Which charts are we referring

19   to, all of them?

20       MR. STROJNIK:  The charts in Exhibit 1,

21   yes.

22       MR. DOWELL:  You are only referring to

23   U.S. charts?  I want to make sure we are on the same

24   page.

25       THE WITNESS:  I can only tell for U.S.

Page 18

1  charts.
2          MR. DOWELL: Maybe you can identify which
3  ones you're referring to if he asks you a question
4  and you respond to it.
5          THE WITNESS: For this chart.
6      Q    BY MR. STROJNIK: I'm sorry, can you
7  identify the number of the bottom of the chart right
8  side?
9      A    Right here?
10     Q    Yes.
11     A    EEOC 0035. I can identify the women, the
12 female employees on this chart.
13     Q    How many women are there?
14     A    There are three women.
15     Q    What is the total population on the chart?
16     A    23, including the blocked out.
17     Q    So there's just a little bit over
18 10 percent women on that particular chart; correct?
19     A    Yes.
20     Q    What are the functions of the women whose
21 names you see?
22     A    One is Jacquelyn Jacobs, administrative
23 assistant, Diane Sahakian, vice-president, and Chris
24 Shea, technical coordinator.
25     Q    Technical coordinator and administrative

Page 19

1  assistant are really secretarial positions, are they
2  not?
3          MR. DOWELL: Object to the form.
4          THE WITNESS: No.
5      Q    BY MR. STROJNIK: Would you agree with me
6  that they are support positions?
7      A    In one way, yes.
8      Q    Will you agree with me that the only
9  engineer woman on the chart that we are discussing
10 is Diane Sahakian, my client?
11     A    Yes.
12     Q    Can you go to the next chart, please.
13 Next chart is actually consistent with a number of
14 charts. There is a chart marked with STATS 660 --
15 well, I'm incorrect. Can you look at STATS 660?
16     A    Uh-huh.
17     Q    Can you tell me how many women appear on
18 this chart?
19     A    Two.
20     Q    One of them is Diane Sahakian; right?
21     A    Yes.
22     Q    The other one is a support position for
23 Chris Shea?
24     A    Yes.
25     Q    Can you flip the page.

Page 20

1          How many women appear on that particular
2  organizational chart?
3      A    I only know the U.S. employees. There are
4  non-U.S. employees here that I am not sure if they
5  are female or male.
6      Q    Can you flip the page and look at Europe
7  and Asia sales organization, 2005.
8          Do you see any women on this chart?
9      A    I am not familiar with everyone on this
10 chart because there are employees here that their
11 names I have never encountered.
12     Q    If you turn the page, Emerging
13 Technologies, how many women do you see on this
14 chart?
15     A    Three.
16     Q    Who are they?
17     A    Chris Shea, Meenakshi Padmanathan and
18 Diane Sahakian.
19     Q    Chris Shea is a support person; correct?
20         MR. DOWELL: Object to the form.
21         THE WITNESS: Yes, she is.
22     Q    BY MR. STROJNIK: Chris Shea is not an
23 engineer?
24     A    No, she's not.
25     Q    She's not involved in the technology?

Page 21

1          MR. DOWELL: Object to the form.
2          THE WITNESS: She is involved in the
3  technology department.
4      Q    BY MR. STROJNIK: If I asked her a what a
5  Bernardus principle is, she wouldn't know, would
6  she?
7          MR. DOWELL: Object to the form.
8      Q    BY MR. STROJNIK: Do you think she would
9  know?
10         MR. DOWELL: Object to the form.
11         THE WITNESS: You should ask her.
12     Q    BY MR. STROJNIK: I am asking you. Do you
13 think she would know?
14     A    I don't know.
15     Q    Who is the other woman on this chart?
16     A    Meenakshi Padmanathan.
17     Q    Do you know what her function is?
18     A    She is an engineer.
19     Q    Okay. Can you flip the next page.
20 Next page is a page titled Technology Division
21 Organizational Chart as of 5 August 2007. It
22 appears to consist of more than just one page. It
23 consists of eight pages -- I'm sorry, nine pages.
24 I'm sorry, ten pages. Eleven pages.
25         Do you see that?

Page 22

1    A    Yes, I do.
2    Q    Is that a complete technology division
3  organizational chart as of August 5, 2007?
4         MR. DOWELL:  Object to the form.
5         THE WITNESS:  I don't know.
6    Q    BY MR. STROJNIK:  If you were to briefly
7  review this organizational chart, if you would, can
8  you tell me how many men you find in this particular
9  chart?
10         MR. DOWELL:  The 11 pages or the first
11  page?
12         MR. STROJNIK:  Eleven pages.
13         THE WITNESS:  I don't know for sure.  I
14  can only look at the U.S. employees and know for
15  sure if they're women or men.
16    Q    BY MR. STROJNIK:  Being that you are in
17  human relations, do you have any idea as to what the
18  relative relationship is of women versus men
19  employees at STATS ChipPAC in the U.S. division?
20         MR. DOWELL:  Object to the form.
21         THE WITNESS:  I don't know for sure.
22    Q    BY MR. STROJNIK:  Does it appear to you
23  that STATS ChipPAC is a male-dominated company?
24         MR. DOWELL:  Object to the form.
25         THE WITNESS:  Maybe.

Page 23

1    Q    BY MR. STROJNIK:  There are more men than
2  women at STATS ChipPAC; right?
3    A    It seems to look that way.
4    Q    Men are more likely to be in management
5  positions than women; correct?
6    A    That's not true.
7    Q    Well, who is the CEO?
8    A    Tan Lay Koon.
9    Q    Is he a man or a woman?
10    A    He's a man.
11    Q    The top spot goes to a man.  Who is second
12  in line?
13    A    I'm not sure who is second in line.
14    Q    Who is BJ Han?
15    A    Chief technology officer.
16    Q    He reports to Tan Lay Koon, does he not?
17    A    Yes.
18    Q    Is he a man or a woman?
19    A    He's a man.
20    Q    Who is Scott Jewler?
21    A    He was the former chief strategy officer.
22    Q    Is he a man or woman?
23    A    He's man.
24    Q    Who is Jeff Howell?
25    A    He is V.P. of worldwide sales.

Page 24

1    Q    Man or woman?
2    A    He's a man.
3    Q    It only appears that STATS ChipPAC is a
4  male-dominated company?
5         MR. DOWELL:  Object to the form.
6         THE WITNESS:  There are also other
7  employees, manager who are not male.
8    Q    BY MR. STROJNIK:  I don't know if I asked
9  you already.  Do you understand the concept of
10  rarity in a work environment?
11         MR. DOWELL:  Objection to the form.
12         THE WITNESS:  No, I don't.
13    Q    BY MR. STROJNIK:  The concept of rarity is
14  that you have one large group of one type of person
15  and then a smaller group of a different type of
16  person.  For example, you have a large group of men
17  and a smaller group of women.  That's called rarity,
18  if the smaller group of women is sufficiently
19  smaller, 15 to 20 percent.  Will you accept that
20  definition for me?
21         MR. DOWELL:  Object to the form.
22         THE WITNESS:  I don't know.
23    Q    BY MR. STROJNIK:  You can accept it or not
24  accept it.  I'm not asking you if it's true.  I'm
25  asking whether or not you will accept my definition

Page 25

1  so we can discuss it intelligently, I suppose is the
2  best way to say.  So will you accept my definition?
3         MR. DOWELL:  Object to the form.
4         THE WITNESS:  Yes.
5    Q    BY MR. STROJNIK:  Okay.  Will you also
6  agree with me as a human resources person that in a
7  case where rarity occurs, the group that is rare is
8  more likely to experience stereotyping and
9  prejudice?
10    A    No.
11    Q    You don't agree with me?
12    A    No.
13    Q    What is your basis for disagreeing?
14         MR. DOWELL:  Object to the form.
15         THE WITNESS:  It depends on the workforce.
16  It depends on the recruiting.  How the position
17  recruited and how many applicants applied for that
18  job.
19    Q    BY MR. STROJNIK:  I understand that.  I am
20  not saying that STATS ChipPAC does not recruit
21  women.  I am asking a different question.  I am
22  asking whether or not at STATS ChipPAC a rarity has
23  occurred on the part of the women.  There are
24  20 percent or less women in the emerging
25  technologies for example, so rarity occurred.

Page 26

1    MR. DOWELL: Object to the form of the
2  question.
3        THE WITNESS: I don't think so, no.
4    Q   BY MR. STROJNIK: So there are more than
5  20 percent women in emerging technologies?
6    A   No.
7    Q   So if there are less than 20 percent
8  women, then rarity occurs. Can you accept that for
9  me?
10   A   No.
11       MR. DOWELL: Object to the form.
12   Q   BY MR. STROJNIK: Studies have been done
13 and psychologists have concluded that's what it is.
14 Do you disagree with psychologists?
15       MR. DOWELL: Object to the form to the
16 extent it requests a medical or psychological
17 opinion.
18   Q   BY MR. STROJNIK: Go ahead and answer, if
19 you can.
20   A   I don't know.
21   Q   I deposed the psychologist that was listed
22 by STATS ChipPAC as their expert. He said that
23 rarity occurs when one group has 15 to 20 percent
24 minority. Will you disagree with that?
25       MR. DOWELL: Object to the form of the

Page 27

1  question. Dr. Wilson is not an expert for STATS
2  ChipPAC. He is an independent medical examiner.
3  You can answer the question if you understand it.
4        THE WITNESS: I'm not sure.
5    Q   BY MR. STROJNIK: Okay. Do you know what
6  priming is?
7    A   No, I don't.
8    Q   Priming is when a larger or dominant group
9  in a work environment or a member of the large or
10 dominant group makes an emotional comment about the
11 rare group. As for an example, a man in a large
12 group would say something negative about a woman in
13 a small group.
14       Are you familiar with that concept?
15       MR. DOWELL: Object to the form.
16       THE WITNESS: No, I'm not.
17   Q   BY MR. STROJNIK: Do you know what happens
18 once priming occurs?
19       MR. DOWELL: Object to the form.
20       THE WITNESS: I don't.
21   Q   BY MR. STROJNIK: Wouldn't you want to
22 know these things if you're going to investigate
23 sexual harassment claims?
24       MR. DOWELL: Object to the form of the
25 question.

Page 28

1        THE WITNESS: Maybe.
2    Q   BY MR. STROJNIK: Something you should
3  learn about?
4        MR. DOWELL: Object to the form.
5        THE WITNESS: Maybe.
6    Q   BY MR. STROJNIK: Well, what do you mean,
7  maybe? It's either yes or no. What do you think?
8        MR. DOWELL: Object to the form.
9        THE WITNESS: Maybe.
10   Q   BY MR. STROJNIK: Maybe, okay. When
11 priming occurs by one person and it is not dealt
12 with immediately a second person in the large group
13 might also engage in priming.
14       Are you aware of that?
15       MR. DOWELL: Object to the form of the
16 question to the extent it's speculative and calls
17 for medical conclusions.
18   Q   BY MR. STROJNIK: Are you aware of that?
19   A   I don't know.
20   Q   Before you know it, if the initial priming
21 and secondary priming is not dealt with by the
22 company, the entire dominant group starts acting
23 prejudicial toward the smaller group.
24       Are you aware of that?
25       MR. DOWELL: Object to the form of the

Page 29

1  question.
2        THE WITNESS: I don't know.
3    Q   BY MR. STROJNIK: Have you received any
4  training in this area?
5    A   No, I have not.
6    Q   Were you even aware that the science of
7  psychology was available that would be able to help
8  you understand sexual harassment cases?
9        MR. DOWELL: Object to the form of the
10 question.
11       THE WITNESS: Yes, I am there aware there
12 is psychology, yes.
13   Q   BY MR. STROJNIK: Were you aware that
14 there was such signs in 2006?
15   A   I don't know for sure.
16   Q   What about in 2007?
17   A   I don't know for sure.
18   Q   Once the priming has come to a point where
19 men in the large group comment negatively regarding
20 a woman in a small group that then becomes a norm.
21       Would that be correct?
22       MR. DOWELL: Object to the form of the
23 question to the extent it calls for either legal or
24 medical conclusions and is hypothetical.
25   Q   BY MR. STROJNIK: Correct?

Page 30

1    A    I don't know that.
2    Q    And if that occurs then a dysfunctional
3    work environment results. Do you agree with that?
4         MR. DOWELL: Same objection.
5         THE WITNESS: I don't know that.
6    Q    BY MR. STROJNIK: Once that occurs, once
7    you have a dysfunctional employment, work
8    environment, then the person in the smaller group,
9    the women becomes what is known as a group deviant.
10        Are you aware of that?
11        MR. DOWELL: Object to the form of the
12   question. Same objection.
13        THE WITNESS: I don't know that.
14   Q    BY MR. STROJNIK: Would you want to know
15   these types of things when you investigate sexual
16   harassment matters?
17        MR. DOWELL: Objection to the form.
18        THE WITNESS: Yes.
19   Q    BY MR. STROJNIK: Okay. Once a person
20   becomes a group deviant, then the same acts that are
21   acceptable by the dominant group become no longer
22   acceptable by the group deviant.
23        Are you aware of that?
24        MR. DOWELL: Object to the form of the
25   question.

Page 31

1         THE WITNESS: I don't know.
2    Q    BY MR. STROJNIK: Let me give you an
3    example. A member of the large group says, boy,
4    that person really is unreasonable and that is
5    accepted by the group, but if a member of the
6    smaller group says the same thing, if the group
7    deviant says the same thing, then the large group
8    looks at that person and says you shouldn't say
9    that.
10        Are you aware of that?
11        MR. DOWELL: Object to the form of the
12   question.
13        THE WITNESS: I don't know that.
14   Q    BY MR. STROJNIK: These are the things
15   that one should know if one is to investigate sexual
16   harassment claims, isn't it?
17        MR. DOWELL: Objection to the form.
18        THE WITNESS: Perhaps.
19   Q    BY MR. STROJNIK: But you knew none of
20   this when you were investigating Diane Sahakian, did
21   you?
22   A    Her complaint was not, I believe was not
23   sexual harassment.
24   Q    My question is somewhat different. My
25   question is you were not aware of any of what we

Page 32

1    talked about just now at the time you were
2    investigating Diane Sahakian's claim?
3    A    No.
4    Q    If you had been aware of these and other
5    matters, maybe you would have seen this was a sexual
6    harassment claim, wouldn't you?
7         MR. DOWELL: Object to the form of the
8    question.
9         THE WITNESS: I don't know.
10   Q    BY MR. STROJNIK: The reason why you
11   testified just a moment ago that this was not a
12   sexual harassment claim could very well be based on
13   the fact that you just don't know what a sexual
14   harassment claim is?
15        MR. DOWELL: Object to the form of the
16   question.
17   Q    BY MR. STROJNIK: Could that be true?
18   A    I don't know.
19   Q    Do you think it is sexual harassment if a
20   man makes inappropriate sexual remarks about a
21   woman's breast?
22        MR. DOWELL: Objection to the form.
23        THE WITNESS: Maybe.
24   Q    BY MR. STROJNIK: In the context of what
25   we talked about, group dynamics and priming, do you

Page 33

1    think for a man in a large group to make a comment
2    about a woman in a smaller group about her breasts,
3    would you consider that to be priming?
4         MR. DOWELL: Object to the form of the
5    question.
6         THE WITNESS: Maybe.
7    Q    BY MR. STROJNIK: Or a man would say to a
8    person in a smaller group, i.e., a woman, you're
9    pretty big, you're pretty big, you're pretty big up
10   there.
11        Would that be sexual harassment?
12        MR. DOWELL: Object to the form of the
13   question.
14        THE WITNESS: Maybe.
15   Q    BY MR. STROJNIK: Do you think that STATS
16   ChipPAC has a, as a company, has a sexually
17   inappropriate environment?
18   A    Can you repeat the question?
19   Q    Do you think that STATS ChipPAC as a
20   company, as a whole, has a sexually inappropriate
21   environment?
22        MR. STROJNIK: Objection to the form.
23        THE WITNESS: No.
24   Q    BY MR. STROJNIK: STATS ChipPAC, Ltd. is a
25   Singaporean company; correct?

Page 34

1    A    Yes.
2    Q    In Singapore they don't have any sexual
3  discrimination laws, do they?
4         MR. DOWELL: Objection to the form.
5         THE WITNESS: I don't know that.
6    Q    BY MR. STROJNIK: Are you aware of any
7  studies conducted in Singapore regarding sexual
8  harassment in the workplace in Singapore?
9    A    No, I'm not.
10   Q    Are you aware that more than 50 percent of
11 the women in Singapore report that they've been
12 sexually harassed in Singapore?
13   A    I don't know that.
14   Q    Are you aware of the Singapore cultural
15 view of the harassment of women in Singapore?
16   A    No.
17   Q    Are you aware of the rapes and abuse and
18 those kinds of things that happen in Singapore of
19 domestic help?
20   A    No.
21   Q    Would you want to know that when you deal
22 with a Singapore company?
23   A    I don't think that's relevant to how our
24 company is being run.
25   Q    Your company is being run out of

Page 35

1  Singapore; correct?
2    A    Right.
3    Q    Your company is officially owned by
4  Temasek; correct?
5         MR. DOWELL: Object to the form of the
6  question to the extent it calls for a legal
7  conclusion.
8         THE WITNESS: I don't know for sure.
9    Q    BY MR. STROJNIK: You don't know?
10   A    I don't know for sure.
11   Q    What do you think?
12        MR. DOWELL: Objection to the form.
13        THE WITNESS: Maybe.
14   Q    BY MR. STROJNIK: What do you know about
15 Temasek, what is it?
16   A    Domestic holdings, it's a private
17 investment company, it invests in companies.
18   Q    It's owned by the Singaporean government;
19 correct?
20   A    I think so, yes.
21   Q    The Singapore government is run
22 fundamentally by a prime minister; correct?
23   A    Yes.
24   Q    Are you aware that the prime minister made
25 a statement that sexual harassment is primarily a

Page 36

1  western-created issue?
2    A    No.
3    Q    Would you be surprised if you learned that
4  he said that?
5    A    Yes.
6    Q    He shouldn't say that, should he?
7         MR. DOWELL: Object to the form of the
8  question.
9         THE WITNESS: I don't know.
10   Q    BY MR. STROJNIK: Okay. Do you think
11 that -- I'm sorry, is Tan Lay Koon a Singaporean
12 fellow?
13   A    I think he is, yes.
14   Q    Do you think that when people come from
15 different cultures that they bring some of their
16 cultures with them when they go to a new culture?
17   A    Maybe.
18   Q    Okay. What is STATS ChipPAC's policy
19 regarding investigations and due diligence of new
20 potential employees?
21   A    We do have -- we have an employee sign a
22 background check release form.
23   Q    And what happens to that form?
24   A    We send it to a third party and then they
25 do all the work for us.

Page 37

1    Q    What do they do?
2    A    They check your references. They run a
3  Social Security trace. They also check the DMV
4  record, and they also check the addresses that
5  they've lived in.
6    Q    Do they check criminal background?
7    A    Yes, they do.
8    Q    When you say they check references, do
9  they check the references listed by the applicant?
10   A    Yes, they do.
11   Q    Why do you think they do that?
12        MR. DOWELL: Objection to the form.
13        THE WITNESS: To see if they actually
14 worked there.
15   Q    BY MR. STROJNIK: Would you also want to
16 know why the person left there?
17   A    Yes.
18   Q    Would you want to know whether the person
19 who is applying for the job, for a job at STATS
20 ChipPAC had previously engaged in sexual harassment?
21   A    Maybe.
22   Q    Maybe, you say. You don't think that
23 previous deviant conduct is relevant in your hiring
24 decision?
25        MR. DOWELL: Object to the form of the

Page 38

1    question.
2         THE WITNESS:  It's not something that
3    comes out of a background check.
4         Q    BY MR. STROJNIK:  Why not?
5         A    I don't know.
6         Q    Are you concerned about that?
7         A    Not really.
8         Q    So if an employee came and applied for a
9    job with you, you would not call the employer or you
10   would not have the independent investigative agency
11   call the employer and ask why did this person leave
12   your employ, would you?
13        A    They would ask that question, yes.
14        Q    If the former employer said, well, we
15   fired him because he's a sexual harasser, would you
16   want to know that?
17        A    Yes.
18        Q    Why would you want to know that?
19        A    Because it might affect how he will
20   perform in our company.
21        Q    Because a leopard doesn't change its
22   spots; right?
23        MR. DOWELL:  Object to the form of the
24   question.
25        THE WITNESS:  I don't know that for sure.

Page 39

1         Q    BY MR. STROJNIK:  You don't?
2         A    I don't.
3         Q    Ever seen a leopard change its spots?
4         A    I don't think I have ever seen a leopard.
5         Q    That is very good.  Would you want to know
6    if the person had a criminal background?
7         A    Yes.
8         Q    Why would you want to know that?
9         A    Because that would also affect how he
10   would work out for our company.
11        Q    Right.  You would want to know because
12   evidence of criminal conduct means that he does not
13   play by the norms of the society?
14        MR. DOWELL:  Object to the form of the
15   question.
16        Q    BY MR. STROJNIK:  Correct?  He doesn't
17   play by the rules?
18        MR. DOWELL:  Same objection.
19        THE WITNESS:  It depends.
20        Q    BY MR. STROJNIK:  How can somebody who has
21   been convicted of a felony be thought of as playing
22   by the rules?
23        MR. DOWELL:  Object to the form of the
24   question to the extent it calls for speculation.
25        Q    BY MR. STROJNIK:  Can you explain to me

Page 40

1    how somebody who has been convicted of a felony can
2    be said to be playing by the rules?
3         MR. DOWELL:  Same objection.
4         THE WITNESS:  It depends on the
5    circumstances of the conviction.
6         Q    BY MR. STROJNIK:  Let me give you the
7    circumstances.  A man goes into a department store,
8    steals a T.V. set.  These are the circumstances.
9    Does this man play by the social rules of norm?
10        MR. DOWELL:  Object to the form of the
11   question.
12        THE WITNESS:  I don't know.
13        Q    BY MR. STROJNIK:  Would you want to know
14   if the person who is applying for a job had in his
15   previous job surfed pornographic web sites while on
16   the job?
17        A    No.
18        Q    You wouldn't want to know that?
19        A    No.
20        Q    Are the computers at STATS ChipPac's
21   employment provided so the person can surf
22   pornographic web sites?
23        A    I don't know.
24        Q    Does BJ Han surf pornographic web sites?
25        A    I don't know.

Page 41

1         Q    Does Tan Lay Koon surf pornographic web
2    sites?
3         A    I don't know.
4         Q    Does Eric Gongora surf pornographic web
5    sites?
6         A    I don't know.
7         Q    Would you want to know if the person who
8    is applying for a job with your company was truthful
9    in his or her application?
10        A    Yes.
11        Q    Why would you want to know that?
12        A    Because that would also affect how he
13   would work out in our company.
14        Q    That would be a serious breach of social
15   norm to lie on the application, wouldn't it?
16        MR. DOWELL:  Object to the form of the
17   question.
18        THE WITNESS:  It depends.
19        Q    BY MR. STROJNIK:  You know what we talked
20   about earlier, a leopard doesn't change its spots,
21   once a liar always a liar.
22        Do you agree with that?
23        MR. DOWELL:  Objection to the form.
24        THE WITNESS:  I don't know.
25        Q    BY MR. STROJNIK:  Would you want put all

Page 42

1  these factors together to assess whether or not a
2  person should be hired based on the application,
3  commits felonies, surfs pornographic web sites
4  during work, what else did we talk about; sexual
5  harasser at previous job. Would you want to know
6  all these things in one big informational sheet?
7      MR. DOWELL: Objection to the form.
8      THE WITNESS: Maybe.
9  Q  BY MR. STROJNIK: Okay. Just maybe?
10 A  Maybe.
11 Q  Maybe not?
12 A  Maybe yes; maybe not.
13 Q  If you had such information would that
14 impact you in your decision making whether or not to
15 hire the employee?
16     MR. DOWELL: Objection to the form.
17     THE WITNESS: It depends on the
18 circumstances.
19 Q  BY MR. STROJNIK: Perhaps it would;
20 perhaps it wouldn't; correct?
21 A  It just depends.
22 Q  It depends on the circumstances?
23 A  Yes.
24 Q  There are some circumstances under which
25 you wouldn't care that a person is a felon, that a

Page 43

1  person is a liar, that a person is a sexual
2  harasser, that a person surfs web -- pornographic
3  web sites while on the job. There are some
4  circumstances where you wouldn't care about that,
5  you would still hire the person; right?
6      MR. DOWELL: Objection to the form.
7      THE WITNESS: Maybe.
8  Q  BY MR. STROJNIK: Okay. It's either yes
9  or no. It's not maybe.
10     MR. DOWELL: Objection to the form.
11     THE WITNESS: Just depends on
12 circumstances.
13 Q  BY MR. STROJNIK: Tell me the
14 circumstances under which you would hire somebody
15 who has lied, committed felonies, committed sexual
16 harassment, surfed pornographic web sites and lied
17 on the application.
18     Tell me the circumstances in which that
19 person who has done all those bad things would be
20 hired by STATS ChipPAC.
21     MR. DOWELL: Object to the form to the
22 extent the it calls for a hypothetical.
23     THE WITNESS: It depends on what kind of
24 lie it was on the application. It depends on if he
25 was really proven guilty of sexual harassment and it

Page 44

1  just depends on the historical facts behind all
2  those that you've mentioned.
3  Q  BY MR. STROJNIK: Do you know any person
4  who presently works for STATS ChipPAC who is a
5  convicted felon?
6  A  No.
7  Q  Who is a sexual harasser?
8  A  No.
9  Q  Who has lied on the application?
10 A  No.
11 Q  You know nobody like that?
12 A  No.
13 Q  Can you take a look at Exhibit No. 2,
14 please.
15     Have you ever seen this document prior to
16 today?
17 A  I did with my attorney yesterday.
18 Q  What do you think about it?
19     MR. DOWELL: Object to the form. Do you
20 understand the question?
21     THE WITNESS: No.
22 Q  BY MR. STROJNIK: You don't understand the
23 question?
24 A  No.
25 Q  Exhibit No. 2 is a discipline memorandum

Page 45

1  to Eric Gongora dated 22 June 2001 by a fellow named
2  Bruce Freyman; is that correct?
3  A  Yes.
4  Q  Bruce Freyman at that time worked for
5  Amcor, from where Eric Gongora came to work for
6  STATS ChipPAC; is that correct?
7  A  I'm sorry. Repeat the question, please.
8  Q  Bruce Freyman worked for Amcor at the time
9  this memorandum was issued; correct?
10 A  Yes.
11 Q  This is a memorandum to your -- this is a
12 2001 memorandum to a person who is now an employee
13 at STATS ChipPAC; correct?
14 A  Yes.
15 Q  It is a discipline memorandum, it points
16 out two things, it says, "You have been viewing
17 pornographic materials or other unacceptable web
18 sites which is strictly prohibited."
19     Do you see that?
20 A  Yes.
21 Q  Do you have any reason to believe this is
22 not a true statement?
23     MR. DOWELL: Objection to the form.
24     THE WITNESS: I don't know.
25 Q  BY MR. STROJNIK: Do you have reason to

Page 46

1  believe that it is a false statement?  I am not
2  asking you if it's true or false.  I'm asking if you
3  have any information or evidence or inkling or any
4  basis to believe that this statement by Bruce
5  Freyman is false?
6      A    No.
7      Q    Mr. Freyman goes on and says,
8  "Additionally, I must remind you that this is the
9  second disciplinary action you've received in the
10 last 12 months."
11          Do you have any reason to believe that
12 this statement is not true?
13     A    No.
14     Q    Is this the kind of information you would
15 want to have about an employee before you hired him?
16     A    Yes.
17     Q    Why would you want that information?
18     A    Because it might affect how he will work
19 out in our company.
20     Q    How would that impact how he would work
21 out in your company?
22          MR. DOWELL:  Objection to the form.
23          THE WITNESS:  He might do the same thing.
24     Q    BY MR. STROJNIK:  He might be like the
25 leopard who doesn't change his spots?

Page 47

1      A    He might.
2      Q    Yes.  He might be like the leopard?
3      A    I don't know.
4      Q    That would be a problem for the company,
5  wouldn't it?
6          MR. DOWELL:  Objection to the form.
7          THE WITNESS:  I don't know.
8      Q    BY MR. STROJNIK:  You just said he might
9  do the same in your company, and that would be a
10 problem in your company?
11     A    If he might do the same thing, it might be
12 a problem.
13     Q    If he did do the same thing it might be a
14 problem; right?
15          MR. DOWELL:  Objection to the form.
16          THE WITNESS:  If he had done the same
17 thing it might be a problem.
18     Q    BY MR. STROJNIK:  It would create an
19 unhealthy work environment?
20          MR. DOWELL:  Object to the form of the
21 questions.
22     Q    BY MR. STROJNIK:  Would it not?
23     A    I don't know that for sure.
24     Q    If you go to Exhibit No. 3.  Exhibit No. 3
25 is an example of the types of e-mails that

Page 48

1  Mr. Gongora was exchanging while he was working at
2  Amcor.
3          Have you seen this document prior to
4  today?
5      A    No, I have not.
6      Q    Would you review it?
7      A    I will.  (Reviewing document.)  Yes, I
8  have reviewed it.
9      Q    It's pretty disgusting, isn't it?
10         MR. DOWELL:  Objection to the form.
11         THE WITNESS:  I don't know.
12     Q    BY MR. STROJNIK:  Do you think that these
13 sort of e-mails are appropriate in a work
14 environment?
15     A    No, they're not.
16     Q    Would you want to know that a potential
17 employee had been exchanging these types of e-mails
18 in their previous work?
19         MR. DOWELL:  Objection to the form.
20         THE WITNESS:  It depends.
21     Q    BY MR. STROJNIK:  What does it depend on?
22     A    It depends on who he is exchanging it with
23 here in this e-mail.
24     Q    Suppose that he's exchanging it with
25 somebody who works at the same place of employment.

Page 49

1  Is that more of a problem or less of a problem?
2          MR. DOWELL:  Objection to the form.
3          THE WITNESS:  It depends on what his
4  relationship is with that person.
5      Q    BY MR. STROJNIK:  I will tell you that
6  they are not husband and wife.  Does that clarify
7  the relationship?
8      A    No, not really.
9      Q    Can you take a look at Exhibit No. 4,
10 please.  Have you seen this exhibit before?
11     A    Yes, I have yesterday with my counsel.
12     Q    What is this exhibit?
13     A    It is a personnel change note.
14     Q    Actually employee status change note, yes,
15 that's what it says.  I'm sorry.  It's a
16 termination, isn't it?
17     A    Yes.
18     Q    Who is being terminated by whom?
19     A    Employee being terminated is Eric Gongora.
20     Q    Is that the same Eric Gongora that we
21 discussed in Exhibits 2 and 3?
22     A    It appears so.
23     Q    Is it the same Eric Gongora who is working
24 for STATS ChipPAC currently?
25     A    Yes.

Page 50

1    Q    What is the cause of the change notice?
2    A    It's termination, and non-voluntarily with
3    reason code CON.
4    Q    What does that mean, CON?
5    A    I don't know.
6    Q    Conduct, possibly?
7    A    I don't know for sure.
8         MR. DOWELL:  Object to the form.
9    Q    BY MR. STROJNIK:  What does it mean, the
10   termination is non-voluntary?
11   A    The person is not leaving on his own
12   initiative.
13   Q    When I was younger, we had an expression
14   for that.  It was called firing.  Was he fired?
15        MR. DOWELL:  Objection to the form.
16        THE WITNESS:  I don't know.
17   Q    BY MR. STROJNIK:  Well, we know that he
18   was terminated and it was not voluntary.  Isn't that
19   what firing means?  Involuntary termination, you're
20   firing Eric Gongora?
21   A    Not really.
22   Q    It doesn't mean the same thing?
23   A    No, not voluntary could be different
24   things too.
25   Q    Like what?

Page 51

1    A    A layoff, a reduction in force.
2    Q    A reduction in force?
3    A    Okay.
4    Q    Does it say reduction in force under
5    reason code?
6         MR. DOWELL:  Objection to the form.
7         THE WITNESS:  Maybe they don't have
8    reduction in force.
9    Q    BY MR. STROJNIK:  So instead of reduction
10   in force they put conduct?
11        MR. DOWELL:  Objection to the form.
12        THE WITNESS:   I don't know if that means
13   conduct.
14   Q    BY MR. STROJNIK:  Would you want to know
15   what that means?
16        MR. DOWELL:  Objection to the form.
17        THE WITNESS:  Maybe.
18   Q    BY MR. STROJNIK:  Maybe; maybe not?
19        If you look at the top left side of the
20   document, you will note under department head the
21   words S-J-E-W-L.
22        Do you know what that means?
23   A    It might mean Scott Jewler.
24   Q    It probably does, doesn't it?
25        MR. DOWELL:  Objection to the form.

Page 52

1         THE WITNESS:  I don't know that for sure.
2    Q    BY MR. STROJNIK:  Scott Jewler also used
3    to work at Amcor?
4    A    I don't know that.
5    Q    Well, if the department head on the
6    employee status change notes on the Amcor form is
7    Scott Jewler, can you deduce from that that he was
8    working for Amcor at that time?
9         MR. DOWELL:  Objection to the form.
10        THE WITNESS:  If the S-J-E-W-L is in fact
11   Scott Jewler, then he had worked at Amcor at that
12   time?
13   Q    BY MR. STROJNIK:  Correct.  Where does he
14   work now?
15   A    I don't know where he works now.
16   Q    Where did he work in 2007?
17   A    I think he was still at STATS ChipPAC.
18   Q    He worked for STATS ChipPAC?
19   A    Yes.
20   Q    Now, whoever hired Eric Gongora knew that
21   Scott Jewler came from STATS ChipPAC?
22        MR. DOWELL:  Object to form.
23        THE WITNESS:  I don't know who hired Eric
24   Gongora.  I was not there.
25   Q    BY MR. STROJNIK:  Do you know if anybody

Page 53

1    made any inquiries of Scott Jewler as to Eric
2    Gongora prior to Eric getting hired?
3    A    I don't know.
4    Q    Do you think that would have been a
5    prudent thing to do?
6    A    It depends on that person who was making
7    the hiring decision.
8    Q    Isn't the most prudent thing to get as
9    much information as you can and then assess that
10   information?
11        MR. DOWELL:  Object to form.
12        THE WITNESS:  Yes, I would think so.
13   Q    BY MR. STROJNIK:  It is never prudent to
14   simply close your eyes to information that is
15   available, is it?
16   A    It depends on the information.
17   Q    There's some information to which you
18   should simply close your eyes and pretend that it
19   isn't there; correct?
20   A    Yes.
21        MR. DOWELL:  Object to the form.
22   Q    BY MR. STROJNIK:  Can you take a look at
23   Exhibit No. 5, please.  Do you recognize this
24   document?
25   A    Yes, I do.

Page 54

1    Q    Again, when was the last time that you saw
2    it?
3    A    I saw it yesterday with my counsel.
4    Q    Did you see it previously to yesterday?
5    A    Maybe once or twice.
6    Q    Under what circumstances?
7    A    Creating a file, updating a file for the
8    high potential employee file.
9    Q    When was that?
10   A    Maybe in '06, when I started working at
11   STATS.
12   Q    Why did you look at this document when you
13   were updating the high employee file?
14   A    Eric Gongora was a high potential
15   employee.
16   Q    Did you call any personal references?
17   A    No.
18   Q    Did you call any professional references?
19   A    No.
20   Q    Are you aware that if you had called
21   professional references that you would have found
22   out that he was fired by Amcor, that he did not
23   leave of his own volition?
24        MR. DOWELL:  Object to the form of the
25   question.  Misstates the evidence.

Page 55

1        THE WITNESS:  I had no reason to call any
2    of his references, because I was only updating the
3    file.
4    Q    BY MR. STROJNIK:  Okay.  Can you take a
5    look at Exhibit No. 6, please.  Do you recognize
6    this document?
7    A    Yes, I do.
8    Q    What is it?
9    A    It's a background check release form.
10   Q    Who does it relate to?
11   A    Eric Gongora.
12   Q    What is the date on it?
13   A    September 30, 2003.
14   Q    If you look at the third full paragraph,
15   the indication is that there would be an
16   investigation and it says, quote, "The investigation
17   will be conducted by Parkin Security Consultants.
18   7258 Bark Lane, San Jose, California 95129," and
19   then the phone number and so forth.
20        Who is it, Parkin?  P-A-R-K-I-N.  I can't
21   read my copy.
22   A    Yes.
23   Q    Who is Parkin Security Consultants?
24   A    It looks like it's the background check
25   company, the background report company hired by

Page 56

1    ChipPAC.
2        Q    Okay.  Are you familiar with this company?
3        A    No, I'm not.
4        MR. DOWELL:  I'm sorry.  For the record
5    which company, ChipPAC, Inc., or the security
6    company?
7        MR. STROJNIK:  No.  The security company.
8        MR. DOWELL:  Okay.
9        Q    BY MR. STROJNIK:  Does this security
10   company normally conduct background checks?
11       A    I don't know.
12       Q    The form says that the investigation will
13   be conducted.
14            Are you aware of any investigation that
15   was conducted by Parkin Security Consultants
16   regarding Eric Gongora?
17       A    I don't know.  It was before my time at
18   the company.
19       Q    I'm asking if you're aware of any such
20   investigation.
21       A    No, I'm not.
22       Q    Well, in 2006 when you were updating his
23   file, you looked at the file, didn't you?
24       A    I only looked at his resume.
25       Q    That's all you looked at?

Page 57

1    A    Yes, that's the only thing.
2    Q    Is the resume in a separate file or is it
3    all one big employee file?
4    A    It's in one big file, but in different
5    sections.
6    Q    Okay.  What other sections are there?
7    A    There is a payroll section.
8    Q    Okay.
9    A    And then there's a section where we kept
10   all the employee change notices, and then there's a
11   section that has performance appraisals, and then
12   there's a section where we kept new hire
13   information.
14   Q    Now, Exhibit 5 would be the new hire
15   information?
16   A    Yes.
17   Q    Now, if there was a investigation done on
18   Mr. Gongora, that information would also be in the
19   new hire portion of the file; correct.?
20        MR. DOWELL:  Objection to the form.
21        THE WITNESS:  Maybe.
22   Q    BY MR. STROJNIK:  What do you mean, maybe?
23   A    Well, I did not create the file.
24   Q    I understand.  Did you see a Parkin
25   Security Consultants or any other investigative

Page 58

1  report in the new hire portion of the file?
2      A    I don't remember.
3      Q    Did you see any other documents in the new
4  hire file?
5      A    It had the application form that he filled
6  out.  It had acknowledgment forms on there.
7      Q    Okay.
8      A    I think those are the only ones.
9      Q    Okay.  Before you came to testify today,
10  did anyone suggest to you how to answer my
11  questions?
12          MR. DOWELL:  Object to the form of the
13  question to the extent it calls for communications
14  between counsel.
15          THE WITNESS:  No.
16      Q    BY MR. STROJNIK:  Did anyone suggest to
17  you what the facts in this case are?
18      A    Only what I have discussed with my
19  counsel.
20      Q    If you go down to the form which is
21  Exhibit No. 6 you will note the box where it says,
22  "You may contact my current employer" is checked?
23      A    Oh, okay, yes.
24      Q    Did the file you reviewed in 2006 indicate
25  that the current employer was contacted?

Page 59

1      A    I don't remember.
2      Q    Can we go on to Exhibit No. 7?  Do you
3  recognize this exhibit?
4      A    Yes, I do.
5      Q    What is it?
6      A    It's an employment application for
7  ChipPAC, Inc.
8      Q    For whom?
9      A    Eric Gongora.
10      Q    Did you see this employment application in
11  the new hire portion of the personnel file?
12      A    Yes, I did.
13      Q    When was the last time you saw this
14  document?
15      A    Yesterday, with my counsel.
16      Q    Prior to yesterday, when was the last time
17  you saw it?
18      A    When I made a copy of it.
19      Q    When?
20      A    When I was asked by counsel to make a copy
21  of the personnel file.
22      Q    Okay.  So your counsel has the entire
23  personnel file?
24      A    I believe so, yes.
25      Q    When you were making copies, did you

Page 60

1  notice what you were copying?
2      A    No, I just made a copy of it.
3      Q    Take a look at page 2 of Exhibit No. 7.  A
4  question is asked of Mr. Gongora, reason for
5  leaving, and he says RIF.  What does that mean, RIF?
6          MR. DOWELL:  Objection to the form.
7          THE WITNESS:  In HR we call it reduction
8  in force.
9      Q    BY MR. STROJNIK:  Okay.  Can you take a
10  look at Exhibit No. 4 and compare the reason for
11  leaving stated in Exhibit No. 4 and Exhibit No. 7.
12  Is there a difference between these two statements?
13      A    Well --
14          MR. DOWELL:  Object to the form.
15          THE WITNESS:  I don't know what CON means.
16      Q    BY MR. STROJNIK:  Does CON mean the same
17  as RIF?
18          MR. DOWELL:  Objection to the form.
19          THE WITNESS:  I don't know.
20      Q    BY MR. STROJNIK:  So if you were
21  confronted with a new hire or potential new hire who
22  says RIF on the reason for leaving, and you have a
23  termination notice from the former employer that
24  says CON, you would not conclude that he was
25  terminated for cause or --

Page 61

1          MR. DOWELL:  Object to the form.
2          MR. STROJNIK:  I need to strike that whole
3  question and start all over again.  You know why,
4  too, don't you?
5          MR. DOWELL:  I do.
6          MR. STROJNIK:  And I do too, counsel.  I
7  apologize for the inartful question.
8      Q    BY MR. STROJNIK:  If you were confronted
9  with a statement by a potential new hire that the
10  reason for leaving is RIF, which you understand
11  means reduction in force, and you also had in your
12  possession an employee status change note that would
13  indicate that the reason for termination is CON,
14  would you conclude that the potential new hire is
15  being untruthful to you?
16          MR. DOWELL:  Objection to the form.
17          THE WITNESS:  No.
18      Q    BY MR. STROJNIK:  You would conclude that
19  he's being truthful?
20          MR. DOWELL:  Objection to the form.
21          THE WITNESS:  Maybe.
22      Q    BY MR. STROJNIK:  Can you take a look at
23  the last page of this particular exhibit, which is
24  Exhibit 7, a question is asked, "Have you ever been
25  convicted of a crime other than a minor traffic

Page 62

1  violation?" And the answer is "No." Why would an
2  employer want to know whether a potential hire has
3  been convicted of a crime?
4          MR. DOWELL: Objection to the form.
5          THE WITNESS: Because that might affect
6  how they would work in our company.
7      Q    BY MR. STROJNIK: Would the employer rely
8  on the new hire in telling the employer that the
9  answer is no, I've never been convicted of a felony?
10         MR. DOWELL: Objection to the form.
11         THE WITNESS: I'm sorry. Repeat your
12 question, please.
13         MR. STROJNIK: Sure. Can you read the
14 question back, please.
15             (Record read back.)
16         MR. DOWELL: Same objection.
17         THE WITNESS: Yes.
18     Q    BY MR. STROJNIK: So if the potential hire
19 has been convicted of a felony and then on the
20 application he says he has not been convicted of a
21 felony, would the fact that the potential hire has
22 lied be an important factor in the employer's
23 decision to hire or not to hire?
24         MR. DOWELL: Objection to the form.
25         THE WITNESS: It depends on the

Page 63

1  circumstances.
2      Q    BY MR. STROJNIK: Can we take a look at
3  Exhibit No. 8, please.
4          What is Exhibit No. 8?
5      A    It appears they are notes from, that has
6  feedback on interview with Eric Gongora.
7      Q    Is any of the handwriting on these notes
8  yours?
9      A    No, they're not.
10     Q    Okay. Can you read all these notes?
11     A    I can try reading them all, but because
12 they're not my handwriting, I can't really tell.
13     Q    If you look at page 1, STATS 001411 under
14 Political Background, what I read is, "Pissed
15 someone off."
16         Do you see that?
17     A    Yes, I do.
18     Q    Do you read it the same way?
19     A    I really can't tell what it means.
20     Q    You don't know what pissing someone off
21 is?
22     A    It might be an abbreviation of something.
23     Q    Like what?
24     A    I don't know. It may look like it pissed
25 someone off. Because I did not write this, I don't

Page 64

1  know. And I never met the person who has written
2  this.
3      Q    Okay. And you are allowing this
4  handwriting might mean something entirely different
5  than pissed somebody off?
6      A    It depends on who's reading it.
7      Q    Well, I'm reading it and you're reading it
8  and we both see pissed somebody off. How can you
9  misunderstand that?
10         MR. DOWELL: Object to the form of the
11 question as argumentative.
12         THE WITNESS: It might look like pissed
13 someone off.
14     Q    BY MR. STROJNIK: All right. Let's move
15 on. Can you take a look at the next exhibit which I
16 believe is Exhibit No. 9.
17         MR. DOWELL: Whenever is good place for a
18 restroom break would be good.
19         MR. STROJNIK: This is as good a place as
20 any.
21         MR. DOWELL: All right.
22             (Short break taken.)
23     Q    BY MR. STROJNIK: We're looking at Exhibit
24 No. 9. Do you recognize this exhibit?
25     A    Yes, I do.

Page 65

1      Q    Are you familiar with this exhibit?
2      A    Yes, I am.
3      Q    Have you taken any courses to understand
4  what this exhibit means?
5      A    I've attended trainings, yes.
6      Q    What is this exhibit?
7      A    It's our sexual and other unlawful
8  harassment the policy.
9      Q    Does your company have a policy against
10 discrimination?
11     A    Yes, we do.
12     Q    Is that policy similar to the policy
13 against unlawful sexual harassment?
14     A    Yes.
15     Q    I'm going to give you some examples as to,
16 and I would ask you whether or not do you think that
17 these events or items constitute sexual or other
18 unlawful harassment.
19         Do you believe that referring to your
20 employees as monkeys -- monkeys, is harassment?
21         MR. DOWELL: Objection to the form.
22         THE WITNESS: It depends.
23     Q    BY MR. STROJNIK: Do you believe that
24 referring to your employees as being fat, lazy, or
25 stupid is harassment?

Page 66

1      MR. DOWELL: Object to form.
2      THE WITNESS: It depends.
3      Q   BY MR. STROJNIK: Do you believe that
4  calling Americans in particular to be fat, lazy or
5  stupid is harassment?
6      MR. DOWELL: Object to form.
7      THE WITNESS: It depends.
8      Q   BY MR. STROJNIK: Do you believe that
9  calling a woman fat immediately following that
10  woman's lung cancer surgery is harassment?
11      MR. DOWELL: Objection to the form.
12      THE WITNESS: It depends.
13      Q   BY MR. STROJNIK: Do you believe that
14  referring to Americans as complainers and whiners is
15  harassment?
16      MR. DOWELL: Object to the form of the
17  question.
18      THE WITNESS: It depends.
19      Q   BY MR. STROJNIK: Do you believe that a
20  male telling a female that she has very large
21  breasts repeatedly is harassment?
22      MR. DOWELL: Object to form.
23      THE WITNESS: It depends.
24      Q   BY MR. STROJNIK: Do you believe that an
25  environment where a woman constantly hears sexual

Page 67

1  comments is harassment?
2      MR. DOWELL: Objection to the form.
3      THE WITNESS: It depends.
4      Q   BY MR. STROJNIK: Making a statement to a
5  woman in an employment environment, quote, "You know
6  you want it."
7      Do you see that as sexual harassment?
8      MR. DOWELL: Objection to the form.
9      THE WITNESS: It depends.
10      Q   BY MR. STROJNIK: Making a sexual pass at
11  a woman by a superior. Is that sexual harassment?
12      MR. DOWELL: Objection to the form.
13      THE WITNESS: It depends.
14      Q   BY MR. STROJNIK: What does that depend
15  on?
16      A   Depends on the contact, situation, depends
17  if it's welcome, persistent, pervasive. Depends on
18  a lot of things.
19      Q   Are you familiar with how STATS ChipPAC
20  conducts business with its customers?
21      A   No, I'm not.
22      Q   Have you heard stories about STATS ChipPAC
23  management, BJ Han among them, going to a dinner
24  with the customer?
25      A   I have heard, yes.

Page 68

1      Q   And then going to a gentleman's club
2  following that?
3      A   No, I have not heard that.
4      Q   And then following that going to a house
5  of prostitution?
6      A   No, I have not heard that.
7      Q   And then in the house of prostitution
8  having the young ladies stand on their head and
9  pouring alcohol onto their private parts and licking
10  them off? Do you think that's harassment?
11      MR. DOWELL: Objection to the form.
12      THE WITNESS: I have not heard that, and I
13  don't know if that's harassment.
14      Q   BY MR. STROJNIK: Would you be absolutely
15  astounded if you heard that STATS ChipPAC management
16  does that?
17      A   Maybe.
18      Q   Would you be absolutely disgusted if you
19  heard that?
20      A   Maybe.
21      Q   Do you think it would be harassment if BJ
22  Han were to turn to a fellow of Indian ancestry in a
23  demeaning manner and say, "They made you a
24  director"?
25      MR. DOWELL: Objection to the form.

Page 69

1      THE WITNESS: Maybe.
2      Q   BY MR. STROJNIK: Do you think that
3  yelling at the employees and berating the employees
4  is harassment?
5      MR. DOWELL: Object to form.
6      THE WITNESS: It depends.
7      Q   BY MR. STROJNIK: You think it's okay to
8  yell at employees under any circumstances?
9      A   Well, yelling is never okay. However, it
10  depends on the circumstances on whether it could be
11  called harassment.
12      Q   Does it depend on who does the yelling?
13      A   No.
14      Q   If Tan Lay Koon yells at an employee
15  that's not appropriate, is it?
16      MR. DOWELL: Object to the form of the
17  question.
18      THE WITNESS: Yelling is always
19  inappropriate.
20      Q   BY MR. STROJNIK: If Tan Lay Koon berates
21  an employee in front of others, that's
22  inappropriate?
23      MR. DOWELL: Objection to the form.
24      THE WITNESS: Berating is always
25  inappropriate. It doesn't matter who you are.

Page 70

1    Q    BY MR. STROJNIK:  Do you believe that it
2  is harassment for BJ Han to say that Koreans,
3  Japanese and Singaporeans are the best and Chinese
4  and Indians are the worst?
5          MR. DOWELL:  Objection to the form.
6          THE WITNESS:  It depends.
7    Q    BY MR. STROJNIK:  Isn't that racism?
8          MR. DOWELL:  Objection to form.
9          THE WITNESS:  It depends on the context.
10   Q    BY MR. STROJNIK:  What is racism?
11   A    Racism is when you take negative actions
12  against a specific ethnic group.
13   Q    Do you have to take a negative action, or
14  are negative words sufficient?
15         MR. DOWELL:  Object to form.
16         THE WITNESS:  In my view it has to be
17  negative actions.
18   Q    BY MR. STROJNIK:  So just saying negative
19  things about a group is not racism?
20   A    To me it --
21         MR. DOWELL:  Object to the form.
22   Q    BY MR. STROJNIK:  To you it isn't?
23   A    It might not be.
24   Q    You work for STATS ChipPAC; correct?
25   A    Yes.

Page 71

1    Q    Is that the prevailing thinking at STATS
2  ChipPAC, one has to actually take some action before
3  it's racism?
4    A    No, just me personally.
5    Q    You personally?
6    A    Yes.
7    Q    What do you think BJ Han thinks?
8    A    I don't know what he's thinking.
9    Q    Do you know Kenny Lee?
10   A    I have heard of his name, yes.
11   Q    Do you think -- is Kenny Lee a Korean
12  fellow?
13   A    I know he is based in Korea, but I'm not
14  sure if he is Korean.
15   Q    Do you know who Ram Ramakrishna is?
16   A    Yes.
17   Q    Is he an Indian fellow?
18   A    Yes, he is.
19   Q    Do you think it is inappropriate, "You
20  should marry a pretty girl like a Korean, not an
21  Indian girl"?  Is that racist?
22         MR. DOWELL:  Objection to the form.
23         THE WITNESS:  Depends on the context.
24   Q    BY MR. STROJNIK:  Do you think it's racism
25  for BJ Han to say he does not like a particular

Page 72

1  company because it is owned by Jews?
2          MR. DOWELL:  Objection to the form.
3          THE WITNESS:  It depends.
4    Q    BY MR. STROJNIK:  Do you think it is
5  racist for BJ Han to disparage Jews?
6          MR. DOWELL:  Objection to the form.
7          THE WITNESS:  It depends.
8    Q    BY MR. STROJNIK:  Is it sexual harassment,
9  in your opinion, to take the face of an employee and
10  superimpose it over another woman's body showing a
11  man groping her breast?
12         MR. DOWELL:  Objection to the form.
13         THE WITNESS:  It depends.
14   Q    BY MR. STROJNIK:  Is it inappropriate for
15  BJ Han, and Tan Lay Koon to treat women as servants?
16         MR. DOWELL:  Object to the form of the
17  question.
18         THE WITNESS:  It depends on the
19  circumstances.
20   Q    BY MR. STROJNIK:  There are times, then,
21  you say that it is okay for BJ Han and Tan Lay Koon
22  to treat women as servants.  Is that what you are
23  saying?
24         MR. DOWELL:  Object to the form of the
25  question.  Calls for speculation.

Page 73

1          THE WITNESS:  I did not say it's okay.
2    Q    BY MR. STROJNIK:  You said it depends.
3  I'm asking you, tell me the circumstances in which
4  it is okay for BJ Han and Tan Lay Koon to treat
5  women as servants.
6          MR. DOWELL:  Object to the form of the
7  question.
8          THE WITNESS:  In Singapore they have maids
9  in their culture.  It's okay.  So they can do that.
10   Q    The maids actually come from right
11  across -- have you ever been to Singapore?
12   A    Yes, I have.
13   Q    They come from right across the bridge in
14  Malaysia; right?
15   A    Malaysia.  I don't know.
16   Q    Do you know how they treat those servants?
17   A    I've never had experience.
18   Q    Do you know what the studies show how
19  Singaporeans treat Malaysian women?
20         MR. DOWELL:  Objection to the form.
21         THE WITNESS:  I don't know that.
22   Q    BY MR. STROJNIK:  Would you like to know
23  that?
24   A    Not really.
25   Q    Because you'd quit if you did, wouldn't

Page 74

1  you?

2          MR. DOWELL:  Object to the form of the

3  questions.

4      Q   BY MR. STROJNIK:  Is it inappropriate for

5  management to brag in the office how they maxed out

6  two credit cards on prostitutes and drinking vodka

7  out of young ladies' private parts?

8          MR. DOWELL:  Object to the form of the

9  question.

10         THE WITNESS:  I don't know.

11     Q   BY MR. STROJNIK:  If you look at Exhibit

12 No. 9 under -- in the middle of the page there's a

13 statement, "Management is responsible to take

14 necessarily steps to prevent all forms of

15 harassment, including sexual harassment from

16 occurring within the department or throughout the

17 company." Who is management?

18     A   All the managers in general.

19     Q   Is Tan Lay Koon management?

20     A   Yes, he is.

21     Q   Is BJ Han management?

22     A   Yes, he is.

23     Q   Who makes sure that BJ Han and Tan Lay

24 Koon do not harass?

25     A   There is a corporate HR function in

Page 75

1  Singapore.

2      Q   Who is that, Cindy Palar?

3      A   No, Cindy is in planning.

4      Q   Who is that?

5      A   There is a senior director of human

6  resources at the corporate level.

7      Q   What is his or her name?

8      A   His name is Johnnie Tan.

9      Q   Let's take a look at Exhibit No. 10.  Do

10 you recognize this exhibit?

11     A   Yes, I do.

12     Q   What is this exhibit?

13     A   It's an employee change notice.

14     Q   It is dated 9-28-06; correct?

15     A   Yes.

16     Q   What does it change?

17     A   It changes a department.

18     Q   For whom?

19     A   For Eric Gongora.

20     Q   From where to where?

21     A   From 5121, which is Diane Sahakian's group

22 to Cindy Palar's group.

23     Q   What is the effective date?

24     A   It was effective I think on the same day.

25     Q   9-28-06.

Page 76

1      A   Yes, I think so.

2      Q   Do you know why this department change was

3  made?

4      A   I don't know.

5      Q   By the way, I brought some waters and

6  diet -- I think this is diet Pepsi Max, it's not

7  diet.  I won't have it.

8          What happened with Diane Sahakian?

9      A   Happened to her in what way?

10     Q   At one point she was working at STATS

11 ChipPAC, and one day she was not working at STATS

12 ChipPAC.  What happened?

13     A   I know she was terminated.

14     Q   She was fired?

15     A   I don't know that for sure.

16     Q   Okay.  Why was she terminated?

17     A   I don't now the circumstances about her

18 termination.

19     Q   Were you involved in any part of any

20 investigation into any aspect of her employment?

21     A   What do you mean investigation of her

22 employment?

23     Q   Any investigation arising out of her

24 employment with STATS ChipPAC?

25     A   There was only one incident that I was

Page 77

1  involved in.

2      Q   That was the ketchup incident?

3      A   Yes.

4      Q   Correct.

5          What happened?

6      A   Diane called me and she was crying over

7  the phone and told me that somebody had put ketchup

8  on her chair in her office.

9      Q   Did she tell you what kind of pants she

10 was wearing?

11     A   She mentioned that she was wearing white

12 pants.

13     Q   Why do you think she mentioned that to

14 you?

15         MR. DOWELL:  Object to the form of the

16 question.

17         THE WITNESS:  I don't know.

18     Q   BY MR. STROJNIK:  You understand that if a

19 woman with white pants sits on ketchup unknowingly

20 that it may make it appear as if she had an accident

21 that she had bled through?  Could it appear that

22 way?

23         MR. DOWELL:  Objection to the form.

24         THE WITNESS:  It might.

25     Q   BY MR. STROJNIK:  Is that sexual in

Page 78

1  nature?
2        MR. DOWELL:  Object to the form of the
3  question.
4        THE WITNESS:  I don't know for sure.
5     Q    BY MR. STROJNIK:  You don't know for sure?
6        MR. DOWELL:  Same objection.
7     Q    BY MR. STROJNIK:  Is a woman's cycle not
8  fundamentally sexual?
9        THE WITNESS:  It depends.
10        MR. DOWELL:  Object to the form.
11     Q    BY MR. STROJNIK:  I'm sorry.  I don't get
12  it.  What does it depend on?  Of course it's
13  fundamentally sexual.  Men don't have cycles.
14        MR. DOWELL:  Object to the form.
15     Q    BY MR. STROJNIK:  Go ahead and answer.
16     A    It depends on who is perceiving it as
17  sexual or not.
18     Q    So it depends on how Diane perceived it?
19     A    It depends on how anyone perceives it.
20     Q    How do you perceive it?
21        MR. DOWELL:  Objection to the form.
22        THE WITNESS:  I don't perceive it as
23  sexual personally.
24     Q    BY MR. STROJNIK:  I will read to you from
25  a declaration of Mr. Yeon Naj (phonetic).  Do you

Page 79

1  know who he is?
2     A    No, I don't.
3     Q    I won't read it.  But he said it's sexual
4  harassment.
5        So tell me, she called you up and she said
6  somebody put ketchup on my chair, and obviously you
7  knew ketchup is red and her pants were white, you
8  knew if she sat on it, it would look like she had an
9  accident.  All of that you knew or know now?
10     A    It would look like if she had red on her
11  pants and there was ketchup on her chair, it would
12  appear to me that she sat on ketchup.
13     Q    You would distinguish that from having an
14  accident how?
15        MR. DOWELL:  Object to the form of the
16  question to the extent it's hypothetical.
17        THE WITNESS:  I don't know.  I just,
18  whatever Diane had told me over the phone, I kind of
19  just put them all together.  She never mentioned
20  about, you know, having her period on that day.  She
21  just said ketchup, white pants.
22     Q    BY MR. STROJNIK:  Okay.  Did you think it
23  was a significant event?
24     A    I'm sorry, say that again.
25     Q    Did you believe that was a significant

Page 80

1  event?
2     A    Somebody had put ketchup on her chair,
3  yes.
4     Q    Did you believe that was something that
5  should be investigated?
6     A    Yes.
7     Q    If it's not sexual harassment, why should
8  it be investigated?
9     A    Because I had a very upset employee call
10  me.
11     Q    Did you investigate it?
12     A    Yes, I did.
13     Q    What did you conclude following your
14  investigation?
15     A    It was inconclusive.
16     Q    It was inconclusive as to who did it;
17  correct?
18     A    Yes.
19     Q    But it was conclusive that somebody did
20  it?
21        MR. DOWELL:  Object to the form of the
22  question.
23        THE WITNESS:  I did not see any ketchup on
24  the chair.  It had been cleaned up.  So I don't even
25  know if ketchup was really put on the chair.

Page 81

1     Q    BY MR. STROJNIK:  So you doubt the very
2  event that forms the subject matter of this lawsuit?
3     A    I believed Diane Sahakian when she called
4  me.
5     Q    You just testified you don't even know.  I
6  am asking you, you doubt the very basis of her
7  complaint?
8        MR. DOWELL:  Object to the form of the
9  question.  Misstates the testimony.
10        THE WITNESS:  I do not doubt the basis of
11  what happened, because I believed what she had
12  told me over the phone.
13     Q    BY MR. STROJNIK:  Did you see any pictures
14  of the chair with the ketchup on it?
15     A    No, I did not.
16     Q    You know that Diane took pictures, don't
17  you?
18        MR. DOWELL:  Objection to the form.
19        THE WITNESS:  I don't know.
20     Q    BY MR. STROJNIK:  Would you have wanted to
21  see those pictures?
22        MR. DOWELL:  Objection to the form.
23        THE WITNESS:  Yes.
24     Q    BY MR. STROJNIK:  That would have
25  satisfied any doubt you might have had about the

Page 82

1  existence of the event?
2      A    Maybe.
3      Q    Did you ask yourself what the motives of
4  the various people who might have put the ketchup on
5  her chair were?
6      A    I did.
7      Q    At the time that you again investigating
8  this matter, what education in your background
9  equipped you to be able to investigate the matter?
10     A    I've attended trainings on sexual
11 harassment.  I also have some notes that I have
12 taken during the sexual harassment training to do
13 investigation.  I also have -- I'm a member of SHRM.
14     Q    What is SHRM?
15     A    Society for Human Resources Management.
16     Q    Okay.
17     A    And they have resources there and how to
18 investigate harassment claims.
19     Q    Now, would you agree with me that one of
20 the first things you would want to find out is the
21 motive of the potential harasser?
22     A    It might be, yes.
23     Q    Did you discern what the motive of the
24 people involved was?
25          MR. DOWELL:  Object to the form of the

Page 83

1  question.
2          THE WITNESS:  Not until after the entire
3  investigation.
4      Q    BY MR. STROJNIK:  And so after the
5  investigation had concluded, you then found out what
6  the motive was?
7      A    We had some inclination of what might have
8  been present.
9          THE REPORTER:  I need to change paper.
10         (Short break taken.)
11     Q    MR. STROJNIK:  You testified earlier that
12 following your investigation you realized that some
13 people had some motives.  Can you tell me what you
14 concluded?
15     A    It was not a conclusion.  It was
16 inconclusive, but there were a lot of speculations
17 of why it was done.
18     Q    What were the speculations?
19     A    Among others it was a prank that had gone
20 wrong.  Their speculation was it was done, that
21 maybe an employee was upset and wanted to do
22 something.
23     Q    Now, at the time that you were initially
24 investigating, did you ask yourself the following
25 question, who has motive to do something like that?

Page 84

1      A    No, no.  I went into the investigation
2  open mined and just seeing, trying to figure out
3  what the facts are behind what had happened.
4      Q    Does your comment that you went into the
5  investigation open minded excuse the fact that you
6  did not inquire into the motive?
7      A    I wasn't quite sure what the motive was.
8  I couldn't start thinking what.  It was something
9  that was just for me very -- it was surreal that
10 somebody, an employee of ours would do something
11 like that.
12     Q    Did you ask anyone, "Do you dislike
13 Diane"?
14     A    No.
15     Q    Did you ask anyone, "Do you have reason to
16 harm Diane"?
17     A    No.
18     Q    I don't know if you know the old
19 expression of "motive, means and opportunity."
20          Do you know what that means?
21     A    No.
22     Q    When you try to find out who did something
23 you always ask yourself three questions.  Motive,
24 means and opportunity.  Were you aware of this
25 trilogy of factors you look at in determining who

Page 85

1  did what?
2          MR. DOWELL:  Object to the form of the
3  question.
4          THE WITNESS:  No, I'm not.
5      Q    BY MR. STROJNIK:  Did you try to find out
6  who had the means of doing this act?
7      A    I did interview a lot of employees and
8  asked them about who might have had ketchup on that
9  day.
10     Q    What did you discern?
11     A    From the investigation I did there has
12 always been ketchup in the office.  People go out to
13 lunch, they come back and bring ketchup packets with
14 them.  They have a break room in the Tempe office.
15     Q    Did you make any conclusion as to where
16 the ketchup came from?
17     A    No.
18     Q    Is it true that Diane told you that Brett
19 Dunlap was having lunch just prior to the incident
20 and that ketchup was on his desk?
21     A    She mentioned that to me.
22     Q    So he would have the means, then?
23     A    And probably other people also who came
24 back from lunch with ketchup packets on their desk.
25     Q    No one else had ketchup packets on his

Page 86

1  desk?
2        A    I don't know for sure.
3        Q    We know Brett had some?
4        A    He was one of them.
5        Q    We don't know of any other person that had
6  ketchup packets on their desk other than Brett
7  Dunlap?
8              MR. DOWELL:  Object to the form.
9              THE WITNESS:  That is what Diane Sahakian
10  told me, yes.
11       Q    BY MR. STROJNIK:  Do you have any evidence
12  to contradict that?
13       A    No, I don't.
14       Q    So you cannot point to anybody else who
15  might have had ketchup on their desk at the time of
16  the incident?
17       A    No.
18       Q    Who had the opportunity?
19       A    The opportunity to --
20       Q    To put ketchup on Diane's chair?
21       A    No one.
22       Q    Well, did Brett have the opportunity?
23       A    You could say he might have, yes.
24       Q    Because he was there?
25             MR. DOWELL:  Objection to the form.

Page 87

1              THE WITNESS:  I don't know for a fact that
2  he was there when it happened.
3        Q    BY MR. STROJNIK:  Eric Gongora had the
4  opportunity?
5        A    He might have.
6        Q    What investigation did you conduct to find
7  out if he had the opportunity?
8        A    I asked -- I had a one-on-one meeting with
9  Eric Gongora in Tempe, Arizona.
10       Q    What did he tell you?
11       A    I asked him if he was in the office when
12  that happened, and he said he did not even hear
13  about it until after it had happened.  And he was,
14  during his lunch time during that time he would go
15  see his house that was being constructed at that
16  time.
17       Q    This happened at 3:00 o'clock in the
18  afternoon.
19       A    People take lunches different times of the
20  day.
21       Q    You are anticipating my question.  First
22  question was this happened at 3:00 in the afternoon?
23       A    I can't remember what time it happened.
24       Q    What was the normal lunchtime for Eric
25  Gongora during this time period?

Page 88

1        A    I don't know what time he went to lunch.
2        Q    Not the question.  The question was what
3  was his normal lunchtime?
4        A    I don't know.
5        Q    Do you have reason to believe it was
6  something other than 12:00 to 1:00?
7        A    Maybe.
8        Q    Maybe what?
9        A    Maybe he takes lunches different times and
10  different days.
11       Q    Okay.  Now, at the time that you were
12  interviewing Eric Gongora, that would have been a
13  good time for you to know whether or not Eric
14  Gongora has been convicted of felonies and whether
15  or not he lies and those kind of things, wasn't it?
16       A    No, it wasn't relevant to the
17  investigation.
18       Q    Was it relevant to his veracity?
19       A    Can you define veracity?
20       Q    Yes.  The art or the propensity of telling
21  the truth.
22       A    I don't think it was relevant at the time.
23       Q    Even one who did not have veracity would
24  be someone you would believe whatever they said,
25  that's what it is?

Page 89

1              MR. DOWELL:  Objection to the form.
2              THE WITNESS:  Depends on the
3  circumstances.
4        Q    BY MR. STROJNIK:  Look at your
5  circumstances.  This particular circumstance, your
6  investigation of Diane Sahakian and the ketchup
7  incident, did you conclude whatever people tell me
8  irrespective of their veracity you accepted as true?
9        A    It was not only Eric Gongora's interview
10  that I used to find any conclusion to what had
11  happened.
12             MR. STROJNIK:  Can you read my question
13  back?  Can you focus on my question only, because I
14  am not communicating what I'm trying to find out.
15  So please try to focus on it.
16                  (Record read back.)
17             THE WITNESS:  Yes.
18       Q    BY MR. STROJNIK:  Would it also be a fair
19  statement you accepted as true irrespective of their
20  motive?
21       A    Yes.
22       Q    Can you take a look at exhibit -- I'm
23  sorry.  I have got to look at yours because mine
24  isn't marked.  11, please.  Have you seen this
25  document before?

Page 90

1    A    I don't think so.
2    Q    Can we take a look at Exhibit No. 12,
3  please. Do you recognize that exhibit?
4    A    No.
5    Q    Can you look at Exhibit 13. What is
6  Exhibit 13?
7    A    It's an e-mail exchange between myself and
8  Diane Sahakian.
9    Q    It's an e-mail exchange from her to you
10 and e-mail from you back to --
11   A    E-mail from her to me and my e-mail to
12 her, yes.
13   Q    At the time that this e-mail was exchanged
14 between the two of you, Eric Gongora was not
15 reporting to Diane, was he?
16   A    No, he wasn't.
17   Q    Can you read the e-mail she wrote to you?
18   A    "Hello, Gail. I've been having great
19 difficulty with Eric's disruptive behavior, which
20 has caused problems with Brett. I am talking to
21 Scott and Cindy about this. Just for the record, I
22 believe Brett was with Eric when he called you.
23 They were locked up in the conference room sometime
24 between 9:00 and 10:00 a.m. Was that when Eric
25 called? Best regards, Diane."

Page 91

1    Q    Then you respond. Can you read that?
2    A    "Hi, Diane, I think Eric called me at
3  around 10:00 PDT. Please let me know what you,
4  Cindy, and Scott agree on. At this point, I think a
5  formal write up should be done since it is a
6  recurring problem with him."
7    Q    A recurring problem between whom and whom?
8    A    It's Diane Sahakian and Eric Gongora.
9    Q    So there was friction between Eric Gongora
10 and Diane Sahakian as of the date of these e-mails;
11 correct?
12   A    I am taking what she had written on
13 e-mail. It says I have been having great
14 difficulty.
15   Q    Does it appear to you that there was
16 conflict between Eric Gongora and Diane Sahakian on
17 the date of the e-mail?
18   A    From what she says it sounds like they
19 have been having great difficulty with each other.
20   Q    In fact you thought a formal writeup
21 should be done?
22   A    Yes, I did.
23   Q    What is a formal writeup?
24   A    We have a performance plan we extended to
25 employees we have difficulties with.

Page 92

1    Q    To whom would you extend this to, Diane or
2  to Eric?
3    A    To the employee. In this case it would be
4  Eric.
5    Q    Did you extend it to him?
6    A    Diane never put together a writeup for
7  him.
8    Q    Well, Diane was not his supervisor, was
9  she?
10   A    Well, she needed to give me details on
11 what the problem was, but she never gave me anything
12 on that.
13   Q    Let's stay with who should do the writeup.
14 Is the writeup done by the supervisor?
15   A    Yes.
16   Q    Diane was not Eric Gongora's supervisor;
17 correct?
18   A    Yes.
19   Q    So the writeup should be done by Eric
20 Gongora's supervisor?
21   A    Yes.
22   Q    Who was that?
23   A    It was Cindy Palar at the time.
24   Q    Did you call Cindy Palar and say I need a
25 writeup on Eric?

Page 93

1    A    I had asked, on this e-mail I had asked
2  Diane to let me know what they have agreed on.
3    Q    Who has agreed on?
4    A    Cindy, Scott and Diane.
5    Q    Scott who?
6    A    Jewler.
7    Q    Is that the same Scott Jewler that was
8  supervisor while at Amcor?
9    A    It appears so.
10   Q    So you wanted to have Cindy and Scott and
11 Diane agree on how to proceed?
12   A    Yes.
13   Q    You didn't ask Diane, give me a writeup?
14   A    With, she's the one having great
15 difficulties with Eric.
16   Q    I'm sorry, you did not ask Diane to give
17 you a writeup, did you?
18   A    Not in this e-mail, no.
19   Q    Okay. The only thing that I can see from
20 this e-mail is that you were expecting Cindy and
21 Scott and Diane to agree on something; correct?
22   A    Yes.
23   Q    In the following sentence then you sought
24 a formal writeup; correct?
25   A    Yes.

## Page 94

1    Q    The formal writeup should be done by Cindy
2  Palar, who was the supervisor of Eric Gongora?
3    A    Yes.
4    Q    The formal writeup was not supposed to be
5  done by Diane Sahakian, because she was not his
6  superior?
7    A    That's correct.
8    Q    Can we take a look at Exhibit 14, please.
9  Do you recognize this exhibit?
10    A    Yes, I do.
11    Q    Does Exhibit No. 14 occur prior to
12  Exhibit 13?
13        MR. DOWELL:  Object to the form.
14        MR. STROJNIK:  Or subsequent to the
15  Exhibit 13.
16        THE WITNESS:  Exhibit 14 happened after,
17  well, her first.  Mailed to me -- her e-mail on
18  Exhibit 13 came before -- I'm sorry.  Her e-mail to
19  me on Exhibit 14 came after her first e-mail to me
20  on Exhibit 13, came after her e-mail to me on
21  Exhibit 13, but my reply to Exhibit 13 to her e-mail
22  came before my e-mail to her on Exhibit 14.
23    Q    BY MR. STROJNIK:  It is kind of confusing,
24  isn't it?
25    A    It is.

## Page 95

1    Q    If you look at the second part of
2  Exhibit 13 where Diane says, "Hello, Gail, I have
3  been having great difficulty," it seems to me that
4  the response to that was top of 14, it says, "Hi
5  Diane, this is the first time Eric contacted me
6  about Brett Dunlap."  Is that correct or am I off?
7    A    The response to her e-mail on Exhibit 13
8  to, "Hi Diane, I think Eric called me at 10:00
9  a.m.," but she sent me also an e-mail on the day
10  that I replied to her e-mail.  The first e-mail that
11  came from her was Saturday, so I didn't get it until
12  Monday.
13    Q    Okay.
14    A    But apparently she had sent me another
15  e-mail on Monday morning.
16    Q    She sent you an e-mail March 31, then she
17  sent you on April 2, at 8:35 a.m., and you responded
18  on April 2 at 8:51 a.m.  Then you responded to the
19  April 2, 8:35 a.m. on April 2 at 9:15 a.m.
20    A    Yes.
21    Q    Okay.  In your e-mail to Diane of April 2
22  at 9:15, you say, "Hi Diane, this is the first time
23  Eric contacted about Brett Dunlap."
24        Why would Eric contact you about Brett
25  Dunlap?  Do either of them report to you?

## Page 96

1        MR. DOWELL:  Object to the form of the
2  question.  Which question?  Two questions.  Which
3  one do you want her to answer?
4        MR. STROJNIK:  Either one of them.
5    Q    BY MR. STROJNIK:  Did either one of them
6  or does either one of them report to you?
7    A    No.
8    Q    Did she report to you then?
9    A    No.
10    Q    Why would they contact you?
11        MR. DOWELL:  Object to the form of the
12  question.
13        THE WITNESS:  Eric had contacted me
14  because of Brett Dunlap's last STI payout.
15    Q    BY MR. STROJNIK:  Is that the normal chain
16  of reporting, to go to you on this kind of an issue?
17        MR. DOWELL:  Objection to the form.
18        THE WITNESS:  Many employees ask me about
19  the STI payout after they are paid.
20    Q    BY MR. STROJNIK:  Eric didn't ask you
21  about his, Eric asked you about Brett Dunlap's?
22    A    I believe the reason he was asking me, the
23  majority of the previous year, the 2006 performance
24  year, Brett Dunlap had reported to Eric Gongora.
25    Q    So was it Eric Gongora who issued the

## Page 97

1  report that was the basis for the for the STI?
2        MR. DOWELL:  Hold on.  You might want to
3  ask it again.  Let him finish.  You might want to
4  ask it again.
5        MR. STROJNIK:  Did you understand my
6  question?
7        MR. DOWELL:  Re-ask the question so we
8  have a clean record.
9    Q    BY MR. STROJNIK:  Was Eric the person who
10  authored the performance review that forms the basis
11  for Brett Dunlap's STI?
12    A    No, he was not.
13    Q    It was Diane Sahakian?
14    A    It was not her only.
15    Q    In her e-mail to you Diane says, "Eric has
16  been manipulative and destructive for some time now.
17  It needs to stop."  Do you see that?
18    A    Yes.
19    Q    Did you conclude from this that there was
20  friction between Diane and Eric?
21    A    Yes.
22    Q    Did you conclude that Eric was
23  manipulative?
24    A    I believe that's what Diane Sahakian was
25  telling me in that e-mail.

Page 98

1    Q    You believed that Eric was manipulative?
2    A    From what Diane said, yes.
3    Q    Actually Eric is manipulative, is he not?
4         MR. DOWELL:  Objection to the form.
5         THE WITNESS:  I don't know that for sure.
6    BY MR. STROJNIK:  Was there ever a time
7    when Dr. Han opined that Eric was manipulative?
8    A    I don't remember.
9    Q    What does this mean?  "We cannot terminate
10   Eric based on his involvement since we do not have
11   proper documentation to do it."  What does that
12   mean?
13   A    Before we terminate employees we have to
14   create some kind of documentation on why he's being
15   terminated.
16   Q    Like what?
17   A    Like for this, Eric called me and asked me
18   about Brett's STI, and I explained to him the
19   process of the STI payments, and he said he was not
20   given the opportunity to put in his review of Brett
21   Dunlap.  In my opinion, then, I did not see that was
22   a reason to terminate Eric Gongora.
23   Q    Was it that had occurred was the reason or
24   was it that there was no documentation supporting
25   the reason for termination?

Page 99

1    A    There was no reason to terminate Eric
2    Gongora based on his phone call to me about his
3    involvement with the STI.
4    Q    When you say we do not have proper
5    documentation to do it, meaning to fire him, did you
6    mean we don't have properly-documented events?
7    A    I meant we don't have proper documentation
8    to prove that Eric had been manipulative and
9    destructive.
10   Q    Can you go to the next exhibit, please,
11   which is Exhibit No. 15.  Have you ever seen this
12   document before?
13   A    No.
14   Q    Never before?
15   A    No.
16   Q    When you were investigating the ketchup
17   incident, did you ask to see copies of statements
18   about a ketchup incident?
19   A    Statements to whom?
20   Q    Statements to anyone.  If you look at
21   Exhibit No. 15, perhaps I should give you the
22   opportunity to review.  It appears to be a statement
23   of an event.
24   A    This e-mail was sent by Diane Sahakian to
25   BJ Han.  I was not copied.  I had no knowledge of

Page 100

1    it.
2    Q    I understand, but while you were
3    investigating wouldn't you want to inform yourself
4    as to whether any party had made a statement about
5    any event you were investigating?
6    A    I had asked Diane about her side of the
7    story, but she never -- in the past she would have
8    copied me on every e-mail that she might think would
9    be important for the investigation, but at this
10   point she never copied me.  I just assumed that she
11   would have copied me on any important e-mails that
12   she was sending out.
13   Q    Did you ask anyone whether they had any
14   statements regarding the event that we've been
15   referring to as the ketchup incident?
16   A    I'm not sure I understand your question.
17   Q    When you investigate an event, I would
18   imagine that you would want to see all the
19   statements by all the parties who were or may have
20   been involved.  In any event my question to you is,
21   did you ask anyone for such statements?
22   A    The only statements I asked were from
23   on-site when I interviewed the employees there.
24   Q    Okay.  Would you read Exhibit No. 15?
25   A    It was an e-mail to BJ Han from --

Page 101

1    Q    You can read it silently.
2    A    Sorry.
3    Q    It's okay.  Just familiarize yourself with
4    it.
5    A    (Reviewing document.)  All right.  I have
6    reviewed this.
7    Q    Is that an accurate recital of the events
8    leading up to the ketchup incident?
9         MR. DOWELL:  Objection to the form.
10        THE WITNESS:  I don't know if it's
11   accurate.  It is what Diane is saying.
12   Q    BY MR. STROJNIK:  Did your investigation
13   disclose that any part of Exhibit 15 is inaccurate?
14   A    That one of the two had poured ketchup on
15   her chair.
16   Q    That's inaccurate?
17   A    We don't know that for sure.
18   Q    I am asking you whether or not anything is
19   inaccurate?
20   A    Probably not.
21   Q    Did you interview Mike Schraeder?
22   A    I did call him, yes.
23   Q    What did he tell you?
24   A    He said that he did not see anyone come
25   into Diane's office.

Page 102

1      Q      Mike Schraeder was actually in the office
2    when this event occurred?
3      A      It appears that he was in his office.
4      Q      Where is his office relative to Diane's
5    office?
6      A      Right next to Diane's office.
7      Q      From his office he can see who goes in and
8    out of Diane's office; correct?
9           MR. DOWELL:  Objection to the form.
10          THE WITNESS:  It depends on where that
11   person is coming in from.
12     Q      BY MR. STROJNIK:  From his office he could
13   also see both Brett Dunlap's cubicle as well as Eric
14   Gongora's cubicle; correct?
15          MR. DOWELL:  Object to form.
16          THE WITNESS:  I am not sure if he could
17   see Eric Gongora's cubicle from his office.
18     Q      BY MR. STROJNIK:  Were you given
19   instructions by anyone at the time that you were
20   investigating this matter to come to certain
21   predetermined conclusions?
22     A      No.
23     Q      Do you know what BJ Han's response to
24   Exhibit No. 14 was?
25     A      Exhibit 14?

Page 103

1      Q      I'm sorry.  Exhibit No. 15 was?
2      A      No, I don't.
3      Q      Would it have been an appropriate response
4    for him to say we shall investigate and let you know
5    the results?
6           MR. DOWELL:  Object to the form of the
7    question.
8           THE WITNESS:  Yes.
9      Q      BY MR. STROJNIK:  Would it be an
10   appropriate response to say I don't want to hear
11   from you again?
12          MR. DOWELL:  Objection to the form.
13          THE WITNESS:  Would be inappropriate.
14     Q      BY MR. STROJNIK:  It would be an
15   appropriate response for him to say I don't want to
16   hear from you again.
17          MR. DOWELL:  Objection to the form.
18          THE WITNESS:  I don't know what he was
19   thinking at that time.
20     Q      BY MR. STROJNIK:  I am asking you whether
21   that would be an appropriate response.
22          MR. DOWELL:  Objection to the form.
23          THE WITNESS:  Maybe.
24     Q      BY MR. STROJNIK:  Would it have been an
25   appropriate response, "Drink a beer, and have a good

Page 104

1    sleep, it will be okay"?
2           MR. DOWELL:  Objection to the form.
3           THE WITNESS:  Maybe it depends on the
4    context.
5      Q      BY MR. STROJNIK:  Well, the context is
6    this.  Diane sends BJ Han an e-mail in which she
7    says that this had occurred to her.  She also says,
8    "I'm wearing white pants today.  I think you get the
9    picture here."  She says, "I will no longer tolerate
10   harassment I am receiving from Eric and/or Brett.
11   One of them needs to be terminated immediately," is
12   the context.  Now, in this context is the response
13   "Drink a beer and go to sleep.  It will be okay" an
14   appropriate response?
15          MR. DOWELL:  Objection to the form.
16          THE WITNESS:  It would not have been an
17   appropriate response at that time.
18     Q      BY MR. STROJNIK:  Can you take a look at
19   Exhibit No. 16, on the very top there is a note from
20   BJ Han to Diane Sahakian in which he says exactly
21   what I asked you earlier.  He says, "Drink a beer
22   and have a good sleep.  It will be okay."  You
23   testified this was not an appropriate response;
24   correct?
25          MR. DOWELL:  Object to the form of the

Page 105

1    question.
2           THE WITNESS:  Well, I think it depends on
3    how he's saying it.  I could look at it and read it
4    as he's saying it will be okay, we'll find out who
5    they are, whoever put ketchup on your chair.
6      Q      BY MR. STROJNIK:  I have to share with you
7    I understand the difficulty you're in in testifying
8    today.  I understand how difficult it is to say
9    something that your boss is not going to like.  I
10   understand that.  BJ Han is not going to like that
11   you said this was an inappropriate response.  My
12   question to you, though, at this point is this, when
13   you didn't know that BJ Han said this, you said it
14   would have been an inappropriate response.
15          Now that you do know that BJ Han said it,
16   now you claim it could be appropriate response, why
17   the difference?  Does it depend on who says it?
18          MR. DOWELL:  Object to the form of the
19   question.  To be clear, counsel characterized BJ's
20   response as responding to Exhibit 15, and that's the
21   way she answered the question.  Exhibit 16 shows a
22   different dialogue, a different e-mail string.  So I
23   object to the form of the question to the extent it
24   mischaracterizes the exhibits and the testimony here
25   today.

Page 106

1    Q    BY MR. STROJNIK: Okay. Can you go to
2  Exhibit No. 17, please. Do you recognize this
3  exhibit?
4    A    Yes, I do.
5    Q    What is the date on this exhibit?
6    A    It was an e-mail sent by BJ Han, April 12,
7  2007 and my reply to him on Friday April 13 of 2007.
8    Q    On April 12, which is three days after the
9  ketchup incident, BJ tells you, "Please transfer
10 Brett to PLM ASAP and let me know the result." What
11 does that mean, "Let me know the result"?
12   A    Let me know when it's done.
13   Q    Okay. In your response you say, "We will
14 make this transfer effective April 16"; correct?
15   A    Yes.
16   Q    Why was Brett transferred?
17   A    I don't know.
18   Q    During this time period Eric Gongora was
19 also part of the PLM group?
20   A    Yes, he was.
21   Q    They had previously been in the emerging
22 technologies group under Diane Sahakian; correct?
23   A    Eric and Brett, yes.
24   Q    Then they both moved in sequence from ET
25 to PLM?

Page 107

1    A    Yes.
2    Q    They were together again?
3    A    You could say that.
4    Q    Were they friends?
5    A    I don't know.
6    Q    Did you ask them?
7    A    I really have no reason to ask them.
8    Q    Can you take a look at the next document
9  which is Exhibit No. 18.
10        Exhibit No. 18 appears to be an e-mail
11 string that occurred before Exhibit 17. The last
12 e-mail, the next to last e-mail is from BJ Han to
13 Dunlap where he asked Dunlap, "Your wish granted,
14 you will be transferred to PLM. Please talk to
15 Flynn and process immediately." It's right here.
16   A    Okay.
17   Q    So is the sequence of events first BJ Han
18 tells Brett that his wish has been granted, then he
19 e-mails to you "Transfer Brett to PLM," then you
20 respond by saying "I'll do it." Is that how it
21 appears it happened?
22   A    I am not aware of any reasons that he was
23 transferred. Transfers occur at the company a lot
24 of times.
25   Q    Okay. Can you take a look at Exhibit 19.

Page 108

1  Do you recognize this exhibit?
2    A    Yes, I do.
3    Q    What is it?
4    A    It is my e-mail exchange with BJ Han.
5    Q    Starting from your report to BJ Han which
6  appears to be on the bottom of page one of two, did
7  you author that particular e-mail?
8    A    Yes, I did.
9    Q    You say, "I spoke with six people this
10 morning from the Tempe office," and then you list
11 them. Phil Wingate, Chris Shea, Ram Ramakrishan,
12 Patrick Kim, Eric Gongora and Brett Dunlap, and none
13 of them saw or heard anyone come into Diane's
14 office.
15        Do you see that?
16   A    Yes.
17   Q    You asked each one of them separately,
18 "Have you seen anyone go into Diane's office?"
19   A    Yes.
20   Q    We know that somebody went into Diane's
21 office.
22        MR. DOWELL: Object to the form.
23   Q    BY MR. STROJNIK: Do we know that?
24   A    We don't know that for sure.
25   Q    When these people told you we didn't see

Page 109

1  anybody and they all denied that they were the ones
2  who went into Diane's office, did you conclude that
3  nobody went into Diane's office?
4    A    No.
5    Q    What did you conclude?
6    A    That I needed to talk to more people and
7  see if anyone did anything.
8    Q    Now, Phil, Chris and Ram Ramakrishan all
9  said Eric Gongora might have done it, but they could
10 not prove it. They had a suspicion?
11   A    Yes, they did.
12   Q    What do you think their suspicion was
13 based on?
14        MR. DOWELL: Object to the form of the
15 question. Calls for speculation.
16        THE WITNESS: I don't really know. I can
17 only speculate why they would have said it.
18   Q    BY MR. STROJNIK: Did you ask them?
19   A    I did ask them, yes.
20   Q    What did they tell you?
21   A    They said that because Eric is very hyper
22 and he plays a lot of pranks with a lot of employees
23 there.
24   Q    And they thought because he's hyper and he
25 plays pranks, he did this?

Page 110

1    A    He might have.
2    Q    He might have done this, okay. What did
3 Eric tell you as to his whereabouts at the time of
4 the incident?
5    A    He said he went to go check the
6 construction of his house.
7    Q    What about the construction of his house?
8    A    He wanted to talk to his contractor.
9    Q    Who is his contractor?
10    A    I don't know.
11    Q    Why don't you know?
12    A    I don't see any reason why I should know
13 about his contractor.
14    Q    Let me suggest the reason. He told you he
15 went to talk to his contractor; correct?
16    A    Yes.
17    Q    If you called the contractor you could
18 have asked the contractor did Eric come talk to you
19 today or yesterday or tonight; you could have asked
20 him that, couldn't you?
21    A    I could have.
22    Q    Then we would have known if Eric is
23 telling the truth or whether he is lying?
24    A    Maybe.
25    Q    What do you mean maybe?

Page 111

1    A    It depends, you know, I could have called
2 the contractor and contractor would have said yes,
3 he was there or no, he wasn't there, but it doesn't,
4 really I don't think it changes anything on the
5 investigation at all.
6    Q    If the contractor who has no motive to lie
7 tells you that he did not talk to Eric Gongora who
8 has a motive to lie, that doesn't change anything?
9        MR. DOWELL: Object to the form of the
10 question.
11        THE WITNESS: Well, I don't know if Eric
12 Gongora has a motive to lie.
13    Q    Well, if Eric Gongora put the ketchup on
14 the chair, that would be a problem for Eric Gongora,
15 wouldn't it?
16        MR. DOWELL: Object to the form of the
17 question.
18    Q    BY MR. STROJNIK: You understand that
19 would be a problem for him, wouldn't it?
20    A    We don't know it for sure.
21    Q    The question is if he did it, that would
22 be a problem for him?
23    A    Yes, it is.
24    Q    If he did it, he would certainly have
25 motive to lie, wouldn't he?

Page 112

1        MR. DOWELL: Object to the form of the
2 question.
3        THE WITNESS: I guess so, yes.
4    Q    BY MR. STROJNIK: If STATS had done its
5 research before hiring him and if STATS had figured
6 that he had lied before, he lied on his application,
7 he had been convicted of a felony, maybe you would
8 have done that investigation, you would called the
9 contractor, wouldn't you?
10        MR. DOWELL: Object to the form of the
11 questions. STATS did not hire Mr. Gongora.
12 Misstates the testimony in evidence.
13    Q    BY MR. STROJNIK: Go ahead and answer the
14 question?
15    A    Perhaps.
16    Q    That would have been important, wouldn't
17 it?
18    A    It could have been, yes.
19    Q    But the way it was, you simply took what
20 people were telling you as the truth?
21    A    We can only go by what the employees are
22 telling us.
23    Q    If everybody is telling you the truth then
24 nobody is lying; right?
25    A    Maybe.

Page 113

1    Q    Well, how can that be? Maybe if everybody
2 is telling you the truth, then nobody is lying,
3 that's definitional.
4        MR. DOWELL: Object to the form of the
5 question.
6        THE WITNESS: I guess so.
7    Q    BY MR. STROJNIK: Did you ever suspect
8 that somebody was lying?
9    A    Yes.
10    Q    Who did you suspect?
11    A    I don't know. It could be any one of
12 them.
13    Q    You suspected Diane?
14    A    At that time no, I did not suspect Diane
15 was lying.
16    Q    So we can take Diane out of the potential
17 liar pool. Brett Dunlap, could he have been lying?
18    A    He could have been.
19    Q    Eric Gongora?
20    A    Could have been.
21    Q    Mr. Schraeder?
22    A    Could have been.
23    Q    What motive did Mr. Schraeder have to lie?
24    A    I don't know.
25    Q    As far as you know he had no motive?

Page 114

1     MR. DOWELL: Object to the form of the
2 question.
3     THE WITNESS: As far as I know.
4     Q    BY MR. STROJNIK: As far you know?
5     A    I don't know for sure.
6     Q    With respect to Eric and Brett, they both
7 had motives; correct?
8     MR. DOWELL: Object to the form of the
9 question.
10     THE WITNESS: I don't know for sure if
11 they have any motives.
12     Q    BY MR. STROJNIK: Let's go through your
13 report. Toward the bottom of your e-mail you say --
14 I'm sorry.
15     In the paragraph beginning with "Eric
16 Gongora said he did not know about the incident."
17 The next paragraph is, "I have sent Scott an e-mail
18 about this and he said he will talk to Eric himself.
19 Eric has denied any involvement in this."
20     This follows the sentence where you say
21 that Eric Gongora said he did not hear about this
22 until he got a call from Scott Jewler yesterday.
23 Yesterday would have been -- yesterday from
24 April 11; right?
25     A    Yes.

Page 115

1     Q    That would have been April 10?
2     A    Yes, it would have been April 10 in the
3 U.S.
4     Q    So Eric told you that he didn't know about
5 this incident until he talked to Scott Jewler the
6 day after the incident. Is that what he told you?
7     A    I can't remember.
8     Q    Well, that's what it says here?
9     A    I know that I had sent an e-mail to Scott
10 Jewler about it. He said he was going to talk to
11 Eric, and he did call Eric. I think it was
12 immediately after Diane had called me.
13     Q    So Diane called you, you called Scott
14 Jewler?
15     A    I think I e-mailed him.
16     Q    You e-mailed him, then Scott Jewler talked
17 to Eric Gongora?
18     A    Yes.
19     Q    The conversation between Scott Jewler and
20 Eric Gongora occurred the following day?
21     MR. DOWELL: Object to the form of the
22 question.
23     MR. STROJNIK: I apologize, Counsel.
24     Q    BY MR. STROJNIK: The day following the
25 ketchup incident?

Page 116

1     A    Probably. I don't recall the exact date.
2     Q    Okay. Did you conclude from this that
3 Eric Gongora did not come back to work on the day of
4 the ketchup incident?
5     A    I don't remember. I don't remember
6 thinking that at all.
7     Q    Okay. Did that cross your mind?
8     A    No, it did not.
9     Q    Did it cross your mind why wouldn't
10 somebody whose cubicle right outside of Diane's
11 office not know about this event until the following
12 day?
13     A    Many employees leave for lunch and never
14 come back in the office. He said that he had to
15 leave for lunch, so I can only think that he left.
16 He took a late lunch and did not come back to the
17 office after his lunch.
18     Q    Somebody says I have a late lunch, to me
19 that implies he came back. If somebody leaves for
20 the day, the person says I am going to leave for the
21 day. Is there a difference between these two
22 events?
23     MR. DOWELL: Objection to the form.
24     THE WITNESS: Maybe. Maybe there is a
25 difference.

Page 117

1     Q    BY MR. STROJNIK: But you assumed that
2 Eric did not come back that day?
3     A    If he did not find out until the next day,
4 I can assume that he did not come back, but if he
5 did come back it would be very unusual that he
6 didn't know about it until the following day,
7 wouldn't it?
8     MR. DOWELL: Object to the form.
9     THE WITNESS: I don't know maybe he didn't
10 know. I really don't know.
11     Q    BY MR. STROJNIK: In the e-mail on the
12 very bottom of Exhibit No. 19 you say, "The
13 interesting part of my conversation with Brett is
14 that he thinks whoever poured the ketchup only sees
15 this as horseplay."
16     Do you see that?
17     A    Yes.
18     Q    So Brett told you that whoever poured the
19 ketchup sees this as horseplay; correct?
20     A    Yes.
21     Q    You know, if Brett told you that whoever
22 poured the ketchup saw it as horseplay, he has to
23 know who did it.
24     A    I asked him that question.
25     Q    You did?

Page 118

1    A    He said he didn't know.
2    Q    Did you follow up with how can you tell me
3  the person who did it sees it as horseplay unless
4  you know who it is?
5    A    He informed me there are a lot of pranks
6  that go on in the Tempe office.
7        MR. STROJNIK:  My question is a little
8  different.  Please read it back.
9            (Record read back.)
10    Q    BY MR. STROJNIK:  Brett tells you the
11  person who did it thinks it's horseplay.  My
12  question is how can he know what the person who did
13  it thinks unless he knows who the person is?
14        MR. DOWELL:  Object to the form of the
15  question.
16        THE WITNESS:  I don't know.
17    Q    BY MR. STROJNIK:  He can't know, can he,
18  unless he knows who the person is?
19    A    Maybe.
20    Q    Okay.  He was covering for his buddy,
21  Eric, wasn't he?
22    A    I don't know.
23    Q    Well, BJ makes an attempt in his response
24  to your e-mail, he says somebody over there is
25  lying.  Do you see that?

Page 119

1    A    Yes.
2    Q    Do you agree somebody over there is lying?
3    A    Yes.
4    Q    We just don't know who it is?
5    A    Yes.
6    Q    Because we believe everybody?
7    A    Well, we just didn't know who it was.
8    Q    We just believe everybody.  We don't
9  investigate everybody, we just take them at their
10  word, was that the essence of the investigation?
11        MR. DOWELL:  Object to the form of the
12  question.  Misstates the testimony.
13        THE WITNESS:  We looked at all the facts
14  and we just found it inconclusive.
15    Q    BY MR. STROJNIK:  You say we looked at all
16  the facts.  You just talked to people.  You didn't
17  look at all the facts.  You didn't talk to the
18  construction guy.  You didn't go to planning and
19  zoning to find out if there was construction even
20  going on.  You didn't do any of that, did you?
21    A    No, I did not.
22    Q    You just talked to people.  When you say
23  we looked at all the facts, what you mean is I just
24  talked to people?
25    A    It was part of the facts.

Page 120

1    Q    What other facts did you have in front of
2  you?
3    A    Those were the only ones that I had at
4  that time.
5    Q    Okay.  BJ goes on and he says something
6  interesting.  He says, "Lying can lead to
7  termination of employee."
8        Do you see that?
9    A    Yes.
10    Q    Do you believe that BJ takes lying to be a
11  serious matter?
12        MR. DOWELL:  Object to the form of the
13  question.
14        THE WITNESS:  Maybe he does.
15    Q    BY MR. STROJNIK:  Okay.  You don't
16  consider it a serious matter?
17    A    It depends on what kind of lying it is.
18    Q    That's what Eric Gongora testified to in
19  his deposition.  It all depends on what kind of a
20  lie it is.
21        You agree with that, it all depends?
22    A    It depends on circumstances.
23    Q    Okay.  In response -- I'm sorry.
24        BJ goes on, "Brett suddenly sent an e-mail
25  to me at 9:09 a.m. Singapore time complaining about

Page 121

1  Diane's recent behavior and his STI."  Just for your
2  information and confidentially."  Why is that
3  important, that Brett was complaining about Diane's
4  recent behavior?
5        MR. DOWELL:  Object to the form of the
6  question.
7        THE WITNESS:  Because it might be timing.
8    Q    BY MR. STROJNIK:  Motive?
9    A    Timing.
10    Q    Timing.  What about timing?
11    A    It just looked like maybe BJ never had
12  received any e-mail from Brett before and suddenly
13  he sends an e-mail.
14    Q    It's not the receipt of the e-mail that I
15  read that he finds interesting, it's the content of
16  it.  He says "Brett is complaining about Diane."
17  Did that show to you that there was friction between
18  Brett and Diane?
19    A    Based on this e-mail, might have been,
20  yes.
21    Q    Did it show you that Brett had a motive?
22    A    Well, I don't know that for sure.
23    Q    Before you go further, you do respond by
24  saying it seems that Brett is digging his hole?
25    A    Yes, I did.

Page 122

1    Q    What did you mean by that?
2    A    Well, what I meant, the conversation I had
3  with Brett, he is the only one who just, he was the
4  one who had a different reaction to my
5  investigation.  He just thought it was a prank that
6  had gone wrong.
7    Q    You testified that he told you that he
8  that a person who did it thought it was a prank.  He
9  didn't tell you he thought it was a prank, did he?
10 He says horseplay, didn't he?
11   A    He said horseplay.
12   Q    He said I believe it's horseplay, but the
13 person who did it believes it's a prank.
14        MR. DOWELL:  Object to the form of the
15 question.
16        THE WITNESS:  My conversation with him.
17   Q    BY MR. STROJNIK:  I'm sorry, I apologize.
18 I misstated what the testimony was.  Thank you.
19        It is not that the person who did it
20 believes that it's a prank.  The person who did it
21 believes it's horseplay.  I don't want to confuse
22 you.  I just want to bring that out.  Whatever
23 question was pending, I will withdraw it because I
24 forgot it.
25   A    Okay.

Page 123

1    Q    Okay.
2    A    Okay.
3    Q    Do you know what the term normalizing
4  means?
5    A    It depends on the context.
6    Q    In the context of sexual harassment or
7  racism.
8    A    No.
9         MR. DOWELL:  Object to the form.
10        THE WITNESS:  No, I don't.
11   Q    BY MR. STROJNIK:  Normalizing.  Remember
12 we talked about group deviants?
13   A    Yes.
14   Q    When a person is made in a group, when a
15 group makes a person a group deviant, sometimes a
16 group deviant will try to normalize her behavior by
17 engaging in the same type of behavior as the
18 majority of the group.  That's called normalizing
19 her behavior, and makes it more like the behavior of
20 the group; right?
21        MR. DOWELL:  Object to the form of the
22 question.
23   Q    BY MR. STROJNIK:  Do you understand that
24 concept?
25   A    Yes, I do.

Page 124

1    Q    In your e-mail you make a fascinating
2  comment.  You say, "It seems that Brett is digging
3  his hole when I talked to him earlier today.  He
4  said that Diane plays pranks on him and Eric as
5  well."
6         What pranks did Eric and Brett play on
7  Diane?
8    A    They mentioned that when she threw things
9  at them that they would throw them back.
10   Q    So she starts the prank and then they just
11 innocently threw things back at her?
12   A    Yes.
13   Q    So the way he explained it to you, not
14 that they would start the prank, but that she would
15 start the prank?
16   A    Yes.
17   Q    Then they would simply respond by acting
18 in the same way she did?
19   A    Sometimes they would, yes.
20   Q    That's what Brett told you?
21   A    That's what he aid.
22   Q    Then you go on you say, "I agree that
23 there is someone lying in Tempe.  Really weird he'll
24 suddenly send you an e-mail."
25        Did you find it weird that Brett Dunlap

Page 125

1  sent an e-mail to BJ Han?
2    A    From my understanding he never sent an
3  e-mail to BJ.
4    Q    It was weird, wasn't it?
5    A    It was.
6    Q    Let's go to Exhibit No. 20.
7         MR. DOWELL:  Can we open the door?
8         MR. STROJNIK:  Why don't we take a
9  two-minute break.
10        (Short break taken.)
11   Q    BY MR. STROJNIK:  Can you take a look at
12 Exhibit 20?
13        Do you recognize this exhibit?
14   A    Yes.
15   Q    Do you recognize the handwriting?
16   A    They're mine.
17   Q    Can you testify when this exhibit was
18 prepared?
19   A    I believe this was prepared, I wrote these
20 after I received that call from Diane Sahakian.
21   Q    Was it within a day or the same day?
22   A    I don't remember the date.
23   Q    Is there some reason why this document is
24 not dated?
25   A    I just probably forgot to date it.

Page 126

1    Q    This document consists of two pages.  Is
2    this the entire document on the matter?
3    A    Yes.
4    Q    The first entry is Phil Wingate, and you
5    say, "Eric and Brett play practical jokes on Diane."
6    Is that what Phil opined?
7    A    Yes.
8    Q    Is that what he said?
9    A    Yes.
10   Q    Did you ask him anything about the ketchup
11   incident?
12   A    Yes, I did.
13   Q    What did he say?
14   A    He said he did not see anyone come into
15   Diane's office.
16   Q    The following entry is "Eric," that would
17   be Eric Gongora, I can't read the first line.
18   "Didn't know"?
19   A    "Who it is."
20   Q    "Didn't know who it is," okay.  "He was
21   out to lunch to see his house"?
22   A    Yes.
23   Q    Next you interviewed Ram, who said "Eric
24   plays pranks on Diane all the time."  What is the
25   business card prank?

Page 127

1    A    He said that Diane had put business cards
2    on top of the window ledge up top, and when you
3    opened her door the business cards would shower
4    down.
5    Q    Who put the cards there?
6    A    Diane.
7    Q    Okay.  So Ram said, "Eric plays pranks on
8    Diane all the time."  Then you describe a prank that
9    Diane plays on people?
10   A    Yes.
11   Q    What is the next line, something
12   "harmful"?
13   A    "Nothing harmful."
14   Q    What is the next one?
15   A    "Hyper kind of guy."
16   Q    Who is the hyper kind of guy?
17   A    Eric.
18   Q    What's the next line?
19   A    Ketchup was from Brett's lunch.
20   Q    That's what Ram told you?
21   A    Yes.
22   Q    Something, "it's Eric"?
23   A    Believes.
24   Q    "Believes it's Eric," next line?
25   A    "Gut feeling."

Page 128

1    Q    Next line, Brett and Eric?
2    A    "Are immature."
3    Q    Next line, "They're rude"?
4    A    "With her."
5    Q    With who?
6    A    With Diane.
7    Q    They are rude with her and --
8    A    "Shout," I think it's shout.
9         MR. DOWELL:  I think it's short.
10        THE WITNESS:  Short.
11   Q    BY MR. STROJNIK:  "Short with Diane"?
12   A    Short.
13   Q    What does that mean, to be short with
14   someone?
15   A    It meant when Diane asked them a question
16   they would be very short with their answers.
17   Q    Does that indicate a level of
18   impoliteness?
19        MR. DOWELL:  Object to form of the
20   question.  Speculative.
21        THE WITNESS:  I don't know.  I really
22   can't say.
23   Q    BY MR. STROJNIK:  When you wrote down the
24   "short," what did you envision that term to mean?
25   A    That they would give her short answers to

Page 129

1    her questions.
2    Q    Why was it important to write down that
3    their answers were short?
4    A    I was just trying to get as much
5    information as I can with my notebook.
6    Q    How was the fact that the answers were
7    short significant in your investigation?
8    A    I don't know.
9    Q    The following page you list Chris Shea,
10   Frank Wang and Blade Gilbert?
11   A    Gillette.
12   Q    I'm sorry.  And you've got two arrows
13   pointing to Frank Wang and Blade Gillette.  Does
14   that have a meaning?
15   A    Reminder for me to call them.
16   Q    Then the next line is, "Eric moved Frank
17   Wang's car," and then it says something I can't
18   read.
19   A    "Saw Frank's car keys."
20   Q    Okay.  What is that all about?
21   A    Eric apparently had seen Frank's car keys
22   on Frank's desk and he took them and moved his car
23   from the curb parking space to another parking
24   space.
25   Q    You think that's funny?

Page 130

1    A    I don't know.
2    Q    What do you think?
3    A    It could be.
4    Q    Could be hilarious; right?
5    A    Might.
6    Q    Could also give a man a heart attack?
7    A    It could.
8         MR. DOWELL: Object to the form.
9    Q    BY MR. STROJNIK: It could. Then you go
10   on to, say "Diane has played pranks, threw food and
11   coins at people." Who said that?
12   A    I think that was -- I can't remember.
13   Q    Next line is Brett Dunlap, and I can't
14   read the following line?
15   A    Not sure he was in the office.
16   Q    Not sure he was in the office. Is that
17   what he said to you? I am not sure if I was in the
18   office?
19   A    Yes.
20   Q    He was not sure if he was in the office
21   when the ketchup incident occurred?
22   A    Yes.
23   Q    Then he goes on, he thinks it's just
24   horseplay, so he thought it was just horseplay?
25   A    Yes.

Page 131

1    Q    Then the next line I believe says, "Many
2    jokes in the office happening"?
3    A    Yes.
4    Q    "Patrick Kim. He was at lunch." What is
5    the next two lines?
6    A    "No idea of who did this."
7    Q    I don't see any note from Mr. Schraeder.
8    A    I gave him a call, but I probably did not
9    write it down.
10   Q    Do you recognize the document which has
11   been marked as Exhibit 21?
12   A    Yes, I do.
13   Q    This is a sexual harassment sign in sheet;
14   right?
15        MR. DOWELL: Objection to the form.
16        THE WITNESS: It was a policies meeting
17   that I conducted in Tempe.
18   Q    BY MR. STROJNIK: This occurred on
19   April 12, 2007?
20   A    Yes.
21   Q    This occurred three days after the ketchup
22   incident?
23   A    Yes.
24   Q    Is there a relationship between the
25   ketchup incident and this policy meeting?

Page 132

1    A    Yes.
2    Q    What is the relationship?
3    A    It was part of the investigation. As part
4    of it I flew in to Tempe, Arizona, as soon as I
5    could and conducted the policy meeting, reiterating
6    the company's policies, sexual and unlawful
7    harassment and also our code of ethics.
8    Q    Did you do it because of what had
9    happened?
10   A    Yes.
11   Q    Go to Exhibit No. 22. Do you recognize
12   this exhibit?
13   A    Yes.
14   Q    What is it?
15   A    This is typewritten note of what I had
16   conducted in Arizona.
17   Q    I don't see -- this is a form memorandum
18   from me to file, or me to BJ. This is just notes to
19   yourself?
20   A    Yes.
21   Q    Did these notes make it in Diane
22   Sahakian's file?
23   A    I don't believe it did.
24   Q    Do you know where these notes come from?
25   A    I wrote them.

Page 133

1    Q    My understanding -- it was an inartful
2    question. Is there a hard copy of these notes
3    somewhere other than in this conference room?
4    A    No.
5    Q    Is this a computer-generated hard copy?
6    A    Yes.
7    Q    I would like you to take a look at
8    paragraph 3, next to the last sentence where you say
9    "He," referring to Eric Gongora, "said that their
10   relationship became strained when he started
11   defending other employees when Diane bad mouthed
12   them."
13        He told you this so you knew that the
14   relationship was strained between Diane and Eric?
15   A    From what Eric had told me when I talked
16   to him.
17   Q    So now we know from previous e-mails from
18   Diane to you and from BJ that it was strained from
19   her perspective. Now we know it was strained from
20   his perspective?
21        MR. DOWELL: Object to the form.
22   Q    BY MR. STROJNIK: Correct?
23   A    I guess so.
24   Q    How did this information impact on your
25   assessment of motive?

Page 134

1      A     I don't know.

2      Q     You say, and I quote, "I mentioned to Eric

3   that we will be moving him away from Diane and away

4   from Brett." Why would you move him away from

5   Diane?

6      A     It seemed to me that having Eric and Brett

7   in front of Diane's office was really upsetting

8   Diane. So to make her life happier at the office

9   because that was very upsetting for her, we said

10   that we will move those two employees away from her

11   office.

12      Q     Now, you say that the fact that they were

13   in front of her office was upsetting to Diane, but

14   that's not true. It's true what they were doing was

15   upsetting to Diane?

16      A     Well, I don't know. From my conversations

17   with Diane, she had brought this up with them before.

18      Q     It was not the fact that they were

19   physically close that was upsetting, it was the fact

20   that they were doing things that were upsetting

21   Diane. That was upsetting. Do you see the

22   distinction I'm trying to draw?

23      A     The thing I believe is the pranks that

24   were being done in the office were just a result of

25   Diane's starting pranks.

Page 135

1      Q     Okay. So it was because Diane started the

2   pranks Brett and Dunlap were going to be removed

3   from her presence?

4      A     Brett and Eric, to keep peace in the

5   office.

6      Q     You know, you probably should read that

7   stuff that independent medical examiner wrote about

8   transference of responsibility. You just said it

9   was Diane's initiation of the problem, that Diane

10   was the one who initiated the problem. Do you

11   realize that?

12          MR. DOWELL: Object to the form of the

13   question.

14          THE WITNESS: I did not say that she

15   initiated the problem.

16      Q     BY MR. STROJNIK: You said she started

17   throwing coins and food and that's why you were

18   going to move Eric and Brett?

19          MR. DOWELL: Object to the form.

20      Q     BY MR. STROJNIK: That's what you just

21   testified to, didn't you?

22          MR. DOWELL: Same objection. Misstates

23   the testimony.

24          THE WITNESS: I don't know.

25      Q     BY MR. STROJNIK: Actually STATS is trying

Page 136

1   to change the entire concept or the entire factual

2   background in this case, making it all Diane's fault

3   and not Brett's and Eric's false; correct?

4          MR. DOWELL: Object to the form of the

5   question.

6          THE WITNESS: I don't know.

7      Q     BY MR. STROJNIK: But we do know that

8   Diane is not a felon; do we know that?

9          MR. DOWELL: Object to the form.

10          THE WITNESS: I don't know that for sure.

11      Q     BY MR. STROJNIK: We know Eric is a felon?

12          MR. DOWELL: Object to the form.

13      Q     BY MR. STROJNIK: We know Eric is a liar?

14      A     I don't know that for sure.

15      Q     We know Eric is a sexual harasser?

16      A     I don't know that for sure.

17      Q     We know that Eric goes to pornographic web

18   sites?

19      A     I don't know.

20      Q     We know Eric hits women?

21      A     I don't know that.

22      Q     Now the company is trying to blame Diane

23   for what occurred; am I correct?

24          MR. DOWELL: Objection to the form.

25          THE WITNESS: That's not true.

Page 137

1      Q     BY MR. STROJNIK: Can we take a look at

2   Exhibit No. 23. Let me ask if you recognize this

3   document.

4      A     Yes, this is an employee change.

5      Q     Can you describe it and what it does?

6      A     This is to change, it's a salary increase.

7      Q     For who?

8      A     For Eric Gongora.

9      Q     Let me understand. The ketchup incident

10   happens on April 9. On April 26 Eric Gongora gets a

11   salary increase?

12      A     Our focal review process.

13      Q     Just say yes or no.

14      A     Yes.

15      Q     April 9, ketchup. April 26, salary

16   increase for Eric Gongora.

17      A     Yes.

18      Q     Okay. Exhibit 24. Are you familiar with

19   Exhibit No. 24?

20      A     No, I'm not.

21      Q     Was there a time that your office began

22   asking questions about Diane?

23      A     Yes.

24      Q     You are beginning to investigate Diane?

25      A     We were not beginning to investigate

Page 138

1  Diane.
2      Q    What kind of questions were you asking
3  about Diane?
4      A    We asked her direct reports of her
5  management style.  What are positive things that
6  they say about Diane.  And on the flip side also are
7  there any improvements that she can also do.
8      Q    Did you have the same type of
9  investigation of Eric Gongora?
10     A    No.
11     Q    Did you have the same type of
12 investigation of Brett Dunlap?
13     A    No.
14     Q    Did you have the same type of
15 investigation of Scott Gooch?
16     A    No.
17     Q    Did you have the same kind of
18 investigation of BJ Han?
19     A    No.
20     Q    So now we are refocusing on May 12 from
21 investigating Brett Dunlap and Eric Gongora to
22 investigating Diane; correct?
23          MR. DOWELL:  Object to the form of the
24 question.
25          THE WITNESS:  This was the result of an

Page 139

1  exit interview from Scott Gooch.
2      Q    BY MR. STROJNIK:  I understand you did not
3  investigate Scott Gooch.  You did not investigate
4  Brett Dunlap.  You did not investigate Eric Gongora.
5  You did not investigate BJ Han.  You investigated
6  Diane Sahakian.
7          MR. DOWELL:  Objection to the form.
8          THE WITNESS:  We did not see that as an
9  investigation.
10     Q    BY MR. STROJNIK:  You were asking
11 questions; right?
12     A    Yes.
13     Q    What would you call it, an inquiry?
14     A    You could say that, I guess.
15     Q    Inquiry, investigation.  I'm sorry.  Could
16 we say that an inquiry is the same as investigation?
17          MR. DOWELL:  Objection to the form.
18          THE WITNESS:  I don't know.
19     Q    BY MR. STROJNIK:  So you commenced an
20 inquiry into Diane; correct?
21     A    Yes.
22     Q    Let's talk about the exit interview.  Do
23 you know who Scott Gooch is?
24     A    Yes.
25     Q    Scott Gooch was working in the Fremont

Page 140

1  office?
2      A    Yes, he was.
3      Q    He reported to Diane?
4      A    Yes, he did.
5      Q    There was a time when Scott Gooch, Brett
6  Dunlap and Eric Gongora all reported to Diane?
7      A    Yes.
8      Q    There was a time when Eric Gongora
9  reported to Diane directly and Brett Dunlap and
10 Scott Gooch reported to Eric Gongora?
11     A    Yes.
12     Q    We have already gone through e-mails in
13 which Brett Dunlap complained about Diane; correct?
14          MR. DOWELL:  Objection to the form.
15          THE WITNESS:  Only that one e-mail from BJ
16 Han that he said.
17     Q    BY MR. STROJNIK:  We have already
18 established there was conflict between Eric and
19 Diane?
20     A    From what Eric had said, the relationship
21 was strained.
22     Q    Well, didn't Diane say the same thing?
23     A    Yes, she did.
24     Q    Now, onto the scene comes Scott Gooch.
25 Scott worked for STATS approximately a year?

Page 141

1      A    Yes.
2      Q    In his initial interview he told Ram
3  Ramakrishna that he had 25 people working for him in
4  China.  Are you aware of that?
5      A    No, I am not.
6      Q    Did anybody investigate if that's true?
7      A    I didn't even know that he said that.
8      Q    Then when he came to work for STATS all of
9  sudden he had no one reporting to him.  Are you
10 aware of that?
11     A    Yes.
12     Q    Was this a demotion for him?
13     A    No.
14     Q    Are you aware that Scott Gooch had felt
15 that he had been misled about his salary, and
16 bonuses?
17     A    Yes, I have been aware of that.
18     Q    What was that all about?
19     A    It was not his salary that he felt he was
20 misled.  It was how our bonus system worked.
21     Q    Who misled him.
22     A    I don't know.
23     Q    Did he ever say BJ misled him?
24     A    No.
25     Q    Ram Ramakrishna misled him?

Page 142

1      A    I don't know.
2      Q    You misled him?
3      A    I never talked to him about that, I don't
4  know.
5      Q    I guess what I am trying to get at is
6  this. At his exit interview he said something that
7  I find fascinating. He said, "I am leaving because
8  Diane Sahakian is the worst manager I have ever
9  had." Do you remember that?
10     A    Yes.
11     Q    That's a strong statement.
12          MR. DOWELL: Object to form.
13     Q    BY MR. STROJNIK: Correct?
14     A    I don't know.
15     Q    What do you mean you don't know. That's
16  a pretty strong statement, "She's the worst manager
17  I've ever had."
18          MR. DOWELL: Objection to the form.
19          THE WITNESS: I can't say.
20     Q    BY MR. STROJNIK: What motivated him to
21  say that?
22     A    I don't know.
23          MR. DOWELL: Object to the form.
24     Q    BY MR. STROJNIK: Did he like Diane?
25          MR. DOWELL: Objection to the form.

Page 143

1          THE WITNESS: I don't know.
2      Q    BY MR. STROJNIK: Did anyone investigate
3  why it is that he said that?
4      A    It's just what he said on the exit
5  interview.
6      Q    Did anybody ask themselves the following
7  question: Is it possible that what Scott Gooch is
8  actually doing is priming?
9          MR. DOWELL: Object to the form of the
10  question?
11          THE WITNESS: I don't know.
12     Q    BY MR. STROJNIK: He's simply becoming
13  part of a group that is coming after Diane?
14     A    I don't know.
15     Q    Did anybody ask that question?
16     A    I don't know.
17     Q    How does he benefit by making that
18  assertion?
19          MR. DOWELL: Object to the form of the
20  question.
21          THE WITNESS: I don't know.
22     Q    BY MR. STROJNIK: Did anybody ask that
23  question before you started to investigate Diane?
24     A    I don't know.
25          MR. DOWELL: Object to the form of the

Page 144

1  question. Misstates testimony.
2      Q    BY MR. STROJNIK: Would that be an
3  important question to ask?
4      A    I don't know.
5      Q    I believe you testified you haven't seen
6  Exhibit 24 previously?
7      A    No, I have not.
8      Q    Can we move on to Exhibit 25.
9          THE REPORTER: I need to put in a new
10  disc.
11          (Off the record.)
12     Q    BY MR. STROJNIK: Before moving on to a
13  new subject, who initiated an inquiry into Diane's
14  management style?
15     A    It was V.P. of H.R. H.R. in Singapore at
16  that time.
17     Q    Who was that?
18     A    It was Jik Hoon Kaw, J-I-K, H-O-O-N,
19  K-A-W.
20     Q    Did anyone suggest to him to --
21
22     A    Her.
23     Q    I'm sorry. Did anyone instruct her to
24  begin this inquiry?
25     A    I don't know.

Page 145

1      Q    Was this inquiry part of a documentation
2  of a person?
3      A    I don't know.
4          MR. DOWELL: Object to the form of the
5  question.
6      Q    BY MR. STROJNIK: Is there any
7  relationship to documenting an employee and doing
8  this type of inquiry?
9          MR. DOWELL: Objection to the form.
10          THE WITNESS: I can't say.
11     Q    BY MR. STROJNIK: Is it possible?
12     A    I really don't know.
13     Q    Is this sort of an inquiry consistent with
14  the employee being documented?
15          MR. DOWELL: Objection to the form.
16          THE WITNESS: I can't say.
17     Q    BY MR. STROJNIK: Once an employee starts
18  being documented, that is not a good sign for the
19  employee, is it?
20          MR. DOWELL: Object to the form of the
21  question.
22          THE WITNESS: It depends.
23     Q    BY MR. STROJNIK: Sometimes after they
24  start getting documented, they get fired?
25          MR. DOWELL: Same objection.

Page 146

1        THE WITNESS:  That's not true.
2        Q    BY MR. STROJNIK:  So do people get
3    documented at random or do they get documented for a
4    reason?
5        MR. DOWELL:  Same objection.
6        THE WITNESS:  There should be a reason.
7        Q    BY MR. STROJNIK:  What was the reason in
8    this case?
9        A    It was a result of the Scott Gooch exit
10   interview.
11       Q    Can you take a look at Exhibit 25, please?
12       A    Okay.
13       Q    Do you recognize that exhibit?
14       A    Yes.
15       Q    You signed it; correct?
16       A    Yes, I did.
17       Q    Why was Mr. Gongora moved again?
18       A    Cindy Palar had moved to Singapore.
19       Q    Was the date on this 5-15-07?
20       A    Yes.
21       Q    I see the date of April 27, 2006 appears
22   next to your signature on 25?  Is this simply an
23   error?
24       A    Yes.
25       Q    Typing error?

Page 147

1        A    Yes.
2        Q    Is this the kind of form that is generated
3    by a computer?
4        A    Yes.
5        Q    Can we look at Exhibit 26.  You've seen
6    this document before?
7        A    No.
8        Q    Can you take a look at Exhibit No. 27.  Do
9    you recognize this exhibit?
10       A    No, I don't.
11       Q    The exhibit contains a documentation of
12   what BJ Han perceives as Diane's conduct.  Would
13   that be a fair statement relative to this particular
14   exhibit?
15       MR. DOWELL:  Object to the form of the
16   question.
17       THE WITNESS:  Can I have time to review
18   it?
19       Q    BY MR. STROJNIK:  Yes, please.  Of course.
20       A    (Reviewing document.)
21       Q    Actually, Ms. Uy, I will not ask you any
22   questions on Exhibit 27.
23       A    Okay.
24       Q    But can you look at Exhibit 28?
25       A    (Reviewing document.)

Page 148

1        Q    Do you recognize this document?
2        A    Yes, I do.
3        Q    This is a string of e-mails starting with
4    an e-mail from Diane Sahakian to yourself informing
5    you that she's taking a medical leave of absence?
6        A    Yes.
7        Q    Was she entitled to take a medical leave
8    of absence?
9        A    Yes.
10       Q    Was there anything in the company policy
11   that said she could not take the medical leave of
12   absence?
13       A    No.
14       Q    Did she have a legal right to take a
15   medical leave of absence?
16       MR. DOWELL:  Object to the form of the
17   question.
18       Q    BY MR. STROJNIK:  Did she have a legal
19   right to take a medical leave of absence?
20       MR. DOWELL:  Same objection.
21       THE WITNESS:  I don't know.
22       Q    BY MR. STROJNIK:  Do you have any reason
23   to believe that she did not have a medical right to
24   take a medical leave of absence?
25       A    I don't know.

Page 149

1        Q    Are you familiar with the laws relating to
2    employees' medical leaves of absence?
3        A    Yes.
4        Q    What do those laws say, that she can or
5    cannot take a medical leave of absence?
6        MR. DOWELL:  Object to the form of the
7    question.
8        THE WITNESS:  Depends on the particular
9    situation.
10       Q    BY MR. STROJNIK:  In that situation does
11   the law say she can take a medical leave of absence?
12       MR. DOWELL:  Object to the form of the
13   question.
14       THE WITNESS:  Yes.
15       Q    BY MR. STROJNIK:  So she was authorized to
16   take it by law?
17       MR. DOWELL:  Object to the form of the
18   question.
19       THE WITNESS:  Yes.
20       Q    BY MR. STROJNIK:  Can you take a look at
21   Exhibit 29, please.  Do you recognize that document?
22       A    Yes.
23       Q    Do you recognize the handwriting?
24       A    Yes.
25       Q    I don't see a date on this document.  Do

Page 150

```
1   you know what the date is?
2         A    I don't remember.
3         Q    Can you describe what this document is?
4         A    These are my notes after I had a
5   conversation with Diane Sahakian.
6         Q    Do these notes also indicate your
7   perceptions after you had a conversation with
8   Mr. Han, or Dr. Han?
9         A    Which conversation would that be?
10        Q    Any conversation.
11        A    I don't know.
12        Q    On the very top I see that the Chris Shea
13  is crossed out.  What does that relate to?
14        A    This is a fresh page of my notebook.  She
15  might have called me and left me a message.  This is
16  a reminder for me to call her back, and I used this
17  page to put in my notes.
18        Q    That makes sense.  The first line of your
19  handwritten note seems to say, "Spell done"?
20        A    Yes.
21        Q    What does that mean?
22        A    Diane had called me and she said that she
23  had a phone conversation with BJ and at one point he
24  said he was done, and he spelled it D-O-N-E.
25        Q    I'm sorry.  Can you repeat that again?
```

Page 151

```
1         A    She had a phone conversation with BJ Han
2   and at one point during that conversation between
3   Diane and BJ Han he had said done, and he spelled it
4   out, D-O-N-E.
5         Q    He said that he was done with her?
6              MR. COELHO:  Object to the form.
7              THE WITNESS:  I don't know if that's what
8   he said.
9         Q    BY MR. STROJNIK:  Is that what Diane
10  reported to you that he said?
11        A    She just said that he was done.
12        Q    Is that all you remember now or is that
13  all you can glean from this particular document,
14  Exhibit 29?
15        A    It's what I can remember.
16        Q    What was being done?  What was done?
17        A    I think their conversation that night.
18        Q    Could it be that he said I am done with
19  you?
20        A    I don't know.
21              MR. DOWELL:  Object to the form.
22        Q    BY MR. STROJNIK:  You don't remember?
23        A    I don't.
24        Q    The following line, "BJ said she can sue
25  him"?
```

Page 152

```
1         A    Yes.
2         Q    Did Diane report to you that BJ said to
3   her that she can sue him, or what does this comment
4   mean?
5         A    Diane said to me that at one point during
6   their conversation that BJ said to her that you can
7   sue me.
8         Q    Why would she be able to sue him?
9              MR. DOWELL:  Object to the form of the
10  question.
11              THE WITNESS:  I don't know.
12        Q    BY MR. STROJNIK:  Did you ever check with
13  BJ to find out what he meant when he said you can
14  sue me?
15        A    I did talk to BJ, I did, but I had general
16  counsel with us there.
17              MR. DOWELL:  Don't discuss the
18  conversations you had with general counsel.
19        Q    BY MR. STROJNIK:  Who else was present
20  during this conversation with you and BJ and the
21  general counsel?
22        A    No one.
23        Q    Did the conversation involve Diane
24  Sahakian?
25              MR. DOWELL:  Object to the form of the
```

Page 153

```
1   question.  I will instruct the witness not to answer
2   any questions that relate to conversation you had
3   with BJ Han and the general counsel.
4         Q    BY MR. STROJNIK:  Was it Janet Taylor?
5              MR. DOWELL:  You can answer that question.
6              THE WITNESS:  Yes.
7         Q    BY MR. STROJNIK:  Was the purpose of the
8   conversation for you and BJ Han to receive a legal
9   opinion on a matter?
10              MR. DOWELL:  Object to the form of the
11  question.  Instruct the witness not to answer the
12  question.
13        Q    BY MR. STROJNIK:  Was the purpose of the
14  conversation to try and find a way of firing Diane
15  without becoming exposed to litigation?
16              MR. DOWELL:  Same objection.  Witness will
17  not testify as to matters discussed with counsel.
18        Q    BY MR. STROJNIK:  Was the conversation you
19  had with BJ Han and Janet Taylor in response to
20  Diane taking the FMLA leave?
21              MR. DOWELL:  Object to form of the
22  question.  Again, the witness will not answer any
23  questions that relate to any conversation she had
24  with Mr. Han, Dr. Han and general counsel, Janet
25  Taylor.
```

Page 154

1    Q    BY MR. STROJNIK: Did you discuss the
2  conversation you had with BJ Han and Janet Taylor
3  with any other person?
4        MR. DOWELL: Object to the form to the
5  extent it calls for communications between you and
6  any other counsel.
7    Q    BY MR. STROJNIK: You have to tell me who
8  that counsel was, if you had a conversation about
9  that conversation with another counsel.
10       MR. DOWELL: You can answer that question.
11       THE WITNESS: I did not have any
12  conversation with any other counsel.
13   Q    BY MR. STROJNIK: Okay. Is this the first
14  time since you had the conversation with Janet
15  Taylor and BJ Han that you are discussing the matter
16  with anyone?
17       MR. DOWELL: To the extent it involves
18  conversations with counsel, then you should not
19  answer, but otherwise you can answer.
20       THE WITNESS: I can't answer that
21  question.
22   Q    BY MR. STROJNIK: I want to make sure that
23  I understand your answer. If you had conversations,
24  I am not asking you what the conversation was. I
25  just want to know if you had a conversation, the

Page 155

1  conversation between you, Dr. Han and Janet Taylor
2  with your current counsel. I don't want to know
3  what you told him or what he told you. I just want
4  to know if you had such a conversation.
5    A    No.
6    Q    I can't read the following line. It
7  says -- what does it say, "re" or "he" or what?
8    A    Which line?
9    Q    After BJ?
10   A    "The third arrow."
11   Q    What does that say, BJ said she can sue
12  him?
13   A    Yes.
14   Q    What is the third arrow?
15   A    I'll take action if she doesn't apologize.
16   Q    Diane Sahakian told you BJ told Diane
17  Sahakian that BJ will take action against Sahakian
18  if she doesn't apologize?
19       MR. DOWELL: Objection to the form.
20       THE WITNESS: I don't know what BJ said.
21   Q    BY MR. STROJNIK: Who was supposed to
22  apologize to whom?
23   A    Diane said that BJ told her that she
24  should apologize to him.
25   Q    Why should she apologize to him?

Page 156

1        MR. DOWELL: Object to the form.
2        THE WITNESS: I don't know.
3    Q    BY MR. STROJNIK: Are you aware of
4  anything that she had done to him?
5    A    I don't know.
6    Q    Had she wronged him in any way that you're
7  aware of?
8    A    No.
9    Q    Did BJ ever tell you that she had done
10  something to him that wronged him?
11   A    I don't know.
12   Q    You don't know or you don't remember?
13   A    I don't think BJ had told me anything.
14   Q    Did anyone ever tell you whether Diane had
15  done anything to BJ that would require her to
16  apologize?
17   A    No.
18   Q    At this point does it appear to you that
19  Diane is being ostracized by the group of men?
20       MR. DOWELL: Objection to the form.
21       THE WITNESS: I don't know.
22   Q    BY MR. STROJNIK: Well, there are the
23  following men. There's Scott Gooch. There's BJ
24  Han. There's Brett Dunlap. And there's Eric
25  Gongora. We have four men who are saying negative

Page 157

1  things about Diane. Do you recognize that?
2        MR. DOWELL: Object to form.
3        THE WITNESS: I really can't tell.
4    Q    BY MR. STROJNIK: You cannot tell if Brett
5  Dunlap said something bad about Diane? You can't
6  tell that?
7        MR. DOWELL: Object to the form.
8        THE WITNESS: He never said anything
9  directly to me about that.
10   Q    BY MR. STROJNIK: So throughout your
11  investigation you could never find anything negative
12  that Brett said about Diane?
13   A    I don't think so.
14   Q    Everything was hunkey-dorey, they were the
15  best of buddies?
16   A    I don't know that for sure.
17   Q    The following line, "Never want to see you
18  again, done with you." What does that mean?
19   A    Diane said that's what BJ told her.
20   Q    Do you have some reason to believe that
21  this was not true?
22   A    I don't know.
23   Q    Do you have some reason to believe that BJ
24  did not say this? Do you have some reason to
25  believe. If you have no reason to believe --

Page 158

1    A    I really can't tell.
2    Q    You have no reason to believe this is a
3  false statement?
4    A    I don't know. It was what Diane Sahakian
5  was telling me at that time.
6    Q    Why were you writing this down?
7    A    Because every time I had a conversation
8  with an upset employee I write them down.
9    Q    She was upset?
10   A    Yes.
11   Q    When she called you?
12   A    Yes.
13   Q    Did this conversation with BJ Han just
14 terminate, was it just done?
15        MR. DOWELL: Objection to the form.
16        THE WITNESS: No, that's not true.
17   Q    BY MR. STROJNIK: When was this
18 conversation between Diane and BJ Han that you
19 record in Exhibit 29?
20   A    I think it was maybe the day after.
21   Q    And Diane was still upset?
22   A    I think so.
23   Q    Was she crying?
24   A    She was not.
25   Q    Then you make a note. I'm sorry, did BJ

Page 159

1  ever express to you that he never wanted to see
2  Diane again and that he's done with her?
3    A    I can't answer that question.
4    Q    Did BJ have the power to fire Diane if he
5  wanted to?
6    A    He can, yes.
7    Q    He could have; correct?
8    A    Yes.
9    Q    So when he said "I never want to see you
10 again, done with you," he could have fired her right
11 then and there?
12        MR. DOWELL: Object to form.
13        THE WITNESS: No, I don't think so.
14   Q    BY MR. STROJNIK: He couldn't have fired
15 her?
16   A    No.
17   Q    What would he have to do to fire her?
18   A    He would have to talk to H.R. about it.
19   Q    Okay. You are H.R.?
20   A    Yes.
21   Q    What would you and BJ Han have to talk
22 about?
23   A    The reasons.
24   Q    And then BJ Han would have to come up with
25 some reasons?

Page 160

1    A    They have to be reasonable. They have to
2  be some reason. There has to be a reason.
3    Q    I believe, maybe I'm wrong, but my
4  impression is that you believe whatever people tell
5  you?
6    A    That's not true.
7    Q    Okay. Sometimes you don't believe what
8  people tell you?
9    A    Sometimes I don't.
10   Q    Sometimes, most of the time you believe
11 what people tell you; sometimes you don't?
12   A    It depends.
13   Q    It depends on who's telling you what?
14   A    It depends on what's being told to me.
15   Q    Okay. Let's talk about that. It depends
16 on what is being told to me. How does that impact
17 on your believing the person who is talking to you?
18        MR. DOWELL: Object to the form to the
19 extent this is all hypothetical.
20        THE WITNESS: It just depends. It does
21 not depend on the person who's telling me. It
22 depends on the circumstances surrounding that
23 conversation.
24   Q    BY MR. STROJNIK: Okay. Did you believe
25 Diane when she was telling you about her

Page 161

1  conversation with BJ Han?
2    A    I did.
3    Q    The following line, you say, and I am not
4  sure if I am reading this correctly, "She did not
5  agree with him, BJ," and then something, something?
6    A    "Handled the investigation on Scott
7  Gooch's exit interview."
8    Q    How did BJ handle the investigation of
9  Scott Gooch's exit interview?
10   A    I don't know what he did. I don't know.
11   Q    Well, I thought you told me earlier that
12 you, being STATS, engaged into an inquiry into
13 Diane's management style.
14        MR. DOWELL: Object to the form of the
15 question.
16        THE WITNESS: That's what H.R. did, but I
17 don't know what BJ did.
18   Q    BY MR. STROJNIK: Okay. Does H.R. work
19 for BJ or is H.R. within BJ's hierarchy?
20   A    No.
21   Q    The following, "Wants to keep quiet, no"
22 what?
23   A    "Direction."
24   Q    "No direction." What does that mean?
25   A    That was Diane talking about the special

Page 162

1  projects.
2        Q    Who wants to keep who quiet?
3        A    She thinks that BJ wants her to keep
4  quiet.
5        Q    Did she say I think he wants me to keep
6  quiet? Or did she say BJ said he wants me to keep
7  quiet?
8        A    I can't remember what exactly she said.
9        Q    Then the following statement is "no
10 direction." What does that relate to?
11       A    Special projects.
12       Q    What does special project mean?
13       A    I don't know.
14       Q    There are those who believe that special
15 projects are a polite way kicking people out of
16 employment. Have you heard that before?
17            MR. DOWELL:  Objection to the form.
18            THE WITNESS:  I don't know.
19       Q    BY MR. STROJNIK:  You know if you heard
20 it. Have you heard it before?
21       A    I don't think I've ever heard it.
22       Q    Okay. Then next one is "Meeting with Lay
23 Koon," doing something, something, something?
24       A    "During week of sales meeting."
25       Q    Then the following line, "She wanted to

Page 163

1  talk to BJ and Lay Koon together but BJ refuses."
2  Okay. So she wanted to meet with BJ and Tan Lay
3  Koon but BJ refused?
4        A    BJ refused to have a meeting with all
5  three of them.
6        Q    Okay. Do you know why he would refuse
7  that?
8        A    I don't know.
9             MR. DOWELL:  Object to the form.
10       Q    BY MR. STROJNIK:  Now, you testified you
11 found her complaint credible?
12            MR. DOWELL:  Object to the form the
13 question. Misstates the testimony.
14            THE WITNESS:  I did not say I found it
15 credible.
16       Q    BY MR. STROJNIK:  You believed it?
17       A    What she was telling me was her side of
18 what happened.
19       Q    Did you get BJ's side of what happened?
20       A    I did.
21       Q    What was his side?
22            MR. DOWELL:  Object to the form to the
23 extent it reiterates your concern earlier about
24 conversations with the general counsel present.
25            THE WITNESS:  Yes.

Page 164

1        Q    BY MR. STROJNIK:  Can you take a look at
2  Exhibit No. 30, please. Do you recognize this
3  exhibit?
4        A    Yes.
5        Q    Can you tell me what it is?
6        A    The date was June 28, 2007.
7        Q    Did you have your meeting -- I'm sorry.
8  Did you have your discussion with BJ Han and Janet
9  Taylor prior to the issuance of this e-mail?
10       A    I can't remember.
11       Q    Was it at or about this time?
12       A    I really can't remember.
13       Q    Exhibit No. 31. You testified earlier
14 that the inquiry into Diane's management style was
15 initiated by Jik Hoon Kaw?
16       A    Yes.
17       Q    Do you see her name on Exhibit 31
18 anywhere?
19       A    Yes, I do.
20       Q    Do you recognize this exhibit?
21       A    Yes, I do.
22       Q    When was the last time you saw it?
23       A    When I made copies for the file.
24       Q    Okay. When was the last time you read it?
25       A    After counsel sent it to Jik Hoon Kaw and

Page 165

1  copied me.
2        Q    Did you read it at that time?
3        A    When she sent it?
4        Q    Yes.
5        A    Yes, I did.
6        Q    This e-mail is inconsistent with the
7  statements made by Scott Gooch in his exit
8  interview, is it not?
9             MR. DOWELL:  Object to the form of the
10 question.
11            THE WITNESS:  I can't tell.
12       Q    BY MR. STROJNIK:  Well, we do know that he
13 said in his exit interview that Diane is the worst
14 manager that he's ever had; correct?
15       A    Yes.
16       Q    Do you see anything consistent with that
17 statement in Exhibit 31?
18       A    Not in the same words.
19       Q    Are there different words expressing the
20 same meaning somewhere in Exhibit 31?
21       A    I think there's a line on here that says
22 one of them said that she was constantly calling
23 them to check up on whether or not Scott was
24 working, saying he didn't seem that busy.
25       Q    Scott Gooch; right?

Page 166

1    A    Yes.

2    Q    Where is the consistency in Scott Gooch's

3    statement that Diane is the worst manager he has

4    ever had, and defining Diane was constantly checking

5    on Scott Gooch to make sure that he was working?

6        MR. DOWELL: Object to the form of the

7    question.

8        THE WITNESS: I don't know.

9    Q    BY MR. STROJNIK: Actually, there are some

10   statements that are entirely inconsistent with Scott

11   Gooch's statement, aren't there?

12   A    Maybe.

13   Q    Which statements do you find to be maybe

14   entirely inconsistent with Scott Gooch's statement?

15       MR. DOWELL: Object to the form of the

16   question. I believe that the witness needs to read

17   this exhibit because this is not Scott Gooch's

18   statement. This is the statement of two other

19   employees concerning their feelings of Scott Gooch.

20   So I don't want counsel to mislead the witness.

21   Q    BY MR. STROJNIK: Do you feel I am

22   misleading you?

23       MR. DOWELL: I don't think she knows that

24   you're misleading her.

25   Q    BY MR. STROJNIK: Do you believe I am

Page 167

1    trying to mislead you?

2    A    I don't know.

3    Q    What have I said that would make you

4    believe I am trying to mislead you? I am asking you

5    questions.

6    A    I don't know.

7    Q    Do you have some evidence that I'm trying

8    to mislead you?

9    A    I don't know.

10   Q    That's a pretty strong statement, isn't

11   it?

12       MR. DOWELL: I have evidence that you are

13   trying to mislead her. And I don't think she knows

14   that you're trying to mislead her.

15   Q    BY MR. STROJNIK: Am I trying to mislead

16   you?

17   A    I don't know.

18   Q    What evidence do you have that I'm trying

19   to mislead you?

20   A    I don't know.

21   Q    Okay.

22       MR. DOWELL: Do you want me to tell you

23   what evidence I have?

24       MR. STROJNIK: No, Counsel, when your

25   deposition time comes, it will come.

Page 168

1    Q    BY MR. STROJNIK: Let me ask you this

2    question. Is it within the policy of STATS ChipPAC

3    to allow its vendors or to encourage its vendors to

4    refer to people as idiots?

5        MR. DOWELL: Object to the form of the

6    question.

7        THE WITNESS: No, it's not in their

8    policy.

9    Q    BY MR. STROJNIK: What should occur when

10   STATS or if STATS finds out that one of its vendors

11   is referring to people as idiots?

12       MR. DOWELL: Object to the form of the

13   question.

14       THE WITNESS: It depends.

15   Q    BY MR. STROJNIK: That's not a good thing,

16   is it?

17   A    It depends.

18   Q    Are you aware that during Diane Sahakian's

19   deposition your counsel, the man sitting to your

20   left, came into the room and began laughing at Diane

21   Sahakian when he didn't like the answers that he was

22   given?

23       MR. DOWELL: Object to the form of the

24   question. Completely misstates the event. This

25   witness was not there at the event. These questions

Page 169

1    are harassing. Counsel, I suggest you move on to

2    some other legitimate questions or we'll be finished

3    here.

4    Q    BY MR. STROJNIK: Are you aware that --

5        MR. DOWELL: One more question --

6    Q    BY MR. STROJNIK: Are you aware that your

7    counsel has called me and my son two idiots, cretins

8    and morons? Is that how your vendors conduct

9    business?

10       MR. DOWELL: We are off the record.

11       MR. STROJNIK: No, we are not.

12       MR. DOWELL: Oh, we're leaving, Counsel.

13   Gail, let's go.

14       MR. STROJNIK: Let the record reflect the

15   witness and counsel have stood up without

16   authorization and they've left.

17       MR. DOWELL: I don't need your

18   authorization. I told you can ask legitimate

19   questions. You refused to do so. And we're done.

20              (Whereupon, the deposition of

21               Gail Uy was concluded at 1:45

22               p.m.)

23

24   Date:_____, 2009

25

_____
GAIL UY

Page 170

1          I, MONICA A. COMER, C.S.R. #11017, a
2    Certified Shorthand Reporter of the State of
3    California, do hereby certify:
4          That the witness in the foregoing
5    deposition was by me duly sworn to tell the truth,
6    the whole truth and nothing but the truth;
7          That the said deposition was taken down by
8    me, a Certified Shorthand Reporter, at the time and
9    place therein named and thereafter reduced to
10   typewriting;
11         And that the witness was given the
12   opportunity to read and, if necessary, correct the
13   said deposition and to subscribe the same.
14         I further certify that I am not of Counsel
15   or Attorney for either or any of the parties in the
16   foregoing deposition and caption named, or in any
17   way interested in the outcome of the cause named in
18   said caption.
19   Dated: _____, 2009
20
21
22         _____
           Monica A. Comer, C.S.R. No. 11017
23
24
25