Peter Strojnik, 006464
3030 North Central Avenue, Suite 1401
Phoenix, Arizona 85012
Telephone: 602-524-6602
Facsimile: 602-296-0135
e-mail: *ps@strojnik.com*
Attorney for Plaintiff

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| DIANE SAHAKIAN, a single woman,<br><br>Plaintiff,<br><br>vs.<br><br>STATS ChipPAC, Inc., a foreign corporation; STATS ChipPAC, Ltd., a foreign corporation; TEMASEK HOLDINGS PRIVATE LIMITED, a foreign corporation; SINGAPORE TECHNOLOGIES SEMICONDUCTORS PRIVATE LIMITED, a foreign corporation.<br><br>Defendants. | NO. CV-08-241-PHX-HRH<br><br>**PLAINTIFF'S REPLY TO DEFENDANTS' RESPONSE TO MOTION FOR IN CAMERA EXAMINATION OF GAIL UY REGARDING THE MEETING WITH CORPORATE COUNSEL**<br><br>(Crime – Fraud Exception) |

**REPLY**

STATS offers two factual disagreements: First, it argues that "Plaintiff has not established that the meeting between Dr. Han, Ms. Uy and Ms. Taylor occurred before Plaintiff's reassignment to the position of Vice President of Special Projects" (See Doc 174 at 4). As a backup position, STATS argues, "Furthermore, Plaintiff's 'inference' that Ms. Taylor provided advice about terminating Plaintiff's employment completely disregards the fact that STATSChipPAC did not terminate Plaintiff's employment until July 2008 – eleven months

-1-

*after* Plaintiff alleges the meeting in question occurred." Id.  Although STATS could easily disclose the *date* of the meeting between Uy, Taylor and Han to support its factual argument, it chose not to do so.

**The Facts Necessary to Determine This Motion are Not in Dispute**

BJ Han's state of mind vis-à-vis Diane Sahakian as of August 7, 2007, was described by Ms. Sahakian in her deposition. *See*, Sahakian Deposition at V. 1 189:17-23 (Exhibit 1).[1]:

> He [Han] screamed at me for three and a half hours saying, I am done with you, I am D-O-N-E -- I think he spelled it about 20 times. I am done, D-O-N-E, I never want to see your face again, I never want to see you again, I don't want to know you. I don't know how many times he repeated that. And asked me to sue him. He said he could defend himself.

Thus, as of August 7, 2007, BJ Han's state of mind was straightforward – he was "done, D-O-N-E" and he "never want[ed] to see [Ms. Sahakian's] face again" and he "never want[ed] to know [Ms. Sahakian]". Id. BJ Han wanted Diane Sahakian fired. There is no dispute on this issue.

Ms. Sahakian called Ms. Uy the day following her "I'm D-O-N-E with you" discussion with BJ Han: "[The conversation between Gail Uy and Ms. Sahakian occurred] "maybe the day after" the conversation between BJ Han and Ms. Sahakian. *See*, Uy Deposition at 158:20 (Exhibit 2).

All parties agree that following the Uy – Sahakian conversation on August 8, 2007, there was a conversation between Uy, Taylor and BJ Han. Independent evidence confirms that on

---

[1] See also Sahakian, pp 227-234 (describing the August 7, 2007 "I'm D-O-N-E with you" discussion. (Exhibit 1) *See also* Gail Uy Deposition.

August 13 – three business days after the "I'm D-O-N-E with you" conversation, Ms. Sahakian was placed on "Special Projects" and stripped of her Vice President title. (BJ Han Email and Org. Chart, Exhibit 3).

STATS proposes that Ms. Sahakian was put on "special projects" because of "high employee turnover and employee dissatisfaction." *See*, Doc 174 at 4.  The "high employee turnover" relates to BJ Han's transfer of Messrs. Gongora and Dunlap from Diane's Emerging Technologies Group to the Product Line Marketing Group. [Note:  The transfer was affected by BJ Han, not Ms. Sahakian.] The "employee dissatisfaction" refers to BJ Han's "I'm D-O-N-E with you" speech.

But the term "special projects" has a special meaning within STATSChipPac: "A 'special project" has been clearly understood as a "kiss of death" at STATSChipPAC." (Declaration of Ramakrishna, Exhibit 4). "A special project is a fictional duty within the company used to politely force a person out of the particular company". (Declaration of Ewanich, Exhibit 5).  "[It] is standard practice for companies to take way their direct reports and reassign an employee to a "special project" if the company no longer wants the employee to work there any longer." Id.  Clearly, Messrs. Ramakrishna's and Ewanich's understanding of "special projects" as a "kiss of death" makes sense when imposed 3 business days after BJ Han's "I'm D-O-N-E with you" speech.

It is also clear that BJ Han had the power to terminate Ms. Sahakian during the "I'm D-O-N-E with you" speech, but did not have the ability to do it at that time according to Ms. Uy. During her deposition, Ms. Uy pointed out that BJ Han needed to talk to HR about terminating Diane first.  Hence, a discussion was had between BJ Han and Gail Uy…*and Janet Taylor*.  A

few days after the Han – Uy – Taylor conversation, Sahakian was put into a position that former STATS employees recognize as a polite demotion and kiss of death and on her way out. Ms. Uy's testimony clarifies:

> Q   BY MR. STROJNIK:  When was this conversation between Diane and BJ Han that you record in Exhibit 29?
>
> A   I think it was maybe the day after.
>
> Q   And Diane was still upset?
>
> A   I think so.
>
> Q   Was she crying?
>
> A   She was not.
>
> Q   Then you make a note.  I'm sorry, did BJ ever express to you that he never wanted to see Diane again and that he's done with her?
>
> A   I can't answer that question.
>
> Q   Did BJ have the power to fire Diane if he wanted to?
>
> A   He can, yes.
>
> Q   He could have; correct?
>
> A   Yes.
>
> Q   So When he said "I never want to see you again, done with you," he could have fired her right then and there?
>
> MR. DOWELL:  Object to the form.
>
> THE WITNESS:  No, I don't think so.
>
> Q   BY MR. STROJNIK:  He couldn't have fired her?
>
> A   No.

-4-

```
Q    What would he have to do to fire her?

A    He would have to talk to HR about it.

Q    Okay.  You are H.R.?

A    Yes.

Q    What would you and BJ Han have to talk about?

A    The reasons.

Q    And then BJ Han would have to come up with some reasons?

A    They have to be reasonable.  They have to be some reason.  There has to be some reason.
```

It indeed appears that Han did not have the reasonable reasons to terminate Ms. Sahakian as she was not terminated after the Han – Taylor – Uy conversation. What *did* occur however was the inclusion of a legally-informed STATS general counsel into the conversation, which was quickly followed by what is recognized as a kiss of death and demotion – Special Project.

The question then, is, did Han, Taylor and Uy during their discussion agree to put Ms. Sahakian on "special projects", thus conspiring to violate Sahakian's rights, see 18 U.S.C. § 241 (Conspiracy Against Rights[2])? If so, then the attorney-client privilege does not apply. If

---

[2] If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or

If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured—

not, then the second question is, did Uy, Han and Taylor attempt, "in bad faith to defeat, or at least reduce, the rightful claim [of Diane Sahakian]"? If so, then the crime fraud exception applies and the communication is not protected. *See United Services Automobile Ass'n v. Werley*, 526 P.2d 28, 33 (Alaska 1974).

STATS is correct, of course, that we do not know what agreements were actually reached during the Uy – Han – Taylor discussions following the "I'm D-O-N-E with you" speech on August 7, 2007, and just prior to the "kiss of death" special project assignment. Hence, the in camera inspection.

**STATS Failed to Carry Its Burden of Persuasion**

Pursuant to the Federal Rules of Civil Procedure, a party is entitled to "obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party, . . . ." Fed.R.Civ.P. 26(b)(1). Generally, the purpose of discovery is to remove surprise from trial preparation so the parties obtain evidence necessary to evaluate and resolve their dispute. *Ragge v. MCA/Universal Studios*, 165 F.R.D. 601, 604-605 (C.D. Cal. 1995) *quoted in Roehrs v. Minnesota Life Insurance Company*, 03-1373-PHX-LOA. (D.Ariz. 06/13/2005). "Toward this end, Rule 26(b) is liberally interpreted to permit wide-ranging discovery of all information reasonably calculated to lead to discovery of admissible evidence; but the discoverable information need not be admissible at the trial." Id.; *U.S. ex rel Schwartz v. TRW, Inc.*, 211

---

They shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, they shall be fined under this title or imprisoned for any term of years or for life, or both, or may be sentenced to death.

F.D.R. 388, 391 (C.D. Cal. 2002). The party resisting production bears the burden of persuasion. *Cable & Computer Technology, Inc. v. Lockheed Saunders, Inc.*, 175 F.R.D. 646, 650 (C.D.Cal. 1997); *Roerhs*, supra. ("[T]he party who resists discovery has the burden to show that discovery should not be allowed, and has the burden of clarifying explaining and supporting its objections."). The party seeking to invoke the protection of the attorney-client privilege carries the burden of proving to a reasonable certainty that the elements of the privilege exist. *Clarke v. American Commerce National Bank*, 974 F.2d 127, 129 (9th Cir. 1992); *United States v. Abrahams*, 905 F.2d 1276, 1283 (9th Cir. 1990). Because the privilege "impedes full and free discovery of the truth," the privilege is strictly construed. *Roman Catholic Diocese v. Superior Court*, 204 Ariz. 225, 230, 62 P.3d 970, 975 (App. 2003); *Weil v. Investment/Indicators, Research and Management, Inc.*, 647 F.2d 18, 24 (9th Cir. 1981); *EEOC v. Safeway Store, Inc.,* 2002 WL 31947153, *3 (N.D.Cal. 2002). Moreover, in discovery matters, including rulings on the assertion of the attorney-client privilege, Arizona law provides the trial judge with broad discretion, reviewed only for abuse, which includes the right to decide controverted factual issues, to draw inferences where conflicting inferences are possible and to weigh competing interests. *Lee*, 13 P.2d at 1174; *Brown v. Superior Court*, 137 Ariz. 327, 331, 670 P.2d 725, 729 (1983).

Here, STATS has failed to carry its burden of persuasion. Instead, it focuses it argument on characterizing Plaintiff's arguments on the content of the three-way conversation as speculative. However, it is difficult to characterize the events as speculative when a STATS officer states he is "D-O-N-E" with Sahakian and never wants to see her face again, which is followed by the three-way meeting and subsequent demotion. Sure, STATS could not fire Ms.

Sahakian after the "I'm done with you" speech, but they certainly believed they could put her into a position that "basically gives notice to the employee that the employee should begin to find new employment or else they will ultimately be fired." *See*, Ewanich Decl. Indeed, this is exactly what happened to Ms. Sahakian.

## CONCLUSION AND PRAYER FOR RELIEF

Sufficient indicia of crime and/or fraud exist to warrant an in-camera interview of Gail Uy with respect to the discussions with corporate counsel during a three day period just prior to the retaliatory demotion of Plaintiff in violation of Title VII.

RESPECTFULLY SUBMITTED this 26th day of June, 2009.

**PETER STROJNIK, P.C.**

_____
Peter Strojnik
Attorney for the Plaintiff