UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

|  |  |  |
|---|---|---|
| Diane Sahakian, a single woman, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | No. CV08-241-PHX-HRH |
| STATS ChipPAC, Inc., a foreign corporation; STATS ChipPAC Ltd, a foreign corporation; Temasek Holdings Private Limited, a foreign corporation; Singapore Technologies Semiconductors Private Limited, a foreign corporation, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

THE DEPOSITION OF DIANE SAHAKIAN
(Videotaped)

Phoenix, Arizona
March 17, 2009
9:04 a.m.

PREPARED FOR:

(CONDENSED COPY)

REPORTED BY:
Az Litigation Support, LLC
Marty Herder, CCR
Certified Court Reporter
CCR No. 50162

© AZ LITIGATION SUPPORT (480)481-0649

2

1                        I N D E X

2    Examination By:                        Page:

3    Ms. Larsen                             5, 250

4    Mr. Strojnik                           237

5

6

7

8                      E X H I B I T S

9    No. 1    E-mail to Diane Sahakian from
              Byung Joon Han                      23
10
     No. 2    Performance review                  48
11
     No. 3    E-mail to B.J. Han from Diane Sahakian    102
12
     No. 4    E-mail string between B.J. Han and
13            Diane Sahakian                      107

14   No. 5    Correspondence between B.J. Han and
              Diane Sahakian                      132
15
     No. 6    E-mail to B.J. Han from Diane Sahakian    135
16
     No. 7    E-mail to Diane Sahakian           217
17
     No. 8    E-mail to Tan Lay Koon from Diane Sahakian  226
18
19

20

21

22

23

24

25

3

1              THE DEPOSITION OF DIANE SAHAKIAN,

2     Taken at 9:04 a.m., on March 17, 2009 at the Law Offices of

3     OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C., 2415 East

4     Camelback Road, Suite 800, Phoenix, Arizona, 85016, before

5     Marty Herder, Certified Court Reporter, pursuant to the

6     Rules of Civil Procedure.

7

8     COUNSEL APPEARING:

9     For the Plaintiff:

10    PETER STROJNIK, P.C.
      BY:  Peter Strojnik, Esq.
11    3030 North Central Avenue
      Suite 1401
12    Phoenix, Arizona  85012

13

14    For the Defendants:

15    OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
      BY:  Caroline Larsen, Esq.
16    2415 East Camelback Road
      Suit 800
17    Phoenix, Arizona 85016

18

19

20

21

22

23

24

25

4

1                                              Phoenix, Arizona
                                                March 17, 2009
2                                                   9:04 a.m.

3

4                      P R O C E E D I N G S

5

6              THE VIDEOGRAPHER:  Good morning.

7              My name is Brent Jensen, certified legal-video

8    specialist with K-Video Productions.

9              Our court reporter is Marty Herder representing

10   Arizona Litigation Support.  Their address is 3788 East

11   Libra Place, Suite 10, Chandler, Arizona.

12             We are at the law offices of Ogletree, Deakins,

13   Nash, Smoak & Stewart, 2415 East Camelback Road, Suite 800,

14   in Phoenix, Arizona, to take the deposition of Diane

15   Sahakian on behalf of the defendants in the United States

16   District Court of Arizona case of Sahakian versus STATS

17   ChipPAC Incorporated, et al.

18             Case number CV08-241-PHX-HRH.

19             The date is March 17th, 2009, and the time is

20   9:05 a.m.

21             The attorneys will now introduce themselves.

22             Plaintiffs first, please.

23             MR. STROJNIK:  My name is Peter Strojnik.  I'm

24   here for the plaintiff.

25             MS. LARSEN:  I am Caroline Larsen with the firm of

1    Ogletree, Deakins, Nash, Smoak & Stewart on behalf the

2    defendants STATS ChipPAC, Inc., and STATS ChipPAC Limited.

3            THE VIDEOGRAPHER:  Thank you.

4            Please swear in the witness.

5

6                    DIANE SAHAKIAN,

7    called as a witness herein, having been first duly sworn,

8    was examined and testified as follows:

9

10                E X A M I N A T I O N

11   BY MS. LARSEN:

12       Q.   Could you state your full name for the record.

13       A.   Diane Sahakian.

14       Q.   And have you ever used any other names, maiden

15   names or anything else?

16       A.   No, I have not.

17            That is my maiden name, by the way.

18       Q.   Oh.  Have you ever had your deposition taken

19   before?

20       A.   Yes.

21       Q.   And when was that?

22       A.   I did it at STATS Chip on behalf of STATS ChipPAC

23   in the patent litigation lawsuit by Tessera, and that was

24   April 2007 time frame.  And then again about a month back,

25   again in the same lawsuit.

6

```
 1              By the way, so everyone knows, I don't hear very
 2    well, so I just need to make sure everyone speaks up.
 3              Okay.
 4        Q.   The court reporter will appreciate it too, so
 5    we'll do our best.
 6        A.   Okay.
 7        Q.   And what was your role in the Tessera patent
 8    action?
 9        A.   I was deposed on behalf of -- well, I represented
10    both myself and also I was a corporate deposition on behalf
11    of R&D.
12        Q.   When you say R&D, do you mean research and
13    develop.
14        A.   Yes.
15        Q.   Okay.  So you were deposed as a witness.
16        A.   Twice, yes.
17        Q.   Not as an individual party --
18        A.   It was an individual as well as on behalf of the
19    research and development group.  In place of Kenny Lee, and
20    B.J. Han, I believe.
21              It was my understanding that Kenny Lee was unable
22    to make the deposition, so I took it for him.
23        Q.   Just a couple of guidelines before we get started.
24    You were just sworn in.  Everything you say here today is
25    under oath.  It will be treated as sworn testimony in any
```

7

1    future proceedings including the trial in this action.

2              I'm going to ask you questions.

3              If you don't understand a term I use or if you

4    don't hear the question, please feel free to ask me to

5    repeat it or rephrase it or explain it.

6              If you proceed to answer a question, I'm going to

7    assume that you understood what I meant.

8         A..   Okay.

9         Q.   The court reporter will be transcribing everything

10   you say today.

11             To help him make a clean record, it helps if you

12   verbalize your answer.  He can't transcribe a nod or

13   shake --

14        A.   Uh-huh.

15        Q.   -- of the head or uh-huh or huh-uh.

16        A.   Okay.

17        Q.   Also he can only transcribe one person speaking at

18   a time, so I will do my best to not talk over you when

19   you're answering a question or speaking.

20             It will help if you let me answer(sic) the

21   question and then proceed to answer.

22             During the course of the deposition your attorney

23   may make objections to questions I ask.  Generally he's just

24   making an objection to preserve the record.

25             Unless he directs you otherwise, just let him

1   state the objection for the record and then go ahead and

2   proceed to answer the question.

3          We have a bathroom here, coffee, water.  If you

4   want to take a break at any point, if you need to get up and

5   walk around, just let me know and we'll be happy to take a

6   break.

7          The only thing that I ask is that if there's a

8   question pending you go ahead and answer the question and

9   then we'll go ahead to proceed to take a break.

10         Do you understand all these instructions?

11     A.   Yes.  If you don't mind, I wanted to start off

12  with a water.  Is that okay?

13     Q.   Absolutely, just unhook the mic.

14         MR. STROJNIK:  I'm good.  Thanks.

15         THE VIDEOGRAPHER:  Go off?

16         MS. LARSEN:  Just clip back on.

17         MR. STROJNIK:  Nothing.

18  BY MS. LARSEN:

19     Q..  Do you have any questions before we start?

20     A.   No.

21     Q.   Are you physically and mentally able to answer

22  questions today?

23     A.   I hope so.

24     Q.   Do you have any reason you wouldn't be able to

25  physically understand questions and answer truthfully?

9

```
 1        A.    I mean, my memory is a little bit shot, but I
 2   think I should be okay.
 3        Q.    What do you mean when you say your memory is shot?
 4        A.    I've been a little bit fuzzy recently.
 5        Q.    Are you under the influence of any medications or
 6   other substances that would affect your memory or your
 7   ability to testify truthfully?
 8        A.    No.
 9        Q.    Are you aware of any physical impairment you have
10   that affects your memory?
11        A.    No..
12        Q.    What did you do to prepare for your deposition
13   today?
14        A.    I reviewed a letter, which was written by
15   Mr. Strojnik to your firm, and copied -- I think David Ball
16   was on copy.
17              It's essentially a summary of the case.
18        Q.    Do you know when that letter was sent?
19        A..   I'm sorry?
20        Q.    Do you know when the letter was sent?
21        A.    No.
22              But it must have been in the last three months,
23   since it was in preparation for the deposition, I believe.
24              MR. STROJNIK:   I believe it was November 6 that I
25   wrote the letter.
```

1            MS. LARSEN:  Okay.

2            THE WITNESS:  What it was?

3            MS. LARSEN:  I'm just asking for testimony from

4    her.

5            THE WITNESS:  What was it?

6            MR. STROJNIK:  I think it was November 6.

7            THE WITNESS:  Oh, was it?  Okay.

8            MS. LARSEN:  I just want to clarify.  If she

9    doesn't understand, I would prefer she state she not know or

10   not understand.  It's actually not appropriate for you to

11   intervene on behalf of the plaintiff.

12           MR. STROJNIK:  Sure.  I was just trying to

13   helpful.

14           MS. LARSEN:  I appreciate that.  But I don't

15   actually want to test your memory, just hers.  So if you

16   could just let her answer the questions, unless you have

17   objections.

18           MR. STROJNIK:  Absolutely.

19   BY MS. LARSEN:

20      Q.   Did you review any other documents in preparation

21   for her deposition?

22      A.   No.

23      Q.   Did you meet with your attorney in preparation for

24   your deposition?

25      A.   Yes.

1      Q.    When was that?

2      A.    Yesterday and briefly this morning.

3      Q.    Did you speak to anyone other than your attorney

4   about your deposition?

5      A.    Just family members, that I was going to be busy

6   today.

7      Q.    Anyone else?

8      A.    No..

9      Q.    What's your date of birth?

10     A.    April 23rd, '61.

11     Q.    What's your current home address?

12     A.    1330 East Calle de Caballos, that's C-A-L-L-E,

13   D-E, C-A-B-A-L-L-O-S, Tempe, 85284.

14     Q.    When did you begin working at ChipPAC?

15     A.    When you say ChipPAC, you mean STATS ChipPAC, or

16   STATS, or -- because I worked at ChipPAC.  I had left.  I

17   joined STATS.  And then STATS and ChipPAC merged.  So I

18   don't know what start date you want.

19     Q.    Oh, I'm referring to ChipPAC specifically.

20     A.    ChipPAC specifically.

21           When did I join..

22           Roughly '97 time frame, I want to say.  I was

23   there about three years.

24     Q.    And which office or location did you work at?

25     A.    ChipPAC, it was Santa Clara, California.

12

1     Q.    And do you recall how much you earned when you

2   started at ChipPAC?

3     A.    Started at ChipPAC.

4           Um, I would say roughly 108, 108,000.

5           I don't really remember, but I think somewhere

6   around there.

7     Q.    And what was your position at ChipPAC when you

8   started?

9     A.    At ChipPAC I was initially a sales manager.

10          And a year later I transitioned over to -- back to

11   the technical side to technical program manager.

12    Q.    And did you remain in the position of technical

13   program manager until you left ChipPAC?

14    A.    Yes.

15    Q.    And what were your job responsibilities as

16   technical program manager?

17    A.    Essentially every technical program manager had a

18   list of customers they were responsible for providing

19   essentially application support to.  Technical support.

20          You were the liaison between customer and the

21   factory on all technical quality issues, new product

22   development issues.

23          So we spent a lot of time with the customers

24   actually, more than internal.

25    Q.    During the time that you worked at ChipPAC did you

1    manage any other employees?

2         A.    When I was a sales manager, yes.

3               As a sales manager I had what's called an account

4    management representative, and I had a TPM.

5               When I became a TPM, no.  You're pretty much an

6    individual technical member at that point.

7         Q.    Who was your manager or supervisor when you were a

8    TPM as ChipPAC?

9         A.    Ken Sicz, S-I-C-Z.

10        Q.    Did you receive any promotions while you worked at

11   ChipPAC?

12        A.    Yes.  Yes, I don't recall what they were though.

13   I always had good reviews there though, I remember.

14        Q.    Were you --

15        A.    Well, I should actually clarify that.  As a TPM

16   you don't really -- you don't change your title.  You're

17   always a TPM.  But you may go up grade levels or salary

18   levels with the same title.

19              So if you're talking about promotion in the sense

20   of a title, no.

21              In terms of salary, perhaps.

22        Q.    Why did you leave ChipPAC?

23        A.    I actually -- many reasons actually.

24              One was I was offered a position at STATS as a

25   product manager, which was a step up career-wise.

14

1           At the time they were very short staffed, and I

2   was working 6:00 in the morning until 10:00 o'clock at

3   night, routinely, and I had a small daughter to take care

4   of, and I didn't think this was healthy for her or healthy

5   for myself in terms of quality of life and taking care of my

6   daughter.  So when a new opportunity came up, I thought why

7   not.

8       Q.   And to clarify, when you say they were short

9   staffed, you are referring to ChipPAC at the time that they

10  worked there.

11      A.   Yes.

12           The good news was business was good, but there was

13  not enough people to cover the business.

14      Q.   And when did you leave your position at ChipPAC?

15      A.   I'm sorry, what was that?

16      Q.   When did you leave your position at ChipPAC?

17      A.   I don't know exactly.  Probably -- I know I joined

18  STATS in August 1999, so roughly one or two months before.

19  I would say July 1999 roughly.

20           Maybe June.  I don't remember.

21      Q.   Do you recall how much you were earning when you

22  left ChipPAC?

23      A.   No.

24      Q.   And where did you go to work after leaving

25  ChipPAC?

15

1       A.   STATS.

2            And I relocated at that time.

3            I relocated from California to Arizona at that

4    time and helped them start their new office.

5       Q.   And this was in August -- July, August, 1999, time

6    frame.

7       A.   Yes, August, 1999.

8       Q.   Why did you move to Arizona?

9       A.   Um, cost of living was a big one.  And it was too

10   hectic for me in the Bay Area to afford the lifestyle I

11   wanted for my daughter in terms of having her in good

12   schools and living in the same location and schools.

13           My work schedule was so demanding that I couldn't

14   have my daughter in daycares and pick her up in enough time

15   with all the congestion and traffic in the Valley.

16           I knew that here in Arizona I could live in a

17   home, get out of an apartment finally, live in a home, and

18   have my daughter close to school, my home close to school,

19   and work close to school.

20           That was the biggest.  And frankly I like the warm

21   weather.

22           Those are the major drivers.

23      Q.   That's what bring everybody here.

24      A.   Actually I was born here, and I wanted to come

25   back.  So it was an opportunity to come back.

1       Q.   And when you started, which office or location of

2  STATS did you work at?

3       A.   For a very brief time, just when I went through

4  orientation and getting situated until I got relocated, I

5  was actually in their Milpitas office.

6            But very soon after I moved to the Tempe location,

7  in Arizona.

8       Q.   And what position did you hold when you first

9  started working at STATS?

10      A.   Product manager.

11      Q.   And what were your job responsibilities as a

12 product manager?

13      A.   You were responsibility for a product line.

14           And the way STATS or any subcontractor operates

15 here in the US is all the offshore manufacturing is in Asia,

16 and their sales, technical, and design support offices

17 throughout the U.S. primarily serviced customers.

18           So, again, pretty much everything here in the U.S.

19 was a liaison between the customers and the factories

20 overseas.

21           So as a product manager, I had a product line.  It

22 was a -- it was called PBGA, plastic ball grid array,

23 product line.  And I basically did technical sales and

24 technical support with the customers based product line.

25      Q.   I'm sorry, what was the product line?

```
 1      A.   It's called PBGA, and variations of PBGA.  It

 2  wasn't just one device package.  So, it stands for plastic

 3  ball grid array.

 4      Q.   Plastic --

 5      A.   Plastic ball grid array.

 6      Q.   Pog, P-O-G?

 7      A.   Ball, like ball.

 8      Q.   Plastic -- plastic ball grid?

 9      A.   Grid, yes.  Like grid work.

10      Q.   Array?

11      A.   Yes, array, A-R-R-A-Y.

12      Q.   And what is that?

13      A.   It's a package to essentially house and

14  interconnect a semiconductor device.

15      Q.   Is semiconductor device packaging the bulk of

16  STATS's -- I'm sorry, STATS' product line?

17      A.   Yes, they do strictly assembly and testing of

18  semiconductor chips.  So they receive the wafers from the

19  customers, and essentially slice and dice them, attach them

20  into some type -- form of a substrate, interconnect them,

21  encapsulate them, test them, and then usually send back the

22  customer or some other end user.

23      Q.   And is the essential process or product line of

24  STATS and STATS ChipPAC the same?

25      A.   I'm not quite sure of your question there.
```

18

1      Q.   Did the product lines or the -- what the products

2    and services the company offered change when STATS and

3    ChipPAC merged?

4      A.   No, actually they were -- they were in the same

5    line of business.  They were actually competitors.  But the

6    merger was a very, in my opinion, sensible one actually,

7    because ChipPAC's strengths were STATS' weaknesses and

8    vice versa.  STATS' strengths were ChipPAC's weaknesses.

9           STATS was very strong in test, not so strong in

10   packaging, and ChipPAC was very strong in packaging and very

11   week in test.

12          So it was a good complement.  And additionally

13   their customer base overlapped in only like four or six

14   customers, which is also pretty good.  It was a sensible

15   merger.

16     Q.   When you started as a product manager at STATS,

17   did you manage any other employees?

18     A.   Initially, no, I was a project manager initially,

19   with no one underneath me.  And then management over time

20   kept moving me up.

21     Q.   Who was your manager when you first began working

22   at STATS?

23     A.   Joe Joroski.

24     Q.   Joe?

25     A.   J-O-R-O-S-K-I.

                    ©  AZ LITIGATION SUPPORT (480)481-0649

1     Q.   And did you have any issues or problems with Joe?

2     A.   No.

3          And soon after -- because he got redeployed to

4     Singapore as an expatriate, so I was only under him maybe

5     six months.  I'm not sure.

6          I immediately began reporting to Jay Ewanich,

7     E-W-A-N-I-C-H.

8     Q.   And were you ever promoted at STATS?

9     A.   Promoted?

10    Q.   Promoted, were you ever promoted at STATS?

11    A.   Yes, several times.

12    Q.   When was your first promotion?

13    A.   I want to say roughly 2001.  I was promoted from a

14    product manager to a senior product manager.

15         2003 time frame maybe -- there's different levels

16    of management, by the way.  So different pay grades.  So it

17    could be senior manager and two pay grades.

18         And then about two years later, roughly 2003 time

19    frame I want to say, director.

20         After the merger, immediately senior director.

21         2006 vice president.

22    Q.   Was that it?

23    A.   Uh-hmm.

24    Q.   I'm sorry, was that a yes?

25    A.   Yes.  I'm sorry.

1    Q.   Okay.

2         And when you were promoted to senior product

3    manager in roughly 2001, do you recall who recommended you

4    for that promotion?

5    A.   I'm sorry, the promotion to senior product

6    manager.

7    Q.   Yes, who recommended you for the promotion to

8    senior product manager?

9    A.   It would have either been Jay Ewanich -- I don't

10   remember, Jay Ewanich or B.J. Han.

11   Q.   And do you recall who recommended you for the

12   promotion to director?

13   A.   B.J. Han.

14   Q.   And do you recall who recommended you for the

15   promotion to senior director?

16   A.   B.J. Han.

17   Q.   And do you recall in 2006 who recommended you for

18   the promotion to vice president?

19   A.   No.  Because there was gross inconsistencies

20   there.

21        Scott Jewler was my supervisor at the time, but

22   later on B.J. advised me that Scott did not promote me,

23   someone else did, and I was never told who.

24        I still don't know who promoted me.

25   Q.   Did you ask B.J. Han who recommended you for the

1    promotion?

2        A.    Yes.

3        Q.    And what was his response?

4        A.    He was vague.  He just said someone else did.

5        Q.    Excuse me.

6              And during the time you worked for STATS, did you

7    ever report to Kevin Moody?

8        A.    Yes.

9        Q.    When was that?

10       A.    That was after Jay Ewanich.

11             Jay had left the company, and I want to say it was

12   roughly two -- sorry for mumbling.

13             Somewhere around 2002.

14       Q.    And how long did you report to Kevin Moody?

15       A.    I believe he was with the company less than a

16   year.

17       Q.    And did you report to him during that entire time?

18       A.    I'm sorry?

19       Q.    Did you report to Mr. Moody during the entire year

20   or so he was with STATS?

21       A.    Yes.  He was Jay Ewanich's replacement.

22       Q..   And do you recall what Mr. Moody's title was?

23       A..   Maybe director.  I'm not sure.

24       Q.    And what was your job title at that time?

25       A.    Senior product manager probably.

                © AZ LITIGATION SUPPORT (480)481-0649

1       Q.    Did you have any issues or problems with Kevin

2   Moody?

3       A.    Yes.

4       Q.    What kind of issues?

5       A.    The whole group had issues with him, and it was a

6   number of things.  He would basically be missing in action a

7   lot of times.  Nobody knew where he was.

8             He either didn't show up to customer meetings or

9   was very late.

10            In fact, senior management was becoming very

11  irritated about that, and talked to him about that many

12  times.

13            He, given his resume, which was rather impressive,

14  did not appear to know our business well at all.

15            And so what ended up happening is all of us

16  underneath him had to bail him out all the time, which was

17  okay.  But, on top of that, I think as insecurities built,

18  he became more and more aggressive toward the team.

19            So it just basically spiraled downhill for the

20  whole group.

21            So B.J. took him out and said that you're in

22  charge of this group.

23            And I became the manager at that point.

24      Q.    I'm sorry, when you --

25      A.    I became manager of the group at that point in

© AZ LITIGATION SUPPORT (480)481-0649

1  time.

2      Q.   Okay.  But when you said B.J. took him out, do you

3  mean B.J. terminated Kevin Moody?

4      A.   Yes, he did.

5      Q.   That could mean anything, took him out.

6           And when you say the group, was there -- was that

7  a specific group, did it have a name or --

8      A.   At that time it was product managing, I think.  I

9  think it was just called product management at that point in

10  time.

11          MS. LARSEN:  I'd like to have that marked as

12  Exhibit 1.

13              (Deposition Exhibit No. 1 was marked for

14  identification by the reporter.)

15  BY MS. LARSEN:

16      Q.   You have what's -- in front of you what's been

17  marked as Exhibit 1.

18          Have you seen this e-mail before?

19      A.   One second, please.

20          (Brief pause.)

21          THE WITNESS:  I don't remember it, but I may have

22  received it.

23          I mean, this is -- what is this, 2001.

24          Yeah, I don't remember this.  But I'm sure I

25  received it.

24

1   BY MS. LARSEN:

2       Q.   And what's marked as Exhibit 1 appears to be an

3   e-mail from Byung Joon Han.  Is that who you refer to as

4   B.J. Han?

5       A.   Yes.

6       Q.   And it's addressed to you.

7       A.   Yes.

8       Q.   The bottom e-mail.

9       A.   Yes.  I mean, the, the lower half of the e-mail is

10  addressed to me.  The upper I didn't see.

11           I mean, I never saw this in my file, is what I'm

12  saying..

13      Q.   Okay.

14           So the top of the e-mail is B.J. Han forwarding

15  the e-mail to someone else, but the bottom e-mail is

16  addressed to you.

17      A.   Correct.

18      Q.   The e-mail he's forwarding; is that correct?

19      A.   Correct..

20      Q.   And did you have a discussion with Dr. Han

21  sometime in November of 2001 about issues between you and

22  Kevin Moody?

23      A.   Oh, I'm sure.  Everybody had issues with him.

24      Q.   And when you say everyone had issues with him, do

25  you mean Kevin Moody?

© AZ LITIGATION SUPPORT (480)481-0649

 1    A.    Yes, the entire group was complaining to B.J.

 2  about him.

 3    Q.    B.J..'s e-mail states it's seeing more and more

 4  pictured as people conflict, mostly you and Kevin.

 5          Did Dr. Han have concerns that you were having a

 6  personality conflict with Kevin Moody?

 7    A.    The problem with -- perhaps part of the reason for

 8  that is some of the people were new to the company.  I was

 9  there the longest out of all these people.  And so they

10  tended to come to me.  And so then I was sort of the voice

11  to B.J. Han.

12          Kevin knew this.  So Kevin didn't care for this.

13          So I became the target, as basically the, the

14  spokesperson for the group.

15    Q.    When did STATS and ChipPAC merge?

16    A.    When?  2004.

17    Q.    And who was your direct supervisor at that time?

18    A.    B.J. Han.

19    Q.    And what was your job title at the time of the

20  merger?

21    A.    Director.

22    Q.    And what business group did you work in?

23    A.    I'm sorry?

24    Q.    What business group did you work in at that time?

25    A.    At that time the group was called -- I don't

1  remember when the names changed, but it might have been

2  Emerging Technology at that point in time.

3      Q.   Okay.

4      A.   We had reorganizations all the time, so I don't

5  always remember exactly the names of the groups.

6      Q.   And who else worked in the same business group at

7  that time, at the time of the merger?  At Emerging

8  Technology.

9      A.   At the time of the merger, Ram Ramakrishna.

10          I believe Raj Pendse.

11          Merger.  I am not sure if Doug Matthews was there

12  or not at the time of the merger.

13          Let's see.

14          I'm having a hard time remember, because people

15  were coming and going.  I don't remember exact snapshots of

16  who, because shortly after the merger they moved people

17  around a lot.  And then -- I can't remember exactly.

18          There was so much changing going on at that time.

19      Q.   And do you recall who managed that business group

20  after the STATS ChipPAC merger?

21      A..  I'm sorry?

22      Q.   Do you remember who managed the Emerging

23  Technology --

24      A.   After the merger?

25      Q.   -- after the merger?

 1      A.    When they merged the companies, they had to make a

 2   decision of who from the STATS or ChipPAC side would take

 3   the lead, and they had decided that I would take the lead.

 4          So I acquired some of the ChipPAC employees.  And

 5   then my old group at that time -- for a very short time Bob

 6   Lanzone was my boss, but they let him go at the time of

 7   merger.  I think he was only my boss for two months.

 8          There was just a lot of changing at merger time.

 9      Q.    And did Bob Lanzone come from the STATS side or

10   the ChipPAC --

11      A.    ChipPAC.

12      Q.    Do you know why STATS ChipPAC let Bob Lanzone go?

13      A.    No.

14      Q.    Did you complain to Dr. Han about Bob Lanzone?

15      A.    After he said that I didn't support him on some

16   strategy that was -- that he needed from myself and a few

17   others, and I was upset because it wasn't true, and later

18   B.J. realized that, because I showed him -- I was able to

19   prove I sent the file supporting them.  And they realized

20   that.

21          Bob Lanzone had a reputation of being political

22   and -- it was unfortunate, but at the time of the merger the

23   ChipPAC and STATS side, as probably in the case of any

24   merger, had animosity toward each other and there was a lot

25   of jockeying for position, so there was a lot of politics.

1    Tension was high.  So, you know, some people are making

2    claims that things were happening or not happening.  A lot

3    of this was happening.

4            And when -- I'm not -- I don't like politics.  And

5    when these things happen, I would flag them to B.J. and say,

6    hey, what's going on here.

7            I provided this information.  This guy is saying I

8    didn't.  This is wrong.

9            And B.J. agreed with it.

10           And they saw the politics.  And perhaps that had

11   something to do with his termination is that there were a

12   series of these types of things.  I don't know.  I don't

13   know for certain.

14           Bob Lanzone, if I recall, also, yeah, he wanted to

15   fire everybody too from the ChipPAC side.

16           I'm sorry, I'm sorry, from the STATS side.

17           When he came on board, he said I want to fire this

18   person, that person, this person.  He was very aggressive.

19           And I think B.J. and Lay Koon didn't like this

20   kind of aggression during the merger.

21      Q.    And so it was, I'm sorry, Bob Lanzone who said

22   that you had not supported him on an initiative?

23      A.    Yeah, that was, that was probably the only thing I

24   can think of he did against me in terms of if you want to

25   say backstabbing.

1          He pretty much left me alone, because at that time

2    he felt that I was very well supported in terms of -- the

3    ChipPAC side was always very anxious about telling B.J.,

4    They were scared to ever cross them, because they thought I

5    was in B.J. and Tan Lay Koon's camp.

6          Bob didn't touch me at that time.  He just left me

7    alone.  But just about everyone else in my group he wanted

8    to fire.

9          MR. STROJNIK:  Can we take a very short break?

10          THE WITNESS:  Yes, actually.

11          MS. LARSEN:  Yes.

12          THE VIDEOGRAPHER:  We are off the record at 9:42.

13          (Brief recess taken.)

14          THE VIDEOGRAPHER:  We are back on the record at

15    9:48.

16    BY MS. LARSEN:

17      Q.    After Bob Lanzone left STATS ChipPAC, who managed

18    the Emerging Technology group?

19      A.    Me.  Myself.

20      Q.    Did you receive a retention payment following the

21    STATS ChipPAC merger?

22      A.    Yes.

23      Q.    Do you recall how much that payment was?

24      A.    It was paid out in two, two sums, two lump sums,

25    over two years.

1              I think combined total was roughly $45,000,

2     somewhere around there.

3         Q.    Do you remember what the terms were of the

4     retention payment?

5         A.    No.  I mean, you had to stay in the company

6     obviously to get the full amount, but I don't -- I think

7     there were two breakdowns.  There was a payout after one

8     year and another after the second year.  And percentages

9     were different, but I don't remember them.

10        Q.    Did you observe any changes in the company as a

11    result of the STATS ChipPAC merger?

12        A.    Well, of course, there were many changes.

13             I mean, you have two different companies and two

14    different cultures.

15        Q.    And what kind of changes did you notice?

16        A.    Just everything from normal business operations,

17    the way different organizations ran, the way people

18    communicated.

19             I mean, you know, you're talking about two

20    companies merging with two styles.

21             There's a whole host of things.

22        Q.    Anything else that you recall?

23        A.    There was a lot of complaining, which is normal of

24    a merger, that there was unequal salary, unequal bonuses,

25    unequal titles, and all of that.

1 Q. When you say unequal salary, bonuses, titles, are

2 you referring to unequal between the STATS -- the employees

3 who come from the STATS side and employees who come from the

4 ChipPAC side?

5 A. Yes.  It was generally felt that STATS people were

6 grossly underpaid compared to ChipPAC employees.  In terms

7 of stock, bonus, salary, even their titles were inflated.

8 Q. Are you aware of whether any adjustments were done

9 to decrease the differences between the former STATS and the

10 former ChipPAC employees?

11 A. They had a so-called title harmonization.  They

12 went through and harmonized people's titles.

13 That's essentially when I became a senior

14 director.  Because ChipPAC had so many directors, they

15 couldn't distinguish me as a leader of the group.  So they

16 gave me a new title of senior director.

17 There was some of that.  Not a lot.

18 And salary-wise, no.  STATS people were always, in

19 my opinion, shorthanded on salary compared to ChipPAC.

20 Q. Did you ever tell anyone at STATS ChipPAC that

21 Dr. Han would not have promoted you to the position of vice

22 president?

23 A. I don't recall.

24 Q. Did you believe that someone other than Dr. Han

25 was responsible for your promotion?

1          A.    I really don't know who.

2                Based on the inputs I received from -- conflicting

3     input from Scott and B.J., I don't know who promoted me.

4          Q.    Do you believe that Dr. Han would not have

5     promoted you to the position of vice president?

6          A.    Do I believe he would not have?

7                Oh, he's, he's -- B.J. has always been pretty

8     tough on promotions.  When Scott Jewler came on board, he

9     had a few people he brought over he wanted to promote

10    immediately.  There was some speculation that maybe my

11    promotion was due to I had been with the company so long and

12    had not deserved the title that others were doing for the

13    level of work I was doing, that perhaps Scott felt he had to

14    promote me in order to promote some other guy.  I don't

15    know.  I don't know.

16               I have no idea on what basis.  I was never told

17    anything other than you're being promoted.

18               I was put on a high potential list as a strong

19    performing employee, but when the promotion came it was just

20    I was promoted.  I didn't know who, or where, or why,

21    anything.

22         Q.    Did Dr. Han ever say anything to make you believe

23    he would not have been willing to recommend you for

24    promotion to vice president?

25         A.    He made comments to me, but that's not unusual for

                © AZ LITIGATION SUPPORT (480)481-0649

1    him.

2         Q.    Like what?

3         A.    He made comments like -- it was, you know, this

4    Scott guy is promoting too many people, or you're going to

5    have -- it was always kind of all threatening kind of stuff.

6    He does this a lot..  Like, you know, you're going to have to

7    work harder to get this title.

8              And he always made the statement, that's right,

9    that people should not have to chase the title, the title

10   should chase them.

11             So he always made me feel like I didn't deserve

12   it.

13        Q.    Because he said you have to work hard to deserve

14   the title or earn the title?

15        A.    Yes, but that's a common comment from him to

16   everybody.  He makes those kind of comments in general.

17        Q.    Did Scott Jewler ever say anything to you to make

18   you believe that Dr. Han would not have been willing to

19   promote you to vice president?

20        A.    No.

21        Q.    Did you ever tell anyone at STATS ChipPAC that you

22   were only promoted to the position of vice president because

23   Mike Schraeder was being promoted?

24        A.    Yes, I remember I might have made that statement.

25        Q.    To whom?

                © AZ LITIGATION SUPPORT (480)481-0649

34

1    A.    I don't remember.

2    Q.    More than one person?

3    A.    I said it to B.J., I know.  Actually I remember
4    that now.

5          Anyone else, I don't remember.

6    Q.    On what did you base that belief?

7    A.    Oh, because within a month of my being promoted
8    Mike Schraeder was promoted, and Mike Schraeder had been
9    with the company at that point less than a year, and there
10   were several other people who had been with the company a
11   long time that deserved promotion and they weren't getting
12   it.

13         Anyhow.

14         I was told that Mike Schraeder was promised a vice
15   president title when it came to STATS ChipPAC, and that
16   Scott was working on it the whole time Mike came over while
17   he was there.

18   Q.    Who did you think deserved a promotion that wasn't
19   being promoted?

20   A.    I'm sorry?

21   Q.    Who did you think deserved a promotion that was
22   not being promoted?

23   A.    Well, I spoke to B.J. Han once and said that if
24   we're going to hand out vice president titles, I felt that
25   I.K. Shim worked hard.

1          He's an employee in Singapore, in R&D.

2          But I said that in the context if we're going to

3    hand out vice president titles like this, you know.  I.K.

4    Shim had been with the company a long time as compared to

5    Mike Schraeder.  That's all.

6          If I had not received my vice president title, I

7    would have been the only person on Scott Jewler's staff that

8    was not a vice president, and I would have been the oldest

9    employee in the company at that time.

10          On his staff.

11          Oldest, I mean years of service.

12    Q.    Do you believe that tenure should be a primary

13    consideration in promoting somebody to vice president?

14    A.    No.  I think it should be a combination of things.

15    Q.    Such as?

16    A.    Performance, contribution.

17    Q.    Did Scott Jewler ever say anything to make you

18    believe that your promotion to vice president had anything

19    to do with Mike Schraeder being promoted?

20    A.    No, never.

21    Q.    During the time you were a vice president at STATS

22    ChipPAC, how many vice presidents did the company have?

23    A.    In the U.S. or total?

24    Q.    Total.

25    A.    I can't answer that.

© AZ LITIGATION SUPPORT (480)481-0649

1      Q.   Do you know how many in the U.S.?

2      A.   I mean, because there's close to 18, 20,000

3   employees.

4           I have no visibility what titles are in all the

5   different factories.

6      Q.   Do you know how many vice presidents were in the

7   U.S.?

8      A.   There was approximately, I want to say, four or

9   five.

10     Q.   Do you know how many of them were women?

11     A.   Only myself.

12     Q.   What was your compensation structure at STATS

13  ChipPAC?  What were the components of your compensation?

14     A.   Total compensation consisted of your base salary,

15  and your STI bonus, and your overall, what do you call it,

16  performance increase annual increase.  I forget the word

17  right now.

18     Q.   When you say annual performance increase, is that

19  an increase to your base salary --

20     A.   Your base, yes.  I'm sorry.  Yes.

21     Q.   And do you recall when you were promoted to vice

22  president what your base salary was?

23     A.   It was somewhere in the order of 140 something.

24          By the way, there were other smaller components.

25  People every now and then got spot recognition bonuses, but

1   much smaller, retention bonuses, as you know.

2        Q.   Did you receive a retention bonus at any other

3   time than the merger?

4        A.   I had that one retention bonus.  As far as I know,

5   that was the only time they gave them out, but I may not

6   know other times.

7             There was also stock, which was never clear to

8   anybody how that -- anyhow.  No comment.

9             I never understood their stock.

10            And employees on the STATS side never benefitted

11  from it.

12            It was minuscule, again, compared to the ChipPAC

13  side.

14       Q.   And I just want to understand that.  Did you

15  receive stock or did you receive stock options?

16       A.   There were grants and there were stock purchase

17  plans and options.  There was a variety of different plans.

18            And in the end probably 80 percent of mine were

19  under the water.

20       Q..  What do you mean by that?

21       A.   I didn't financially gain from it.

22            When I joined the company and throughout the time

23  I received the options, they were always under water.

24            I mean, that's true for anyone from the STATS

25  side.

1          I'm not alone there.

2      Q.   I just want to clarify.  When you say that your

3  stock or your options were under water, if I -- as I would

4  understand that, I would assume that you mean at the time

5  you are granted stock or options the value was less than the

6  stock was trading at.

7      A.   No, it became less than that.  That was later the

8  value of the stock dropped.

9          Obviously they're not going to give you stock

10  below market value when you -- but when I joined, see what

11  happened.

12         I don't remember the whole transaction, but our

13  stock just kept going down from the day I got the options,

14  from the day I joined until the day I was fired.

15     Q.   Okay.  So you got -- the company gave you options

16  at a certain price.

17     A.   Uh-hmm.

18     Q.   Is that correct?

19     A.   Vested at different times, yes.  And when they

20  vested, they were under water.

21     Q.   They were worth less than the --

22     A.   Yes.

23     Q.   -- issue price.

24     A.   Yes.

25     Q.   Do you know how often you were granted options?

1          A.    It was very irregular.

2                They kept changing the stock plans.  We had

3     different HR management every year almost.

4          Q.    During the time that you were vice president, did

5     you receive any raises?

6          A.    No.

7          Q.    How often did you receive raises at STATS ChipPAC?

8          A.    Typically people received them once per year.  So,

9     what, I was probably a vice president, what was it, 2006 I

10    became a vice president.

11               So probably unlikely I was going to receive a

12    raise with all the problems that started occurring, as far

13    as -- anyhow.

14         Q.    Were you finished?

15         A.    Yes, I'm finished.

16         Q.    Okay.

17               Do you know what factors would determine whether

18    you received an annual raise?

19         A.    What factors you said?

20         Q.    Yes.

21         A.    Performance.  Metrics.

22         Q.    When you say metrics, do you mean the performance

23    formula or raise formula?

24         A.    Performance metrics.  Every year we would set

25    goals, and at the end of the year we would measure how we

1    performed to those goals.

2              That's all.

3        Q.   Okay.  Is that how your raise was calculated?

4        A.   Essentially, yeah.

5              There was also a component tied into the overall

6    corporate revenue how the company was doing as well, so. . .

7        Q.   Was there a set amount of raise or were there

8    variations in how much of an increase you could receive each

9    year?

10       A.   Don't know.

11             They were very secretive about bonuses, how, who

12   got what, and how much was distributed.  I never had good

13   insight or visibility into this.

14       Q.   And who decided whether you received a raise or

15   how much?

16       A.   I don't know.

17       Q.   Did you receive any kind of commissions?

18       A.   Any kind of what?

19       Q.   Commissions.

20       A.   No.  No.  No.

21       Q.   And what kind of bonuses were you eligible for?

22       A.   When you say eligible, they had, on the STI bonus,

23   they had a formula for this, and you could be up for, say,

24   10 percent or 15 percent or 20 percent of your salary.

25             I believe mine was 15 or 20 percent.  I don't

1    remember.

2              So that would be what I was eligible for.

3              And then, you know, based on your performance, you

4    either got 100 percent of that or less.

5        Q.    How was your performance calculated for the -- how

6    was your performance assessed for the purposes of

7    calculating bonuses?

8        A.    I don't know.  I have no idea.

9              As far as myself rating my employees, I could make

10   suggestions, but I didn't have -- I did not have control

11   over or was not allowed to have control over what my people

12   made.

13             Singapore made that decision.  Singapore

14   ultimately made all salary decisions.

15             When it comes to compensation, it was a black hole

16   in my opinion.

17       Q.    And did you feel that was true for your comp and

18   the compensation for the employees you supervised?

19       A.    Yes, anyone in the United States.

20       Q.    How often did STATS ChipPAC pay bonuses?

21       A.    Again, I can only go by what I know, but once a

22   year.

23             When you're talking about STI bonus, I'm sorry?

24       Q.    Yes.

25       A.    That would be once per year.

1           Annual increase, once per year.

2      Q.   Did you always receive a bonus?

3      A.   No.

4           No, there were times when, when the economy was

5      down in the, I want to say, 2002 to 2004 time frame, we had

6      salary cuts.  And depending on your level, you either had a

7      10 percent or a 5 percent cut.

8           And mine was never reinstated, because of the

9      level I was at, I guess.  I don't know.  Again, I don't know

10     why.

11          But we had salary cuts, we had bonus freezes, pay

12     increase freezes.  Everything was frozen for about

13     two years.  And that was across -- I believe across the

14     board.  Again, I don't know.

15          I don't know what happened in the factories.

16          I know recently this past year, because of the

17     downturn, U.S. employees were frozen but the factories were

18     allowed to receive increases.

19          But, again, who knows.

20          There was a memo that went out to that effect,

21     that only non-factory locations were on a salary freeze.

22     Q.   Did STATS ChipPAC offer you any sort of 401(k) or

23     retirement plan match or contribution?

24     A.   Uh-hmm.  401(k) match.

25     Q.   And do you know how much the 401(k) match was?

1      A.   It was a formula.  I want to say it was something

2  like -- I don't remember the amount, I'm sorry.

3           It's like 8 percent of something.

4           I don't remember.

5      Q.   How often did STATS ChipPAC make 401(k)

6  contributions or matches for you?

7      A.   It was a once-a-year match.

8      Q.   Did you receive a 401-K matching contribution

9  every year?

10      A.   I always put in, yes.

11           And they matched, yes.

12      Q.   Do you know if you always received the full

13  possible 401(k) contribution match?

14      A.   I'm assuming so.  I always put the full amount

15  into 401(k)s as well, the max limit.

16      Q.   Were there any other components of your

17  compensation plan at STATS ChipPAC?

18      A.   Not that I can recall.

19      Q.   When did you first begin reporting to Dr. Han?

20      A.   That was when Kevin Moody was let go.

21           2001, 2002.  According to this e-mail, maybe it's

22  2001.

23      Q.   And just to clarify for purposes of your

24  deposition, Dr. Han Byung Joon is Dr. Han, B.J. Han, all the

25  same person.

44

1      A.    Yes.

2      Q.    Okay.

3      A.    I should clarify one thing.  I always was under

4    Dr. Han's organization.  Now, whether I was directly

5    reporting to them or not changed.

6          So when Kevin Moody was no longer with the company

7    was the first time I began directly reporting to Dr. Han,

8    B.J. Han.

9      Q.    And I just want to make sure I'm clear.  When you

10   say that you were always in Dr. Han's organization, was that

11   true even when you reported to Scott Jewler or was that a

12   different corporate organization?

13     A.    Up until, I'm sorry, up until Scott Jewler in

14   2004 -- up until 2004, I was always in the technology

15   division, and B.J. was in charge of the technology division.

16          B.J. and Scott were, you know, lateral.  Both

17   reported to the CEO.

18     Q.    And so in 2004 you began reporting to Scott

19   Jewler.

20     A.    Yes.  After the merger.

21     Q.    And was that still part of the technology

22   division?

23     A..   No.  No.

24          That was called -- he was called the CSO, chief

25   strategy officer.  And he had both sales, product

©  AZ LITIGATION SUPPORT (480)481-0649

1    management, product marketing functions.

2        Q.    And out of those areas, which function did your

3    group fall into?

4        A.    Product management.

5        Q.    Product management.

6              And do you know what Dr. Han's job title is?

7        A.    CTO, chief technology officer.

8        Q.    Do you know how you came to report to Scott Jewler

9    instead of Dr. Han?

10       A.    It was simply a restructuring of the company after

11   the merger.

12             Scott Jewler, by the way, had just come on board,

13   so they were giving him additional responsibility being new.

14   They weren't taking B.J. and giving him strictly technology

15   and then everything else is Scott.

16             So it was just basically a re, re-org from the

17   merger, again.

18       Q.    Can you describe Scott Jewler as a manager, from

19   your experience?

20       A.    He's pretty level headed in terms of -- he's

21   capable being both technical and having an astute business

22   mind.  So he tended to act on a lot of business discussions

23   around technology.  For example, any time we had major

24   technology acquisitions or licensing type activities,

25   management would rely on him because he had a good balance.

1    Q.    How was your working relationship with Scott

2    Jewler?

3    A.    It was fine.

4    Q.    And when did you return to Dr. Han's business

5    organization?

6    A.    Technology.

7          Roughly 2006.  Maybe the latter half of 2006.

8          Because I had my promotion, I think, early 2006,

9    at the first half, and not too long after that, so latter

10   half 2006 we switched back to I reported to B.J. again.

11   Q.    And how did that happen?

12   A.    Just, again, another reorganization of the

13   company.

14   Q.    So did you change business groups or did product

15   management return to the technology division?

16   A.    I don't understand the question.

17   Q.    I'm not sure I understand the question.

18         Were you always in product management?

19   A.    Yes.  Now, you might get confused a little bit

20   here, because off and on they split up product management

21   into technology product management, which I fell in, and

22   there was actually for a little while a group there called

23   business product line management, which did strictly the

24   business aspects of the products, cost margin improvement,

25   cost reduction activities.  And my group always focused on

47

1    the technology side of it.

2        Q.   So when your group was -- started reporting to

3    Dr. Han's organization again, did your -- did Dr. Han's

4    responsibility change or did your group again become part of

5    the technology division?

6        A.   No.  You know, it was just a shift of who reported

7    to who.

8             My group always performed the same function.

9        Q.   Did you ever report directly to Tan Lay Koon?

10       A.   I don't know.

11            The reason I say that is I found out through --

12   you know, after the fact in this discovery of documents and

13   all this, apparently I did.

14            I never knew that.

15            Sometime after the demotion on paper in my HR file

16   it said I was reporting to Tan Lay Koon directly, but I was

17   never actually told this.

18            In fact, quite frankly I never knew what group I

19   was in after my demotion.

20            It changed when I asked.

21       Q.   And when you say demotion, what are you referring

22   to?

23       A.   The humiliating e-mail B.J. Han sent out in early

24   August time frame suddenly telling the entire corporation

25   that he was in charge of my group and I was relocated to a

48

1    box in the absolute far lowest corner of the page that said

2    special projects and my title was removed.

3        Q.    When you say August time frame, August --

4        A.    Early August.

5        Q.    -- of which year?

6        A.    2007.

7        Q..   Did you receive a performance review from Dr. Han

8    in 2006?

9        A.    B.J. never gave reviews.

10           The last -- I think it was Tan Lay Koon himself

11    that gave me my review.  He gave it to me one on one in

12    person while I was in Singapore.

13           Typically the way B.J. did reviews is I looked on

14    the system to see if he had comments or not, and that was

15    it.

16           MS. LARSEN:  Can you mark that as Exhibit 2,

17    please.

18               (Deposition Exhibit No. 2 was marked for

19    identification by the reporter..)

20    BY MS. LARSEN:

21        Q.    You have in front of you what has been marked as

22    Exhibit 2.

23           And I apologize, highlighting at the top makes it

24    a little difficult to read, but do you recognize this

25    document?

1      A.    I recognize it, yeah.

2      Q.    Could you tell me what it is?

3      A.    Performance review.

4      Q.    Have you seen this document before?

5      A.    Yes.

6      Q.    Where have you seen it?

7      A.    On the systems.

8            We have an online -- they have an online

9   performance appraisal system, and this is a printout from

10  that system.

11     Q.    I'm sorry, is this a printout of your evaluation?

12     A.    I have to look at this.

13           One moment, please.

14     Q.    Sure.  Take your time.

15     A.    I'm going based on inputs here.

16           This is showing my self-assessment, so manager

17  assessment is not in there.

18           So let me get to the back.

19           And then, yes, it looks like this is a version

20  where management inserted comments on Page 5.  There's a

21  management assessment on that page.

22     Q.    Okay.  I'm just trying to determine if you know

23  what this is.

24     A.    Oh, okay, I'm sorry.

25     Q.    That's okay.

1      A.    Okay.

2      Q.    Can you tell me what this is?

3      A.    It's a performance review.

4      Q.    Is it your performance review?

5      A.    Yes.

6      Q.    Okay.

7            For what time frame?

8      A.    It was 2006 to -- January 2006 to December 2006.

9            So this would be the one, I believe, when I was in

10    Singapore, January of 2007, when I was in Singapore Tan Lay

11    Koon gave me my verbal review.  And he gave me a very strong

12    review, positive.

13           B.J. Han did not meet with me about this review.

14     Q.    In the -- approximately the middle of the rows of

15    columns on each page, there's a heading self-assessment.

16     A.    Uh-hmm.

17     Q.    Is that correct?

18     A.    Yes, that's correct.

19     Q.    And is that information that you filled in?

20     A.    Yes.

21     Q.    And just for identification sake, there's a what

22    we call Bates labels, numbers at the bottom that identify

23    the document.

24           If you turn to what's marked STATS 000282, in the

25    bottom box, step three, self-assessment.

© AZ LITIGATION SUPPORT (480)481-0649

1          It states:  Unfortunately spend more time on

2   people issues than I like.

3          What did you mean by that?

4   A.   I wanted to be more technical.

5          But it was a demanding group in terms of -- it's,

6   it's considered a technically elite group.  There's very

7   bright people in this group.

8          They are probably -- well, in the U.S. they're the

9   strongest technical contributors in the company.

10         Obviously we have technically astute people in R&D

11  as well.  But many of these people had Ph.D.s, masters,

12  double masters degrees.  And, you know, they are good, very

13  good at what they do.

14         But senior management felt that they didn't always

15  have the ability to be good people managers, and so they put

16  me in that position to manage them.

17         So it had its challenges, and I dealt with those.

18         It's just that I was a technologist in the past,

19  and I felt like I was spending too much on people issues.

20  That's all, that's all that comment was.

21         I wanted to be more technical.

22  Q.   Right after that you state:  My goal -- it says is

23  is..  My goal is to manage this better by setting clear

24  expectations so that I can improve on areas I've not been

25  able to spend time on.

© AZ LITIGATION SUPPORT (480)481-0649

1          What did you mean by that?

2     A.    Technology.

3          I felt like I was losing a little of the

4     technology edge, that I needed to be competent in front of

5     customers.

6          I was not allowed to attend any training courses

7     or maintain my technical expertise, attend conferences.  It

8     was just manage this group, is what I was told to do.

9          I hate to do this, but may I take a restroom

10    break?

11         MS. LARSEN:  Absolutely.

12         THE VIDEOGRAPHER:  We are off the record at 10:29.

13         (Brief recess taken.)

14         THE VIDEOGRAPHER:  We are back on the record at

15    10:33.

16    BY MS. LARSEN:

17    Q.    Returning to what's been marked as Exhibit 2 in

18    your self-assessment, unfortunately spend more time on

19    people issues than I like.  My goal is manage this better by

20    setting clear expectations.

21         How did you plan to set expectations to spend less

22    time on people issues?

23    A.    Okay.  So I was referring to -- I didn't

24    articulate it here clearly, but I wanted to attend more

25    technical conferences, spend more time, even on just the

1   Internet, doing web searches on technology development.

2           Just trying to keep myself in tune with technology

3   more.

4           And I wanted to have a specific goal of what I

5   wanted to learn.  That was all.

6   Q.    I guess what I'm trying to understand is how did

7   you plan to accomplish that, based on what you've put in

8   your self-assessment?

9   A.    Well, attend conferences, training.  Even -- I

10  talked to B.J. about this, even perhaps spending an hour a

11  week with different technologists to learn more about

12  different aspects of technology that I wasn't very strong

13  on.

14          That was all.

15          But this never happened.

16          The needs of the business were so demanding that I

17  just never had the time and frankly was never allowed to

18  attend.

19          Every time I made an application to attend

20  technical training, B.J. didn't feel it was necessary..

21          I never had training in this company.

22  Q.    In the same section here, step three, there's a

23  section with the heading manager assessment.

24          Do you know if that feedback came from Dr. Han?

25  A.    No, that's just input into the system.  You don't

54

1    know for sure who did it.

2              I had assumed it was him, but I don't know.

3    Q.   And is he -- I'm sorry, go ahead.

4    A.   I assumed it because while my actual interview was

5    given by the CEOs, I don't know.

6    Q.   Is Dr. Han listed on the first page of the

7    performance and bonus review as the evaluating manager?

8    A.   I'm sorry, I didn't hear you.

9    Q.   Is Dr. Han listed on the first page of the

10   performance and bonus review as the evaluating manager?

11   A.   Yes.

12   Q.   And in the same section, on the fifth page under

13   manager assessment, it states:  Need to improve handling

14   conflicts.

15             Did you agree with that feedback?

16   A.   I didn't have issues with it.

17             I mean, there's always room for improvement.

18             I had a challenging group, and I don't consider

19   myself to be perfect.  So there's always room for

20   improvement.

21   Q.   Did you discuss that feedback with anyone?

22   A.   Tan Lay Koon actually discussed this with me in

23   person.

24             In fact, when I mentioned wanting to spend more

25   time on technology, he said, no, that I was doing an

1    excellent job managing a difficult group, to keep doing what

2    I was doing.

3        Q.    And when was that meeting with Tan Lay Koon?

4        A.    I think it was January 7 for one of the large

5    sales meetings I was over there for.

6            It was either a sales meeting or a strategy

7    meeting.  I don't remember.

8        Q.    When you say over there, do you mean Singapore?

9        A.    Singapore.  I'm sorry.

10       Q.    It's okay.

11           And on the next page, under the heading additional

12   comments, in the section overall comments by evaluating

13   manager --

14       A.    When you say next page, what page are you on?

15       Q.    It's Page 6 of 7 at the top, or STATS 00283 at the

16   bottom.

17       A.    Okay.

18       Q.    I'm looking at that last section.

19       A.    Okay.

20       Q.    I think that's supposed to be areas to build more

21   capable organization, improve teammate environment with peer

22   departments.

23           What did you take that feedback to mean?

24       A.    This probably was B.J.  B.J. always -- this is not

25   a new statement from him.  He and I agree with it.  He

1    always told me hire the best people that you can, better

2    than yourself, you will have succeeded if you have done

3    that.

4            So that was always my goal, always get the best

5    people I could.

6            In fact, I had people under me that made more

7    money than me, but I didn't have an issue with that in terms

8    of -- if they were experts in the industry, that we wanted

9    them to perform a technical function and didn't want them to

10   manage, I was okay with them making more than me, if they

11   were, you know, truly experts.

12           So B.J. said hire the best that you can, your job

13   was to manage them.  That was one comment.

14           The other one here you say improve teamwork

15   environment with peer departments, again, after the merger

16   there was a lot of jockeying and politicking.  He was just

17   saying try to smooth the wrinkles between the groups.

18           This is true of any company you want to do this.

19       Q.   I'm sorry, I may have already asked this, but did

20   you discuss this performance review with Dr. Han?

21       A..   No.

22       Q.   And you said you discussed your performance with

23   Lay Koon in Singapore in January of 2007.

24       A.   Yes.  That's correct.

25       Q..   Did you specifically discuss this review?

57

```
 1        A.    No.  It was just a one-on-one verbal.

 2              He didn't do them like that.  He calls people in

 3   one by one, and. . .

 4              One thing I don't understand, though, is when I

 5   looked at this, in the last year, for some reason somebody

 6   went into the system and changed my review reading after the

 7   fact to a two, this went back to the three, but this is

 8   correct now.

 9              I have a copy of it.

10        Q.    Okay.  So you're looking at the first page --

11        A.    Uh-hmm.

12        Q.    -- of Exhibit 2.

13        A.    Yes.

14        Q.    Overall performance review score, 69, rating

15   three.

16        A.    Uh-hmm.

17        Q.    STI score 51.

18        A.    Uh-hmm.

19        Q.    Is that your understanding of what your review

20   result was?

21        A.    Yes, it was a rating of a three.

22        Q.    Okay.

23        A.    But after I was demoted I went back and looked at

24   this, and somebody had changed it to a two in the system,

25   which should not be allowed, but they did it.
```

1           And somebody went back in and changed it back to a

2     three.

3           So my point is it's now correct again.

4     Q.    And when did you look at it and see that it was a

5     two?

6     A.    It was sometime in the first half of 2008 this

7     happened.  Before I was let go.

8     Q.    And can you tell me what that means, a rating of

9     three versus a rating of two?

10    A.    Again, in this company, the ratings changed the

11    way they did it almost every year.

12          This year I believe it was one through five, it

13    changed..  Sometimes we had one through three, one through

14    four, one through five.

15          I believe this year was one through five.

16          And a three was exceeds expect -- I'm sorry,

17    exceeds expectations.

18          A four or five was usually indicative of a major

19    promotion.

20          This was during the year.

21          So I was promoted this year, but I was a three.

22    That's not too surprising.

23          I probably should have been a four or five if they

24    were promoting me, but for whatever reason I was a three.

25          They promoted me, just so you know, this year, and

1    I was a three.  So. . .

2        Q.    And what does that mean, overall -- it says

3    P-E-R-F, which I assume is performance review score.

4        A.    Yeah, this, these numbers you're look at have to

5    do with all of the -- you know, when you set the goal, you

6    weight the goals, how well you performed the goals.  So

7    there's ratings.  My overall performance goes into basically

8    my annual increase.

9            The STI score goes toward the STI bonus every year

10   so they're essentially separate type payout systems.

11       Q.    Where it says overall performance review score 69,

12   do you know what that's on a scale of?

13       A.    I don't remember right now.

14       Q.    Just --

15       A.    Just so you know, because people were oftentimes

16   confused by this, when you see in the first revenue and GM,

17   it's very careful -- important you note that my performance

18   target was 65 percent, actual performance 13.65 percent.

19   The zero on the actual STI should have been nonapplicable.

20   What happens is they go back through and rate the exact same

21   metrics, but for STI only then the performance becomes a

22   zero.

23            Many people misread this, including one of my

24   reports, Brett Dunlap, that I gave him zeros.  I didn't.

25                And he went screaming to management that I gave

1    him an unfair review.  It was that he didn't know how to

2    read reviews.

3              I just want to clarify that, because people

4    misunderstand these.

5         Q.   So I'm looking at step one on Page 1 of Exhibit 2.

6              And where you're referring to it, for example, the

7    individual goal is revenue and GM goals as per AOP, and

8    individual strategies for FC/WLCSP, 3D, and SIP.

9              And then performance target percentage achieved

10   has a score in it.

11             Actual performance review score has a score in it,

12   actual STI score is zero.

13             On Page 3 of 7 of the same exhibit, the second

14   entry, is that the same evaluation but for your STI?

15        A.   Correct.

16        Q.   Okay.

17        A.   So now you see a zero in the second to last

18   column, and then yes.

19        Q.   And then the score and then the STI score.

20        A.   Right.

21        Q.   So everything, all goals are evaluated twice.

22        A.   It's really evaluated once.  It's just the way

23   they had to input it and the way the software was in the

24   system.

25             That's why I say it's a little confusing.

1    Q.   Thank you.

2         When did you first meet Eric Gongora?

3    A.   Very first introduction in a hallway in Fremont,

4    just passing through before he reported to me in shortly

5    after the merger.  It was the first time I actually met him.

6    Q.   Did Eric Gongora eventually come to report to you?

7    A.   Uh-hmm, yes.

8    Q.   When was that?

9    A.   Around November of 2004, I think.

10        It wasn't immediately after the merger.

11        The way I remember, at the time of the merger I

12   reported to B.J. Han.  Sometime after that I began reporting

13   to Scott Jewler.

14        While I was reporting to Scott Jewler, Eric

15   Gongora was assigned to my group.  And that was all in 2004.

16   Q.   Do you recall who else worked in the Emerging

17   Technology Group when Eric joined the group?

18   A.   Raj Pendse.  Flynn Carson was in and out, but he

19   may have been there at the time.

20        So Flynn Carson.  Ram Ramakrishna.  I believe

21   Chris Shea was there at that time.

22        Adrian Murphy.

23        Jeff Yang, I believe.

24        I apologize, some of this may be a little

25   inaccurate.  People were moving all the time.  But that's

1    who I recall at this point in time.

2        Q.    At STATS ChipPAC what's a high potential or a high

3    pot employee?

4        A.    High potential, you just said it.  High pot is

5    high potential.

6              It means someone who's been slotted to potentially

7    enhance their career growth.

8              Management views that person as someone who might

9    be able to develop into another position, higher position.

10       Q.    Do you know how high pot employees are selected?

11       A.    By their management.

12             It's pretty -- I don't know if it's subjective or

13    objective.  It's by the management.

14       Q.    And were you identified as a high pot employee?

15       A.    I should say one clarification though.

16             So, for example, if I wanted to recommend

17    somebody, then your management above, it goes through an

18    approval process.  I can't randomly say I want this guy.  I

19    have to somewhat justify it, and then management approves

20    it.

21       Q.    Were you identified as a high pot employee?

22       A.    Yes.

23       Q.    Do you know when that was?

24       A.    I think 2004 or '5.  I don't remember exactly.

25             Probably 2005, beginning.

63

1                It was a new system.

2        Q.    And do you know who identified or recommended you

3    to be a high pot employee?

4        A.    Scott Jewler.

5        Q.    Was Eric Gongora identified as a high pot

6    employee?

7        A.    Yes, he was.

8        Q.    Do you know when that was?

9        A.    I'm sorry?

10       Q.    Do you know when that was?

11       A.    Probably around the same time.

12              This high pot system was a new system put in place

13   around 2005, early 2005.

14              And it lasted a year.  They scrapped it.  They

15   didn't follow through with it.

16       Q.    And who identified Eric Gongora or recommended him

17   to be a high pot employee?

18       A.    Myself.

19       Q.    And why did you select Eric Gongora to be a high

20   pot employee?

21       A.    When Eric was first transferred to my group, he

22   was highly enthusiastic and was energetic and really wanted

23   to grow.  He wanted to improve.  He wanted to form his

24   little group.  And he seemed to be, you know, pretty capable

25   with his own product line, but -- and I thought, it was a

1    mistake of mine, that he could be developed further for

2    managerial responsibilities.

3           By the way, when I, when I went to select who was

4    going to be a high pot, part of that process is those people

5    need to be receptive to being a high pot.  What I mean is

6    some people do not want to go the management chain.  Some

7    people want to stay technology.

8           We were looking to develop somebody under me to be

9    more of a small group manager.

10          So, most of the people I had were really true

11   technologists and really didn't want to be bothered by

12   management responsibilities.

13          Eric seemed extremely keen on it.  So I thought,

14   well, I'll give him a shot.

15       Q.   Do you believe that Scott Jewler fired Eric

16   Gongora from AMKOR?

17       A.   I was told he did.

18       Q.   Who told you that?

19       A.   Scott Jewler.

20            Later.

21       Q.   What do you mean later --

22       A.   I shouldn't say later.  Sometime -- I don't know

23   exactly when he told me that.  But I do recall that Scott

24   repeatedly saying to me -- you know, he said I fired him and

25   you know why.

1          You know, he was making fun of the fact that he

2    was -- well, he made apparently a lot of sexual advances

3    toward women, having affairs, sending -- they were -- Scott

4    was kind of joking about how he wrote Playboy editor type of

5    letters.

6          He said, you know, you better keep your eye on

7    this guy, if he gives you any trouble whatsoever, you know,

8    I'm on it, he'll be out of it, we'll move him out to the

9    side or out.

10          He asked me a few times about this.  And I said I

11   don't have issues with him.

12          In fact, I told Scott, in fact, I said, I don't

13   know, maybe it's a new Eric, I don't know him from your

14   former employment, maybe it's a new Eric, maybe he's really

15   trying to do a turnaround in life.

16          And he started dating a girl who was a very nice

17   young lady, very intelligent young lady.  And I thought,

18   well, maybe he's calming down.

19          And I told him this.  I said, I think maybe he's

20   calming down in life and give him a shot.

21          But, I was fooled.

22      Q.   Do you believe that Eric Gongora is a convicted

23   felon?

24      A.   Do I believe it?

25          I wouldn't be surprised.

1     Q.   Well, have you alleged that in this lawsuit?

2     A.   Well, I learned about it after the fact, after I

3  was terminated, from my attorney.

4          But it wouldn't surprise me.

5          I mean, he was in trouble all the time.  Later on.

6          Again, you know, these things I didn't know about

7  him until trouble started happening with him.

8          He came to my office many times talking about

9  problems he was having with his ex-wife, fights, his

10  divorce.  He would seek advice on how to handle custody,

11  and, you know, money issues with his ex-wife, and arguments

12  and fights he had with her.

13          But he came to me one time because he knew I had a

14  friend who was an attorney and he wanted me to help him out.

15          I have a friend who's a public defender here in

16  Phoenix.  And he wanted my friend to help him out, and I

17  didn't want to get involved with it.  It had to do with a

18  road rage situation, he was asked to attend anger

19  management, and et cetera, et cetera.

20          So I say I'm not surprised.  He's been in trouble

21  before and will probably get in trouble again.

22     Q.   What felony do you think he's been convicted of?

23     A.   Only what I was told.  Grand theft or something

24  like this.

25     Q.   Who in STATS ChipPAC referred to Eric as a

1   troublemaker?

2       A.   Scott Jewler, B.J. Han, Blake Gillette, Jeff

3   Howell.  A list of people.  Chris Shea.  Ram Ramakrishna.  A

4   lot of people saw him as a troublemaker.

5       Q.   Did Scott Jewler say why he thought Eric was a

6   troublemaker?

7       A.   His experience from AMKOR.

8       Q.   Did Blake say why he thought Eric was a

9   troublemaker?

10      A.   Blake Gillette used to work at the same company as

11  Eric, at AMKOR.  So he knew him from there, but I don't

12  think -- I don't know what he based his comments on, but he

13  repeatedly told me that Eric was a troublemaker.

14           And, in fact, he told me he advised Mike

15  Schraeder, who sat next to him, not to be too close to him,

16  because it would bring him down.  It would bring down his

17  career being too tightly associated with him.

18           Blake told me repeatedly in his office that, um,

19  he and Brett were always up to trouble, no good, fighting

20  with others.  It wasn't just me.  He was fighting with other

21  people.  He was fighting with Adam Moya, who was another

22  product manager in the company.

23           They were always ganging up on somebody.  You

24  know, it was a bad environment, very bad..

25           You know, when the ketchup incident happened,

© AZ LITIGATION SUPPORT (480)481-0649

1   everybody pointed the finger at Eric.  Or Brett.  But I saw

2   firsthand what happened, and I'm 100 percent sure I know who

3   did it.

4          But anyhow.

5   Q.   Did you ever discuss personal matters with Eric?

6   A.   Yeah, he came to my office many times to discuss

7   personal matters.

8          And early on I tried to help him.  You know,

9   that's just me.  Maybe I should not have, but that's my good

10  nature to do those things.

11         He was having financial problems with his ex-wife.

12  I advised him perhaps in the best interest of anybody and

13  from my own divorce, I learned, you know, just take all the

14  lump sum money, put it in the child's name, and, sorry, that

15  way attorneys don't get it.

16         But, I mean, put the interest in the child -- and

17  it worked, and I was happy I was able to resolve that for

18  him and his ex-wife.  He said he did it and he thanked me.

19         And that kind of stuff, yes.

20         He came to me about the road rage incident, and I

21  really tried to stay clear of that one.

22         He came to me about several things.

23         I didn't like when he came to me about saying

24  things like, you know, you got pretty good, pretty large

25  breasts or this or that.

© AZ LITIGATION SUPPORT (480)481-0649

1          He was always making inappropriate remarks.

2          And he also -- it was his -- he typically came to

3    whoever he reported to and bad mouth whoever he used to

4    report to.  So when he came to my group, he would gossip

5    about Cindy Palar, Scott Jewler, everybody.

6          When he left my group, he did the same thing about

7    me to other people.  It's just his nature.

8          He would come to me actually -- it was very

9    disruptive because he would come to me and tell me that

10   Blake, Mike, all these people were dangerous political

11   people, and that don't trust them, don't trust them.  You

12   know, they're going to wreak havoc with you.

13         He was a trouble maker.  I just don't know any

14   other word for it.

15         But I did not know that at that time.

16         It was when he began to become insubordinate that

17   I started picking up on it.

18     Q.   Did you talk to Eric about your dating

19   experiences?

20     A.   My dating?

21         I remember having conversations about.  We would

22   joke every now and then about driving to work and, you know,

23   somebody who would let you see something strange happen on

24   the road and, you know, there's weirdos out there.  Stuff

25   like that.

1          I was dating someone at the time that came to my

2    office once.  And he was asking me, who's that guy, who's

3    that guy.  And I said, oh, somebody I've been dating.

4          And later on when he asked me, you're still seeing

5    that guy, and I said no, God no.  Turned out to be a sort of

6    a strange guy.

7          So, yeah, that kind of conversation.

8          That was it.

9    Q.    Did you tell Eric about a discussion you had with

10   your daughter regarding sexual activity?

11   A.    With my daughter regarding sexual activity?  No.

12   Like what?

13   Q.    About anything?  I mean, anything regarding -- did

14   you say anything to Eric about a conversation you had with

15   your daughter regarding sexual topics?

16   A.    Never.

17         I mean, I don't even know.

18   Q.    Did you ever call Eric on his cell phone after

19   work hours?

20   A.    Sure.  I called all my employees at one point in

21   time probably.

22         We had meetings, late night, all the time.

23   Q.    How often do you think you called Eric on his cell

24   phone after work hours?

25   A.    I don't know.  It depended on what was going on at

© AZ LITIGATION SUPPORT (480)481-0649

71

1    the time.

2              You know, it wasn't that often.

3              I mean, every now and then he would ask me what's

4    going on after a meeting, filling me in after a meeting,

5    call him up, this is happening, that's not happening.

6              You know, he was very -- it was -- he's kind of a

7    hyper guy and always wanted to know what was happening all

8    the time.

9              And he would ask me, can you fill me in, and I

10   would say sure.  So I filled him in on something.  It could

11   be anything.  Strategy, re-org, it could be anything.

12        Q.   Do you know if you called him weekly, more than

13   once a week?

14        A.   No.

15              I mean, weekly?  If I did, it was for a short

16   period of time.

17              But no.  I don't remember that at all.

18        Q.   Did you ever invite Eric to have breakfast with

19   you before work?

20        A.   Sure.  I did that with all my employees.

21        Q.   How often?

22        A.   Probably twice.

23              Breakfast was Starbucks around the corner.

24        Q.   Why did you ask Eric to have breakfast with you

25   before work?

1    A.   Sometimes he wanted to know things like -- he kept

2    pushing me at one point in time for an increase from

3    director to senior director.  And I kept telling him, no, I

4    can't do that.  It's not fair.  There are others in the

5    company many more -- that have many more years experience

6    that are more senior in every way possible, and I can't do

7    this.

8         It could have been a number of things.  I don't

9    know.

10    Q.   You don't know.  You mean you don't remember.

11    A.   Yeah, no, I mean -- no.  I mean, if you were to

12    ask me why I had breakfast with Raj Pendse or -- I couldn't

13    tell you right now.  I just don't remember.  I mean, various

14    issues came up.

15         I had breakfast with -- usually I had breakfast

16    with members of my team who came from out of town just to

17    be, you know, sociable friendly, say hey, you know, because

18    I knew they were staying at a hotel.  And so they were not

19    alone, I'd say, hey, meet me at Starbucks, we'll grab a cup

20    of coffee before the office.  That was it.

21         MS. LARSEN:  He needs to change the videotape.

22         THE VIDEOGRAPHER:  This concludes tape one in the

23    deposition of Diane Sahakian.

24         We are off the record at 11:04.

25         (Brief recess taken.)

73

1          THE VIDEOGRAPHER:  This begins tape two in the

2    deposition of Diane Sahakian.

3          We are on the record at 11:16.

4    BY MS. LARSEN:

5      Q.   Did you ever engage in any kind of horseplay with

6    Eric Gongora or other employees?

7      A.   I have to define horseplay.

8      Q..  Would you throw cones or candy at them from your

9    office?

10     A.   Eric used to throw candies or something, because

11   he had a direct clean shot into my office.  And I'd tell him

12   knock it off and throw it back.

13          I did that.  Yeah, that was just.  That was it.

14     Q.   Anything else?

15     A.   No.

16     Q.   When did Eric Gongora make inappropriate sexual

17   remarks about your breasts?

18     A.   It was ongoing.

19          I don't remember exact dates, but, in fact, one

20   time -- frankly it was really disgusting.  I don't know how

21   he got on this subject, but somehow or another the

22   conversation came into, he said -- it might have been

23   because guys were always kind of, you know, making fun of

24   him shaving his arms for weightlifting and all that.  I

25   don't know how the subject came up.  It might have been

74

1    that.  And he asked me if I shaved down below.

2          And I was totally -- I was just flabbergasted he

3    asked that.  And I said I didn't want to go there.  It was

4    just a disgusting conversation.

5          But that's kind of Eric.  That's just how he is.

6          You have to understand, I was in an environment

7    where it wasn't too surprising to hear these kind of things.

8          I've heard that and way worse, you know, about

9    what goes on in bars and after hours in the workplace --

10   after work I mean.

11         So I just tended to turn my head all the time to

12   this stuff.

13   Q.   What inappropriate sexual remarks did he make

14   about your breasts?

15   A.   He just said, you know, you're pretty big, you're

16   pretty big.  You know.

17         Okay.  What did you want to make of that?

18         I mean, it's kind of weird.

19         I didn't say anything, like, okay.

20         I don't know where he was going with that.

21   Q.   How many times did that happen?

22   A.   Probably two or three times.

23         I'm trying to think of anything else he said.

24         Oh, he said -- he would make remarks every now and

25   then, because there were pictures of the team in, in -- we

1    used to hold, what do you call them, technology, I forget

2    what we called them, conferences for our customers and

3    vendors that I had organized.  And there would be, like,

4    team photos afterward.  And, you know, prior to my lung

5    surgery in 2004 I was a lot slimmer.  And he said, look at

6    those photos, and say, you're a lot slimmer.

7            He's always making comments like that.  So the

8    breast thing kind of went in there with it.

9        Q.  When would he make comments about your breasts

10   being pretty big, was that during the time that he reported

11   to you?

12       A.  That was when he reported to me, yeah.

13       Q.  How did you respond to his comments?

14       A.  I didn't.

15           I mean, I dismissed it, and I was embarrassed.

16           I would change the subject.  I mean, what was I

17   supposed to say?

18           I just changed the subject.

19       Q.  Did you tell Eric that you didn't welcome these

20   kind of remarks?

21       A.  I just changed the subject.

22           No.

23       Q.  Did you tell Eric you had had breast augmentation?

24       A.  I'm sorry, what was that?

25       Q.  Did you tell Eric you had had breast augmentation?

76

```
 1      A.    No.

 2            He told me that Brett's wife had breast

 3      augmentation.

 4            He had that conversation, because Brett's wife was

 5      out -- Brett was out for a few days, and so Eric said

 6      Brett's taking care of his wife because his wife had breast

 7      augmentation.

 8      Q.    Did Eric make any -- ever make any other

 9      inappropriate remarks that you heard?

10      A.    What now?

11      Q.    Did Eric ever make any other remarks that you

12      considered inappropriate?

13      A.    Sexually or otherwise you mean, in total?

14      Q.    Any kind.

15      A.    He's always talking about inappropriate, telling

16      me that other people were bad people when they really

17      weren't.

18            I think those were inappropriate.

19            I mean, he -- that's an ongoing thing.  I'd really

20      have to sit and thing here for a few minutes of all the

21      things he said.

22            It's ongoing with him.

23            He's always making comments about people's

24      physique.

25            There was another girl in the office, Pauline
```

1   something.  I don't know.  I believe was a designer or in

2   the design group.  I don't know exactly what she did.  I

3   think document control.

4           And he was always saying, you know, her perfume

5   smells like a French whore.  She's got a weird body, huge

6   tits and no ass.

7           That's just the way he talked.

8           My way sometimes dealing with things, because it's

9   a male dominant environment, if I were to complain about

10  these things every day in that place, I would be filing

11  charges every day in that company.  I just turned my cheek

12  to it all the time, ignored it, because, you know, unless

13  something directly affects my career, I'm just going to turn

14  my head to it.

15          Unless it's affecting someone else.

16          I mean, you have to understand, I remember one

17  time when a woman, an engineer coming in from Europe, and

18  all the guys -- I shouldn't say that..  One employee in

19  particular kept saying things like, oh, I wonder what she's

20  going to be wearing.  Gee, I can't wait to see her.  I

21  wonder if she'll be wearing a skirt or pants.

22          And I got mad and said, look, this is so

23  inappropriate to wonder what some woman's going to be

24  wearing getting off the plane and having a technical

25  question.  I said you treat her as an engineer and only as

1    an engineer and not a sex object.

2            This was not Eric.  This was another employee.

3            And he continued on with this, and I had to have

4    him -- ask him to leave the conference room.  There's no way

5    you can deal with a customer if you're acting like this..

6            Did I stand up?  Absolutely.  But as far as it

7    affecting me, I had to turn my cheek to it all the time

8    because it happened all the time.

9        Q.    Who was that employee?

10            Who was that person?

11            Who was the --

12        A.    Dean Kossives, K-O-S-S-I-V-E-S.

13            I know how he is, and he's essentially harmless

14    person, and I wasn't going to reprimand him, but I also

15    wasn't going to have this woman subjected to him, so I asked

16    him to leave the room.

17        Q.    As a manager, did you think that you had any

18    responsibility to advise Eric that the kind of comments

19    you've referenced were inappropriate for the workplace?

20        A.    You know what, I think my -- when I sit here and

21    think about it right now, I probably didn't say anything

22    because I always felt like I had to fit in as one of the

23    guys.

24            And that if I said anything, she was a squealer,

25    she's this or that, so I felt like I had to shut up and put

1  up.  All the time.

2      Q.   You were Eric's boss, weren't you?

3      A.   Yes, but I was not allowed to assert myself as a

4  boss.

5           If people did things like this and I said

6  something to my management about it, I was told to ignore

7  and move on and I was viewed as a squealer.  I was not

8  allowed to complain.  I was not allowed to take things up

9  with HR or my management, without repercussion, clearly.

10     Q.   Did you ever tell Eric that you considered any of

11 the comments he made inappropriate?

12     A.   I might have said this is disgusting or gross on

13 occasion, but I don't remember specifically.

14          Typically those are comments I would make, like,

15 that's gross, or you can -- enough.

16     Q.   Do you remember any other sexual comments Eric

17 made?

18     A.   Not immediately, I can't think of examples.  I

19 don't want to say generalities until I think of something

20 very specific.

21     Q.   I guess what I'm trying to pin down is if there

22 are any comments you remember.

23          If there are comments that you believe you recall

24 later, I would prefer that you spend the time to figure that

25 out now.

1          What I want to know is what you do or don't

2     remember.

3          A.   Every now and then he would make comments about

4     women in the gym, like big boobs, you know, hanging out of

5     their tops, whatever.

6          But, I mean, you know, you have to understand, and

7     it was an environment that I was in.

8          Q.   Would he make comments about women at the gym or

9     at work?

10         A.   Both.

11         Q.   You and Eric go to the same gym; is that right?

12         A.   Yes.

13         Several employees, there's a large gym across the

14    street from where our office is, so several employees went

15    there.

16         Q.   Did you report to anyone at STATS ChipPAC that

17    Eric Gongora made sexual remarks about your breasts?

18         A.   I made comment to -- one of my subordinates, Ram

19    Ramakrishna.

20         I'm trying to remember anyone else.

21         No, I didn't want to talk about my employees to

22    other people, so, in fact, I was -- you know, no, it was

23    only Ram.

24         Q.   Why did you tell Ram?

25         A.   Uh-hmm?

1          Q.    Why did you tell Ram?

2          A.    Why did I tell him?

3                I've known him since -- he and I have almost like

4     eight years together history.  I was comfortable with him.

5     I trusted he wouldn't say things to other people.

6          Q.    And what did you specifically tell Ram?

7          A.    Just, you know, that Eric is gross when he makes

8     comments like this.

9                And, you know, I treated it casually, I guess.

10    And I probably in hindsight, you know, you know, you have to

11    understand I was in an environment, if you complain, it's

12    not, it's not accepted.

13               There was always repercussion.

14               All you could do is maybe vent a little bit and

15    then move on.

16               And I was afraid to tell some of these guys

17    straight to their face, especially him, hey, knock it off or

18    I won't tolerate this, because what he does is goes and

19    tells all the guys, oh, she's a stick in the mud, she's a

20    witch, she's a this, that.  Be careful, she's take you to

21    HR..

22               I mean, that's the environment I was in.

23               If I said anything, it was she's a squealer to HR,

24    then I was totally outcasted.

25               I was trying to fit in as guess I can by ignoring

                © AZ LITIGATION SUPPORT (480)481-0649

1    some of this stuff that was directed to me.

2            Now, like I said, if it was directed to someone

3    else, I wouldn't stand for it, and I didn't.

4        Q.   Why do you believe that Eric would react in that

5    way, would tell other people that you were a squealer or

6    would get him in trouble with HR --

7        A.   That's his nature.  He does that with everybody.

8    He did it to Cindy Palar.  He did it to Scott Jewler.  He

9    used to badmouth Scott Jewler and Cindy Palar to me all the

10    time.

11        Q.   For what?

12        A.   Everything from, you know, the guy is a jerk, you

13    can't trust him, he's political, watch your back side.

14            He's an extremely manipulative person.

15        Q.   So you didn't tell Eric that you did not want to

16    hear comments about your breasts or other sexual comments --

17        A.   I changed the subject.

18        Q.   -- and the reason that you would not tell him to

19    not make those comments is because you were afraid he would

20    badmouth you to others.

21        A.   Yeah.  In part, yes.

22        Q.   Any other reason?

23        A.   Actually to avoid confrontation with him

24    altogether.  He had an anger problem.  He would blow up..

25            Anytime I tried to assert any kind of discipline

1    or instruct him to do something he didn't want to do, he

2    would blow up.

3          I flew my team to California once to attend a

4    technology -- custom technology seminar for our group

5    specifically, for the company, but for our group

6    specifically.

7          It's technology workshop, given by Prismark

8    consultants.

9          And myself, Eric, Ram, whoever was in Arizona was

10   expected to be there.  We're spending a lot of money with

11   these consultants.  So our team flew there, and I asked that

12   everybody try to maximize the purpose of this trip, so that,

13   you know, they could take care of customer issues, other

14   meetings, as well as to attend this workshop to keep costs

15   down, et cetera, et cetera.

16         What happens was we got there, and I had a

17   flare-up medically.  I ended up in Stanford Hospital.  And

18   while I was there, Eric instructed everyone in my group to

19   leave and do what they wanted to do and not go to the

20   workshop, because he wanted to come home for whatever

21   reason.

22         So from Tuesday to Friday we were all supposed to

23   be there.

24         And while I was in the hospital, by Thursday he'd

25   instructed two people I know for sure to go home.

1          One of them said, no, we came here for this

2     conference and, you know, that's not what Diane advised us

3     to do, instructed us to do.  And he wanted for whatever

4     personal reason to go back.

5          So he instructed another person, Scott Gooch, to

6     go ahead and fly to the East Coast and not attend the

7     workshop.

8          He was a new employee, and I really wanted that

9     employee to go to that workshop so he could come to speed

10    technically.

11         He didn't attend because Eric told him not to.

12         Eric didn't attend because he figured he could

13    take it upon himself to go back to Arizona and attend the

14    workshop through a conference call, which does not have the

15    same effect.

16         When I called him and said why did you this, he

17    screamed at the top of his lungs to the point of many others

18    heard him in a conference room with the door shut.

19         Blake Gillette heard him.  Chris Shea heard him.

20    Chris Shea sits three, four offices away from him.

21         That gives you a good example of what he was like

22    when I questioned him on something..

23         So did I avoid -- and, mind you, all the while, if

24    I said anything to my management about this, I was told to

25    shut up, focus on my work.

1              So now put yourself in my position.  Would you

2    want to sit there and confront this guy unnecessarily and

3    just keep doing your job.

4              I mean, management didn't support me disciplining

5    him and I didn't want to deal with him bullying me and

6    yelling at me and threatening me.

7         Q.   Who was the other employee that Eric told to go

8    home?

9         A.   Told what?  I couldn't hear you.

10        Q.   Who was the other employee that Eric told to go

11   home?

12        A.   Brett Dunlap.

13             I'm sorry, not Brett.

14             Scott Gooch.   Yeah.

15        Q.   I'm sorry, you said there were two employees --

16        A.   Ram Ramakrishna.  And Ram did not listen to him.

17   Scott Gooch listened to him because Scott reported to him

18   through me.

19             I mean, it was myself, Eric, and then Scott Gooch.

20   Scott Gooch was a new hire.

21             It was pretty much from that point on that I

22   started noticing Eric was manipulating the two guys under

23   him and becoming very insubordinate toward me.

24             I don't know if it was a power thing he was after.

25   I don't know what it was.

1           But that's when trouble began is when I allowed

2    him to form a group.

3        Q.   When did Eric Gongora distribute a photo of women

4    with large breasts from his former place of employment?

5        A.   I don't remember.  It was 2006 or '7 time frame.

6    I don't remember.

7           He was always talking about the HR manager and the

8    chairman's daughter having large breasts, and you should see

9    them, you should see them.

10          So he sent me a photo of them.

11          I guess he went on a river raft trip or something

12   with these people.

13       Q.   What was the photo of?

14       A.   River rafting.

15          They were standing there in bathing suits.

16       Q.   Who was in the photo?  Who was in the photo?

17       A.   I'm sorry, who?

18       Q.   Who was in the photograph?

19       A.   I don't know most of the people because they were

20   AMKOR employees.

21          But the HR manager.  Eric was in it.  I think the

22   chairman's daughter was in it, I'm not sure.

23          I don't know these people, because I didn't work

24   there.

25          He was always talking about what a sleazy place it

1   was, but that was -- yeah.  Anyhow.

2       Q.    Aside from Eric, did you know anybody in the

3   photo?

4       A.    No.

5       Q.    Did you ask to see the photo?

6       A.    I might have, you know, when he, when he said you

7   should see them, you should see them, I said -- you know,

8   because he said, do you know Cathy -- that was her name.

9   That's right, do you know -- I think that's the HR manager.

10  I said no, I don't know her.

11          Because she was sort of well known because she was

12  the HR -- head of HR and apparently married to the chairman,

13  and there was a lot of stuff that went on like this in this

14  company, from what I heard.

15          So he said have you ever seen her.  I said no, I

16  haven't.

17          And have you ever seen Don Bruce's daughter?

18          I said, no, I haven't.

19          Don Bruce, the chairman of the company.

20          And so he sent me the photo.

21      Q.    Did you ask to see the photo?

22      A.    No, he just sent it.

23      Q.    Sent it to you how?

24          MR. STROJNIK:  I'm sorry, I didn't hear.

25

88

1    BY MS. LARSEN:

2        Q.    I'm sorry.  He sent it to you how?

3        A.    E-mail.

4        Q.    Did he e-mail the photo to anyone else that you

5    know of?

6        A.    No.  I think it was just to me.

7        Q.    How did you respond when Eric e-mailed you the

8    photo?

9        A.    I was like, okay.

10       Q.    Did you e-mail him back?

11       A.    No.

12             I don't, I don't -- if I did, I don't recall it,

13   but I think no.

14       Q.    Did you say anything to him about the photo?

15       A.    No, I just -- I didn't see the point of, I just

16   didn't see the point of it.

17             Again, it's one of those things I went, as my boss

18   said, move on.

19             I mean, I was told continually, focus on the

20   business, focus on the business, don't pay attention to

21   these kind of things.

22       Q.    To what kind of things?

23       A.    These kind of incidents, anything like this.

24   Whether it would be harassment or, or bullying, whatever,

25   that went on in the office.

1          Every time I mentioned these kind of things to my

2    boss, he would say, focus on the business, don't get dragged

3    down by the issues.

4          When I said that these issues were bringing me

5    down and it was going to eventually bring down my career,

6    like it did, he just kept saying, focus on the business.

7    Q.    Did you tell anyone at STATS ChipPAC that Eric had

8    e-mailed you a photo of a woman with large breasts?

9    A.    I don't remember.

10          I just, I just treat it like one of those, yuck,

11    here we go again type of things.

12    Q.    So you don't recall telling B.J. Han that you had

13    received this photo.

14    A.    No, I don't think I bothered telling him.  No way.

15    Because he wouldn't want to be bothered by it.

16          There are a lot of things I didn't tell B.J. he

17    doesn't want to be bothered with.  I mean, I had people

18    telling me, oh, you know, walking around in Singapore, you

19    know, I said something about, gosh, I'm hot.

20          I mean, I couldn't even say things like, gosh, I'm

21    hot, sweating like a dog.  You know.  Oh, no wonder why I'm

22    attracted to you, you've got pheromones you're releasing.

23    I'm, like, oh, my gosh.

24          It's like every little thing I said.  You get some

25    kind of response like this.

1          But, you're talking about -- this company had, you

2     know, no other women in technology.  I was it.

3          I'd go to the meetings.  I'm only the only female

4     probably 80, 90 percent of the time.  More than that.

5     Ninety percent of the time.

6     Q.   And who made a comment about being attracted to

7     you?

8     A.   Dean Kossives again.

9          I had one guy -- one of my employees make a pass

10    at me, physically grab me.  I pushed him off.

11         I mean, this just went off.

12         Yes, I did tell Scott Jewler about that one

13    because that was over the line for me.

14         And I did tell him, don't ever do that again, and

15    I pushed him off.

16    Q.   Who was that?

17    A.   That was Doug Matthews.

18    Q.   And where were you at the time?

19    A.   San Francisco, in a taxicab, leaving a vendor

20    hospitality party thing, going on.

21         It was during the SEMICON international show.

22    Q.   When was this?

23    A.   2005, 2006.

24         Scott Jewler was aware of that.

25         He actually thanked me.  That's something for you.

1  He thanked me for not making a big deal out it.  I

2  appreciate you not making a big deal out of this.

3         So I was, quote, I guess, being one of the guys at

4  that point in time, putting up with this.

5     Q.   I'm sorry, you were in a taxicab leaving a party

6  during SEMICON?

7     A.   Yeah, it was one of these, you know, hospitality

8  vendor parties.

9         You know, it's one of our suppliers that invites

10  you to socialize, have dinner, whatever.  And then we were

11  on our way back to the hotel.

12         And he apologized to me later.  The next morning

13  he apologized for stepping out of line.

14         I had another incident with the plant manager of

15  Korea was going to make a pass at me, and B.J. had to call

16  him off.

17         Things went on all the time, I mean.

18     Q.   And what happened in the cab in San Francisco?

19     A.   Oh, this fellow had reached over to -- he actually

20  put his arms around me and I pushed him off, what are you

21  doing.

22         He says, oh, you know you want it.  I do.

23         And I said, I don't want it.  And I said,

24  furthermore you are married.

25         He said, oh, you don't know the relationship I

© AZ LITIGATION SUPPORT (480)481-0649

1    have with my wife.  She wants me to be happy.

2         And I said, gee, that's a pretty selfish thing to

3    say.  She wants you to be happy therefore it's okay to cheat

4    on her.

5         You know, I was pretty mad that he made a

6    statement like that, and I went off on that.

7         And then he kind of backed off.  We got to the

8    hotel.  I went my way.  He went his way.  He woke up and

9    apologized the next day when we went back to the show.

10        Q.   Was anyone else in the cab?

11        A.   No.

12        Q.   When did you tell Scott Jewler?

13        A.   Within -- maybe the next day or the day later.  I

14   don't -- it was pretty quickly.

15        Q.   What did you tell Scott?

16        A.   I told him what happened.

17             And Scott laughed.  And he said, yuck, I can't

18   even manage that.

19             I don't know.  Maybe I should have complained

20   harder.

21             You know, he was a technically pretty bright guy,

22   and so I felt like if I got rid of him management would have

23   a fit.

24             He got out of control a number of times, and he

25   ended up having to leave the company because of his violent

1   outbreaks.

2          Q.   Is that Doug --

3          A.   And Scott Jewler said, just get rid of him, let

4   him go, next time he has an outbreak let him go.

5          Q.   And that's Doug you're referring to.

6          A.   Doug, yeah.

7          Q.   So what -- was there anything else to your

8   discussion with Scott Jewler about what happened in the cab?

9          A.   No.

10               He just thanked me for not making a big deal out

11   of it.

12          Q.   Did you ask him to do anything?

13          A.   No.

14          Q.   Did you expect him to do anything?

15          A.   I didn't know what he would do with it.

16               I pretty much put it for the record so that, you

17   know, I'll let my management know.

18          Q.   And you said a plant manager in Korea made a pass

19   at you.

20          A.   Uh-hmm.

21               That was during the merger.  We were -- many

22   people that were senior management from both sides of the

23   company had to attend a week long meeting in Palo Alto, at

24   the time it was Ricky's Hyatt House.

25               It's not there anymore, by the way.

94

1          It was a meeting to basically merge companies, HR,
2     all the systems, that you -- product naming, you name it.
3          So, during that week, as usual, there was the
4     drinking, the eating, the getting out of control at night.
5     And I had dinner, and I'll tell you for the life of me I'm
6     trying to remember who it was, but I went to dinner with a
7     friend.  I didn't stay there for all the drinking stuff.  I
8     left.
9          When I came back, you had to go through where the
10    bar was to get to the rooms and all that.
11         The driveway actually.
12         And I'm not sure how or why, but I had gone in the
13    lobby, and people wanted a ride, and I wasn't drunk, so they
14    asked if I would drive people back because they wouldn't
15    walk they were so drunk.
16         I said, okay, okay.
17         So I pulled up.  I had an SUV.  So I pulled up,
18    and they were piling up.  There must have been six --
19    actually one, two, three, four, five, six, seven.  There
20    were seven or eight people in this car, because there were
21    two rows of back seats.
22         And one of the men that was super drunk that they
23    were worried about, you know, he was the plant manager of
24    the Korea facility, and he had a lot of prestige and, you
25    know, a lot of respect there and all that.  And they were

1   trying to take care of him, and they were trying to get him

2   into the front seat of the car, passenger's side.

3            And they finally got him in.  And when everybody

4   else was getting in, not paying attention, all that, this

5   guy was so drunk, he like reached over and it was about to,

6   I don't know, who knows, grab me, kiss me, I don't know what

7   he was going to do.  He didn't touch me.

8            He was going to but he didn't.

9            He kind of like leaned over, and my boss, B.J.

10  Han, was in the back.  And he yelled out, no, no, she's one

11  of us, leave her alone.

12           This man I'm talking about, B.K. Han didn't know

13  me really, because he came from the ChipPAC side of the

14  house and I was on the STATS side.

15           So he said, no, no, she's one of us, leave her

16  alone.

17           So my point is, this stuff, it went on all the

18  time.

19           And these meetings I'm talking about, maybe one or

20  two other women at the most.  Usually none.  That was the

21  environment.  That was the culture.

22      Q.   And did anything else happen in Palo Alto in the

23  SUV?

24      A.   One guy was so drunk he jumped on the hood of the

25  car.

1          I mean, it was just out of control.

2          To me, I mean, no, not really.  Not with all that,

3    no.  They just -- they kind of got him to calm down, and I

4    dropped them off at their rooms.

5          Q.    Did you mention the event to anybody else?

6          A.    I might have.  And I just don't remember who.

7          I mean, it was like -- I might have done it in,

8    in, you know, in a fashion, like, oh, my God, these people

9    were so drunk, you know.  And I mean, I might have said

10   that, but I don't know who I was talking to.

11         Q.    How did Eric Gongora pit other employees against

12   you?

13         A.    Well, when they -- when he started getting very

14   aggressive with me, he started writing lengthy e-mails and

15   really getting hard on me.  And when I simply asked him to

16   show up to work like he was supposed to.

17         I was getting -- I'm sorry, I'm jumping around a

18   little bit here.

19         That's right.  I was getting many complaints from

20   sales managers, customers, others, that they couldn't find

21   him.

22         He was never -- always missing in action, couldn't

23   find him.

24         So I was calling him and asking where are you,

25   where are you.

1          He was always coming up with something.  I'm

2    coming in or whatever.

3          There was one time I had to rush home because

4    there was somebody coming in to install a new air

5    conditioner on my home.

6          And I said, look, I always let people know where I

7    was, if I was leaving.

8          I said -- I sent an e-mail to my team.  I said,

9    look, I'm leaving, I'll be back.

10          During that time I left, I was getting complaints

11    that Eric was missing in action.

12          I said, you know, I was disappointed because I had

13    just, you know, put him on the high pot list and not too

14    long ago I was trying to develop him and I thought he was

15    settling down and all that, you know, from what Scott told

16    me.

17          And I was like, oh, my God, I don't know where he

18    is.

19          And so I sent an e-mail, because I think I

20    couldn't call him on his phone or whatever, and said, you

21    know -- and I sent it generically, because I didn't want to

22    attack any one person, I didn't want to -- I said, look,

23    folks, understand, you know, I have to be able to trust you

24    guys.  You know, if I'm out of the office, you got to

25    continue.  I can't stand there and be standing over you all

1    the time.  You guys are mature.  You're professionals.

2                He got very mad about that e-mail.  Extremely mad.

3    And wrote me volumes about how, oh, you know, you take off

4    and take care of your daughter.

5                I said, you know what, number one, I clear it with

6    my boss.  Number two, I always let everybody know where I

7    am, contrary to you.  I don't know where you are and you're

8    not doing your job.  So there's a difference there.  And

9    furthermore, B.J. is my boss.  If there are issues, he

10   should manage me and not you.

11               And he had a huge problem with that.

12               I was not allowed to be authoritative over him at

13   all.

14               He started complaining to Eric and anybody.

15               I mean, he started complaining to Brett Dunlap and

16   any guys around him, saying, whatever, I don't know.  But

17   you could definitely see as, you know, this turning against

18   me.

19               It was like gang or mob against me, you know,

20   developing where it's just more and more animosity.  And I

21   think, my God, what is going on in this place.

22               And I complained to B.J. about this, and Scott.

23   Scott had told me, if it continues, move the guy to the side

24   or out.

25               B.J. would tell me, focus on your job, stop

1    complaining type of e-mails.

2         And I had, you know, written back saying, this is

3    getting out of control, if it doesn't stop it's going to

4    damage my relations with people.

5         He just kept telling me, move on, move on.

6         So, they eventually moved Eric out of my group.

7         But that's when it got really bad, because I had

8    no control over him.

9         And he started pulling Brett Dunlap and Scott

10   Gooch, who are his two reports, out from under me.

11        And I asked him to stop it.

12        I asked his new manager, tell him to stop it, stop

13   disrupting with my group, disrupting my group.

14        And they supposedly told him this, but this went

15   on and on and on..  And it got really bad when Scott -- when

16   during review time, Eric inserted himself about proprietary

17   confidential matters of Brett Dunlap's review, and told him,

18   you know, she's screwing you over, you're getting screwed

19   here, you should have gotten X, Y, Z money, you should have

20   gotten this and that, so then he became very angry.

21        I got a call from Flynn Carson in Fremont saying,

22   something is very wrong here, everybody is talking,

23   everybody meaning Cindy Palar, Mike Schraeder, Blake

24   Gillette, saying that, you know, you're basically being a

25   witch to Brett on his review.

1        And I said, number one, it's no one's business

2   what goes on in anybody's review.  Number two, why is he

3   doing this?  Why is he involved?

4        So I called HR.

5        They agreed he shouldn't be involved in this guy's

6   review.  They told them to, quote unquote, shut up.

7        It continued to get out of hand.

8        According to B.J., I found out later, Brett, you

9   know, said all kinds of complaints to him wanting out of my

10  group, because he didn't get the review he liked.

11       B.J. was very angry with him at the time because,

12  A, he didn't know how to read his own review, and, B, he

13  made a lot of claims which were never substantiated by the

14  way, is another thing.

15       MR. STROJNIK:  I'm sorry.  Before you ask the next

16  question, are you ready?

17       MS. LARSEN:  She's not finished answering.

18       MR. STROJNIK:  Are you finished?

19       THE WITNESS:  So, anyhow, yeah, this just got out

20  of control.  Okay.

21       And I kept asking his new management, please,

22  would you ask him to stop it, ask him to stop it.

23       And they supposedly talked to him, and said -- and

24  I asked HR, why isn't this of record, why don't they -- if

25  it's not stopping, then why don't they write him up, because

1    he just doesn't stop.

2         I mean, there's -- I don't know how much you want

3    to hear, but there's a whole slew of this kind of stuff that

4    went on.

5         But he, yes, he did pit people against me.

6         MR. STROJNIK:  Are you done?

7         THE WITNESS:  I'm done.

8         MR. STROJNIK:  Can we take a two-minute break?

9         THE WITNESS:  What?

10        MR. STROJNIK:  Can we take a two-minute break,

11   please?

12        MS. LARSEN:  Well, it's noon.  I mean, I don't

13   know when you want to take a break break.  It's entirely up

14   to you.

15        MR. STROJNIK:  Sure, do you want to take -- how

16   long do you want to go?  Half an hour?

17        MS. LARSEN:  That's fine by me.

18        MR. STROJNIK:  Okay.  Take a half an hour for

19   lunch?

20        MS. LARSEN:  Is that okay with both of you?

21        MR. STROJNIK:  Come back at 12:30 perhaps.  Is

22   that good?

23        MS. LARSEN:  That's fine.

24        THE VIDEOGRAPHER:  We are off the record at 11:56.

25        (Lunch recess taken.)

102

 1             THE VIDEOGRAPHER:  We are on the record at 2:36 --

 2   12:36.

 3             MS. LARSEN:  I'd like to mark that as Exhibit 3.

 4                  (Deposition Exhibit No. 3 was marked for

 5   identification by the reporter.)

 6   BY MS. LARSEN:

 7        Q.   You have in front of you what's been marked as

 8   Exhibit 3.

 9             Have you seen this document before?

10        A.   Uh-hmm, yes.

11        Q.   Where have you seen it?

12        A.   I'm sorry?

13        Q.   Where have you seen this?

14        A.   I sent it to B.J.

15        Q.   And what, I'm sorry, what is Exhibit 3?  Can you

16   tell me?

17        A.   It's an e-mail from myself to B.J. Han regarding

18   insubordination issues I was having with Eric and the fact

19   that Scott didn't want me to waste time with him anymore.

20        Q.   And the earlier underlined e-mail exchange, is

21   that between you and Eric Gongora?

22        A.   Yes.  Yeah.

23        Q.   And in the last e-mail that you had with Eric on

24   September 19th, at 10:09 p.m. --

25        A.   I'm sorry, what now?

1      Q.    At 10:09 p.m. is the time on the e-mail.

2      A.    Okay.  Yeah.

3      Q.    Your e-mail states:  Many of the claims you make

4    below are twisted and false, so spare me with the, quote,

5    this is what people are saying about you tactic.  You need

6    to put your head down and worry about your work.  I have to

7    wonder how you get yourself into these conversations about

8    your boss and others to begin with.

9            Is that accurate?

10     A.    Yes.  That's what written here.

11     Q.    That's what your e-mail to Eric says.

12     A.    Uh-hmm.

13     Q.    Was that a yes?

14     A.    Yes.  Sorry.

15     Q.    Did you feel that your communication was a

16   productive way for a vice president to deal with a

17   scheduling or work issue involving her subordinate?

18     A.    Did I think it was productive?

19     Q.    Did you feel that the tone of your e-mail of

20   professional?

21     A.    Given the situation, I don't think I had much

22   choice.

23     Q.    Why do you say that?

24     A.    Because he was very aggressive to me.

25     Q.    Eric was aggressive with you.

                © AZ LITIGATION SUPPORT (480)481-0649

```
 1    A.   Yes.

 2    Q.   And so how did that dictate how you responded?

 3    A.   Just a moment, please.

 4         I want to look at something.

 5    Q.   Sure.  Take your time.

 6         (Brief pause.)

 7         THE WITNESS:  Yes, this whole e-mail, it's -- I

 8    started talking about this previously.

 9         This came about because I was receiving complaints

10    with from sales managers that they could not reach him, he

11    was not fulfilling his commitment.

12         And this is after, as you can see on my e-mail to

13    him on September 19th, that I had requested him many times

14    to be more responsible.  But he came back -- and apparently

15    I'm not allowed to do this as his manager in this company,

16    but he came back very aggressively stating -- well, actually

17    you -- you're talking about the tone of my e-mail.  If you

18    look at his e-mail from me -- himself to me on the 19th at

19    8:17 p.m., that is inappropriate to talk to your boss this

20    way.

21    BY MS. LARSEN:

22    Q.   In what way?

23    A.   So -- his tone.  Just, you know, you just called

24    me on my tone, and I am talking about his tone first.

25         So. . .
```

1    Q.   How is --

2    A.   If I talk to my boss this way, I fully expect my

3    boss to come back not very happy either.

4         I'm simply asking him to show up to work and do

5    what he's supposed to do.

6         And, as his boss, I guess I'm not allowed to do

7    this.

8    Q.   So I repeat my question.  Do you think that the

9    tone of your e-mail is productive for what you are hoping to

10   achieve?

11        MR. STROJNIK:  Object to the form.  Asked and

12   answered.

13        THE WITNESS:  Excuse me?

14        MR. STROJNIK:  I said object to the form.  Asked

15   and answered.

16        THE WITNESS:  I think it was necessary.

17   BY MS. LARSEN:

18   Q.   Necessary to do what?

19        MR. STROJNIK:  Object to the form.  Argumentative.

20        THE WITNESS:  For him to realize that he was not

21   acting appropriately toward his manager.

22   BY MS. LARSEN:

23   Q.   Is that what you were trying to convey with your

24   e-mail?

25   A.   Not just that.

106

```
 1          I'd have to read through all this.  If you want me

 2   to do that, I will.

 3       Q.   Okay.

 4       A.   Okay.

 5          (Brief pause.)

 6          THE WITNESS:  This is typical of how, you know,

 7   Eric does twist things around, try to make himself look like

 8   the good guy, and try to make everyone else look like the

 9   bad guy.

10          And I was saying enough.

11          And, hold on, I'll read through it.

12          Yes, I was asking him to stop poisoning others,

13   basically, and do his job.

14          There's nothing wrong with this.

15          I'm asking him to behave basically.

16          As his manager, I'm documenting him at the same

17   time.

18       Q.   So do you believe, as you sit here and read it

19   now, that the tone of your e-mail was professional?

20          MR. STROJNIK:  Object to the form of the question.

21          THE WITNESS:  I just --

22          MR. STROJNIK:  The question has been asked and

23   answered twice before.

24          MS. LARSEN:  It's never been answered.

25          THE WITNESS:  I have no comment.
```

© AZ LITIGATION SUPPORT (480)481-0649

1   BY MS. LARSEN:

2       Q.   It's not a no comment situation.

3            Do you believe --

4       A.   It was necessary.

5       Q.   Do you believe the tone of your e-mail was

6   professional?

7            MR. STROJNIK:  Object to the form.  Lack of

8   foundation.

9            THE WITNESS:  Yes.

10           MS. LARSEN:  I'd like to have that marked as

11  Exhibit 4.

12               (Deposition Exhibit No. 4 was marked for

13  identification by the reporter.)

14           THE WITNESS:  Might I add, as someone who's a

15  professional who's acting professionally, it's not

16  necessary.  But the way he's behaving, it was necessary.

17           Is that yours?

18           MS. LARSEN:  Got this one.  That's the new

19  exhibit, Exhibit 4, I believe.

20           THE WITNESS:  I'm sorry.

21           There you go.

22  BY MS. LARSEN:

23      Q.   Have you seen this document before?

24      A.   Hold on, let me read it, please.

25               (Brief pause.)

1              THE WITNESS:  Yeah, I haven't read it all, but go

2    ahead.

3              Yes, I've seen this.

4    BY MS. LARSEN:

5         Q.   Where have you seen it?

6         A.   On my computer.

7         Q.   Can you tell me what Exhibit 4 is?

8         A.   Excuse me?

9         Q.   Can you tell me what Exhibit 4 is?

10        A.   It's yet another e-mail between myself and B.J.

11   explaining the difficulties I'm having with Eric.

12        Q.   So this is an e-mail exchange between you and B.J.

13   Han.

14        A.   At the end, yes.

15             Before that, let's see.

16             It's quite an e-mail strand, so let's see.

17             And there's e-mail communication between Eric and

18   myself early on.  And it became myself and B.J.

19        Q.   So when you say the end, we're actually referring

20   to the most current e-mail at the top.

21        A.   Yes.

22        Q.   And the second e-mail in the chain is an e-mail

23   from B.J. Han to you dated September 20th, 2006; is that

24   correct?

25        A.   Okay.  I'm looking at that.  Yes.

109

1     Q.   I'm looking at the first page, the second e-mail.

2     A.   I'm sorry, 3:11 a.m. one?

3     Q.   Correct.

4     A.   Yes.  Okay.  B.J. to myself, yes.

5     Q.   And in the second paragraph of B.J.'s e-mail, it

6 states:  You need to make a simple decision whether to keep

7 him or not.

8        To your understanding, is that referring to Eric

9 Gongora?

10    A.   Yes.

11    Q.   And in your response e-mail, above, you say:

12 Hello B.J., I agree with you below.

13    A.   Yes.

14    Q.   Was your e-mail accurate?  Did you agree with

15 Dr. Han's feedback about how to handle Eric Gongora?

16    A.   Yes.

17        I agree with him saying you need to make a

18 decision to keep him or not.

19        And some of the other comments, some of the other

20 comments, yes.

21    Q.   But --

22    A.   But keep in mind you have to agree with him.  But,

23 go ahead.

24    Q.   But did you agree with him?

25    A.   Yes.

1            And you have to agree with him.

2            Go ahead.

3       Q.   When you drafted the response e-mail, the

4   September 20th, 5:05 p.m., e-mail to B.J., do you believe

5   that you'd understood his prior e-mail to you?

6       A.   Whose prior e-mail?

7       Q.   B.J.'s e-mail below to you.

8       A.   Okay.  Hold on.

9            (Brief pause.)

10            THE WITNESS:  Now, what was your question again?

11  BY MS. LARSEN:

12       Q.   When you responded to B.J.'s e-mail, on

13  September 20th, 2006, at 5:05 p.m., do you believe that you

14  had understood --

15       A.   Yes.

16       Q.   -- his e-mail to you?

17       A.   Yes.

18       Q.   And did you agree with his feedback about how to

19  handle Eric?

20       A.   Yes.

21            That's what I said in here.

22       Q.   Did you find Dr. Han's feedback or his suggestions

23  about how to handle Eric difficult to decipher?

24       A.   No.

25            But he contradicts his own instructions, you know

                ©  AZ LITIGATION SUPPORT (480)481-0649

1  that.

2          Because everything he is stating here is exactly

3  what he didn't do for me.

4          But continue.

5      Q.   But in terms of the feedback Dr. Han gave you

6  regarding Eric Gongora, did you find his e-mail or his

7  suggestions contradictory?

8      A.   Yes, he does not practice what he preaches here.

9      Q.   I'm asking if in this e-mail that you responded to

10 and said I agree with you below, did you understand --

11     A.   Yes.

12     Q.   -- what he was suggesting?

13     A.   Yes, I've said that three times now, yes.

14     Q.   And did you find what he was suggesting confusing?

15     A.   No.  Not as I read it right now..

16     Q.   And what did you do in response to Dr. Han's

17 e-mail?

18     A.   I began documenting Eric and I suggested that I

19 restructure.

20          Well, no, I -- hold on.

21          I know that I began documenting him for sure.  I

22 knew I had to do that.

23          Let's see.

24          Yes, okay, I'm sorry, go ahead.  What was your

25 question again?

112

1    Q.    My question is:  What did you do in response to

2  Dr. Han's e-mail?

3    A.    Well, I felt the solution was to, A, document him,

4  and, B, because he was incapable of managing people without

5  causing problems, that it was best to put him in a -- back

6  to an independent contributable.  That's where I thought he

7  might perform best until he shaped up.

8    Q.    When you read Dr. Han's e-mail and he stated you

9  need to make a simple decision whether to keep him or not,

10 what did you take that to mean?

11   A.    How else do you take that to mean?

12         You either make a decision to keep the person in

13 your group or not.

14   Q.    Okay.  So whether or not to keep him in the

15 Emerging Technology Group that you managed.

16   A.    Yes.

17   Q.    And did you decide to keep Eric in your group?

18   A.    Yes.  At this point.  I mean, I just can't move

19 him out, you know, without as he said a long and fair due

20 process.

21         You know, I need to work with him.

22   Q.    How often did you e-mail Dr. Han with complaints

23 about Eric Gongora?

24   A.    Apparently not enough.

25   Q.    What does that mean?

113

1     A.    But pretty frequently.

2           Probably every other day, depending on the time

3   frame.

4           But -- depending on what was going on.

5           If it was necessary, I complained.

6           But I had to always ask myself, did I really want

7   to complain, because there was backlash if I did.

8     Q.    How was there backlash?

9     A.    It would be construed as I was the problem.  I was

10  not allowed to discipline my employees.

11    Q.    Who would construe it as if you were the problem?

12    A.    B.J. and Tan Lay Koon.

13          This management did not accept anything but yes,

14  sir responses.

15    Q.    Was that, was that just from you or was that

16  towards everyone?

17    A.    Company-wide.

18          No, I shouldn't say company-wide.  Largely

19  U.S.-wide.

20          I can't speak on behalf of the factories.  It's

21  not fair for me to do that.

22    Q.    If you had so many issues with Eric Gongora, why

23  didn't you terminate his employment?

24    A.    I didn't hear the beginning.  What was that?

25    Q.    If you had so many issues with Eric Gongora, why

1   didn't you terminate his employment?

2       A.   I wanted to, but B.J. didn't want me to.  He

3   wanted me to supposedly write him up first and do the due

4   diligence, which is the HR policy.  You don't just fire

5   someone on the spot.  You have to put a corrective action in

6   place, a corrective action plan in place, you have to

7   document them, and that's what I began to do when they

8   transferred him out of my group.

9       Q.   Did you ever put Eric Gongora on a performance

10  improvement plan?

11      A.   No, not officially, not yet.  I didn't have time

12  to.

13      Q.   How long did you have issues with Eric while you

14  supervised him?

15      A.   As a matter of fact, let's see, the 20th -- I

16  don't -- right now I can't recall dates, but it probably

17  wasn't too long after this that he was transferred out of my

18  group.  Just when I went to document him, it was, they moved

19  him out.

20          I never had the opportunity to do an official

21  90-day corrective action plan.

22      Q.   How long did you supervise Eric Gongora?

23      A.   He came into my group roughly November-ish of

24  2004.

25          I don't know when he was transferred out.  I don't

1   remember.

2        Q.    Was it after that e-mail?

3        A.    I don't know, that's why I don't recall.

4        Q.    Well, when you sent this e-mail in September of

5   2006, was Eric still reporting to you?

6        A.    Yes, probably.

7              Yes.

8        Q.    So that's almost two years, November 2004 to at

9   least September 2006.

10       A.    But I can't be certain.  I don't remember exact

11  dates.

12             I don't have a time schedule in front of me.

13       Q.    But you said you didn't have time to write him up.

14  You supervised Eric for almost two years --

15       A.    He didn't misbehave from the get-go.  You do

16  realize that; right?

17       Q.    That's what I'm asking you.  When did you start to

18  have problems with Eric Gongora?

19       A.    In 2006.

20             I mean, I put him on a high pot status because he

21  was a very, very good actor in the beginning.

22       Q.    Do you recall when Eric transferred to another

23  group?

24       A.    And might I -- I might add that I tried to be very

25  fair to him, by just regardless of what Scott Jewler said

              ©  AZ LITIGATION SUPPORT (480)481-0649

1   about him, I put that aside and tried to give him a new

2   leash in life.

3            But that was all turned against me.

4            I'm sorry I did it.

5            Now, what was your question?

6            MS.. LARSEN:  Could you read it back?

7            (Pending question read.)

8            THE WITNESS:  No, I don't remember an exact date,

9   no.

10  BY MS. LARSEN:

11       Q.   Do you know if it was in 2006?

12       A.   Let me think about that.

13            Major events.  Hold on.

14            You know, I just don't remember.

15       Q.   You don't know if you transferred him in 2006.

16       A.   No, I don't remember when it was.

17       Q.   Do you know --

18       A.   Here I've got November -- I mean, September of

19  2006.  Probably it was in 2006.  It probably was very

20  shortly after this.

21       Q.   Do you know what group you transferred to?

22       A.   He went to the business part of management

23  reporting to Cindy Palar.

24            Cindy is a male by the way.  Some people get

25  confused by that.

117

1      Q.    Was Cindy Palar still working in the U.S. at that

2   point?

3      A.    Yes.

4      Q.    Was Cindy working in Tempe?

5      A.    No.  Fremont.

6      Q.    Why did Eric Gongora transfer to the business PLM

7   group?

8      A.    I don't know.

9            Oh, I do, I'm sorry.  Let me take that back.

10           At one point in time, as I understand it, who

11   knows what goes on behind the scenes, but, yes, I was having

12   difficulty with Eric, managing, you know, that situation in

13   terms of insubordination and all that.

14           But, at this time, coincidently, Scott Jewler, who

15   was not my boss at this time, right.  He was -- I was under

16   B.J. at this point.  Scott Jewler's group was apparently

17   short on resources for what's called system and package

18   technology.  I mean, product management.

19           They needed -- they were shorthanded.  They wanted

20   one of my resources.

21           He asked initially for another fellow named Scott

22   Gooch, and I said, well, no, we just brought that guy on

23   board.  And he said, okay, I'll take Eric.

24           I said, fine, take Eric.  If that's what you want,

25   take him.

```
 1              So that's what happened.

 2              They transferred him.

 3              So, essentially Scott Jewler asked for him.

 4       Q.   Do you know what if Scott's manager had any

 5   complaints regarding Gongora's work after he transferred?

 6       A.   He got on -- well, he told me he got on him a few

 7   times for misbehaving.  But I don't know the details there,

 8   no.

 9       Q.   Who told you that?

10       A.   HR.  Human resources.

11              Said that Cindy had confronted him a few times

12   about misbehaving, such as inserting himself in other

13   people's confidential reviews, et cetera.

14       Q.   Anything else that you're aware of?

15       A.   In terms of what?

16       Q.   Any other concerns or issues that Eric's new

17   manager had with Eric after he transferred?

18       A.   You have to ask him that.

19              I. . .

20       Q.   I'm asking you if you know of any issues --

21       A.   No, I didn't discuss these things with him.

22              I discuss the bare minimums at that point about

23   Eric.

24       Q.   Did you continue to have issues with Eric after he

25   transferred out of the group you supervised?
```

1     A.    Did I have issues?  No.

2           He had issues with me.

3           I was hoping he would just leave me alone, but he

4    wouldn't.

5     Q.    How so?

6     A.    He continued to manipulate my staff.  Turned

7    others against me.

8           He tried to pull resources out of my group, by

9    badmouthing me, therefore turning others against me.

10          And so I continually -- you know, when this

11   happened, I would ask Cindy and Scott Jewler and B.J. to

12   please step in and manage the situation.

13          (Whereupon, Mr. Eric Dowell enters the room.)

14          THE WITNESS:  Unfortunately Cindy then forwarded

15   one of my e-mails to Eric.

16          And I think that worsened that situation.

17   BY MS. LARSEN:

18    Q.    How was Eric manipulating your staff after he

19   transferred to PLM, or business PLM?

20    A.    Trying to pull them out of my group, saying they

21   belonged in another group, kept pulling at them.

22          They even complained about it.  One of them

23   complained.  Scott Gooch complained about it.  Said he was

24   tired of getting pulled by Eric.

25          Flynn Carson contacted me about this.

©  AZ LITIGATION SUPPORT (480)481-0649

1    Q.    Flynn contacted you about Scott's concerns.

2    A.    Flynn Carson contacted me saying that Scott Gooch

3    complained to him that he was getting pulled in different

4    directions.

5          I said, who's pulling him.

6          He said, Eric Gongora.

7          And then Cindy later confirmed this.

8    Q.    How did Eric badmouth you after he transferred to

9    the business PLM group?

10   A.    I don't know the details.

11   Q.    How do you know he badmouthed you?

12   A.    I was getting secondhand news from people saying

13   he's running around telling people you gave an unfair review

14   to Brett.

15         I mean, you can also read it in reading the way

16   people start turning against you for no good reason.

17         People that are close to him, I should say.

18   Q.    Who turned against you?

19   A.    Brett Dunlap.  Scott Gooch.

20         And there may be some others affected but didn't

21   blatantly make it obvious.

22   Q.    So you believe that Eric somehow turned Scott

23   Gooch and Brett Dunlap against you.

24   A.    Yes.

25   Q.    And how do you believe he did that?

© AZ LITIGATION SUPPORT (480)481-0649

121

1       A.   How do I think he did that?  Is that what your
2   question was?
3       Q.   How do you believe he turned Scott and Brett
4   against you --
5       A.   I don't know.  You'd have to ask him that.  Who
6   knows what he tells them.
7            But it was clear in their actions and their
8   behavior toward me and their animosity toward me.  It was
9   night and day.
10           The minute Eric had left my group, things changed.
11           And I started hearing he was trying to pull people
12   out.  Those two out of the group.
13           And he was mucking up their reviews.  And I just
14   told you about Scott Gooch, so. . .
15      Q.   How did Scott Gooch turn against you?
16      A.   How?
17           I don't -- you would have to ask what he was told
18   by Eric.  I don't know.
19           I hardly knew this fellow.  He was very new to the
20   company.  And when I did try to get a hold of him, he was
21   not all that easy to get a hold of.
22           He was not exactly a stellar performer, by the
23   way.
24           But, he was difficult to get a hold of.
25           And I -- but, but he was Eric's report at the time

122

1    in my group.  Eric tried to pull him.  He was actually -- he

2    was allowed to leave the group.  And he began reporting to

3    Mike Schraeder.  When he left the company, he was reporting

4    to Mike Schraeder, not me.

5        Q.    But on what do you base your statement that Eric

6    turned Scott against you?

7              MR. STROJNIK:  Object to the form.

8              THE WITNESS:  He made very strong statements in an

9    exit review, which made no sense whatsoever.

10   BY MS. LARSEN:

11       Q.    Who did?

12       A.    Scott Gooch.

13       Q.    So the basis for your belief that Eric Gongora

14   somehow turned Scott Gooch against you is based on Scott

15   Gooch's exit interview.

16       A.    Sure.

17       Q.    Anything else?

18       A.    No, I had very little -- no.  Nothing else.

19       Q.    And why do you believe that Eric turned Brett

20   Dunlap against you?

21       A.    He also made very strong remarks to B.J. about me,

22   after his review, after Eric inserted himself in that review

23   process.

24       Q.    Did you feel you gave Brett a positive review?

25       A.    Excuse me?

123

```
 1        Q.    Did you feel you gave Brett a positive review?

 2        A.    I thought it was -- it was middle of the road.

 3              He had been with the company, what, less than a

 4    year at that point.

 5              And a $9,000 bonus is not all that bad.

 6              I didn't have a bonus like that with this company

 7    for three or four years, because they weren't giving them

 8    out at that time.

 9              I mean, it was a fair review.  And it was

10    accurate.

11        Q.    But, to your knowledge, is that, is that why Brett

12    was unhappy with you, because of his review?

13        A.    You know, I don't know why.  You have to talk to

14    Eric.

15        Q.    But you somehow believe that Brett's unhappiness

16    with you was due to something Eric did or said.

17        A.    Yes.

18        Q.    Why do you believe that?

19        A.    I just said.  It wasn't too long after Eric left

20    the group and started pulling those two away that I started

21    having problems.

22        Q.    And so timing, is that the only basis --

23        A.    How could I possibly know what was being said

24    behind my back?

25              Okay.  You can only go based on people's actions..
```

© AZ LITIGATION SUPPORT (480)481-0649

1   And those two were closest to Eric Gongora, and those are

2   the two that turned against me.

3           That's all I have to say.

4           And after that it's what management told me.

5       Q.    What did management tell you?

6       A.    That they had bad feedback from those two about

7   me.

8           Which, by the way, was unsubstantiated, all of it.

9       Q.    Did you have any other -- did you experience any

10  other kind of problems with Eric Gongora after he

11  transferred to the business PLM group, besides what you just

12  described?

13      A.    Not, in an obvious sense.

14          I suspect he did things behind my back, creating

15  the problems.

16          Again, those are things that, you know, I can't

17  give you specifics, because they're done behind my back.

18          I do know the ketchup incident clearly did.

19          I think that speaks for itself.

20          He also, when I took family medical leave of

21  absence, ran around screaming things about me as well.  I

22  heard from the office, because they called me and said why

23  is this guy running around saying things about you being out

24  of the office, saying you're not sick, you're not this or

25  that.

125

```
 1          So I asked HR to please tell him to be quiet, tell
 2     him to stop doing these things.
 3          Q.   When was that?
 4          A.   When was that?  My first day of family medical
 5     leave of absence.
 6               Our admin contacted me saying why is Eric
 7     screaming saying you're not really sick, you're this and
 8     that.
 9               I said, I don't know.
10               So I contacted both B.J. and Gail Way (phonetic)
11     immediately and I said, would you please ask him to stop
12     this.
13          Q.   Who was it that called you?
14          A.   I'm sorry?
15          Q.   Who was it that called you?
16          A.   Chris Shea.
17          Q.   She called you at home.
18          A.   Yes.
19               And I'm trying to think.
20               She might have, out of concern also, come to my
21     home as well.  She was upset because I didn't come to work.
22          Q.   And what did Chris Shea say to you?
23          A.   Essentially that he was being a pain, and running
24     around saying, I know Diane's not sick, I know Diane's not
25     sick, I saw her at a gym, et cetera, et cetera.
```

126

1              You know, just more of the same with him.

2         Q.   And what did you do once Chris told you that?

3         A.   I didn't say anything.

4              I said, okay, thank you.  And I asked her -- oh, I

5    did ask her to please contact HR on my behalf.

6              And I contacted HR and B.J. Han at that point in

7    time.

8         Q.   You contacted Gail in HR.

9         A.   Yes.

10        Q.   And what did you say to Gail?

11        A.   I repeated what Chris told me, and asked that

12   somebody please ask him to leave me alone, stop damaging my

13   reputation like this.

14        Q.   To stop damaging your reputation?

15        A.   Yes, by running around screaming lies.

16             He has no business running around saying what I am

17   or not doing when he doesn't know.

18             I mean, what I was doing at that point in time was

19   not his business.

20             So. . .

21        Q.   Did you contact Gail by phone or e-mail?

22        A.   Um.

23             I think e-mail.

24        Q.   Did Gail respond to your e-mail?

25        A.   I believe so.

1    Q.   What was her response?

2    A.   I don't remember, but she -- something to the

3    effect of -- something to the effect of I'll ask him to shut

4    up or something like this.

5         I don't know.

6    Q.   And did you contact B.J. Han as well?

7    A.   I probably copied him on the same e-mail.

8    Q.   Did you contact him in any other form?

9    A.   No.

10   Q.   Do you recall if B.J. responded to your e-mail?

11   A.   I don't remember.

12        I was just not in good form at that point in time.

13   I was very upset and didn't want anything to do with this

14   place anymore.

15   Q.   So aside from what you've described, Eric

16   manipulating your staff, badmouthing you, trying to turn

17   others against you, and telling other employees he didn't

18   think you were sick, did you have any other issues with Eric

19   after he transferred to PLM?

20   A.   I think -- did you catch the ketchup?  He put that

21   on my chair.

22        And later lied about where he was.

23        So I think that's sort of an admission in itself.

24   He was there, and people saw him there, and he said he

25   wasn't there.

128

1          So why would you lie if you didn't do it?

2          So, yeah, he did that also.

3          So, anyhow, I think that's enough.

4     Q.    Okay.  But were those the only problems you had

5  with Eric?

6     A.    Not the only.

7          Those are examples.

8     Q.    Okay.  What other problems did you have with

9  Eric --

10     A.    I don't remember right now.  I really don't.

11          We would have to go through a series of e-mails,

12  and I don't have everything in my mind right now.

13     Q.    Okay.  Did you do anything aside from reviewing

14  the letter your attorney sent me to prepare for your

15  deposition today?

16     A.    I said I read the review, and I -- have you seen

17  the documentation?  There's volumes of this stuff.

18          So if you're asking me if I can recite and recount

19  every e-mail, I cannot.

20          Everything that happened was documented.  I

21  guarantee you that.

22          As far as the harassment from Eric, after he was

23  transferred from my group, I was documenting from that point

24  very clear for certain.

25          I documented one of two ways, either my own

1    personal notes, or, if I felt bold enough, I actually told

2    management.

3            But, every time I told management, it was -- it

4    came back on me.

5        Q.    Have you disclosed those notes in this case?

6        A.    Uh-hmm.

7        Q.    Your personal notes.

8        A.    Yep.

9        Q.    And so without reviewing your e-mail

10   correspondence, you're unable to testify about any other

11   issues you had with Eric Gongora after he transferred to the

12   business PLM group.

13       A.    Oh, I'll take some time and try to think.  Is that

14   okay?

15       Q.    Sure.

16       A.    Okay.

17            (Brief pause.)

18            THE WITNESS:  The issues you're talking about,

19   when he reported me or after?

20   BY MS. LARSEN:

21       Q.    I'm talking about following Eric's transfer --

22       A.    Okay.

23       Q.    -- to the business PLM group.

24       A.    Okay.  No, the primary ones were him pulling

25   people away from me, putting ketchup on my chair, and what

1    I'm aware of, you know, him running around, like I say, when

2    I filed for FLMA, where is she, where is she, she's lying,

3    whatever.

4            Those are the ones I know.

5            Do I think there's others?  Probably.

6        Q.    But you're not aware of them.

7        A.    Yeah, let's just go with that.

8            I think it's sufficient.

9        Q.    Well, I'm not, I'm not evaluating at all.  I'm

10   asking you what you can and can't remember.

11           And so if you're telling me that that's --

12       A.    That's all I can remember right now.

13       Q.    And you believe that if you reviewed your e-mail

14   that would refresh your recollection.

15       A.    Could, yes.

16           I might add, these days I do see him every now and

17   then in the gym.  And clearly I don't like the way he looks

18   at me.  He's very aggressive.  When he walks toward me he

19   stares me down and walks away.

20           So, if you want to add that, you can.

21           When he stares at me in a very intimidating way,

22   when I see him, in public.

23       Q.    You're talking about now.

24       A.    I'm talking about now.

25       Q.    When did that start?

1       A.   I go to the gym four times a week or so.  I see

2  him often.

3            He's always there..

4            So it can be once or twice a week.

5       Q.   When did it start?

6       A.   It actually started more noticeably -- he used to

7  avoid me, but now as of about, let's say, three, four weeks

8  ago he's become a little bold.

9            Or he'll actually -- if I'm on a system, a machine

10 or something, he'll walk right at me, stare at me, and then

11 turn, like, three or four feet away from me.

12           And he'll be staring right at me.  I mean, it's

13 not necessary, I don't think.

14      Q.   And this is recently in the last three to

15 four weeks.

16      A.   Uh-hmm.

17      Q.   Is that yes?

18      A.   I've actually left the gym -- yes.  I've actually

19 left the gym when he's done this thinking God knows what's

20 happening at home with my daughter.

21           I've been freaked out by this guy since.  I don't,

22 I don't feel comfortable about this guy at all.

23      Q.   Has Eric ever threatened you?

24      A.   Verbally, no.

25      Q.   In any manner.

1       A.   His physical manners, I mean, don't you think

2  it's -- I think it's threatening when somebody walks at you

3  staring at you like this and then turns.

4           I don't -- yes, that's threatening.  And that's

5  threatening body language to me.

6           MS. LARSEN:  If we can mark that.

7              (Deposition Exhibit No. 5 was marked for

8  identification by the reporter.)

9  BY MS. LARSEN:

10      Q.   You have in front of you what's been marked as

11 Exhibit 5.

12      A.   Uh-hmm.

13      Q.   Do you recognize that document?

14      A.   Could you just give me one moment here?

15           (Brief pause.)

16           THE WITNESS:  Okay.  Yes, I remember this.

17 BY MS. LARSEN:

18      Q.   Can you tell me what Exhibit 5 is?

19      A.   It's a correspondence, in the end, it's a

20 correspondence between myself and B.J. regarding the Intel

21 sales team.

22           MR. STROJNIK:  My copy seems to be incomplete.  Is

23 your copy redacted --

24           THE WITNESS:  In terms of what?

25           MR. STROJNIK:  Well, it says redacted up on top.

1    Is there a full copy somewhere?

2            Or is this redacted copy --

3            MS. LARSEN:  What's been disclosed has been

4    redacted --

5            MR. STROJNIK:  Okay.

6            MS. LARSEN:  -- for attorney-client privilege.

7            MR. STROJNIK:  Okay.

8            THE WITNESS:  Oops.

9    BY MS. LARSEN:

10       Q.   So the last part of Exhibit 5, the top, below the

11   redaction, is an e-mail that you forwarded to B.J.

12       A.   Uh-hmm.

13       Q.   Is that a yes?

14       A.   What about it?

15       Q.   I'm sorry, could you answer verbally?

16       A.   One more time.

17       Q.   Could you answer verbally?  Was that a yes?

18       A.   No, ask me one more time.  I didn't hear you.

19            MS. LARSEN:  Could you read it back?

20            (Pending question read.)

21            THE WITNESS:  Yes..

22   BY MS. LARSEN:

23       Q.   And in your e-mail, is it the sales team that

24   you're referring to there?

25       A.   Yes.

1      Q.    And it's the sales team that you're referring to

2  as Ms. --

3      A.    Yes, it's a function.  But not any one individual,

4  but yes.

5      Q.    Your e-mail -- tell me if this is accurate.  Your

6  e-mail states:  This was another cluster I had to sort out

7  today with these misfits.  It's very frustrating trying to

8  work with these neanderthals.

9            Is that what your e-mail said?

10     A.    Yes.

11     Q.    Did you think that your e-mail was a professional

12 way for a vice president to refer to colleagues when

13 speaking to her boss?

14     A.    No, but this is very, very typical in our

15 corporate culture.

16            And B.J. often asked me to speak candidly, openly,

17 and vent to him.

18            If I talked like this, it was strictly between he

19 and I.

20            And verbally I can assure you he said way worse

21 than this to me about sales teams.

22            Both he and Lay Koon have a reputation of not

23 liking salespeople and they often asked me to go in and sort

24 out the messes.

25            So, that's where we are.

1          Here you go.

2          Are you done with this one?

3          MS. LARSEN:  I am.

4          If you could mark that for me.

5          (Deposition Exhibit No. 6 was marked for

6     identification by the reporter.)

7     BY MS. LARSEN:

8          Q.    Do you recognize what's been marked as Exhibit 6?

9          A.    Yes, I do.

10         Q.    Can you tell me what that is?

11         A.    It was probably an off-color joke between --

12    again, between B.J. and I.  And, once again, this is in line

13    with B.J.'s humor.

14         I wouldn't be surprised if he sent this to Tan Lay

15    Koon laughing, but, anyhow, yes, I recognize it.

16         Q.    So Exhibit 6 is an e-mail that you were

17    forwarded -- that you sent to your boss, B.J. Han.

18         A.    Uh-hmm.

19         Q.    And who were you talking about in your e-mail?

20         A.    Brett Dunlap.

21         Q.    And who was Brett Dunlap?

22         A.    He was one of my reports..

23         He used to report to Eric Gongora, but when Eric

24    was moved out then he was reporting to Flynn Carson..

25         Q.    And your e-mail to B.J. states:  Somehow Dean

1    Kossis --

2        A.    Kossives.

3        Q.    -- Kossives and Doug Matthews must have managed to

4    conceive a baby and create Brett.  He has Dean's bullshit

5    factor and Doug's arrogance and inability to be realistic.

6        A.    Uh-hmm.

7        Q.    That was your e-mail to B.J.

8        A.    Uh-hmm.

9        Q.    Could you answer verbally?

10       A.    Yes.

11       Q.    Again, do you think this is a professional way for

12   a vice president to describe one of her direct reports to

13   her boss?

14       A.    Is it professional?  Outwardly absolutely not.

15             Is this the way Tan Lay Koon, B.J., myself spoke?

16   Yes.  This is typical communication between us.

17             They spoke this way as well.  That was the

18   corporate culture.

19             And I might add, if this was an issue, why didn't

20   B.J. say so.

21       Q.    Who did, who did B.J. talk about in this sort of

22   manner?

23       A.    Oh, he would make jokes about Dean because --

24   well, who didn't he.  I mean, he insulted sales all the

25   time.

```
 1          MR. STROJNIK:  I'm sorry.  Let me know when you're
 2   done.
 3          THE WITNESS:  Yeah.
 4          I'm sorry, go ahead.  I got distracted.  What were
 5   you asking me.
 6          MR. STROJNIK:  Before --
 7   BY MS. LARSEN:
 8      Q.  I'm asking you who B.J. would speak about in this
 9   manner.
10      A..  Salespeople.  Often.
11          MR. STROJNIK:  Let me take a two-minute break
12   before the next question is asked.
13          MS. LARSEN:  Okay.
14          MR. STROJNIK:  Is this a good time?
15          MS. LARSEN:  I'd prefer to just clarify.
16   BY MS. LARSEN:
17      Q.  Can you refer to any specific examples of who B.J.
18   would -- you say this is B.J.'s kind of humor, Lay Koon's
19   kind of humor --
20      A.  Uh-hmm.
21      Q.  -- the kind of statements they would make about
22   employees.  Is this your testimony?
23      A.  B.J. used to call Dean a bullshitter all the time.
24          MR. STROJNIK:  I need to take a break.
25          MS. LARSEN:  We'll go off.
```

138

```
1              THE VIDEOGRAPHER:  We're off the record at 1:26.

2              (Brief recess taken.)

3              THE VIDEOGRAPHER:  We are back on the record at

4    1:35.

5    BY MS. LARSEN:

6         Q.   Referring back to what's been marked as Exhibit 6,

7    the other two individuals there, Dean Kossives and Doug

8    Matthews, who are they?

9         A.   Former employees of STATS ChipPAC.

10        Q.   Former employees that you supervised?

11        A.   Uh-hmm.  Yes.

12        Q.   When did you first report to someone at STATS

13   ChipPAC that subordinate male employees were undermining

14   your authority within your group?

15        A.   Probably sometime in 2006.

16        Q.   Can you recall more specifically?

17        A.   No.

18        Q.   And who did you report to?

19        A..   B.J. Han.

20        Q.   And how did you make your report?  In writing?

21   E-mail?

22        A.   Well, e-mail.

23             I may have done it verbally as well..  I don't

24   know.

25        Q.   And what specifically did you report to B.J.?
```

© AZ LITIGATION SUPPORT (480)481-0649

139

```
 1        A.    Specifically, I don't know.  If I can't remember
 2    exact date..  I can't remember.  I don't know.  I don't know
 3    right now.
 4             You want to know what triggered that e-mail
 5    or. . .
 6        Q.    I'm referring to your second amended complaint,
 7    paragraph 20, where you state:  Beginning in 2006 and
 8    through April 2007, plaintiff reported to her management and
 9    human resources department that certain subordinate male
10    employees, including but not limited to Eric Israel
11    Gongora -- skipping a bit -- were undermining her authority
12    within her group.
13        A.    But I think you just answered your own question.
14    2006 to 2007.
15             There is no specific.  You asked me for a specific
16    time frame there.  Went on.
17        Q.    I'm asking when your report was to B.J. Han.
18        A.    I don't remember.
19             I mean, there were many reports.
20             There were many times I said, these -- there
21    were -- these employees were undermining my ability to --
22    certainly when management doesn't support me, to manage my
23    employees.
24             I mean, when I'm told to walk the other way,
25    ignore and focus.  And, you know, they see this.  Okay.
```

© AZ LITIGATION SUPPORT (480)481-0649

1          When, when troublemakers are allowed to get away

2     with what they are because management -- and they begin to

3     realize management's not supporting me, it gets worse and

4     worse and worse.

5          And that's when I began telling B.J. repeatedly,

6     if this doesn't get under control fast, my career is down

7     the tubes.

8          Boy, I guess I predicted that one pretty well.

9          They continued to get out of -- you know, it just

10    spiraled out of control.  Because they knew they could get

11    away with it.

12         I had no power, no control over these people.

13         Even as a vice president, I could not stop these

14    things that were happening.

15    Q.   I guess what I'm asking is:  Do you recall any

16    specific examples of what you told B.J. that communicated or

17    in your mind constituted a report that your employees were

18    undermining your authority within your group?

19    A.   Well, I could think of one very good example where

20    it did happen was when I specifically asked my team, I

21    already mentioned this earlier, okay, to attended the

22    Prismark technology workshop.  And when I'm sitting in a

23    hospital, Eric is telling everybody just go do your own

24    thing, I call that undermining my authority.

25         I mean, you want more examples like this?

© AZ LITIGATION SUPPORT (480)481-0649

1    Q.    Well, I guess my first question would be:  Did you

2    report that indent to B..J. Han?

3    A.    Yes, it's in e-mails all over the place.

4    Q.    In multiple e-mails?

5    A.    Multiple incidents and multiple e-mails.

6    Q..    Okay.

7    A.    And I distinctly remember telling B.J. that when I

8    asked -- when I called Eric, when I got out of the hospital,

9    and said, why did you tell people not to go to the

10   conference when that was the whole purpose of everybody

11   going to California, he started saying, it's not a big deal,

12   big deal we can call in, you know.

13          And I said it's not your call -- shot to make..

14          There's a difference between calling in and being

15   there physically in a conference where you can participate.

16          And, he screamed -- this is the incident I

17   mentioned earlier -- at the top of his lungs where people

18   could hear him clear across the office with the door shut.

19          And when I mentioned this to management, I was

20   told, again, you know, focus on your work.

21          So I've got an employee who reports to me that is

22   allowed to scream at the top of his lungs to me and I am not

23   allowed to do anything about it.

24   Q.    So you reported in an e-mail to -- if I'm

25   understanding you correctly, you reported in e-mail to B.J.

© AZ LITIGATION SUPPORT (480)481-0649

1   that Eric screamed at you when you questioned him about

2   allowing employees not to attend the Prismark conference.

3       A.    It was either an e-mail or a phone.  That one was

4   either e-mail or a phone conversation.

5       Q.    You can't recall which.

6       A.    I can't, no.

7       Q.    And what was your recollection of B.J.'s response?

8       A.    The usual.  Focus on what you do.  Manage the

9   group.  Ignore these things.

10      Q.    And did you report to anybody else that Eric

11  screamed at you when you asked him why he told members of

12  your group they didn't have to --

13      A.    I didn't have to report it.  Many people heard it.

14      Q.    I'm sorry, for Marty's sanity, could you let me

15  finish the question.

16      A.    Sorry.

17      Q.    Just to be sure I got it.

18            Did you report to anybody besides B.J. that Eric

19  Gongora screamed at you when you asked him why he told other

20  members of your group that they didn't have to attend the

21  Prismark event?

22      A.    No, I had three people ask me why Eric was yelling

23  at me because they could hear it so loudly.

24      Q.    And who are those people?

25      A..   Chris Shea, Ram Ramakrishna, Blake Gillette.

143

1          Now, there may have been others who heard it and

2    they just didn't say anything, but -- because there were

3    people actually between.

4          Whether they were sitting in their office or not,

5    I don't know.

6          Oh, by the way, when he did that, yelling at me,

7    he was on a phone in a conference room, in Arizona, where he

8    wasn't supposed to be, and I was in, I was in California on

9    a phone.

10         So I was not physically there.

11         He was sitting in a conference with the door shut

12   screaming, and people could hear it.

13         And then they called me later saying, what the

14   hell is going on, why is he yelling at you like this.

15   Q.    Do you know if you reported that incident to human

16   resources?

17   A.    Not at that moment.  I was having medical things

18   going on, and so I just -- it was -- frankly I had medical

19   concerns on top of my mind, and I just -- I told -- I

20   probably -- I don't know for a fact.

21         I probably told Gail Way later as part of a, you

22   know, a larger conversation.

23   Q.    But you don't remember specifically --

24   A.    No.

25   Q.    -- if you told Gail.

144

1    A.    Not specific on that one.

2    Q.    Just to make sure -- I'm sorry.  Please --

3    A.    I'm sorry.

4    Q.    Please let me finish the question.

5    A.    Okay.

6    Q.    We're keeping him on St. Patrick's Day.

7          We can at least go easy on him.

8          So, to clarify.  I just want to make sure I got

9    everything.  You don't recall specifically if you told Gail

10   about the incident where Eric screamed at you.

11   A.    Not a specific discrete incident, no.

12   Q.    And you believe you told B.J. by phone or e-mail.

13   You can't recall which.

14   A.    Yes.

15         But I don't recall, I don't recall which.

16   Q.    And do you recall any other situations that you

17   reported to human resources or management regarding

18   subordinate male employees undermining your authority within

19   your group?

20   A.    Other people, you're saying?

21         MS. LARSEN:  Would you read back my question?

22         (Pending question read.)

23         THE WITNESS:  When I had issues, I pretty much --

24   B.J. always told me come to me when you have issues.

25         And I did.

© AZ LITIGATION SUPPORT (480)481-0649

1          But when I did, I was told to dismiss it.

2          So that's what I did.  He said, don't talk -- he

3     always said, don't talk to others, don't complain to others,

4     come to me.

5          You can -- in fact, there's e-mails that say you

6     can never be too honest with me, he said in some of his

7     e-mails.  Come to me and vent openly and tell me everything.

8          But I do that and nothing would happen.

9          Actually something would happen.  It would usually

10    be turned against me somehow.

11         But, I went to him.  Whether it be on a phone call

12    or e-mail, I went to him.

13         But it's kind of funny, because he would tell me

14    to come to him, but then if I did, I was told basically to

15    shut up, don't complain.

16         So, I go to him, about things, calling people,

17    salespeople, whatever, you know, you know.  This is a man

18    who, by the way, called these people -- called people

19    monkeys.  Our CEO referred to -- these are two managers,

20    Tan Lay Koon and B.J., who would call people fat, lazy,

21    stupid.

22         I was called fat by my own boss.  The day I came

23    back from my lung surgery I was told you've become fat.

24         I mean, these people are telling me to be open

25    with them and honest with them about, you know, things that

1  are going on at other organizations, they were telling me,

2  you know, sales -- they never liked salespeople.

3         You know, you know, you get on the sale team.

4  They're not doing their job.  I want you to set up a meeting

5  with X, Y, Z.  And I do it, and the sales team got angry

6  with me by me doing my job.  Sometimes they hurt me.

7         And, you know, and some of these people would

8  become very upset with me, so -- yeah, you know, I've seen

9  correspondence that sales was upset with me.  That's because

10 I was following marching orders from B.J. Han and Tan Lay

11 Koon, doing my job.

12        And when, you know, times got tough, they weren't

13 there to back me when, you know, all of a sudden there's

14 these claims that Diane is difficult, or this or that.  I

15 was doing my job.

16        And they asked me to do that job.

17        And when people complained about me doing my job,

18 they weren't there to back me.

19        Now, you're asking me did I complain or talk about

20 others.  Yeah, I went to him several times.

21        Either right through him or backlashed on me.  So

22 there's your answer.

23 BY MS. LARSEN:

24    Q.   Aside from the Prismark event that you've

25 described --

© AZ LITIGATION SUPPORT (480)481-0649

1     A.    Uh-hmm..

2     Q.    -- can you remember any specific examples of

3  reports you made to human resources or management that

4  subordinate male employees were undermining your authority

5  within your group?

6     A.    I also very strongly asked HR to ask Eric Gongora

7  to stay out of other people's reviews that -- on

8  confidential matters they had no business being part of.

9           Now, there should have been severe HR action on

10  it, what he did there.

11          And I asked repeatedly if there was anything in

12  his file about what he had done.

13          Never.  Never did they write this guy up.

14     Q.    What situation are you referring to with other

15  people's reviews?

16     A.    Brett Dunlap's review.  I went through this

17  earlier.

18          He ran around screaming that I gave an unfair

19  review to Brett Dunlap and how he got screwed.

20          How did I know about this?  Is that one of the

21  unusual times somebody actually picked up a phone and said

22  these guys are running around doing this and that and it's

23  not correct.

24          I don't -- Flynn Carson was the one who called me

25  and said, I don't agree with what these guys are doing, it's

1    wrong, they shouldn't be, A, talking about your reviews with

2    your employees, and, B, you know, it's confidential, you

3    know, why is Eric involved in this.

4            So that's another example.

5    Q.    And you asked human resources to talk to Eric.

6    A.    I asked HR to work with his management and Eric

7    directly to stop this.

8            When I sent an e-mail to Cindy Palar, his manager,

9    asking him once and for all if verbal warnings weren't

10   working please write him up, Cindy forwarded that e-mail to

11   Eric and said, what's going on here.

12           Now, bad judgment call.

13           That was a confidential e-mail between one manager

14   to another.

15           And, oh, guess what, three days later there's

16   ketchup on my chair.  You don't think someone backlashed on

17   that e-mail.

18   Q.    When you made your report to HR to work with

19   Eric's manager, was that in writing or e-mail, phone?

20   A.    Which -- I'm sorry, say that again.

21   Q.    I believe you testified that you had asked human

22   resources to work with Eric and his manager, and direct Eric

23   to stay out of other people's reviews.

24   A.    That was an e-mail.

25   Q.    That was an e-mail.

149

```
 1        A.    And it was verbal to Gail Way.  I called her up.
 2        Q.    Who was the e-mail to?
 3        A.    Scott Jewler was on copy.  B.J. was on copy.
 4   Cindy Palar was on copy.
 5              And Gail was on copy.
 6        Q.    And you followed up with Gail by phone.
 7        A.    Uh-hmm.
 8        Q.    Is that a yes?
 9        A.    Yes.
10        Q..   And what was the response that you received?
11        A.    Lip service.
12              Nothing.
13              It was, yeah, we'll take care of this.
14              Nothing happened though.
15              Because up until the day I took FMLA, I asked, was
16   anything ever put in that file, and I was told no.
17              So after all the incidents that took place, there
18   was nothing in that guy's file, Eric's file.
19        Q.    Who told you they would take care of it --
20        A.    Gail Way.
21              Sorry.  I interrupted.
22              MR. STROJNIK:  You have to apologize to him.
23              THE WITNESS:  Sorry.
24   BY MS. LARSEN:
25        Q.    And so I just want to make sure he did get it.
```

1          In fact, who was it that told you they would take

2     care of it in response to your phone call or e-mail?

3          A.   Gail was going to approach -- was going to work

4     with Eric's management.  And Cindy promised that they

5     would -- not reprimand him, but that they were going to take

6     it up with Eric.  Write him up, whatever, I don't remember

7     Cindy's exact words.

8          Q.   Was your conversation with Cindy by phone?

9          A.   I had phoned Cindy a number of times, yes, but at

10    this point in time I made sure I also sent e-mails.

11              So, both.  Both.

12              I talked to Cindy many times on the phone as well,

13    about these kind of incidences.

14              Cindy, by the way, was never surprised.  He had

15    problems with Eric too.

16         Q.   But you said that Cindy promised that Eric would

17    be reprimanded; is that correct?

18         A.   He said he would take it up with him and -- I

19    don't know if he was -- he -- let me think, hold on.

20              He said he would take it up.  He said he would

21    take it up with Eric.

22              And at the same time though he forwarded, like I

23    said, he forwarded the e-mail direct to Eric and said, is

24    this true, what's going on.

25              I guess that's, I guess that's Cindy's way of

1   writing him up.  I don't know..

2       Q.   And when you say forwarded your e-mail, is this

3   the e-mail in response to Eric's involvement in Brett's

4   review?

5       A.   Yes.

6       Q.   And when you said that Cindy promised that he

7   would address the issue with Eric, was that in e-mail or

8   verbally?

9       A.   Cindy -- I can't remember what Cindy responded,

10  but he told me verbally he would take care of it, he would

11  look into it.

12           I was told that Scott Jewler did make a phone call

13  to Eric.

14           And told him behave supposedly.

15           Now, whether that happened or not, I don't know.

16      Q.   Where did you, where did you get the information

17  that Scott had called Eric?

18      A.   Where did I see that.

19           I think it was actually an e-mail, either from

20  Gail Peters saying that Scott called Eric -- I don't

21  remember.  I don't remember.

22           There were a lot of e-mails that went back and

23  forth.  I just can't recall all these things.

24           MS. LARSEN:  We can go ahead and change.

25           THE VIDEOGRAPHER:  This concludes tape two in the

                © AZ LITIGATION SUPPORT (480)481-0649

1  deposition of Diane Sahakian.

2          We are off the record at 1:55.

3          (Brief recess taken.)

4          (Whereupon, Mr. Dowell did not return from the

5  break.)

6          THE VIDEOGRAPHER:  This begins tape three in the

7  deposition of Diane Sahakian.

8          We are on the record at 2:09.

9  BY MS. LARSEN:

10     Q.   How were your subordinate male employees at

11  STATS ChipPAC creating a hostile working environment for

12  you?

13     A.   Not following my directions, number one.

14          Number two, sending e-mails to my boss, making

15  many false accusations, and statements, that were not

16  substantiated.

17     Q.   Anything else?

18     A.   Yeah, there were several staff meetings.  I mean,

19  I was pretty flexible.  When I -- I had a weekly staff

20  meeting.  And I was very flexible if you have vacation, sick

21  time, or you had a business meeting that was unavoidable or

22  you were traveling, no problem.  Just let the admin know and

23  get in your time.

24          Some of these individuals, like Scott Gooch,

25  just flat up wouldn't show up and I couldn't get a hold of

1    them.

2           And when I asked him, his supervisor, which was

3    either Eric at the time or Flynn later, to, you know,

4    please, you know, make sure he at least states if he's going

5    to come or not, or why, if he can't make it, so we don't

6    plan on getting his inputs.  Just never got feedback.  It's

7    just a lack of cooperation in general.  They were making it

8    more and more difficult for me to manage the group

9    effectively by not cooperating.

10        Q.    Anything else?

11        A.    No.

12        Q.    And which specific male employees are you

13   referring to?

14        A.    I'm sorry, I couldn't hear you.

15        Q.    Which specific male employees are you referring

16   to?

17        A.    Largely those three:  Eric Gongora, Scott Gooch,

18   and Brett Dunlap.

19        Q.    Did you have these problems with Flynn Carson?

20        A.    Before what?

21        Q.    Did you have these problems, these same problems

22   that you've just described, not following directions,

23   sending e-mails to your boss, making false accusations, not

24   attending weekly staff meetings, did you have these problems

25   with Flynn Carson?

                © AZ LITIGATION SUPPORT (480)481-0649

154

1    A.    No.

2    Q.    Did you have these problems with Raj Pendse?

3    A.    No -- you know, both Flynn and Raj are

4    legitimately -- I mean, they traveled so much, that it

5    wasn't -- internationally, I mean, not domestically.

6    Sometimes they -- but I knew that they were traveling, and

7    they didn't always tell me.  But during a meeting someone

8    would say, oh, Raj is on the way, okay, okay, okay fine.

9            They didn't tell me, but, you know, I knew.  And

10   it was understandable that they didn't, you know.

11           So they sometimes were remiss, but that was

12   because they were in the air and had been flying all over

13   the globe, and it was kind of typical for them, but it was

14   excusable.

15           But when people are in town, and they have no

16   excuse, they should be calling in, and at lease telling me

17   why they are not calling in.

18   Q.    So aside from Eric Gongora, Scott Gooch, and Brett

19   Dunlap, did any of your subordinate male employees create a

20   a hostile work environment for you?

21   A.    Jerry Allen maybe off and on.  I had a little bit

22   of -- I wouldn't say hostile.  It was more he didn't want to

23   cooperate with me.

24           And, again, this was somebody that was pretty

25   close to Eric.

1            And he was probably a little angry with me because

2    he was one of -- you know, he was in charge of this, at the

3    Intel sales account, and I had tight relations with very

4    senior people at Intel.

5            And every now and then B.J. would ask me to just

6    go around these people and set up meetings on my own.  And

7    they became very angry.

8            So he was not happy with me.

9            Because I was doing what my boss asked me to do.

10           But, you know, point is, he would see Eric and

11   him, you know, pretty -- it was an old boy network going on

12   there.  That's all I can say.

13           You could tell just by communication every day who

14   was tight with who.

15           I mean, it was pretty obvious to most people who

16   was tight with who and who is not friendly to you and who is

17   friendly to you.

18           And by and large people that Eric is associated

19   with were not friendly to me.

20      Q.   Aside from Eric, Scott, Brett, and Jerry, did

21   anybody create a hostile work environment for you?

22      A.   No.

23      Q.   And when did you first report to someone at STATS

24   that other male employees were creating a hostile work

25   environment --

 1      A.   All of these things started happening in 2006.

 2      Q.   I'm sorry, I just want to make sure that --

 3      A..   Sorry.

 4      Q.   Do I need to repeat?

 5           I just want to make we got it.

 6      A.   No.

 7      Q.   So when did you first report to someone at

 8  STATS ChipPAC that certain male employees were creating a

 9  hostile work environment for you?

10      A.   It would have, it would have been in 2006.

11      Q.   And who did you report to?

12      A.   At that time, B.J. Han.

13      Q.   I'm sorry, I might not have been clear.

14           Who did you make your report to?

15      A.   Oh.  B.J. and Scott Jewler.

16      Q.   And what did you report to B.J.?

17      A.   Do you want me to go back through everything

18  again?  I mean, we've been talking about this all morning.

19           How much do you want me really -- I reported all

20  the things that we've been talking about.

21           It wasn't well received, but I reported all these

22  things to B.J. Han..

23           Everything from -- you know, you can see the

24  e-mail I forwarded to B.J.  Right?

25           You showed me those earlier today as exhibits.

1           I talked to him about him pulling employees away

2    from me.

3           I talked to him about the ketchup incident.

4           I talked about all these things we've just been

5    through.

6       Q.   I guess I'm trying to pin down here, in your

7    complaint, second amended complaint, where it states that

8    beginning in 2006 and through April 2007, plaintiff reported

9    to her management and human resources department that

10   certain subordinate male employees were creating a hostile

11   work environment.

12      A.   Uh-hmm.

13      Q.   And what I'm trying to clarify is exactly what

14   that report or reports consisted of.

15      A.   It was no one report.

16           It was a series of e-mails, a series of events, a

17   series of communications.

18           Which you have -- we've been going through here

19   today.

20           So, everything from the day that I asked my team

21   to attend the Prismark workshop, Gooch didn't go because

22   Eric told him not to.

23           Eric didn't attend in person.

24           And when I asked him why not, he got very

25   volatile.

                ©  AZ LITIGATION SUPPORT (480)481-0649

1          From that point on, I pretty much reported as much

2    as I could to B.J. without, you know -- as much as I could.

3    But, I mean, he would become angry and I knew that, so I had

4    to be careful what I reported to him and what I didn't.

5          So, I mean, was it that?  It was him pulling

6    employees out of my group, badgering -- he was badgering

7    Scott Gooch.

8          He badgered Chris Shea about my whereabouts when I

9    took the FMLA.

10          He inserted himself into other people's reviews.

11    Q.    Is there anything else that we haven't discussed

12    that you reported to management or human resources?

13    A.    No, I think I've covered most of it.

14          The thing that -- the thing I didn't report to HR,

15    that maybe I should have, is that B.J. Han told me on

16    several occasions that the reason why they wouldn't take

17    action on Eric is because they were scared of a lawsuit by

18    him.

19          And to this day, I don't know what the fear is.  I

20    don't know what grip Eric has over management there.  But

21    they would not take action on him because of some threat by

22    him and that he was going to sue them.

23          I did not tell HR this.  I probably should have.

24    Q.    Do you know when B.J. told you that?

25    A.    He told me that the day I came back from family

1    medical leave of absence, and he told me that another month

2    after that.

3              Again, the day -- the night before he demoted me.

4              He told me that again.

5              When I asked over and over again why the culprit

6    wasn't being dealt with, the response was because they were

7    scared of a lawsuit from him.  So I guess they decided to go

8    after me instead.

9        Q.    When you say that B.J. told you this when you came

10   back from FMLA leave, are you referring to your leave in the

11   summer of 2007?

12       A.    Wait.

13             It would be July and August of 2007.

14       Q.    Did you hire any women to work in the Emerging

15   Technology Group?

16       A.    Did I what now?

17       Q.    Did you hire any women to work in the Emerging

18   Technology Group?

19       A.    Meenakshi.

20             Wait, it's a long one.

21             Meenakshi Padmanthan, I'm not quite sure I'm

22   saying that -- I can't, I can't remember her last name.

23       Q.    Meenakshi?

24       A.    Meenakshi.  M-E-E-N-A-K-S-H-I.

25             The last name is Padmanthan, P-A-D-M-A-N-T-H-A-N.

160

1      Q.    And you hired Meenakshi.

2      A.    I did.

3            She's, as far as I know, no longer there.  She's

4      maybe working in Singapore.

5            It was a green card issue.  Work employment visa

6      issue.

7            As I was told.

8      Q.    So, to your knowledge, was anything done to Eric,

9      Scott, Brett, or Jerry in response to your complaints?

10     A.    No.

11           Nothing was done.

12     Q.    What did you expect --

13     A.    Even, even when they knew they were lying, nothing

14     was done.

15     Q.    What are you referring to?

16     A.    There were e-mails between Gail and B.J.

17     acknowledging that somebody was lying, and they were

18     referring to Brett and Eric.

19           Brett and Eric both claimed they were not in the

20     office when the ketchup incident occurred.

21           I don't know how much more of an obvious lying

22     there than that, but they were there.

23           I was talking to both of them when the incident

24     happened.

25           And there were other people there as well that saw

© AZ LITIGATION SUPPORT (480)481-0649

1    them there.  So. . .

2        Q.    What did you expect to happen in response to your

3    reports?

4        A.    That incident or?

5        Q.    In regards to everything that you reported

6    regarding Eric, Scott, and Brett.

7        A.    Scott, I wasn't expecting anything, because I

8    didn't know he had issues with me at all, until after the

9    fact, until he left the company.

10           So the only two -- actually Brett was already sort

11   of being dealt with.  B.J. was very hard on him in terms of

12   his performance.  He would send two or three long e-mails

13   berating the heck out of him that I never saw.  They were

14   very humiliating.  Brett would show them to me, but he -- it

15   was my employee, but B.J. never copied me on them.

16           Brett would just call me over to his cube and show

17   me on the tube, and I don't have copies of those.

18           But, so I knew B.J. was kind of all over Brett,

19   but yet it's kind of funny how -- it's not funny actually.

20   It's pretty sad.  That when he made false claims about me,

21   all of a sudden, after I followed my claim, you know, his,

22   his claims are, you know, holding merit all of a sudden.

23           Eric, I expected to have been written up and

24   probably fired by this point in time, for all of his antics,

25   everything from his screaming at me to meddling, pulling

1    people out of my organization, to inserting himself in other

2    people's review, to lying about where he was with the

3    ketchup incident, and yet to the day that I took FMLA,

4    which is after all this, I was told by HR nothing was in his

5    file.

6           So that's why I said lip service earlier, that

7    they were talking to him and dealing with him.

8           MR. STROJNIK:  I need to take a break, please.

9           THE VIDEOGRAPHER:  We're off the record at 2:25.

10          (Brief recess taken.)

11          THE VIDEOGRAPHER:  We are on the record at 2:28.

12   BY MS. LARSEN:

13      Q.   Does STATS ChipPAC have any kind of written or

14   formalized discipline policy?

15      A.   There is a form, that I've only seen filled out

16   once, and it's a 90-day corrective action plan form.

17          Now, whether it's an official document in the

18   company or not, I don't know.

19          It is procedural though to do a 90-day corrective

20   action plan in general.

21      Q.   I'm sorry, I just want to clarify that.

22          So, to your knowledge, during the time that you

23   worked there, did STATS ChipPAC have a written or formal

24   discipline policy?

25      A.   I don't know.

1          They were suggestions given always by HR or

2    management, but they never like formally sent you a document

3    or procedure.

4          Q.   When you were a vice president, could you make the

5    decision to terminate a STATS ChipPAC employee?

6          A.   No.

7          Q.   Did you ever discipline anyone in your group for

8    undermining your authority?

9          A.   I was not allowed to do anything like that.

10          I can tell you if I was a male, I would be able

11    to, but not as a woman.

12          Q.   What male supervisors are you aware of who are

13    allowed to discipline employees in their group for

14    undermining their authority?

15          A.   Any male.

16          I mean, other men were allowed to send e-mails

17    like I did to their subordinates without backlash, without

18    those people talking back to them, like Eric did to me, or

19    anybody else for that matter.

20          I mean, you could send e-mails saying, hey, I

21    won't tolerate this, this is what I expect of you, end of

22    story.  You were a good manager.

23          But in this company, if I did that, I was a witch.

24          It was not, it was not acceptable for a woman to

25    do her job and be a strong, good manager.

1        Now, it's funny that Tan Lay Koon said he really,

2   really, you know, admired my management skills, but push

3   comes to shove I had no, I had no power.

4        Q.   What kind of supervisor sent e-mails like you did

5   to their employees?

6        A.   I'm sorry, what was that?

7        Q..   What other managers sent e-mails like you did to

8   discipline their employees?

9        A.   I'm not privy to that..

10        I'm not privy to the details, if that's what

11   you're asking me that.  Which employees did they reprimand

12   or who did this kind of disciplining you're saying.

13        Q.   What I'm asking you is you stated that other male

14   supervisors, if I'm not misstating it, I believe you

15   testified that other male supervisors were allowed to send

16   e-mails to discipline their employees without backlash.

17        A.   Well, for one, Jeff Osmond who used to be the

18   former president of the U.S. operations and head of sales, I

19   would sit in meetings and listen to him berate people right

20   there in meetings, screaming and yelling at them.  You know,

21   never mind e-mails, he would do it right there and say, hey,

22   I'm not -- you know, every other four letter word.

23        That was the culture of this company.  People

24   screamed and yelled, especially Tan Lay Koon.  Tan Lay Koon

25   would insult the heck out of everybody.  Well, I shouldn't

1    say that.  Salespeople, Americans and salespeople in

2    particular.

3            All the time.

4            God forbid I were to ever do one percent of what

5    he did, or Jeff Osmond or the other senior sales executive.

6    I would be labeled the bitch or witch or whatever.

7            It was very difficult for me to be able to

8    effectively manage people out of line because I was not

9    allowed to.

10    Q.    So you mentioned specifically Jeff Osmond and

11    Tan Lay Koon.  These were senior executives.

12    A.    Yes.

13    Q.    What about other vice presidents?

14    A.    All of them.

15            Male.

16    Q.    Okay.

17    A.    Male executives were allowed to put their foot

18    down, assert their power, assert their position, title,

19    whatever, and people would just say yes, sir, yes, sir, and

20    it was accepted.

21            And they were allowed to succeed.

22            In my case, by trying to be effective and say I

23    can't tolerate this, I need to do this, you know, oh, it was

24    like, no, why should we.

25            You know, they knew that I was going to get walked

©  AZ LITIGATION SUPPORT (480)481-0649

1    all over because I was a woman.

2            That's the way this company was.

3            There was no other women in the U.S. in senior

4    management.  Zero.

5            I was the only one.

6            There are no vice president women in this country.

7    Let alone the rest of the country.

8            Certainly not -- I was the only one in technology.

9    Q.    So who were the other male VPs you're referring to

10   that could put their foot down?

11   A.    Jeff Powell, Jeff Osmond, Mike Schraeder.  It goes

12   on and on and on.

13           All of them.

14   Q.    How did Mike Schraeder discipline his employees in

15   a way that you weren't permitted to?

16   A.    If he was upset about something and told somebody

17   even to F off, no problem.

18           If I did that, oh, my God, I'd be out the door.

19           These guys could make jokes, no problem.  They

20   could flip each other off.  They could do whatever they

21   wanted.

22           If I did any of -- there are so many double

23   standards.  If I did any of those things, I was in trouble,

24   I was unprofessional, I was a bitch.

25   Q.    Who did Mike --

1       A.   I mean, this shouldn't come as a surprise to you.

2   I mean, how many times have you heard this story about women

3   in, you know, these kind of companies that, you know, get

4   treated terribly?

5           I mean, it's terrible the way I got treated in

6   this company.

7       Q..  Who did Mike Schraeder tell to F off?

8       A.   Oh, jokingly I saw him and the admin flip each

9   other off.

10      Q.   I'm trying to figure out who was allowed --

11      A.   And he actually used -- I can remember one time he

12  called Lay Koon, early on, fucking asshole or something like

13  this.

14          I mean, I never talked that way about our

15  management.  I never talked that way about my management,

16  period.

17          And I would hear Jerry Alameda talk that way.  I

18  remember him in a drunken stupor once calling Tan Lay Koon a

19  drunken jerk asshole, you name it.

20      Q.   To Lay Koon?

21      A.   Tan Lay Koon, the chairman..

22      Q.   No, I'm sorry, did Jerry say this to Lay Koon?

23      A.   No, Jerry, no, no, no.  God no.  Not with him

24  there, no.

25              No, this is all behind their backs.

1    Q.   I guess what I'm trying to understand though is

2    when you say that Mike Schraeder could say negative things

3    about Tan Lay Koon or Jerry Alameda could call him a

4    asshole, did Lay Koon --

5    A.   He didn't know.

6    Q.   -- know that B.J. -- I'm sorry, know that Jerry or

7    Mike said these things?

8    A.   No.

9    Q.   So when you say they were allowed to, they were

10   allowed to because --

11   A.   I mean --

12   Q.   -- their boss didn't know what happened.

13   A.   Right.

14        But they didn't have other people in the office

15   ratting on them.

16        That's my point.

17        If I did that, you better believe Eric and Brett

18   and these guys were going to run to Tan Lay Koon and B.J.

19   and say do you know she's saying these things about you.

20        I was -- I was not allow to do anything.  I wasn't

21   allow to tell jokes.  I wasn't allowed to voice concerns,

22   opinions.  I wasn't allowed to manage people obviously.

23        I had to put up with whatever came at me,

24   including sexual advances, inappropriate remarks, being

25   excluded from social events because I'm not allowed to go to

1    strip joints and everything else.

2        Q.    I thought you previously testified --

3        A.    Excuse me, one other thing, if you don't mind.

4        Q.    Go ahead.

5        A.    It doesn't help when you sit there and hear Korean

6    executives are making comments like -- when a woman is

7    taking picture with a camera, don't have, a woman, what do

8    you expect, she can't take a picture.

9            Always making derogatory remarks about women.  I

10   had to sit and listen to this all the time.

11           Now, that one wasn't directed to me.  It was --

12   but you're in that environment.

13           You pretty much know where you stand with these

14   people.

15           I had one Indian employee reporting to me,

16   complaining to me that Kenny Lee and B.J. Han were

17   ridiculing him for not having a Korean girlfriend.

18           You know, he said, you know, they told him, why

19   don't you get yourself a Korean girlfriend, not like the

20   Indian kind, implying Indian women are ugly.

21           I mean, you know, this poor guy just was so

22   insulted by this.

23           And he came to me about it.  What could I do?

24   What was I supposed to do?

25           He wasn't reporting to me by that time, by the

                © AZ LITIGATION SUPPORT (480)481-0649

1    way.  I was already demoted.

2         Q.   Who was that?

3         A.   Kenny Lee and B.J. Han making those remarks.

4         Q.   Who was the employee?

5         A.   Ram Ramakrishna.

6              That stuff went on all the time.  Especially

7    race-wise.  Americans were fat, dumb, stupid, lazy according

8    to Tan Lay Koon and B.J.  We had horrible cars..  American

9    cars are lousy.  American hotels are lousy.  American

10   airlines are lousy.  It just went on and on and on.

11             And Chinese, according to B.J., are the bottom of

12   the cesspool there with Indians.

13             I mean, this environment was toxic, just toxic.

14             And I could not manage troublesome employees

15   doing -- I'm just trying to do my job.  I can't even do

16   that.  And these guys are running around do making toxic

17   remarks like this.

18             I'm amazed that they still exist.

19        Q.   Did Cindy Palar also have problems managing Eric

20   Gongora?

21        A.   Yes, he did.

22        Q.   How so?

23        A.   Every time I went to Cindy about an issue, he

24   would say, yeah, yeah, I know, Eric does these things.

25             He would always acknowledge, yeah, yeah, all too

1    familiar to me.

2              He would laugh it off and shrug it off.

3              Cindy was not willing to battle Eric, but I think

4    Eric was probably willing to listen to Cindy because he was

5    a male.  So he didn't get as much friction as I did as a

6    woman.

7              Eric piped down when he was under a male.  With

8    me, he walked all over me.

9              He didn't like when Scott Jewler got on him.

10             And he'd come running to me saying that Scott

11   Jewler, I don't understand him, he's -- you know -- he's

12   crazy, he goes back and forth, one day he's this, one day

13   he's that.

14             You know.  Behind his back.

15             But if Scott told him to do something, he

16   certainly didn't yell at him.

17             Me, I'd get yelled at.

18        Q.   Did you ever discipline anyone in your group for

19   undermining your reputation in the company?

20        A.   I wasn't allowed to.

21        Q.   Did you ask anyone if you could place any of your

22   employees on a performance improvement plan?

23        A.   Yes, I did.

24             I asked to put Eric for sure, and I was also about

25   to write Brett up because he was getting out of control

1    there.

2        Q.    And why didn't you put Eric on a performance

3    improvement plan?

4        A.    Why did I not put Brett on an improvement plan?

5    He was taken away from me.  He transferred.

6            He wished to go into the PLM group with all the

7    other fellas that were creating this environment for me.  He

8    wanted to go hide with them, and he did.  They allowed him

9    to go over there.

10           And might I add, that when both Scott Gooch and

11   Brett Dunlap left my group, and were allowed to -- when

12   their wish was granted, and it was B.J.'s words exactly, we

13   will grant your wish to transfer to the PLM organization,

14   they quit three, four, five, six, seven months, whatever it

15   was later.

16           And yet when Scott Gooch leaves the company, he's

17   badmouthing me.

18           That didn't make sense.

19           And B.J. even acknowledged that didn't make sense.

20   And he suspected foul play here.  And I even have

21   correspondence to that effect.

22           It was only after I filed my initial claim

23   that all of a sudden his review was serious taken against

24   me.

25           Actually when I took FMLA, all of a sudden around

173

```
1    that time frame, you know, Scott Gooch -- Scott Gooch's
2    claims were starting to hold water according to B.J.
3         Because they needed whatever backup they could to
4    fight my claim.
5         Q.   When you say you weren't allowed to put Gongora on
6    a performance improvement plan, I thought you previously
7    testified that you didn't put him on an improvement plan
8    because he left your group.
9         A.   I was documenting him.
10        And it was getting -- I had been saying, I'm going
11   to write him up, I'm going to do this, do that.  And I got a
12   call from Scott saying we're going to move him to my group,
13   and I said fine.
14        Q.   So when you say you weren't allowed to, who
15   wouldn't allow you to put Gongora on a performance
16   improvement plan --
17        A.   B.J. was resisting it.
18        I have e-mails from B.J. saying you have to make a
19   very long, fair process, you can't -- you know, you need to
20   document, you need to, you know, be fair, give a long --
21   it's kind of funny because that didn't happen for me.
22        But. . .
23        I wasn't given a long, drawn out, fair 90-day
24   corrective action plan process.
25        Q.   I'm maybe just not grasping this.
```

```
 1              You testified that you were not allowed to put

 2     Eric Gongora on a performance improvement plan, but then you

 3     just stated that B.J. told you to document --

 4         A.   He did.

 5         Q.   Let me finish the question, please.

 6              Told you to document your problems with Eric if

 7     you wanted to do anything about it.

 8         A.   That was on paper.

 9              He did this -- B.J. would write e-mails to cover

10     himself.

11              This is what you need to do.

12              But when I actually went to do it, he wouldn't

13     allow me to.

14              He would balk or say, hey, you know, he'd reverse

15     it and say that I was the problem.

16              Whenever I went to document either Brett or Eric,

17     he would come full turn around and say you're the problem.

18     I don't see you managing them well.  I don't see you doing

19     this.  I don't see you doing that.

20              B.J., I'm trying to document these guys.

21              And all of a sudden I get this call that Scott

22     wants Eric in his group.  And at the same time -- so then he

23     moved Scott.  Tell me there isn't something going on here.

24              So he moves.

25              He continues to -- actually becomes a bigger
```

1   menace.

2           And then I'm told repeatedly that they don't want

3   to do anything to him because they're scared of a lawsuit.

4   And he's a known troublemaker.

5           I'm being told by Scott and B.J. that he's a known

6   troublemaker.

7           Cindy Palar laughed it off all the time, yeah,

8   yeah, I know his antics, I know what he's all about.  We

9   said enough.  He's not the only problem with this company.

10  Anyhow.

11      Q.   This is Eric you're referring to.

12      A.   Yes.

13           There are bigger issues in this company.  There's

14  a lot of racism, a lot of discrimination.  There's big

15  issues in this company.

16      Q.   And when did you ask to place Brett on a

17  performance improvement plan?

18      A.   Right, right before he was transferred.

19           He was getting very confrontational with me.

20           And I told B.J. once again, I'm not going to --

21  you know, that I was not going to tolerate this.

22           He has to show respect.

23           But he knew by then he didn't have to.

24           Because he could pull the stunts that Eric and

25  Scott Gooch pulled and get away with it.

1          Why not.

2          He didn't have to respect me, because management,

3    my management sent a very loud signal told him you don't

4    have to respect Diane.

5          And squeal -- you know, make up a bunch of lies

6    and, you know, accusations and, okay, get out of there,

7    we'll put you somewhere else.  That's essentially what

8    happened.

9          Brett Dunlap created a power point file with so

10   many false allegations I never saw until after I was

11   terminated during the discovery process.

12         Based on this power point presentation, B.J.

13   allowed him to move to another group.  He never

14   substantiated anything Brett said.

15         Now, how is that not undermining my management

16   ability?

17         Every time somebody wants to make up a lie about

18   Diane Sahakian, they get to move out of the group.

19         That's all I have to say about that.

20    Q.   So I'm going to clarify, did you ask B.J. if you

21   could put Brett on a performance improvement plan?

22    A.   I don't know if I asked him.

23         I think I mentioned to him that I think I need to

24   start a process with him as well, in an e-mail.

25    Q.   And what was B.J.'s response?

1      A.    There was none.  He was transferred.

2            And mind you, through all this, I had e-mails from

3      B.J., every now and then, I smell politics and I don't like

4      it.

5            He knew, he knew there were politics going on.  He

6      knew there were some bad things going on, but he would not

7      support me.

8            Now, this is a company that I've been with, mind

9      you, nine years.

10           These, these fellows I'm talking about, Brett less

11     than a year, Gooch less than a year, were allowed to have

12     this kind of credibility over me.

13           B.J. did nothing but -- B.J. and Lay Koon used to,

14     used to praise me on my ethics, my morals, my integrity.  I

15     always put the company first, never myself.

16           And this is what I get in return.

17           Now, how could they, how could they say these

18     things about me, and then the minute someone makes a false

19     allegation, okay, this guy wants to transfer out of your

20     group, let him.

21           Maybe I felt like, you know, was I going to be

22     able to do that.  If I was upset with something, a bad

23     review from B.J., could I just say, hey, you know what, I'm

24     going to make a false claim about B.J. and go work for

25     someone else?  No way.

178

1          I did not have the same rights in the company.

2          I was always told to shut up and put up.

3     Repeatedly.

4          Even when somebody physically makes an advance at

5     me, thank you for not making a stink of it and just telling

6     me quietly.

7     Q.   Did you ever discipline anyone in your group for

8     anything?

9     A.   Yes, I was asked by B.J. Han to write up -- he

10    hasn't been mentioned any in this case.  It's long --

11    several years ago.  I was asked to write up Jeremy Alante to

12    terminate him.  B.J. didn't think he was effective.

13         And he was correct.  He probably wasn't terribly

14    effective.

15         So I put him on a 90-day corrective action plan

16    and I terminated him.

17         But it was pre-merger, many years ago.

18    Q.   Did you ever discipline anyone else in your group?

19    A.   Dean Kossives started to get out of line, but he

20    quit on his own, because he knew he was getting into some

21    hot water, so he quit on his own, and since has come back

22    and apologized and said I was one of the best managers he

23    ever had.

24         So was I starting discipline him?  Yes.  But I

25    didn't finish it because he quit.

1          He had some personal issues going on.  It's -- he

2    had a lot of family issues.  He had a lot of things going

3    on.

4          So it probably was to his benefit to quit and fix

5    the issues and move on.

6          Q.    Did you ever discipline anyone else in your group?

7          A.    No, not that I can think of.

8          Q.    Did you ever terminate anyone else in your group?

9          A.    Sort of.

10         What I say sort of, because Elmer Delrasario

11   soon -- a little bit after Jeremy Alante, Elmer had been

12   with the company actually even longer than me.

13         We had a very good relationship.

14         Um, I think B.J. knew I had a very good

15   relationship with him, and out of the blue they decided to

16   terminate him.

17         I don't -- he -- I shouldn't say out of the blue.

18   He was not a stellar performer.  I thought he was workable.

19   But due to cutbacks or whatever was going on at the time,

20   B.J. said this guy is going.

21         But the way they did that one was B.J. called from

22   Singapore, and I was on the line with Elmer.  And I was

23   pretty upset.  I was crying that day.

24         I -- it -- I didn't want to see Elmer go just

25   because -- it was just hurtful to me to see the guy go the

                © AZ LITIGATION SUPPORT (480)481-0649

1    way he went.

2          But they -- it was, it was fortunate they ended up

3    rehiring him in a different position.

4          So, but, yeah, I was involved with that

5    termination process.

6          B.J. probably was the one -- he was the one that

7    actually told him we're letting you go.

8    Q.    And did you ever terminate any other employees

9    from your group?

10   A.    No.

11   Q..    Also in your second amended complaint it states:

12   As a result of her complaints, plaintiff's supervisor, B.J.

13   Han, became increasingly hostile toward her and undermined

14   her further within her group.

15          When did you begin to feel that Dr. Han was

16   becoming hostile toward you?

17   A.    When I started pressuring -- when I began pressing

18   for resolution to the ketchup incident, he got very angry

19   with me.

20          He became angry when I started talking about Eric

21   disrupting the group, but it became very apparent when I

22   said enough was enough after the ketchup incident.

23          I said, how far does this have to go?  I said,

24   there needs to be some correction here.

25          And, like I said, when you complain about

1    something to management, and it's not something they want to

2    deal with, there's backlash.

3              So there was backlash on that.

4              So as I complained about issues affecting me, he

5    became more and more hostile to me.

6              When I say hostile, he was sending e-mails,

7    nitpicking things that shouldn't be nitpicked, questioning

8    things that shouldn't be questioned.  He was berating me

9    or -- I ran -- I chaired a technology steering committee,

10   cross functional committee that essentially established road

11   maps for the company.  Highly effective.  It was the most

12   well ran group, team effort in the company.

13             And the CEO even commented to that effect on a few

14   occasions.

15             I had received accolades from several employees

16   that it was the best they'd seen benchmark of our

17   competition.  But B.J. was nitpicking, just you didn't do

18   this, you didn't do this, you didn't hold the meeting long

19   enough.

20             I didn't need to hold the meeting.  He was mad

21   because I was going to hold cross functional meeting for

22   four hours instead of eight hours or two days.

23             I said, B.J., I just had a meeting.  We're up to

24   speed on everything.  I only need four hours.  Why waste

25   everybody's time.

1           You're not doing your job.

2           It was sometimes irrational, vague.  Sometimes I

3   didn't understand why he was yelling.  That's why I say he

4   became very agitated, increasingly, you know, hostile to me.

5   For no good reason.  And that was what led up to me -- I

6   couldn't take it anymore.

7           I said, my God, I'm continually the victim, the

8   victim, the victim, and here he is turning on me, putting

9   pressure on me, when all I'm asking for is to be treated

10  fairly in this company.

11          And that's when I broke down.  I was on my way to

12  work and couldn't stop crying.

13          And my doctor said, you're out there of, this is

14  ridiculous, you know, to see somebody such a mess.

15          He thought I was a mess.

16      Q.   And how did you feel that Dr. Han was undermining

17  you within your group?

18      A.   How Dr. Han was undermining me you're saying?

19      Q.   Yes.

20          MR. STROJNIK:  Object to the form.

21          I don't understand the question.

22          I thought we had gone through all of that at least

23  twice today.

24  BY MS. LARSEN:

25      Q.   Your complaint states:  As a result of her

© AZ LITIGATION SUPPORT (480)481-0649

1    complaints, plaintiff's supervisor, B.J. Han, became

2    increasingly hostile towards her and undermined her further

3    within her group..

4        A.    Oh, yes.

5              MR. STROJNIK:  I'm sorry.  You asked that question

6    earlier.

7              Are you re-asking it?

8              MS. LARSEN:  I don't believe I did.

9              But if I did, I am.

10             MR. STROJNIK:  Well, if you did, if you did, she

11   shouldn't, she shouldn't, she shouldn't have to answer a

12   question seven, eight times.

13             MS. LARSEN:  Seven or eight times?  Are you

14   kidding me?

15             MR. STROJNIK:  I'm sorry.

16             MS. LARSEN:  Are you kidding me?

17             MR. STROJNIK:  I'm using, I'm using poetic

18   license.

19             Can we see if that question was asked earlier?

20             MS. LARSEN:  We're not going to review the entire

21   transcript.

22             MR. STROJNIK:  It was asked within the last

23   five minutes.

24             MS. LARSEN:  No.  I asked her the first part of

25   her statement as a result of her complaints plaintiff's

1    supervisor, B.J. Han, became increasingly hostile towards

2    her.

3            She answered that.

4            Now I'm asking about the second part of her

5    allegation which is that he undermined her further within

6    her group.

7            MR. STROJNIK:  Let me just share my concern.  I

8    think you have seven hours to take this deposition.

9            Will you make it in seven hours the way these

10   questions are being asked?

11           MS. LARSEN:  I have a presumptive seven hours --

12           MR. STROJNIK:  Yes.

13           MS. LARSEN:  -- of which we've covered --

14           THE WITNESS:  Can I take a quick break and explain

15   it outside?

16           MR. STROJNIK:  Yeah, we can take a break.

17           I mean, is it okay with you, counsel?

18           MS. LARSEN:  I'm just advising you, I think we

19   have at least two, two and a half hours remaining of my

20   time.

21           MR. STROJNIK:  Sure.

22           MS. LARSEN:  So --

23           MR. STROJNIK:  Yeah, I'm not -- obviously you have

24   seven hours.  I'm not, I'm not questioning that.

25           I just want to make sure that we get it done in

1   seven hours.

2            And perhaps I can have maybe 20 minutes at the

3   end, so I can clean up some of the issues that I feel need

4   to be cleaned up.

5            That's all I'm asking.

6            I'm not suggesting that we go less than

7   seven hours.

8            MS. LARSEN:  I'm not planning to reserve time,

9   since she's your witness.

10           MR. STROJNIK:  Right, right, but I will take

11  20 minutes after your seven hours or so.

12           Can we take a break now though?

13           MS. LARSEN:  That's fine by me.

14           THE VIDEOGRAPHER:  We are off the record at 2:59.

15           (Brief recess taken.)

16           THE VIDEOGRAPHER:  We are on the record at 3:17.

17  BY MS. LARSEN:

18       Q.   Did you report to anyone at STATS ChipPAC that you

19  felt Dr. Han was treating you in a hostile manner or

20  undermining you within your group?

21       A.   Did I tell anyone at STATS?  I don't know.  But I

22  felt he was.

23       Q.   Did you report it to anyone at STATS ChipPAC?

24       A.   Gail, HR.

25           I don't exactly remember at what point, but I know

1   I had this conversation with her, because she had asked me

2   to escalate the issues up to -- his name was Tiong Gee Ng,

3   TG.  I'm sorry, TG Ng.  N-G is his last name.  Tiong Gee Ng,

4   N-G.

5           And I said to her that -- this came after the

6   demotion actually.

7           And I had been talking to Gail about how I felt

8   that that was probably where the undermining came in as far

9   as what you guys were talking about earlier.

10          I found out -- B.J. told me that HR interviewed my

11  direct reports while I was out on FMLA.

12          And when B.J. stated this to me, I said, why on

13  Earth would you do this?  When we had just got done, you

14  know, agreeing, acknowledging my group was back to running

15  well with the troublemakers gone, why would you go then

16  interviewing my people while I'm out on FMLA.

17          And that's when he began literally a temper

18  tantrum screaming at the top of his lungs for three and a

19  half hours.

20          I explained this to Gail, and she said, well, the

21  demotion came as a total shock to me.  HR was not aware of

22  it.

23          And she told me that TG Ng even told her to

24  contact me and see if I was, quote quote, okay, and that he

25  was hasty in his actions, and that perhaps I should take

1    this back up with TG.

2            And I said, if TG was unaware of it and he made

3    this decision, then most likely Tan Lay Koon and B.J. are

4    aware of it and there's probably no more point in taking it

5    anymore -- taking it up the ladder anymore.  What was done

6    was done.

7            I mean, when the CTO and CEO have made this kind

8    of action there is nowhere else to complain, so I did make

9    her aware of this.

10            And I told her that was a form of undermining, I'm

11    sorry, my authority, interviewing my people when my group

12    was working well.

13            And, by the way, they got a good report card.

14    There were no issues with my reports in that group.

15        Q.    And so Gail's recommendation to you was to elevate

16    the issue to TG, and you did not do so.

17        A.    Um, no, because I know how that company works.

18            TG didn't have any power.  Nobody has power.

19    Whatever Tan Lay Koon says goes and you don't question it.

20    That's the culture in this company.

21            B.J. and Tan Lay Koon are very close.  And when

22    they make a decision, you do not question it.

23            The die is cast, done.  Whatever they decided is

24    done with.

25        Q.    And you assumed that Lay Koon was aware of B.J.'s

188

1  decision to remove you from the vice president of Emerging

2  Technologies --

3      A.   TG -- TG, I'm sorry, was not aware of it.

4          MS. LARSEN:  I'm sorry, did you get the question?

5  BY MS. LARSEN:

6      Q.   My question was:  Did you assume that Lay Koon was

7  aware of B.J.'s decision to remove you from the position of

8  VP of Emerging Technology?

9      A.   I didn't assume he was aware of it at the time it

10 happened when he yelled and screamed.  When he had the

11 temper tantrum yelling at me for three and a half hours,

12 Lay Koon may or may not have already told him this is her

13 fate, you know and he was just carrying it out at that

14 point.

15          That part I don't know.

16          When he sent out the e-mail demoting me, I am sure

17 he cleared that with B.J.. -- I mean, Tan Lay Koon, because

18 nothing goes -- nothing like that goes out without Tan Lay

19 Koon's seal of approval.

20     Q.   And so when you're referring to him sending the

21 e-mail you mean B.J.

22     A..  B.J., yeah.  The company-wide memo saying I'm

23 taking over the group and Diane is over here on special

24 projects.

25          HR was not aware of this.

© AZ LITIGATION SUPPORT (480)481-0649

1           So this was no -- this was in part a very reactive

2    thing by B.J. and his tantrum when he was having when I said

3    I didn't agree with his action to interview my employees

4    without my knowledge.

5           And, yes, I think that's undermining me in front

6    of my group.

7           I mean, can he do it?  Of course.

8           Do I think it was the appropriate measure?  No.

9    Because, once again, it's setting that tone in the company

10   that, you know, Diane is -- has no power, no credibility or

11   anything at this point in time.

12          Rather than helping me to recuperate from all the

13   trouble I just had, he was questioning me once again in

14   front of my reports.

15          By the way, that three and a half hour phone call,

16   I mean, talk about professional.

17          He screamed at me for three and a half hours

18   saying, I am done with you, I am D-O-N-E -- I think he

19   spelled it about 20 times.  I am done, D-O-N-E, I never want

20   to see your face again, I never want to see you again, I

21   don't want to know you.  I don't know how many times he

22   repeated that.  And asked me to sue him.  He said he could

23   defend himself.

24          And I said, you're being ridiculous.

25          I had no intention of suing the company, even at

© AZ LITIGATION SUPPORT (480)481-0649

1    that point.

2              I still tried to resolve things with them, but

3    they continued to insult the heck out of me.

4              Even after I was demoted, and I felt I had nowhere

5    else to go.

6              (Whereupon, Mr. Dowell enters the room.)

7    BY MS. LARSEN:

8         Q.   When did you first retain an attorney to represent

9    you in regards to your employment at STATS ChipPAC?

10        A.   I actually -- it was after the demotion, for sure.

11        Q.   How long after?

12        A.   And I think -- let's see.

13             Um, June, July, August..  About a month is my

14   guess, roughly.

15             And I had, um. . .

16             MR. STROJNIK:  Let me make sure you don't ask

17   about what you and your lawyer talked about.

18             THE WITNESS:  Okay.

19             MR. STROJNIK:  Is there a question pending?

20             MS. LARSEN:  I couldn't tell if she was done

21   answering.

22             THE WITNESS:  It was roughly a month after.

23   BY MS. LARSEN:

24        Q.   You just stated that you thought it was

25   inappropriate for human resource to interview -- human

1    resources to interviewer direct reports while you were on

2    leave; is that correct?

3        A.    Yes.  Because -- that is correct, because, once

4    again, I was being treated as the violator, rather than the

5    victim.

6            I thought it was so wrong that they would sit

7    there and interview my people, when all along I was saying

8    this is a hostile environment, highly hostile environment.

9    Sexist-wise, discrimination-wise.  You name it.

10           And yet I'm under the magnifying glass.

11           I was just flabbergasted by this.  Why would they

12   go and question my employees about me, when, in fact, I've

13   been continually telling B.J. and HR, these people are

14   ganging up on me, creating a hostile environment, and they

15   continued to put me under the magnifying glass.

16           And B.J. knew me nine years.  He didn't even know

17   these people for a year.

18           That's completely disrespectful and humiliating.

19   I don't even have enough words for it.

20       Q.    Were you aware that Scott Gooch gave an exit

21   interview when he left STATS ChipPAC?

22       A.    Not until after the fact.

23       Q.    Were you aware that in the notes from Scott's exit

24   interview he described you as the worse manager he had ever

25   had?

1      A.    I heard that after the fact.

2            Are you aware that Scott Gooch was not reporting

3    to me when he left the company?

4      Q.    I am.

5      A.    Okay.

6      Q.    When Scott Gooch gave this information to human

7    resources upon leaving the company, what do you think that

8    STATS should have done in response to that?

9      A.    They should --

10           MR. STROJNIK:  Object to the form.

11           THE WITNESS:  I'm sorry.

12           MR. STROJNIK:  I object to the form.

13    BY MS. LARSEN:

14     Q.    You can answer.

15     A.    What should STATS have done about his exit

16    interview?

17           They should have substantiated it.  You know, any

18    exit employee can say anything they want about any employee

19    and get away with it.

20           Any -- who knows why he left the company for real.

21           He was reporting to Mike Schraeder.  Who knows why

22    he made -- he had nothing to gain by that.

23           He wasn't even reporting to me at the time.

24           You have to ask yourself why did he make the

25    remarks.  I had no impact on his life at that point in time.

1    Why bother.

2             Because -- and furthermore, B.J. said that

3    himself, he thought it was very sketchy..  He didn't -- he

4    said it was questionable that Scott made those comments.

5             And I asked B.J. if this was in writing.  He

6    didn't know.

7             I said, was it substantiated.

8             He said, how would I know, he left the company.

9             So there you go.

10   Q.    How do you think the company should have

11   substantiated Scott's statement?

12   A.    They should have followed up on his complaints and

13   validated every one of his complaints to see what merit

14   there was behind them.

15            When he says she's the worst manager, clarify

16   that.  How was I the worst manager.

17            You just can't make up a blatant statement like

18   that.

19            Who knows if someone doesn't say, hey, make sure

20   you slam her on the way out.  A buddy-buddy thing.  Who

21   knows.  Who knows where that came from.

22            I can tell you one thing.  I had very little

23   interaction with him.

24            So how could he say that.

25            That was Flynn's responsibility and it was Eric's

             ©   AZ LITIGATION SUPPORT (480)481-0649

194

1   responsibility to manage him under me.

2           That would be like me saying -- anyhow, go ahead,

3   that's enough.

4       Q.   Well, if you expected STATS to substantiate

5   Scott's concerns about your management, wouldn't it make

6   sense for them to interview your direct reports to see if

7   they had similar problems with your management?

8       A.   The timing wasn't the same, I don't think.

9           When was -- I don't know.  When was the -- when

10  did he leave the company.

11      Q.   You don't recall?

12      A.   When did Scott leave the company?  No, I don't.

13  He didn't report to me.  Why would I know exactly when he

14  left?

15      Q.   So do you know if it was -- if his departure from

16  the company corresponded to your FMLA leave?

17      A.   It was before my FMLA, yes.

18      Q.   How long before?

19      A.   That I don't know.

20      Q.   So do you know how long the time frame was between

21  his departure and human resources talking to your direct

22  reports?

23      A.   No.

24      Q.   Tell me about the ketchup incident that happened

25  on April 9th, 2007.

1    A.    What about it?

2    Q.    What happened?

3    A.    The ketchup incident?

4    Q.    Yes.

5    A.    At every -- 2:15, like clockwork every day, I had

6  to leave to pick up my daughter, drive her home, and then

7  come back to work.

8         It was -- everybody pretty much knew this in my

9  group.  I was gone 15, 20 minutes.

10        I left.  I forgot my cell phone.  I was gone, I

11 don't know, a minute at the most.

12        Came back, went to my desk, I looked down, and

13 there's a ketchup there on my chair.  It's one of the few

14 days -- I don't know normally wear white pants, I was

15 wearing white pants, and it doesn't take Einstein to figure

16 out what was going on here.

17        So obviously somebody was trying to humiliate me,

18 in a very sick and twisted way.

19        And when I saw the ketchup, I turned around

20 immediately.  Only person sitting there was Eric in his cube

21 like this.

22        He doesn't normally sit like that, by the way.

23        That was the only person that sat in my office.

24        As I was walking out of my office, Brett Dunlap

25 came around with a burger in his hand putting ketchup on it.

196

1          Now, I don't think Brett did it or he wouldn't be

2     working around the corner with ketchup in his hand putting

3     on it a burger.  Okay.

4          Now, I came out and said who put ketchup on my

5     chair and looked at both of them, and Eric refused to look

6     up.  Okay.

7          Now, normally everything is his business and he

8     looks up and he sticks his nose into everything.

9          But this time he was huddled over and scared as a

10    little doggy with his tail between his legs.  Almost

11    shivering.

12         Because he, he was too close to call.  He didn't

13    think I was going to come back in one minute, so he was out

14    of breath.

15         Brett turned to me, and I don't know who put

16    ketchup on your chair, and just totally dismissed me.

17         Now, kind of an odd reaction.

18         I mean, if I had heard -- if somebody asked me

19    that, you're kidding me..

20         He just went I don't know.

21         Totally dismissed me.  Sat down.

22         I walked over.  I got our admin.  And I walked

23    back with her back to my office.  I pointed out the ketchup

24    to her.

25         I was pretty upset.  I said, look, I'm leaving.

1           I'm going home.  I'm going to get a camera.  Don't

2   you dare let anybody in my office.  Please keep my door shut

3   and locked.

4           I left, crying my eyes out so no doubt.  I was

5   just flabbergasted and appalled, beside myself that anybody

6   could do this.

7           Got in my car.

8           I called B.J. first.

9           In Singapore, well, it was probably 5:00, 4:00,

10  5:00 in the morning for him, woke him up.

11          I was very upset, crying.  And he told me -- first

12  thing out of his mouth when I told him what happened was you

13  sure you didn't have ketchup for lunch.

14          I mean, he questioned me right there.

15          Nothing I said was taken at face value.  I was

16  always questioned.

17          I said, you're kidding me, wouldn't you know if I

18  spilled my own ketchup from my own lunch on my own chair.

19          But I never -- I rarely ate lunch in my office.

20  And when I did it was the sink -- I didn't have ketchup in

21  my office.  I never had ketchup in my office.

22          So I told him, no, B.J., I didn't have lunch in my

23  office, there was no ketchup in my office.  It was pretty

24  clear to me that somebody put it there.

25          Well, call HR, and -- and that was it.  Get a hold

1    of HR and report to them.

2            So we hung up.

3            I called HR.

4            And she -- I hung up with her.  I don't remember.

5    I was very -- I was hysterical the whole time.  I was upset

6    crying at this point.

7            I don't know what -- I just reported to her and

8    said, this is sick -- and I do remember saying to both her

9    and B.J., this -- the bucks stops here, this is crazy, I

10   mean, how much further does this harassment have to go, how

11   much do I have to take before you people believe that, you

12   know, I'm treated horribly in this company, et cetera,

13   et cetera.

14           And I was very strong and loud with both B.J. and

15   Gail about them putting an end to this kind of harassment in

16   this company, sick harassment.

17           And I went home, got my camera, came back, took

18   the pictures.

19           I don't remember what I did the rest of the day.

20   I really don't.

21           But I do know I sent an e-mail to B.J., again,

22   stating something to the effect of how much more of this,

23   you know, when does this end, how much do I have to endure.

24   I don't remember the exact words right now.

25           But he replied -- I was floored with this response

1    of it will be fine, drink a beer, and go to bed.

2           I thought, my God.  It's just going to get

3    dismissed, just like that.

4           Then I was told -- oh, I'm sorry.  I was pretty

5    much consumed.  I guess it was good.  But I had tremendous

6    pressure at this point in time.

7           I didn't go to the office.

8           I was dealing with the law firm that was

9    representing STATS ChipPAC and the whole Tessera litigation

10   case.

11          I was getting trained that week.  I think it was

12   that week.  Yeah, I was getting trained that week, and I had

13   a deposition the very next day.  That's right.

14          So I wrote an e-mail to B.J., and I said, you

15   know, this is -- again, I'm just horrified by this, but I

16   need to pull myself together.  I have to get ready for the

17   depositions.

18          And here I am, you know, trying to put my best

19   foot forward for the company, despite all of this, and I

20   did.  You know, and I did a very good job on the depositions

21   for the next two days.  And it was two full days of

22   depositions, and so I was out of the company when -- off

23   site at a hotel where the depositions took place, when

24   supposedly they had HR fly down and interview people about

25   the ketchup incident and conduct a sexual harassment

1    training, which I don't know who attended that, because

2    later on I was told by Blake Gillette that he was angry he

3    had to go because he didn't think that the culprits were

4    there.

5            And I said, what do you mean?

6            He said -- Blake said that he didn't see Brett

7    Dunlap or Eric Gongora there, why the hell should I go with

8    the culprits aren't there.

9            That kind of tells you right there who some of the

10   people thought did it.

11           Whether they really went to that training or not,

12   I don't know.

13           But I do know that it's not uncommon for people to

14   not attend these kind of training classes and go and tell

15   admin let me put my name down and walk out.

16           Whether they actually took that training or not, I

17   don't know.  But one person said he didn't see him there,

18   and he was upset about it.

19           What else would you like to know about that?

20       Q.   Did you sit in the ketchup?

21       A.   Did I what now?

22       Q.   Did you sit in the ketchup?

23       A.   No.

24       Q.   Who else saw the ketchup on your chair?

25       A.   Couldn't say.

1          And I have photographs of it.

2          So HR, B.J., whoever I e-mailed them to, I don't

3    remember.

4      Q.   Why did you photograph your chair?

5      A.   Why would I not?

6          You think I was just going to clean it up and say

7    this never happened?

8          I don't understand your question, why did I

9    photograph it.

10          In fact, if I'm not mistaken, Gail or somebody

11    asked me to.

12          I said, don't worry, I've got a camera, I'm taking

13    a picture.

14      Q.   Okay.  But you testified that you were going home

15    to get your camera before you called Gail; is that right?

16      A.   I was also going home to get my daughter and pick

17    up the camera at the same time.  I was taking my daughter

18    home.  I picked up the camera at the same time.

19      Q.   Why did you think you needed to photograph your

20    chair?

21      A.   Proof.

22          Would it had have been better if I had sat in the

23    chair and got it on my chair and humiliated myself?  Would

24    that be better proof?

25      Q..   Who do you believe put ketchup on your chair?

© AZ LITIGATION SUPPORT (480)481-0649

1       A.    Eric Gongora.

2       Q.    Why did you think that?

3       A.    I think I just went through that.

4       Q.    Are there any reasons that you believe that you

5    didn't previously describe?

6       A.    Well, let's put it this way.  I was dead certain

7    of it at the time.

8            And I am even more certain after I see

9    correspondence between Gail Way and B.J. Han during this

10   discovery process, which, by the way, I'm quite surprised

11   they gave me that e-mail, because I sure as heck haven't

12   received any other e-mails I've asked for.

13           But, so that one might have gotten in there by

14   mistake.

15           But who knows how that e-mail got in there.

16           But Gail Way and B.J. Han were corresponding back

17   and forth about her conversation dialogues with people in

18   that office, and the two of them were both acknowledging

19   people were lying in the office, but they were referring to

20   conversations with B.J. -- I mean, conversations with Brett

21   and -- sorry I'm going fast -- conversations with Brett and

22   Eric, because they were both lying about their whereabouts.

23   They were both in the office, and they both told B.J. and --

24   well, they told Gail they were out of the office.

25           Why would you lie if you didn't do it?

1    Q.    Why do you think Brett told Gail he was out of the

2    office?

3    A.    What do I think -- I don't know.  I can only go by

4    what was provided in the discovery process.

5          I saw he took a two, three hour -- no, he took a

6    two, three hour -- he said he had just gotten back from

7    lunch.

8          I don't know what that means, gotten back.  So

9    maybe he did just get back from lunch.  The fact of the

10   matter was he was there when it happened, because I went out

11   and asked him, who put ketchup in my chair.

12         There was one minute from the time I left my

13   office, went to the door, and didn't even get out the door,

14   turned around.

15         And you've been in the office.  You know what I'm

16   talking about.  I went from my door in my office to the back

17   door, forgot my cell phone, came back, here's a guy huddling

18   over in his cube and another guy working around with a

19   burger and a ketchup in his hand.

20   Q.    Why do you think that whoever put ketchup on your

21   chair did so with the implied assurance of impunity from

22   B.J. Han?

23   A.    Excuse me?

24   Q.    Your complaint says:  That on or about April 9th,

25   2007, with the applied insurance -- assurance of impunity

© AZ LITIGATION SUPPORT (480)481-0649

1  from B.J. Han, male employees put ketchup on plaintiff's

2  office chair.

3      A.   I'm sorry, I don't understand your question.  What

4  is -- I'm missing question here I guess.

5      Q.   Why do you think that whoever put ketchup on your

6  chair did it with the implied assurance of impunity from

7  B.J. Han?

8      A.   How would I know?

9      Q.   Well, it's your complaint.  I'm asking you.

10      A.   I don't know why. . .

11      Q.   I'm quoting from your complaint.

12      A.   I don't know why anybody would -- I don't even

13  know how somebody could conceive of something like this,

14  okay, never mind do it.

15          I don't know.  I don't know.  I don't understand.

16  I don't understand the question here.

17      Q.   Okay.

18          What I'm asking you is why your complaint states

19  that whoever put ketchup on your chair did so with the

20  implied assurance of impunity from B.J. Han.

21      A.   I don't know.

22      Q.   Did you think that whoever put the ketchup on your

23  chair had the implied assurance of impunity from Dr. Han?

24      A.   I think this person didn't think they weren't

25  going to get caught.

1        They thought I was out the door.  They didn't

2    think about that.

3        Q.  But is it your belief that Dr. Han would authorize

4    or support that kind of conduct?

5        A.  I don't know anymore.

6        Did you -- well, actually, I don't know, but I was

7    a little bit surprised to see his e-mail to Gail saying that

8    if the person confesses they can be written up and

9    reprimanded, but if they lie they will be fired.

10        They lied.  Nobody was fired.

11        Okay.

12        Q.  Aside from who was in the office that day, near

13    your office, which you've described as Brett and Eric, do

14    you have anything to indicate who put ketchup on your chair?

15        A.  Well, I put any what?

16        Q.  Do you have anything to indicate who put ketchup

17    on your chair?

18        A.  Anything to indicate who -- yeah, the fact that

19    you have a guy sitting in his cube out of breath, not

20    looking up, looking entirely suspicious, when I asked the

21    question wouldn't look up..  Normally he would.

22        That's one thing.

23        Two, he was the only guy sitting there.

24        Mike Schraeder was in a conference call.  I don't

25    know, something next door.  Brett was walking around the

1   corner.

2              He was the only guy sitting there.

3              I mean, how much more do I need?

4              Not motive.  Well, yeah, it was, like I said, one

5   or two days, whatever it was, after Cindy Palar sends an

6   e-mail saying this guy needs to be written up.

7              He was mad as hell about that e-mail.  He doesn't

8   like that kind of stuff.

9              Cindy had no business sending that e-mail to him.

10             Cindy didn't manage him very well.  Cindy wanted

11  to look like the good guy here.  He didn't want to say,

12  Eric, you're out of line, I'm writing you up.  He wanted to

13  say, Diane wants you written up.

14             This was pretty typical that I was set up kind of

15  like all the time.  I couldn't do -- even when I asked

16  management to help me out, please, reprimand, write this

17  person up, he's your employee, I can't do it.  Well, Diane

18  wants me.  Oh, my God, you mean to tell me this manager

19  can't be responsible and own up to a problem employee and

20  write up the guy in fear of, you know, not being one of the

21  guys.

22             I mean, that's how this environment was.  It was

23  always if you're not one of the boys, you know, you had to

24  be one of the guys, one of the boys.  This environment.

25             And so nobody wanted to go outside that..

1          So I was always painted to be the bad person.  So

2     when I said write this person up, Diane wants you to be

3     written up.

4          That's what Cindy did.

5          And he was mad.

6          I can't think of anybody else who would want to do

7     this to me.

8     Q.   Do you know who Gail interviewed in response to

9     your report --

10    A.   No.

11    Q.   -- about the ketchup incident?

12    A.   Sorry.  No.

13         I wasn't there.  I was told everybody in the Tempe

14    office, but I don't know for sure.

15         But I saw the correspondence you people provided,

16    and it sounds like they went around the whole office.

17         And at least, what, four, five, six people said if

18    they had to guess they would say it was Eric and/or Brett.

19         It certainly wasn't a bird flying by.

20    Q.   And is it your recollection that Gail told you she

21    didn't believe that someone putting ketchup on your chair

22    was a prank she considered harassment?

23    A.   You know, that one, I -- you know, I have tell

24    you, I'm very confused on this one.  Because when it

25    happened, I was shocked that anybody would even refer to it

© AZ LITIGATION SUPPORT (480)481-0649

1   as a prank.

2            Prank is something to me, in my opinion, it's kind

3   of funny, mildly amusing.

4            This was sick and twisted.

5            Okay.

6            When people call it a prank, that's an insult in

7   itself right there.

8            That's pretty severely downplaying it.

9            In fact, later that day when I was leaving or the

10  next, I don't remember -- it couldn't have been the next

11  day.  Probably when I was leaving that day, Mike Schraeder

12  was standing outside of Blake Gillette's and I walked by,

13  and I go, um, pretty unbelievable.

14           I was pretty upset, and they go, what.

15           And I said, the whole ketchup thing, you know, how

16  sick does it get around here.

17           He says -- Mike Schraeder, he said, oh, come on,

18  it's just a prank, get over it.

19           And I said, are you serious.

20           So Mike, if somebody put ketchup on your chair

21  with your tan pants you're wearing right now and you sat in

22  it and stained your pants -- now it's different for a guy

23  than a girl.  No doubt.  I mean, if a guy it's just a stain.

24  For a woman it's implied female accident.

25           I said, you think would you be ha ha laughing at

1   it.

2               He said, no, I would be pissed as hell.

3               I'm supposed to laugh at it.  I'm supposed to

4   be -- it's supposed to be acceptable for me and walk out of

5   offices.

6               That's the environment I was in.

7               I was supposed to always put up with stuff.

8               Diane, you know, you're making a big deal out of

9   nothing.

10              Diane, she's being a pain in the office about this

11  stuff going on.

12              That's how it was.

13              And that's how B.J. treated it, drink a beer, go

14  to bed.

15      Q.   Your complain alleges that STATS ChipPAC

16  acknowledged the ketchup incident was harassment and not

17  merely horseplay.

18              Who, who made that acknowledgement?

19      A.   That came later in the papers.

20              It was Gail, I think, said it was harassment.

21              You have the paperwork.  I didn't see that until

22  after the fact.

23      Q.   I'm asking you about what's in your complaint.

24              Your complaint alleges that STATS ChipPAC

25  acknowledged the ketchup incident was harassment and not

1    merely horseplay.

2         A.    Yes.  And if I recall, that statement came from

3    documents that Tod Schleier discovered in this discovery

4    process.

5              This came from your side, not ours, not mine.

6         Q.    Okay.  So no one said that to you.

7              MR. STROJNIK:  I'm sorry, she just testified she

8    saw it in the paperwork.  So somebody said it.

9              THE WITNESS:   Somebody said --

10             MS. LARSEN:  I'm asking her.

11             And, again, I'm doing her, not you, if anybody

12   said that to you.

13             THE WITNESS:  I don't know where the statements

14   came from in the documents, because, again, that was

15   something I wasn't privy to at the time.

16             But I do recall having a conversation with Gail,

17   and I said when -- something she said or somebody referred

18   to it as a prank, I said, Gail, I don't want to hear this

19   again.  This is not a prank.  This is sick.

20             She says, yes, I agree.

21             And I don't know who said the word harassment in

22   that conversation, but she agreed with it.

23             That's different than what was in the documents

24   you guys provided.

25             I do remember having that conversation with her.

211

```
 1   BY MS. LARSEN:

 2        Q.   And when did that occur?

 3        A.   Maybe the same day.

 4             Because the next two days I was in the

 5   depositions.  I was tied up.

 6        Q.   And when you're talking to Gail, in person or on

 7   the phone?

 8        A.   Phone.  She was in California.  I was in Arizona.

 9        Q.   And did Gail say anything else to you about the

10   ketchup incident?

11        A.   No.

12             She pretty much -- no.

13        Q.   Do you know if anyone that Gail spoke to saw

14   someone put ketchup on your chair?

15        A.   Nobody says they saw anybody do it.

16        Q.   And do you know if anyone Gail spoke to admitted

17   putting ketchup on your chair?

18        A.   As far as I know, no one admitted.

19             It took one month for Eric to be -- office to be

20   moved away from me after repeated requests, and I think

21   that's highly unacceptable.

22             The bare minimum, they could have moved this guy's

23   office away from me immediately.  And it took over a month

24   of me begging and pleading.

25        Q.   But they did move Eric's office away from you.
```

© AZ LITIGATION SUPPORT (480)481-0649

1    A.    After me being a, quote unquote, whiny-type

2   person, saying how many times do I have to ask you guys to

3   move this office.

4          Gail kept coming up with excuses.

5          All the while, Eric was jockeying -- trying to get

6   an office, a walled up office upstairs, an upgrade.

7          And they were actually contemplating it.

8          And I became upset with Cindy saying, you're

9   kidding me.  This guy is a suspect in this thing and here he

10   is admiring her office upstairs, a walled off office, and

11   you're trying to figure out how to accommodate this.

12          And B.J. got mad at me for being angry with that.

13          I was not allowed -- that's probably where I'm

14   moody, by the way.  I'm being sarcastic.

15    Q.    You wanted Eric to be relocated to STATS ChipPAC

16   in Fremont, as a result of this ketchup incident; is that

17   right?

18    A.    Uh-hmm, yes, I did.

19          That's actually pretty reasonable considering I

20   think really the person should have been fired.  But they

21   couldn't prove it.  You know, if they weren't willing to

22   prove it, willing to do anything else, at least get him out

23   of the office if this is the way he's going to behave.

24          They did it to other people.

25          Let me, let me, let me tell you something, a

1    little something about that.  That's standard Tan Lay Koon

2    management 101.

3             When you want someone out of the company, move

4    them.  That's what they did to Dennis Daniels and several

5    others in this company.

6             Dennis Daniels is probably the best HR vice

7    president I've ever seen in any corporation.

8             He put all the policies, procedures, and benefits

9    and compensation plans together better than anyone else I've

10   ever seen in any company.  When the companies merged, they

11   didn't like him.  I have a pretty good idea I know why.

12   But, anyhow, they moved him to Singapore.

13            I even heard B.J. said, you know, that they were

14   going -- they moved him to Singapore to put the screws on

15   him and treat him like a dog over there, because they knew

16   they could.  They couldn't do it in the United States.

17   Okay.

18            I've never seen a man treated so disrespectfully

19   in my life.

20            Basically anybody who had dark skin was treated

21   badly in this company.

22            It didn't matter if you were Black or Indian or

23   otherwise, you were treated horribly in this company.  There

24   was so much racism in this company.

25            Dennis was moved to Singapore.  When he was there,

1    he was treated horribly.  I'd go by his office, and he was

2    just sitting there miserable.  How are you, and he'd go --

3    you know, he'd make comments under his breath like, you

4    know, as soon as I get the hell out of here I will be fine.

5            They were treating him horribly, and -- anyhow,

6    so..

7            I got off on a tangent there.

8            So, well, my point was when they want, when they

9    want to get rid of somebody and avoid a lawsuit, they move

10   them to a location where they beat the guy down so badly

11   that they want to quit.  And that's what he did.

12           I figure, well, if you're not going to fire

13   someone, why don't you let me move Eric to Fremont.  You

14   know, he can have his job, but he's got to move and stay

15   away from me.

16           They weren't willing to do that.  No.  They were

17   willing to put pressure on me instead.

18           Because I wasn't threatening them with a lawsuit

19   like Eric was.

20   Q.   Well, in actuality you did want STATS ChipPAC to

21   fire Eric; correct?

22   A.   I did.  Because he had done enough.  I've never

23   seen anybody cause as much trouble as him and continue to

24   not be reprimanded or disciplined in any way.

25           He has a grip hold on this company, and to this

1    day I don't know what it is.

2              Maybe you can tell me.

3              MS. LARSEN:  Can we take a quick break?

4              THE VIDEOGRAPHER:  We are off the record at 3:56.

5              (Brief recess taken.)

6              THE VIDEOGRAPHER:  We are on the record at 4:09.

7              MS. LARSEN:  I don't know what you want to do.

8              We're -- from my calculation, we're a little over

9    five hours in, but we are covering a lot.

10             I'm not sure.  Normally I would say if we were

11   close, at seven I would ask you to stay shortly over, if we

12   were close.

13             MR.. STROJNIK:  Let's finish today.

14             MS. LARSEN:  Okay.

15             MR. STROJNIK:  I don't know, I don't know how --

16   can you finish today?  Do you have two hours left?

17             MS. LARSEN:  I hope that we would be flexible to

18   leave it open depending on where we were.  I mean, my

19   preference would be to wrap it up as well, but I want to be

20   reasonable about what we have to cover and getting a good

21   record.

22             MR. STROJNIK:  I've only set aside a day for this,

23   but let's try to get it done today.

24             MS. LARSEN:  I would like to mark that.

25

1              (Deposition Exhibit No. 7 was marked for

2      identification by the reporter.)

3      BY MS. LARSEN:

4          Q.   You have in front of you what's marked as

5      Exhibit 7.

6              Have you seen this before?

7          A.   Yes.

8          Q.   Where?

9          A.   Where?  It was e-mailed to me.

10         Q.   When?

11         A.   It was e-mailed to me after I called in sick for a

12     meeting, which I found interesting, because it seems like

13     whenever someone calls in sick in this company there's

14     retaliation.

15         Q.   What meeting did you call in sick for?

16         A.   It was, again, the TSE, a technology steering

17     committee meeting.  It was a meeting in which I chaired.  We

18     met monthly.  However, this particular month I had scheduled

19     two meetings, because of people's conflicting schedules,

20     whatever, and we weren't sure who could attend which, so I

21     did a redundancy backup meeting.

22             I was not in good shape.  I called in sick and

23     told B.J. not to worry, when I called in sick, I said

24     because I had scheduled a backup meeting and we're in good

25     shape.  And the response was this e-mail.

```
 1            And I was just floored by this.  I felt like I was
 2   being beaten down further.
 3            And that's basically when I broke down.
 4       Q.   Did you agree with any of the feedback in
 5   Dr. Han's e-mail?
 6       A.   Did I agree with, I'm sorry, what now?
 7       Q.   Did you agree with any of the feedback in
 8   Dr. Han's e-mail?
 9       A.   I have to go through this and let you know.
10            I can't. . .
11            May I make a few comments?
12       Q.   Please.
13       A.   If you look at the fourth sentence, I know
14   motivations on occasions of the comments, that's because he
15   knew there were politics going on.
16            So if he knew there were side politics and other
17   ulterior motives going on, I'm not sure why he bothered to
18   beat me down with this e-mail, okay, after I called in sick.
19            So that's one comment I have.
20            It really bothered me.
21            On the one hand, he's saying I know the
22   motivations here.  They weren't good ones.  But I'm still
23   going to beat you down with this.
24            So, that's one comment.
25       Q.   Well, doesn't the next line say so I haven't
```

1   worried about it too much, while I concerned on the fact

2   that the number of cases has been increasing?

3        A.   Yes.  Again, I am shocked that he would make that

4   comment too, because I'm the one that told him this was

5   going to happen.

6             I was the one that was warning him that there was

7   essentially a good old boy gang network being formed against

8   me and that eventually it would bring me down.

9             And here he's saying the number of incidents

10  increasing.

11            Of course.

12            I could have told him that.  I could have

13  predicted that.

14            And I also had issue with comments are officially

15  recorded.

16            I have a lot of issues with this e-mail.

17            If they're officially recorded, how come I never

18  saw them?

19            And when I later asked him about that, whether

20  they were substantiated, he said no.

21            I said, well, you know, any exiting employee can

22  make any comments and leave the company.

23            And furthermore his comment about when an employee

24  leaving -- number two, so I'm looking at the item number

25  two.  When an employee is leaving us, damage has been done

1    to our company.

2            Go take a look at a spreadsheet of who's left this

3    company who they reported to.

4            I think the number one manager with the most

5    number of resignations is Tan Lay Koon.  Okay.

6            And I could go down, down, down a list.  Do you

7    know who's at the bottom of the list that I created?  Me.

8    People didn't leave my group.

9            They didn't leave the company, I mean.

10            They were transferred from me when I went to

11    discipline them, but they did not leave the company under

12    me.

13            So, that statement number two, I don't agree with

14    that.

15            I mean, I agree that damage may be done to the

16    company, but that wasn't me.

17            Go -- they should look at Tan Lay Koon himself.

18            We've had executive vice presidents, two HRs of

19    the company leave under him.  We've had chief officers leave

20    under him, a president of United States operations, and vice

21    president of sales leave under him -- United States

22    president head of office.

23            I can't even count the number of people that left

24    under that man.

25            So when they want to sit there and look at damages

220

1   done to this company, they ought to look to the CEO himself.

2          Would you like me to comment more on this?  I

3   could go on and on.

4          But, okay, I'll look at it.

5          Let's see.

6          I mentioned, you know, this Scott Gooch -- by the

7   way, when I asked B.J. who this was, he wouldn't tell me.

8      Q.   Do you believe that an employee who makes a

9   complaint about their manager should be disclosed to the

10  manager they complained about?

11     A.   If they've left the company?  Sure.

12         This guy left the company.  Why that wouldn't you

13  tell me.

14         He wouldn't tell me.

15         He would not tell me until well after my leave of

16  absence, I remember that.

17         I have no more comments about the rest of this.  I

18  think you get the gist of what I'm saying.

19     Q.   In his e-mail B.J. advised of a few actionable

20  emphases coming from my further investigation.

21         The first be less confrontational with people.

22     A.   I'm sorry, could you just tell me where you are,

23  so I don't have to read through the whole thing.

24     Q.   On the last paragraph on the first page there are

25  two bullet points.

221

1     A.    Okay.

2     Q.    So --

3     A.    So are you on item one there?

4     Q.    Right.

5     A.    Okay.

6     Q.    And his statement is, I'm advising few actionable

7  emphases coming from my further investigation, be less

8  confrontational with people --

9     A.    By the way, one moment.

10          You see his comment here is proof.  I cannot fully

11  reveal the source.  Why not?  Why can't he tell me who's

12  making these comments?

13          But, okay, I'm sorry, I shouldn't be asking you

14  that question.

15          Be less -- go ahead.  I'm sorry, go ahead.

16     Q.    Did you agree with that feedback?

17     A.    I don't mind that, I don't mind that feedback from

18  him.

19     Q.    Did you agree that you could be less

20  confrontational with people?

21     A.    Sure.  But I'm not sure that I was.

22          I could be less, yes.  Everybody can be less.

23          You know, when, when I'm, when I'm beaten down so

24  many times, you know what, you become exhausted, you start

25  to break down.

1          That's why I went on my family medical leave of

2    absence.  I couldn't take it anymore.  And I probably wasn't

3    in my best form anymore.

4          The best thing I could have done was leave the

5    company at that point in time.

6          So at that point in time, was I probably

7    increasingly frustrated and angry and confrontational?

8    Maybe.

9          They drove me to that point.

10    Q.   What did you do in response to this e-mail from

11    Dr. Han?

12    A.   What did I do with this?  I went on family medical

13    leave of absence.

14          Because when I saw this, I was so -- I gave up.

15          I realized he was never going to acknowledge that

16    I was a victim.

17          I didn't know what else to do.  This is when I

18    broke down, and said, my God.

19    Q.   What was the condition that necessitated your

20    medical leave?

21    A.   Crying.  Uncontrollable crying.

22          I was on my way to work and could not stop crying.

23    I turned around and went home.  I called my doctor's office.

24    If I'm not mistaken, it was a Tuesday -- Monday -- no, it

25    was a Tuesday, because he doesn't work Wednesdays, I

1    couldn't see him until Thursday or something like this.

2           I don't remember, but I couldn't see him for

3    24 hours.  I remember that.

4           I went home.

5           I couldn't stop crying.

6           And, if you need evidence, Chris Shea came to my

7    home looking for me, and I was bawling my eyes out at home.

8      Q.   Prior to your return from medical leave, did you

9    have a discussion with Dr. Han about your return to work?

10     A.   Yes.  But -- yes.

11     Q.   And during that discussion did you tell Dr. Han it

12   was hopeless for you to return to work because people needed

13   to be terminated from the company and some people were so

14   bad you couldn't work with them?

15     A.   I might have.  I was so upset.  Who knows what I

16   said.  I might have.

17          I wouldn't be surprised if I said that.

18          I -- when you're that upset and depressed and

19   frustrated and overwhelmed, anything can come out of your

20   mouth.

21          I might have said that.  I probably did say that.

22   I'm not going to deny it.

23     Q.   You don't remember if you did --

24     A.   No, I don't know what I said exactly, but I'm not

25   going to deny it.

1           I'm not going to deny it.

2      Q.   Did you tell Dr. Han that you couldn't work at

3   STATS ChipPAC anymore and ask him to come up with a

4   financial package for you to disappear?

5      A.   I don't think it was in those words, but I said

6   that -- no, I said, no, it was more of a if you can't

7   support me, and if you're not going to back me and come up

8   with a resolution, then you'll have to -- yeah, you'll have

9   to buy me out, because I'm not going to leave me on my own.

10  I basically said it wasn't going to -- they were trying to

11  force me to quit.

12          They were trying to force me to quit, and I was

13  not going to do that.

14     Q.   Do you recall when you returned to work following

15  your medical leave?

16     A.   Did I remember, I'm sorry?

17     Q.   Do you recall when you returned to work following

18  your medical leave?

19     A.   Yes.

20     Q.   When was that?

21     A.   27th, I want to say, of July, I believe.  Right?

22  No, yeah.

23     Q.   2007?

24     A.   Yeah.

25          And I was promised that the situation would

1    improve.

2             It got worse.

3         Q.   Who promised you that?

4         A.   B.J.

5         Q.   When was that?

6         A.   He -- what?  That was the night I -- before I

7    returned to work, he and I had a conference call.

8             And he -- in that conversation I recall a number

9    of statements he made.  And one of them was that he would --

10   well, several statements to the effect that I was, quote

11   unquote, with B.J. forever, I was -- you know, he

12   appreciated I had high integrity, high work ethics, morals,

13   you name it.  He was, he was -- and that he was going to try

14   to come up with a position of less stress where I didn't

15   have to deal with this kind of, you know, abuse.

16            And he also told me that they couldn't do

17   anything, in that conversation, that you know, they weren't

18   going to do anything to Eric because Scott Jewler told him

19   that he made some sort of threat that he would sue the

20   company, and Scott told B..J. what that reason was.

21            And when B.J. heard it, he said -- he goes I

22   understand where Scott's coming from, and I support him.

23   Not taking action on Eric.

24            And I don't know what it is.

25            So that was a conversation I had with him.

```
 1            And I let it go at that point.  Okay.  Whatever.
 2            MS. LARSEN:  Can you mark that as Exhibit 8.
 3               (Deposition Exhibit No. 8 was marked for
 4      identification by the reporter.)
 5      BY MS. LARSEN:
 6         Q.   You have in front of you what's been marked as
 7      Exhibit 8.
 8            Do you recognize that document?
 9         A.   Do I recognize -- you know, it's -- I recognize my
10      e-mail to Tan Lay Koon.  I just don't remember his response.
11            And I'm not saying he didn't do it.  I just don't
12      remember it.
13         Q.   And so --
14         A.   I don't remember talking to him on Monday.
15            I don't remember -- we never had a conversation,
16      him and I, that I can recall.
17         Q.   You and Lay Koon.
18         A.   Uh-hmm.
19         Q.   I'm sorry.
20         A.   Yes, I don't remember talking to him.  He said
21      let's talk on Monday.  I don't remember this conversation,
22      to be honest with you.
23         Q.   Okay.  But the underlying e-mail --
24         A.   I do remember this, yes.
25         Q.   And that's an e-mail that you sent to Lay Koon.
```

1      A.   Yes.

2      Q.   August 10th, 2007.

3      A.   Yes.  No.  Yes.

4           The 2:38 one, yes.

5      Q.   And in your e-mail to Lay Koon on August 10th, you

6  write:  The last time B.J. and I spoke was Tuesday August 7.

7           Could you describe your August 7th discussion with

8  B.J. Han?

9      A.   Can, can you tell me where you were reading that?

10     Q.   The first paragraph in your e-mail.

11     A.   Oh, yeah.

12          Okay.  Hold on.

13          Okay.

14          Do you want to know about that conversation with

15  B.J. you're saying?

16     Q.   Your August 7th discussion with B.J.

17     A.   Yeah, I received a -- I was on another conference

18  call.  B.J. called me on my cell phone and asked me to speak

19  with me, as soon as possible.

20          I said no problem, as soon as I hung up on the

21  conference call, I'd call him back.

22          I did.

23          I believe that started at 4:36, my conference call

24  with him.

25          And he started the conversation by talking

1    about -- actually I talked about it earlier, about the

2    technology steering committee, basically telling me how

3    disappointed he was with it.

4          And I had no idea why he was -- it's as if someone

5    told him just get rid of her, because his attitude was so

6    aggressive.

7          He just started immediately attacking me about the

8    technology steering committee, about issues that were not

9    there.  You know, it's like, you know, this isn't working,

10   that's not working.

11         I said, what are you talking about?  We've met all

12   of our metrics.  We exceeded all of our metrics.  This team

13   is working better than any in the history of this company.

14         And he kept saying that you're a failure, you're

15   this, you're that.  He went on and on saying how it's not

16   working.

17         And he was really getting on this whole point of

18   the upcoming sales meeting in California.  You scheduled

19   four hours.  That's unacceptable.

20         And I said, that's all we need.

21         And I said, I was trying to accommodate

22   everybody's schedules coming in from around the world that

23   are here for less than a week, and I didn't want -- I always

24   felt like I couldn't waste people's time and it was hard to

25   get people's time, so I tried to be as compact and efficient

1    as possible because God forbid if I had scheduled a two-day

2    meeting, I would have been yelled at for that.  I mean, it's

3    like I'm damned if I do and damned if I don't.

4         Okay.  That's where I was at this point with B.J.

5    Okay.  If I had scheduled a two-day meeting, he would have

6    had yelled at me and said why do you need two days, why are

7    you wasting company -- valuable company resources.  People

8    coming in from around the world for a meeting that should

9    only do this in four hours.

10        So what do I do.  I schedule it for four hours.

11        He says, how dare you -- you know, when I schedule

12   for four hours, he said, how dare you hold a meeting in

13   four hours, what could you possibly get done in four hours.

14   You're totally belittling, I don't know his exact word, you

15   know, the importance of this team and this committee.

16        I said, well, not true.  I've already laid out the

17   agenda, this is how much time the team felt we needed to

18   cover it, the team agreed to it.  And furthermore, I told

19   him he had insisted on face-to-face meetings on a semiannual

20   basis.

21        I had had them quarterly, which was in excess of

22   what he wanted, and so we were on top of things more than

23   normal.

24        And I said, as I told him, we just met a few

25   months ago, we don't need a full one- or two-day meeting

1    because we're having meetings more frequently.

2            He went on screaming at me.

3            Somehow or another, and I don't remember how, the

4    conversation shifted from that to what I think he really

5    wanted to talk about, and that was this whole -- you just

6    showed it earlier to me, the complaint against me.

7            And I told him, you know, I don't even know who

8    this came from.

9            And I think during this call he finally told me it

10    was Scott Gooch.

11            And that basically lucky for me, you know, they

12    interviewed my direct reports and you were supported by your

13    group.

14            And I said, well, I could have told you that.  You

15    know, I don't even know why you did interview my people,

16    once I went -- you know, that comes into the undermining.

17            I said, once again, you know, I've been undermined

18    by, you know, by my direct reports, in front of my direct

19    reports.

20            He said, how do you figure?

21            I said, you're again making me look like the

22    questionable figure.

23            Again, the victim, the victim, the victim.  I

24    said, why are you questioning my ability to manage this

25    group, I have no issues.

1          Yes, but you're telling me I did something wrong.

2          I said, I don't agree with what you did.

3          But then we have a right to disagree.  I have a

4     right to disagree, don't I.

5          Which, by the way, in this company actually you

6     don't.  You never disagree with Lay Koon or B.J. or what

7     happens to me is what happens to people that.  You get

8     demoted or fired or sent somewhere to some remote place and

9     hope to God you'll quit type of thing.

10          So, yes, I disagreed with them.  I got demoted

11     that night.  Okay.

12          So I told him I disagree with what you did.  I

13     don't think it was necessary.

14          And he said -- that's when he start screaming

15     repeatedly I'm done with you, I'm D-O-N-E, do you hear me,

16     do you understand me.  I kept saying yes.

17          He kept screaming, I don't know how many times, I

18     am done, D-O-N-E, do you hear me.

19          Three and a half hours I got yelled at.  That's

20     unacceptable.

21          You want to talk about professionalism, I don't

22     think that's very professional.  Three and a half hours

23     screaming at me..

24          And it was quite apparent he was -- it seemed like

25     a temper tantrum to me, because he would repeat this D-O-N-E

1    thing and spell it about 10 or 15 times.  I don't even

2    remember.

3              And then he said, if you, if you apologize to me

4    right now -- and I said, what for, what have I done.

5              And he said, you tell me now I did something wrong

6    or I'll take severe action on you.

7              Why am I apologizing.  I didn't do anything.

8              You tell me now that you -- you apologize to me

9    now.

10             I said, no, because I haven't done anything.  Why

11   am I apologizing.

12             You tell me now.  Again, he repeated this many

13   times.  If I have done something wrong, and, you know, you

14   apologize for this.

15             And he asked me this several times.  I'm not going

16   to repeat it over and over.

17             He said, do you hear me, multiple times.

18             I kept saying yes.

19             I think he was hoping I would apologize, and I

20   didn't.

21             He said, if I don't hear from you in 30 minutes in

22   writing, I will take severe action.  So he did.  He demoted

23   me.

24             He sent out a humiliating, disrespectful, totally

25   undesired e-mail, publicly disgracing me in front of the

1     entire company, and announcement that has never before been

2     done in the history of the company.

3          I have never seen anything like this, anywhere in

4     fact.  Ever.

5          Where I'm taking over this group.  Puts me in a

6     box way -- a bold line.  It was like a little child took a

7     crayon and was just mad as hell, and just slashed this org

8     chart and took this big bold line and put me in the very

9     bottom right-hand corner of the chart.  Diane Sahakian.  No

10    title.  He stripped me of my title.  Special projects.

11    Everybody in the company knows that that means you're out

12    the door.

13         And just said I'm taking over the group.

14         There was no, no, there was no thank you, Diane,

15    for, for your good work with the ET group.  There was no

16    transition of, you know, thanking Diane for what she did,

17    and help support Diane in her new, her new endeavors.  There

18    were no new endeavors.  Okay.

19         So, of course, I'll tell you the damage.  In my

20    case is the worse damage of all is the future earning

21    potential I have at this point in time, because I have

22    vendors, I have customers.  Intel, Alpha Logic, Sysco.  I

23    could go on and on and on, contacts I've had known for years

24    since my days out of college.  Twenty-five years in this

25    industry that were calling me saying what happened.

```
 1          Not, oh, gee, I heard -- it was, what happened.
 2          Everybody knew I got slapped down, in the company,
 3  outside the company.  I'm ruined in this industry.
 4          And you wonder why I'm not happy.
 5          Ruined.
 6          MS. LARSEN:  You want to go ahead and switch?
 7          THE VIDEOGRAPHER:  This be concludes tape three in
 8  the deposition of Diane Sahakian.
 9          We are off the record at 4:35.
10          (Brief recess taken.)
11          THE VIDEOGRAPHER:  This begins tape four in the
12  deposition of Diane Sahakian.
13          We are on the record at 4:49.
14          MS. LARSEN:  Okay.  So we're trying to figure out
15  what we're going to do as far as time and reconvening the
16  deposition.
17          It's my understanding we are not going to be able
18  to complete at least seven hours of deposition today, which
19  is the presumptive limit the defendants are entitled to.
20          And it's my understanding that schedule wise you
21  don't believe, Mr. Strojnik, that we can reconvene for at
22  least two weeks; is that correct?
23          MR. STROJNIK:  That's correct, yes.
24          MS. LARSEN:  Okay.  As far as reaching some sort
25  of agreement regarding rescheduling or setting to reconvene,
```

1    part of my concern is that we do have several intervening

2    depositions in the meantime.  And while, you know, if we

3    could go through seven today and be effective with the time,

4    I could certainly try and finish within that time frame, but

5    the longer we postpone, the more discovery that occurs in

6    the meantime, the more we will to discover -- to cover.

7         So I guess what I'd like to figure out is I

8    understand you don't have your calendar, and we can't

9    reach -- maybe we cannot set a definitive date today, but I

10   would ask that plaintiff would stipulate to somewhat extend

11   the time when we reconvene because we will have more to

12   cover.  And what we'd like to know is some idea on time

13   frame and whether or not we need to move the court for

14   additional time in the meantime.

15        MR. STROJNIK:  How much more time do you want?

16        MS. LARSEN:  I mean, I think we'll have, by my

17   estimation, I believe we're set for at least -- currently

18   set for at least eight depositions between now and then.

19        I think we just determined where we're at

20   approximately five and a half hours for today.

21        MR. STROJNIK:  Correct.

22        MS. LARSEN:  We'd ask for three more hours.

23        MR. STROJNIK:  Three more hours.

24        I'll split you down the middle, two and a half.

25   How's that sound?

1           But I ask you to allow me approximately 20 minutes

2    today to tie up some issues that were brought up earlier

3    today.

4           MS. LARSEN:  As long as hour court reporter --

5           MR. STROJNIK:  If the court reporter is okay with

6    that.  And I'll speak very slowly.

7           THE WITNESS:  Me too.

8           MR. STROJNIK:  And you will too.

9           Do you want me to sit over there?

10          THE VIDEOGRAPHER:  It might be better if you did.

11          THE WITNESS:  Do you want me --

12          MR. STROJNIK:  No, no, you sit here, and I'm going

13   to go sit over there.  So you look over sort of into the

14   camera.

15          THE WITNESS:  Oh, you're going to ask me now?

16          MR. STROJNIK:  I'm going to ask you some questions

17   now, yeah.

18          Thank you, counsel.

19          How's the sound?

20          THE VIDEOGRAPHER:  Good.

21

22                    E X A M I N A T I O N

23   BY MR. STROJNIK:

24      Q.   Are we set together?

25          Ms. Sahakian, as you know, I'm your lawyer.  I get

1   the opportunity to ask you some questions after Ms. Larsen

2   has had approximately five and a half hours at you.

3            There is one thing that I'm not clear on, and I

4   would like you to clarify it for me.

5            You testified earlier today about three different

6   areas of impropriety on behalf of STATS.

7            The first one was that they were undermining your

8   authority.

9            And you talked at length about Eric Gongora and

10  B.J. Han.

11           The second area was the unwelcome sexual advances

12  that were made to you by Eric Gongora and others.

13           And the third area was, was the racial component,

14  where B.J. Han and others would make comments about

15  Americans and about others.

16           And I want to make sure I understand how these

17  three areas sort of tie together.

18           So, when you were testifying about a hostile work

19  environment, was it your intention to testify about these

20  three different areas?

21           MS. LARSEN:  Objection; form.

22           THE WITNESS:  Yes.

23           MR. STROJNIK:  How can I correct my form, counsel?

24           MS. LARSEN:  Well, for one thing you just

25  testified for approximately ten minutes.

                 ©  AZ LITIGATION SUPPORT (480)481-0649

238

```
 1          I believe misstating her testimony pretty

 2   extremely and certainly misstating her allegations as set

 3   forth in the pleadings.

 4          MR. STROJNIK:  Okay.

 5   BY MR. STROJNIK:

 6     Q.   How would you generally describe the hostile work

 7   environment areas that you, that you are complaining about?

 8   What are the various areas that caused the environment to be

 9   hostile?

10     A.   Well, there's a widespread feeling, especially in

11   the U.S., and anybody who essentially was non-Singapore or

12   non-Korean in the company, if you were not Singapore or

13   Korean, you were not going to be treated respectfully,

14   equally.  There was always question about pay disparity, but

15   we never knew what that was, because they do not -- they're

16   very secretive about who's getting paid what where.

17     Q.   Was there a racial component to this?

18     A.   Certainly.

19     Q.   Did you ever hear anybody make any comments about

20   how STATS management viewed different races?

21     A.   Yes.  All the time.

22          It goes back from almost the beginning when I

23   started with the company.  I remember I had just met B.J.

24   It was year 2000, I believe.  I was at a semiconductor

25   international show.
```

1          And we were walking around the show.  I walked

2    into -- I was walking with B.J. Han, into Kulook & Sofa

3    (phonetic.)  It's a large equipment manufacturer's booth.

4    To look at their equipment.  And as we were walking toward

5    it, because I was telling B.J., oh, we should go look at

6    their latest wire bonders or something.  And as we walked

7    toward it, he said, no, no, I don't want to go there.

8          And he turned around, did a U-turn, and walked

9    away.

10          I said, why, what's going on.  I mean, we've got

11   how many hundreds of their machines.

12          He says, I don't like that company, they're

13   Jewish.

14          And walked away.

15          And that was pretty typical.  He doesn't like

16   Jews.  He doesn't like anyone that's not Korean, quite

17   frankly.  That's how B.J. is, because he even puts Chinese

18   down.

19          Anthony Kahn, who was a former employee of this

20   company, told me repeatedly he left this company because of

21   remarks like this from B.J. Han.  He couldn't stand the man

22   and left because of him.

23          Apparently this goes back to your -- I want to say

24   year 2000, 2001 time frame.  B.J. had come -- had confronted

25   Anthony, putting him down about what his previous place of

1    employment was.  Basically calling the place a flunky place.

2    And continue to berate Anthony more, saying, you know, you

3    know, you Chinese are not at the top of the Asian race pool,

4    like, you know, the Japanese are number one, up there with

5    the Koreans.  You Chinese are down there at the bottom of

6    the cesspool with the Indians.

7          You know.  I mean, this is very common in this

8    company.

9          Tan Lay Koon made these comments continually.

10          I remember Ram Ramakrishna -- definitely Indians

11    were not treated fairly in this company.

12          Actually some of our brightest engineers were

13    Indian, and there was definitely a ceiling for them in this

14    company.  You never saw one become a vice president ever.

15          Ram Ramakrishna, when he traveled with -- to

16    Korea, he would call me extremely angry about remarks that

17    were being made to him, at him, or around him.  And he would

18    come back just feeling like a dog basically, like, you know,

19    he knew where he stood with them and that was at the bottom

20    of the pool.

21          But there was -- I can recall one trip where he

22    named four or five things that went on.

23          One was Kenny Lee, who was executive vice

24    president of research and development, and B.J. were kind

25    of -- they were berating him, making fun of him.  And Kenny

1  Lee said, you know, Ram, you need to get yourself a pretty

2  girlfriend.

3          Ram is married, by the way.

4          You need to get yourself a pretty girlfriend, and

5  I don't mean the Indian kind.  You need to get yourself a

6  Korean girl.

7          And, of course, they were laughing at this.

8          And then on another occasion B.J. made remarks in

9  front of Ram that the only reason why there's a senior

10  technologist at AMKOR Technology who is Jewish -- and he

11  made a remark to -- in front of or to Ram, I'm not sure,

12  that the only reason why -- his name was Robert Darveaux,

13  had the position he had was because his wife is Jewish, you

14  know, Bruce Freyman is Jewish and Scott Jewler is Jewish,

15  that's why Robert Darveaux was so high with this company is

16  because of his Jewish connection.

17          And he made comments like this all the time.

18      Q.    So from B.J.'s perspective, the racial hierarchy

19  was relatively clear.  It was Japanese and Koreans on top.

20      A.    Yes.

21          MS. LARSEN:  Objection.  Foundation.

22  BY MR. STROJNIK:

23      Q.    And then as you indicated he would say that the

24  Chinese and the East Indians were at the bottom of the

25  cesspool.

1    A.   Yes.

2    Q.   And he would say this to the Chinese and to the

3  Indians.

4         MS. LARSEN:  Objection; form.

5         THE WITNESS:  He said that to Anthony for certain.

6  BY MR. STROJNIK:

7    Q.   Okay.  Anthony Kahn.

8    A.   He said this to Anthony Kahn for certain.  And Ram

9  Ramakrishna felt this kind of discrimination continually.

10   Q.   And as you testified, you're aware at least two

11 instances where he disparaged the Jews.

12   A.   Yes.

13   Q.   Did he ever disparage Americans?

14   A.   All the time.

15        He and Lay Koon both all the time.

16   Q.   What kind of things would he say about Americans?

17   A.   Fat.  Lazy.  Bunch of complainers.  Bunch of

18 whiners.

19        You know, Americans and their legal systems, and

20 their lawsuits and -- it was just nonstop.  I mean, like I

21 said earlier, it was like Americans have lousy hotels,

22 Americans have lousy food.  That was a big one.  I hate

23 Mexican food.  It's all the same crap all the time.  It's

24 different form.  It's always rice and beans.

25        It's just nothing -- it was everyone was inferior

243

1  to the Singaporeans and the Koreans in every way, whether it

2  be their, their physique, their intelligence, their cuisine,

3  the hotels, the food, everything.

4           And, and furthermore, there was a total lack of

5  regard for Americans and in terms of their day-to-day

6  lifestyles and schedules.

7           I can recall Jeff Osmond, who is a tough guy, he

8  was a president of the U.S. operations and vice president --

9  executive vice president of sales.  He got beaten down.  He

10  was -- he left because of Lay Koon.  He couldn't take the

11  beatings anymore.  He left because of incidents such as

12  Lay Koon screaming and yelling at him for not calling in on

13  a Sunday night when it was his daughter's birthday.

14          And Jeff is like, Jesus Christ, it's my daughter's

15  birthday.

16          You know, I mean, it's a Sunday night.

17          It got pretty bad in this company where there was

18  just no regard for American quality of life or American -- I

19  mean, I remember there was a technology steering committee,

20  and they were -- B.J. and Lay Koon were irate that many

21  people, Mike Schraeder included, wouldn't call in for the

22  meeting because it was Christmas or Christmas Eve, I forget.

23  I did, foolishly.  But, boy, I heard ear full about how the

24  others were obviously not taking this company seriously

25  because they wouldn't call in on Christmas.

1           But they just had -- but -- you know, it was kind

2    of ironic because when they had their holidays, or their

3    schedules, their dinners, we couldn't touch those.

4           I mean, those are off limits.

5           Our conference calls always -- it was amazing,

6    they would start anytime from 3:30, 4:00, usually --

7    actually they started the earliest at 4:30, typically,

8    because that was their 7:30, 8:00, and that was early for

9    them to go to work.

10          But we would start at 4:30 at the earliest, but

11   usually 5:30 to 6:00 is when the conference call would

12   start, our time, which was more like 9:00, 10:00 their time.

13   Korea was 10:00.  Singapore was 9:00.

14          And these calls would go four, five hours, so

15   you're not having dinner with your families.  And this would

16   go four, five nights a week.

17          But they didn't care.  But, boy, you know, the

18   minute lunch hour came, we're going.  Okay.  We just missed

19   our dinners, but you guys have to rush to lunch.

20          I mean, it was just this kind of environment.

21   Q.    You also testified about unwelcome sexual advances

22   that Eric Gongora toward you and I believe a fellow named

23   Mr. Matthews made toward you.

24   A.    Yeah.

25   Q.    Did those kind of sexual advances make the

245

1    environment at STATS hostile to you?

2        A.   Of course.

3             MS. LARSEN:  Objection; form.

4             THE WITNESS:  Of course.

5    BY MR. STROJNIK:

6        Q.   Was there anything else that you can think of that

7    made --

8        A.   I remember one day in the office everybody was

9    laughing about a picture.  It was a magazine picture, you

10   know, like a Vogue-type magazine or something like that,

11   fashion style magazine.  It had a picture of a guy that

12   looked like my former employee, Dean Kossives, in a pretty

13   funky '70s type outfit, as I recall, and he was groping a

14   woman's breast, had his hands around it, and they

15   superimposed or overlaid my picture on that, and they put it

16   on the website.

17            And they all thought it was funny.

18            Eventually, you know, I had gone in there and

19   deleted it.

20            I shouldn't have, but I did.

21            You know, that was --

22       Q.   Let me understand.  Your face was on somebody

23   else's picture.

24       A.   They put my picture over another woman.  It was a

25   magazine picture and they scanned it and put it in the

             ©  AZ LITIGATION SUPPORT (480)481-0649

246

1    computer.

2        Q.    Do you know who did that?

3        A.    Doug Matthews.

4        Q.    Was that on a STATS computer?

5        A.    Yes, on the server.

6        Q.    On a STATS server.

7        A.    Yes.  We had -- yes, it was on the -- gosh, I've

8    forgotten already.

9              It was on the Emerging Technology database server.

10   We had a name for it, and I don't remember it.

11       Q.    Did that particular incident make the environment

12   hostile to you?

13       A.    Of course.  I mean, it's pretty demeaning.

14       Q.    How did B.J. Han and Mr. Koon treatment women who

15   did not work for them, for example, in restaurants, in

16   places of entertainment where they went?

17       A.    They were servants.  I mean, women are servants to

18   them.

19             I mean, they would go to karaoke bars.  It was

20   like get me this, get me this.

21             There's no respect.

22       Q.    Did they go to gentlemen bars?

23             MS. LARSEN:  Object.  Foundation.

24             THE WITNESS:  Go to what?

25

 1   BY MR. STROJNIK:

 2       Q.   Did they go to gentlemen's bars?

 3            MS. LARSEN:  Object.  Foundation.

 4            MR. STROJNIK:  How can I improve on the

 5   foundation, counsel?

 6            MS. LARSEN:  If she has any basis for knowing

 7   whether they went, she can answer.

 8   BY MR. STROJNIK:

 9       Q.   Have you heard any stories about them going to

10   gentlemen's bars?

11       A.   All the time.  I mean, that was -- I probably

12   don't mention these things because I'm so used to it

13   unfortunately, but I can given several examples on that

14   front.

15            I can remember one incident in the ChipPAC days

16   where my boss, Ken Sicz, told me he was absolutely disgusted

17   by -- I don't want to mention the customer's name.  I could,

18   but I'd rather not.  They took one customer out, and I knew

19   some of the individuals who went, to a bar in Korea where --

20   I find this vulgar, but the totally nude women would be

21   doing handstands and they'd be drinking Vodka or some other

22   liquor out of their you know what, their genitals.

23            They -- I heard they maxed out two credit card

24   limits of $10,000 at this bar to pay this bill.  And that's

25   the talk -- the reason why they were all talking about this

1    was because they were just like, my God, we had to take out

2    two credit card limits to pay this bill off.

3        Q.    And they were proud of the fact that they spent

4    the money in a Korean house of prostitution?

5            MS. LARSEN:  Objection; form..  Foundation.

6            THE WITNESS:  They were amused by it obviously.

7            And, you know, for me to hear about it, they were

8    amused to be talking about it so much in the office place.

9    BY MR. STROJNIK:

10       Q.    And they were talking, they were talking about it

11   in your presence.

12       A.    Of course.

13       Q.    Did you feel that was hostile, that created a

14   hostile work environment?

15       A.    It makes me -- yes.  I feel very uncomfortable

16   around that.  It's disgusting to me.  And it tells me how

17   they view women..  And it's not in very high regards.  It's

18   like women are whores in their eyes.

19       Q.    So the hierarchy goes something like this.  The

20   Japanese are on top with Koreans, then somewhere along the

21   line are Americans, Chinese, and east Indians; correct?

22           MS. LARSEN:  Objection; form.  Foundation.

23   BY MR. STROJNIK:

24       Q.    Is that correct?

25       A.    That's correct.

1          MS. LARSEN:  Repeat the objection.

2     BY MR. STROJNIK:

3          Q.    Where, where do the women come in in this

4     hierarchy?

5          A.    I'm sorry, I didn't hear you.

6          Q.    Where do the women come in in this hierarchy?

7          MS. LARSEN:  Objection; form.  Foundation.

8          THE WITNESS:  They're not even on that scale, in

9     my opinion.

10          MR. STROJNIK:  That's all the questions I have for

11    today.

12          THE WITNESS:  Well, I have a few more comments.

13          You know, I can tell you that I -- I actually went

14    back to my hotel room a few times in Asia feeling so lonely

15    because I was so alienated from -- we'd go out to -- I'd go

16    to these big sales or strategy meetings off sites, and we'd

17    be on a bus coming back to the hotel, and everybody would

18    like gather and look at me and whisper, and they'd all take

19    off and go somewhere, dinner, whatever, and just leave me by

20    myself, because of course they wanted to go to all the strip

21    joints or the whore bars or whatever they were going to.

22          I mean, there was a -- you know, there was a very

23    nice evening I arranged at the South Mountain Pointe Resort

24    here in Phoenix, very nice occasion, very elegant, outdoor

25    patio, hors d'oeuvres, drinks, and all that for Intel.

1          And when it was closing down, B.J., Jerry Alameda,

2    several other STATS employees, took some of the Intel people

3    over to Christie's strip joint.  And B.J. thought it was

4    funny and said, whoa, want to go with us.

5          I said, yeah, I don't think so.

6          And I was kind of -- I was angry because I was

7    supposed to talk to them about something, I couldn't get

8    time with him, and he was off to the strip joint.

9          So later that night we were -- you know, at 1:00

10   in the morning I'm in e-mail with him after he comes back

11   from strip joints, but this, you know, this kind of stuff

12   went on all the time.

13          MR. STROJNIK:  Okay.  Thank you.  Thank you for

14   now.

15          MS. LARSEN:  If I could just ask a couple of

16   follow-up questions.

17

18            F U R T H E R   E X A M I N A T I O N

19   BY MS. LARSEN:

20   Q.    When's the last time that Eric Gongora made a

21   sexual comment to you?

22   A.    It -- he went quiet as far as direct communication

23   with me after the ketchup incident because I think he knew

24   he was very guilty.

25          I would say it would have to be pre-ketchup

1  incident.  I don't know exactly when.

2      Q.   And when's the last time you heard B.J. Han refer

3  to Americans as fat?

4      A.   He said it to me, for certain.  I remember that

5  very clearly, more than other incidences, because it was

6  directed at me.

7          But that was within a month of when I came back

8  from my lung surgery, having lung cancer.

9          It was my first trip to California after my

10  surgery, and the first thing he said to me is it looks like

11  you became fat, rather than glad you're alive..

12      Q.   Was that the only time you heard B.J. make a

13  comment like that?

14      A.   I don't know.

15          I don't know.

16          I'm sorry.

17      Q.   And when did you hear B.J. Han refer to Americans

18  as lazy?

19      A..   As what?

20      Q.   As lazy?

21      A.   He did that all the time.  Ongoing -- him and Lay

22  Koon both.  It's almost like, you know, the wife husband

23  abuse syndrome.  You just get so used to it after a while.

24  It's all the time.

25          I mean, if you talk to any of our salespeople,

© AZ LITIGATION SUPPORT (480)481-0649

1  they talk about being beaten down and totally incompetent

2  and you call yourself a sales manager.

3        And it's just always, you know, you, you

4  Americans, you know, you complain about this, you complaint

5  about that, you want your fat -- I mean, it was just

6  nonstop.

7        Q.    And when did Ram Ramakrishna tell you that Kenny

8  Lee had told him he should get himself a pretty girlfriend,

9  not an Indian girlfriend?

10       A.    That had to have been -- because he wasn't

11  reporting to me anymore.

12       Well, actually, even if he was reporting to me, I

13  couldn't do anything about it, but I remember I went like

14  this.  Well, you don't report to me anymore, I can't help

15  you.

16       But, so that had to have been post -- he left

17  around April 2008, so it was sometime between August of 2007

18  and April 2008.

19       I can't tell you exactly.

20       Q.    Why didn't you include any of the sexual comments

21  that Eric Gongora made to you in your EEOC charge?

22       A.    I mentioned that earlier.  Number one -- in the

23  what now?

24       Q.    In your charge of discrimination to the EEOC.

25       A.    I was focused on the -- I felt that the biggest

1    damage was the lack of support from the company, the future

2    earnings potential, that, you know, the demotion was to me

3    extremely damaging.  You could take all this stuff and say,

4    oh, it's going to make me -- you know, put me -- made me

5    uncomfortable, made me this or that, but when they come flat

6    out and demote me in front of the entire industry like this

7    and strip me of 25 years of my college education working up

8    to where I was, you know, that kind of becomes my priority,

9    not some little -- Eric Gongora's little comments to me.

10   I'm sorry, it's just down the priority list.

11        Q.    Did you find his comments offensive?

12        A.    Yes.

13              Of course.  I mean, how would you like it if

14   someone is asking you about your breasts and you're sitting

15   in your office going, what's the hell, what's up -- you

16   know, asking you whether you shave down below -- yeah.

17              But dare I question him or say anything, because

18   he'd blow up or I'd be told to shut up.

19              I couldn't do anything.

20        Q.    And why didn't you include any of these racial

21   comments in your complaint or your first amended complaint

22   or your second amended complaint?

23        A.    Just part -- well, several reasons, but probably

24   primarily, once again, I focused on, I think, me first.

25              And until I met with counsel and they asked me

              ©  AZ LITIGATION SUPPORT (480)481-0649

1    examples, it didn't come out until later.

2            MS. LARSEN:  We don't want to venture into any

3    discussions between two and your attorney.

4            If we can reconvene within the next couple weeks,

5    I think we can finish.

6            MR. STROJNIK:  That would be great.  That would be

7    great.  Thank you.

8            THE VIDEOGRAPHER:  This concludes tape four in the

9    deposition of Diane Sahakian.

10           We are off the record at 5:15.

11            (Whereupon, the deposition concluded at
     5:15 p.m.)
12

13

14            _____

15                       DIANE SAHAKIAN

16

17                    * * * * *

18

19

20

21

22

23

24

25

255

```
 1  STATE OF ARIZONA      )
                          )      ss.
 2  COUNTY OF MARICOPA    )

 3          BE IT KNOWN that the foregoing deposition was

 4  taken before me, Marty Herder, a Certified Court Reporter,

 5  CCR  No. 50162, State of Arizona; that the witness before

 6  testifying was duly sworn by me to testify to the whole

 7  truth; that the questions propounded to the witness and the

 8  answers of the witness thereto were reduced to typewriting

 9  under my direction; that the witness elected to read and

10  sign the deposition transcript; that the foregoing 254 pages

11  constitute a true and accurate transcript of all proceedings

12  had upon the taking of said deposition, all done to the best

13  of my skill and ability..

14          I FURTHER CERTIFY that I am in no way related to

15  any of the parties hereto, nor am I in any way interested in

16  the outcome hereof.

17          DATED at Chandler, Arizona, this 26th day of

18  March, 2009.

19

20                              _____

21                              C. Martin Herder, CCR
                                Certified Court Reporter
22                              Certificate No. 50162

23

24

25
```

© AZ LITIGATION SUPPORT (480)481-0649