L. Eric Dowell, SBN 011458
Caroline Larsen, SBN 022547
Monique Young, SBN 025121
Ogletree, Deakins, Nash, Smoak & Stewart, P.C., SBN 00504800
2415 East Camelback Road, Suite 800
Phoenix, Arizona 85016
Telephone:  (602) 778-3700
Facsimile:   (602) 778-3750
Eric.Dowell@ogletreedeakins.com
Caroline.Larsen@ogletreedeakins.com
Monique.Young@ogletreedeakins.com

Attorneys for Defendants STATS ChipPAC, Inc.
and STATS ChipPAC, Ltd.

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Diane Sahakian, a single woman,<br><br>     Plaintiff,<br><br>vs.<br><br>STATS ChipPAC, Inc., a foreign corporation; STATS ChipPAC Ltd, a foreign corporation; Temasek Holdings Private Limited, a foreign corporation; Singapore Technologies Semiconductors Private Limited, a foreign corporation,<br><br>     Defendants. | CV08-241-PHX-HRH<br><br>**RESPONSE TO MOTION TO COMPLETE DEPOSITION OF BJ HAN AND FOR SANCTIONS BY DEFENDANTS STATS ChipPAC, INC. AND STATS ChipPAC, LTD.** |

I.  **INTRODUCTION**

On June 11, 2009, Plaintiff's counsel, Peter Strojnik, took the deposition of Dr. Byung Joon Han ("Dr. Han"). Dr. Han is STATS ChipPAC, Ltd's Chief Technology Officer based in Singapore and Plaintiff's former supervisor. The deposition lasted seven hours and 25 minutes and resulted in 296 transcribed pages of testimony. Mr. Strojnik had a full and fair opportunity to ask Dr. Han all of the questions on all of the topics pertinent to his client's lawsuit (*see* Doc. 166, Motion at pp. 1-2, items (i)-(iv)). Mr.

Strojnik now moves to "complete" the deposition of Dr. Han, yet fails to articulate why the deposition is incomplete. Mr. Strojnik does not state with any particularity what more he wants to ask Dr. Han or how much additional time he reasonably feels he will need to do so. Yet, Mr. Strojnik requests an order from this Court for STATS to pay his $450 hourly rate for a full day, or $3,600. Plaintiff's request is disingenuous and overreaching. It should be denied.

**II      ARGUMENT**

Plaintiff argues that Dr. Han's deposition was "not an exercise of open exchange of information," but "an exercise in obfuscation, unnecessary delays, non-responsive answers and repetitive recitals of talking points." (Doc. 166, Motion p. 2) Rather than direct the Court to any specific examples, Plaintiff simply attaches the entire 296-page deposition transcript of Dr. Han, presumably suggesting the Court should hunt and peck for Plaintiff's argument.

Plaintiff's Motion should be denied for the simple reason that Mr. Strojnik was given wide latitude to ask Dr. Han all of the questions reasonably relevant to Plaintiff's two claims for relief involving: (1) hostile work environment based on sex; and (2) retaliation. Both claims are asserted under Title VII of the Civil Rights Act of 1964. Dr. Han fully answered counsel's questions and the deposition transcript speaks for itself. It was only when: (1) Mr. Strojnik strayed far beyond the realm of reasonableness and civility, as well as the two claims asserted, and began to harass and annoy Dr. Han with irrelevant, argumentative and inappropriate questions; and (2) Mr. Strojnik ignored defense counsel's repeated requests that Mr. Strojnik stop his behavior, that STATS' defense counsel stopped the deposition of Dr. Han (again, after over seven (7) hours of testimony). (*See* Doc. 166, Exh. 3, pp. 291-296.)

According to the charge of discrimination Plaintiff filed with the EEOC in 2007, and the Second Amended Complaint she filed in this lawsuit, Plaintiff claims that as the Vice President of STATS' Emerging Technology group, she was subjected to a sexually hostile work environment by subordinate male employees in her group. (Doc. 61 ¶ 20,

21, 28.) There is ample record evidence that Plaintiff complained repeatedly to Human Resources, co-workers and Dr. Han, that at least one of her subordinates, Eric Gongora was acting "insubordinately" (e.g., arriving late for work, skipping training, writing aggressive emails about work-related topics to Plaintiff, and contacting Human Resources to question the amount of a bonus Plaintiff authorized for another employee).[1] While Plaintiff admits she never sat in the dab of ketchup left on her chair, she claims the act was designed to sexually harass and humiliate her. STATS' Human Resources department took the complaint seriously and immediately and fully investigated the incident over five (5) days. HR concluded the perpetrator of the ketchup was unknown, nevertheless, HR retrained all of the office employees on the company's established policies and the need to conduct themselves professionally. The legal basis for Plaintiff's retaliation claim simply is that Plaintiff was allegedly demoted four months later to Vice President of Special Projects and then fired about fifteen months after complaining about the ketchup incident.

While the legal premise for this single plaintiff, Title VII lawsuit is straightforward, Plaintiff and her counsel apparently have been trying to morph this lawsuit into something else—a lawsuit that STATS ChipPAC, a Singaporean-based semiconductor test and packaging service provider (with operations in several countries), allegedly discriminates against its widely diverse workforce based on race and/or national origin. Indeed, virtually all of Plaintiff's discovery has been directed toward these unasserted, collateral claims. Additionally, Plaintiff has spent a substantial amount of effort digging up dirt on a STATS ChipPAC employee, Eric Gongora (not a defendant in this case), presumably to show that he has a propensity to mistreat women (primarily his

---

[1] That the evidence will show that while HR, Dr. Han and others repeatedly encouraged Plaintiff to write-up, discipline or terminate Mr. Gongora, Plaintiff never did. Moreover, not one of Plaintiff's complaints had anything to do with a sexually hostile work environment, with the one arguable exception, the complaint Plaintiff made on April 9, 2007, that someone (she admits she does not know who) allegedly placed a dab of ketchup on her leather office chair on a day she claims she was wearing white pants.

two former wives). The problem with Plaintiff's theory, of course, is that virtually everything she claims makes Mr. Gongora a bad person vis-à-vis women allegedly occurred many years before he ever started working for STATS and, more significantly, none of these allegedly bad acts by Mr. Gongora have any relation or correlation to the alleged acts of insubordination that Plaintiff contends gave rise to Mr. Gongora's alleged sexual harassment of her while she supervised him.

The deposition that Plaintiff's counsel, Mr. Strojnik, took of Dr. Han on June 11, 2009, had little to do with the actual claims asserted in this lawsuit. Rather, it appeared to focus almost exclusively on Plaintiff's collateral, yet untimely and unasserted, claims of race and national origin discrimination and a few other unintelligible theories. Indeed, Mr. Strojnik squandered a substantial amount of his deposition of Dr. Han by attempting to harass, intimidate, demean and embarrass Dr. Han with vague and hypothetical questions such as the following, among many others:[2]

1. "There's a fundamental conflict between sciences and philosophy. Will you agree with me on that?" (Doc. 166-4, at p. 10)

2. "Actually, a science deals with the physical world as it is but philosophy deals with the world as it should or could be?" (Doc. 166-4, at pp. 10-11)

3. "As a philosopher, you don't necessarily try to quantify anything. You quantify thought, you quantify a subjective view of the world." (Doc. 166-4, at p. 11)

4. "But as a scientist, you do tend to quantify the world as it is or do you tend to quantify the world as it could be or as it should be?" (Doc. 166-4, at p. 11)

5. "As a scientist, would it be a fair statement that you can predict certain outcomes for which you have a basic knowledge. Let me give you an example. If you throw 20 masses into space and if you know their velocity, if you know their size or mass, and if you know their relative positions, you can probably quantify or predict what those 20 masses are going to do in a period of time in the future. (Doc. 166-4, at p. 12)

---

[2] Note that Dr. Han's first language is not English, but Korean.

6. "What is the mass of one cubic centimeter of iron?" (Doc. 166-4, at p. 13)

7. "How much of a variation is there between the absolute accuracy and the potential error in determining the mass of one cubic centimeter of iron?" (Doc 166-4, at p. 13)

Following this line of question, Mr. Strojnik continued to ask Dr. Han many more questions involving physics and chemistry, not Dr. Han's specialty, chemical engineering. (*See* Doc 166-4, at pp. 10-19.)

9. "What training do you have in the predictability of human reactions?" (Doc. 166-4, at p. 19)

10. "Do you think there is a science that deals with reactions within a group?" (Doc 166-4, at p. 19)

11. "Can you predict what a group will do in your line of work?" (Doc. 166-4, at p. 21)

13. "Have you ever taken a course in which the word rarity was used? (Doc 166-4, at p. 24)

14. "Have you ever taken a course in which the term priming was used?" (Doc. 166-4, at p. 25)

15. "I'm asking you Dr. Han do you recognize there are differences between men and women?" (Doc. 166-4, at p. 28)

16. "There are a number of social rules and regulations that govern persons and groups, would you agree with that?" (Doc. 166-4, at p. 31)

17. "Does the Singaporean law allow for physical punishment?" (Doc. 166-4, at p. 34)

18. "What does the term national origin relate to?" (Doc. 166-4, at pp. 40-41)

19. "What does the term beyond a reasonable doubt mean?" (Doc. 166-4, at p. 69)

20. "Did you ever refer to Americans as a necessary evil?" (Doc. 166-4, at p. 178)

5

21. "Have you ever referred to Americans as fat and lazy?" (Doc. 166-4, at p. 179)

22. "A feeding frenzy is when you throw a chicken into the Amazon and the Piranhas come out and they just eat it up. That's a feeding frenzy. Do you know what priming is?" (Doc. 166-4, at p. 235)

Throughout Dr. Han's deposition, Mr. Strojnik questioned Dr. Han extensively on many other questionable topics, such as the substance of his conversations with STATS ChipPAC's General Counsel about this case (Doc. 166-4, at pp. 282-83) and the reasons and due diligence regarding the hiring of employee Eric Gongora, who was hired by STATS' predecessor company, ChipPAC in 2003. (Doc. 166-4, at pp. 128-30.) STATS and ChipPAC merged until 2004, at which time Mr. Gongora became an employee of the merged entity, STATS ChipPAC. There is no evidence that anyone from STATS was involved in Mr. Gongora's hiring, nor that the company had any knowledge of his alleged prior bad acts while at a previous employer (Amkor Technology) before Mr. Gongora joined ChipPAC in approximately 2003.

Dr. Han's deposition became more surreal, absurd, embarrassing and harassing when Mr. Strojnik, late in the day, began to ask Dr. Han about racism, national origin discrimination and unsubstantiated, alleged stray discriminatory remarks regarding race and national origination by and about others (but never concerning Plaintiff). (*See* Doc. 166-4, at pp. 178-79, 290-296.) And at about the seventh hour of the deposition, Mr. Strojnik began to ask Dr. Han whether, on business trips, he and others take clients to dinner, then to "gentlemen's clubs" and then consort with prostitutes, including pouring alcohol onto their naked bodies, then licking it off. (*See* Doc. 166-4, at pp. 292-296.) Although STATS ChipPAC's undersigned counsel objected and pointed out that he had previously addressed, in writing, Mr. Strojnik's habit of asking harassing and irrelevant questions of STATS ChipPAC's witnesses at deposition (*see* Exhibit A, letter from L. Eric Dowell to Peter Strojnik, dated June 9, 2009), Mr. Strojnik ignored counsel's objections and continued his attempts to harass, intimidate and embarrass Dr. Han. Over

STATS ChipPAC's counsel's objections, Dr. Han answered Mr. Strojnik's questions, denying that he had ever engaged in such activities. (*See* Doc. 166-4, at pp. 293-296.) More to the point, there is not one allegation in this lawsuit that Plaintiff was subjected to any discrimination or hostile work environment by being required or encouraged to go to "gentlemen's clubs," consort with prostitutes, or any of the other salacious conduct Mr. Strojnik repeatedly asks STATS ChipPAC's witnesses.

From a fair review of the deposition transcript, there is little doubt Plaintiff's counsel, Peter Strojnik, undertook every possible approach to harass, annoy, frustrate, intimidate and embarrass Dr. Han on a variety of topics that have no relevance whatsoever to the two claims Plaintiff asserts in this case. Further, Mr. Strojnik had more than the full allotment of time permitted by Federal Rule of Civil Procedure 30(d)(1) (seven hours and 25 minutes) to ask all of the relevant questions he wished concerning Plaintiff's claims. He abused that privilege.[3]

Federal Rule of Civil Procedure 30(d)(1) imposes a presumptive durational limitation of one day of seven hours for any deposition. "[O]verlong depositions can result in undue costs and delays in some circumstances." Fed. R. Civ. P. 30(d)(1) advisory committee's notes to 2000 amendment. "The party seeking a court order to extend the examination, or otherwise alter the limitations, is expected to show good cause to justify such an order." *Id.* No such good cause exists here. There simply is no good reason to require a busy executive like Dr. Han to come back for any more of Mr. Strojnik's abuse and certainly not for an additional eight (8) hours (Mr. Strojnik's request

---

[3] To direct attention from his own abusive tactics, Plaintiff's counsel takes a "kitchen sink" approach at attacking what he believes is improper conduct by STATS ChipPAC's counsel's. First, there simply is no truth to the allegations that undersigned counsel aimed and threw his lapel microphone at the Plaintiff. As for the "certifiable" reference, early in the case, defense counsel were exchanging e-mails among themselves and inadvertently copied Mr. Strojnik on an e-mail describing him as certifiable. Finally, STATS ChipPAC's counsel did not try to engage the Strojniks (father or son) in a "fist fight." The unfortunate incident occurred off-the-record at a deposition and is more fully explained in context in an e-mail exchange between counsel later that day. *See* Exh. B attached. Nothing more really need be made of this flair up between counsel.

$3,600 divided by his $450 hourly rate), particularly when Mr. Strojnik believes that the answers Dr. Han gave to the questions counsel did pose "proved devastating to STATS." (*See* Doc. 166, Motion, p. 2, l. 7.)

For the foregoing reasons, STATS respectfully requests that the Court deny Plaintiff's Motion to Complete Deposition of BJ Han and for Sanctions (Doc. 166) and award STATS its reasonable fees in responding to this motion .

DATED this 2nd day of July 2009.

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.


By: s/L. Eric Dowell
L. Eric Dowell
Caroline Larsen
Monique Young
2415 East Camelback Road, Suite 800
Phoenix, Arizona 85016
Attorneys for Defendants STATS ChipPAC, Inc. and STATS ChipPAC, Ltd.

**CERTIFICATE OF SERVICE**

I hereby certify that on July 2, 2009, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Peter Strojnik
Peter Strojnik, P.C.
3030 North Central Avenue, Suite 1401
Phoenix, Arizona 85012
Attorney for Plaintiff

Peter K. Strojnik
The Law Firm of Peter Strojnik
3030 North Central Avenue, Suite 1401B
Phoenix, Arizona 85012


s/G. S. Ready, PLS

7470669.1 (OGLETREE)