**THE LAW FIRM OF PETER STROJNIK**
**ATTORNEYS AT LAW**
**SUITE 1401**
**3030 North Central Avenue**
**Phoenix, Arizona 85012**
**(602) 297-3019**
Peter Kristofer Strojnik AZBN 026082 CABN 242728
pksesq@aol.com
Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| DIANE SAHAKIAN, a single woman, | ) NO.  2:08-cv-241-PHX-HRH |
| | ) |
| Plaintiff, | ) **PLAINTIFF'S MOTION FOR PARTIAL** |
| vs. | ) **SUMMARY JUDGMENT** |
| | ) |
| STATS ChipPAC, Inc., a foreign | ) (Oral Argument Requested) |
| corporation; STATS ChipPAC, Ltd., a | ) |
| foreign corporation; TEMASEK | ) |
| HOLDINGS PRIVATE LIMITED, a | ) |
| foreign corporation; SINGAPORE | ) |
| TECHNOLOGIES SEMICONDUCTORS | ) |
| PRIVATE LIMITED, a foreign | ) |
| corporation. | ) |
| Defendants. | ) |

Plaintiff brings this Motion on the basis that there are no genuine issues of material fact justifying a trial on her Complaint.  Therefore, Summary Judgment is appropriate.  This Motion is more fully supported with a thorough Statement of Facts with citations to the record and the following Memorandum of Points and Authorities both of which are by this reference incorporated herein.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. FACTUAL BACKGROUND

### A.  Ms. Sahakian's Rise at STATS ChipPAC

Plaintiff Diane Sahakian began her employment with ChipPAC in 1997 as a sales manager. She consistently received good reviews and promotions.  *Plaintiff's Statement of*

*Facts* (PSOF) ¶5.    During Ms. Sahakian's employment with STATS and its predecessors, PSOF ¶¶2, 6, 7, she was promoted several times.  PSOF ¶7.  In 2001, Dr. Han promoted her from product manager to senior product manager.  PSOF ¶7.  In 2003, Dr. Han promoted her from senior product manager to director.  *Id*.  In 2004 after the merger, Ms. Sahakian received a retention bonus of $45,000.00  PSOF ¶8, and Dr. Han again promoted her from director to senior director.  PSOF ¶7.  Ms. Sahakian was designated as a "high pot", or high potential employee.  *Id*.  In 2006, Ms. Sahakian was promoted from senior director to Vice President of the Emerging Technologies group ("ET").  *Id*.  On January 24, 2007, the Company's CEO – Mr. Tan Lay Koon – approved Ms. Sahakian's 2006 annual performance review in which Dr. Han made overall comments on Ms. Sahakian's performance:  "Overall good contributions to the company for many business wins."  PSOF ¶3, 53.    Ms. Sahakian's performance was reflected on her 2006 bonus of $39,084.96, which even STATS admits was a significant bonus. PSOF ¶54.  **As of February 14, 2007**, Mr. Koon and Dr. Han were pleased with Ms. Sahakian's performance at the Company, and she was meeting her expectations.  *Id*. As the Vice President, Ms. Sahakian managed eight to ten elite engineers (depending on the time period) who were considered to be the strongest technical contributors in the Company.  PSOF ¶11.  Among Ms. Sahakian's engineer reports were Mr. Eric Gongora, Mr. Brett Dunlap, Mr. Scott Gooch, Mr. Ram Ramakrishna, and Mr. Raj Pendse. PSOF ¶11, 18.

Ms. Sahakian directly managed Mr. Gongora in ET from at or around April of 2006 until September 28, 2006.  PSOF ¶12.  From early June of 2006 until September 28, 2006, Mr. Gongora directly supervised Messrs. Dunlap and Gooch in the ET group.  *Id*.  Therefore, from June 2006 to September 28, 2006, the supervisory hierarchy was as follows:  Ms. Sahakian directly managed Mr. Gongora, who in turn directly managed Messrs. Dunlap and Gooch.  *Id*.

From April of 2006 until mid-May 2007, Mr. Gongora's cubicle was located immediately outside of Ms. Sahakian's office. *Id.*

**B.  Mr. Gongora's Historical Background**

Mr. Gongora has a long history of misogyny. He has historically referred to women as "cunt", PSOF ¶219, assaulted a woman's car while a child was inside, PSOF ¶218, placed a gun to a woman's head, *Id.*, kicked a woman in her back while she was pregnant, *Id.*, ran into a woman with his car, *Id.*, repeatedly assaulted another woman causing injuries, PSOF ¶219, harassed women, *Id.*, told a woman that he had a "huge hard on right now", PSOF ¶223, asked a woman where she wanted him to "stick it", *Id.*, told a woman that he was getting his "8 inches nice and hard", *Id.*, told a female that he likes a "girl that is trimmed at least", *Id.*, viewed pornographic websites while at work, PSOF ¶226, told Ms. Sahakian that she has big breasts on repeated occasions, PSOF ¶233, asked Ms. Sahakian if she "shaved down below", *Id.*,  made comments to Ms. Sahakian that "Pauline" smells like a French whore and has a weird body – "huge tits and no ass", PSOF ¶234, sent a photograph to Ms. Sahakian of a woman he claimed had large breasts, PSOF ¶236, and attempted to physically intimidate Ms. Sahakian at the gym at which they both exercise.  PSOF ¶241.

Prior to joining STATS, Mr. Gongora was employed at Amkor Technology, Inc. ("Amkor") from 1999 to 2003.  PSOF ¶221.  While Mr. Gongora was employed there, his supervisor and department head was one Mr. Scott Jewler.  PSOF ¶224, 225.  While at Amkor, he was disciplined for viewing pornographic websites on Amkor computers during working hours.  PSOF ¶222.  Mr. Gongora also used Amkor computers to write sexually graphic emails advising others that he had a "huge hard on", that he begins to "drip just by licking nice pussy", that he likes girls that "is trimmed at least", asked others "where you want me to stick it?"

PSOF ¶223.  Such emails made the recipients nervous.  *Id*.  Also while at Amkor, Mr. Gongora repeatedly made unwanted advances on a female Amkor receptionist notwithstanding her repeated rebuffs.  PSOF ¶226.  Mr. Gongora also attempted to use Amkor's resources by attempting to smuggle drugs from Arizona to the Philippines using Amkor's FedEx account. *Id*.  Ultimately, Amkor's Vice President of Human Resources – Mr. Mike Gentry – terminated Mr. Gongora and told him in a face to face communication that the reasons for his termination are the incidents stated above, e.g. porn websites, porn emails, unwanted sexual advances, drugs, etc.  *Id*.

After Mr. Gongora's termination from Amkor, he applied for employment with ChipPAC on September 30, 2003.  PSOF ¶227.   On the employment application, Mr. Gongora stated that he left Amkor because of R.I.F., which means Reduction in Force.  *Id*.  Mr. Gongora's application also states that he has never been convicted or criminal offense other than a traffic citation.  *Id*.  During Mr. Gongora's ChipPAC interview process, the interviewers expressed perplexity as to why Mr. Gongora left Amkor, but they never contacted Amkor to discover the reason.  PSOF ¶229, 230.

## C.  STATS General Culture of Male Dominance, Racial Prejudice and Fear[1]

STATS is a male-dominated environment, PSOF ¶251-253, 255, 257-259, 263, and is an environment where it is not surprising to hear comments of a sexual nature.  PSOF ¶260[2].  Ms.

---

[1] STAT is run as a totalitarian monarchy.  PSOF ¶281.  For example, Mr. Koon would often yell, scream and inspire fear, intimidation and divisiveness among nationalities.  *Id*.  Mr. Koon is ruthless and is not one of the most loved persons at STATS; in fact, calling him a "fucking asshole" may be some of the kindest words one could refer to Mr. Koon.  PSOF ¶279.

[2] For example, STATS believes it is inappropriate for a male employee to ask a female employee whether she is "shaved", but does not believe it is sexual harassment.  STATS believes it is inappropriate for a male employee to put his arms around a female employee and say "you know you want it", but does not believe it is sexual harassment.

Sahakian had to deal with sexual advances and culture at STATS on a repeated basis, e.g. Gongora's sexual comments, PSOF ¶233-234, 236, Doug Matthews touching her and saying "you know you want it", PSOF ¶264, Korean plant manager attempting to kiss her, ¶265, superimposing Ms. Sahakian's face on woman with picture of Mr. Kossives grabbing her breasts, PSOF ¶266, inability to act as a supervisor in direct manner or else being cast as a "bitch", PSOF ¶270, repeatedly listening to other employees make derogatory remarks about women, ¶271, listen to rumors that she and Mr. Gongora are having an affair, PSOF ¶60, etc[3].

**D.  Complaints About Mr. Gongora And The Boys; The Beginning Of Ms. Sahakian's Downfall – Stereotyping And Gender Discrimination In A Male Dominated Work Environment – "Rarity" And "Priming" As Acts Of Gender Harassment**

Mr. Gongora's hostility toward Ms. Sahakian began at or around June of 2006 when Mr. Gongora's work performance started to become unsatisfactory.  PSOF ¶22.  In essence, Mr. Gongora rejected Ms. Sahakian's management authority over him and began to complain to the men around him, which ultimately caused Ms. Sahakian to believe that mob mentality had taken over.  *Id.* Some of the examples of Gongora's aggression and attempts at dominance are collected in PSOF ¶¶24, 26, 28, 29, 30, 32, 36 Mr. Gongora's underperformance was well known throughout the Company. See, e.g., PSOF ¶27.

Ms. Sahakian continuously reported Mr. Gongora's aggressive, dominant actions to her superiors Dr. Han and Mr. Jewler. *See*, e.g., PSOF ¶¶ 31, 33, 34, 39, 40, 43, 44.  Dr. Han's reaction to Ms. Sahakian's several complaints was to advise that she "be direct" with Mr.

---

[3] STATS' cultural derogation is not limited to women as it includes Asian and non-Asian races.  PSOF ¶273-277.   For example, Dr. Han would often communicate his prejudice against Jews, Chinese, Indians and Americans, e.g. the Japanese and Koreans are at the top of the race hierarchy while the Chinese and Indians are at the bottom.  PSOF ¶273.  Mr. Koon and Dr. Han did not seem aware of customs or laws other than their own, PSOF ¶276, and they often made racial remarks about Americans, e.g. fat, lazy, dumb and stupid.  PSOF ¶277.

Gongora, PSOF ¶43, 45, give him a 90-day corrective action plan, PSOF ¶44, and "focus on his work time and performance, PSOF ¶45, even though Ms. Sahakian directness resulted in Mr. Gongora becoming disrespectful and aggressive. *Id*. (What Dr. Han *really* thought was that Ms. Sahakian's complaints were exaggerated, and STATS and even Mr. Koon characterized Ms. Sahakian as a complainer. PSOF ¶41.) Ultimately, Mr. Gongora was transferred to PLM on September 28, 2006; however, Mr. Gongora's cubicle remained immediately outside of Ms. Sahakian's office. PSOF ¶46. Since Mr. Gongora was no longer in Ms. Sahakian's ET group, she could not give him the 90-day corrective action plan. PSOF ¶47. But Mr. Gongora's harassment of Ms. Sahakian did not end. See, e.g. PSPF ¶¶ 48-51, 52. In fact, Mr. Gongora now enlisted Brett Dunlap and Scot Gooch to commence a campaign of harassment against her. See, e.g. PSOF ¶¶ 55, 56, 57, 58, 83, 84. This conduct constituted a clear example of "priming" as disclosed by Dr. Wilson. See Footnote 4.

Ms. Sahakian complained to complaint to Dr. Han about the rumors of an affair with Mr. Gongora. PSOF ¶60. Dr. Han responded that she should simply "dismiss it." *Id*. Ms. Sahakian's complaints continued to Dr. Han, Ms. Uy, and Mr. Jewler,, see e.g. PSOF ¶¶ PSOF ¶¶62, 63, 64, 66, 70, 72.

In response to Ms. Sahakian's complaints, Ms. Uy advised that Mr. Gongora should be written up because it is a "recurring problem" with him, PSOF ¶66, 70, 77, but Mr. Gongora was never "written up" during his entire employment history at STATS. PSOF ¶71. Dr. Han responded by saying he would let Mr. Jewler "deal with it" and that it was wrong for Ms. Sahakian "to keep on raising the same point over and over." PSOF ¶72. Even though Dr. Han

advised Ms. Sahakian to come to him when she had issues, when she did, she was always told to dismiss it or stop complaining. PSOF ¶76. STATS Employee Handbook encourages employees to pursue discussion of their work-related concerns until such matter is fully resolved, and Mr. Koon and STATS itself agree that employees have this privilege. PSOF ¶73-75.

Ultimately on April 2, 2007, Mr. Palar, a member of PLM, forwarded the Sahakian/Jewler email to Mr. Gongora in which she had requested that Mr. Gongora be "officially warned for his disruptive and damaging behavior." PSOF ¶63, 78. On April 3, 2007, Ms. Sahakian expressed shock to Dr. Han that Mr. Palar would do such a thing, and advised him that such lack of confidentiality made her life worse since Mr. Dunlap must have seen the email by then. PSOF ¶79. On April 6, 2007, Ms. Sahakian summarized her feelings:

> But what is really very disturbing to me, is to hear from Flynn that all of the PLM guys are talking about how unfair I was to Brett. Mike S, Blake and Cindy were commenting on how I screwed Brett over w/ his review/STI. Even Flynn is saying this is none of any of their business … Now tell me I've been imagining the attitude I've been copping from these guys… If Cindy and Mike are going to be VPs, they should learn to act professionally like one. Brett's STI and review are personal. NOBODY else should be discussing this. I don't run around telling everyone about how SD Lee and Adam and others wanted out of PLM and how Cindy must be a horrible mgr to drive people to leave.

Dr. Han responded, "See if Cindy [(Palar in PLM)] wants Brett." PSOF ¶80-81.

## E. The Ketchup Incident and Subsequent "Investigation"

At or around 2:15 p.m. on April 9, 2007, ketchup was placed on Ms. Sahakian's desk chair on a day when she was wearing white pants (the "ketchup incident"). PSOF ¶86. Ms. Sahakian left her office to pick up her daughter from school, which she did every day at the same time. *Id*. Approximately one minute after she left her office, she returned to the office to pick up her cell phone she had left there. *Id*. When she approached her desk chair, she saw

ketchup on it. *Id*. It was clear to Ms. Sahakian that the ketchup was placed on her chair so that if she sat on it with her white pants, it would appear that she bled through during her menstrual cycle. Ms. Sahakian immediately turned around and saw Mr. Gongora sitting in his cubicle. *Id*. Ms. Sahakian exited her office and saw Mr. Dunlap walking with a hamburger in his hand putting ketchup on it. *Id*. Ms. Sahakian asked who put the ketchup on her chair, and Mr. Gongora did not look up. *Id*.

Ms. Sahakian became extremely distraught. She began crying and immediately telephoned Dr. Han advising what happened; Dr. Han's first response was to ask whether *Ms. Sahakian* had any ketchup for lunch. PSOF ¶88. Seeing that BJ Han was completely unaware of the woman's perspective, Sahakian contacted Ms. Uy in HR advising her that she would no longer tolerate this harassment. *Id*. Later that day, Ms. Sahakian communicated to Dr. Han that she "will no longer tolerate the harassment I am receiving from Eric and/or Brett." PSOF ¶89. In response to Ms. Sahakian communicating her humiliation, Dr. Han stated, "Drink a beer and have a good sleep. It will be OK." PSOF ¶90. Dr. Han actually suspected that it was Ms. Sahakian who was harassing the "fellows", not vice versa. PSOF ¶91.

Ms. Uy interviewed with approximately six different employees. She accepted as true *their* version – but not Plaintiff's - version of the facts. PSOF ¶97-98, 106, 109. Of the six employees interviewed, three of them and Ms. Sahakian pointed their finger at Mr. Gongora. In response, Mr. Gongora produced a (false) alibi that he was at his home construction site speaking with his contractor at the time of the ketchup incident. PSOF ¶102. STATS made no effort to verify Mr. Gongora's false alibi even though they viewed the ketchup incident as a serious matter. *Id*., PSOF ¶87.

At the time of the ketchup incident, Ms. Uy knew that all evidence pointed to Mr. Gongora as the harasser.  See, e.g., PSOF ¶¶ 69, 92, 94, 99, 101, 106, 112, 113, 115, 119, 120, 128.  However, Ms. Uy did not know, nor did she attempt to learn, whether Messrs. Gongora and Dunlap had a motive to harass, PSOF ¶103-104, the name and contact information from Mr. Gongora's alibi, PSOF ¶102, Mr. Gongora's public records, his prior acts of sexual harassment, or any other relevant information. PSOF ¶¶ 109, 110.  Ms. Uy admitted that she has no training on sexual harassment and no training on sexual harassment investigations. She does not know what "rarity", "priming", "normalizing", or "group deviant" connote in a male dominated gender harassment context[4].  PSOF¶121.  No STATS employee was fired, written

---

[4] The Anatomy of Stereotyping and Gender Discrimination in the Work Environment

Stereotyping and gender discrimination in a work environment where men greatly outnumber women are well understood. The anatomy of "gender harassment" of a female in a male dominated work environment was described by Dr. Wilson in Exhibits 4 (The Heuristics of Attributional Search and Examiner Bias in the Examination of Hostile Work Environment and Sexual Harassment Claims:  Avoiding Type I and Type II Error) and 8 (Index of Exhibits in Case No CV 05-0618 PTC DGC accepted as true by Dr. Wilson) to his Deposition.  Dr. Wilson notes:

Gender …is the most common and most powerful cognitive category [of stereotyping]….

Evidence of stereotyping includes rarity, priming, the characteristics of a environment structure and the general ambiance of the work environment. Stereotyping is more likely when an individual represents a group that is rare; less than 15 to 20%. 'Solos' are much more likely to experience such stereotyping and resulting discriminating behavior leading to extreme responses to their behavior including corporate behavior and responses.

Priming exists when certain stimuli in the work environment 'prime' certain categories for the application of stereotyped thinking.  An example is … denigration of women … The effect is to make objects of the targeted group (women for instance); resulting in the normalizing of behavior towards the individual or group which would not be condoned if directed towards the group or its members.

The power structure of hierarchy in a work environment if fostering among the in group (men for instance) a sense of belonging will create an accompanying sense of immunity among the group thereby fostering fewer inhibitions against discrimination or other prohibited behavior. This creates an in group / out group effect.  One result is that of diminishing concerns of complaints of the out group (a woman for instance) and labeling the complainant or the out group as the 'problem'".

up or suffered any adverse employment consequences as a result of the ketchup incident. PSOF ¶130.  Ms. Sahakian was unhappy with the complete lack of any resolution arising from this investigation.  PSOF ¶127.

As a direct result of the ketchup incident, STATS conducted a sexual harassment training course on April 12, 2007.  PSOF ¶124-126.  Dr. Han admitted that it is possible the ketchup incident was an incident of sexual harassment.  PSOF ¶126.  Ms. Sahakian views the ketchup incident as sexual harassment.  PSOF ¶86.  Mr. Jay Ewanich, former STATS employee and Sahakian manager, views the incident as sexual harassment.  PSOF ¶8, 126.

### F.  The Events Leading Up to Ms. Sahakian's FMLA Leave

A few days following the ketchup incident, Ms. Uy proposed to move the cubicles of Messrs. Gongora and Dunlap away from Ms. Sahakian for the purpose of making her life happier, PSOF ¶129, but it was not until April 26, 2007 that Ms. Uy asked Mr. Gongora to move "at his convenience".  *Id*. During this time, STATS believed that Ms. Sahakian was an asset to the Company and rewarded here, on April 17, 2007, with a merit increase.  PSOF ¶134. Mr. Pendse, one of Ms. Sahakian's reports in ET, acknowledged on April 25, 2007 that her

---

*** 

The elements of harassment and discrimination are well researched.  They typically lead to putting the out group or individual in a state of fear, isolating the individual, reducing the capacity of the individual to function in the corporate environment, degrading and ridiculing the individual and creating consequences where the individual suffers for no legitimate organizational purposes.

Dr. Wilson's description of a dysfunctional work environment speaks directly to Ms. Sahakian's situation. She worked in a clearly male dominated environment.  Rarity existed. The continuing and unrelenting harassment by Gongora (priming) was gender based – it was initiated by a man whose group was in majority against a woman whose gender was in minority. The harassing behavior was directed toward Ms. Sahakian only; it was not directed toward any of her male counterparts. Mr. Gongora's historical narrative confirms gender based motive. STATS took no action to address the harassment. Gongora's pre-April 9, 2007, acts of harassment and STATS failure to respond are thus well documented.

management style was a "great asset for the company." PSOF ¶136. The following day, Ms. Sahakian communicated to Dr. Han that STATS gender environment was unfair to her as a woman because if is she is tough, she is characterized as a bitch. PSOF ¶137. As of May 2, 2007, Mr. Gongora's cubicle had not been moved and Ms. Sahakian communicated to Ms. Uy and Dr. Han that she believed the move was merely "lip service" to a "rather humiliating incident." PSOF ¶138.

On May 11, 2007, Ms. Sahakian again expressed her dissatisfaction with the ketchup investigation. Dr. Han responded by requesting that Ms. Sahakian bring him "material evidence beyond a reasonable doubt [that it happened and that Gongora did it]". What Dr. Han meant was that Ms. Sahakian bring to him "physical evidence, multiple people witnessed it, the person clearly admits it". PSOF ¶140. At this time, STATS no longer investigated the Mr. Gongora's act of harassment and the ketchup incident; instead, on May 12, 2007, STATS began investigating *Ms. Sahakian's* management style. PSOF ¶141[5].

## G.  The FMLA Leave

---

[5] On June 6, 2007, Mr. Gooch resigned from the company because he received an offer of employment with better money and stock, (Mike Schrader Deposition). However, in his exit interview, he stated the main reason he left was because Ms. Sahakian was the worst manager he ever had even though he was not reporting to her at resignation. PSOF ¶144, 146-147. Actually, Mr. Gooch also blamed Ms. Sahakian for his bonus about which topic Messrs. Dunlap and Gooch spoke on occasion. As a consequence of Mr. Gooch's exit interview, Ms. Jik Hoon Kaw, Vice President of HR in Singapore, initiated an inquiry into Ms. Sahakian's management performance, PSOF ¶146, 148, but STATS never contacted Mr. Schraeder as to what Mr. Gooch had told him about the real reasons for leaving. PSOF¶147. In fact, Mr. Gooch confided in Mr. Schareder, his direct supervisor, that the true reason for his leaving was for better opportunity – Mr. Gooch never mentioned anything about Ms. Sahakian. Nonetheless, on June 21, 2007, Dr. Han first notified Ms. Sahakian of the Gooch exit interview and cautioned her to "reflect" on her management style. PSOF ¶152. On July 11, 2007, the investigation into Ms. Sahakian concluded that Ms. Sahakian's reports "have no problem with Diane and respect her as a manager", and one employee commented that "she was one of the best managers…" PSOF ¶160. **Dr. Han agreed in his deposition that that as of July 11, 2007, this positive and inspirational conclusion of the investigation of Sahakian was true.  PSOF¶¶61.**

On the day prior to Ms. Sahakian's FMLA leave, she broke down and began to cry uncontrollably because she realized that in light of Dr. Han's admonishment, she would never be acknowledged as the victim. PSOF ¶153. On June 23, 2007, Ms. Sahakian began her FMLA leave with a proposed return date of July 23, 2007. PSOF ¶155. She expresses the reasons as follows:

> I was being treated as the violator, rather than the victim. I thought it was so wrong that they would sit there and interview my people, when all along I was saying this is a hostile environment, highly hostile environment. Sexist-wise, discrimination-wise. You name it. And yet I'm under the magnifying glass. I was just flabbergasted by this. Why would they go and question my employees about me, when, in fact, I've been continually telling B.J. and JR, these people are ganging up on me, creating a hostile environment, and they continued to put me under the magnifying glass. And B.J. knew me for nine years. He didn't even know these people for a year. That's completely disrespectful and humiliating. I don't even have enough words for it. Id.

While Ms. Sahakian was on FMLA, she was rattled and ragged, PSOF ¶156, but Mr. Gongora was telling Ms. Shea that he did not believe she (Sahakian) was sick. PSOF ¶157. On July 11, 2007, the investigation into Ms. Sahakian concluded that the employees STATS interviewed "have no problem with Diane and respect her as a manager", and one employee commented that "she was one of the best managers…" PSOF ¶160. Dr. Han agrees that as of July 11, 2007, the content of the Sahakian investigation was true. Ultimately, Human Resources recommended that Ms. Sahakian take a management seminar, *id.*, but she was never given that opportunity. PSOF ¶163.

## H.  The Events Leading Up to "Special Projects"

On the day of Ms. Sahakian's return from FMLA leave, July 27, 2007, she advised Dr. Han that she never received a three-way meeting with herself, Dr. Han and Mr. Koon. PSOF ¶168-169. On the same day, Ms. Sahakian accepted the burden of "proof beyond a reasonable

doubt" and provided Dr. Han with what she believed was sufficient evidence of Mr. Gongora's creation of a hostile work environment, which included over 20 emails from Mr. Gongora. PSOF ¶170.  Ms. Sahakian further communicated to Dr. Han:

> During this conversation, I mentioned I didn't think Eric has been dealt with appropriately. It is extremely disappointing to me, but no longer a surprise to me, that Eric has never been officially written up. Unacceptable. Eric acted with insubordination on many occasions, and has damaged my reputation and relations with others. I've put 25 years into this industry, established the STATS office in place today, worked my way to a VP level, and have to endure this harassment??? Something is very wrong here.

> You requested evidence of what I felt was the root cause of the hostile work environment I've been enduring, so I will provide a summary. However, this should be unnecessary by now. *Id.*

On **August 7, 2007**, a few days prior to Ms. Sahakian's "special projects", she and Dr. Han had a conversation in which Dr. Han was very aggressive with her, yelling at her continuously.  PSOF ¶171.  After Ms. Sahakian told Dr. Han she did not agree with how he handled the investigation, Dr. Han responded with furor by yelling, that **he was done D-O-N-E with her**; that if she did not apologize for disagreeing with him, **he would take severe action**; that **he never wanted to see her again**; that if she did not apologize within 30 minutes, **he will take severe action**.  Dr. Han continued to repeat "tell me I did something wrong." (This conversation is referred to as the "D-O-N-E conversation").  PSOF ¶171-178.  A day after, Ms. Sahakian advised Ms. Uy of the content of the conversation, PSOF ¶173-177, and Ms. Uy testified that Ms. Sahakian had done nothing wrong to Dr. Han, that Dr. Han never told Ms. Uy that Ms. Sahakian had done anything wrong to him, and that no one ever advised Ms. Uy of anything that would require Ms. Sahakian to apologize to Dr. Han.  PSOF ¶183.

On **August 9, 2007**, Dr. Han advised Ms. Sahakian that he **has started his side of the action**.  PSOF ¶181.  At the time of the D-O-N-E conversation, Dr. Han had the *authority* to

fire Ms. Sahakian, but was *not able to* fire her because he would have to speak with HR first and give reasonable reasons for her termination.  PSOF ¶187.  On or around **August 10, 2007**, Dr. Han, Ms. Uy and Janet Taylor, STATS' general counsel, had a three-way conference that STATS has represented was attorney-client privileged ("Uy/Han/Taylor conference").  PSOF ¶3, 188.

## I.  Ms. Sahakian's "Special Projects"

Three business days after the "D-O-N-E Conversation", that is, on **August 13, 2007**, Ms. Sahakian was assigned to "special projects" a/k/a "kiss of death", and her vice president title was taken away, PSOF ¶189-190.  She was demoted to "special projects" because she did not apologize to Dr. Han for her critique of Dr. Han's handling of the investigation; had she apologized, she would have received management training. *Id*. The reassignment to "special projects' was a significant and adverse employment action, and it was so viewed by witnesses. See, e.g., PSOF ¶¶189, 190, 195, 198, 199, 200, 207 208[6].

## J.  Two EEOC Complaints, Two Lawsuits…and a $250,000 Offer to Resign Voluntarily

Approximately one month after Ms. Sahakian's "reassignment", on September 18, 2007, Ms. Sahakian filed her first EEOC Complaint.  PSOF ¶210.  On April 11, 2008, STATS offers Ms. Sahakian a $250,000 in consideration for her voluntary resignation.  PSOF ¶212.  On July 1, 2008, 2 ½ months after STATS' request for Ms. Sahakian to voluntarily resign, STATS

---

[6] "Special projects" have been characterized as, for example, a "**kiss of death**", PSOF ¶207, "**on her way out**", PSOF ¶209, "**polite/subtle way of demoting**", *Id*., "**career-limiting position**", *Id*., "**fictional duty within the company used to politely force a person out of the company**. *Id*. Mr. Schraeder summarized: Ms. Sahakian's "reassignment" to "special projects" was a demotion. PSOF ¶205. In fact, Dr. Han did not have a "special project" for Ms. Sahakian to perform. See PSOF ¶¶201, 202, 203, and 204. Mr. Schraeder summarized:  "You never heard anything about what was going on, were we looking at new investment opportunities, new technology opportunities…but it just didn't seem to fit."  PSOF ¶206.

terminated Ms. Sahakian's employment for pretextual reasons. PSOF ¶213. Ms. Sahakian filed

her second EEOC Complaint on July 30, 2008. PSOF ¶210.

## II.  ARGUMENT AND SUPPORTING LAW

### A.  STATS Created And Maintained A Hostile Work Environment By Failing to Effect a Credible Investigation or Impose the Appropriate Remedy

In *Swenson v. Potter*, 271 F.3d 1184 (9th Cir. 11/30/2001) the 9th Circuit Court of

Appeals noted:

> The most significant immediate measure an employer can take in response to a
> sexual harassment complaint is to launch a prompt investigation to determine
> whether the complaint is justified. An investigation is a key step in the employer's
> response, see *Swentek v. USAIR, Inc.,* 830 F.2d 552, 558 (4th Cir. 1987) (employer
> obliged to investigate complaint and to present a reasonable basis for its
> subsequent action), and can itself be a powerful factor in deterring future
> harassment. By opening a sexual harassment investigation, the employer puts all
> employees that it takes such allegations seriously and will not tolerate harassment
> in the workplace. An investigation is a warning, not by words but by action. We
> have held, however, that the "fact of investigation alone" is not enough, *Fuller* [*v.
> City of Oakland*, 47 F.3d 1522, 1529 (9th Cir. 1995)] 47 F.3d at 1529. An
> investigation that is rigged to reach a pre-determined conclusion or otherwise
> conducted in bad faith will not satisfy the employer's remedial obligation.

If an employer fails to take corrective action after learning of an employee's gender

harassing conduct, or takes inadequate action that emboldens the harasser to continue his

misconduct, the employer can be deemed to have adopted the harasser's conduct and its results.

*Swenson*  271 F.3d at 1192. Launching a **good faith** investigation is the most significant

measure to be taken in response. Id. at 1192-93.

As anticipated in *Swenson*, STATS' lack of action against Mr. Gongora "emboldened

the harasser to continue his misconduct."   Notwithstanding Ms. Sahakian's pre-ketchup

incident complaints about Mr. Gongora's insubordination, intimidation, yelling, manipulation,

bullying, and defiance, STATS never took the time to verify Ms. Sahakian's subjection to

hostility, and instead characterized her as a complainer.  STATS' lack of remedy emboldened Mr. Gongora even after he transferred to PLM; he continued to collaborate the "PLM boys" into a mob against Ms. Sahakian, continued to interfere in her business in ET.  Messrs. Gongora and Dunlap became even more emboldened when they knew that all they had to do was escape to PLM, as did Mr. Gooch.   STATS' inaction resulted in the culmination of hostility toward Ms. Sahakian – the ketchup incident – which even STATS characterized as sexual harassment and serious, but did not affect an appropriate investigation or remedy.

a)  **Ms. Sahakian Had the Right to Complain**

Plaintiff opposed Gongora's acts of insubordination, manipulation, control and aggression that were directed toward her because of her gender. *Little v. Windermere Relocation, Inc.,* 301 F.3d 958, 969 (9th Cir. 2002); 42 U.S.C. § 2000e-3(a).  Gongora's history reveals his gender based motivation to harass Plaintiff, a woman. ("It is unnecessary that the employment practice actually be unlawful; opposition thereto is protected when it is 'based on a "reasonable belief" that the employer has engaged in an unlawful employment practice.'") (quoting *Moyo v. Gomez*, 40 F.3d 982, 984 (9th Cir. 1994)[7].  It is clear that Mr. Gongora's deviant mind views women in two lights:  (1) sexual playthings; and, (2) lesser beings to be

_____

[7] The reasonableness of an employee's belief must be assessed according to an objective standard that makes allowance "for the limited knowledge possessed by most Title VII plaintiffs about the factual and legal bases of their claims." *Moyo*, 40 F.3d at 985 (holding that the discrimination victims' employment status was irrelevant because plaintiff could bring his retaliation claim either by showing that he was required to discriminate as a condition of his employment or that he had a reasonable belief an unlawful employment practice occurred). A plaintiff may make a reasonable mistake of fact or law. Id. Furthermore, Title VII is construed broadly as it applies to the reasonableness of a plaintiff's belief that a violation occurred. Id. (citing *Davis v. Valley Distrib. Co.,* 522 F.2d 827 (9th Cir. 1975), cert. denied, 429 U.S. 1090 (1977)). Thus, where a Plaintiff complains about harassment by a non-employee – reasonably believing that the practice violates Title VII - even if it was legally or factually erroneous, then Plaintiff engaged in a protected activity when she reported the behavior. See *Moyo*, 40 F.3d at 985. *Eakerns v. Kingman Regional Medical Center*, No. CIV 06-3009-PHX-SMM (D.Ariz. 2009)

dominated.  There is no evidence on the record indicating that Gongora treated *men* in the same way that he treated Plaintiff. His gender motivation is undeniable.

### 2) Retaliatory Discharge

Plaintiff in a retaliatory discharge case must show that (1) she engaged in a protected activity; (2) her employer subjected her to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action. *Passantino v. Johnson & Johnson Consumer Prods., Inc.,* 212 F.3d 493, 506 (9th Cir. 2000); *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000); *Little v. Windermere Relocation, Inc.,* 301 F.3d 958, 969 (9th Cir. 2002).

Plaintiff was first demoted and then fired because she (i) complained too much about the ketchup and her treatment as a woman and took the FMLA leave and (ii) did not produce "material evidence beyond a reasonable doubt" and (iii) declined to apologize to Dr. Han for critiquing his investigation. Dr. Han admitted that much. Obviously, the demotion to "special projects" and the firing are "adverse employment actions".  It is clear that as of April 11, 2008, they could not have fired her because of their offer of money for resignation…in 2 ½ months thereafter STATS claims Ms. Sahakian did enough to cause her termination.

### CONCLUSION AND PRAYER FOR RELIEF

STATS' own witnesses admit to the salient facts entitling Plaintiff to summary judgment on the issue of liability.  Grant of this extraordinary remedy is appropriate in this case.

RESPECTFULLY SUBMITTED this 18th day of July, 2009.

THE LAW FIRM OF PETER STROJNIK



_____
Peter Kristofer Strojnik
Attorney for Diane Sahakian