L. Eric Dowell, SBN 011458
Caroline Larsen, SBN 022547
Monique Young, SBN 025121
Ogletree, Deakins, Nash, Smoak & Stewart, P.C., SBN 00504800
2415 East Camelback Road, Suite 800
Phoenix, Arizona 85016
Telephone:    (602) 778-3700
Facsimile:    (602) 778-3750
Eric.Dowell@ogletreedeakins.com
Caroline.Larsen@ogletreedeakins.com
Monique.Young@ogletreedeakins.com

Attorneys for Defendants STATS ChipPAC, Inc.
and STATS ChipPAC, Ltd.

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Diane Sahakian, a single woman, | CV08-241-PHX-HRH |
| Plaintiff, | **SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS STATS ChipPAC, INC. AND STATS ChipPAC, LTD.** |
| vs. | |
| STATS ChipPAC, Inc., a foreign corporation; STATS ChipPAC Ltd, a foreign corporation; Temasek Holdings Private Limited, a foreign corporation; Singapore Technologies Semiconductors Private Limited, a foreign corporation, | |
| Defendants. | |

Defendants STATS ChipPAC, Inc. and STATS ChipPAC, Ltd (collectively, "STATS ChipPAC") submit the following Separate Statement of Undisputed Facts in Support of their Motion for Summary Judgment filed concurrently herewith.

**A. Plaintiff's Employment with STATS ChipPAC**

1.      Plaintiff Diane Sahakian started her employment with STATS as a Product Manager in August 1999.   She joined STATS ChipPAC's Tempe, Arizona office. [Deposition of Diane Sahakian, taken March 17, 2009 ("Sahakian Depo. Volume I"), pp. 14:16-15:7, 16:1-10, Exh. 1.]

2.      During her employment with STATS, Plaintiff was promoted several times. Her direct supervisor, the Executive Vice President and Chief Technology Officer Dr. Han Byung Joon  ("Han"), recommended her for these promotions.  [Sahakian Depo. Volume I, p. 20:1-16, Exh. 1.]

3.      STATS acquired a competitor, ChipPAC, in 2004 and, thereafter, Plaintiff was employed by the new merged entity, STATS ChipPAC.  At that time, Plaintiff held the position of Director in the Emerging Technology business group and reported to Han. [Sahakian Depo. Volume I, pp. 25:15-26:5, 61:8-15, Exh. 1.]

4.      In 2005, STATS ChipPAC promoted Plaintiff to the position of Vice President, supervising the Emerging Technology group.  At the time of her promotion, Plaintiff reported to Scott Jewler, who was Chief Strategy Officer at that time.  [Sahakian Depo. Volume I, p. 20:17-21:4, 44:18-45:1, 61:8-15, Exh. 1.]

5.      The Emerging Technology group was a technical group responsible for generating the corporate technology roadmaps and emerging technology strategies, and engaging customers in emerging technologies.  [Second Amended Complaint, Doc. 61, ¶ 19.]

6.      As a result of various reorganizations of business groups at STATS ChipPAC, in 2006, Plaintiff again reported to Han, who managed Plaintiff from his office in Singapore.  [Sahakian Depo. Volume I, p. 46:4-13, Exh. 1; Doc. 61, Second Amended Complaint, ¶ 19.]

7.      As Vice President of Emerging Technology, Plaintiff supervised a team of approximately seven technologists and engineers, who worked in Tempe, Arizona and Fremont, California.  After Plaintiff assumed this role in 2006, she had significant

turnover in her group.  [Gooch Depo., pp. 27:13-28:9, Exh. 2; STATS000660, Exh. 3; Deposition of Byong Joon ("BJ") Han, taken June 11, 2009 ("Han Depo."), pp. 229:1-230:8, Exh. 4.]

8.    Plaintiff had conflicts with many of her coworkers and other departments in STATS ChipPAC.  In emails to Han, she called Jeff Yang, a Director at STATS ChipPAC, "useless" and a "sneaky SOB."  Plaintiff further engaged in territorial arguments and exchanges with other groups, including Sales and Product Line Management ("PLM").  She referred to the entire sales team as "dysfunctional" and called them "misfits," "Neanderthals" and "asses" in various email communications. Plaintiff called one Director-level STATS employee "arrogant" and called another a "baby."  She complained that an email from a coworker, Patrick Kim, did not make sense, "but then he NEVER does."  She complained that another Vice President in the office engaged in bad politics and unprofessional behavior.  Plaintiff herself admitted that these kinds of references to her colleagues, made to her supervisor, were not professional. [Gooch Depo., pp. 22:5-10, Exh. 2; STATS000793-804, Exh. 5; STATS000832-833, Exh. 6; STATS000641-0006432, Exh. 7; STATS000616-617, Exh. 8; DS-0447, Exh. 9; Sahakian Depo. Volume I, pp. 133:10-134:25, Exh. 1.]

9.    STATS ChipPAC's Employee Handbook states: "The Company will not tolerate unlawful harassment of any type."  The Handbook also states:  "Sexual or other unlawful harassment includes any conduct that has the purpose or effect [of] unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive work environment."  [Doc. 61, Second Amended Complaint, ¶¶ 23, 24; DS-0001-40, at DS0005-7, Exh. 10.]

10.    STATS ChipPAC also has an open door policy that encourages employee participation in decisions affecting them.  Employees who have job-related concerns or complaints are encouraged to talk them over with their supervisor or any other management representative with whom they feel comfortable, as soon as possible after the events that cause the concern.  Employees are further encouraged to pursue discussion

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C. 2415 EAST CAMELBACK ROAD, SUITE 800 PHOENIX, ARIZONA 85016 (602) 778-3700

of their work-related concerns until the matter is fully resolved. This policy reflects the company's belief that employees' concerns are best addressed through informal and open communication. [DS-0001-40, at DS0006-7, Exh. 10.]

11.     Plaintiff received copies of STATS ChipPAC's sexual harassment policies several times during her employment, received sexual harassment training, and was aware of the Company's anti-harassment and open door policies. Furthermore, Plaintiff could review the Company's sexual harassment policy at any time, since it was posted in the cafeteria of the Tempe, Arizona office in which she worked. Plaintiff understood that it was STATS ChipPAC's policy not to tolerate harassment and to protect its employees from retaliation for opposing or reporting harassment. Finally, Plaintiff understood that she should report any sexual harassment she experienced to her manager and/or Human Resources. [STATS000116, Exh. 11; STATS000118, Exh. 12; DS-0001-40, at DS0005-7, Exh. 10; Deposition of Diane Sahakian, taken April 9, 2009 ("Sahakian Depo. Volume II"), pp. 76:25-77:20, 78:13-24, Exh. 13.]

**B. Several of Plaintiff's Direct Reports Transferred and/or Resigned due to Conflicts with Plaintiff.**

**1. Eric Gongora**

12.     From approximately 2004 to October 2006, Plaintiff directly supervised Eric Gongora ("Gongora"), a member of the Emerging Technology group. Gongora worked for ChipPAC, in the Product Line Management ("PLM") group, prior to ChipPAC's merger with STATS. After the merger, in late 2004, Gongora became a member of Emerging Technology, reporting to Plaintiff. [Sahakian Depo. Volume I, p. 61:6-15, Exh. 1.]

13.     In her first evaluations of Gongora, Plaintiff classified him as a "high potential" employee, meaning she recommended that Gongora should be developed for promotion opportunities and increased responsibility within STATS ChipPAC. Plaintiff described Gongora as highly enthusiastic, energetic, capable, and dedicated to improving

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

himself.  She admits that Gongora behaved very, very well when he first began reporting to her.  [Sahakian Depo. Volume I, pp. 62:2-64:14, 115:17-21, Exh. 1.]

14.    Plaintiff had a pleasant relationship with Gongora when she first began supervising him.  She would talk to him about personal matters, such as her dating relationships, and would ask him to have breakfast with her before work.  On at least one occasion, Plaintiff invited Gongora over to her house for a social visit.  [Sahakian Depo. Volume I, pp. 69:18-70:8, 71:18-23, Exh. 1; Deposition of Lauren Sahakian, taken May 22, 2009, pp. 39:3-40:9, Exh. 102.]

15.    In April 2006, Plaintiff contacted her manager at the time, Scott Jewler, to make certain that Gongora received a promotion.  [DS-0138-139, Exh. 14.]

16.    In approximately August 2006, Plaintiff began emailing Han and Jewler to complain about Gongora.  She felt he was fostering animosity towards her and thought her subordinates were undermining her.  Plaintiff became suspicious that Gongora was trying to pit other employees against her.  She felt he was aggressive in his emails to her and complained about her to others.  Plaintiff complained that Gongora told other employees that they did not have to attend a conference that Plaintiff had directed them to attend.  Plaintiff and Gongora yelled at each other over this issue, and Plaintiff reported the incident to Han.  Han had to repeatedly tell Sahakian to ignore these and other issues and focus on her job.  [STATS000612-615, Exh. 15; STATS000597-606, Exh. 16; Sahakian Depo. Volume I, pp. 96:11-101:5, 138:12-142:9, Exh. 1.]

17.    Plaintiff's complaints that her work environment was "hostile" were based on the following alleged actions by three of her subordinates (Gongora, Brett Dunlap, and Scott Gooch): not following her directions, complaining about Plaintiff to her supervisor, and not cooperating with her, including not attending staff meetings.  [DS-0566, Exh. 17; Sahakian Depo. Volume I, pp. 152:10-153:18, 156:7-158:13, Exh. 1.]

18.    Plaintiff allegedly complained to Han, Jewler and Tan Lay Koon (STATS ChipPAC's Chief Executive Officer) that her work environment was hostile because she

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

felt her direct reports were insubordinate and management was not helping her deal with her inability to manage her group. [Sahakian Depo. Volume II, pp. 82:5-83:7, Exh. 13.]

19. On September 6, 2006, Plaintiff sent an email to her team informing them that she was taking the day off to have her air conditioner installed. Almost immediately thereafter, she sent an email to the managers who reported to her, including Gongora, Brett Dunlap and Ram Ramakrishna, telling them that she was not impressed with the work ethic in Tempe (where they all worked) and asking them to set a better example. [STATS000689, Exh. 18; STATS000728-735, Exh. 19; Sahakian Depo. Volume I, pp. 96:11-101:5, Exh. 1.]

20. On September 19, 2006, Plaintiff sent an email directly to Gongora criticizing him for coming in after 9:00 a.m., taking long lunches, and leaving between 4:30 and 5:00 p.m. The tone of her email was sarcastic and she compared him unfavorably to others within the group. [STATS000728-735, Exh. 19.]

21. Gongora responded to Plaintiff's September 19, 2006 email with a lengthy email telling Plaintiff that, if she wanted him to exhibit good leadership skills, she had to do so as well. Gongora cited many instances when Plaintiff left work early or came in late and asked her not to compare him to other employees, as she had done in her email. Instead of focusing on items that Gongora needed to improve or counseling him about his retort to her, Plaintiff responded to Gongora with sarcasm and personal comments about him and others within the group. Gongora replied with an email telling Plaintiff that her email was "hurtful," agreeing to keep his conversations with her professional and work-related, and asking her not to involve him in future discussions about any peer, manager, or other employee about whom she wanted to comment. [STATS000728-735, Exh. 19.]

22. On September 20, 2006, Plaintiff forwarded Gongora's emails to Han and asked if she could reorganize the group to remove Gongora's two direct reports, Scott Gooch and Brett Dunlap, from Gongora's supervision. Han responded with detailed instructions to Plaintiff telling her to be more direct with Gongora and not let personal or other issues cloud the main message - that Plaintiff was concerned about Gongora's work

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

ethic.  Han told Plaintiff she needed to clearly communicate her concerns before taking any action regarding Gongora.  [STATS000728-735; STATS000675.]

23.     Plaintiff responded to Han's email, saying that it was Gongora who was clouding the issues.  She reported that anytime she confronted Gongora, "he becomes disrespectful, aggressive and manipulative."  Plaintiff suggested to Han that she might reorganize her group to remove Gongora from his supervisory position and make him an individual contributor, since his management skills were lacking.  [STATS000728-735, Exh. 19; STATS000676-679, Exh. 23; Sahakian Depo. Volume I, pp. 112:1-7, Exh. 1; Sahakian Depo. Volume II, pp. 42:24-43:16, 45:5-9, Exh. 13; DS0274-0277, Exh. 24.]

24.     In an email dated September 20, 2006, Han told Plaintiff that reorganizing an entire department to deal with personnel problems was not in the best interests of STATS ChipPAC and would not solve the problem.  Han agreed that Plaintiff did not have to tolerate insubordination or poor performance, but since Gongora was a high-potential employee with a good work record, she needed to address his performance problems and build up documentation before terminating his employment could be considered.  Han told Plaintiff to decide whether she wanted to retain Gongora or not, and gave her very specific instructions for how to communicate her issues to Gongora and manage his improvement.  Plaintiff understood and agreed with Han's feedback to her.  She decided she did want to keep Gongora in her group and to try to work things out with him.  [STATS000666-674, Exh. 20; Sahakian Depo. Volume I, pp. 107:10-111:15, 112:8-21, Exh. 1; DS0285-0291, Exh. 21; Han Depo. pp. 230:9-232:18, Exh. 4.]

25.     Plaintiff was amused when Gongora told her he had heard a rumor that the two of them were having an affair.  In an email to Han dated March 20, 2007, Plaintiff stated, "As I become older...I take it as a compliment that I'm having an affair w/guys 10-15 yrs my junior."  She also stated that she was "surprised" there had not been similar rumors about her having affairs with Han or Tan Lay Koon, the Chief Executive Officer.  Han responded that he thought Plaintiff's "sudden change of attitude for/against" Gongora likely prompted the rumors.  [STATS000819-821, Exh. 25.]

26.    Plaintiff emailed Han approximately every other day with criticisms of Gongora. [Sahakian Depo. Volume I, pp. 112:22-113:7, Exh. 1; DS-0292, Exh. 26; STATS000662-000663, Exh. 27.]

27.    Plaintiff claims that Gongora made inappropriate remarks on an ongoing basis.  She alleges he made comments about her breast two or three times and once asked her if she "shaved down below."  She also claims he emailed Plaintiff a photograph of two women he used to work with at Amkor Technology who had large breasts.  Plaintiff did not respond to Gongora's email, and did not report to her supervisor, Han, that Gongora had emailed her a photograph of a woman with large breasts.  This photograph, depicting men and women from Gongora's former employer on a company rafting trip, wearing swimsuits, was the only remotely sexual content that Gongora ever emailed to Plaintiff or showed her on his computer.  [Sahakian Depo. Volume I, pp. 68:5-69:17, 73:16-78:8, 86:3-87:20, 88:7-21, 89:7-90:5, Exh. 1; DS-0109-0111, Exh. 28; Sahakian Depo. Volume II, pp. 10:2-13, 12:2-7.]

28.    Plaintiff admits Gongora never asked her out on a date nor expressed any interest in a sexual relationship with her. [Sahakian Depo. Volume II, p. 122:16-20, Exh. 13.]

29.    Plaintiff admits that the last time Gongora made any kind of sexual comment to her was prior to October 2006, when he transferred out of the ET group she managed.  [Sahakian Depo. Volume I, pp. 250:20 – 251:1, Exh. 1; Sahakian Depo. Volume II, p. 7:13-15, 8:25-9:9, Exh. 13.]

30.    Plaintiff admits she treated Gongora's alleged comments casually.  She further admits that she did not say anything in response to these alleged comments, never told Gongora that she did not welcome these kinds of remarks, never disciplined him for allegedly making these kinds of comments, and never reported his alleged sexual comments to her supervisor or to Human Resources. [Sahakian Depo. Volume I, pp. 75:13-78:8, 78:17-79:15, 80:16-23, 81:6-82:3, 82:15-21, Exh. 1; Sahakian Depo. Volume II, p. 9:10-13, Exh. 13.]

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

31.    Plaintiff admitted the comments that Gongora allegedly made did not affect her position at STATS ChipPAC, saying that she "just turned [her] cheek to it all the time, ignored it, because, you know, unless something directly affects my career, I'm just going to turn my head to it."  Plaintiff reported incidents that she felt directly impacted her in doing her job or that she felt reflected a hostile work environment, but admitted these alleged comments by Gongora did not impact her in this manner.  [Sahakian Depo. Volume I, pp. 76:11-78:8, Exh. 1; Sahakian Volume II, pp. 80:24-81:14, Exh. 13.]

32.    Plaintiff understood that she should not just terminate Gongora, but should write him up, try to correct his actions, and document her concerns about him.  She was also aware that Human Resources offered a form for corrective action plans.  [Sahakian Depo. Volume I, pp. 113:25-114:8, 162:13-163:3, Exh. 1.]

33.    After receiving Han's direction to take appropriate disciplinary procedure with Gongora and document his problems, Plaintiff failed to take any action.  She supervised Gongora for nearly two years, but did not document a verbal or written warning to Gongora, did not place him on a performance improvement plan, and did not seek advice from Human Resources.  [Sahakian Depo. Volume I, pp. 114:9-115:21, Exh. 1; Sahakian Depo. Volume II, pp. 44:7-45:4, Exh. 13; Han Depo., pp. 235:25-236:14, Exh. 4.]

34.    On October 2, 2006, Plaintiff proposed to Han that Gongora be transferred to another department.  Cindy Palar ("Palar"), a Vice President in the Product Line Management ("PLM") group, needed someone for his group.  The Company agreed that Gongora could transfer out of Plaintiff's group to the PLM group.  [STATS00658-661, Exh. 29; Sahakian Depo. Volume I, pp. 116:21-118:3, Exh. 1.]

35.    Even after Gongora transferred to PLM, Plaintiff continued to criticize and complain about him.  For example, after Gongora transferred to the PLM group, Plaintiff complained to Han about Gongora whistling loudly in the office, taking too much time off for lunch, manipulating other employees, eloping with his fiancée, and talking on the phone to his fiancée during work hours.  Han repeatedly instructed Plaintiff to focus on

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

her own work and to stop worrying about Gongora.  [Sahakian Depo. Volume I, pp. 96:11-101:5, 118:24-119:12, Exh. 1; DS-0294, Exh. 30; DS-0295, Exh. 31; DS-0297-298, Exh. 32; DS-0299, Exh. 33; STATS000822, Exh. 34; STATS000834, Exh. 35.]

36.    In December 2006, Plaintiff complained to Cindy Palar that Gongora was speaking negatively about her and did not treat her with respect.  Palar responded that he would speak to Gongora about this issue and asked Plaintiff to keep him posted to determine whether additional action needed to be taken.  [DS-0306, Exh. 36.]

37.    Even when Gongora was pleasant to Plaintiff, she complained about him to Han:

> "Some reason Eric G. is trying to kiss my ---?  Makes me nervous!  Telling me ET was better…BJ is more direct…Scott has no loyalty.  He must not be happy…He'll never come back to my group no matter what…I was burned sticking up for him once…never again…"

[STATS000335, Exh. 37.]

38.    The only issues Plaintiff had with Gongora after he transferred to PLM were: that she thought he attempted to have Scott Gooch and Brett Dunlap transferred out of Plaintiff's group; that he said "negative things" to try to turn others against her; and that he told other employees he did not believe Plaintiff was really sick when she took a medical leave of absence.  [Sahakian Depo. Volume I, pp. 96:11-101:5; 127:15-130:12, Exh. 1.]

## 2.  Scott Gooch

39.    In 2006, Plaintiff and Gongora hired Scott Gooch ("Gooch") as a Director at STATS ChipPAC to grow the radio frequency ("RF") segment of the company's business.  Gooch worked in the Fremont, California office and reported directly to Gongora.  [Gooch Depo., pp. 8:17-10:6, 91:20-92:9, Exh. 2; STATS1958-1959, Exh. 38.]

40.    When Plaintiff hired Gooch, she told him that stock options would be available as part of his compensation program.  Gooch later learned that the stock option program had been cancelled before he even started working at STATS ChipPAC.  He felt that Plaintiff misled him.  Plaintiff also told Gooch that he was eligible for a bonus equal

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C. 2415 EAST CAMELBACK ROAD, SUITE 800 PHOENIX, ARIZONA 85016 (602) 778-3700

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

to 20 percent of his annual salary, and that almost everyone got the bonus. The actual bonus Gooch received, however, was much, much smaller than 20 percent. [Gooch Depo., pp. 78:3-79:21, 86:11-87:20, Exh. 2; STATS001962-1965, Exh. 39.]

41.    Gooch had issues with Plaintiff's management style and did not think she should be a manager. Gooch felt Plaintiff would disparage other members of the Emerging Technology group and make very negative, unprofessional comments about them. He felt she was not strong interpersonally or professionally in how she dealt with Gooch and others. Gooch found Plaintiff to be moody and petty. [Gooch Depo., pp. 20:14-21:18, 27:11-12, 33:13-34:24, 36:18-38:8, 40:18-42:7, 62:22-63:9, 100:21-22, 112:15-19, Exh. 2]

42.    Plaintiff imposed unreasonable expectations on her group, which she herself would not meet. For example, she would require employees in California to be in the office for a staff meeting at 8:00 a.m., instead of permitting them to call into the meeting from home and then drive to the office. Plaintiff, however, would handle the staff meeting from her cell phone, and would not come into the office, even though the meetings were an hour later for her, because she resided in Arizona. [Gooch Depo., pp. 40:18-42:7, 105:7-18, Exh. 2.]

43.    Plaintiff was not strong technically, which prevented her from being a leader for her group. She admitted she was losing her technical edge and her ability to appear competent in front of customers. Plaintiff provided no overriding guidance or direction to her those who reported to her. When there were disagreements between a member of her group and the STATS ChipPAC factories about the direction a project should take, Plaintiff would not support her employees, even if she had previously agreed with the direction her employees had taken. Plaintiff would disavow her role in approving the direction her employees had taken. [Gooch Depo., pp. 38:9-39:18, 43:12:-22, 44:18-48:10, 94:14-20, Exh. 2; Sahakian Depo. Volume I, pp. 51:22-52:8, Exh. 1; STATS001345-1353, Exh. 49.]

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

44. At the time of his annual performance review, Gooch was no longer reporting to Gongora, but instead he reported to Flynn Carson. At review time, Gooch learned that he had not met several performance criteria, however, these criteria had never been explained to him. Carson's review of Gooch was based on feedback that came from Plaintiff. From his discussions with Gongora, Gooch believed that Gongora, who had supervised him until right before the reviews were prepared, would have given him an evaluation that would have resulted in a better bonus. [Gooch Depo., pp. 17:8-19:22, 80:1-10, 83:24-85:7, 92:24-93:22, Exh. 2; STATS001950-1955, Exh. 41.]

45. In February 2007, Gooch wrote an email to Han and advised him that he thought his job function was best suited for a different business group. He was motivated, at least in part, by his desire to report to a manager other than Plaintiff. At Gooch's request, Han permitted him to transfer out of Plaintiff's group to the PLM group. [Gooch Depo., pp. 98:4-99:17, Exh. 2; DS-0348-0351, Exh. 42.]

46. After Gooch transferred to the PLM department, he felt that his manager provided more guidance and suggestions, and was more supportive and less petty. His new manager, Michael Schraeder, did not disparage others who worked at STATS ChipPAC. [Gooch Depo., pp. 98:4-99:17, Exh. 2; DS-0348-0351, Exh. 42.]

47. Gooch worked for STATS ChipPAC for approximately one year. He left after receiving an attractive offer from another company. When he resigned from his employment in June 2007, he stated in his exit interview that Plaintiff was a very poor manager, he could not communicate with her at all, and he did not know why she was employed with STATS ChipPAC. In fact, Gooch expressed that Plaintiff was one of the worst managers that he has worked for. Her management style was one of the reasons why he wanted to leave STATS ChipPAC to find another opportunity. Gooch thought someone other than Plaintiff should lead the Emerging Technology group, and stated that he did not know why she was in that position. [STATS001962-1965, Exh. 39; STATS000722-000723, Exh. 43; Gooch Depo., pp. 11:18-19, 30:19-31:3, 31:16-32:12, 51:7-20, 59:8-60:11, 83:13-23, 99:22-100:20, 103:5-104:10, Exh. 2.]

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

48.     During the time Gooch worked at STATS ChipPAC, Plaintiff <u>never</u> complained that he was harassing her in any way.  In fact, Plaintiff admitted she had "little to no interaction" with Gooch, and when she did, it was positive.  She described Gooch as "positive and pleasant."  [Sahakian Depo. Volume I, pp. 193:10-194:3, Exh. 1; STATS000675, Exh. 22; STATS000666-674, Exh. 20.]

49.     Plaintiff believed that Gongora turned Gooch against her, based on Gooch's negative comments during his exit interview.  [Sahakian Depo. Volume I, pp. 121:15-122:18, Exh. 1.]

### 3. Brett Dunlap

50.     Brett Dunlap ("Dunlap") was a Product Manager at STATS ChipPAC, in charge of a product line called Integrated Passive Technologies.  He was hired in January 2006 by Gongora and reported to Gongora, who in turn, reported to Plaintiff.  [Deposition of Brett Arnold Dunlap, taken April 17, 2009 ("Dunlap Depo."), pp. 16:11-14, 17:4-9, 22:21-24, 52:12-20, 172:23-173:11, Exh. 44; STATS001980-1981, Exh. 45.]

51.     When Plaintiff interviewed Dunlap for a position at STATS ChipPAC, she commented to him that she had reviewed several résumés, but he was the only "white guy" who applied for the job, thus, she interviewed him.  Dunlap considered this to be a racist comment, and was offended by it.  He thought the insinuation that he was hired because of his race, and not his performance, was degrading.  Plaintiff repeated the comment several times during Dunlap's employment at STATS ChipPAC.  [Dunlap Depo., pp. 23:17-24:1, 24:25-25:24, 102:16-103:15, Exh. 44.]

52.     Dunlap accepted the position, at least in part, because he believed that Eric Gongora, who would be his direct supervisor, was not influenced in his decision to hire Dunlap based on his race.  Dunlap believed that Gongora wanted to hire him because he believed that Dunlap deserved the position, based on his credentials, and because of what Gongora thought Dunlap could accomplish in the  position.  [Dunlap Depo., pp. 37:11-38:14, Exh. 44.]

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

53.    Dunlap worked at STATS ChipPAC for 18 to 19 months, in a cubicle located directly outside of Plaintiff's office.  Dunlap interacted with Plaintiff on a daily basis. [Dunlap Depo., pp. 16:10-17:3, 173:12-174:1, Exh. 44.]

54.    Dunlap, Gongora and Plaintiff used to engage in jokes and pranks with one another.  For example, they would throw pennies and candies at each another around the office.  Plaintiff also made jokes about her supervisor's name, BJ Han.  She went so far as to have a T-shirt made that said, "I ♥ BJ," referring to both her supervisor's name and the slang term of as referring to oral sex.  She also sent inappropriate joke emails to Han. [Dunlap Depo., p. 46:4-19, 196:14-198:8, Exh. 44; Sahakian Depo. Volume I, p. 73:5-13, 135:8-136:20, Exh. 1; STATS001860-1861, Exh. 46; Sahakian Depo. Volume II, 73:11-75:23, Exh. 13.]

55.    Gongora engaged in jokes with other employees as well.  On one occasion, he took a coworker's keys from his desk and moved his car to another section of the company parking lot.  Gongora then left a note for the employee saying that his car had been towed.  Plaintiff participated in this prank, pretending to make a call to the towing company.  Others in the office thought the prank was funny and laughed about it, including the employee whose car Gongora moved.  [Dunlap Depo., pp. 46:20-47:14, 95:6-25, Exh. 44.]

56.    Based on his experience working with Plaintiff, Dunlap thought she was often disruptive.  She was often inappropriate and unprofessional.  Plaintiff would often call Dunlap into her office to show him joke emails, interrupting his work.  He believed Plaintiff was a detriment to business, including his project and others' projects. [Dunlap Depo., pp. 15:3-14, 66:10-70:15, 90:5-12, 195:9-196:13, Exh. 44.]

57.    Dunlap could hear Plaintiff's loud outbursts from his cubicle outside her office.  She ranted and called others immature.  When she was in a bad mood, she would use the f-word several times a day.  Dunlap heard Plaintiff use other obscenities and observed Plaintiff dressing inappropriately for the office.  She would wear short skirts

14

and clothes that fit too tightly.  [Dunlap Depo., pp. 196:14-197:21, 198:9-23, 200:6-22, Exh. 44; Sahakian Depo. Volume II, pp. 71:7-11, Exh. 13.]

58.    Plaintiff would discuss sexual topics at the office, including what sexual acts she liked and what she did not like.  Plaintiff also described sexual acts.  Plaintiff would also reveal personal information that her employees shared with her to other employees.  [Dunlap Depo., pp. 200:23-202:2, 203:18-204:4, Exh. 44.]

59.    The Emerging Technology group was responsible for scheduling customer visits to discuss development projects.  Plaintiff would start scheduling a customer visit, then make mistakes and hand the project off to someone else, such as Gongora.  That employee would then have to scramble to make the arrangements for the scheduled visit at the last minute.  Plaintiff once cancelled her plans to attend a customer meeting in Dallas because she had conflicts in the past with someone who worked for the customer, and she was too nervous to go the meeting and interact with him.  [Dunlap Depo., pp. 198:24-200:5, Exh. 44; STATS001253-1254, Exh. 48.]

60.    Plaintiff often told Dunlap to escalate a problem or questions, sometimes all the way up to Han, the Chief Technology Officer, because she did not know how to address the issue.  Dunlap generally found that the way Plaintiff advised him to proceed was not the right path.  She was also inattentive to details, from a technical standpoint. [Dunlap Depo., pp. 73:6-24, 186:6-187:1, Exh. 44.]

61.    Plaintiff was unnecessarily controlling about unimportant issues, such as when employees came and left the office.  During the time Dunlap worked for Plaintiff, he worked 80+ hours per week.  Nonetheless, Plaintiff would insist that he come into the office at 8:00 a.m., even when he had been at the office on a conference call until 10:00 or 11:00 p.m. the night before.  Plaintiff, on the other hand, was in the office approximately 30 hours per week, at most.  [Dunlap Depo., pp. 66:10-70:15, 209:20-210:13, Exh. 44.]

62.    Plaintiff interfered with Dunlap's ability to work productively with other business groups at STATS ChipPAC.  She created conflicts and started arguments with

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

15

her coworkers. Even though Plaintiff was a Vice President, she would immediately escalate issues to the top levels of management, instead of trying to deal with issues at her level. She would send emails to the chief officers of the company, Han and Jewler, complaining about her colleagues. [Dunlap Depo., pp. 187:2-188:17, Exh. 44.]

63.    Plaintiff lacked the technical ability to effectively evaluate and support the members of the Emerging Technology group. Dunlap constantly had to explain the technical concepts of his projects to Plaintiff. Plaintiff provided Dunlap with very weak support for this projects, and towards the end of his employment, he felt Plaintiff was actually detrimental to his efforts to accomplish the goals set for him by the company. [Dunlap Depo., pp. 188:19-190:17, Exh. 44.]

64.    Plaintiff fixated on minor issues, including Dunlap's failure to provide receipts for inexpensive ($2-$4) meals with his expense reports and the unavoidable roaming fees on his cell phone bills when he traveled. She also refused reimbursement for expenses for Gooch when he started working at STATS ChipPAC. [STATS001986, Exh. 49; Dunlap Depo., pp. 174:2-177:8, Exh. 44; Gooch Depo., pp. 14:12-15:14, Exh. 2; STATS1253-1254, Exh. 48.]

65.    The employees who reported to Plaintiff heard her constantly disparage other employees of STATS ChipPAC, including members of the Emerging Technology group she supervised. She called her colleagues worthless and said they did not add value to the company. She said Gongora, in particular, lied to her, relied on his charisma too much, was a slacker and a negative influence on Dunlap. [Dunlap Depo., pp. 190:18-194:21, Exh. 44.]

66.    Plaintiff repeatedly sent Han unproductive emails complaining about trivial issues regarding Dunlap. On March 28, 2007, Plaintiff told Han that she was fed up with Dunlap's attitude and poor performance. She never, however, gave Dunlap a verbal or written warning, nor did she put him on a performance improvement plan. [STATS000583, Exh. 47; STATS000637-638, Exh. 50; STATS000538-539, Exh. 51; DS-0357, Exh. 52; Dunlap Depo., pp. 194:22-195:8, Exh. 44.]

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C. 2415 EAST CAMELBACK ROAD, SUITE 800 PHOENIX, ARIZONA 85016 (602) 778-3700

67.    When Dunlap started at STATS ChipPAC, Gongora, his direct supervisor, met with him and explained all of the objectives Dunlap was supposed to meet during his first year of employment.  His performance review was supposed to be based on his progress towards those goals.  By the time of his annual performance review, Dunlap had met or exceeded each of these goals, thus, he reasonably expected a positive evaluation. [Dunlap Depo., pp. 177:9-179:5, Exh. 44.]

68.    Dunlap did not receive the positive performance review for 2006 that he expected.  He did not feel his review represented an accurate statement of his performance and was concerned it reflected poorly on him.  Dunlap believed that Plaintiff was having other issues, which motivated her to give him a poor performance evaluation. [Dunlap Depo., pp. 57:19-59:12, 77:14-19, 179:2-8, Exh. 44; STATS001970-1977, Exh. 53; DS-0385, Exh. 54.]

69.    Dunlap wanted to do what he could to revise his performance review.  First, he spoke with his immediate manager at that time, Flynn Carson.  Dunlap asked Carson for a justification of the feedback in the review, and Carson told Dunlap that most of the feedback in his performance review came directly from Plaintiff.  [Dunlap Depo., pp. 77:20-78:14, Exh. 44.]

70.    Dunlap spoke with Plaintiff about his review.  Dunlap explained how he had met the goals set for him and posed technical questions to Plaintiff regarding the basis for his negative assessment.  Plaintiff could not explain to Dunlap how she believed he had failed to meet his set objectives and could not rationalize why she had given him a poor performance evaluation.  She told Dunlap that he should have listened to her instructions, instead of listening to Gongora, his direct supervisor.  Plaintiff could not answer Dunlap's questions, became upset, defensive, and confused, and nearly started to cry during their discussion.  Dunlap asked that she follow up their conversation with a formal response justifying the review she gave him, which Plaintiff did not do.  [Dunlap Depo., pp. 78:4-14, 81:15-82:7, 83:25-84:18, 106:5-16, 184:15-186:5, Exh. 44; DS-0347.]

71.     In an email to Han on the subject, Plaintiff referred to Dunlap as a "little twit" and said she laughed at his concerns regarding his bonus.  [STATS000594-596, Exh. 55; DS-0344, Exh. 56.]

72.     Dunlap also sent an email to Plaintiff's supervisor, Scott Jewler.   In the email, Dunlap advised that he did not feel his performance review was accurate and he asked Jewler to review it.  Jewler did not respond to Dunlap's email.  [Dunlap Depo., pp. 78:4-79:20, 80:20-81:3, Exh. 44.]

73.     Dunlap then took his concerns to Gail Uy, STATS ChipPAC's Human Resources Manager, and asked what recourse he had.  Uy told him he could speak with Han.  Dunlap also spoke with Gongora, who had managed him for most of the year, to see if he agreed with the feedback in Dunlap's review.  [Dunlap Depo., pp. 79:21-80:19, 81:4-5, 84:19-85:4, Exh. 44.]

74.     In response to Dunlap's discussion with Gongora, Gongora also contacted Uy to learn why Dunlap's evaluation did not reflect the positive feedback Gongora had submitted regarding Dunlap's performance.   Plaintiff became very upset when she learned that Gongora had called HR, and asked Scott Jewler to "officially warn" Gongora.  She alleged that Gongora had involved himself in a confidential situation he had no business with and she blamed Gongora for Brett Dunlap's "very poor attitude and sense of entitlement" and said that Dunlap was "cocky," which she also blamed on Gongora.  [DS-0375, Exh. 57; DS-0376, Exh. 58; STATS000646-654, Exh. 59; Sahakian Depo. Volume I, pp. 96:11-101:5, 146:24-148:4, Exh. 1.]

75.     In responses to Plaintiff's complaints about Gongora's call to HR, Gongora's supervisor, Cindy Palar, asked Gongora to explain himself.  Palar discussed Gongora's call with Uy, and instructed Gongora that he was not to make any more inquiries about individuals that did not report to him.  [DS-0393-0394, Exh. 60.]

76.     Dunlap then contacted Han to express his disagreement with his performance review.  Han pointed out to Dunlap that Dunlap did not understand the rating system, which was new, and he explained the ratings to Dunlap.  [Dunlap Depo.,

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

pp. 85:5-22, 87:21-88:5, 116:18-119:24, 131:21-133:24, Exh. 44; STATS000802-804, Exh. 61; STATS001275-1281, Exh. 62; STATS001265-1270.]

77.    Dunlap created a PowerPoint presentation for Han to explain the difficulties he was experiencing working for Plaintiff, in response to Han's request for details of the issues Dunlap was experiencing.  Dunlap reported that Plaintiff was moody, disruptive, slammed doors at work, yelled out comments in the office, and directed rude comments at Dunlap and Gongora.  He also said Plaintiff did not understand technical aspects of her job, which made it hard to work for her, and attributed the departures of several employees to Plaintiff.  [STATS000802-804, Exh. 61; STATS001275-1281, Exh. 62; Dunlap Depo., pp. 97:11-98:17, 100:15-101:9, 104:24-106:23, Exh. 44.]

78.    Dunlap also reported that he felt Plaintiff was creating a hostile work environment for himself and others.  Dunlap felt that Plaintiff "was making it very, very difficult for [him] to even focus and do [his] job."  Plaintiff made racial comments to Dunlap and to others.  Specifically, Dunlap complained that Plaintiff had told him, and several other employees in his presence, "We received several résumés for this position. You were the only white guy to apply, that's why we were interested in hiring you." Dunlap also reported to Han that Plaintiff had remarked that a new employee who joined the Emerging Technology group, which Plaintiff managed, was a "Korean spy."  [Dunlap Depo., pp. 102:2-104:11, 106:5-23, Exh. 44; STATS001275-1281, Exh. 63.]

79.    Given Dunlap's specific complaints about Plaintiff, Plaintiff's unwillingness to help him improve his performance problems, and the effect the breakdown in their relationship was having on the department, Han consented to Dunlap's request to be transferred to the Product Line Management ("PLM") group. Dunlap interpreted Han's decision to transfer him as an indication that Han agreed Plaintiff had treated Dunlap unfairly.  [Dunlap Depo., pp. 87:21-88:3, 136:23-137:25, 182:24-183:14, Exh. 44; STATS001265-1270, Exh. 63.]

80.    Han also adjusted the portion of Dunlap's performance review that determined how much his performance-based bonus would be.  At that point, it was too

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

1   late for the adjustments to change the amount of the bonus Dunlap received.  Instead of

2   the maximum bonus Dunlap could have received, which was $20,000-$22,000, he

3   received less than $8,000, which was based purely on company performance, and not his

4   individual contribution.  [Dunlap Depo., pp. 181:6-182:23, Exh. 44.]

5        81.     After Dunlap transferred to another business group and began reporting to a

6   different manager, he was promoted to a Senior Manager.  Following the transfer, Dunlap

7   felt more confident in his job and supported by his management.  His new manager

8   understood what Dunlap was working on and could demonstrate ways to get things down

9   without the need for escalation and conflict, unlike when Dunlap reported to Plaintiff.

10  [Dunlap Depo., p. 172:8-15, 204:13-24, Exh. 44.]

11       82.     Plaintiff continued to harass Dunlap, even after he no longer reported to

12  her.  She made deliberate efforts to sabotage a client project, Sirrific, for which Dunlap

13  was responsible.  During a presentation Dunlap gave regarding the progress of the

14  project, in front of several other STATS ChipPAC employees, including two Vice

15  Presidents, Plaintiff lost control of herself and called Dunlap a f---ing liar.  [Dunlap

16  Depo., pp. 162:13-165:9, 214:3-23, Exh. 44.]

17       83.     STATS ChipPAC eventually lost Sirrific's business because of the delays

18  Plaintiff caused.  Sirrific took their substantial business to a competitor.  [Dunlap Depo.,

19  p. 165:10-19, Exh. 44.]

20       84.     In November 2007, Dunlap resigned from STATS ChipPAC and went to

21  work for a competitor.  In his exit interview, he reported that his prior manager – Plaintiff

22  – had prompted him to start looking for a different job.  He also reported that he felt the

23  performance review system could easily be skewed.  He noted his satisfaction with

24  changes that were made in the Emerging Technology group, but that they should have

25  been made sooner.  Dunlap felt that Plaintiff should have been replaced as manager of the

26  group.  [DS-1002, Exh. 64; STATS001282-1285, Exh. 65; Dunlap Depo., p. 17:10-14,

27  205:14-208:19, Exh. 44.]

28

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

85.    Dunlap absolutely considered Plaintiff the worst manager he has ever had. [Dunlap Depo., p. 210:18-211:3, Exh. 44.]

86.    When Dunlap resigned, Plaintiff told him she wanted to talk to him prior to his exit interview.  Plaintiff apologized for her conduct and for the way she had treated Dunlap while he worked at STATS ChipPAC.  [Dunlap Depo., pp. 160:20-161:23, Exh. 44.]

87.    Although Plaintiff did discipline and terminate employees as a manager, and mentioned the need for Dunlap and Gongora to be disciplined, she never disciplined Dunlap, Gooch or Gongora.  [Sahakian Depo. Volume I, pp. 178:7-179:7, Exh. 1; STATS000593.]

**C. Plaintiff Reported that Someone put Ketchup on her Office Chair.**

88.    On April 9, 2007, Plaintiff reported to Han and to Gail Uy ("Uy"), Human Resources Manager, that, while she was away from her office, someone put ketchup on her office chair.  Plaintiff noticed the ketchup before she sat down, thus, she did not sit in the ketchup.  Plaintiff admits she did not sit in the ketchup.  Plaintiff told Uy that Dunlap, Gongora, and another Vice President, Mike Schraeder, were the only people in the office when the incident occurred.  [Sahakian Depo. Volume I, pp. 194:24-201:3, Exh. 1.; Doc. 61, Second Amended Complaint, ¶ 21.

89.    Plaintiff admitted she did not know who put ketchup on her chair, yet she still insisted that STATS ChipPAC should terminate Dunlap or Gongora, or both, immediately.  [DS-0392, Exh. 67; Sahakian Depo. Volume I, pp. 201:25-202:25, 205:16-207:7, Exh. 1.]

90.    Uy, who works from STATS ChipPAC's Fremont, California location, conducted six telephonic interviews on April 9, 2007 and, on April 12, 2007, flew to Tempe, Arizona to further investigate Plaintiff's report.  [STATS001239, Exh. 68; STATS001242, Exh. 69; Sahakian Depo. Volume I, pp. 207:8-19, Exh. 1.]

91.    Uy interviewed the two employees who Plaintiff suspected put ketchup on her chair – Gongora and Dunlap – as well as several others.  No one saw anyone put

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C. 2415 EAST CAMELBACK ROAD, SUITE 800 PHOENIX, ARIZONA 85016 (602) 778-3700

21

ketchup on Plaintiff's chair and everyone interviewed denied doing so. Despite the thorough investigation, Uy was not able to determine who had put ketchup on Plaintiff's chair. [STATS001240-1241, Exh. 70; Dunlap Depo., pp. 114:16-116:16, 138:7-139:19, 211:4-18, Exh. 44; Gooch Depo., p. 24:16-22, Exh. 2; Sahakian Depo. Volume I, p. 211:13-24, Exh. 1; Sahakian Depo. Volume II, p. 16:18-25, Exh. 13.]

92.    Several employees thought the ketchup on Plaintiff's chair was just an extension of the pranks that regularly occurred in the office, to which Plaintiff was a willing participant. [STATS000385; Dunlap Depo., pp. 108:16-24, 113:22-114:8, 124:10-125:9, 138:7-140:2, 143:12-20, Exh. 44; Sahakian Depo. Volume I, pp. 207:20-209:14, Exh. 1.]

93.    On April 12, 2007, Uy held a meeting with all employees in the Tempe, Arizona office, reviewed the sexual harassment policy with them, and made it clear that horseplay would not be tolerated. STATS ChipPAC also relocated Gongora's and Dunlap's cubicles away from Plaintiff and transferred Dunlap to a different department. [Dunlap Depo., pp. 150:7-16, 151:25-153:25, Exh. 44; EEOC 10068, Exh. 71; DS-0411-0412, Exh. 72; STATS001250, Exh. 73; Sahakian Depo. Volume I, pp. 211:25-212:14, Exh. 1; Sahakian Depo. Volume II, p. 17:1-9, 17:16-18:6.]

94.    Plaintiff convinced herself that Gongora had put the ketchup on her chair. She demanded that STATS terminate his employment, or, since the allegation could not be proven, at least relocate him to Fremont, California. [STATS000385-387, Exh. 74; Sahakian Depo. Volume I, pp. 212:15-24, 214:20-215:2, Exh. 1.]

95.    Han told Plaintiff that, if she had any proof that Gongora was the one who put ketchup on her chair, Han could terminate Gongora's employment, but without proof he would not do so. Han explained numerous times that he did not condone what happened, that STATS ChipPAC had done all it could to determine who had put ketchup on her chair, and that if he learned for certain who it was, that person would be terminated. [STATS000385-387, Exh. 74.]

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

**D. STATS Became Increasingly Concerned about the Growing Number of Complaints Regarding Plaintiff.**

96.    In Plaintiff's performance evaluation for 2006, Han advised her that she needed to improve the teamwork environment with peer departments and get better at handling conflicts.    Plaintiff agreed that she could improve in these areas. [STATS000278-284, Exh. 75; Sahakian Depo. Volume I, pp. 54:9-20, 55:20-56:18, Exh. 1.]

97.    By May 2007, Han was losing confidence in Plaintiff's ability to perform her job given the fact that she did not work effectively with the Sales group or PLM group, she was fixated on having Gongora terminated, and she was repeatedly late in submitting her weekly and monthly reports, which often contained inaccuracies and information that Plaintiff could not explain.  In mid-May 2007, Han talked to Plaintiff about the possibility of moving her to a special projects function that would enable her to work as an individual contributor without managing others.  Plaintiff stated she was tired of the "political" environment in the office and agreed that Han might need to rethink her position.  She hoped there might be another function she could serve, in which the Company could better support her.  [STATS000385, Exh. 74; STATS000856-000857, Exh. 76; Sahakian Depo. Volume II, pp. 24:10-23, attached as Exh. 13.]

98.    Han warned Plaintiff that she was not listening to him, that she was creating numerous enemies, and that he was hearing too many complaints about her. Han also raised Plaintiff's performance problems with her, explaining that she had failed to provide the requested input for a project, despite having more than two months to work on it.  Han had to retype Plaintiff's presentation at the last minute.  [DS-0448-DS-0449, Exh. 77; DS-0476-DS-0477, Exh. 78.]

99.    Plaintiff complained that she felt other groups were not cooperating with her.  She felt she was enduring insubordination and that she was not being supported to try to "fix things."  [DS-0478-DS-0480, Exh. 79.]

100.    Han advised Plaintiff that he was extremely frustrated with her, because she would report something, but did not know what was actually going on when Han

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

questioned her about what she reported.  He cautioned her to stop making excuses and to know what she was reporting.  He also told her that she was asking for unnecessary directions when common sense dictated what was expected.  [DS-0490, Exh. 80.]

101.    On June 19, 2006, Uy forwarded the feedback from Gooch's exit interview to Plaintiff's manager, Han.  Uy advised that she had heard complaints about Plaintiff previously, but no one had been willing to make an official complaint.  Han asked Uy if she had any other feedback regarding Plaintiff that she could share with him, so he could understand the situation before it got out of hand.  [STATS0000722-723; EEOC/0047-0049, Exh. 83.]

102.    The next day, Uy provided Han with feedback that she asked him to keep very confidential, advising Han that the comments she had heard were from people who refused to go "on the record" for fear of losing their jobs.  She relayed the complaints she had heard, which were that Plaintiff did not know how to manager her people, she imposed everything on those she managed and wanted them to do exactly what she told them, that she pulled rank if she did not get her way, that she was moody, that she had made numerous racial remarks, that she criticized everyone in the company, that she professional "attacked" people on conference calls without reason, and that she called people names.  Plaintiff's direct reports also reported that she could be very blunt, to the point of being offensive and politically incorrect.  They reported that she tends to say things very emotionally, without really thinking, and sometimes speaks out of anger.  Her employees reported that she could be overly harsh, and was unwilling to put trust and respect into people she was not fond of.  [STATS001261, Exh. 82; EEOC/0047-0049, Exh. 83.]

103.    On June 21, 2007, Han informed Plaintiff that an employee had complained about her and asked her, in writing, to reflect upon her management style and her relationships with others.  He reminded Plaintiff that he had given her much advice on that topic, and told her he was going to closely monitor the situation, and then speak to

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

24

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

her officially.  DS-0492-DS-0493, Exh. 84; Sahakian Depo. Volume II, pp. 20:22-21:14, Exh. 13.]

104.    Plaintiff did not respond well to this email and demanded to see the actual complaint.  Han declined to reveal who had made the comments, but told Plaintiff she could call him if she had any other questions.  [STATS000774-775, Exh. 85.; DS-0496-DS-0498, Exh. 86.]

105.    Plaintiff accused Human Resources of "polling" people about her and punishing her for complaining about the ketchup incident.  Han explained that no one polled anyone about her.  He merely wanted her to be aware that she needed to work on improving her relationships.  Han also advised Plaintiff that, if she declined to accept his suggestion that she work to improve her management skills, he would remove her from a supervisory position.  [DS0420-0421, Exh. 81; Sahakian Depo. Volume I, pp. 188:20-190:5, 190:24-191:19, 227:5-230:25, Exh. 1; STATS000385-387, Exh. 74; Sahakian Depo. Volume II, pp. 30:10-21; Han Depo., p. 248:3-18, Exh. 4.]

106.    Han then sent Plaintiff a very detailed email regarding the complaints and giving her specific suggestions on how to modify her behavior.  He noted that he was particularly concerned because this was not the first time one of Plaintiff's subordinates had complained about her, and the complaints seemed to be increasing.  Han felt that the fact that the comments were made in the context of an exit interview made them more accurate, since the departing employee had no vested interest in saying anything negative.  Specifically, Han told Plaintiff to stop worrying about others, focus on her own management and work relationships, be less confrontational with people, respect others, stop making any racial comments, even as a joke, be consistent, distinguish business from personal relationships, and focus on facts when communicating with others.  Han also noted that Plaintiff had a tendency not to accept criticism, instead responding that she was always right and the other person was completely wrong, or that her behavior was justified because she observed others doing the same or worse.  [DS-0496-DS-0498, Exh. 86.]

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

107. Plaintiff admitted she could be less confrontational with others. [Sahakian Depo. Volume I, pp. 221:19-222:9, Exh. 1.]

108. Plaintiff did not respond to this email, but instead, on June 25, 2007, she advised STATS ChipPAC that she was taking a 30-day leave of absence for medical reasons, beginning immediately. [Sahakian Depo. Volume I, pp. 222:10-223:7, Exh. 1; STATS000164-165, Exh. 87; STATS000204, Exh. 88; DS-0501, Exh. 89; Doc. 61, Second Amended Complaint, ¶ 25.]

109. While she was on leave, Plaintiff complained that Gongora had asked the office administrator, Chris Shea, why Plaintiff was out of the office. Uy immediately contacted Gongora, made it clear to him that the reasons for Plaintiff's leave were none of his business, and asked the administrator to contact her if Gongora asked again. [DS-0510, Exh. 90; Sahakian Depo. Volume I, pp. 124:9-127:5, Exh. 1.]

110. Plaintiff's allegation that Han was hostile toward her is based on his sending emails to her nitpicking her work, questioning things Plaintiff did not feel needed to be questioned, criticizing her for scheduling a meeting to be too short, yelling at her for reasons she did not understand. [Sahakian Depo. Volume I, pp. 180:11-182:15, Exh. 1.]

111. The only alleged discriminatory or sexually hostile comment that Plaintiff alleges Han made to her, in the nine years that she worked with him, was to call her fat on one occasion. Plaintiff claims that he made other demeaning remarks about women, but could not cite a single example. [Sahakian Depo. Volume II, pp. 63:15-64:9, Exh. 13.]

112. When Plaintiff was scheduled for her performance review with the Chief Executive Officer in February 2007, she advised Han that she had nothing negative to say about him. [DS-0322, Exh. 91.]

113. Plaintiff alleges that she told Uy in HR that Han had yelled at her when she asked him why HR interviewed her direct reports. Plaintiff also claims that Uy told her to escalate her issues to Tiong Gee Ng, the Senior Vice President of Human Resources.

Plaintiff admits she did not contact Ng with her concerns. [Sahakian Depo. Volume I, pp. 185:18-187:24, Exh. 1.]

114. Prior to returning from leave, Plaintiff emailed Han asking for a face-to-face meeting with him and Tan Lay Koon ("Tan"), Chief Executive Officer, at their offices in Singapore. Tan advised Plaintiff that he would be in California at the end of August and could meet with her then. [DS-0616-617, Exh. 92; DS-0621-0622, Exh. 93.]

115. As Plaintiff's return to work date approached, Han called Plaintiff at home to determine when she was planning to return and to inquire about her health. During that call, Plaintiff told Han that the people she worked with did not respect her as a manager and did not want a woman vice president. Han told her that he and Tan Lay Koon, the CEO, supported her and that, with the two strongest people in STATS ChipPAC behind her, she had the luxury of moving the ball forward without worrying about how others are doing. Han advised Plaintiff that, if she wanted to make changes, she needed to earn the respect of others. [Affidavit of Dr. Han Byung Joon ("Han Aff.") ¶ 5, attached hereto as Exh. 98.]

116. The night before she returned from leave, Plaintiff spoke with Han. Han told Plaintiff he would try to come up with a position for her with less stress. Plaintiff told Han that, if he was not going to support her and offer some kind of resolution, STATS would have to "to buy [her] out, because [she was] not going to leave…on [her] own." [Sahakian Depo. Volume I, pp. 224:2-225:25, Exh. 1; Han Aff. ¶ 6, Exh. 98.]

117. Plaintiff returned to work on July 27, 2007. [DS-0517, Exh. 94; Sahakian Depo. Volume I, p. 224:17-24, Exh. 1; Han Aff. ¶ 7, Exh. 98.]

118. After she returned, Han again raised his concerns regarding the complaints he had received regarding her management style, since Plaintiff took leave, without providing any response to Han's prior correspondence on the topic. Plaintiff reiterated that she believed it was wrong for the Company to criticize her management skills. Han instructed her that she needed to take immediate action. He also advised Plaintiff that the

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

1    Company would not entertain her request to "buy her out." [DS-0601-605; Han Aff. ¶ 8,

2    Exh. 98.]

3    119.    On or about August 7, 2007, Han called Plaintiff to discuss some

4    specifications that Plaintiff had been drafting, unsuccessfully, for almost three years.

5    Plaintiff was late on the project again and Han asked her to finish it one time, *error* free,

6    as he had continually rejected it with errors in the past. Han gave Plaintiff detailed

7    instructions and asked her to finish it.  Han told her that if she could not finish it, he

8    would do it himself.  [Han Aff. ¶ 9, Exh. 98.]

9    120.    Plaintiff then shifted the conversation away from her own work to the

10   information that Human Resources had brought to Han's attention.  Plaintiff told Han that

11   his email to her about her performance problems (sent before she went on medical leave)

12   and Human Resources' inquiries about her management style was "illegal." [Han Aff. ¶

13   10, Exh. 98.]

14   121.    Plaintiff was very emotional and cried during her telephone conversation

15   with Han.  She said she was always the one who received scrutiny, not the people who

16   actually deserved it.  Han told Plaintiff that, if she truly thought that Human Resources

17   was not allowed to investigate complaints about her and that Han was not allowed to

18   correct her performance problems, she should not be in a management role as she was

19   refusing to acknowledge her need to improve her performance.  [Sahakian Depo. Volume

20   II, pp. 28:11-29:1, Exh. 13; Han Aff. ¶ 11, Exh. 98.]

21   122.    During their phone call, Plaintiff also told Han that he was doing the

22   "wrong thing" as her manager and said he was acting "illegally."  She told Han she could

23   sue him and STATS ChipPAC.  Han said that he could not keep arguing with her and that

24   he was done dealing with her while she screamed at him.  Han asked Plaintiff to

25   apologize for screaming at him and to accept that there were areas in which she needed to

26   improve, namely, her management style and communications with others.

27   [STATS001262-1263, Exh. 95; STATS001264, Exh. 96, Exh. 96; DS-0616-617, Exh. 92;

28

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

1    Sahakian Depo. Volume I, pp. 227:5-232:20, Exh. 1; Han Depo., pp. 240:9-243:16, Exh.

2    4; Han Aff. ¶ 12, Exh. 98.]

3        123.    Han also told Plaintiff that, if she refused to accept this feedback, he would

4    have to reassign her to a position in which she would not supervise others. Plaintiff did

5    not apologize and would not acknowledge that she needed to correct her own behavior.

6    [STATS001262-1263, Exh. 95; STATS001264, Exh. 96; DS-0616-617, Exh. 92; Han

7    Aff. ¶ 13, Exh. 98.]

8        124.    Han advised Plaintiff that, if she did not believe the company had the right

9    to look into the concerns its employees raised about Plaintiff, and if she would not admit

10    that she needed to improve her management skills, he would have no choice but to take

11    action.  [STATS001262-1263, Exh. 95; STATS001264, Exh. 96; Han Depo., pp. 240:9-

12    243:16, 243:20-244:4, Exh. 4; Han Aff. ¶ 14, Exh. 98.]

13        125.    When Plaintiff failed to respond to Han with an apology and an

14    acknowledgement of her need to improve her management skills, STATS ChipPAC

15    removed Plaintiff from her position as Vice President of Emerging Technology.

16    [STATS001262-1263, Exh. 95; STATS001264, Exh. 96; Sahakian Depo. Volume I, pp.

17    232:21-233:18, Exh. 1; Han Aff. ¶ 15, Exh. 98.]

18        126.    Han announced Plaintiff's reassignment to her direct reports in the

19    Emerging Technology group and others who had a business need to know, via email.

20    [DS-0632-0633, Exh. 97; Han Aff. ¶ 17, Exh. 98, and Exhibit A thereto.]

21        **E.  Plaintiff's Reassignment to Special Projects**

22        127.    Plaintiff considered her reassignment to the role of Vice President, Special

23    Projects to be a demotion, however, she retained her Vice President title and received the

24    same salary.  The Company retained the discretion to modify or alter an employee's

25    position, with or without cause or prior notice, and Plaintiff was aware that STATS had

26    previously transferred high-level executives to special project assignments to meet

27    specific business needs.  She was assigned to handle special projects, a role in which she

28    would not be responsible for managing others.  [DS-001- 0040, at 0004; DS-0683-0694,

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

29

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

at 0691 (showing Plaintiff's title as of September 2, 2007), Exh. 99; DS-0930-0941, at 0938 (showing Plaintiff's title as of November 4, 2007), Exh. 100; STATS001262-1263, Exh. 95; STATS001264, Exh. 96; Doc. 61, Second Amended Complaint, ¶ 26; Sahakian Depo. Volume II, p. 41:6-7, Exh. 13; Sahakian Depo. Volume I, pp. 47:9-48:2, Exh. 1.]

128.    Although Plaintiff's Complaint alleges that she was transferred to the position of Vice President of Special Projects in retaliation for complaining about retaliation, Plaintiff actually believes that her reassignment was in retaliation for her taking a 30-day FMLA medical leave.  [Sahakian Depo. Volume II, pp. 32:8-33:1, Exh. 13.]

129.    The role of Vice President, Special Projects was a newly created position. There was no formal job description for this new position, as it was created to allow Plaintiff to work autonomously, given her inability to manage or work well with others. Plaintiff was expected to help shape and define her role, and Han gave guidance to help her with this.  [Han Aff. ¶ 18, Exh. 98.]

130.    Initially, when Plaintiff assumed the role of Vice President, Special Projects, Han asked her if she was passionate about working in any other division of STATS ChipPAC's business, such as research and development, Product Line Management (which serves more of a business function), sales, purchasing, quality assurance, etc.  Han told Plaintiff that, if she told him what she wanted to do, he would try to facilitate a transfer for Plaintiff to that business unit.  If not, then he would utilize her expertise to undertake special projects in the Emerging Technology sector.  [Han Aff. ¶ 19, Exh. 98; Sahakian Depo. Volume II, pp. 34:25-36:13, 45:10-20, 48:9-21, Exh. 13.]

131.    In response, Plaintiff suggested, out of left field, that she could help STATS establish a foothold in the alternative energy production sector by establishing a pilot line for the manufacture of customer and/or application-specific solar panels.  Plaintiff's proposed project had no practical or business relationship to any existing segment of STATS ChipPAC's business or products.  [Han Aff. ¶ 20, Exh. 98.]

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

132.    Accordingly, Tan responded to Plaintiff that STATS had no intention of venturing into the alternative energy business. He tried to redirect Plaintiff by suggesting she focus on STATS ChipPAC's existing business, and proposed she help bridge the gap between technology and market applications. Plaintiff then emailed Han, saying she did not understand what he meant when he asked if she had any "passion" to do something within the existing organization. [Han Aff. ¶ 21, Exh. 98.]

133.    As the former Vice President of Emerging Technology, Plaintiff should have been fully versed in the various segments of STATS ChipPAC's business. Instead, she simply parroted what Tan had proposed and stated she wanted a role "bridging the gap between technology and market applications." [Han Aff. ¶ 22, Exh. 98.]

134.    On September 5, 2007, Han asked Plaintiff to complete a study on cost-effective solutions and strategies to attack various markets, and to identify ways to significantly reduce costs for current technology solutions offered by STATS ChipPAC. Han asked her to identify market opportunities and creative ways to promote STATS ChipPAC's technology solutions and specifically asked that she take a complete view of how STATS ChipPAC could understand its target markets, competitors, and how to become more competitive. Han suggested a 2-3 week deadline, and asked whether Plaintiff thought she could complete a comprehensive report in this time. [Han Aff. ¶ 23, Exh. 98.]

135.    What followed was an endless round of emails, in which Plaintiff expressed a complete inability to understand what was being asked of her, requested a formal job description, and implied she did not think she could complete the project until Han ran it by other organizations to determine whether it "fit." Han clarified that he was not asking Plaintiff to execute the plan, but merely to develop and present it, therefore, she did not need to coordinate with other business units. He also repeated his request for a target completion date. [Han Aff. ¶ 24, Exh. 98.]

136.    More than a week later, Plaintiff was still peppering Han with questions that she said she needed answered to "size up" the undertaking. On September 17, 2007,

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

1   Plaintiff emailed Han indicating that she still did not understand which market he wanted

2   her to focus on, and proposing the various "angles" from which she might approach the

3   project (suggesting she still had not undertaken any actual work in the intervening 12

4   days since Han assigned the project). [Han Aff. ¶ 26, Exh. 98.]

5          137.    These circular emails continued until September 22, 2007, when Plaintiff

6   emailed Han some initial analysis.  Han responded on October 10, after nearly a month of

7   traveling in Europe with limited access to email.  He advised Plaintiff that he could not

8   understand how some of the items mentioned in Plaintiff's analysis related to cost, and

9   asked her to be more specific so that action items could be developed.  He also asked

10  Plaintiff for the status of a draft of the rest of the report.  [Han Aff. ¶ 27, Exh. 98.]

11         138.    Plaintiff responded that she would move forward if he agreed with her

12  initial analysis, suggesting that she had made no progress on the project between the time

13  she sent her initial, cursory analysis on September 22 and the time Han responded on

14  October 10.  Han advised Plaintiff that the project was taking much longer than he

15  initially expected. He also called Plaintiff and spent a long time discussing the project

16  with her and coaching her.  Plaintiff responded with a five-page PowerPoint presentation

17  revising her initial analysis on October 13.  [Han Aff. ¶ 28, Exh. 98.]

18         139.    By November 26, 2007, Han still had not received a final report, which he

19  had asked to have completed approximately two months earlier.  Plaintiff responded that

20  she was awaiting feedback from Han "before delving deeper."  She also suggested that

21  she work with outside consultants rather than trying to handle the project independently.

22  [Han Aff. ¶ 29, Exh. 98, and Exhibit B thereto.]

23         140.    Han responded that he had not provided feedback regarding the brief

24  PowerPoint presentation because much of it was completely unrelated to what he had

25  asked her to do, and he thought his earlier discussion with Plaintiff was sufficient to

26  direct her through completion of the project.  It is unclear what – if anything – Plaintiff

27  was doing in the meantime.  [Han Aff. ¶ 39, Exh. 98.]

28

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

141.    Plaintiff complained that the project was "ill defined" and unrealistic and complained that she lacked "real" support.  Han responded that, if after all of their calls and emails, she still could not understand his expectations, he would have to get results from someone else.  [Han Aff. ¶ 31, Exh. 98.]

142.    Plaintiff responded with a demand that Han provide her even further instructions, in writing, and stated that, if he needed to resort to getting help from someone else, she understood.  [Han Aff. ¶ 31, Exh. 98.]

143.    Han emailed Plaintiff again, reiterating all of the prior written instructions he had provided Plaintiff, and asked her to communicate with him in a less confrontational manner, "[a]s the constant confrontation does not help achieve the results we need."  [Han Aff. ¶ 32, Exh. 98, and attached as Exhibit C thereto.]

144.    In mid-December, three months <u>after</u> Han assigned Plaintiff a project he expected would take 2-3 weeks, Plaintiff began emailing other business units to gather the underlying market research necessary for her analysis.  She did not deliver her final report until December 17, 2007.  [Han Aff. ¶ 33, Exh. 98.]

145.    Plaintiff's final report failed to suggest any new strategies for marketing STATS ChipPAC's low-cost solutions, which was the purpose of the assignment.  Plaintiff did not provide the analysis, research or conclusions Han requested.  Han had to complete the research and analysis on his own, but still did not have the thorough report he needed.  Although Plaintiff had several months to work almost exclusively on the project, the end result totally failed to meet Han's expectations.  [Han Aff. ¶ 34, Exh. 98, and Exh. D thereto.]

146.    The next project Han asked Plaintiff to spearhead was researching and developing a strategy for the Original Equipment Manufacturer ("OEM") market.  Again, after months of working on the project, Plaintiff failed to provide the information Han needed, so he had to divide the project into three markets - memory, system and mobile – and assigned someone to research each market segment.  He asked Plaintiff to study the memory application.  [Han Aff. ¶ 35, Exh. 98.]

33

147.    Collectively, the team concluded that OEM marketing was a useful effort, but had to be focused on a vital few segments, in light of resource constraints. Specifically, the team determined that OEM marketing for memory applications, the segment that Plaintiff evaluated, was unnecessary, since it overlapped with other market segments STATS already targeted.  The team members responsible for the system and mobile markets were asked to spearhead OEM marketing efforts for their business segments, but there was no further work to be done on the OEM marketing project that Plaintiff had handled.  Plaintiff spent almost eleven months in the role of Vice President of Special Projects.  During that time she completed just two projects, each of which should have taken only a few weeks.  Moreover, her final work product did not provide what Han had requested, and failed to provide any value to STATS ChipPAC.  Before and during this period, Plaintiff was already searching for other employment.  Plaintiff fully participated in the team as they reached these conclusions.  [Han Aff. ¶ 36, Exh. 98; Sahakian Depo. Volume II, pp. 52:20-53:2, 54:16-55:2; 87:14-88:6, Exh. 13.]

### F. After Nearly a Year of Her Non-Performance, STATS ChipPAC Eventually Terminated Plaintiff's Employment.

148.    In May 2008, STATS asked Plaintiff to set forth her goals for the coming year, as all STATS employees must do.  Rather than embracing the independent role that STATS had created for her, Plaintiff turned to Han, her supervisor, to define her goals. [Han Aff. ¶ 37, Exh. 98.]

149.    Han responded by asking Plaintiff to suggest at least five to seven individual goals in accordance with Company protocol, so he could review them before he and Plaintiff mutually set them.  [Han Aff. ¶ 38, Exh. 98.]

150.    A few days later, Plaintiff emailed Han and asked about the status of the OEM marketing project he had previously assigned to her.  She also proposed several potential goals, mostly related to that strategy.  Plaintiff's proposal completely ignored the fact that the research group, of which she had been part, had concluded that business needs did not justify initiating OEM marketing efforts in the memory business segment

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

1  that Plaintiff had studied.  [Han Aff. ¶ 39, Exh. 98; Sahakian Depo. Volume II, 84:2-13,

2  Exh. 13.]

3      151.    Han reminded Plaintiff of the conclusions of the group, and pointed out that

4  the team members who had evaluated the other business segments (after Plaintiff failed to

5  timely provide relevant market data for these segments) had already identified specific

6  companies or customers to target, and were following up on those marketing efforts.

7  [Han Aff. ¶ 40, Exh. 98.]

8      152.    Han offered to give Plaintiff more special projects, as he had previously,

9  with specific expectations and time lines that could account for half of the individual

10  goals she needed to define.  Han recommended that a previously-defined project could be

11  another part of her goal-setting, therefore, Plaintiff need only define specific goals to

12  occupy approximately ten percent of her time for the next year.  Han advised Plaintiff

13  that these goals need to be useful to the business, specific, measurable, achievable and

14  realistic, with target completion times.  [Han Aff. ¶ 42, Exh. 98.]

15      153.    Plaintiff submitted the goals she previously had proposed, which pertained

16  to business activities already being handled by other STATS employees or which related

17  to projects that STATS already had decided were unlikely to succeed.  In explaining her

18  actions, Plaintiff claimed that she did not know the OEM marketing project for the

19  memory segment of the business had been abandoned.  She also professed confusion

20  about why the STATS employees responsible for the other industry segments were

21  pursuing OEM marketing efforts in their respective business segments.  Plaintiff seemed

22  to forget or ignore the fact that, just months earlier, she had fully participated in the OEM

23  marketing research team and attended conference calls and received emails confirming

24  their conclusion that there was no business need to pursue an OEM marketing project for

25  the memory segment of the industry.  Plaintiff also suggested that she could work on

26  OEM marketing for the system and mobile segments, disregarding that these efforts were

27  already underway and being handled by others.  [Han Aff. ¶ 43, Exh. 98.]

28

154.    In setting goals for the next year, she displayed a complete lack of understanding (or concern) with STATS ChipPAC's business needs, a fatal flaw for someone who is supposed to demonstrate the initiative necessary to develop independent special projects for the progressive Emerging Technology section of the business. [Han Aff. ¶ 44, Exh. 98.]

155.    STATS ChipPAC could not put Plaintiff back in a management role, due to her total inability to effectively manage others. She was unsuccessful in the Special Projects role created for her, due to her complete lack of drive and failure to follow directions without burdensome hand-holding. [Han Aff. ¶ 45, Exh. 98.]

156.    For these reasons, combined with her ongoing confrontational and insubordinate communication style with everyone, including her immediate supervisor and the company's Chief Technology Officer, Han, STATS ChipPAC terminated Plaintiff's employment on July 1, 2008. [Doc. 61, Second Amended Complaint, ¶ 35; Han Aff. ¶ 46, Exh. 98; Sahakian Depo. Volume II, pp. 85:9-14; 86:19-87:7; Exh. 13; Han Depo., pp. 282:6-284:4, 285:6-287:19, Exh. 4.]

157.    Following Plaintiff's termination, Han assumed responsibility for managing the remaining employees in the Emerging Technology group. STATS ChipPAC has not hired any replacement for Plaintiff. [Han Aff. ¶ 47, Exh. 98; Sahakian Depo. Volume II, p. 39:12-16, Exh. 13.]

158.    Plaintiff filed a charge of discrimination on the basis of sex and retaliation against STATS ChipPAC with the Equal Employment Opportunity Commission (hereinafter "EEOC") on or about September 18, 2007. In the Charge of Discrimination, Plaintiff complained that she was demoted from her position of Vice President, Emerging Technology, into a newly-created position, titled "Special Projects," with no job description. She complained that she had been subjected to mental and emotional distress and physical symptoms as a result of a hostile work environment the company has condoned, created by subordinate male employees and her supervisor. [Charge of

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

Discrimination, dated September 18, 2007, Exh. 101; Doc. 61, Second Amended Complaint, ¶ 15.]

159.    Plaintiff's Charge of Discrimination specifies that, beginning in 2006 and through April 2007, she reported to her "management and human resources that certain male employees were undermining [her] authority within [her] group, [her] reputation in the company, and were creating a hostile work environment.    As a result of[her] complaints, [her] supervisor became increasingly hostile towards [her] and further undermined [her] further within [her] group."    After Plaintiff returned from leave due to stress, her manager made a company wide announcement without notification of her demotion, removing her from supervising her group.    Plaintiff was given a new position - "Special Projects."    Plaintiff claimed she was given assignments with no really possibility of completing them as assigned by her supervisor.    Plaintiff stated that she was "being set up for failure.    Despite [her] complaints, no disciplinary action was taken against the male employees who undermined [her] authority within [her] group and [her] reputation in the company, and created a hostile work environment."    Plaintiff claimed she was demoted when she complained to her management and human resources.    [Charge of Discrimination, dated September 18, 2007, Exh. 101.]

160.    Plaintiff filed a subsequent charge of retaliation against STATS ChipPAC with the EEOC on July 30, 2008 as a result of the termination of her employment.    In her second Charge of Discrimination, Plaintiff alleged that she was terminated as a result of her prior filing of a charge of sex discrimination and retaliation with the EEOC, her filing of a lawsuit against STATS ChipPAC, and her refusal to accept a settlement offer from STATS ChipPAC.    Plaintiff further alleged that she was isolated from attending meetings, receiving emails and traveling as she had previously done.    Charge of Discrimination, dated July 30, 2008; Doc. 61, Second Amended Complaint, ¶ 15.

///

///

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

1    DATED this 21st day of July, 2009.

2

3                                        OGLETREE, DEAKINS, NASH,
                                         SMOAK & STEWART, P.C.

4

5

6                                        By: s/ Caroline Larsen

7                                            L. Eric Dowell
                                             Caroline Larsen

8                                            Monique Young
                                             2415 East Camelback Road, Suite 800

9                                            Phoenix, Arizona 85016
                                             Attorneys for Defendants STATS ChipPAC,

10                                           Inc. and STATS ChipPAC, Ltd.

11

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on July 21, 2009, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Peter Strojnik
Peter Strojnik, P.C.
3030 North Central Avenue, Suite 1401
Phoenix, Arizona 85012
Attorney for Plaintiff

Peter K. Strojnik
The Law Firm of Peter Strojnik
3030 North Central Avenue, Suite 1401B
Phoenix, Arizona 85012


s/ Debra A. Perkins

7488317.2 (OGLETREE)

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700