L. Eric Dowell, SBN 011458
Caroline Larsen, SBN 022547
Monique Young, SBN 025121
Ogletree, Deakins, Nash, Smoak & Stewart, P.C., SBN 00504800
2415 East Camelback Road, Suite 800
Phoenix, Arizona 85016
Telephone:   (602) 778-3700
Facsimile:    (602) 778-3750
Eric.Dowell@ogletreedeakins.com
Caroline.Larsen@ogletreedeakins.com
Monique.Young@ogletreedeakins.com

Attorneys for Defendants STATS ChipPAC, Inc.
and STATS ChipPAC, Ltd.

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Diane Sahakian, a single woman, | CV08-241-PHX-HRH |
| Plaintiff, | **MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS STATS ChipPAC, INC. AND STATS ChipPAC, LTD.** |
| vs. | |
| STATS ChipPAC, Inc., a foreign corporation; STATS ChipPAC Ltd, a foreign corporation; Temasek Holdings Private Limited, a foreign corporation; Singapore Technologies Semiconductors Private Limited, a foreign corporation, | (Oral Argument Requested) |
| Defendants. | |

Defendants STATS ChipPAC, Inc. and STATS ChipPAC, Ltd. (collectively, "STATS" or the "Company") move for summary judgment on both claims in Plaintiff Diane Sahakian's ("Plaintiff") Second Amended Complaint. This Motion is supported by the following Memorandum of Points and Authorities and Defendants STATS' Separate Statement of Undisputed Facts (hereinafter "DSOF") filed concurrently herewith.

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

This case arises out of Plaintiff's employment with STATS.  During the nine years she worked for the Company, Plaintiff enjoyed substantial encouragement and support from her managers, who eventually promoted her to the position of Vice President.  As a manager, however, Plaintiff was hostile, petty, and confrontational towards her peers, subordinates and manager.  When her manager validly expressed concerns over Plaintiff's management style, Plaintiff was completely resistant to constructive feedback, and refused to acknowledge that she needed to improve her management and communication skills. STATS deemed it necessary to remove Plaintiff from a supervisory role and placed her in charge of Special Projects, where she could be an individual contributor to the Company. While Plaintiff maintained her title, salary, and other perquisites of her position, she failed and refused to apply herself in this new role.  As such, STATS finally terminated Plaintiff's employment.

Plaintiff alleges that she experienced a sexually hostile work environment and that she was terminated in retaliation for her complaints about the sexually hostile work environment.  While Plaintiff made numerous work-related complaints, none of them had anything to do with a sexually hostile work environment.  Moreover, the issues about which Plaintiff complained were not sufficiently severe or pervasive to alter the terms or conditions of her employment.  As for the alleged adverse employment actions that Plaintiff claims she experienced - reassignment to Special Projects and termination - she has no evidence to refute STATS legitimate, non-discriminatory reasons for these actions or to show that the real reason for the actions was Plaintiff's sex or retaliation.

In addition, STATS has an affirmative defense to Plaintiff's claims.  Plaintiff was fully aware of the Company's policy against sexual harassment and its reporting procedures, yet she unreasonably failed to report incidents of alleged sexual harassment to her manager or Human Resources ("HR"), nor did she use her authority, as a Vice President, to discipline the alleged harassers, who were her subordinates.  STATS fully

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

and promptly responded to all complaints that Plaintiff made. Finally, STATS has demonstrated its good faith effort to comply with Title VII, thus, no basis exists for Plaintiff's demand for punitive damages.

For the reasons set forth below, STATS is entitled to summary judgment in its favor on Plaintiff's claims.

## II.    FACTUAL BACKGROUND

### A. Plaintiff's Employment with STATS

Plaintiff started her employment with STATS in August 1999, working in STATS' Tempe office. [DSOF ¶ 1.] STATS promoted Plaintiff several times, at the recommendation of her direct supervisor, Executive Vice President and Chief Technology Officer, Dr. Han Byung Joon ("Han"). [DSOF ¶ 2.] In 2004, STATS acquired a competitor, ChipPAC, and, thereafter, Plaintiff worked for the merged entity, STATS ChipPAC. [DSOF ¶ 3.] In 2005, the Company promoted Plaintiff to Vice President, supervising the Emerging Technology ("ET") group, a technical group tasked with generating emerging technology strategies, and engaging customers in these technologies. [DSOF ¶¶ 4-5.] Plaintiff supervised a group of approximately seven technologists and engineers, who worked in Tempe, Arizona and Fremont, California. [DSOF ¶ 7.]

### B. Several of Plaintiff's Direct Reports Transferred and/or Resigned due to Conflicts with Plaintiff.

#### 1.    Eric Gongora

From approximately 2004 to October 2006, Plaintiff supervised Eric Gongora ("Gongora"), a member of the ET group. [DSOF ¶ 12.] In her first evaluations of Gongora, Plaintiff identified him as a "high potential" employee, meaning she recommended that STATS should develop Gongora for promotion opportunities and increased responsibility within the Company. [DSOF ¶ 13.] Plaintiff described Gongora as highly enthusiastic, energetic, capable, and dedicated to improving himself. [*Id.*] She made sure he was promoted in April 2006. [DSOF ¶ 15.]

In approximately August 2006, Plaintiff's view of Gongora changed, and she began emailing Han and Jewler complaining about him. [DSOF ¶ 16.] She became suspicious that Gongora was fostering animosity towards her or trying to pit other employees against her. [*Id.*] Plaintiff and Gongora engaged in work-related disagreements during which they raised their voices at each another. [*Id.*] On September 28, 2006, Plaintiff asked Han if she could reorganize her group to remove Gongora's two direct reports, Scott Gooch and Brett Dunlap, from his supervision. [DSOF ¶ 22.] She proposed that she might make Gongora an individual contributor, since she felt he lacked management skills. [DSOF ¶ 23.] Han responded to Plaintiff with detailed instructions telling her to be more direct with Gongora and not let personal issues cloud the main message - that Plaintiff was concerned about Gongora's work ethic. [DSOF ¶ 22.] Han told Plaintiff that reorganizing her group to deal with a personnel problem was not in the best interests of the Company and would not solve her problem. [DSOF ¶ 24.]

Nonetheless, on October 2, 2006, Plaintiff proposed to Han that Gongora be transferred to another department. [DSOF ¶ 34.] STATS agreed to transfer Gongora to another department. [*Id.*] Even after Gongora transferred, Plaintiff continued to complain about him. [DSOF ¶ 35.] Han repeatedly instructed Plaintiff to focus on her own work and stop focusing on Gongora. [*Id.*]

### 2.    Scott Gooch

In June 2006, Plaintiff hired Scott Gooch ("Gooch") as a Director to work in STATS' Fremont, California office. [DSOF ¶ 39.] Soon after he started working at STATS, Gooch developed concerns with Plaintiff's management style. [DSOF ¶¶ 40-43.] He often heard Plaintiff make negative, unprofessional comments about other members of the ET group. [DSOF ¶ 41.] Her interpersonal skills were weak, and she was not professional in how she dealt with Gooch and others. [*Id.*] Plaintiff also lacked strong technical knowledge, which prevented her from being a leader for the ET group. [DSOF ¶ 43.] During the time Gooch worked at STATS, Plaintiff <u>never</u> complained that he harassed her in any way. [DSOF ¶ 48.] In fact, Plaintiff admitted to Han that she had

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C. 2415 EAST CAMELBACK ROAD, SUITE 800 PHOENIX, ARIZONA 85016 (602) 778-3700

"little to no interaction" with him, and when she did, it was positive. [*Id.*] She described Gooch as "positive and pleasant." [*Id.*]

In approximately February 2007, Gooch transferred to a different group, in part so he could report to a manager other than Plaintiff. [DSOF ¶ 45.] Gooch only worked for STATS for approximately one year. [DSOF ¶ 47.] When he resigned in June 2007, he stated in his exit interview that Plaintiff was a very poor manager, he could not communicate with her at all, and he did not know why she was employed with STATS. [*Id.*] In fact, Gooch expressed that Plaintiff was one of the worst managers that he has worked for and that her management style was one of the reasons why he had started looking for a different job. [*Id.*]

### 3. Brett Dunlap

In January 2006, Plaintiff hired Brett Dunlap ("Dunlap") to be a Product Manager at STATS. [DSOF ¶ 50.] Dunlap worked in a cubicle located directly outside of Plaintiff's office. [DSOF ¶ 53.] Dunlap, Gongora and Plaintiff engaged in jokes and pranks with one another, such as throwing pennies and candies at each another around the office. [*Id.*] Plaintiff also joked about her supervisor's name, BJ Han. [*Id.*] She even gave Han a T-shirt that read "I ♥ BJ," referring to both her supervisor's name and a slang term for oral sex. [*Id.*] She also sent vulgar joke emails to Han. [*Id.*]

Based on his experience working with Plaintiff, Dunlap thought she was often disruptive, inappropriate and unprofessional. [DSOF ¶ 56.] She interfered with Dunlap's ability to work effectively with other departments of STATS. [DSOF ¶ 62.] Even though Plaintiff was a Vice President, she immediately escalated issues to the top levels of management, instead of dealing with issues at her level. [DSOF ¶¶ 60, 62.] Plaintiff would often call Dunlap into her office to show him joke emails, interrupting his work. [DSOF ¶ 56.] When Plaintiff was in a bad mood, she would use the f-word several times a day. [DSOF ¶ 57.] Dunlap also heard Plaintiff discuss sexual topics at the office, including what sexual acts she did or did not like. [DSOF ¶ 58.]

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

Plaintiff repeatedly sent Han unproductive emails with trivial complaints about Dunlap. [DSOF ¶ 66.] She never, however, gave Dunlap a verbal or written warning, or put him on a performance improvement plan. [*Id.*] By the time of his annual performance review for 2006, Dunlap expected a positive evaluation. [DSOF ¶ 67.] He did not receive a good performance review and he felt his review did not fairly reflect his performance. [DSOF ¶ 68.] Dunlap spoke with Plaintiff about revising his performance review. [DSOF ¶ 70.] Plaintiff could not explain to Dunlap how she believed he had failed to meet his set objectives and could not rationalize why she had given him a poor evaluation. [*Id.*]

In March 2007, Dunlap spoke with several other members of management about his review, and then took his concerns to Gail Uy ("Uy"), STATS' HR Manager. [DSOF ¶¶ 72-74.] Uy told Dunlap he could speak with Han. [DSOF ¶ 73.] Dunlap contacted Han to express his disagreement with his performance review. [DSOF ¶ 76.] Dunlap created a five-page PowerPoint presentation for Han explaining his difficulties working for Plaintiff. [DSOF ¶ 77.] Dunlap advised Han that Plaintiff was moody and disruptive. [*Id.*] He also said Plaintiff did not understand technical aspects of her job, and that several talented engineers left the Company because of her management style. [*Id.*]

Dunlap also reported to Han that Plaintiff was creating a hostile work environment for him and others. [DSOF ¶ 78.] Dunlap told Han that he heard Plaintiff comment several times, "We received several résumés for [Dunlap's] position. You were the only white guy to apply, that's why we were interested in hiring you." [DSOF ¶¶ 51, 52, 78.] Dunlap considered this a racist comment, and was offended by it. [DSOF ¶ 51.] Dunlap also reported to Han that Plaintiff had referred to a new employee who joined her ET group as a "Korean spy." [DSOF ¶ 78.]

Partially in response to Dunlap's complaints about Plaintiff, on April 16, 2007, Han approved Dunlap's transfer to another department, just like Gongora and Gooch before him. [DSOF ¶ 79.] After working for STATS for approximately 18 months, Dunlap resigned on November 25, 2007 to work for a competitor. [DSOF ¶ 84.] In his exit

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

6

interview, he reported that he felt Plaintiff should be replaced as manager of the group, and he considered her the worst manager he ever had.  [*Id.*]

### C. Plaintiff Reported That Someone Put Ketchup on her Office Chair.

The only incident that Plaintiff reported that could be possibly construed as harassing was on April 9, 2007, when she reported to Han and to HR that, while she was away from her office for a few minutes, someone put ketchup on her office chair.  [DSOF ¶ 88.]  Plaintiff noticed it before she sat down, thus, she did not sit in the ketchup.  [*Id.*] She admitted she did not know who put ketchup on her chair.  [DSOF ¶ 89.]  As explained in more detail Section III.B.2, *infra*, STATS immediately and fully investigated and responded to Plaintiff's report.

### D. STATS Became Increasingly Concerned about the Growing Number of Complaints Regarding Plaintiff.

In Plaintiff's performance evaluation for 2006, Han directed her to improve the teamwork environment with peer departments and get better at handling conflicts.  [DSOF ¶ 96.]  Plaintiff agreed she could improve in these areas.  [*Id.*]  Han warned Plaintiff that she was not listening to him, she was creating numerous enemies, and that he was hearing too many complaints about her.  [DSOF ¶ 98.]  In mid-May 2007, Han spoke to Plaintiff about possibly moving her to a special projects function within the ET group that would enable her to work as an individual contributor without managing others.  [DSOF ¶ 97.] Plaintiff acknowledged that Han might need to rethink her position because she was tired of the "political arena" in the office.  [*Id.*]

On June 19, 2006, Uy forwarded the comments from Gooch's exit interview to Han. [DSOF ¶ 101.]  Uy advised that she had previously heard complaints about Plaintiff, but no one had been willing to make an official complaint.  [*Id.*]  Uy also provided Han with feedback from people who refused to go "on the record" for fear of losing their jobs. [DSOF ¶ 102.]  Some of these complaints were: that Plaintiff did not know how to manage her people, she pulled rank if she did not get her way, she was moody, she made racial remarks, she openly criticized everyone in the Company, including calling people names,

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

1    and she professionally "attacked" other employees without reason.  [*Id.*]  Plaintiff's direct

2    reports also reported that she could be overly harsh, tended to say things very emotionally,

3    without really thinking, and spoke out of anger.  [*Id.*]

4         On June 21, 2007, Han informed Plaintiff that an employee had complained about

5    her and asked her, in writing, to reflect upon her management style and her relationships

6    with others.  [DSOF ¶ 103.]  Plaintiff demanded to see the complaint, but Han felt he

7    should keep the identity of the person who made the comments confidential.  [DSOF ¶

8    104.]  Plaintiff accused HR of "polling" people about her and punishing her for

9    complaining about the April 9 ketchup incident.  [DSOF ¶ 105.]  Han explained that no

10    one polled anyone about her.  [*Id.*]  Han sent Plaintiff a very detailed email regarding the

11    complaints and gave her specific suggestions on how she could improve.  [DSOF ¶ 106.]

12    Han was particularly concerned because this was not the first time one of Plaintiff's

13    subordinates had complained about her, and the complaints seemed to be increasing.  [*Id.*]

14         Plaintiff did not respond to Han's email.  [DSOF ¶ 108.]  Instead, on June 25, 2007,

15    she advised STATS that she was taking a 30-day leave of absence for medical reasons,

16    beginning immediately ("Plaintiff's FMLA leave").  [*Id.*]  The night before she returned

17    from her leave, Plaintiff spoke with Han.  [DSOF ¶ 116.]  Han told Plaintiff he would try to

18    come up with a position for her with less stress.  [*Id.*]  Plaintiff told Han that, if he was not

19    going to support her and offer some kind of resolution, STATS would have to "to buy [her]

20    out, because [she was] not going to leave … on [her] own.  [*Id.*]

21         Plaintiff returned to work on July 27, 2007.  [DSOF ¶ 117.]  In early August, Han

22    again approached Plaintiff about the complaints he had received regarding her

23    management style, since Plaintiff took leave without providing any response to Han's prior

24    request that she reflect on ways to improve her management style.  [DSOF ¶ 118.]

25    Plaintiff reiterated that she believed it was wrong for the Company to criticize her

26    management skills.  [*Id.*]  Han instructed Plaintiff that she needed to take immediate

27    action, and told her that the Company would not entertain her request to "buy her out."

28    [*Id.*]

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

On August 7, 2007, Han called Plaintiff to discuss the status of a long overdue project she was supposed to be handling. [DSOF ¶ 119.] Plaintiff shifted the conversation away from her work to the complaints that HR had brought to Han's attention. [DSOF ¶ 120.] Plaintiff told Han that his June and July emails to her about her performance problems were "illegal." [*Id.*] She told Han she could sue him and STATS. [DSOF ¶ 122.] Han said he could not keep arguing with Plaintiff and he would not deal with her while she screamed at him. [*Id.*] Han asked Plaintiff to apologize for yelling at him and to accept that there were areas in which she needed to improve, namely, her management style and communications with others. [*Id.*] Han also told Plaintiff that, if she refused to accept this feedback, he would have to reassign her to a position in which she would not supervise others. [DSOF ¶¶ 123-124.]

Plaintiff did not apologize and would not acknowledge that she needed to correct her own behavior. [DSOF ¶ 125.] Accordingly, STATS reassigned Plaintiff from the position of Vice President of ET to Vice President of Special Projects. [*Id.*]

**E. Plaintiff's Reassignment to Special Projects**

Plaintiff considered her reassignment to be a demotion, however, she retained her Vice President title and received the same salary. [DSOF ¶ 127.] The Company retained the discretion to modify an employee's position, with or without cause or prior notice, and Plaintiff was aware that STATS had previously transferred high-level executives to special project assignments to meet specific business needs. [*Id.*] Plaintiff's reassignment put her in a role in which she would not be responsible for managing others. [*Id.*]

Following Plaintiff's reassignment, Han asked her if she was passionate about working in any other division of STATS business, such as research and development, sales, quality assurance, etc. If so, Han would try to facilitate a transfer for Plaintiff to one of these departments. [DSOF ¶ 130.] If not, he would utilize her experience to handle special projects in the ET area. [*Id.*] When Plaintiff did not identify any other business group with STATS to which she wanted to transfer, on September 5, 2007, Han asked Plaintiff to complete a study on cost-effective solutions and strategies for various markets.

[DSOF ¶ 134.]  He suggested a 2-3 week deadline.  [*Id.*]  An endless round of emails followed, in which Plaintiff expressed a complete inability to understand what Han was asking of her, despite her years of experience as the manager of ET.  [DSOF ¶¶ 135-143.]

By November 26, 2007, Han still had not received the final report from Plaintiff, which he had asked her to complete nearly two months earlier.  [DSOF ¶ 139.]  She did not deliver her report until December 17, 2007.  [DSOF ¶ 144.]  Plaintiff's final report failed to suggest any new strategies for marketing STATS' low-cost solutions, which was the very purpose of the assignment.  [DSOF ¶ 145.]  Plaintiff took several months working exclusively on the project, however, the end result totally failed to meet Han's expectations.  [*Id.*]

The next project Han asked Plaintiff to spearhead was researching and developing a strategy for the Original Equipment Manufacturer ("OEM") market.  [DSOF ¶ 146.]  Again, after months of working on the project, Plaintiff failed to provide the information Han needed.  [DSOF ¶ 147.]  Plaintiff spent almost 11 months as Vice President of Special Projects.  [*Id.*]  In that time, she completed only two projects, both of which she completely botched.  [*Id.*]

**F. After Nearly a Year of Her Non-Performance, STATS ChipPAC Eventually Terminated Plaintiff's Employment.**

In May 2008, STATS asked Plaintiff to set her goals for the coming year.  [DSOF ¶ 148.]  Han asked her to suggest at least five to seven individual goals for him to review before they were finalized.  [DSOF ¶ 149.]  A few days later, Plaintiff emailed Han several potential goals, mostly related to the OEM marketing strategy that Han had previously assigned to her.  [DSOF ¶ 150.]  Plaintiff's proposal completely ignored the fact that the research group, of which she had been a part, had concluded that business needs did not justify initiating OEM marketing efforts that Plaintiff had studied.  [*Id.*]  Han explained to Plaintiff that the goals she proposed contradicted the conclusions of the team and, therefore, did not fit within any defined business needs.  [DSOF ¶ 151.]

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

10

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

Han offered to give Plaintiff more special projects to account for half of the goals she needed to define. [DSOF ¶ 152.] Plaintiff only needed to set specific goals to account for approximately ten percent of her time for the next year. [*Id.*] Plaintiff submitted the goals she previously had proposed, even though they pertained to projects already being handled by other employees or related to projects that STATS had decided were unlikely to succeed and, thus, had abandoned. [DSOF ¶ 153.] By setting pointless goals for the next year, Plaintiff displayed a complete lack of understanding of (or concern for) the Company's business needs. [DSOF ¶ 154.] STATS could not put Plaintiff back in a management role, due to her total inability to effectively manage others. She made no effort to succeed in the Special Projects role created for her. For these reasons, combined with her ongoing confrontational and insubordinate communication style with everyone, including Han, STATS terminated Plaintiff's employment on July 1, 2008. [DSOF ¶ 156.]

## III.    LEGAL ARGUMENT

### A.    Plaintiff cannot establish STATS liability for the alleged sexually hostile work environment.

Plaintiff cannot present evidence that she was subjected to a sexually hostile work environment. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.* ("Title VII") makes it unlawful for an employer to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of sex. 42 U.S.C. § 2000e-2(a)(1). Plaintiff specifically alleges she experienced a sexually hostile work environment. Second Amended Complaint, Doc. 61, ¶¶ 36-38.

To demonstrate a *prima facie* case of a hostile work environment, Plaintiff must raise a triable issue of fact as to whether (1) she was subjected to verbal or physical conduct because of her sex; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment. *Manatt v. Bank of America, NA,* 339 F.3d 792, 798 (9th Cir. 2003) (citation omitted). Not all "workplace conduct that may be described as

11

'harassment,' affects a 'term, condition, or privilege' of employment within the meaning of Title VII." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986).  Whether an environment is sufficiently hostile or abusive is determined by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993)).  Plaintiff's allegations against STATS, even if they were true, do not constitute a sexually hostile work environment under Title VII.

Even if Plaintiff could raise a triable issue of fact regarding the existence of a sexually hostile work environment, she cannot establish that STATS is liable for the alleged hostile work environment.  To determine an employer's liability, the Court must assess whether alleged harassers are Plaintiff's co-workers or her supervisor.  An employer can be held strictly liable for harassment by the plaintiff's supervisor.  If the alleged harasser is a co-worker, however, the plaintiff must show that "the employer knew or should have known of the harassment but did not take adequate steps to address it." *Swinton v. Potomac Corp.*, 270 F.3d 794, 803 (9th Cir. 2001).  Thus, an employer may "avoid liability for [co-worker] harassment by undertaking remedial measures reasonably calculated to end the harassment." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1120 (9th Cir. 2004) (internal quotations omitted).

In this case, the alleged harassers are neither Plaintiff's supervisors nor her co-workers; rather, the alleged harassers were Plaintiff's <u>subordinates</u>, whom she had the authority to discipline.  Plaintiff cannot meet her burden of proving that she was sexually harassed by her subordinates, that STATS knew or should have known of the alleged sexual harassment, and that the Company failed to take adequate steps to address it.

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

**1.    Plaintiff fails to offer any evidence that she experienced sexual harassment by management, including her supervisor, BJ Han.**

Plaintiff has offered no evidence to support her claim that she was sexually harassed by her supervisor, Han.  Her allegation that Han was "hostile" towards her is based on: Han sending emails to Plaintiff nitpicking her work, questioning things Plaintiff did not feel needed to be questioned, criticizing her for scheduling a meeting to be too short, and yelling at Plaintiff for reasons she did not understand.  [DSOF ¶ 110.]  Plaintiff also claims that Han told her she was getting fat.  [DSOF ¶ 111.]  Yet, when Plaintiff was scheduled for her performance review with the C.E.O. in February 2007, she advised Han that she had nothing negative to say about him.  [DSOF ¶ 112.]

Han's alleged conduct towards Plaintiff was not, in any way, sexual.  Plaintiff has failed to demonstrate that Han subjected her to <u>any</u> verbal or physical conduct because of her sex or that his alleged conduct was sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and create a sexually hostile working environment. *Manatt v. Bank of America, NA,* 339 F.3d 792, 798 (9th Cir. 2003) (citation omitted); *Williams v. Goelitz Candy Co.*, 1997 WL 735006 (9th Cir. 1997) (district court correctly excluded from its determination incidents in which co-workers teased plaintiff, hid her time-sheets, and moved her work materials, because incidents were not sexual in nature). Statements and conduct to support a gender-based hostile work environment claim must be sexual or gender-related, such as sexual advances or requests for sexual favors.  *Pierri v. Cingular Wireless, LLC*, 397 F. Supp. 2d 1364, 1377 (N. D. Ga. 2005) (internal citation and quotation marks omitted).  "[P]laintiff must prove that her sex or gender was the underlying reason for the alleged harassment she suffered."  *Id.* (citation omitted).

The alleged "harassing conduct" by Han is no more than a supervisor taking action because of Plaintiff's poor work performance, and not the result of her gender. *Joens v. John Morrell & Co.,* 354 F.3d 938, 941-42 (8th Cir. 2004) (there was no evidence that harasser yelled and swore at plaintiff because of her sex, as opposed to her work performance).  Plaintiff cannot demonstrate the *prima facie* elements of a hostile work environment based on any alleged conduct by her supervisor, Han.

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

### 2. Alleged "insubordinate" conduct by Plaintiff's subordinates was unrelated to her gender.

With respect to Plaintiff's claim that her subordinates sexually harassed her, Plaintiff cannot establish STATS liability because she cannot prove that the Company knew or should have known of the alleged sexual harassment by Gongora, Gooch or Dunlap, or that the Company failed to take adequate steps to address it. *Swinton v. Potomac Corp.,* 270 F.3d 794, 803 (9th Cir. 2001).

Plaintiff complained about her subordinates to Han and HR, however, her complaints did not did not even suggest that Plaintiff was subjected to verbal or physical conduct <u>because of her sex</u>.[1]  Plaintiff specifically testified that her work environment was "hostile" based on the following alleged actions by her subordinates (Gongora, Dunlap, and Gooch): not following Plaintiff's directions, complaining about her to her manager, and not cooperating with her, including not attending staff meetings.  [DSOF ¶¶ 17-18.] After Gongora transferred out of Plaintiff's group, in October 2002, Plaintiff complained that he attempted to have Gooch and Dunlap transferred out of Plaintiff's group; he said negative things to try to turn others against her; and he told other employees he did not believe Plaintiff was really sick during her medical leave of absence.  [DSOF ¶ 38.]

The conduct about which Plaintiff complained was, in no way, sexual in nature. She has no evidence to demonstrate her employees allegedly misbehaved because of her gender.  The only complaint Plaintiff made that possibly could be construed as gender-based harassment is her report that someone placed ketchup on her office chair.  As discussed in Section III.A.3, *infra*, this single incident is not sufficiently severe to constitute sexual harassment.

Plaintiff's complaints about her subordinates, even viewed in the light most favorable to her, are insufficient as a matter of law to reasonably place STATS on notice that *any* sexual harassment issue might exist.  *See Nurse "BE" v. Columbia Palms W.*

---

[1] Plaintiff admits that she never reported several sexual comments Gongora allegedly made to her to anyone in management or HR.  *See* Section III.B.3, *infra*.

*Hosp. Ltd. P'ship*, 490 F.3d 1302 (11th Cir. 2007) (reporting "harassing" conduct insufficient to put employer on notice where employee did not properly communicate that the conduct was sexual harassment).

Plaintiff cannot establish a prima facie case for hostile work environment because none of the alleged conduct by her subordinates was gender-specific or bore any relation to Plaintiff's protected status as a woman. *Figueroa v. City of New York*, 118 Fed.Appx. 524, 526 (2d Cir. 2004) (upholding summary judgment in favor of defendant-employer where plaintiff alleged offensive, but gender-neutral conduct, and she offered only the conclusory statement that harassment occurred because she is a woman).

### 3.    Plaintiff reported only one incident of alleged harassment, which was not sufficiently severe to make the environment hostile.

In order "to ensure that Title VII does not become a general civility code, ... conduct must be extreme to amount to a change in the terms and conditions of employment." *Faragher,* 524 U.S. at 788 (citations and internal quotations omitted). Allegations of a few isolated incidents will not suffice; rather, Plaintiff must demonstrate the alleged harassment was "so intimidating, offensive, or hostile that it poisoned the work environment." *Tuggle v. Mangan,* 348 F.3d 714, 720 (8th Cir. 2003) (citation omitted). Sexual harassment must be ongoing, rather than a set of isolated or sporadic incidents. *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 351 (6th Cir. 2005). "If a single incident can ever suffice to support a hostile work environment claim, the incident must be extremely severe." *Brooks v. City of San Mateo,* 29 F.3d 917, 926 (9th Cir. 2000).

Unpleasant or boorish behavior is not sufficiently offensive as to create a "hostile or abusive" work environment. In *Sprague v. Thorn Americas, Inc.*, the plaintiff complained of five separate incidents over a span of approximately sixteen months. 129 F.3d 1355, 1366 (10th Cir. 1997). On one occasion, when plaintiff entered her supervisor's office, he allegedly told her she needed to undo her top button. *Id.* During another incident, plaintiff's supervisor "brought up the subject about women and PMS and you know how they are at that time of the month." *Id.* The court found that plaintiff was not subjected to

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C. 2415 EAST CAMELBACK ROAD, SUITE 800 PHOENIX, ARIZONA 85016 (602) 778-3700

such offensive comments or conduct as to create a "hostile or abusive" work environment. *Sprague*, 129 F.3d at 1365-66 (citing *Harris,* 510 U.S. at 22).  Moreover, since the conduct occurred sporadically over an extended period, the remarks at issue "were not sufficiently severe or pervasive as to alter the condition of [plaintiff's] employment and create an actionable hostile work environment."  *Id.*; *see also De la Torre v.  Merck Enters., Inc.*, 540 F. Supp. 2d 1066, 1080-81 (D. Ariz. 2008) (holding that evidence that Plaintiff's former supervisor gave her a brief, unwelcomed shoulder massage and told an inappropriate story about another employee was not necessarily sexual and did not rise to the level of severity required to constitute sexual harassment).

Incidents much more severe than that alleged by Plaintiff have been found insufficient to support a claim that a workplace was sexually hostile.  In *Brooks v. City of San Mateo*, the Court found that a single instance in which the plaintiff's co-worker placed his hand on plaintiff's stomach, commented on its sexiness, and then forced his hand underneath plaintiff's sweater and bra to fondle her bare breast was not sufficient to support plaintiff's claim of sexual harassment.  229 F.3d 917, 921-22 (9th Cir. 2000).  The court found that the encounter between the plaintiff and her co-worker was "highly offensive," but was not sufficiently frequent, severe or intense to interfere with plaintiff's working conditions and permit a reasonable woman in plaintiff's position to consider the terms and conditions of her employment altered.  *Id.* at 926.

In *Rosario v. Department of Army*, the court found that supervisor's conduct, including downloaded sexually-oriented jokes from the computer and commenting on them loudly in plaintiff's presence; telling everyone around the office that plaintiff dressed like a whore, a street woman, and a prostitute; saying that Plaintiff looked disgusting, was fat and had delinquent kids did not qualify as the type of severe conduct required to find a violation of Title VII.  573 F. Supp. 2d 524, 530 (D. P.R. 2008).

In *Gwen v. Regional Transit Authority*, the plaintiff's co-worker twice exposed his genitals to her and approached her while making "rude and inappropriate comments." *Gwen*, 7 Fed.Appx. 496, 498 (6th Cir. 2001).  The plaintiff had not shown that the conduct

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

16

unreasonably interfered with her work performance and created a hostile working environment. *Id.* at 501 (citation omitted).

In *Jaquez v. Herbert*, 447 F. Supp. 2d 858, 870-72 (N.D. Ohio 2006), plaintiff alleged that she saw several co-worker expose their genitals. One time, a repairman slapped plaintiff's buttocks so hard that she had to sit down. He kept telling plaintiff she should "give up some of that ... before you get too old and nobody wants you." *Id.* The Court found that plaintiff failed to present any evidence regarding the effect these incidents had on her work. *Id.* (finding plaintiff's evidence was not sufficient to create a factual issue for the jury).

In this action, the <u>only</u> complaint Plaintiff made that was even arguably based on her sex was that someone placed ketchup on her office chair. Even if this incident occurred (and notably, Plaintiff was the <u>only</u> person who saw the ketchup on her chair), it was inappropriate for the workplace, but not sexual in nature. That is merely how Plaintiff chooses to characterize it. Even if the Court accepts Plaintiff's characterization, however, this single incident was not "extremely severe," as necessary to affect a term, condition, or privilege of Plaintiff's employment and support her hostile work environment claim.

**B.    STATS is entitled to an affirmative *Faragher/Ellerth* defense.**

With respect to the alleged harassment by Plaintiff's subordinates, STATS is shielded from liability by the *Faragher/Ellerth* defense. *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998). The defense contains two elements: (1) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (2) that the plaintiff-employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Faragher*, 524 U.S. at 807. Both elements are met here.

**1.    STATS took reasonable steps to prevent sexual harassment.**

The evidence overwhelmingly shows that STATS took reasonable care to prevent sexual harassment at the Company by promulgating employment policies and procedures.

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C. 2415 EAST CAMELBACK ROAD, SUITE 800 PHOENIX, ARIZONA 85016 (602) 778-3700

*See Kohler v. Inter-Tel Techs.*, 244 F.3d 1167, 1180 (9th Cir. 2001) (citation omitted). STATS Employee Handbook states: "The Company will not tolerate unlawful harassment of any type.  Sexual or other unlawful harassment includes any conduct that has the purpose or effect [of] unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive work environment." [DSOF ¶ 9.]  STATS also has an open door policy that encourages employees who have job-related concerns are encouraged to talk them over with their supervisor or any other management representative with whom they feel comfortable, as soon as possible after the events that caused the concern.  [DSOF ¶ 10.]  Employees are encouraged to pursue discussion of any work-related concern until the matter is fully resolved.  [*Id.*]  Plaintiff received copies of STATS sexual harassment policies several times during her employment, received sexual harassment training, and was aware of the Company's anti-harassment and open door policies, and knew she could report harassing behavior.  [DSOF ¶ 11.]  STATS fully satisfied its responsibility to prevent sexual harassment.

### 2.    STATS responded fully and appropriately to any alleged harassment that Plaintiff did report.

Plaintiff cannot establish STATS liability for the alleged harassment because the Company undertook appropriate remedial measures reasonably calculated to end the harassment.  *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1120 (9th Cir. 2004).  The most significant immediate measure an employer can take in response to a sexual harassment complaint is to launch a prompt investigation to determine whether the complaint is justified.  *Swenson v. Potter*, 271 F.3d 1184, 1193 (9th Cir. 2001).

In *Kohler v. Inter-Tel Technologies*, 244 F.3d 1167 (9th Cir. 2001) the employer-defendant conducted an independent investigation of plaintiff's complaints of sexual harassment.  244 F.3d at 1181.  The investigator interviewed numerous employees, but did not confirm plaintiff's claim that she had been harassed.  *Id.*  After the investigation was complete, the employer reviewed its anti-harassment policy with the alleged harasser and conducted mandatory sexual harassment training seminars for the entire work force.  *Id.*

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

The Ninth Circuit Court of Appeals found that the employer satisfied the first element of the affirmative defense, and "could hardly have done more to investigate [plaintiff's] allegations in a prompt and neutral manner." *Id.*; *see also Watson v. Las Vegas Valley Water Dist.*, 268 Fed. Appx. 624, 626 (9th Cir. 2009) (upholding summary judgment in favor of the employer based solely on finding that employer's response to the complaint of harassment was prompt and effective); *Star v. West*, 237 F.3d 1036, 1038-39 (9th Cir. 2001) (employer's response to harassment allegations was adequate where employer interviewed the alleged harasser, informed him of the seriousness of the allegations against him, told him to stay away from the plaintiff and later moved him to a different shift).

STATS similarly responded promptly and assertively to Plaintiff's report that someone put ketchup on her office chair. The HR Manager, Gail Uy, who works from STATS' California office, interviewed six employees in the Tempe office by telephone the same day she received Plaintiff's report and, three days later, she flew to Arizona to investigate further. [DSOF ¶ 90.] Uy interviewed the two employees who Plaintiff suspected put ketchup on her chair – Gongora and Dunlap – as well as several others. [DSOF ¶ 91.] No one saw anyone put ketchup on Plaintiff's chair and everyone interviewed denied doing so. [*Id.*] Despite a thorough investigation, STATS could not determine who had put ketchup on Plaintiff's chair. [*Id.*] Several employees reported that they thought the ketchup on Plaintiff's chair was just another of the pranks that regularly occurred in the office, in which Plaintiff willingly participated. [DSOF ¶ 92.]

Three days after the alleged incident, Uy held a meeting with all employees in the Tempe, Arizona office, reviewed the Company's policies, including the sexual harassment policy, and made it clear that horseplay and unprofessionalism would not be tolerated. [DSOF ¶ 93.] Plaintiff convinced herself that Gongora had put the ketchup on her chair. [DSOF ¶ 94.] She wanted STATS to terminate Gongora, Dunlap or both of them, or at least relocate Gongora to the Company's California office. [*Id.*] STATS tried to remedy the tension between Plaintiff and the Dunlap and Gongora by moving their cubicles away from Plaintiff's office, and transferring Dunlap to a different department. [DSOF ¶ 93.]

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C. 2415 EAST CAMELBACK ROAD, SUITE 800 PHOENIX, ARIZONA 85016 (602) 778-3700

Han told Plaintiff that, if she had any proof who put ketchup on her chair, rather than just her suspicions, he would terminate that person's employment.  [DSOF ¶ 95.]  Han explained several times that he did not condone what happened, that STATS had done all it could to determine who had put ketchup on Plaintiff's chair, and that if he learned for certain who it was, that person would be disciplined.  [*Id.*]

STATS took patently reasonable steps, in accordance with its policies, that were calculated to correct the only alleged instance of sexual harassment about which it was aware.  Thus, the first prong of the *Faragher/Ellerth* defense is met.

### 3.  Plaintiff failed to avail herself of the protective remedies STATS made available.

The second prong of the *Faragher/Ellerth* affirmative defense also is met because Plaintiff failed to avail herself of the various avenues to report complaints available via STATS sexual harassment and open door policies.  *Kohler v. Inter-Tel Techs.*, 244 F.3d 1167, 1181-82 (9th Cir. 2001) (holding that plaintiff unreasonably failed to take advantage of preventative and corrective opportunities provided by defendant-employer, although she knew of company's policy against sexual harassment).

Months after she initiated this lawsuit, Plaintiff alleged – for the first time - that Gongora made sexual remarks to her on an ongoing basis.  [DSOF ¶ 27.]  She claims he commented about the size of her breasts two or three times and once asked "if [she] shaved down below."  [*Id.*]  She also claims Gongora once asked her if she shaved "down below," and emailed her a picture of two women, wearing bathing suits, whom he used to work with at Amkor Technologies, allegedly commenting to Plaintiff about the large breasts of the women in the photograph.  [*Id.*]  Plaintiff did not respond to Gongora's email, and did not report to anyone that Gongora had sent her the photograph.  [DSOF ¶ 27.]

Plaintiff admits she treated Gongora's alleged comments casually.  [DSOF ¶ 30.]  She did not say anything in response to Gongora's alleged comments, never told him that she did not welcome these kinds of remarks, never disciplined him for making these comments, and <u>never</u> reported any sexual comments that he allegedly made to her

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

supervisor, to HR or to anyone else. [*Id.*] Moreover, Plaintiff admits Gongora's alleged comments did not interfere with her employment at STATS, saying that she never complained about these alleged comments because she "just turned [her] cheek to it all the time, ignored it, because, you know, unless something directly affects my career, I'm just going to turn my head to it." [DSOF ¶ 31.]

With no report or complaint from Plaintiff, STATS simply did not know, and had no reason to know, that Gongora allegedly made inappropriate comments to Plaintiff.[2] With respect to what the Company did know, as explained above, its response was ample. Furthermore, if Plaintiff felt her subordinates were creating a hostile work environment for her, she could have and should have disciplined them. Despite being counseled by Jewler, Han and HR to implement corrective action plans or other disciplinary measure for her subordinates who were not meeting her expectations, Plaintiff never disciplined Gongora, Gooch or Dunlap during the time they reported to her. [DSOF ¶ 87.]

## C.    Plaintiff did not experience any retaliation for complaining about her subordinates.

Plaintiff alleges that STATS retaliated against her for the following actions: (1) reporting complaints of a sexually hostile work environment; (b) filing a charge of discrimination and retaliation with the EEOC; (c) engaging in settlement negotiations with STATS; (d) filing the present lawsuit against STATS; and (d) taking FMLA leave. Plaintiff alleges that STATS retaliated by "demoting" her to the position of Vice President, Special Projects and by eventually terminating her employment on July 1, 2008.

To establish her retaliation claim, Plaintiff must show: (1) she engaged in a protected activity, such as making a complaint alleging gender discrimination; (2) STATS subjected her to an adverse employment action; and (3) a causal link between the protected activity and the alleged adverse action. *Manatt v. Bank of America, NA,* 339 F.3d 792, 800

---

[2] Furthermore, Plaintiff alleges that she reported to Uy that Han yelled at her when she asked him why HR interviewed her direct reports. [DSOF ¶ 113.] Plaintiff claims that Uy told her to escalate her concerns to Tiong Gee Ng, the Senior Vice President of HR, but Plaintiff never did so. [*Id.*]

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

(9th Cir. 2003) (citation omitted). Once Plaintiff establishes a prima facie case, the burden shifts to STATS to articulate some legitimate, non-retaliatory reason for the alleged adverse action. *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1066 (9th Cir. 2003). STATS need not prove the absence of retaliatory intent or motive; it simply must produce evidence to dispel the inference of retaliation raised by Plaintiff. *Id.* If STATS meets this burden, Plaintiff must then show that the asserted reason was a pretext for retaliation. *Id.*

### 1. Plaintiff's reassignment to Special Projects was not retaliatory and did not represent an adverse employment action.

Plaintiff's retaliation claim, as it relates to her alleged "demotion," fails because she cannot establish that she engaged in a protected activity, nor can she establish that she experienced an adverse employment action. To engage in a protected activity, Plaintiff must make an overt stand against suspected illegal discrimination by complaining about mistreatment based on gender. *Maynard v. City of San Jose,* 37 F.3d 1396, 1405 (9th Cir. 1994) (evidence did not support retaliation claim where plaintiff framed his complaint in terms of the employer's hiring practices, not in terms of racial discrimination); *see also Pieszak v. Glenda Adventist Med. Ctr.,* 112 F. Supp. 2d 970, 993-994 (C.D. Cal. 2000) (plaintiff did not engage in protected activity where her complaints of "harassment" did not mention "sex," "gender," or describe any incident that would have disclosed that alleged harassment had anything to do with sex or gender bias).

Here, Plaintiff's retaliation claim, as it relates to her alleged "demotion" to the position of Vice President, Special Projects fails because, with one exception, her vague and general comments to HR and to her manager, Han, were not related to gender and certainly do not constitute an "overt stand" against gender discrimination. Plaintiff complained that her subordinates (Gongora, Dunlap, and Gooch) did not follow her directions, complained about Plaintiff to others, and did not cooperate with her. [DSOF ¶ 17.] Nothing in Plaintiff's complaints suggested alleged discrimination based on Plaintiff's gender, therefore, her complaints to Han and HR do not constitute protected activity. *See Kitchen v. WSCO Petroleum Corp.,* 481 F. Supp. 2d 1136, 1145 (D. Or.

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

2007) (employee's complaint that his supervisor set him up for failure and sabotaged his performance does not constitute a protected activity because it was too vague and general and not related to a protected characteristic or unlawful activity).

Even assuming Plaintiff's complaints constituted protected activity, her retaliation claim still fails because no causal link exists between her complaints to Han and HR regarding her subordinates and her assignment to Special Projects. Plaintiff "must present evidence to raise the inference that her protected activity was the *likely* reason" for her reassignment. *Cohen v. Fred Meyer, Inc.,* 686 F.2d 793, 796 (9th Cir. 1982) (emphasis added). Here, STATS has presented substantial evidence of its reasons for reassigning Plaintiff to Special Projects, and Plaintiff cannot show a causal link between her reassignment and her complaints.

Plaintiff has presented no evidence that Han become hostile towards her because of any alleged protected activity by Plaintiff. As early as May 2007, Han and Plaintiff discussed the possibility of reassigning Plaintiff to a different, with less stress, in which Plaintiff could work more independently, without supervising others. [DSOF ¶¶ 91, 116.] Through June and July 2007, Han became increasingly concerned regarding employee complaints about Plaintiff's management style and communication issues, and tried to counsel Plaintiff on how she could improve. [DSOF ¶¶ 96-103, 105-107.] Plaintiff responded with a defensive demand to know who complained about her, then took a 30-day medical leave to avoid responding to Han's critique. [DSOF ¶¶ 104, 108.]

After Plaintiff returned from leave, Han again spoke to her about her need to improve her working relationships with her colleagues and subordinates. [DSOF ¶ 118.] Plaintiff responded by screaming at Han that the Company had no right to assess her management style. [DSOF ¶¶ 118-122.] Immediately before Han announced Plaintiff's reassignment, he gave her the opportunity to apologize to him for screaming at him (which was insubordinate) and to agree to work on improving her management style and communication methods. [DSOF ¶¶ 122-124.] By her silence and refusal to agree to improve her performance, Plaintiff chose the Special Project role. Notably, by her own

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

admission, Plaintiff does not believe she was retaliated against based on her gender or her alleged complaints regarding her subordinates. Plaintiff testified that she believes her reassignment was in retaliation for her taking a 30-day medical leave. [DSOF ¶ 128.]

In addition, Plaintiff provides no support for her allegation that her reassignment was a "demotion." Plaintiff retained her Vice President title. She was still in the ET group, reported to the same supervisor, maintained her private office, and received the same salary. Plaintiff alleges the reassignment was a "dead-end position," but provides no admissible evidence to support her claim. Plaintiff did not suffer any change in pay, benefits or privileges of her employment, and her subjective opinion that her Special Projects role was somehow less prestigious or important to the organization does not create an issue of fact as to an adverse employment action. "[I]f personal preference alone was sufficient to establish adverse employment action, the objective requirement for such a finding would effectively be eliminated and federal employment law would become a mechanism for enforcing employee preferences rather than remedying materially adverse treatment." *Lucero v. Nettle Creek School Corp.*, 566 F.3d 720, 729-30 (7th Cir. 2009); *see also Kortan v. California Youth Auth.*, 217 F.3d 1104, 1111-12 (9th Cir. 2000) (finding that plaintiff failed to establish retaliation claim based on her largely unsubstantiated allegations that, after she reported alleged harassment, alleged harasser ridiculed her to other employees, stared at plaintiff in a hostile fashion, became more critical of her performance, and yelled at plaintiff during a meeting).

Plaintiff has failed to show that she engaged in a protected activity prior to her reassignment; has not demonstrated that her reassignment to Vice President, Special Projects was an adverse employment action; and cannot establish a causal link between the alleged protected activity and her reassignment. STATS is entitled to summary judgment on Plaintiff's retaliation claim, as it relates to her reassignment.

2. **Plaintiff was terminated for poor performance and insubordination.**

As explained above, Plaintiff completely failed to succeed in her new role as Vice President, Special Projects. She could not work independently, did not follow direction, spent months on projects that resulted in no value or results for STATS and, all the while, engaged in combative and unproductive email exchanges with her manager, Han. [DSOF ¶¶ 135-154.] If Plaintiff was not deliberately trying to get herself terminated, she certainly did nothing to avoid it. Once it became clear that there was no way for Plaintiff to provide value to the Company, her employment was terminated. Her termination was totally appropriate under the circumstances, and was unrelated to her complaint about the ketchup incident on April 9, 2007, or to her later Charge of Discrimination and baseless lawsuit.

D. **Plaintiff has offered no evidence that could support an award for punitive damages.**

Punitive damages are "an extraordinary remedy" in employment discrimination cases. *Dudley v. Wal-Mart Stores, Inc.*, 166 F.3d 1317, 1322 (11th Cir. 1999). To recover punitive damages, a plaintiff must show that the employer acted with "*malice or with reckless indifference* to [plaintiff's] federally protected rights." *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 535 (1999) (citations and internal quotations omitted) (emphasis in original). An employer may not be vicariously liable for discriminatory employment decisions of its agents where these decisions are contrary to the employer's "good-faith efforts to comply with Title VII." *Id.* at 545 (citations omitted).

Here, there is no evidence that anyone at STATS harbored any animosity or malice towards Plaintiff, nor is there any evidence that Dunlap, Gooch, Gongora or Han, against whom Plaintiff has directed her allegations of harassment, engaged in any conduct that they believed violated federal law. Plaintiff also has failed to produce evidence to refute STATS' showing that it made a good faith effort to comply with Title VII. *See* Section III.B, *supra*. Consequently, Plaintiff's claim for punitive damages fails as a matter of law.

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

**IV.    CONCLUSION**

For the above-stated reasons, Defendants STATS ChipPAC, Inc. and STATS ChipPAC, Ltd. respectfully ask that the Court enter an Order finding that Plaintiff's claims fail as a matter of law and that Defendants are entitled to a summary judgment.

DATED this 20th day of July, 2009.

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.

By: s/ Caroline Larsen
        L. Eric Dowell
        Caroline Larsen
        Monique Young
        2415 East Camelback Road, Suite 800
        Phoenix, Arizona 85016
        Attorneys for Defendants STATS ChipPAC,
        Inc. and STATS ChipPAC, Ltd.

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700

**CERTIFICATE OF SERVICE**

I hereby certify that on July 20, 2009, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Peter Strojnik
Peter Strojnik, P.C.
3030 North Central Avenue, Suite 1401
Phoenix, Arizona 85012
Attorney for Plaintiff

Peter K. Strojnik
The Law Firm of Peter Strojnik
3030 North Central Avenue, Suite 1401B
Phoenix, Arizona 85012

s/ Debra A. Perkins

7440778.1 (OGLETREE)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
2415 EAST CAMELBACK ROAD, SUITE 800
PHOENIX, ARIZONA 85016
(602) 778-3700